## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WADE F. HALL**,<br>**Route 1-Box 54**<br>**Ceres, VA  24318,**<br><br>**HATTIE N. MCCOY-KEMP,**<br>**33 Charman Avenue**<br>**Lawnside, NJ  08045**<br><br>**VICTORIA F. STATON,**<br>**11780 Buckley Court**<br>**Woodbridge, VA  22192**<br><br>**On behalf of themselves and on**<br>**behalf of all others similarly situated,**<br><br>    **Plaintiffs,**<br><br>  **v.**<br><br>**RETIREMENT INCOME PLAN FOR**<br>**EMPLOYEES OF NATIONAL RAILROAD**<br>**PASSENGER CORPORATION**<br><br>**NATIONAL RAILROAD PASSENGER**<br>**CORPORATION,**<br><br>**RETIREMENT PLAN COMMITTEE,**<br>**RETIREMENT INCOME PLAN FOR**<br>**EMPLOYEES OF NATIONAL RAILROAD**<br>**PASSENGER CORPORATION, and**<br><br>**60 Massachusetts Avenue, N.E.**<br>**Washington, D.C.,  20002**<br><br>    **Defendants.** | **No.**<br><br>**CLASS ACTION** |

## CLASS ACTION COMPLAINT

Plaintiffs, by and through their counsel, allege as follows:

## NATURE OF THE ACTION

1.      In *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995), the Supreme Court held that a purported ERISA[1] plan amendment not adopted in accordance with a plan's amendment procedures is ineffective to alter the terms of such plan and that adversely affected participants may sue to have such purported amendments declared ineffective on that basis.  This is such a case.

2.      Plaintiffs are former employees of Defendant National Railroad Passenger Corporation ("Amtrak" or the "Corporation") and participants in Amtrak's pension plan, Defendant Retirement Income Plan for Employees of National Railroad Passenger Corporation (the "Pension Plan" or "Plan").  They bring this action on behalf of themselves and some 375 other similarly situated Pension Plan participants.  They seek, among other things, to which they were entitled under the terms of the Plan, plus interest.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C.  § 1331 because this is a civil action arising under the laws of the United States, namely, ERISA § 502(a), 29 U.S.C. § 1132(a).

4.      This Court has personal jurisdiction over the Defendants because each resides and/or may be found and/or transacts or transacted business in, and/or has or had significant contacts with, the District of Columbia.

5.      Venue is proper here, under ERISA § 502(e), 29 U.S.C. § 1132(e), on each of the four bases provided under the statute.  This is the District where the Plan is administered;

---

[1] The Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*

this is the District where some of the breaches took place; this is the District where one or more of the Defendants may be found; this is the District where one or more of the Defendants reside.

## THE PARTIES

6.     Plaintiff Wade F. Hall was and is a participant in the Plan under ERISA § 3(7), 29 U.S.C. §1002(7).

7.     Plaintiff Hattie N. McCoy-Kemp was and is a participant in the Plan under ERISA § 3(7), 29 U.S.C. §1002(7).

8.     Plaintiff Virginia F. Staton was and is a participant in the Plan under ERISA § 3(7), 29 U.S.C. §1002(7).

9.     Defendant Retirement Income Plan for Employees of National Railroad Passenger Corporation (the "Pension Plan" or the "Plan") is an ERISA-governed noncontributory defined benefit pension plan.  It was at all relevant times and is an "employee pension benefit plan," and more specifically a "defined benefit plan," within the meaning of ERISA §§ 3(2)(A) and 3(35), 29 U.S.C. §§ 1002(2)(A) and 1002(35).

10.     Defendant National Railroad Passenger Corporation ("Amtrak" or the "Corporation") was and is the Plan sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).  Amtrak was also at times relevant to this action the Plan's administrator under ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and otherwise a fiduciary with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as a result of its communications with affected participants regarding the Plan

benefits at issue here.   Any reference to "Amtrak" or the "Corporation" should also be read to include any of its current or former directors, officers, employees, lawyers or agents.

11.    Defendant Retirement Plan Committee ("Committee") is currently the Plan administrator and a named fiduciary of the Plan within the meaning of ERISA §§ 3(16)(A), 402(a), 29 U.S.C. §§ 1002(16)(A), 1102(a).  Any reference to the "Committee" should also be read to include its current or former members.

## STATEMENT OF FACTS

**The VERP with the Railroad Retirement Supplement is added to the Pension Plan.**

12.    In early 2001, Amtrak began planning for a significant downsizing of its management workforce in an attempt to ease its persistent budgetary problems.  Management viewed the Pension Plan as integral to this effort.  In May 2001, management tasked the Plan's actuaries to design a voluntary early retirement package ("VERP"), that would effectively downsize senior staff through the use of the Plan's assets.  Management considered a wide range of alternative VERPs before selecting in July 2001 the one it deemed most appropriate to recommend to Amtrak's Board of Directors at the Board's scheduled July 26, 2001 meeting for inclusion by amendment in the Pension Plan.

13.    That proposal called for participants 55 years of age or older with 10 years of Amtrak service who retired during a September 15-October 31, 2001 retirement "window" to be given two different kinds of pension enhancements.  First, the VERP would subsidize the existing early retirement benefit that was already part of the Pension Plan by adding five years of age to participants' formula.  Second, the VERP would pay participants a monthly supplement until the participant was able to commence unreduced Railroad Retirement

annuity benefits, equal to the amount of the full, unreduced Railroad Retirement annuity the participant would eventually receive from the Railroad Retirement Board.  This latter aspect of the VERP came to be known as the "Railroad Retirement Supplement."

14.    Management estimated and informed the Board at its July 26, 2001 meeting that this VERP could cost the Plan some $17 million or more if it proved to be as popular with eligible employees as expected.

15.    Taking on this added pension liability was viewed both by management and the Board as a means of saving the Corporation more than the VERP would cost.  It was also seen as well-timed because the Plan was fully funded, to the point that Amtrak then enjoyed a pension contribution "holiday."

16.    The VERP became part of the Pension Plan on July 26, 2001 when it was authorized and approved by the Board as an amendment to the Plan as reflected in the Board's minutes and written resolutions adopted by unanimous vote at a meeting held that day pursuant to a quorum and in accordance with the Corporation's governing statute, articles of incorporation, by-laws and D.C. corporations law.[2]

17.    Following the July 26th action amending the Plan to include the VERP, Amtrak communicated the amendment to the Corporation's workforce and encouraged eligible participants to avail themselves of the opportunity it presented.  By the end of August 2001, the popularity of the VERP was such that management informed the Board at the in-person

---

[2] Under the terms of the Pension Plan, Amtrak's Board of Directors has the exclusive authority to make substantive changes to the Pension Plan that "modify or amend" the Plan.  Plan § 13.01 ("The Sponsor reserves the right at any time and from time to time and retroactively if deemed necessary or appropriate, by action of its Board, to modify or amend the Plan in whole or in part").  By virtue of the Corporation's governing statute, articles of incorporation, by-laws and D.C. corporations law, such "action" must generally be taken at a meeting of the Board held pursuant to a quorum and by majority vote, as occurred on July 26th.

August 30, 2001 Board meeting that most eligible employees were expected to elect the

VERP.  Despite the VERP's expense, the Board expressed continued support for it at that

time and voiced no concern about the short-term costs to the Pension Plan.

**Management attempts but fails to obtain Board "action" effective to reduce the VERP.**

18.    Management failed to disclose to the Board at the August 30, 2001 meeting or

indeed until the eve of the opening of the VERP window (September 14, 2001) that it had

begun to have second thoughts about the cost to the Plan of the enhanced benefits promised

by the VERP, ostensibly based on revised actuarial estimates.

19.    By early September 2001 management decided to ask the Board at its

scheduled September 12, 2001 meeting to authorize and approve an amendment that would

eliminate the Railroad Retirement Supplement and replace it with an additional one-time

lump sum payment of $15,000.

20.    Management estimated that the reduced VERP would cost some $10 million

less than the VERP's original cost estimates.

21.    The Board's September 12, 2001 meeting was cancelled due to September

11th.  Work continued, however, on the revised VERP even on September 11th.

22.    Generally, under the D.C. Business Corporations Act ("DCBCA") and the

Corporation's by-laws, Amtrak's Board must manage the business and affairs of the

corporation through "action . . . taken" at "meeting[s]" of the board pursuant to a quorum.

D.C. Code § 29-101.42(b).  (The DCBCA governs Amtrak's internal operations to the extent

not inconsistent with federal law, *see* 49 U.S.C. § 24301(e).)  Meetings under the DCBCA

and the Corporation's by-laws may be in-person or telephonic or some combination of both. *See* Corporation by-laws § 4.07.

23.    Although the in-person Board meeting scheduled for September 12th had been cancelled on September 11th, management could have convened or attempted to convene a telephonic meeting of the Board on September 12th, September 13th or September 14th, to ask the Board to consider whether to adopt management's recommendation to again amend the Plan to eliminate the Railroad Retirement Supplement from the VERP and replace it with an additional one-time lump sum payment of $15,000.

24.    However, management decided not to convene or attempt to convene such a meeting and no such meeting occurred. Instead, management decided to attempt to obtain, on September 14, 2001, the Board's "unanimous written consent" to take that action without a meeting.

25.    The DCBCA and the Corporation's by-laws allow for action to be taken by a board without a meeting via an "unanimous written consent" procedure. D.C. Code § 29-101.136 ("Requirements of action without meeting"); Corporation by-laws, § 4.12 ("Unanimous Written Consent"). However, such action will be valid only "if a consent <u>shall be signed</u> . . . <u>by all of the members of the board</u>" permitting action in the absence of a meeting and "setting forth the action so taken." *Id.* (emphasis added).[3]

---

[3] The provision reads in full: "Any action required or permitted to be taken at a meeting of the shareholders of a corporation or of the board of directors or of any committee thereof may be taken without a meeting if a consent in writing setting forth the action so taken shall be signed by all of the shareholders entitled to vote with respect to the subject matter thereof, or by all of the members of the board or of such committee as the case may be, and such written consent is filed with the minutes of proceedings of the shareholders or the board or the committee. Such consent shall have the same force and effect as a unanimous vote of the shareholders or the board or the committee, as the case may be, and may be stated as such in any article or document filed with the Mayor under this chapter."

26.     However, on September 14, 2001, no consent to take action without a meeting was signed by any of the Directors.  Moreover, not all Directors signed a writing purporting to authorize and approve the recommended amendment.  Additionally, other defects in the process and/or its aftermath rendered the Board's purported action that day a nullity.  For each of these reasons, ERISA does not recognize that the Plan was amended on September 14, 2001 to eliminate the Railroad Retirement Supplement from the VERP and thus Plaintiffs were and are entitled to the additional benefits the Plan offered and indeed still offers them .

27.     On September 14, 2001, management sent Directors two related documents. One was an "Executive Summary" of management's recommendation regarding the VERP that explained management's proposal and the alleged need to eliminate the Railroad Retirement Supplement.  The other was a one-page document containing draft resolutions, and which stated as follows:

RESOLUTIONS AUTHORIZING AMENDMENT TO
2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that
provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan
based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of the
proposed amended Voluntary Early Retirement Plan which has been fully described to
Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached
Executive Summary is authorized and approved; and be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take
all necessary steps to implement the terms of the plan described in the attached Executive
Summary.

Approved:

_____                          September 14, 2001
Board Member                             Date

28.     Even assuming it had been signed by all of the Board's Directors, nothing in

this document evidences the Board's unanimous consent or agreement that the Board to take

the action in question in the absence of a meeting.

29.     Moreover, not all of the Directors signed the document, as expressly required

by the DCBCA and the Corporation's by-laws.  One Director, former Virginia Governor

Linwood Holton, did not sign the document and indeed, on the day in question, did not

possess or read the document, did not possess or read the Executive Summary referenced in it

as being attached to it, and did not have proposed Plan amendment "fully described" to him as

represented by the terms of the document.

30.     Instead, Governor Holton merely discussed the matter with a relatively low-level Amtrak staff member, John Carten, who also acted as one of the Board's assistant secretaries, and then purported to give Mr. Carten his assent to what the Governor believed to be management's proposal.  However, Governor Holton had a manifestly different understanding of the proposal than that set forth in the draft resolutions and Executive Summary such that there was no meeting of the minds between Governor Holton and the rest of Amtrak's Board as to the proposed amendment's terms or the claimed needed for its adoption.[4]

31.     The signature requirement of the DCBCA's and the Corporation's by-laws' unanimous written consent procedure serves an important function and cannot be waived by any individual Director or the Board as a whole.  The requirement is not "ministerial" nor delegable.  Because not all of the Directors signed the resolutions, they never became effective as Board "action" and the Plan was never amended to eliminate the Railroad Retirement Supplement.

32.     Even if the signature requirement were a delegable duty, such delegation was itself required to have been set forth in writing but in this instance was not, rendering the alleged delegation void.  There was no written Board action deputizing or authorizing Mr. Carten or anyone else to sign an unanimous consent resolution "for" a Director.  Nor were there any written guidelines or standards by which a Director could follow to determine whether, when and how he or she could or should delegate such duty and no written

---

[4] Governor Holton's failure to sign (or read) the draft resolutions opens the door to a meeting-of-the-minds inquiry that his signature would have forestalled.

guidelines or standards instructing the person to whom the duty had been delegated how to discharge that duty.

33.    The absence of such standards in this instance permitted an abuse of process that itself requires the setting aside of the purported September 14, 2001 action.  Here, Mr. Carten ignored Governor Holton's instructions or intent that Mr. Carten show on the draft resolutions that while Governor Holton gave his assent he did not actually sign the resolutions.  Instead, intending to conceal that Governor Holton did not sign the resolutions, Mr. Carten took a photocopy of an actual signature that Governor Holton had personally affixed to <u>another</u> document and cut-and-pasted it above the signature line on the draft resolutions and then ran multiple photocopies of that document to make it <u>look</u> like the Governor had personally signed the resolutions.  Nowhere did Mr. Carten indicate, whether on the document itself or in any official record of the Board's proceedings, that Governor Holton had not personally signed the document.  Governor Holton did not authorize his "signature" to be affixed to the resolutions in such a misleading fashion, nor could he have. In fact, what Mr. Carten did was so misleading that his actions were a nullity even assuming an otherwise proper delegation.

34.    There are additional reasons why the resolutions of September 14, 2001 cannot be applied to the determination of what Plan benefits Plaintiffs are due.

35.    First, they were not filed with the minutes of the proceedings of the Board, as required by the DCBCA and the Corporation's by-laws.

36.    Second, the resolutions were not regularly available in the public reading room for public inspection as required by law, including but not limited to the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, to which the Corporation is subject.  *See* 49

U.S.C. § 24301(e).[5]

37.    Third, even if appropriately filed with the minutes of the Board and accessible

as required by law, the resolutions at least as far as Governor Holton is concerned are simply

not what they purport to be, vitiating any compliance with these access-to-information laws

and rules.  No one looking at what purported to be Governor Holton's signed resolutions

would have any idea that he had not in fact signed them.

38.    In the ways set forth above and in other ways (included but not limited to

creating and producing to Plaintiffs in related litigation a document that affirmatively

misstates that all Directors signed the September 14, 2001 resolutions), Defendants and

Defendants' agents fraudulently concealed the fact that Governor Holton did not sign the

resolutions.  As a result, Plaintiffs were only able to discover the true facts underlying this

action in mid-April 2004 during discovery in the above-referenced related litigation.

**Defendants' failure to administer the Plan according to its terms.**

39.    On or about September 14, 2001, Amtrak began informing participants that the

Board had acted to eliminate the Railroad Retirement Supplement and that the Plan no longer

---

[5] Under FOIA, among other things, the Corporation was required to have regularly available in the public reading room for public inspection "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register," 5 U.S.C. § 552(a)(2)(B) and "a record of the final votes of each member in every agency proceeding," 5 U.S.C. § 552(a)(5).  The Board's alleged action in amending the Pension Plan on September 14, 2001 was a policy statement or interpretation and/or an agency proceedings within the meaning of the FOIA.  *See Aug v. National Railroad Passenger Corporation*, 425 F. Supp. 946, 950-52 (D.D.C.1976).  Under the FOIA, "[a] final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public" cannot be relied upon or used unless "it has been indexed and either made available or published as provided by this paragraph" or "the party has actual and timely notice of the terms thereof."  Neither condition was met.  Because the Corporation violated the public reading room and final votes of agency proceedings requirements of the FOIA, the alleged September 14, 2001 "amendment" to the Plan which renders the "amendment" "secret law" precluding Amtrak from invoking it against Plaintiffs and the proposed Class.  *See* 5 U.S.C. § 552(a)(2).

contained the VERP originally adopted on July 26, 2001.  Consequently, whereas all or

virtually all of the 375 eligible participants would have elected the original VERP, as a result

of being misinformed that the Plan offered a VERP that paid a one-time $15,000 lump sum

payment instead of the Railroad Retirement Supplement, only 75 employees elected the

VERP and retired under it as of November 1, 2001.

40.    The remaining 300 eligible employees – many under explicit protest – declined

to elect what they were told was the reduced offer.  Had they not been misled into believing

that the Plan no longer contained the originally enacted VERP, they would have elected that

benefit.  Since September 14, 2001, these participants have been prevented from electing a

benefit for which they were and are eligible and to which they were and are entitled under the

terms of the Plan.

41.    Meanwhile, the 75 participants who elected the VERP as then described by

Amtrak are entitled to but have been denied the balance of the benefits due under the terms of

the originally enacted VERP.

**Plaintiffs raise the issue in _Hall I_ and then through the Plan's claims process.**

42.    Promptly upon learning the true facts regarding the events of September 14,

2001, Plaintiffs, litigants in _Hall v. National Railroad Passenger Corp.,_ 03-1764 (GK)

(D.D.C.) ("_Hall I_"), brought these facts to the attention of the Court and amended their

Complaint accordingly.  Amtrak and the Committee subsequently moved to dismiss the

amended complaint on, among other grounds, that Plaintiffs had failed to exhaust the Plan's

internal claims process relative to this claim.  On August 5, 2005, the Honorable Gladys

Kessler dismissed Count One of the _Hall I_ Complaint on that basis without prejudice.

43.     Later the same day, August 5, 2005, Plaintiffs filed a claim for benefits with the Committee.  As expressly authorized by the Department of Labor's notice-and-comment regulations, *see* 29 C.F.R. § 52560.503-1, Plaintiffs specifically asked that in the event of an adverse determination that the Committee produce to Plaintiffs, among other relevant information, all documents upon which the Committee relied in making any such adverse determination.

44.     On November 1, 2005, the Committee wrote Plaintiffs, through counsel (Venable, LLP ("Venable")), informing them, of among other things, that "special circumstances require a 90-day extension of time for processing the claims."

45.     On January 23, 2006, the Committee denied Plaintiffs' claim.  The Committee acknowledged that Amtrak's Board did not actually comply with the terms of D.C. Code § 29-101.136 and by-laws § 4.12 "because Governor Holton did not personally sign the written consent."  *Id.* at 5.  However, the Committee concluded that it did not matter that not all Directors signed the resolutions approving a reduced VERP because the signature requirement was nothing more than a "ministerial" act that any board member was free to "delegate[e]" to a third-party.  Denial Ltr. at 5.  The Committee found compliance with the signature requirement should be excused here "because Governor Holton fully understood and agreed with the content of the resolutions and intended to manifest his agreement in writing." *Id.*

46.     The Committee did not dispute that Governor Holton did not read nor had read to him verbatim the resolutions in question and did not read nor had read to him verbatim the Executive Summary.  The Committee also did not dispute that Governor Holton had no prior

notice or warning of the changes to the VERP that management would be proposing. The Committee did not explain the basis for its conclusion that the Governor fully understood and fully agreed with what the signing Directors understood and agreed when all he received was a summary from a staff member who was himself paraphrasing the resolutions based on his (the staff member's) understanding of them.

47.    As an alternative basis for its denial of Plaintiffs' claim, the Committee held even if the Board failed to comply with the statute and by-law's unanimous written consent procedure as a matter of corporate law, that "technical" non-compliance could be excused as a matter of ERISA law because although the Plan specified that the sponsor could amend the plan only through by "action of its Board," the Plan did not "require[e] any more specific methodology." *Id.* at 3 (stating that Amtrak has reserved the right in the Plan document to amend the Plan 'by action of its Board', without requiring any more specific methodology"). The Committee explained that "courts have held that an ERISA plan amendment should not be invalidated for technical violations of a plan's procedures unless there is a showing of bad faith or active concealment on the part of the sponsor." *Id.* at 5. The Committee cited no case

law to support its assertion or discuss whether there is authority to the contrary.[6]

48.    The Committee did not address the fact that the "written consent" that the other Directors did sign did not state or manifest their consent that the Board take official "action" with respect to the matter in the absence of a formal meeting with a quorum. The Committee appears to have assumed that that requirement could also be ignored even though the signed resolutions are equally consistent with an intent on the part of one or more of the signing Directors that the Board would still be taking the action referenced in an official and legally effective manner only after first discussing the matter during a meeting.[7]

49.    The Committee also ignored Plaintiffs' specific request for pertinent documents and failed to produce any such documents, in violation of the express provisions of

---

[6] Having found that the failure to comply with the statute and by-laws constituted a "technical" violation, the Committee went on to say that it found no reason to believe the Board had not acted in good faith. It did not discuss questions Plaintiffs raised about the manner in which Mr. Carten chose to show Governor Holton's agreement with what had been described to him or assess the candor and conduct of other persons involved directly and indirectly in the events of September 14th. The Committee indicated that it was relying on Mr. Holton's and Mr. Carten's depositions in the *Hall* litigation to determine as a matter of fact what occurred on September 14, 2001. It did not explain why it did not rely on the other sources of factual information which it stated the Committee or counsel had reviewed as to the events of September 14, 2001. The Committee apparently did not make any attempt to reconcile the discrepancies in their testimony or to question Governor Holton further. The Committee asserted that "the Board acted in good faith, to the best of its abilities in light of the September 11, 2001 terrorist attacks," although it did not say that it found that a telephonic meeting was not possible between September 12th and September 15th. It also did not reference the evidence well known to Amtrak as to Governor Holton's habits and that with advance notice Governor Holton could have easily made arrangements to receive and review personally all necessary papers and sign (and/or modify) any resolutions or consents that met with his approval. The Committee asserted that "Amtrak clearly communicated to eligible Amtrak employees before the window opened on September 15, 2001 that the terms of the VERP had changed from the terms previously communicated to them." The Committee did not address the evidence to which Plaintiffs have pointed in support of arguments to the contrary or mention the fact that the issue is a contested one. The Committee rejected what it said it understood to be Plaintiffs McCoy-Kemp's and Staton's challenges to the purported releases they signed upon terminating employment with Amtrak, saying "[t]he Committee rejects this claim, because the Committee finds that the terms of the VERP were accurately represented to Ms. McCoy-Kemp and Ms. Staton." *Id.* at 6.

[7] The Committee did not address the fact that nothing in the resolutions is inconsistent with one or more of the Directors believing that a telephonic meeting would still be held. Under those circumstances, a pre-signed resolution might be necessary or useful as a proxy or for otherwise evidencing one or more Directors' agreement with management's proposal, whether or not other Directors, after discussion, may wish to decline to adopt the proposal or to modify it.

the Department of Labor's claims regulation.  The Committee also failed, in violation of the

regulations, to inform Plaintiffs that they had the right to "be provided, upon request and free

of charge . . . all documents, records, and other information relevant to the claimant's claim

for benefits."  29 C.F.R. § 52560.503-1(h)(2)(iii).

50.     The Committee closed by stating that "[t]he Claimants have 60 days following

receipt of this letter to appeal this adverse determination.  The officer of Amtrak designated to

adjudicate appeals is the Vice President, Human Resources, Ms. Lorraine Green. Appeals

may be directed to Ms. Green's attention at National Railroad Passenger Corporation, 60

Massachusetts Avenue, NE, Washington, D.C. 20002.  If there is an adverse determination on

appeal, the Claimants have a right to bring a civil action under Section 502(a) of ERISA."

51.     On February 9, 2006, Plaintiffs appealed the denial of their claim.  Ex. 3.

Plaintiffs objected that the Committee had violated and ignored Plaintiffs' rights to receive all

documents, records and information relevant to their claim and asked that this be immediately

corrected and Plaintiffs' appeal be held in abeyance pending the required requested

disclosures and Plaintiffs' submission of further arguments after having had an opportunity to

review same.  Plaintiffs also asked that Ms. Green recuse herself because of "[her] intimate

involvement in the matters in question."  Plaintiffs noted that, for example, the factual record suggests that "you authorized the printing of pamphlets to be sent to VERP eligible employees on September 14th without even knowing whether or not the Board had taken official action to amend the Plan.

52.    On February 16, 2006, Plaintiffs wrote Venable to ask whether it was representing the new Committee Members in connection with Plaintiffs' claim for benefits and/or in any capacity in the *Hall* litigation.  On February 22, 2006, in response, Venable wrote Plaintiffs stating it represented both the Committee <u>and</u> Ms. Green in connection with Plaintiffs' claim for benefits.  Feb. 22, 2006 Ltr. at 4 ("We also have been retained to represent Ms. Lorraine Green in her fiduciary capacity as the plan's appeals officer in connection with the August 5, 2005 claim").  The Venable letter did not reference the fact that on February 9th, Plaintiffs had asked Ms. Green to recuse herself.

53.    On March 16, 2006, Ms. Green, presumably on advice from counsel, wrote Plaintiffs saying that she was in receipt of Plaintiffs' appeal and that "[p]ursuant to your request, we are assembling certain documents, records and information which you have asked for.  We expect this process to be completed in the next week or two."'  Ms. Green did not explain who "we" referred to or how or why she was involved in correcting the Committee's violations of Plaintiffs' rights to relevant documents, records and other information under the claims regulations.  Ms. Green also failed to make any reference to the fact that Plaintiffs had asked her to recuse herself from any involvement in this matter.  Instead, she stated only: "pursuant to your request, I will hold [Plaintiffs'] appeal in abeyance for the time being."

54.    Notwithstanding Ms. Green's promise that the withheld documents, records and other information would be provided within the "the next week or two" (of March 16, 2006), Plaintiffs did not hear from Ms. Green again until April 21, 2006 when, under cover of a letter sent on her behalf by Venable, she forwarded Plaintiffs some but not all of the documents, records and other information they had requested nine months earlier.  However, Ms. Green, who still did not explain in what capacity she was acting with respect to Plaintiffs' request to the Committee that it disclose all relevant documents, records and other information, said that she was withholding such documents, records and other information on alleged grounds of "privilege."  April 21, 2006 Ltr. at 1 ("We are enclosing with this letter all non-privileged, non-work product relevant documents responsive to your request, and a list of those documents which are being withheld").  Other withholdings were premised on relevance grounds.  *Id.* ("Please note that we have determined that some of the documents you requested in your February 9, 2006 letter are not relevant under the applicable regulations").

55.    The letter also states:  "We have not enclosed copies of the pleadings filed in the *Hall v. National Passenger Railroad Corp.* litigation because you already have them."  *Id.* However, the letter did not assert or explain how or which of those filings were relevant to Plaintiffs' claim within the meaning of the Department of Labor claims regulations.  From the documents produced, it appears that Ms. Green (through Venable) used the word "pleadings" to refer not only to pleadings (which under the Federal Rules of Civil Procedure are limited to complaints, answers, counterclaims, etc.) but also any court filings (such as motions, memoranda, etc.) that are not pleadings.  At the time, the docket in *Hall I* contained over 90 separate entries of the pleadings and other filings.

19

56.     Finally, notwithstanding the express language of the regulation, the April 21, 2006 letter ignored entirely Plaintiffs' request for all documents, records and other information that demonstrate compliance with the administrative processes and safeguards required by 29 C.F.R. § 52560.503-1(b)(5) including, without limitation, processes and safeguards to assure that plan provisions were and are applied consistent with governing plan documents and consistently with respect to similarly situated claimants.

57.     The Venable letter sent on Ms. Green's behalf concludes by saying that "as the appeals officer under the Plan," Ms. Green will "provide a response to the substance of the matters raised in [Plaintiffs'] letters . . . dated February 9, 2006 and March 20, 2006, following receipt of [Plaintiffs'] 'further arguments', as described in [Plaintiffs'] March 20, 2006 letter." No reason was given for the continued failure to address Plaintiffs' requests for Ms. Green's recusal, as to which Plaintiffs had not indicated they believed they needed to make any "further arguments."

58.     On May 16, 2006, Plaintiffs wrote Ms. Green in further support of their appeal and to challenge the withholding of relevant documents, records and other information.

59.     On June 16, 2006, Ms. Green wrote Plaintiffs, acknowledging receipt of their May 16, 2006 letter and stating "I anticipate sending a response to your letter on or before July 15, 2006, which is 60 days after I received your May 16th completed appeal."

60.     On July 14, 2006, Ms. Green wrote Plaintiffs, denying their appeal and their challenge to the withholding of relevant documents, records and other information, except as to some interview notes that Venable lawyers took when they interviewed Mr. Carten, Amtrak General Counsel Alicia Serfaty and when they met with the Committee. In all other respects,

without addressing any of Plaintiffs' detailed arguments for why the remaining withholdings were improper, Ms. Green affirmed her own earlier determination that the materials and information would not be disclosed. Appeal Denial Ltr. at 13. She ignored, as she had previously, that the DOL claims regulation does not limit a participant's entitlement only to those documents, records and other information that the fiduciary in question "reviewed" but required disclosure of all documents, records and other information that were "submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination."

61.    Ms. Green's reasoning in denying Plaintiffs' claim did not differ in any material respect from the Committee. Unlike the Committee, she did purport to address Plaintiffs' contention that the resolutions were not effective to dispense with the need for a meeting because they nowhere evidence even a single Director's consent to do so. But all Ms. Green said was that she did not believe there was a requirement to state the resolutions were "being adopted by consent without a meeting as opposed to at a meeting," (emphasis added), which avoids the fact that there can be no Board "action" in the absence of a meeting unless the Board unanimously consents in writing that there be no meeting and that here there is no writing anywhere reflecting the Board's written unanimous consent to take action without a meeting. Such consent must be express and in writing. (As it is, no such consent can even be inferred from the face or fact of the resolutions since they are fully consistent with the proposed action being taken at an in-person or telephonic meeting.)

62.    Regarding Plaintiffs' contentions of conflict of interest in the decision making process, she mischaracterized Plaintiffs' arguments and failed to address the facts they asserted in support.  For example, Ms. Green did not address let alone deny Plaintiffs' Plaintiffs' explicit contention that she would have a conflict of interest in finding for Plaintiffs because she authorized the printing of pamphlets to be sent to VERP eligible employees on September 14th without even knowing whether or not the Board had taken official action to amend the Plan.

63.    Ms. Green showed her clear bias in other respects.  For example, she asserted without support in the record that "[l]eft without time to reschedule a Board meeting before the VERP election window would open on September 15, 2001, the Board approved the revised version of the VERP on September 14, 2001 by written consent."  *Id.* at 2 (emphasis added).  The record shows that management could have convened a telephonic Board meeting on September 12th, 13th or 14th if it had been confident that its proposal could have survived a true give-and-take such as occurs at Board meetings.  Ms. Green elsewhere made similar assertions, blaming September 11th for Governor Holton and Amtrak's failure to comply with the unanimous written consent requirements of the law when the record shows one had nothing to do with the other.  As Ms. Green well knew, contrary to her partisan rewriting of the facts, *id.* at 7, Governor Holton was <u>not</u> "unable" to receive, personally review and decide whether to sign the resolutions management tendered to him:  as on other occasions, Governor Holton simply chose not to make the minimal effort required for him to do so, and management, for reasons of self-interest, was happy to indulge him.

**Standard of Review**

      64.    Ms. Green's decision to deny Plaintiffs' appeal is not entitled to any deference

for numerous reasons, including but not limited to:

- First, Plaintiffs were denied a full and fair review of their claim because the Plan lacks a reasonable claims process and because Plaintiffs were denied access to documents, records and other information relevant to their claim and request for review of the claim denial.

- Second, Ms. Green's decision that the Board took action effective to amend the Pension Plan is a question of law to which this Court should not defer.

- Third, Ms. Green's decision is the product of her conflicts of interest.

- Fourth, to the extent that Ms. Green made factual findings, they are entitled to no deference.

- Fifth, the operative SPD or SPD's fail to disclose that the decision as to whether or not a participant is entitled to benefits is discretionary. In that critical regard, the Plan conflicts with the SPD in which case the SPD prevails.

- Sixth, the language contained in the Plan document upon which Defendants rely as supposedly conferring discretion in fact does not do so with sufficient clarity to displace the default standard of *de novo* review.

- Seventh, Defendants cannot prove that the Plan document which they contend is the Plan's governing instrument – the legend on which states "*Printed* 12/23/94," as opposed to "as amended and restated" on that date – and which they will contend contains the language conferring Ms. Green with discretion was ever validly adopted as the Plan document by action of the Board. Despite the fact that Plaintiffs repeatedly raised this point, both the Committee and Ms. Green declined to decide or squarely address it. None of the validly adopted Plan documents, all of which pre-date December 23, 1994, purport to confer discretionary authority upon someone in Ms. Green's position.

- Eighth, Ms. Green is not an authorized named fiduciary within the meaning of the statute or the claims regulations and lacked power to decide Plaintiffs' claims.

## COUNT ONE

65.    Plaintiffs, on behalf of themselves and the proposed Class, repeat and re-allege the allegations contained in all paragraphs of this Complaint.

66.    On July 26, 2001, the Amtrak Board of Directors amended the Plan to provide for a VERP that included a monthly Railroad Retirement Supplement equal to the participant's full Railroad Retirement Annuity and payable until such time as the participant began receiving that Annuity from the Railroad Retirement Board.

67.    On September 14, 2001 management asked the Board to enact an amendment to the Plan to eliminate the monthly Railroad Retirement Supplement as originally adopted in the July 26, 2001 VERP, and replace it with a less valuable $15,000 lump sum payment. However, for the reasons set forth above and such other reasons as may be developed during discovery, the Board failed to take any such valid "action" with respect to the Plan that day or at any other time.  Neither on September 14, 2001 nor anytime before or after did the Amtrak Board validly amend the Pension Plan and modify the original terms of the July 26, 2001 VERP.

68.    Defendant Amtrak and Defendant Committee since September 14, 2001 have failed to administer the Plan according to its terms, misstated the relevant facts to participants regarding the effective terms of the Plan, prevented eligible participants from electing benefits to which they were and are entitled under the Plan and failed to ensure that participants who retired pursuant to the so-called September 14, 2001 VERP actually receive the benefits to which they are due under the Plan.

## COUNT TWO

69.     Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs herein.

70.     ERISA § 503(a)(2), 29 U.S.C. § 1133(a)(2) provides, "in accordance with regulations of the Secretary, every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  ERISA § 503(a)(2), 29 U.S.C. § 1133(a)(2).

71.     The regulation applicable to Plaintiffs' claim states that any plan's claims review procedure must "[p]rovide that a claimant shall be provided, upon request and free of charge . . . copies of, all documents, records, and other information relevant to the claimant's claim for benefits.  Whether a document, record or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section."  29 C.F.R. § 52560.503-1(h)(2)(iii).

72.     Paragraph (m)(8) provides in pertinent part:  "A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information:  (i) Was relied upon in making the benefit determination; (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination; (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination."  *Id.* § 52560.503-1(m)(8).

73.     Disclosure to a claimant of all "relevant" documents and other information is critical to a full and fair review, because only then can a claimant have access to the evidence upon which the decision-maker relied in denying the claim and thus the opportunity to challenge its accuracy and reliability.

74.     Plaintiffs have been denied their right to review the relevant documents, records and other information as defined in the applicable claims regulations.  The Plan should be ordered to permit Plaintiffs to review all relevant documents, records and other information forthwith.

## CLASS ACTION ALLEGATIONS

75.     Plaintiffs bring suit on behalf of themselves and on behalf of all other participants and beneficiaries similarly situated under the provisions of Rule 23 of the Federal Rules of Civil Procedure with respect to violations alleged herein.  The proposed Class is defined as follows:

> All persons who are or were participants in or beneficiaries of the Retirement Income Plan for Employees of National Railroad Passenger Corporation (the "Plan") who were eligible to receive benefits under the Voluntary Early Retirement Plan ("VERP") as adopted by the Board of Directors of the National Railroad Passenger Corporation ("Amtrak" or the "Company") on July 26, 2001 but were not allowed to accept the July 26, 2001 VERP due to an alleged September 14, 2001 Plan amendment and/or the adherence to the terms of that alleged amendment by those administering the Plan.

76.     The requirements for maintaining this action as a class action under Fed. R. Civ. P. 23(a)(1) are satisfied in that there are too many Class members for joinder of all of them to be practicable.

77.     The claims of the Class members raise numerous common questions of fact and law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2).

26

78.    Plaintiffs' claims are typical of the claims of Class members, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(3).  They do not assert any claims relating to the Plan in addition to or different than those of the Class.

79.    Plaintiffs are adequate representatives of the class, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(4).  The interests of Plaintiffs are identical to those of the class.  The Plan has no unique defenses against them that would interfere with their representation of the class.  Plaintiffs have engaged counsel with extensive ERISA class action litigation experience and expertise.

80.    Additionally, all of the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for defendants and individual adjudications present a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members who are not parties.

81.    All of the requirements of Fed. R. Civ. P. 23(b)(2) also are satisfied in that the Plan's actions affected all Class members in the same manner making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants and that the Court award the following relief:

A.    Certification of this action as a class action for all purposes of liability and relief and appointment of undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23.

B.      Judgment for Plaintiffs and the Class against Defendants on all claims expressly asserted and/or within the ambit of this Complaint.

C.      An order awarding, declaring or otherwise providing Plaintiffs and the Class all other such relief under ERISA § 502(a), 29 U.S.C. § 1132(a) to which Plaintiffs and the Class are or may be entitled.

D.      An order awarding pre- and post-judgment interest.

E.      An order awarding attorney's fees on the basis of the common fund doctrine (and/or other applicable law, at Plaintiffs' election), along with the reimbursement of the expenses incurred in connection with this action.


                                        By:


Dated:  August 30, 2006                 _____/s/Eli Gottesdiener_____
                                        Eli Gottesdiener (D.C. Bar 420764)
                                        Gottesdiener Law Firm, PLLC
                                        1025 Connecticut Avenue, N.W.
                                        Suite 1000
                                        Washington, D.C. 20036
                                        Telephone:  (202) 243-1000
                                        Facsimile:   (202) 243-1001
                                        eli@gottesdienerlaw.com