IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WADE F. HALL,<br>HATTIE N. MCCOY-KEMP,<br>VICTORIA F. STATON,<br><br>On behalf of themselves and on<br>behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>RETIREMENT INCOME PLAN FOR<br>EMPLOYEES OF NATIONAL RAILROAD<br>PASSENGER CORPORATION, *et al.*<br><br>      Defendants. | No. 06-CV-1539 (GK)<br><br>Class Action<br><br>Next scheduled Court deadline:<br>Initial Scheduling Conference -<br>November 3, 2006, 9:45 a.m. |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY
PROCEEDINGS PENDING RESOLUTION OF MOTIONS
FOR SUMMARY JUDGMENT IN RELATED CASE**

Plaintiffs respectfully submit this opposition to Defendants' motion to stay proceedings in this action pending resolution of motions for summary judgment in the related action, *Hall, et al. v. National Railroad Passenger Corp. et al.,* No. 03-CV-1764 (GK) ("*Hall I*").

## INTRODUCTION

The power of a federal trial court to stay its proceedings is beyond question. *See Landis v. North Am. Co.*, 299 U.S. 248, 254-55 (1936). This power springs from the inherent authority of every court to control the disposition of its cases. *Id*. at 254. Thus, when, why and how to stay proceedings is within the sound discretion of the trial court. *Id.* at 254-55. In exercising this discretion, a court "must weigh competing interests and maintain an even balance," *id*. at 254-55,

recognizing that the determination of whether a stay is warranted in one set of cases "will not always fit within the mould appropriate" to the determination of a motion to stay in another. *Id*. at 256.

Yet in all cases "the suppliant for a stay must make out **a clear case of hardship or inequity in being required to go forward**, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Id.* at 255 (emphasis added); *accord id.* at 256 ("the burden of making out the justice and wisdom of a departure from the beaten track **lay heavily on the petitioners**, suppliants for relief") (emphasis added).

Here, notwithstanding this extremely high standard, Defendants barely make any effort to show how that it has been met here. Defendants assert that if the Court does not grant Defendants the stay they seek "both the Court and the litigants will incur considerable expense and costs," Defs. Mtn. (Doc. 8) at 5, but provide no specifics. Unmentioned is the fact that the core issue in *Hall II -- i.e.,* whether the Amtrak Board of Directors amended the Amtrak Pension Plan in compliance with ERISA's amendment procedure, ERISA § 402(b)(3), 29 U.S.C. § 1102(b)(3), on September 14, 2001 when management sought the Board's approval to eliminate the "Railroad Retirement Supplement" portion of a Voluntary Early Retirement Plan ("VERP") which management had had the Board adopt and approve just a few months earlier, on July 26, 2001, as part of company-wide downsizing – has been on the table and actively litigated for the

past <u>two and a half years</u>.[1]

Surely Defendants (who managed to file an Answer without too much difficulty) cannot claim hardship if required to respond to some limited discover and brief the questions of law *Hall II* presents which Plaintiffs are prepared to submit to the Court for decision promptly. The Court could and should deny Defendants' motion without more.

## **FACTUAL BACKGROUND**

### **The Nature of this Dispute**

As Defendants explain in their motion, *Hall II* encompasses former Count I from the *Hall I* litigation, which this Court dismissed without prejudice on August 5, 2005 while Plaintiffs pursued the internal plan claims process (through which they obtained no relief). *See* Order, August 5, 2005 (Doc. 80). The Court determined that former Count I of *Hall I* was, at bottom, a claim for benefits, *id.,* which indeed it is, albeit one premised on the <u>statutory</u> claim that Defendants failed to comply with ERISA's amendment procedure and more specifically failed to heed the Supreme Court's admonition in *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995), that "whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Id.* at 85.

In *Curtiss-Wright*, the Supreme Court held that a purported ERISA plan amendment not adopted in accordance with a plan's amendment procedures is ineffective to alter the terms of

---

[1] Former Count I, the core of *Hall II,* was part of *Hall I* for well over a year, even since Plaintiffs stumbled upon the factual predicate for the claim during discovery in *Hall I* in 2004. Defendants have been actively litigating or at least lawyering the issue ever since: in fact, the very same day this Court dismissed former Count I from *Hall,* August 5, 2005, Plaintiffs filed their claim for benefits – a claim that it took Plaintiffs *one full year* to exhaust because of approximately six (6) months of worth of delay Defendants inserted into their "review." Compl. ¶¶ 43-44, 49.

such plan and that adversely affected participants may sue to have such purported amendments declared ineffective on that basis. *Id.* This is such a case.[2]

**The Undisputed (or Indisputable) Facts**

It is undisputed that the Amtrak Pension Plan specifies that Amtrak's Board of Directors (not just "the Company" generally, as was the case in *Curtiss-Wright*) is solely empowered to amend or modify the Plan, and further specifies the method through which the Board may exercise its power and discretion to amend or modify the Plan is through Board "action." *See* Plan § 13.01; Defs. SJ Reply at 19 (Doc. 91) ("It is true that Amtrak reserved the right to amend the Amtrak Retirement Board by action of its Board"). What constitutes Board "action" is defined by the D.C. Business Corporations Act ("DCBCA"), which governs Amtrak's internal operations to the extent not inconsistent with federal law. *See* 49 U.S.C. § 24301(e).

The DCBCA requires that the business and affairs of a D.C. corporation such as Amtrak be managed through "action . . . taken" at "meeting[s]" of its board of directors. D.C. Code § 29-101.42(b). The DCBCA also allows for "action" to be taken by a board without a meeting by what is commonly referred to as "unanimous written consent." *Id.* § 29-101.136 ("Requirements of action without meeting"). The DCBCA is specific, however, that such action will be valid only "if a consent" to take action in the absence of a meeting "shall be ***signed . . . by all of the members*** of the board," which consent must also "set[] forth the action so taken." *Id.* (emphasis added).

---

[2] The Court's review is *de novo* given that it owes no deference to a plan administrator's views on questions of law. *Holt v. Winpisinger*, 811 F.2d 1532, 1536 (D.C. Cir. 1987) (whether individual is "employee" involves interpretation of ERISA and is therefore reviewed *de novo*).

There is no dispute that on the day in question, September 14, 2001, which was the eve of the start of the September 15-October 31, 2001 VERP election period (or "window"), the Board did not meet and that management therefore attempted to secure Board "action" via this unanimous written consent procedure. However, one Director, former Virginia Governor Linwood Holton, did not sign any resolution consenting to the Board acting outside of a regular Board meeting nor did he sign the Resolutions that other Board members did that purported to eliminate the Railroad Retirement Supplement. Compl. ¶¶ 29-33. Instead, he merely discussed the matter with an Amtrak staff member and gave that staff member oral consent that that staff member sign "for" him. *Id.* Yet, as noted, the DCBCA requires that a board's written consent to take action in the absence of an actual meeting "be <u>signed . . . by all of the members</u> of the board."

The person who "signed" "for" Governor Holton was not a member of the Amtrak Board nor in fact did even he sign the resolutions in question: rather, what he did, because he wanted to make it look like the Governor *had* signed the resolutions, was take a photocopy of an actual signature that Governor Holton had affixed to <u>another</u> document and cut-and-pasted it above the signature line on the draft resolutions and then ran multiple photocopies of that document so that the fact that the Governor did not sign the resolutions would not be apparent to someone looking at the document. *Id.* ¶ 33.

**<u>The Legal Claim Plaintiffs Assert Here</u>**

Plaintiffs contend, among other things, Defendants' failure to comply with the signature requirement of the DCBCA's unanimous written consent procedure (and therefore the Plan and thus ERISA itself, per ERISA § 402(b)(3) and *Curtiss-Wright*) vitiates the Corporation's attempt

5

to amend the Plan to eliminate the Railroad Retirement Supplement. *Id.* ¶ 67. Thus, even assuming the Railroad Retirement Supplement could have been eliminated without violating ERISA's anti-cutback prohibitions or the Tax Code's nondiscrimination rules, *but see* Pls. Mtn for PSJ re Count II, *Hall I* (Doc. 65); Pls. Opp. to Defs. SJ Mtn. re Counts II and III, *Hall I* (Doc. 87), and even assuming it would have been eliminated even if Amtrak's President had not breached his fiduciary duty to appoint and monitor a Plan Administrator as required by the Plan and the statute, *but see* Pls. Opp. to Defs. SJ Mtn re Count III, *Hall I*, the Railroad Retirement Supplement was and is nevertheless a vested, contractual benefit under the Plan which Plaintiffs and the proposed Class of some 375 similarly situated participants must now be given the opportunity to claim.

**Defendants' Motion and the Current Procedural Posture of the Case**

The Complaint in this case was filed on August 31, 2006. Doc. 1. Defendants moved for an extension of time within which to respond, and on October 5, 2006 filed an Answer. Doc. 6. The following day, October 6, 2006, the parties conferred regarding scheduling and discovery, and filed their meet-and-confer statement on October 20, 2006. On October 11, 2006, Plaintiffs propounded document requests, confined largely to the same requests made but denied during the claims process.

On October 10, 2006, Defendants filed the instant motion. Doc. 8. Defendants argue that "this case . . . is likely unnecessary and duplicative" of *Hall I*. Defs. Mtn. at 1. They argue that a stay of "all proceedings"in *Hall II* is appropriate because "Plaintiffs' claims in *Hall II* are entirely predicated on the notion that Amtrak's Board amended the Plan in July 2001" but Defendants are likely to convince the Court in *Hall I* that "the July 2001 action by the Board

6

simply delegated authority to management [to amend the Pension Plan], rather than authorizing an "amendment" to the Plan, as Plaintiffs allege." Defs. Mtn. at 5-6. Defendants argue that "[t]his Court should decide Defendants' summary judgment motion before it permits *Hall II* to proceed, if it is necessary." *Id.* at 5.[3]

As noted above, Defendants assert, without further explanation, that in the absence of a stay "both the Court and the litigants will incur considerable expense and costs." *Id.* Defendants also assert, again without further explanation, that "Plaintiffs would suffer no harm if this Court granted a stay." *Id.*

**DISCUSSION**

**I.    "[T]he stay for which [Defendants] pray[] will work damage"**

Plaintiffs will suffer real prejudice if Defendants are able to continue to prevent them from presenting this claim to the Court now. Plaintiffs, who just spent <u>one year</u> dutifully exhausting Defendants' claims process, from getting the September 14, 2001 question before the Court. It amounts to more than the fact that Plaintiffs, retirees on fixed incomes, would be required to endure additional unnecessary delay (Defendants intentionally injected approximately *six* months of wholly unnecessary delay in claims process, Compl. ¶¶ 43-44, 49) in a three-year old case about retirement payments they allegedly should have received five years ago. The even greater prejudice is being subjected to the artificial bifurcation Defendants desire,

---

[3] As this indicates, though styled "Motion to Stay Proceedings Pending Resolution of Motions for Summary Judgment in Related Case," Defendants talk only about their own November 1, 2005 motion for summary judgment. However, Plaintiffs' April 1, 2005 summary judgment motion explicitly seeks a ruling on the July 26, 2001 question. The fact that Plaintiffs even have a summary judgment motion pending is mentioned only once, in passing, in a parenthetical in a footnote in Defendants' filing. *Id.* at 3 n.2.

whereby the July 26, 2001 question gets decided before and without its natural counterpart, *i.e.,* the September 14th question.

As shown more fully below in Part II, the September 14th and July 26th questions are mirror images of one another legally, they overlap factually, and they are intertwined in several evidentiary senses. the fact is that when considered together, Plaintiffs' arguments as to the September 14th and July 26th questions are mutually reinforced, and the inconsistency and illogic in Defendants' positions made all the more clear. Indeed, it is because Defendants know how much weaker their July 26th argument is when considered in tandem with the September 14th question that they keep pressing the Court would reach the July 26th question first, in isolation, and why they manufactured the delay they did in what should have been a swift and straightforward claims process.[4]

*Hall II* is not "duplicative"of *Hall I,* as Defendants claim, merely because the two actions share *one* common threshold question – the July 26, 2001 question. They are *complementary*. In fact, resolution of the September 14, 2001 question now (together with the July 26, 2001 question) is probably the easiest way for the Court to resolve the entire *Hall* controversy -- *and* without necessarily having to wade into "the complexity of the issues," August 5, 2005 Order at 18, now before the Court in *Hall I* in the parties' cross-motions for summary judgment as to

---

[4] It is well to recall that Plaintiffs could not have known of the former Count I claim prior to filing suit in August 2003 and only discovered the basis for their claim while in discovery in *Hall I* . Nor should Plaintiffs be faulted for attempting to assert the claim, once discovered, via an amended complaint rather than through the claims process. Not only had the D.C. Circuit not spoken (and it still has not spoken) on the issue of whether participants with a benefit claim premised on a statutory violation must necessarily exhaust before proceeding to court, in the case of former Count I Plaintiffs were already *in* court against the same Defendants who would be adjudicating any such claim, and there is no clear rule whether in such circumstances exhaustion requirement continues to apply.

Count II (raising questions relating to ERISA's anti-cutback provision and the Code's nondiscrimination requirements), and Defendants' motion for summary judgment with respect to Count III (raising breach of fiduciary duty and remedial questions).

**II.    Defendants can articulate no "clear case of hardship or inequity in being required to go forward."**

Defendants do not carry their burden to establish "a clear case of hardship or inequity in being required to go forward" by making the boilerplate assertion that being required to go forward in *Hall II* will force them to "incur considerable expense and costs." Defs. Mtn. at 5. Even with respect to stays of *discovery*, "bare assertions that discovery will be unduly burdensome or that it should be stayed pending dispositive motions that will probably be sustained, are insufficient to justify the entry of an order staying discovery generally." *People With AIDS Health Group v. Burroughs Wellcome Co.*, No. 91-0574, 1991 WL 221179, at *1 (D.D.C. Oct. 11, 1991) (internal quotation marks omitted). Rather, the burden is on the party seeking to delay the proceedings to show that the need for a stay outweighs the prejudice caused by one. *Id.*

Any claim of hardship would be unavailing because the core issue in *Hall II* is a pure question of law, one that Plaintiffs plan on presenting to the Court promptly via a motion for partial summary judgment. Obviously, the Federal Rules of Civil Procedure do not contemplate delaying the resolution of purely legal arguments. Those rules make clear that a plaintiff is entitled to file a motion for summary judgment at any time after the expiration of 20 days from the commencement of the lawsuit. *See* Fed. R. Civ. P. 56(a). In other words, the so-called "costs" about which Defendants are complaining are probably not even cognizable as such. As

one district court stated in refusing to stay merits briefing pending resolution of a jurisdictional defense, "[h]aving the parties submit briefing on the merits is a minor burden ... that permits the court to come to a sound result on" the jurisdictional defense. *Bell Atlantic-Delaware, Inc. v. Global Naps South, Inc.*, 77 F.Supp.2d 492, 497 (D.Del.1999); *see also Tele-Port, Inc. v. Ameritech Mobile Comm'ns, Inc.*, 49 F.Supp.2d 1089, 1090 n.1 (E.D. Wis. 1999).

Defendants' desire to avoid briefing the legal issue of whether the Board complied with ERISA on September 14, 2001 may be understandable but is not a basis for prejudicing Plaintiffs, who are suffering ongoing harm as a result of Defendants' conduct, or this Court and the court system as a whole which also suffers whenever the resolution of an action is unnecessarily delayed. *See Lowinger v. Johnston*, 2005 WL 3557401, at *3 (W.D.N.C. Dec. 27, 2005) (denying motion to stay briefing on motion to dismiss pending decision on motion to remand because "staying briefing . . . will result only in further unnecessary delay").

**III.    Defendants' cases do not support their request.**

None of the case Defendants cite support their request. *NL Chemicals, Inc. v. Southern Clay Prods., Inc.*, 704 F. Supp. 299 (D.D.C. 1989), as well as the *dicta* from *American Life Ins. Co. v. Stewart*, 300 U.S. 203 (1937), that *NL Chemicals* and Defendants both cite regarding the propriety of a stay where there are two cases involving "the same issues," show those cases have nothing to do with this one, where by definition, after the dismissal of former Count I, *Hall II* and *Hall I* raise almost entirely *different* issues, and entirely different theories of recovery.

There was nothing like that going on in *NL Chemical,* where the question was whether to stay a federal court 35 U.S.C .§ 291 patent-patent interference suit in favor of a pending PTO interference where "the identical central issues" were involved. 704 F. Supp. at 300. The

plaintiff opposed the stay not so it could pursue an alternative theory of recovery, as is the case here, but because it thought the effect of the stay would deprive it of "due process equivalent to the district court proceedings." 704 F. Supp. at 300. The Court properly rejected those arguments, relying on the ability of the plaintiff to obtain review of the PTO's decision in a district court or the Court of Appeals for the Federal Circuit. *Id.* at 301.[5]

### IV. Defendants have little if any chance of success on the merits.

Defendants also fail to meet their burden because, on the merits, there is little, if any chance, that this Court will adopt their tortured characterization of the events of July 26, 2001. A stay pending the outcome of other litigation is never justified where, as here, the potential effect of the second case on the case sought to be delayed is too speculative or attenuated. *Landis,* 299 U.S. at 256-57; *accord Turner v. District of Columbia*, 268 F.Supp.2d 23, 26-28 (D.D.C. 2003) (denying motion to stay the proceedings until the disposition of a related case in the Superior Court because chance of conflicting rulings was low); *Cherokee Nation of Oklahoma v. United States*, 124 F.3d 1413, 1416 (Fed. Cir. 1997); *Neenah Foundry Co. v. United States,* 24 CIT 202, 203-205 (CIT 2000).[6]

According to Defendants, on July 26, 2001 the Board did not amend the Pension Plan,

---

[5] Defendants' two other cases, neither of which even cite *Landis* or *American Life Ins. Co. v. Stewart*, are likewise inapposite.   The federal case Defendants cite involved what was essentially a bankruptcy stay, a *sui generis* circumstance with no relation to this case.  The local D.C. case was a landlord-tenant case where the stay was ordered to await the outcome of a federal court action not involving any of the parties but that was to determine the rule of decision for their litigation and all follow-on cases.  That case has no resemblance to this one.

[6] *Cf. Feldman v. Flood,* 176 F.R.D. 651, 652,-53 (M.D. Fla. 1997) ("While it is not necessary for the Court to, in effect, decide the motion to dismiss to determine whether the motion to stay discovery should be granted, it is necessary for the Court to "take a preliminary peek" at the merits of the motion to dismiss to see if it appears to be clearly meritorious and truly case dispositive").

either to add the VERP or for any other purpose. Defs. SJ Reply at 1, 18-23. Instead, Defendants claim that the Board did that day was "merely" "delegated" to management its sole and exclusive discretionary authority to amend the Pension Plan. *Id.* at 1, 23. The Board authorized management to add the VERP with the Railroad Retirement Supplement but "[m]anagement never acted upon its delegated authority to amend the Amtrak Retirement Plan to include a Railroad Retirement Supplement, and instead ultimately enacted the proposal approved by the Board of Directors on September 14, 2001."

Of the many problems with this theory, one must start with the fact that it is not describing any kind of "delegation" at all, other than a ministerial one. Management approached the Board on both occasions with a single proposal, not vice versa, and on neither occasion did management propose or the Board "authorize" *not* enacting a VERP for these employees. Yet conferring upon management the power to make that choice would have been in this setting based on Defendants' own description the *sine qua non* of the type of *discretionary* delegation Defendants claim management had, *i.e.,* to **not** adopt the VERP with the Railroad Retirement Supplement Defendants admit the Board at least "authorized" on July 26, 2001. Nothing in the record anywhere shows the Board saying to management on either date "you can do this **or not** do this, **as you see fit."**

Indeed, confirming this is unanswered question: If management already had the power to amend as a result of the July 26, 2001 meeting, *why did it bother running back to the Board*, on the eve of the opening of the window, trying to get authorization to eliminate the Railroad Retirement Supplement? Why try so hard to have the Board act by unanimous written consent – to the point that the staff member discussed above felt it necessary to Photoshop Governor

12

Holton's signature? The only sensible explanation is that everyone involved, including the Board, **knew** the Plan had been amended on July 26, 2001, and knew it had to be amended again on September 14, 2001 before the VERP window opened if the Railroad Retirement Supplement was to be eliminated from the offer employees could accept as early as the following day.

Defendants concede that the Plan specifies that **only the Board** has the power to amend the Pension Plan. *See* Defs. SJ Reply at 19 ("It is true that Amtrak reserved the right to amend the Amtrak Retirement Board by action of its Board"). In *Curtiss-Wright*, the Supreme Court could not have been clearer: "whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." 514 U.S. at 85. Thus, if the Board really wanted to "delegate" its sole and exclusive right and responsibility to amend the Pension Plan to management, *it would have had to amend the Plan's amendment provision* to accomplish that result. Yet according to Defendants **no** amendment to the Plan occurred that day, to add the VERP or otherwise amend the Plan. Defs. SJ Reply at 19, 21.

Plaintiffs do *not* argue, as Defendants claim, "that the Board was not allowed to delegate the authority to amend the Plan." Defs. SJ Reply at 23. They argue that to be lawful under *Curtiss-Wright,* under *this* Plan, the Board had to *amend* the Plan's *amendment* provision to effectuate such delegation. Tellingly, the only time the Board did that is in the amendment Defendants discuss in their reply brief at page 23, enacted solely to ensure the Plan would be in compliance with the panoply of new Code § 401(a) qualification requirements contained in several statutes collectively referred to as "GUST." (*See* Ex. 1 attached hereto).

Defendants argue that this amendment contains "a sweeping delegation of authority [that] hardly be referred to as merely ministerial." Defs. Reply at 23. That is absurd - y*es it can* – this

13

amendment confers no discretionary authority upon Amtrak's President and CEO, for example, to increase Plan benefits. In this amendment the Board is saying to management, in effect, "don't bother us with amendments we *have* to make to keep the Plan qualified – we just want to hear about *discretionary* changes."

If the Board wanted to do what Amtrak says it did in this GUST amendment or on July 26, 2001 – *i.e.,* hand over its amendment authority -- the amendment would or could have simply said: "The Board hereby amends the amendment provision to delegate its amendment authority to the CEO." Instead, the GUST amendment carefully restricts management's authority to amend only, in effect, where the amendments are required to comply with law or clarify ambiguities that might raise questions about compliance with law – never to add benefits or terms not required by law.

In sum, Defendants' entire "delegation" theory is made-up. At bottom, it rests on nothing more than a jejeune reading of the boilerplate "go-forth-and-implement" language appearing at the end of the July 26th Resolutions (and practically every other board resolution ever enacted) which authorizes the President and CEO to take all necessary steps to implement (and not, *not* implement, if he doesn't like what the Board thinks is appropriate) the three plans adopted that day and spelled out in detail in management's summary. Defendants confuse – intentionally – such proper delegations of implementing authority with the power to make discretionary amendments to the Plan.

\*   \*   \*

If the Board did not amend the Plan on July 26, 2001 but merely delegated to management its discretionary authority to do so, the question arises: when did management

actually exercise that discretionary authority and authorize the VERP (*without* the Railroad Retirement Supplement, as Defendants would have it)?  According to Defendants, that only occurred on <u>November 30, 2001</u>, in a document signed by an Amtrak vice president, *after* the VERP election period (September 15, 2001-October 31, 2001) was over.

But, as the IRS explicitly told Amtrak in an August 1, 2003 memo, if the amendment only occurred then, what transpired during and after the VERP election period was ***illegal*** - *i.e.,* a fiduciary or plan sponsor cannot disburse qualified pension plan assets *gratuitously* and then after the fact try to enact a retroactive plan amendment:

> Included for our consideration and determination with the 2-28-02 determination request filing for this plan was Amendment II - dated November 30, 2001.  The effect of this amendment was to provide for an early retirement benefit for those eligible who applied between the dates of September 15, 2001 and October 31, 2001. Without some corporate action prior to the September 15 date, **this amendment is not valid, *as it is not possible to amend your plan retroactively for this operational aspect.*** Therefore, i[t] will be necessary to provide us with any corporate resolution which transpired prior to the September 15, 2001 to implement this benefit.

IRS memo, August 1, 2003 (Ex. 2 attached hereto) (emphasis added).

In response to this memo, Defendants wrote a letter to the IRS on August 14, 2003 to assure the agent handling the case that the Plan *was* amended before the start of the VERP window, in fact on September 14, 2001, the night before:  "The amendment occurred **before** the beginning of the VERP election period."  *See* Ltr. to IRS, August 14, 2003 (emphasis added) (Ex. 3 attached hereto).  That obviously contradicts both the theory that the Board delegated its discretionary amendment authority to management on July 26, 2001 and Defendants' theory here that the only time the Plan was ever amended was on November 30, 2001.

Defendants try to deal with these contradictions in their reply brief by accusing **Plaintiffs** of having misrepresented to the Court what the August 14, 2003 letter to the IRS says. Defs. SJ Reply at 25-26. Defendants say that all they meant to say to the IRS on August 14, 2003 was *not* that the Board amended the *Pension Plan* on September 14, 2001 but rather than the Board *amended its delegation* to management on September 14, 2001. *Id.*

That is obviously not true. Defendants were responding directly to a statement from an IRS agent saying, in effect, if you keep telling me that November 30, 2001 was the only date the Pension Plan was amended to add a VERP you have a big problem. Of course Amtrak was saying *the Pension Plan* was amended. That was the whole point of the Amtrak's response.

Here, despite the multiple times they have briefed the issue, Defendants have never once addressed IRS' contention that "***it is not possible to amend your plan retroactively for this operational aspect***" nor do they challenge the IRS's assertion that they needed a "valid" "corporate action" prior to the start of the window period. The proposition is incontestable. To qualify for preferential tax treatment, Code § 401(a)(2) requires a plan to prohibit the use of plan assets for any purpose other than the benefit of plan beneficiaries prior to the satisfaction of all liabilities under the plan. 26 U.S.C. § 401(a)(2). If the VERP, with or without the Railroad Retirement Supplement, had not become part of the Plan, then the benefits payable under it were not plan liabilities, and yet plan assets were used not for the benefit of the several thousand plan participants but gifts to a choice few.

Defendants have now repeatedly disavowed reliance on September 14, 2001 as the date that the Pension Plan was amended to add the VERP (a fact which, ironically given the motion to stay this action, will make Plaintiffs' motion for summary judgment in *Hall II* at least on that

16

issue quite easy to resolve), so that date is unavailable to them.  This leaves Defendants with precious few options.  Indeed, that leaves July 26, 2001 as the only date, on the facts which no one disputes, the Pension Plan *could* have been amended to add a VERP that would make the events of September 15, 2001 to October 31, 2001 and subsequent disbursement of plan assets to VERP retirees who accepted the reduced VERP **not** the violation of the Tax Code the IRS said it was concerned about on August 1, 2003.

  Yet Defendants are asking this Court to stay proceedings in this action based on supposition that there is a good chance the Court will conclude that the VERP (with the Railroad Retirement Supplement) did *not* get added to the Amtrak Pension Plan on July 26, 2001.  Plaintiffs can understand if there are reasons other than those discussed here why the Court may find a stay appropriate – for example, it may be readying a ruling on an unrelated aspect of *Hall I* that it believes may cause Defendants to re-evaluate their position as to a non-litigative resolution to these cases.  But Plaintiffs are confident that the Court would not premise it upon its likely endorsement of a theory so thoroughly flawed.

Dated:  October 27, 2006      Respectfully submitted,

                  s/Eli Gottesdiener
                Eli Gottesdiener (D.C. Bar 420764)
                Gottesdiener Law Firm, PLLC
                1025 Connecticut Avenue, N.W.
                Suite 1000
                Washington, D.C. 20036
                Telephone:  (202) 243-1000
                Facsimile:   (202) 243-1001
                eli@gottesdienerlaw.com

                *Attorney for Plaintiffs and the proposed Class*