IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WADE F. HALL,<br>HATTIE N. MCCOY-KEMP,<br>VICTORIA F. STATON,<br><br>On behalf of themselves and on<br>behalf of all others similarly situated,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>RETIREMENT INCOME PLAN FOR<br>EMPLOYEES OF NATIONAL RAILROAD<br>PASSENGER CORPORATION, *et al.*<br><br>　　　　　　　Defendants. | No.  06-CV-1539 (GK)<br><br>Class Action<br><br>Next scheduled Court deadline:<br>Initial Scheduling Conference -<br>November 3, 2006, 9:45 a.m. |

## ERRATA

Attached hereto are corrected copies of pages 3, 7, 8, 12, and 14 to Doc. 11, Plaintiffs'

Opposition to Defendants' Motion to Stay Proceedings Pending Resolution of Motions for

Summary Judgment in Related Case, filed October 27, 2006.

　　　　　　　　　　　　　　　　　Respectfully submitted,


　　　　　　　　　　　　　　　　　 /s/Eli Gottesdiener _____
　　　　　　　　　　　　　　　　　Eli Gottesdiener

　　　　　　　　　　　　　　　　　**GOTTESDIENER LAW FIRM, PLLC**
　　　　　　　　　　　　　　　　　1025 Connecticut Avenue, N.W.
　　　　　　　　　　　　　　　　　Suite 1000
　　　　　　　　　　　　　　　　　Washington, D.C.  20036
　　　　　　　　　　　　　　　　　Phone: (202) 243-1000
　　　　　　　　　　　　　　　　　Fax:    (202) 243-1001

October 30, 2006　　　　　　　　　*Attorney for the Plaintiff and the proposed Class*

past <u>two and a half years</u>.[1]

Surely Defendants (who managed to file an Answer without too much difficulty) cannot claim hardship if required to respond to some limited discovery and brief the questions of law *Hall II* presents which Plaintiffs are prepared to submit to the Court for decision promptly. The Court could and should deny Defendants' motion without more.

## FACTUAL BACKGROUND

### The Nature of this Dispute

As Defendants explain in their motion, *Hall II* encompasses former Count I from the *Hall I* litigation, which this Court dismissed without prejudice on August 5, 2005 while Plaintiffs pursued the internal plan claims process (through which they obtained no relief). *See* Order, August 5, 2005 (Doc. 80). The Court determined that former Count I of *Hall I* was, at bottom, a claim for benefits, *id.,* which indeed it is, albeit one premised on the <u>statutory</u> claim that Defendants failed to comply with ERISA's amendment procedure and more specifically failed to heed the Supreme Court's admonition in *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995), that "whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Id.* at 85.

In *Curtiss-Wright*, the Supreme Court held that a purported ERISA plan amendment not adopted in accordance with a plan's amendment procedures is ineffective to alter the terms of

---

[1] Former Count I, the core of *Hall II,* was part of *Hall I* for well over a year, even since Plaintiffs stumbled upon the factual predicate for the claim during discovery in *Hall I* in 2004. Defendants have been actively litigating or at least lawyering the issue ever since: in fact, the very same day this Court dismissed former Count I from *Hall,* August 5, 2005, Plaintiffs filed their claim for benefits – a claim that it took Plaintiffs *one full year* to exhaust because of approximately six (6) months of delay Defendants inserted into their "review." Compl. ¶¶ 43-44, 49.

simply delegated authority to management [to amend the Pension Plan], rather than authorizing an "amendment" to the Plan, as Plaintiffs allege." Defs. Mtn. at 5-6. Defendants argue that "[t]his Court should decide Defendants' summary judgment motion before it permits *Hall II* to proceed, if it is necessary." *Id.* at 5.[3]

As noted above, Defendants assert, without further explanation, that in the absence of a stay "both the Court and the litigants will incur considerable expense and costs." *Id.* Defendants also assert, again without further explanation, that "Plaintiffs would suffer no harm if this Court granted a stay." *Id.*

### DISCUSSION

### I.    "[T]he stay for which [Defendants] pray[] will work damage"

Plaintiffs will suffer real prejudice if Defendants are able to continue to prevent them from presenting this claim to the Court now. It amounts to more than the fact that Plaintiffs, retirees on fixed incomes, would be required to endure additional unnecessary delay in a three-year old case about retirement payments they allegedly should have received five years ago. The even greater prejudice is being subjected to the artificial bifurcation Defendants desire

---

[3] As this indicates, though styled "Motion to Stay Proceedings Pending Resolution of Motions for Summary Judgment in Related Case," Defendants talk only about their own November 1, 2005 motion for summary judgment. However, Plaintiffs' April 1, 2005 summary judgment motion explicitly seeks a ruling on the July 26, 2001 question. The fact that Plaintiffs even have a summary judgment motion pending is mentioned only once, in passing, in a parenthetical in a footnote in Defendants' filing. *Id.* at 3 n.2.

whereby the July 26, 2001 question gets decided before and without its natural counterpart, *i.e.,* the September 14th question.

As shown more fully below in Part II, the September 14th and July 26th questions are mirror images of one another legally, they overlap factually, and they are intertwined in several evidentiary senses.  The fact is that when considered together, Plaintiffs' arguments as to the September 14th and July 26th questions are mutually reinforced, and the inconsistency and illogic in Defendants' positions made all the more clear.   Indeed, it is because Defendants know how much weaker their July 26th argument is when considered in tandem with the September 14th question that they keep pressing the Court would reach the July 26th question first, in isolation, and why they manufactured the delay they did in what should have been a swift and straightforward claims process.[4]

*Hall II* is not "duplicative" of *Hall I,* as Defendants claim, merely because the two actions share *one* common threshold question – the July 26, 2001 question.  They are *complementary*.  In fact, resolution of the September 14, 2001 question now (together with the July 26, 2001 question) is probably the easiest way for the Court to resolve the entire *Hall* controversy -- *and* without necessarily having to wade into "the complexity of the issues," August 5, 2005 Order at 18, now before the Court in *Hall I* in the parties' cross-motions for summary judgment as to

---

[4] It is well to recall that Plaintiffs could not have known of the former Count I claim prior to filing suit in August 2003 and only discovered the basis for their claim while in discovery in *Hall I* .  Nor should Plaintiffs be faulted for attempting to assert the claim, once discovered, via an amended complaint rather than through the claims process.  Not only had the D.C. Circuit not spoken (and it still has not spoken) on the issue of whether participants with a benefit claim premised on a statutory violation must necessarily exhaust before proceeding to court, in the case of former Count I Plaintiffs were already *in* court against the same Defendants who would be adjudicating any such claim, and there is no clear rule whether in such circumstances exhaustion requirement continues to apply.

either to add the VERP or for any other purpose. Defs. SJ Reply at 1, 18-23. Instead, Defendants claim that the Board did that day was "merely" "delegated" to management its sole and exclusive discretionary authority to amend the Pension Plan. *Id.* at 1, 23. The Board authorized management to add the VERP with the Railroad Retirement Supplement but "[m]anagement never acted upon its delegated authority to amend the Amtrak Retirement Plan to include a Railroad Retirement Supplement, and instead ultimately enacted the proposal approved by the Board of Directors on September 14, 2001."

Of the many problems with this theory, one must start with the fact that it is not describing any kind of "delegation" at all, other than a ministerial one. Management approached the Board on both occasions with a single proposal, not vice versa, and on neither occasion did management propose or the Board "authorize" *not* enacting a VERP for these employees. Yet conferring upon management the power to make that choice would have been in this setting based on Defendants' own description the *sine qua non* of the type of *discretionary* delegation Defendants claim management had, *i.e.,* to **not** adopt the VERP with the Railroad Retirement Supplement Defendants admit the Board at least "authorized" on July 26, 2001. Nothing in the record anywhere shows the Board saying to management on either date "you can do this **or not** do this, **as you see fit."**

Indeed, confirming this is the unanswered question: If management already had the power to amend as a result of July 26th, *why did it bother running back to the Board*, on the eve of the opening of the window, trying to get authorization to eliminate the Railroad Retirement Supplement? Why try so hard to have the Board act by unanimous written consent – to the point that the staff member discussed above felt it necessary to Photoshop Governor

12

amendment confers no discretionary authority upon Amtrak's President and CEO, for example, to increase Plan benefits. In this amendment the Board is saying to management, in effect, "don't bother us with amendments we *have* to make to keep the Plan qualified – we just want to hear about *discretionary* changes."

If the Board wanted to do what Amtrak says it did in this GUST amendment on July 26, 2001 – *i.e.,* hand over its amendment authority -- the amendment would or could have simply said: "The Board hereby amends the amendment provision to delegate its amendment authority to the CEO." Instead, the GUST amendment carefully restricts management's authority to amend only, in effect, where the amendments are required to comply with law or clarify ambiguities that might raise questions about compliance with law – never to add benefits or terms not required by law.

In sum, Defendants' entire "delegation" theory is made-up. At bottom, it rests on nothing more than a jejeune reading of the boilerplate "go-forth-and-implement" language appearing at the end of the July 26th Resolutions (and practically every other board resolution ever enacted) which authorizes the President and CEO to take all necessary steps to implement (and not, *not* implement, if he doesn't like what the Board thinks is appropriate) the three plans adopted that day and spelled out in detail in management's summary. Defendants confuse – intentionally – such proper delegations of implementing authority with the power to make discretionary amendments to the Plan.

\*       \*       \*

If the Board did not amend the Plan on July 26, 2001 but merely delegated to management its discretionary authority to do so, the question arises: when did management

14