## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **WADE F. HALL**,<br>**HATTIE N. MCCOY-KEMP,**<br>**VICTORIA F. STATON,**<br><br>On behalf of themselves and on<br>behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br><br>**RETIREMENT INCOME PLAN FOR**<br>**EMPLOYEES OF NATIONAL RAILROAD**<br>**PASSENGER CORPORATION,** *et al.*<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>: **No. 06-CV-1539 (GK)**<br>:<br>: **Class Action**<br>:<br>:<br>: **Next scheduled Court deadline:**<br>: **Defense opposition/cross-motion**<br>: **February 15, 2006**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## PLAINTIFFS' MOTION FOR PARTIAL
## SUMMARY JUDGMENT UNDER COUNT ONE, AND
## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT</u>

Eli Gottesdiener
**GOTTESDIENER LAW FIRM, PLLC**
1025 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 243-1000
Facsimile: (202) 243-1001

Dated: January 16, 2007          *Attorney for Plaintiffs and the proposed Class*

## **Table of Contents**

Introduction..................................................................................................................... 1

Summary of Argument …………………………………………………………….. 1

I.    The Board Did Not "Act[]" to Amend the Plan on September 14, 2001………………1

    A.    Mr. Warrington did not sign a consent…………………………………….. 4

    B.    Mr. Mineta did not sign a consent……………………………………….. 4

    C.    Governor Holton did not sign a consent…………………………………… 5

II.   The Board Did "Act[]" on July 26, 2001 to Amend the Plan with the VERP………….. 8

Rule 56 Statement of Facts……………………………………………………………. 10

Argument……………………………………………………………………….. 37

I.    The Board's July 26 VERP Resolutions Amended the Amtrak Pension Plan…………. 37

    A.    The Board Amended the Pension Plan with the VERP on July 26…………..... 37

    B.    The VERP was an "Established" ERISA Plan, if not an
        Amtrak Pension Plan Amendment……………………………………………. 40

    C.    Defendants' Delegation Theory Lacks Merit………………………………… 41

II.   The Board Failed to Take Effective Action on September 14, 2001…………………. 45

    A.    Mr. Warrington did not sign a consent………………………………………... 46

    B.    Mr. Mineta did not sign a consent…………………………………………. 49

    C.    Governor Holton did not sign a consent…………………………………… 50

Conclusion…………………………………………………………………………. 52

## INTRODUCTION

In *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995), the Supreme Court held that a purported ERISA plan amendment not adopted in accordance with the plan's amendment procedure is ineffective and that adversely affected participants may sue to have the alleged amendment set aside. *Id.* at 84-85. This is such a case.

Plaintiffs, former employees of Defendant National Railroad Passenger Corporation ("Amtrak," the "Corporation or the "Company") and participants in Amtrak's ERISA-governed defined benefit pension plan, Defendant Retirement Income Plan for Employees of National Railroad Passenger Corporation (the "Pension Plan" or the "Plan"), respectfully move, pursuant to Local Rules 7(h) and 56.1, and Fed. R. Civ. P. 56 and 57, for a declaration under Count One of the Complaint that on September 14, 2001 Amtrak's Board of Directors (the "Board") did not take effective "action" in compliance with the Plan's amendment procedure when it eliminated the most valuable feature of an early retirement plan enacted approximately two months earlier.[1]

## SUMMARY OF ARGUMENT

### I.    The Board Did Not "Act[]" to Amend the Plan on September 14, 2001

With the exception of technical amendments required to keep the Plan compliant with federal tax law, Amtrak's Pension Plan specifies that it can only be amended "by action of [Amtrak's] Board." Ex. 1, Plan § 13.01.[2]

Plan § 13.01's reference to Board "action" is to "action" as defined by Amtrak's governing statutes and bylaws. The statutes are the two statutes, one federal and one District of Columbia, under which Amtrak was incorporated in 1971: the Rail Passenger Service Act of 1970 ("RPSA") and the District of Columbia Business Corporations Act ("DCBCA"), D.C. Code § 29-101.01 *et seq.* Ex. 2 at 1 (Articles of Incorporation).

---

[1] Plaintiffs will address questions of further appropriate relief at a later date should the Court rule in Plaintiffs' favor.

[2] All references to "Ex. _" are to the exhibits attached to the Declaration of Eli Gottesdiener ("Gottesdiener Decl."), filed herewith.

Congress specified in the RSPA that Amtrak is subject to the requirements of the DCBCA (which Congress also enacted, in 1954) to the extent not inconsistent with the RPSA. 49 U.S.C. § 24301(e).

Under the DCBCA, which was modeled after the Modern Business Corporation Act of 1950, a board "acts" or "take[s]" "action" only by holding a lawfully noticed meeting at which the directors present (in person or by telephone) constitute a quorum, and decisions are taken by majority of the directors present and entitled to vote. DCBCA §§ 29-101.36, 101.42(b). This comports with the historical rule that required an actual meeting of the board of directors to take action: under that rule, even if all directors agreed, action taken without a meeting was invalid. *See, e.g,, Baldwin v. Canfield*, 1 N.W. 261 (Minn. 1879). The theory underlying the meeting requirement was (and is) that the consultation and exchange of views is an integral part of the functioning of the board: views may be changed as a result of discussion**,** and the sharpening of minds as a result of joint deliberation improves the decisional process to the benefit of shareholders and the public alike. *See* Model Business Corporation Act Annotated (3d ed., 1996), Volume 2, pp 8-108, 8-109.

Like most jurisdictions, however, D.C. does permit a board to take action without a meeting provided certain procedural safeguards are followed. Specifically, DCBCA § 29-101.136, entitled "Requirements of action without meeting," permits action to be taken by a board without a meeting if "a consent in writing setting forth the action so taken shall be signed by all . . . of the members of the board . . . and such written consent is filed with the minutes of proceedings of. . . the board." DCBCA § 29-101.136.

Because Amtrak's Board held no meeting on September 14, 2001, the validity of Amtrak's attempt on September 14, 2001 to eliminate the Railroad Retirement Supplement feature of the Voluntary Early Retirement Plan ("VERP") the Board adopted on July 26, 2001 (unanimously, and during a lawfully called and convened meeting) turns on whether the Board complied with the DCBCA's unanimous written consent statute. Count One of *Hall II* contends, and the instant motion is intended to demonstrate, that Amtrak indeed failed to comply with the

unanimous written consent statute.  As a result, the Board's purported action of September 14, 2001 replacing the VERP's Railroad Retirement Supplement with a one-time $15,000 lump sum payment was ineffective as a matter of corporate law and, hence, under Plan § 13.01, ineffective under ERISA as well.

Ex. 3 contains what Defendants consider the official Resolutions of the Board from September 14, 2001, copied from the Corporation's formal Resolutions Books.  Ex. 4 (letter from defense counsel).  Ex. 3 consists of nine pages, together with a xerox of a tabbed divider labeled "Sept. 14, 2001."  The nine pages are copies of three different kinds of documents.  First, there is the one-page "Resolutions Authorizing Amendment to the 2001 Voluntary Early Retirement Plan" which state at the bottom that they were "Adopted" on September 14, 2001.  Ex. 3, AMT 15059.  Next, there is a two-page "Executive Summary" which the Resolutions recite is "attached" and is thrice stated as "describ[ing]" or "set[ting] forth" "the terms" of the amended VERP.  *Id.,* AMT 15060-61.  Finally, there is a set of six signed copies of the Resolutions, modified to serve as a signed written consent form:  beneath the Resolutions a line was added on which a "Board Member" could sign his or her name under the word "Approved."  *Id.,* AMT 15062-67.  Each of the six signed modified Resolutions (as modified, to serve as consents) appear to bear the signature of a different Amtrak "Board Member."  *Id.*

However, on September 14, 2001, there were **seven** Amtrak Board members, not six: (1) George D. Warrington, Amtrak's President and CEO; (2) Norman Y. Mineta, the Secretary of Transportation; (3) A. Linwood Holton, former Governor of Virginia; (4) Michael S. Dukakis, former Governor of Massachusetts; (5) John Robert Smith, Mayor, Meridian, Mississippi; (6) Sylvia A. de Leon, a Washington, D.C. attorney; and (7) Amy M. Rosen, a New Jersey executive.

**Three** of these seven Board members – Warrington, Mineta and Holton – did not, on September 14 or ever, sign a consent to amend the VERP.  Without consents signed by each of the seven Board members then in office, the Court is precluded from recognizing what the Board purported to do on September 14, 2001 as valid under the DCBCA or ERISA.

### A.    Mr. Warrington did not sign a consent.

Amtrak did not obtain a signed consent from Mr. Warrington, Amtrak's President and a member of the board without voting power by virtue of his position as President.  49 U.S.C. § 24302(a)(2)(D).  Amtrak did not seek Mr. Warrington's consent because it believed that the fact that Mr. Warrington lacked voting power at Board meetings made his consent to take action without a meeting unnecessary.[3]

While this is certainly one way that DCBCA § 29-101.136 could have been written, the statute is quite clear that action can be taken only when "all members of the board" sign written consents.  No exception is made for a board member who might lack voting power generally or just on the matter at issue (say, due to conflict of interest).

That "all" members of the board really means "all" is confirmed by the other half of DCBCA § 29-101.136 which addresses the requirements for a corporation's <u>shareholders</u> to take action without meetings.  DCBCA § 29-101.136 provides that, whereas "all members of the board" must sign consents to take action without a meeting, only those shareholders "**entitled to vote**" on the matter are required to do so.  The absence of such limitation within the same one-paragraph statute precludes any other interpretation.

### B.    Mr. Mineta did not sign a consent.

Amtrak also did not obtain a signed consent from Mr. Mineta, then Secretary of Transportation.  Amtrak believed that because under the 1997 amendments to the RSPA a sitting Secretary of Transportation, if appointed a director, is permitted by statute to be "represented at Board meetings by his designee," 49 U.S.C. § 24302(a)(2)(ii), he also could be represented by his designee when asked to consent to a particular action without a meeting.  Based on that understanding, Amtrak only sought and obtained the "consent" of Michael Jackson, one of two

---

[3] Amtrak embodied this mistaken belief in a bylaw, Bylaw § 4.12.  *See* Ex. 5.  Amtrak is restricted, however, to enacting bylaws consistent with the DCBCA.  To the extent that Bylaw § 4.12 conflicts with DCBCA § 29-101.136, it cannot be relied upon to excuse Amtrak's failure to obtain Mr. Warrington's signed written consent.

government officials who had represented Mr. Mineta at Board meetings.  *See* Ex. 3, AMT 15065.

Congress certainly could have exempted the Secretary from personal compliance with DCBCA § 29-101.136 as well as the requirement to attend actual meetings but Congress chose not to do so.  The RSPA says that Amtrak is subject to the DCBCA to the extent not inconsistent with the RPSA.  49 U.S.C. § 24301(e).  The DCBCA makes a director's duties essentially non-delegable (as at common law, *e.g., Las Ovas Co. v. Davis*, 35 App. D.C. 372 (1910), *aff'd,* 227 U.S. 80 (1913) ("a director may not legally delegate his powers")).  Thus, as a general rule, the DCBCA does not permit a director, in contrast to a shareholder, to perform actions by proxy.  RSPA § 24302(a)(2)(ii) carves out an exception but only for a sitting Secretary of Transportation (if appointed) and only to allow him or her to be represented "at Board meetings" by a designee.  In the statutory context, these are clearly words of limitation – they cannot be extended to also eliminate the requirement that the Secretary, like any other member of the Board, personally consent to a proposed action <u>in the absence of a meeting</u>.  Congress did not say the Secretary can be represented by a designee in respect to <u>any</u> duties he deemed appropriate, or any duties under the DCBCA:  it said "at Board meetings."

The distinction it creates here is sensible.  Presumably because of his or her busy schedule, RSPA § 24302(a)(2)(ii) relieves a sitting Secretary of the requirement to physically attend meetings, in person or by telephone.  At meetings, minutes are kept and numerous additional procedural safeguards must be observed.  By contrast, there are no or almost no safeguards in the case of unanimous written consents <u>other than</u> the direct involvement of all directors.  Despite what the consent he signed seems to "say," *see* Ex. 3, AMT 15065 (Michael Jackson signing as "Board Member"), RSPA § 24302(a)(2)(ii) did not make Mr. Jackson a "member[] of the board" for purposes of DCBCA § 29-101.136.

**C.    <u>Governor Holton did not sign a consent.</u>**

Governor Holton also never signed a consent to amend the VERP.  *Hall II* Ans. ¶ 30 (admitting same).  Instead, Governor Holton purported to sign his consent, in effect, by proxy, by

having an Amtrak employee, Amtrak Assistant Corporate Secretary and Board liaison John Carten, sign "for" him.

But DCBCA § 29-101.136 is explicit that consents must be "signed by" each director and no reason appears for not applying the statute as written.[4]  To the contrary, via its treatment of shareholders, the statute confirms the importance it places on the "signed by" requirement which it imposes equally on shareholders seeking to take action without a meeting.  Other provisions of the DCBCA relieve shareholders in every other instance of the requirement to sign or take action personally.[5]  The fact that the statute compels them to personally provide signed consents to otherwise take action without a meeting underscores the premium the statute places on action taken at meetings and that action taken without a meeting should be the exception not the rule.

Requiring each director (or shareholder entitled to vote on the matter) to personally manifest his or her agreement to forego a meeting and take the action set forth in the consent by themselves signing on the dotted line helps ensure that when action is taken without a meeting it is truly because in the considered judgment of each director (and shareholder entitled to vote on the matter) that the meeting would not and could not serve any useful purpose.

The facts here show how important or potentially important the signature requirement can be.  Governor Holton authorized Mr. Carten to sign "for" him after a brief telephone conversation, having been given (like the other directors) no prior notice whatsoever that management considered there was anything wrong with the VERP the Board had unanimously adopted in July, and without either having personally received or read the Resolutions or Executive Summary.  Stmnt. ¶ 61.  He was thus "wholly reliant" on a report from an employee

---

[4] *See, e.g., EAW Group, Inc. v. Republic of Gambia*, Civ. No. 02-2425 (GK), 2006 WL 3361544, *6 (D.D.C. Nov. 20, 2006) (applying "the plain and unambiguous terms" of another portion of the DCBCA).

[5] The DCBCA lets shareholders attend meetings by proxy, vote by proxy, sign proxies by proxy – and even provide signed, written consents to dissolve the corporation by proxy.  DCBCA § 29-101.31(a) (at meetings shareholders may be represented in person or by proxy for purposes of constituting a quorum); § 29-101.27(e) (shareholder may vote either in person or by proxy executed in writing by the shareholder or by his duly authorized attorney in fact); § 29-101.77(5) (written consent to dissolve corporation may be signed by shareholders "or signed in their names by their duly authorized attorneys").

who had no involvement in the development of the VERP and could not have answered any of the Governor's questions if the Governor had had any. *Id.* ¶ 63. (Neither the Governor nor Mr. Carten memorialized their call. *Id.*). As it happens, the Governor appears to have misunderstood the nature of the amendment management sought to make to the July 26 VERP: he testified that he thought management simply wanted to reduce the value of the benefit **"somewhat,"** *id.* ¶ 64, when the fact was that management wanted to cut the value of the promised July 26 benefit by more than half.

A careful reading of the Executive Summary may have revealed that or caused the Governor to want to know more since the whole point of the VERP was to save Amtrak cash by leveraging the Pension Plan's assets (then running a substantial surplus) to incentivize older, long-serving employees to get off Amtrak's payroll years before it otherwise made economic sense for them to do so, *id.* ¶1: if the VERP were cutback too much, the centerpiece of the Company's 2001 restructuring effort would not accomplish its objective.

And indeed that was what happened: Amtrak expected fully 70-85% of the 375 eligible employees to have retired under the July 26 VERP (with the Railroad Retirement Supplement) but, once the Railroad Retirement Supplement was eliminated, only 20% of eligible employees found it adequate enough to leave. *Id.*. ¶ 78. Amtrak may have extended its Pension Plan contribution "holiday" for a few more years, *id.* ¶ 55 & n.15, but at the expense of retaining employees it could not longer afford.

Of course there is no way to know if Governor Holton -- or Mr. Warrington, who presented the Board with the July 26 VERP and was apparently uninvolved in the decision to ask for September 14 amendment -- or Mr. Mineta, who Mr. Jackson may or may not have consulted before signing and faxing back "his" consent -- would have declined to sign consents had they been placed before them. Likewise, there is no way to know if the VERP would have been reduced (or reduced as much as it was) if one of them had not signed and a meeting would have had to be held. (The facts show there was no reason a special telephonic meeting, which like all meetings would have only required a quorum of four, Bylaw § 4.08, could not have been held in

the first place, *id..* ¶ 53).  But rules and procedures must be followed precisely so that important decisions can be taken and implemented without those adversely affected left forever wondering what "might have been" had things been done the right way.

Based on the fact that Mr. Warrington, Mr. Mineta and/or Governor Holton did not sign consents to amend the VERP, the Court should find that the Board failed to take valid "action" on September 14, 2001 to eliminate the Railroad Retirement Supplement from the Amtrak Pension Plan.[6]

## II.    **The Board Did "Act[]" on July 26, 2001 to Amend the Plan with the VERP.**

Amtrak agrees with Plaintiffs, albeit based on different reasoning, that on September 14, 2001 the Board did not amend the Pension Plan.  *See, e.g., Hall II* Ans. ¶ 19.  Defendants contend, however, that this still entitles Plaintiffs to nothing because, Amtrak says, the Board never added the VERP as an amendment to the Pension Plan in the first place.  *Id.* ¶ 17.  This contention is without merit.

Defendants claim that what the Board did on July 26 was "merely delegate[]" to management the Board's otherwise sole and exclusive discretionary authority to amend the Pension Plan.  Defs. *Hall II* Mtn. to Stay (Doc. 8) at 2.  As of September 14, however, "[m]anagement [had **n[ot] [yet] acted** upon** its delegated authority to amend the Amtrak Retirement Plan to include a Railroad Retirement Supplement." *Id.* (emphasis added).  Then, on September 14, management had the Board act by unanimous consent to amend the prior delegation of the Board's amendment power.  Defs. *Hall I* SJ Reply (Doc. 91) at 25-27.  The

---

[6] Plaintiffs note that it makes no difference for purposes of the litigation whether the Court concludes that on September 14, 2001 the Board failed to amend the Pension Plan as the Pension Plan had been amended on July 26, 2001 through the addition of the VERP, or whether it failed to amend the July 26 VERP if the VERP is considered a separate ERISA plan "established" informally, (as Plaintiffs argue below in the alternative).  Either way, the benefit was never validly eliminated from an ERISA plan in which Plaintiffs were participants or eligible to participate.  To be sure, Plaintiffs regard the July 26 VERP as a Pension Plan amendment and the purported action of September 14 as a **second** purported amendment of the Pension Plan (to modify the prior VERP amendment).  However, below, Plaintiffs refer interchangeably (as Amtrak did at the time) to the September 14 purported action as a purported amendment of the VERP, as well as a purported amendment of the Pension Plan's previously adopted (on July 26) VERP provisions.

Board, according to this version of events, never amended the Pension Plan to add the VERP, not in July nor in September:  *management*, not the Board, amended the Pension Plan but not until November 30, 2001, when an Amtrak Human Resources Vice President (Lorraine Green) signed a formal instrument describing the September 14 reduced VERP.  *Id.*; Defs. *Hall I* SJ Mtn. (Doc. 85) at 26-27.   This was after the close of the September 15-October 31st early retirement window, after the November 1st retirement of all persons who elected the reduced VERP, and after the Pension Plan had already disbursed to those participants over $1 million in one-time lump sum distributions.

Defendants' recasting of the facts (largely undisputed) is unpersuasive.  First, it is fanciful to suggest that the Board did not amend the Pension Plan on July 26 with the VERP but instead delegated to management the Board's sole and exclusive discretionary power to amend the Plan (or not) in that respect.  Especially given that it had already at least once amended the Pension Plan, in 1994, to include a VERP with a Railroad Retirement Supplement, Ex. 1, Pension Plan § 4.06, the Board's intent on July 26, 2001 to <u>itself</u> amend the Pension Plan again with a new VERP is clear.  The Board's Resolutions and Meeting Minutes from July 26, 2001 are unambiguous:  at a formal Board meeting, following a written and oral presentation by Mr. Warrington and Amtrak's Chief Financial Officer, including a detailed term sheet ("Executive Summary") specifying the Pension Plan as the source of the VERP's funding, the Board voted unanimously to "authorize and approve" a plan that operated directly upon eligible participants' Amtrak Pension Plan benefit by, among other things, subsidizing that benefit through the addition of five years of age to the calculation of participants' pensions.  No other sense can be made of the Board's action other than that it intended to amend the Pension Plan with the VERP.

Any doubt that the Board amended the Plan that day with the VERP is dispelled by Amtrak itself, which between July 26 and September 14, 2001 repeatedly stated, through its directors, officers, employees, and counsel, that the Board <u>did</u> amend the Pension Plan on July 26, that the VERP <u>was</u> officially adopted, and that <u>no</u> additional approval was necessary and

indeed any deviation from the terms of the Plan as announced and adopted by the Board <u>would violate the law</u> and jeopardize the Plan's tax-qualified status.  *See, e.g.,* Stmnt. ¶¶ 18-48, 68-77.

By contrast, there is no admissible, objective documentary evidence to support Amtrak's contention that on July 26 (and again on September 14) instead of amending the Plan itself the Board delegated its discretionary power to amend the Plan to management.  This would not have been possible even according to Amtrak's version of events:  such a delegation, under Plan's amendment clause, would have itself required a Plan amendment, which Amtrak says did not happen on July 26 (or September 14).

Amtrak's delegation theory, under which the Board never amended the Pension Plan, was developed only once it was revealed during discovery in *Hall I* that the Board failed to amend its July 26 amendment on September 14.  Prior to that time, Amtrak represented to the IRS that Amtrak's Board had amended the Plan on September 14 (though Amtrak did not disclose to the IRS that the Board had also taken action with respect to the VERP on July 26).  Stmnt. ¶¶ 83-84.  And prior to that time Amtrak only sought dismissal in *Hall I* on the theory that the Railroad Retirement Supplement was not a protected benefit – it did not argue then that the VERP with the Railroad Retirement Supplement had never made it into the Pension Plan in the first place.  Defs. *Hall I* Mtn. to Dismiss (Doc. 8).

Changes in position cannot change the facts or their legal implications:  the VERP with the Railroad Retirement Supplement <u>did</u> get added to Pension Plan on July 26 and did <u>not</u> get validly eliminated by a second purported amendment on September 14.

## RULE 56 STATEMENT OF FACTS

### Background to the July 2001 VERP

1.    In 2001, "Amtrak was contemplating a workforce restructuring as a means to achieve costs savings.  Part of this restructuring meant a significant downsizing of management employees."  Defs. *Hall I* SJ Mtn.at 4.  "On or about May 2001, Amtrak's management requested that the Plan's actuaries design a proposal that contemplated various early retirement options."  *Hall II* Ans. ¶ 12.  To the extent possible, Amtrak wanted to fund what became the

"Voluntary Early Retirement Plan" ("VERP") out of "excess pension assets."  Ex. 6 (actuaries'
presentation:  "Utilizes excess pension assets – saves Amtrak cash").[7]

2.    On May 17, 2001, Amtrak's Director of Compensation & Benefits Warren Reisig,
who was chiefly responsible for the design of the VERP and Amtrak's point of contact with the
Plan's actuaries (from Aon Consulting ("Aon")), discussed the steps he was taking regarding the
plan in an email to Amtrak's Vice President for Human Resources Lorraine A. Green.  Ex. 7.
One of the "broad steps" necessary for the early retirement window, Reisig explained, was:
"**Seek Board of Director approval** (retirement plan as well as Board's statement of policy
**require** seeking Board approval)."  *Id.* (emphasis added).

3.    Three days earlier, Mr. Reisig made the same point, about required Board
approval, regarding a proposed change to the 401(k) Plan.  Mr. Reisig noted in another:
"Savings Plan document **requires a board action** to change the match (see attached article
13.01 of the plan document)."   Ex. 8.  As it happens, the Pension Plan and 401(k) Plan not only
have similarly worded amendment provisions, requiring Board action, but they are each
contained in § 13.01 of the two respective plans.  Ex. 9 (Saving Plan extract).

4.    Amtrak received presentations from Aon in late May.  Ex. 10.  "Numerous
conference calls" between Amtrak and Aon took place "during June and early July to work
through various logistical issues and designs being discussed by Amtrak senior management."
Ex. 11.

5.    On July 16, 2001, Reisig told Aon:  "Amtrak will be going forward with the early
retirement window, **pending Board approval on July 26.**"  Ex. 12.  July 26, 2001 was the date
of the Board's next scheduled, regular meeting.

6.    The same day that Mr. Reisig informed Aon that Amtrak was moving forward
with the early retirement window pending Board approval on July 26, an Amtrak document

---

[7] The use of plan assets for such corporate purposes is not impermissible.  *See, e.g., Hughes Aircraft Co.
v. Jacobson,* 525 U.S. 432 (1999).

created or modified that day (according to "metadata" produced along with an image of it, Gottesdiener Decl. ¶ 13), entitled "Staff Reduction Options" also reflects management's recognition that "**Board approval is necessary**" to add an "Early Retirement Window" to the Pension Plan.  Ex. 13.  "Staff Reduction Options" further asserts:  "**Assuming Board approval** in July, retirement date for employees who elect this option will be 12/1/2001."  *Id.*

**The July 26, 2001 Board action amending the Pension Plan with the VERP**

7.    In keeping with customary practice, Ex. 14, Carten Tr. 76-77; Ex. 15, Serfaty Tr. 57, in advance of the July 26, 2001 Board meeting, management sent each Director a briefing book with materials relevant to the upcoming meeting.  Ex. 16.  Management explained that it would be seeking Board approval of a VERP with a Railroad Retirement Supplement described, in part, as follows:  "Eligibility:  All active management employees age 55 or older with 10 years or more of Amtrak service."  "Design": -"Employee receives an additional 5 years of age to pension formula – Employee is provided a monthly supplement equal to railroad retirement annuity until employee is able to commence full benefit with railroad retirement with no reductions for early retirement."  *Id.*  Management also specified:  "Funding: costs are to be paid out of **the Amtrak Retirement Plan."**  *Id.*[8]

8.    The briefing book also separately discussed the two other plans management had developed to downsize management employees not eligible for the VERP.  One, the Voluntary Separation Plan ("VSP"), which was set to run from August 1 to August 24 and would be paid out of current "operating expenses"; the other, the Involuntary Separation Plan ("ISP"), to be completed on November 1 and also to be funded out of "operating expenses."  *Id.*

9.    The Board had previously approved a VERP with a Railroad Retirement Supplement in 1994, during an earlier downsizing effort.  *See Hall I* Ans. ¶ 13.  The 1994 VERP was also funded out of the Pension Plan and its provisions were directly incorporated into the

---

[8] The description of the proposed VERP also discussed the window period (September 15-October 31) during which eligible employees would elect to retire, the effective date of their retirement (November 1), the need for employees to execute election and release forms and employees' eligibility for the retiree medical plan.  *Id.*

Pension Plan document's last restatement, dated December 30, 1994.  Ex. 1, Pension Plan, pp.

36-37, § 4.06 ("Voluntary Early Retirement Plan").  As amended, the 1994 restated Pension Plan

was the same document Amtrak's Board would have had available to it on or about July 26,

2001.  (The 1994 restated Plan, as amended (and purportedly amended), continues to serve as the

Pension Plan's basic plan document.  Gottesdiener Decl. ¶ 1)

10.    The July 26, 2001 meeting was attended by five of the seven directors then in

office (Warrington, Holton, Dukakis, Rosen, de Leon), plus Mr. Mineta's designee Michael

Jackson.  Ex. 17 (official Minutes).  Mayor Smith was absent.  *Id.  See* Ex. 18 (materials

establishing Board's composition on this date, other dates in 2001 and other years).

11.    The Board received written and oral presentations concerning the VERP and

proposed Voluntary and Involuntary Severance Plans by Mr. Warrington and Amtrak's Chief

Financial Officer.  Ex. 17.  Management's "Executive Summary," incorporated into the

Resolutions once adopted by the Board later in the meeting, set forth the terms of the VERP in

essentially the same detail as the directors received prior to the July 26 meeting.  Ex. 19

(Executive Summary); *see also* Ex. 20 (slightly different version of Executive Summary).[9]

12.    Management explained that, if approved, the VERP **"will be funded out of**

**Amtrak's Retirement Income Trust**," Ex. 19-20, that is, out of the Pension Plan's assets,

which as of July 30, 2001 were running a $35 million surplus. Ex. 21.

13.    The Board was told the VERP could cost from $9-12 million, Ex. 19, or $5.9

million if 100 employees elected it, $11.7 million if 200 employees elected it, and $17.6 million

if 300 employees elected it.  Ex. 20.

14.    By a vote of 5-0, the Board adopted the VERP, the Voluntary Severance Plan and

the Involuntary Severance Plan in one combined set of Resolutions that incorporated by

---

[9] It is not clear which of these two versions of the Executive Summary the Board received or is attached
to the Resolutions.  Defendants contend that Ex. 19 is the one presented to the Board but there are
indications in the record that it was Ex. 20 that went to the Board.  Gottesdiener Decl. ¶ 20.  For purposes
of this motion, the difference is immaterial because the terms of the VERP as set forth in both Executive
Summaries are identical and identically worded.  They differ only, as regards the VERP, in the way in
which they present cost estimates for the program.

reference management's Executive Summary setting forth the terms of three Plans.  Ex. 22 (Resolutions); Ex. 17 (Minutes) at p. 12 (AMT005027).

15.    The July 26 Resolutions specifically state that the Plans including the VERP as set forth in the attached and incorporated Executive Summary "are **authorized *and* approved.**" Ex. 22 (emphasis added).  The Resolutions conclude by authorizing the President and CEO to take "all necessary steps to implement" the Plans "described in the attached Executive Summary."  *Id.*

16.    Neither the Resolutions nor management's recommendation that they be adopted were made contingent on a continued Pension Plan overfunding or any particular level of overfunding still then existing at the point of implementation.  Exs. 19, 21-23 *passim.*

17.    The Resolutions do not say anything about the Board delegating to management the authority to amend the Pension Plan or vary the terms of the VERP as set forth in the Executive Summary.  The Resolutions also do not require or direct that the President and CEO return to the Board for further authorities or direction before exercising the authority the Resolutions confer on him to implement the VERP "described in the attached Executive Summary."

**Amtrak's Pre-September 14 Admissions Re the July 26 VERP Pension Plan Amendment.**

18.    The day after the Board's July 26 meeting, Friday, July 27, Mr. Warrington sent all employees an "Employee Advisory" informing them that in connection with Amtrak's restructuring "voluntary separation and early retirement incentives will be offered to 2,900 eligible employees beginning almost immediately."  Ex. 23.  He added:  "The details of these incentives will be provided to affected employees early next week."

19.    In the meantime, stories about Amtrak's offer began running in major newspapers across the country.  *See, e.g.,* Ex. 24, *Boston Herald,* "Report:  Empty Seat Plague N.Y.-to-Hub Acela Line, Sunday, July 29, 2001 ("Amtrak announced a major corporate restructuring on Friday that includes a buyout of 2,900 management employees.  The buyout offers will start next week….").

20.     On Monday July 30, 2001, Amtrak sent all employees eligible for the VERP or the Voluntary Severance Program a six-page letter from Lorraine Green, communicating the terms of the two plans and discussing the possibility of involuntary separation. Ex. 25. Regarding the VERP, Amtrak represented that the VERP would "[a]dd five years to your age when computing your Retirement Income Plan (pension) benefit" and would "[p]rovide you with a supplement equal to your full-unreduced Railroad Retirement Annuity.  Amtrak will pay the supplement until you are able to receive your full Railroad Retirement Annuity benefit."  *Id.* Nothing in the July 30 letter states or implies that there was anything tentative about the VERP's design.  Nothing in the July 30 letter states or implies that its key feature, the Railroad Retirement Supplement, was subject to change or revocation by management.  On Tuesday, July 31, Amtrak posted Ms. Green's letter on the Company intranet.   Ex. 26.

21.     Throughout August 2001, Amtrak made statements directly and indirectly admitting that the Board had amended the Pension Plan on July 26 in approving the VERP; that no additional approval was needed for the VERP to become official; that as part of the Pension Plan the VERP's terms had to be faithfully followed; and that if the Company deviated from the terms of the VERP, the Pension Plan's tax qualified status might be jeopardized.[10]

22.     For example, on August 1, 2001, Mr. Reisig asserted that the VERP had been made part of the Amtrak Pension Plan when he told employee "AJ" in response to AJ's inquiry, copying Ms. Green, that there could be no exceptions to the VERP's stated eligibility requirements:  "The eligibility requirements for the voluntary early retirement plan require an employee to be age 55 (or older) with 10 years of service as of 10/31/01. **The Amtrak pension plan** must follow certain rules in order to maintain its approved status from the Internal Revenue

---

[10] Defendants in neither *Hall I* or *II* produced any documents stating, suggesting or implying that Amtrak or any Amtrak director, officer, employee, or lawyer during this time believed that on July 26 the Board had merely delegated to management the discretionary authority to amend the Pension Plan to add a VERP or not, or to exercise discretionary authority with respect to the VERP's design.  Gottesdiener Decl. p.2.

Service.  Therefore we are unable to make exceptions with regards to **the pension plan**."  Ex. 27 (emphasis added).

23.    Also on August 1, 2001, Mr. Reisig made similar statements regarding the VERP's incorporation into Pension Plan to "LW" who missed satisfying the 10 year service requirement by 8 months and to "EM" who missed satisfying the age criterion by 9 days:  "In order for **the plan** to maintain its approved status with the Internal Revenue Service we are unable to make any exceptions to this rule." Ex. 28; Ex. 29.

24.    On or about August 5, 2001, in response to an email from "ST" who had specifically asked "can we count on it [the VERP] really happening," Ex. 30, Mr. Reisig stated: "The VERP has been approved by the Amtrak Board of Directors.  **There is no additional approval needed for this to happen.**"  Ex. 31.

25.    On August 6, 2001, Mr. Reisig also told "BH" that the VERP's terms were final and incorporated into the Pension Plan and therefore could not be altered to accommodate his personal circumstances:  "I understand that you turn 55 on November 5, 2001.  **Pension plans like the Amtrak pension plan** follow IRS guidelines and we must adhere to them in order to maintain the pension plan's approved status with the IRS.  **Making exceptions to the approved voluntary early retirement plan** would jeopardize the plan's approved status with the IRS. Unfortunately we are unable to make an exception for you."  Ex. 32.

26.    On August 9, 2001, Reisig forwarded colleagues with responsibilities for employee communications "a series of Q&A's for posting to the Intranet" regarding the VERP. Ex. 33.  Reisig specified that he would have to specifically approve any edits because "[t]he information is rather technical and a change of a word may alter the answers to a[] [question] and cause **the pension plan** to be disqualified by the IRS."  *Id.* (emphasis added).  The "Q&A's" related solely to the VERP, making clear Reisig's view that the VERP was part of the Pension Plan.

27.    On August 9, 2001, Amtrak's outside ERISA counsel, Piper Marbury Rudnick & Wolfe (now DLA Piper, litigation counsel to Defendants in *Hall I* and *II*), forwarded Mr. Reisig

"a sample letter to participants explaining why Amtrak cannot vary the eligibility criteria for the early retirement window." Ex. 34. According to the Piper Marbury sample letter (reproduced here in its entirety):

> You have asked whether Amtrak can vary the terms of the 2001 Voluntary Early Retirement Plan in order to allow you to participate. Unfortunately, the laws governing our retirement plan prohibit us from making any exceptions.
>
> The Retirement Income Plan for Employees of National Railroad Passenger Corporation must comply with the rules for retirement plans in the Internal Revenue Code and the Employee Retirement Income Security Act (ERISA). Under those rules, a retirement plan must have a written plan document, and the plan must be administered according to its written terms. **In order to make any design changes, such as an early retirement window, <u>Amtrak's Board of Directors</u> must amend the written plan document.**
>
> **<u>The amendment adopted by the Board of Directors</u>** requires active participants to have attained age 55 or older and completed at least 10 years of service by October 31, 2001 in order to participate in the voluntary early retirement plan. **If Amtrak administers the voluntary early retirement plan under any other criteria, it will violate both the Internal Revenue Code and ERISA provisions requiring adherence to the written plan document.**

*Id.* (emphasis added). The "amendment adopted by the Board of Directors" refers to the Board's July 26 action, and the plan in question whose written plan document had been so amended refers to the Pension Plan (the "Retirement Income Plan for Employees of National Railroad Passenger Corporation" referenced in the first line of the letter).

28.    The Piper Marbury letter was forwarded to Amtrak by the same Piper Marbury lawyer who, according to one of Defendants' privilege logs, advised management as late as July 22 as to the form and content of the VERP proposal management presented to the Board on July 26. Ex. 35 at p.1, Doc. #10.

29.    Amtrak began using language from the Piper Marbury letter almost immediately in communications with employees. Thus, on August 10, 2001, Mr. Reisig sent retiree "JB" a letter responding to his inquiry as to whether Amtrak could permit him to retroactively participate in the VERP. Ex. 36. Reisig explained that this was not possible for all the reasons stated in the Piper Marbury letter. He open copied Amtrak's Deputy General Counsel for Labor

and Employment William Herrmann and HR Vice President Lorraine Green. *Id.* Neither Mr. Herrmann nor Ms. Green expressed any disagreement with any of the statements contained in the letter, in any further communications with JB or any other communications regarding these matters prior to the initiation of litigation in *Hall I.* Gottesdiener Decl. ¶ 36.

30. Sometime between August 10 and August 14, 2001, Mr. Herrmann specifically concurred in the explanation stated in the Piper Marbury letter. On August 10 at 10:00 a.m. Mr. Reisig asked Mr. Herrmann to review Mr. Reisig's draft response to retiree BB who had made an inquiry similar to JB's. The letter that Mr. Reisig eventually forwarded to BB open copies Mr. Herrmann and utilizes the text of the Piper Marbury letter word-for-word. Ex. 37.

31. On August 10, 2001, Mr. Reisig responded to LZ who had explained: "I am interested in the early retirement package. I turn 55 November 1st. <u>I was born 12:05 a.m. so I</u> <u>miss the cut off by 5 minutes</u> but since the package is effective November 1st, I thought an exception could possibly be made. Please let me know if something could be done and if I could appeal to someone. Thank you for your consideration." Ex. 38. Mr. Reisig said in reply in effect that management was powerless to bend the rules, that only the Board of Directors could amend the Pension Plan, and that as it stood under the amendment adopted by the Board adding the VERP (referring to July 26), LZ did not qualify for the benefit. *Id.*

32. On or about August 13, 2001, Amtrak posted on the Company's intranet "Early Retirement Frequently Asked Questions," discussed in ¶ 26, *infra.* Ex. 39. In the answers to the frequently asked questions, Amtrak presented the VERP with Railroad Retirement Supplement as an established fact. For example, in response to a question about when additional information about the VERP would be provided, Amtrak stated that employees would receive additional information the second week of September including "A statement showing the amount of your monthly pension and the amount of the monthly railroad retirement supplement <u>you will receive</u> if you elect to participate in the VERP." *Id.* at 1 (emphasis added).

33. In response to a question asking for more information about the Railroad Retirement Supplement, Amtrak also stated that: "Amtrak <u>will</u> provide you with a supplement

equal to your full railroad retirement annuity based on credited service earned under the railroad retirement system as of December 31, 2000. This includes your Tier 1 and Tier 2 benefits. Amtrak <u>will</u> pay the supplement monthly until you are able to receive your full Railroad Retirement Annuity benefit as stated below." *Id.* at 2 (emphasis added).

34.    The Company further explained that assuming a Full Railroad Retirement Annuity commencing at age 66 of $2,000 per month, "[t]hen Amtrak <u>will</u> pay you a railroad retirement supplement of $2,000 per month until age 66. Once you reach age 66 you may begin receiving your annuity from the [R]ailroad [R]etirement [B]oard and the Amtrak supplement stops." *Id.* Nothing in the questions-and-answers contains any suggestion that the VERP was subject to later modification by management acting in its discretion.

35.    On or about August 13, 2001, two participants, writing separately, each asked whether if they accepted the VERP they could be certain that they would receive "all of the supplement[al] payments that Amtrak is committing to?" Mr. Reisig responded to both participants by stating: "**Funding for the VERP is from the Amtrak pension plan**. <u>Your benefit is protected</u> by the Pension Benefit Guaranty Corporation." Ex. 40.

36.    On August 15 and 16 , 2001, Reisig exchanged a number of emails with employee "JJ" which culminated in Reisig again representing that the Board had amended the Pension Plan on July 26, 2001 to add the VERP using specific criteria that management could not alter and had to follow, lest the Pension Plan's tax qualified be jeopardized. Ex. 41.

37.    On August 16, 2001, Mr. Reisig fielded an inquiry from "AF" who was considering electing the VSP or the VERP and concerned he did not have enough information to do an accurate comparison prior to date by which he would have to elect the VSP (August 24). Ex. 42. Mr. Reisig told AF, however, that "there is no comparison between the VERP and the VSP. **The VERP is a much richer benefit**." *Id.* Addressing AF's stated concerns about the availability of future funding for the Railroad Retirement Supplement aspect of the VERP, Mr. Reisig said: "**[t]he funding of the railroad retirement supplement is from the pension plan assets** and <u>your payment is insured</u> by the pension benefit guaranty corporation." *Id.*

19

38.    On August 16, 2001, Reisig forwarded to Mr. Herrmann, Ms. Green and several other colleagues a copy of a VERP booklet for eligible employees that had been in preparation since July 30, 2001, shortly after the Board authorized and approved the VERP, to be sent to them in early September with individualized calculations.  Ex. 43.  In the booklet, Amtrak presented the VERP with Railroad Retirement Supplement as an established fact with no mention of any aspect of the VERP being subject to subsequent change by management.  *Id.,* Booklet at 5-6.  In forwarding the booklet, Mr. Reisig said:  "Attached is a copy of the booklet describing the VERP that ***will*** be mailed to eligible employees in early September."  *Id.* (emphasis added).

39.    Mr. Reisig discussed the VERP in the same manner in email exchanges with Treasurer Dale Stein that same day (August 16, 2001).  Ex. 44.  Mr. Reisig noted that although the VERP with the Railroad Retirement Supplement was estimated to cost the Pension Plan a total of $23.5 million at 100% participation (375 participants) ($8.6 million for the addition of five years of age to the Amtrak Pension Plan benefit, and $14.9 million for the Railroad Retirement Supplement), Amtrak and Aon believed that "we should still have a pension holiday for a couple more years."  *Id.*  He added: "this does not take into account [possible] stock market [losses]" as well as the fact that the estimate of the Railroad Retirement Supplement's cost "may be a bit low."  *Id.*  He noted he had asked Aon to review the Railroad Retirement Supplement's cost for that reason again.  *Id.*

40.    On August 22, 2001, Mr. Reisig responded to "GB"'s complaint that as an older employee, he would not benefit equally from the VERP as his younger, similarly situated colleagues.  Employing the language Piper Marbury used to explain the situation (*i.e.,* detailing how the Pension Plan had been amended on July 26 with the VERP from which terms management could not deviate), Mr. Reisig told GB that the Board had spoken and he could do nothing to alter the terms of the VERP.  Ex. 45**.**

41.    On August 22, 2001, Mr. Reisig told "TS" that an alternative VERP, as several people had suggested, that would allow employees to benefit from an expected, impending

change in the Railroad Retirement law was not possible: **"[t]he amendment to the pension plan that the Amtrak Board approved states** that employees electing the VERP must retire effective 11/1/01," as opposed to the later date called for under the alternative TS proposed. Ex. 46. Mr. Reisig said nothing about a delegation from the Board to management of authority to issue a different Pension Plan amendment if management thought that advisable.

42.    On or about August 23 or August 27, 2001, Deputy General Counsel Herrmann, copying George Warrington and blind copying Amtrak General Counsel James Lloyd, wrote to retiree "BPB" in pertinent part as follows: "You also requested that Mr. Warrington make an exception to the terms of the Voluntary Early Retirement Program ("VERP") to permit you to take advantage of its early retirement option. **The VERP was created as a qualified employee benefit plan** and as such Amtrak must adhere to its terms and conditions. Under the terms of the VERP, an employee must be currently employed, must be 55 years or older by October 31, 2001, and must retire between September 15, 2001 and October 30, 2001. Unfortunately, no exceptions can be made to the VERP's terms and conditions." Ex. 47. From materials produced in discovery, it appears neither Mr. Warrington nor General Counsel Lloyd dissented from any of Mr. Herrmann's statements. Gottesdiener Decl. ¶ 47.

43.    On August 24, 2001, Aon and Amtrak (represented by Mr. Reisig and Deputy General Counsel Herrmann) conferred by telephone. Ex. 48. The conversation concerned the discovery that Amtrak and/or Aon had underestimated the true cost of the Railroad Retirement Supplement. *Id.* Aon explained that with actual participant data in hand, supplied by the Railroad Retirement Board, the Supplement would cost many million dollars more than Amtrak and Aon had thought. *Id.* But Reisig and Herrmann rejected any talk of modifying the VERP, as one of Aon's actuaries contemporaneously recorded: "Reisig and Herrman said **design would not change, all details were already 'out there'** and people were pushing for even more enhancements. **They did not ask for updated cost on that basis**." *Id.* (emphasis added).

44.    Materials sent to the Board around August 24, approximately a week before its regularly scheduled August 30 meeting, also discuss the VERP as an accomplished fact, waiting

to be implemented, with the only unknown variable being how many employees would retire under it:

"Program material has been distributed to all eligible employees – Human Resources is currently preparing individual analyses for eligible employees – Notice and review period required for eligible employees means that results will not be known until the end of September – **Anticipate that most of the 360 eligible employees will take advantage of the program**."

Ex. 50 (emphasis added).  Management said nothing to the Board about how it might exercise any authority the Board may have delegated to it to make discretionary amendments to the VERP or Pension Plan.

45.    On August 29, 2001, Mr. Reisig circulated among senior managers a one-page document entitled "Voluntary Early Retirement Plan Update," intending that it be given to Amtrak's Board the following day.  Ex. 49.   In pertinent part, the document states: "[b]ased on updated information we estimate that the Voluntary Early Retirement plan will cost $25 million, assuming a participation rate of 50%.  **Although we do not believe this will place <u>the pension plan</u> in an under funding position**, the pension plan's pension contribution holiday will be shortened.  If a greater percentage of employee[]s participate and the stock market continues to decline the potential exists that Amtrak will need to make a contribution to the pension plan in 2003.  The actual cost of the Voluntary Early Retirement Plan will not be known **until we know which employees elect to participate in the plan**."  *Id.* (emphasis added).  Nothing in this document suggest the VERP is subject to discretionary changes management may see fit to make.

46.    Management did not provide the Board with a copy of the "Update" on August 30 or disclose to the Board until September 14, 2001 that it had discovered that Amtrak and/or Aon had underestimated the cost of the Railroad Retirement Supplement.  Gottesdiener Decl. ¶ 49.  Amtrak's then-General Counsel Alicia Serfaty testified that although management was aware as of August 30 that a "mistake" had been made with respect to the cost of the VERP, management decided it was "too soon" to let the Board know.  Serfaty Tr. 99, 101.  Accordingly, the August 30 minutes reflect that there was relatively little discussion regarding the VERP and certainly

22

nothing about any need for the Board to revisit what it did in July.  Ex. 51 at p. 5 ("Mr.

Warrington briefed the Board on the status of the Voluntary Separation and Voluntary Early

Retirement Programs").[11]

47.     On August 30, 2001, Mr. Reisig responded to "BM"'s request to be permitted to

participate in the VERP.  Ex. 52.  Reisig denied the request, explaining that:

**Amtrak's Board of Directors approved an amendment to Amtrak's pension plan** to allow
the company to offer the VERP.  **The amendment that was approved stated** that in order to be
eligible to participate in the VERP an employee must be an 'active participant' of the Amtrak
pension plan. . . . You are not earning credited service in the pension plan in your current
position with Amtrak and you are not an active participant of the pension plan. Therefore you are
not eligible to participate in the VERP."

*Id.* (emphasis added).

48.     On September 5, 2001, Amtrak's Executive Vice President for Operations, E.

Stanley Bagley, wrote a letter to retiree BB, blind copying Lorraine Green, denying her request

to participate in the VERP.  Ex. 53.  Mr. Bagley's letter states:

 "I've looked into your request that Amtrak grant an exception to the rules of the Voluntary Early
Retirement Program. Unfortunately, my attorneys advise me that the law is very clear that there
can be no exceptions granted to **a retirement plan**. The plan documents must be followed to the
letter and any exception would subject Amtrak to significant liability.  While we cannot grant
your request, I want to personally thank you for your 30 years of service to Amtrak."

*Id.* (emphasis added).

49.     On September 6, 2001, in preparation for the scheduled September 12, 2001

Board meeting, management circulated the agenda and related materials to each of the Directors.

Ex. 54.  Consideration of the VERP or an amendment to the Pension Plan or VERP was <u>not</u> one

of the listed items – apparently because management believed it was still "too soon" to inform

the Board that a "mistake" had been made.  Serfaty Tr. 99, 101.

---

[11] Without comment, the Board approved the minutes reflecting the Board's July 26, 2001 authorization
and approval of the VERP.  *Id.* at p. 2 (AMT005006).

**Management's attempt to have the Board re-amend the Pension Plan.**

50.     On September 8 and 10, 2001, management held conference calls regarding the VERP.  Ex. 55.  Management concluded no later than September 10 to ask the Board during its September 12 meeting to "amend" the VERP by eliminating the Railroad Retirement Supplement and replacing it with a one-time $15,000 lump sum payment.  *See, e.g.,* Ex. 56.  The addition of 5 years of age to calculation of participants' Amtrak Pension Plan benefit was to remain unchanged.  *Id.*

51.     Even then, no effort was made to apprise the Board in advance of the scheduled September 12 meeting that the VERP was to be added to the agenda and the Board asked to amend it.  Ex. 57, Holton Tr. 124.[12]

52.     The September 12 meeting was cancelled due to September 11th.  Defs. *Hall II* Ans. ¶ 21.  Nevertheless, work continued throughout the day at both Amtrak and Aon on the revised VERP and preparations for the start of upcoming VERP election period.  Ex. 58.  In telephone calls with Board members on 9-11 cancelling the September 12 meeting, management did not apprise Board members of the need to amend the Plan prior to the start of the September 15 election period or that management would be shortly contacting Board members again on an unanimous written consent matter.  Serfaty Tr. 99-101; Holton Tr. 124.  The first time management informed the Board of the need to amend the VERP or management's need to seek unanimous written consent was on September 14.  *Id.*; Carten Tr. 262, 264-65, 267.

53.     No attempt was made to convene a telephonic meeting although such a meeting could have been convened with a quorum of just four Board members, Bylaw § 4.08, and most if

---

[12] It can be determined from the documents that by the morning of September 11, 2001, before terrorists struck targets in New York and Washington, D.C., management had in hand final draft Resolutions and an Executive Summary to give to the Board at the September 12 Board meeting requesting such amendment.  Ex. 56; Gottesdiener Decl. ¶ 56.  These draft Resolutions and Executive Summary were sent out three days later for unanimous written consent on September 14 after the September 12 meeting was cancelled.  The Resolutions were modified only slightly for that purpose.  First, whereas the Resolutions had stated "9-12-01" in anticipation of being approved at the September 12 meeting, as a consent the form now had the date "September 14, 2001" to the right of the page. On the left margin a line on which a "Board Member" could sign was added, underneath the added word "Approved." Ex. 59, AMT007287.

not all Board members were reachable by telephone:  Ms. Serfaty apparently reached all of the

directors without difficulty by telephone on September 14.  Ex. 59; Serfaty Tr. 216, 299; Carten

Tr. 305; *see also id.,* Tr. 261, 110 (Mr. Carten testifying that no one told him that a telephonic

meeting could not be convened; and that convening such a meeting is often more efficient than

attempting to have the Board act by unanimous written consent).

54.    On September 14, management faxed to four directors (Dukakis, Holton, Rosen,

and Smith) and to Mr. Jackson (Mr. Mineta's designee) the proposed Resolutions and Executive

Summary discussed above.  *See* Exs. 3, 59; Carten Tr. 134; Serfaty Tr. 102.  Attempts were also

made to reach the directors and Mr. Jackson by telephone to alert them to the faxes heading their

way.  Ex. 59; Serfaty Tr. 216, 299; Carten Tr. 305.[13]

55.    The Executive Summary management forwarded to the referenced Board

members and Mr. Jackson recounted that "the Board approved a Voluntary Early Retirement

Plan (VERP) at its meeting on July 26, 2001" and explained that "[t]he VERP as approved had

two main components," namely, the 5 years of age add-on to the Amtrak Pension benefit and the

Railroad Retirement Supplement.  Ex. 59.  However, management continued, it now appeared,

based on revised figures, that unless the Board eliminated the Railroad Retirement Supplement

component, the Pension Plan surplus would be "depleted" and "as early as" 2003 the Company

would be "required" to "make a significant contribution" to the Plan.  *Id.*[14]  The Executive

Summary stated that even though the Plan was still running a surplus management thought it

"would be prudent" to eliminate the Supplement and so asked for "an amendment to the

---

[13] There is a question of fact as to Board member Sylvia de Leon's method of transmitting her signed consent.  While Plaintiffs received an assurance from Defendants that Ms. de Leon did personally sign a consent there is nothing in the record explaining how she transmitted her consent to Amtrak.  A photocopy of the consent signed by Ms. Leon appears in the official Resolutions Book, Ex. 3, but, like the photocopy of the consent pertaining to Governor Holton, the copy of the de Leon consent form contains no fax header.  Moreover, the photocopy of Ms. de Leon's signed consent contains faint marks of an unknown nature near each of the four corners of the page and alongside the text in the right and left margins that do not appear in the consents signed by anyone else.   Gottesdiener Decl. ¶ 59.

[14] Management did not disclose anything about a "mistake" having been made in the estimated cost of the July 26 VERP.

Voluntary Early Retirement Plan as set forth [in the Executive Summary]" to substitute a one-time lump sum payment of $15,000 for the Supplement. *Id.* The Summary explained that the amended VERP would cost between $7.2-$8.6 million at a 50-60% participation rate, which would leave the Plan with "at least a $10 million surplus." *Id.* "Amtrak will therefore continue to enjoy a contribution holiday for several more years." *Id.*[15]

56.     The draft Resolutions forwarded to five Board members and Mr. Jackson were entitled "Resolutions Authorizing Amendment to 2001 Voluntary Early Retirement Plan." Ex. 3. No mention is made of a request for an amendment of a prior delegation the Board had made of its amendment authority. Instead, the Resolutions state:

"WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board **adopt an amended benefit plan** based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of the proposed **amended** Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the **amended** Voluntary Early Retirement Plan described in the attached Executive Summary is **authorized and approved**; and be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Ex. 3 (emphases added).

57.     Four directors (Dukakis, Rosen, Smith, and de Leon) signed the Resolutions and faxed them back (or in the case of Ms. de Leon, otherwise returned it) to Amtrak. Exs. 3-4.

58.     However, neither George Warrington nor Norman Mineta signed a written consent amending or authorizing an amendment to the VERP. *Id.* Nor did Governor Holton sign

---

[15] In fact Amtrak was not required to make any contributions to the Pension Plan until sometime in 2005. Ex. 65.

such a consent.  *Hall II* Ans. ¶ 30 (admitting same); Holton Tr. 128, 133-34, 142, 351; Carten Tr. 342, 350.

59.    Governor Holton confessed to having a "silly aversion" to modern technology such as faxes.  Holton Tr. 55.  *See also* Serfaty Tr. 127 ("I do know with Governor Holton that this question of fax and sending things back and forth was always an issue with him. . . .  He would very often call and ask can you read us something, you know, tell me about this, tell me about that.  We clearly had to deal with him in a different way").

60.    To accommodate Governor Holton, Amtrak had developed a practice whereby Amtrak Assistant Corporate Secretary and Board liaison John Carten would purport to sign "for" Governor Holton whenever he was not in the District of Columbia on Amtrak business.  Carten Tr. 138, 140, 320-22; Holton Tr. 130, 152-53.  Pursuant to this practice, Amtrak had previously allowed Governor Holton to authorize Mr. Carten to "sign" his name not just to routine letters and alike but also to underlined unanimous consent resolutions, *see* Carten Tr. 310-11, 343, with neither Governor Holton nor Amtrak making any distinction between the two.  *Id;* Holton Tr. 154-55.  What happened on September 14, 2001 was simply one more instance of that practice.

61.    In addition to not signing a written consent, Governor Holton testified that he did not receive or read the Resolutions or the thrice-referenced and attached Executive Summary he authorized Mr. Carten to sign "for" him.  Holton Tr. 123-24, 142-43.  Amtrak had faxed them to Governor Holton's law office in Richmond that morning but Governor Holton spent that day at home in Weems, 75 miles away.

62.    Knowing that it could probably get Governor Holton's agreement that Mr. Carten sign "for" him, Amtrak made no real effort to get a copy of the proposed Resolutions and attached Executive Summary into the Governor's hands so he could personally review and sign (assuming he was in agreement),   In contrast to the fax cover sheets sent to the other directors (or Mr. Jackson), which prominently state:  "**Please execute the resolution and fax to John Carten** at . . . .," the fax cover sheet to Governor Holton makes no such request.  The fax cover sheet to Governor Holton reads:  "Per our discussion, attached is the amended executive

summary and resolutions for the voluntary early retirement program.  Please call me if you have any further questions."  Ex. 59.  No request was made asking Governor Holton to sign.

63.    When Governor Holton received word from his office that Amtrak was attempting to contact him, he called Mr. Carten.  Carter Tr. 329.  Mr. Carten asked if they could proceed using the "sign for" practice they had developed, and Governor Holton agreed.  Holton Tr. 128; Carten Tr. 350.  The telephone call was a brief one.  Holton Tr. 129.  Neither Mr. Carten nor the Governor memorialized it.  Carten Tr. 140-41.  Lacking a copy of the Resolutions and Executive Summary, and not having discussed the matter with any of the other directors, *see* Holton Tr. 144, Governor Holton was "wholly reliant" on Mr. Carten's "description of the situation and the approach that management wanted to take to address the situation."  *Id.* at 123-24.

64.    As noted in the Introduction, in at least one critical respect, Governor Holton misunderstood management's proposal.  Governor Holton testified that Carten told him, in substance, that the plan "had been found to be very expensive and that an amendment was needed to cut down on the costs of it *somewhat*."  Holton Tr. 128.  The amendment management sought from the Board was not designed to cut down on the costs "somewhat":  management sought to cut the value of the Board's July VERP by far greater than **half** of what employees had been told they could expect.

65.    To evidence the Governor's consent to the proposal, Mr. Carten took a photocopy of Governor Holton's signature from another document that the Governor had actually signed, and cut-and-pasted that signature above the line in the proposed Resolutions on which Governor Holton was to sign.  Carten Tr. 316-17, 319, 338.  This was done such that someone who did not know better would think Governor Holton had signed the Resolutions himself.  Ex. 3, AMT 15064.[16]

---

[16] Amtrak tried to pass the Resolutions off to Plaintiffs as having indeed been "Signed **_by_**" the Governor when Amtrak obviously knew otherwise.  Ex. 60, AMT 7270 (signed Resolutions as produced in discovery to Plaintiffs, bearing the label "Signed by Board members").  Plaintiffs only discovered the truth during Mr. Carten's deposition.  *E.g.,* Carten Tr. 316.

66.     On September 14, 2001, management began informing employees that the
Railroad Retirement Supplement had been eliminated and replaced with the $15,000 lump sum
payment.  Ex. 61 (suggesting that stock market declines were largely responsible for the cutback;
making no mention of any "mistake" having been made).  Numerous participants complained
and protested in writing, but were told in essence that the Company had absolute discretion in the
matter and the employees thus had no legal basis to complain.  Ex. 62 (collecting some three
dozen eligible employee-participant complaints or letters of protest).

67.     Between September 15, 2001 and October 31, 2001, approximately 75 employees
elected the reduced VERP and retired under it as of November 1, 2001.  Ex. 63.  This
represented 20% of eligible participants.  Amtrak and Aon had estimated that between 70-85%
of eligible employees would have elected the original VERP.  Ex. 64.

**Post-September 14 admissions.**

68.     During the VERP window period and beyond, Amtrak, through its directors,
officers, employees and counsel, continued to make statements such as those referenced above,
admitting that the Board had amended the Pension Plan on July 26, 2001.  Amtrak also made
statements admitting that the Board had amended the Pension Plan again (or amended the VERP)
on September 14 to eliminate the Railroad Retirement Supplement.[17]

69.     Thus, for example, on October 22, 2001, Mr. Reisig wrote to "PH," copying Ms.
Green to explain why PH could not be offered additional early retirement benefits in excess of
those offered under the amended VERP:  Because, Mr. Reisig said, only the Board could amend
the Pension Plan and "[t]he amendment [the Board] adopted" did not provide for anything more
than the addition of 5 years of age when computing pension benefits and a one-time lump sum
payment of $15,000.  Ex. 65.  "If Amtrak administers the voluntary early retirement plan under

---

[17] Defendants produced no documents in discovery in *Hall I* or *II* in which Amtrak states, suggests or
implies that on September 14 the Board did not amend the Pension Plan or VERP but rather it amended
only its previously delegated authority given to management to make discretionary amendments to the
Pension Plan or VERP.  Gottesdiener Decl. p.2.

any other criteria, it will violate both the Internal Revenue Code and ERISA provisions requiring adherence to the written plan document." *Id.*

70.    On November 7, 2001, copying Board members Dukakis and Warrington, Mr. Reisig sent individual letters to three different retirees denying their request that they be permitted to participate retroactively in the VERP. Ex. 66. Again, in each case Mr. Reisig, with Governor Dukasis's and Mr. Warrington's acquiescence, stated that only the Board could amend the Pension Plan and that under the amendment the Board had enacted (*i.e.,* on September 14, 2001) only active participants in the Plan were eligible to participate: "If Amtrak administers the voluntary early retirement plan under any other criteria, it will violate both the Internal Revenue Code and ERISA provisions requiring adherence to the written plan document." *Id.* Nothing disclosed to Plaintiffs in discovery suggests that Governor Dukasis or Mr. Warrington or anyone else at Amtrak disagreed with Mr. Reisig's characterization of the facts. Gottesdiener Decl. ¶ 66.

71.    In a series of emails with VERP-eligible employee "PB," Deputy General Counsel Herrmann admitted that on July 26 the Board adopted the VERP as formal ERISA plan and then amended it, also formally under ERISA, on September 14. He made these statements in response to pointed questions from PB as to the legality of the switch from the July 26 VERP to the September 14 VERP.

72.    The PB-Herrmann exchanges began on September 24, 2001, when PB emailed Mr. Herrmann and Mr. Reisig (and another HR employee) about the release he received in his VERP packet management had sent to eligible employees:

The General Release Agreement mentions two items in topic 10: The 2001 Voluntary Early Retirement Plan and the 2001 Voluntary Early Retirement Plan Summary Plan Description. I do not see these exact titles on the materials I have received. How do I get access to these vital documents? Thanks, P[].

Ex. 67. A short time later PB emailed Mr. Herrmann, saying

Warren [Reisig] phoned to tell me that you wrote the release agreement. He said the SPD is the 'Amtrak Voluntary Early Retirement Program' booklet. He said the 2001 Voluntary Early Retirement Plan is the [September 14th] Board Resolution that modified the normal retirement

plan to add 5 years age and $15,000. If we are to rely on only three sources of information, why is it unclear as to what they are and why did we not receive all three? Thanks, P[].

*Id*. (emphasis added).

73.    Mr. Herrmann responded the next day, September 25th:

"P[], **Because this is an ERISA retirement plan,** we refer to the plan and the Summary Plan Description (SPD) in order to identify the benefits you are entitled to. **The 'Plan' is the entire program that was authorized by the Board of Directors**. The SPD is the document that you have received and it fully describes the benefits that you are entitled to under the Plan should you choose to participate. I hope this answers your question. Byl."

*Id*. (emphasis added).

74.    On October 18, 2001, PB again wrote Mr. Herrmann in an email entitled:

"Changes in the VERP from July [26] to September 14, " saying:

Bill, Thanks for the earlier answers. I apologize if I am a slow learner, but can you explain the legal basis for the changes in the VERP package from the July [26] version to the September 14 version. Was Warren correct when he told me that the entire VERP could not only be changed but totally withdrawn between July [26] and September 14? Your help in understanding the series of events would be appreciated. In the current atmosphere, it would help some of us to understanding the company's thought process on this subject.

Ex. 68.[18]

75.    Mr. Herrman replied, copying Mr. Reisig:

P[], You are defin[i]tely not a slow learner. You have asked a new question which I would not expect you to know the answer to. If I understand your question, you want to know whether it was legal for Amtrak to modify the VERP. The answer is yes.

The federal law regulating these kinds of programs - or plans - is the Employee Retirement Income Security Act, commonly known as ERISA. ERISA does many things to safeguard employee benefits, but ERISA also does not require that an employer give its employees any benefits and it does not prevent an employer from modifying those benefits that it does decide to give.[19]

---

[18]PB used the date July 30 (the date of the Lorraine Green letter announcing the VERP) instead of July 26, the date of the Board's July 26 action. To avoid confusion Plaintiffs will substitute the correct date.

[19] [Plaintiffs disagree that this is an accurate statement of law. It confuses pension plans with welfare plans. Subject to compliance with procedural requirements, welfare plans may indeed be generally amended unilaterally without substantive constraint. *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.,* 520 U.S. 510, 515 (1997). As to pension plans, however, ERISA and the Tax Code tightly constrain what an employer can do to pension benefits already accrued even if not vested, *i.e.,* it may not cut them back, under ERISA § 204(g), so long as the benefit in question is an

**The VERP is an ERISA plan** and therefore subject to the requirements of ERISA.  Under ERISA, plan sponsors (employers) may amend a plan - or even eliminate a plan all together.[20] In doing so, the plan participants must be notified of this change.  **That is what occurred in this case**.  **The original VERP was amended resulting in the modified VERP** that is currently being offered. And yes, Warren was correct when he said Amtrak could have decided to abandon the Plan altogether.[21]  Rather than do that, Amtrak decided to modify the Plan so that the original eligible employees would still be eligible for an early retirement benefit, albeit a lesser one.

P[], I understand your frustration at the change that was made. You should know that the decision to amend the VERP was made very carefully and with an understanding that many people would be disappointed. However, *given the reduction in funding levels as a result of stock market investments since the beginning of the year*, it would have been incredibly imprudent to proceed with the original VERP. The cost of the VERP would have so negatively impacted the Pension Plan that the VERP simply had to be modified. Byl Herrmann.

*Id*.

76.    PB responded to Mr. Herrmann, copying Mr. Reisig, as follows:

If not a slow learner, at least a medium and not a fast learner.  I think your explanation is helping me circle in for a landing.  If I understand correctly:

1.  **The retirement plan was amended with the VERP described on July [26]**

2.  **The plan was amended with the September 14 VERP which replaced/superseded the July [26] amendment.**

3.  The reason for the September 14 amendment was 'given the reduction in funding levels as a result of stock market investments since the beginning of the year, it would have been incredibly imprudent to proceed with the original VERP. The cost of the VERP would have so negatively impacted the Pension Plan that the VERP simply had to be modified.'  Am I to assume this change was made to exercise the proper fiduciary oversight of the plan for the beneficiaries?

4.  Any and all plan amendments relating to the July [26] VERP could have been made prior to September 15 but not during the window of September 15-October 31.

I appreciate your trying to clear this up in my mind and hopefully I have not crash landed in the above.

---

accrued benefit, early retirement benefit, retirement-type subsidy or optional form of payment.  *See Central Laborers' Pension Fund v. Heinz,* 541 U.S. 739 (2004).]

[20] [Again, Plaintiffs respectfully submit this statement is inaccurate.]

[21] [Again, Plaintiffs submit this statement is inaccurate, at least as regards the 5 year addition to age in the calculation of participants' Amtrak Pension Plan benefit which was a protected early retirement benefit or retirement-type subsidy].

*Id.*

77.     In response, Mr. Herrman, copying Mr. Reisig, indicated that he agreed with PB's

1st point ("The retirement plan was amended with the VERP described on July [26]") and PB's

2nd point ("the plan was amended with the September 14 VERP which replaced/superseded the

July [26] amendment").  But he said he did not necessarily agree with PB's 3rd and 4th points:

> P[], Without getting into technical details, **I think you generally have the picture**.  I don't
> necessarily agree with your **4th** point [regarding the permissible time for amending the VERP],
> but it is irrelevant for what has taken place since <u>it didn't happen</u> [meaning, the VERP <u>was</u>
> amended prior to September 15].  I also want to be clear that I didn't say that the reduction in the
> funding levels was the only reason for the decision [3rd point] - but I believe it was a significant
> factor.  I hope this helps.  Byl.

*Id.* (emphasis added)

78.     From mid to late November 2001, at a time when Amtrak now contends no

Pension Plan amendment had yet been enacted, Amtrak officials caused over $1 million in

payments to be made from the Pension Plan in connection with the VERP, representing $15,000

one-time lump sum payments to the approximately 75 participants who elected the reduced

VERP (such as Plaintiff Hattie McCoy-Kemp).  Ex. 63.

79.     On November 30, 2001, Lorraine Green executed a document entitled

"Amendment II to the Pension Plan," memorializing the amended VERP's terms in formal plan

language.  Ex. 69.

80.     The content of this executed plan instrument describes the reduced VERP in four

sentences (including one typographical error).  *Id.*  The formal amendment describes the reduced

VERP in no greater detail than the July 26 VERP is described in the briefing books sent to Board

members in July 2001, in the July 26 Executive Summary, in the July 30 Lorraine Green letter,

in the July 31 intranet posting, several of the more detailed emails Mr. Reisig sent participants

prior to the posting of the August 13 intranet Q&A's, or in those Q&A's.

**Amtrak's representations to the IRS in 2002 and 2003.**

81.    In 2002 and 2003, Amtrak made certain representations of fact to the IRS in connection with its request for an updated determination letter for the Pension Plan concerning the events of July 26, September 14, and November 30, 2001.

82.    On February 28, 2002, in request for a determination letter submitted to the IRS, Amtrak represented that Pension Plan Amendment No. II, signed by Ms. Green on November 30, 2001, was "Effective September 15, 2001" and "Amend[ed] the Plan to add an early retirement window for Active Participants who as of October 31, 2001 attained age 55 and completed at least 10 Years of Service." Ex. 70 at p. 10 (AMT001387). Elsewhere in its submission, Amtrak identified the November 30th document as a "copy of Amendment No. [II] to the Plan **as adopted by the Board of Directors on September 14, 2001** and executed on November 30, 2001." *Id.* at p.2 (AMT001388) (emphasis added).

83.    Amtrak represented to the IRS that "[t]he plan document included in this submission is complete in all respects" but did not disclose to the IRS the resolutions and minutes memorializing the Board's July 26, 2001 action authorizing and approving the VERP with the Railroad Retirement Supplement or the Board's purported September 14, 2001 action amending the July 26 VERP.

84.    On July 29, 2003, an IRS agent called Amtrak's outside ERISA counsel (Piper Marbury) and told counsel that the IRS had significant "concerns" based on information it had received from another source as to the existence of the original July 26, 2001 VERP that Amtrak may have violated ERISA and the Tax Code's anti-cutback provision. Ex. 71. Among other things, the IRS asked to see a complete record of Amtrak's amendments and purported amendments to the Plan in this regard. *Id.*[22]

---

[22] Contrary to Amtrak's belief, neither Plaintiffs nor undersigned counsel (or anyone acting on any of their behalves) had anything to do with the IRS' discovery of the July 26 Board action. In early 2002, an aggrieved participant apparently informed the IRS that the Board acted on July 26 with respect to the VERP. Undersigned counsel had no involvement in this matter prior to 2003 and has never had any contact with the aggrieved person. Gottesdiener Decl. ¶ 71 n.5.

85.      On July 31, 2003, at the direction of counsel, Mr. Reisig faxed or caused to be faxed to outside counsel a 36-page fax comprised of, among other things, the July 26, 2001 Board Resolutions adopting the VERP, management's proposal incorporated by reference into those resolutions, and related materials.  Ex. 72.

86.      On August 1, 2003, the IRS wrote to Amtrak "[a]s a follow-up and further development" of what was discussed on July 29th on the telephone.  Ex. 71.  In this memo, the IRS said that the November 30, 2001 document which Amtrak submitted "is not valid" absent valid corporate action prior to September 15, 2001 "as it is not possible to amend your plan retroactively for this operational aspect."  *Id.*  (emphasis added).  The IRS continued, saying: "Therefore, i[t] will be necessary to provide us with *any corporate resolution which transpired prior to the September 15, 2001 to implement this benefit*."  *Id.*  The agent also added:  "Please also assure us of when and how this action was communicated to the employees."  *Id.*

87.      In this same August 1, 2003 communication, the IRS agent reiterated that assuming a valid, pre-window authorizing amendment, nevertheless **"**we have 411(d)(6) concerns," meaning concerns that there was a violation of the anti-cutback rule if Amtrak had in fact amended the Plan on July 26, 2001 to provide for a larger early retirement benefit than the one referred to in the November 30, 2001 document.  *Id.*  The Service therefore asked Amtrak to produce "NOT . . . [for just] a checklist of requested items" but a "demonstrat[ion] [of] the timeline and facts of this issue" and "all relevant items to verify the facts of this issue."  *Id.*

88.      On August 14, 2003 (before *Hall I* was filed or Amtrak knew it would be filed), the Company responded.  Ex. 73.  As to the IRS's stated anti-cutback concerns, Amtrak did *not* argue (as it eventually did in *Hall I* in late November 2003) that the benefits that were cutback were not entitled to statutory protection.  Rather, Amtrak argued that the Board's action of July 26, 2001 was, in effect, insufficiently final to constitute a plan amendment solely because the VERP's terms **were not *sufficiently communicated* to employees at that time**, prior to the September 14, 2001 changes.  *Id.* at 1-3.  Amtrak said nothing about the Board's action on July 26 constituting a mere delegation to management of the Board's authority to amend the Plan.

Amtrak never claimed to the IRS that management, rather than the Board, amended the Pension Plan, as Amtrak claims here.

89.    In arguing that the VERP's terms were not sufficiently communicated to employees at the time, Amtrak referenced only the July 30 letter sent to participants.  None of the other communications, such as the Frequently Asked Questions posted on the Company intranet, were disclosed to the IRS.  Moreover, Amtrak claimed that the July 30, 2001 letter to participants (which admittedly disclosed "details on the types of benefits available under the initial VERP authorized by the Board") "did not communicate the **final terms**" of the VERP, but Amtrak did not explain in what respect the July 30 letter incompletely disclosed the terms of the July 26 VERP.  *Compare* Ex. 48 (report by one of Aon's actuaries that Messrs. Reisig and Herrmann told them that "all [the] details were already 'out there'" and that they "did not ask for updated cost [of a differently structured VERP] on that basis").  The July 30 letter disclosed the terms of July 26 VERP in all its material aspects and contained as much if not more detail that the formal plan instrument Lorraine Green executed on November 30.  If all Amtrak meant was that on July 30, Amtrak did not disclose *the cutback* terms of the VERP, as implemented, that begged the question.

90.    As to the Board's purported action of September 14, 2001, Amtrak told the IRS that "management presented the Board with a revised VERP," *id.*, and that "[t]he Board approved the amended VERP." *Id.*  Amtrak said nothing about the Board merely amending its previous delegation of its amending authority to management that day.  Amtrak clearly intended the IRS to believe that Amtrak was representing that the Board had taken effective action to amend the Pension Plan on September 14.  Amtrak received the determination letter it sought shortly thereafter.  Ex. 74.

## ARGUMENT

### I.     The Board's July 26 VERP Resolutions Amended the Amtrak Pension Plan.

The Board's Resolutions incorporating the VERP terms detailed in the Executive Summary and the Board's meeting minutes reflect that by "action of [the] Board" on July 26, 2001 the VERP featuring the Railroad Retirement Supplement became part of the Pension Plan for purposes of ERISA.  Defendants' argument to the contrary lacks merit.  Amtrak's argument is also unavailing because if not an amendment to the Pension Plan, the VERP was an ERISA plan "established" by Amtrak in its own right, based on the criteria established in *Kenney v. Roland Parson Contracting Corp.,* 28 F.3d 1254 (D.C. Cir. 1994).

### A.     The Board Amended the Pension Plan with the VERP on July 26.

Amtrak told participants and others that on July 26 Amtrak's Board amended the Pension Plan with the VERP featuring the Railroad Retirement Supplement and that anyone eligible electing to take early retirement would receive its benefits starting November 1.  It made these statements in writing, repeatedly, without equivocation, after due reflection, based on advice of counsel, sometimes *through* counsel, with copies to Amtrak Board members, and at a time when it had no reason to suspect that that fact might later become at issue in litigation.

Not a word was said once in any of these dozens of communications suggesting that the VERP's terms were anything other than final or subject to further study or change.  Not a word was said in any of these communications about the Board having delegated to management the authority to amend the VERP or modify its terms.  The reason is clear:  because the Board had adopted the VERP as an amendment to the Pension Plan on July 26, Amtrak knew it and did not realize at the time that it would later have an incentive in litigation to not have made such statements, at least in writing.  These statements are not only uniquely probative:  given their solemnity, frequency and clarity, they should be deemed conclusive.

Defendants nevertheless now urge the Court to find that the Board did not intend on July 26 to amend the Pension Plan with the VERP because it never actually used the word "amend."

Defs. *Hall I* SJ Reply at 19, 21.  This is not persuasive.  The word "amend" did not have to be used to make the Board's intent plain.  The 1994 Board had previously enacted a similarly structured VERP (with a Railroad Retirement Supplement) and that VERP was, properly, memorialized *in* the Pension Plan document, with which the Board should be presumed have been familiar.  *See* Ex. 1, Plan § 4.06 at pp. 36-37.  It thus would have been obvious to the Board that this VERP would amend and/or otherwise become part of the Pension Plan as well.

Moreover, the Resolutions, via the Executive Summary, explicitly state, as did the briefing book management sent Board members a week before the July 26 meeting, that the costs of VERP were to be paid with the assets of the Pension Plan*, something that could occur only via an amendment to the Pension Plan.  In addition, the Resolutions authorize and approve a five-year age enhancement in the calculation of eligible participants' Amtrak Pension Plan benefit, an action that could only have been intended to amend the Pension Plan as to such participants.  While the word "amend" would have obviously been appropriate its absence means nothing in this context of material significance to the question whether what the Board did on July 26 had the intent and effect of an amendment.  Indeed, the omission of the word "amend" should not be particularly surprising since the Board on July 26 was adopting in one set of resolutions three "**plans**" – a Voluntary Early Retirement **Plan**, a Voluntary Separation **Plan** and an Involuntary Separation **Plan**, only one of which was, in addition to being a plan, also an amendment to the Pension Plan.

If Defendants' objection is that the Resolutions, attached Executive Summary detailing the VERP's terms and Minutes memorializing the Board's consideration of management's report and adoption of its proposed Resolutions are not the same as a formal, executed plan instrument, written up in formal plan language, the law does not require such formalism, so long as the plan does not.  As noted in the Introduction, in *Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73 (1995), the Supreme Court confirmed that purported ERISA plan amendments not adopted in accordance with the plan's amendment procedures are ineffective.  The Court construed ERISA § 402(b)(3), 29 U.S.C. § 1102(b)(3), the amendment provision, as requiring a plan sponsor to

honor with precision the procedure set forth in its plan, noting ERISA "follows standard trust law principles in dictating that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level." *Id.* at 84-85.

Here, however, there is nothing in Plan § 13.01's amendment clause that requires that the required "action by [the] Board" take a particular *form* or that it becomes effective, say, only upon a corporate officer's execution of formal plan instrument. The central teaching of *Curtiss-Wright,* applied to July 26, is that the Board's amendment to the Plan was effective without more, *i.e.,* without there necessarily *ever* being a formal plan instrument executed, provided the Board took "action" within the meaning of the DCBCA, which it did, to amend the Plan.

Numerous cases, decided both before and after *Curtiss-Wright,* on facts quite similar to this one, so hold. Thus, for example, in *Horn v. Berdon Inc. Defined Benefit Pension Plan*, 938 F.2d 125 (9th Cir. 1991), the court found the board's resolutions amended the plan without more, saying "there is no requirement that documents claimed to collectively form the employee benefit plan be formally labeled as such." *Id.* at 127. And, in *Huber v. Casablanca Industries, Inc.*, 916 F.2d 85 (3d Cir. 1990), the trustees were held to have validly amended a plan to increase benefits when they formally adopted resolutions to that effect at a regularly constituted board meeting, despite the fact that the resolutions were not reflected in an executed plan document. *Id.* at 105.[23]

Numerous district court cases are to the same effect. In *Franklin v. First Union Corp.,* 84 F. Supp.2d 720 (E.D. Va. 2000), where the plan, as here, only required "action of the Board," the court found the Board had amended the plan in resolutions approving a merger of the company with an acquiring company and generally approving of a future merger of the company's employee benefit plan into the acquiring company's plan, months before a formal instrument was

---

[23] *Accord O'Connell v. Continental Can Co., Inc.,* 2 F.3d 1153, 1993 WL 300810, *3 (7th Cir. Aug. 5, 1993) (where plan gave the Board the power to amend, Board properly amended the plan by formally approving an asset purchase agreement in which the company stated its intention to discontinue the severance benefits at issue; "[i]t is irrelevant that . . .the official language of the plan was not amended until several months later").

drawn up. *Id.* at 723-24, 727-28. In *Aramony v. United Way of America,* 1997 WL 732447 (S.D.N.Y. Nov. 24, 1997), the court found it irrelevant that "no written plan amendment was ever drafted" because the board's resolutions adopted at a meeting recorded in the meeting minutes is a "process [that] produces duly adopted amendments to the plan." *Id.* at *6.[24]

### B.     The VERP was an "Established" ERISA Plan, if not an Amtrak Pension Plan Amendment.

In *Kenney v. Roland Parson Contracting Corp.,* 28 F.3d 1254 (D.C. Cir. 1994), the Court of Appeals found an employer "established" an ERISA pension plan by telling employees, in a brochure and through oral representations, that it was funding a pension plan when in fact that was not the case. *Id.* at 1258-59. Noting that under ERISA a pension plan "need not be formalized" and its "establish[ment]" can be inferred from the "surrounding circumstances," ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), the Court of Appeals employed a multi-factor test, borrowed from the Eleventh Circuit, to conclude a plan had indeed been "established." *Id.*

Should the Court need to reach this issue, it will find the facts here satisfy all or virtually all of the factors discussed in *Kenney,* often with direct parallels to the facts of that case. Here, as in *Kenney*, there were: numerous detailed and definitive written and oral communications to employees explicitly assuring them that the VERP was real; a deliberate failure to correct known perceptions of the plan's existence; a reasonable understanding on the part of employees that the plan did exist and would be imminently implemented; a clear intent by the sponsor (absent in *Kenney*) to establish and maintain the plan according to its (July 26) terms; and a fund to pay benefits, *i.e.,* the Pension Plan trust. The only factor to be considered that the July 26 VERP does not satisfy is that there was no <u>actual</u> payment of benefits here. But neither was there in

---

[24] *Accord Normann v. Amphenol Corp.*, 956 F.Supp. 158, 163 (N.D.N.Y.1997) (amendment valid although it had not been reduced to complete or formal form; adoption and ratification of Board resolution sufficed).

*Kenney.* That did not defeat the plaintiff's claim there and should not do so here.[25]

### C.    Defendants' Delegation Theory Lacks Merit.

Amtrak's contention that on July 26 the Board merely delegated to management its authority to amend the Pension Plan (instead of exercised its amending authority itself) is more than merely at odds with the dozens of statements Amtrak made at the time.  It is "emptily semantic," *Berger v. Xerox,* 338 F.3d 755, 761 (7th Cir.2003) (Posner, J.), because it does not in fact describe a delegation of amending authority at all:  Amtrak is simply describing, under the misnomer "delegation," a Board amendment (July 26), followed by a decision by management to seek a second Board amendment (September 14) effectively amending the first amendment.  In other words, "delegation" is a label.[26]

The proposition that on July 26 the Board delegated its amending authority rather than exercised it itself is untenable in several respects:

***First***, the delegation theory posits that after the July 26 delegation, management had the discretionary authority to amend or not amend the Pension Plan so long as management acted within the Board's authorization of July 26.  But management's 11th hour return to the Board makes little sense if management already possessed discretionary authority to amend the Pension Plan within the confines established on July 26:  management sought to **reduce** the costs to the

---

[25] In several ways this is actually a more compelling case than *Kenney* for finding the establishment of a separate ERISA plan.  As noted, the employer in *Kenney* never really intended to come through on its promises.  That was obviously not true here.  Moreover, the communications in this case were far more frequent, formal and pointed than in *Kenney*.  For example, Amtrak's Deputy General Counsel asserted, in a letter in which both the General Counsel and Mr. Warrington were copied:  "**The VERP was created as a qualified employee benefit plan**."  Stmnt. ¶ 42.  Even after the VERP was cutback he continued making such assertions about the July 26 VERP presumably unaware it had not been validly amended on September 14.  *Id.* ¶¶ 71-77.

[26] Plaintiffs note all of the same arguments in this section apply equally to any inquiry into whether the VERP was a separately established ERISA plan, rather than an amendment to the Pension Plan.  In that case, Defendants' objection would still be that on July 26 the Board delegated its authority to establish (vs. amend) an ERISA plan and did not intend to establish (vs. amend) such plan but wanted to leave that discretionary decision to management.  Plaintiffs would counter with, among other things, all of the arguments here that that does not comport legally or factually with what happened and is in any event unavailing under the *Kenney* test.

Pension Plan by eliminating a feature of the VERP, not increase them.  If management needed

Board approval to **reduce** the VERP below what the Board "authorized <u>and</u> approved" on July

26, how is that different than saying the Board <u>did</u> amend the Plan on July 26 and had to re-

amend the Plan for management to make the alteration it wanted?  Having kept the Board in the

dark from August 24 to September 14 about the "mistake" it had discovered, management surely

was not seeking the Board's *advice* that day.  Nor was management merely responding to the

Board's summons.  So was not management's act of going back to the Board on September 14

with a unanimous consent resolution a statement that a second Board amendment was needed?

> **Second,** Defendants describe what occurred on September 14 as an amendment of the

Board's delegation of its amendment authority, but there is not a single document relevant to this

case that mentions anything about such a "delegation."[27]  Defendants premise their delegation

argument instead on the concluding "go-forth-and-implement" language appearing at the end of

the July 26th Resolutions but this plainly delegates no *discretionary* implementing authority in

the sense necessary to Amtrak's argument.  While the power to implement may confer some

measure of discretion, here any such discretion was tightly constrained since the Resolutions

merely authorized the President and CEO to "take all necessary steps to implement the three

plans <u>*described in*</u> *the attached Executive Summary*."  Ex. 22.[28]  Defendants confuse such proper

delegations of essentially ministerial implementing authority with the power to make

---

[27] This objection cannot be compared with Amtrak's regarding the absence of the word "amend" from the July 26 Resolutions since Plaintiffs have shown that literally dozens of times Amtrak used that exact word to describe what the Board did that day.  By contrast nothing anywhere in the record speaks of the Board's actions on July 26 or September 14 as delegating to management the Board's otherwise sole and exclusive authority to make discretionary amendments to the Pension Plan.

[28] *Accord* Ex. 3 (September 14 Resolutions, authorizing the President and CEO "to take all necessary steps to implement *the terms of the plan <u>described in</u> the attached Executive Summary*") (emphasis added).

discretionary amendments to the Plan.[29]

*Third,* the Board cannot lawfully have delegated to management the power to amend the Pension Plan, *see* Plan § 13.01, without first or at least simultaneously <u>amending the amendment provision</u> – something which Defendants agree did not occur on July 26.  *Hall II* Ans. ¶ 17 ("deny[ing] that the Plan was amended in July 2001").  Had the Board done so it would have violated Plan § 13.01 itself since § 13.01 vests the Board with the sole and exclusive power to amend the Plan.  The Court should be hesitant to find the Board did something impliedly that it could only legitimately have done expressly.

The only time the Board *did* confer management with authority to amend the Pension Plan it did so expressly by <u>amending the Pension Plan's amendment provision</u> and it carefully limited management's delegated authority to the making of **technical** changes needed to ensure the Plan's continued compliance with federal tax law so as to retain its qualified status.  On December 8, 1999, the Board adopted, via resolutions, a "GUST" amendment to ensure the Pension and Savings Plans would be in compliance with the panoply of new Code § 401(a) qualification requirements contained in several statutes collectively referred to by that acronym.  Ex. 75.  Far from providing support for Amtrak's delegation theory, this tightly limited amended proves the rule.  The GUST amendment confers no discretionary authority upon management to add or subtract or modify benefits or terms not required by law.  Instead, the GUST amendment carefully restricts management's authority to amend only where the amendments are required to comply with law or clarify ambiguities that might raise questions about compliance with law.  *Id.* (also attaching Board meeting minutes and management Executive Summary explicitly making these points).

---

[29] The essence of discretion is **choice**, including, critically, the choice *not to do something*, or not to do it *to the extent one can*.  Nothing in the record anywhere shows the Board saying to management either on July 26, 2001 or September 14, 2001, "you can do this **or not** do this, or you can do *some* of this, **as you see fit.**"  Instead, management approached the Board on each occasion (July 26, 2001 and September 14, 2001) with a single, up-or-down proposal.  On neither occasion did management propose, or did the Board "authorize," that management *not* implement the very specifically proposed VERPs for these employees or implement only *some* of what the Board authorized.  The entity making the choices was the Board, not management.

**Fourth,** Defendants argue that having delegated away its power on July 26 and again on September 14, the Board never amended the Pension Plan with either version of the VERP – only management amended the Pension Plan, one time only, not until November 30, 2001, with the reduced VERP. But this would have been after the close of the VERP election window and after the disbursement of $1 million in $15,000 lump sum payments. This thus necessarily assumes that the VERP was implemented in violation of law. Amtrak has never argued that the IRS agent was incorrect when, seeing Amtrak might be contending that the Plan was only amended after-the-fact on November 30, he said: "it is not possible to amend your plan retroactively for this operational aspect." If it disagreed with that proposition, it certainly never told him that. To the contrary.

Of course the proposition is incontestable. To qualify for preferential tax treatment, Code § 401(a)(2) requires a plan to prohibit the use of plan assets for any purpose other than the benefit of plan beneficiaries prior to the satisfaction of all liabilities under the plan. 26 U.S.C. § 401(a)(2). If the VERP, with or without the Railroad Retirement Supplement, had not become part of the Plan, then the benefits payable under it were not plan liabilities, and yet plan assets were used not for the benefit of the several thousand plan participants but gifts to a choice few. Congress provides generous tax subsidies to retirement plans. It does not do so in order that they can release monies willy-nilly to persons not entitled to them.

With Defendants' disavowal of September 14 as a date that the Pension Plan was amended, July 26, 2001 becomes the only date that the Pension Plan *could* have been amended to add a VERP that would make the events of September 15, 2001 to October 31, 2001 and subsequent disbursement of plan assets to VERP retirees who accepted the reduced VERP not

the violation of the Tax Code the IRS said it was concerned about on August 1, 2003.[30]

## II.    The Board Failed to Take Effective Action on September 14, 2001.

In *Curtiss-Wright*, the Court held that in cases where the plan merely says that "[t]he Company" may amend the plan, "principles of corporate law provide a ready-made set of rules for determining, in whatever context, who has authority to make decisions on behalf of a company."  514 U.S at 81.  But where the plan is more specific, the sponsor must follow whatever detailed procedures are set out in the plan.  *Id.* at 84-85 (ERISA "follows standard trust law principles in dictating that whatever level of specificity a company ultimately chooses, in an amendment procedure or elsewhere, it is bound to that level").  If it does not, the purported amendment must be declared invalid, even if it frustrates the sponsor's otherwise clearly expressed intent.[31]

The Amtrak Plan is more specific than the Curtiss-Wright plan:  it makes the Board solely responsible for amendments, and specifies that the sole procedure open to the Board for amending the plan is through Board "action," which is, by law, defined by the DCBCA to the extent not inconsistent with the RSPA.[32]  Amtrak was thus bound to take legally valid Board

---

[30] Surely, Defendants would not have received the determination they did if they argued, as they do (or will) here, that there was no amendment of the Pension Plan on September 14 but rather only an amendment of a delegation of amending authority.  The IRS could not have been clearer that it was not about to issue a determination letter if Amtrak maintained that the Plan was only actually amended after-the-fact on November 30, 2001 by an Amtrak vice-president.  On these facts, the doctrine of judicial admission should apply:  having gained a benefit in one proceeding from saying one thing, Amtrak should not be permitted to change positions here in opposition to Plaintiffs' request for relief.  *See, e.g., Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 264-65 (4th Cir. 2004) (applying doctrine in ERISA case; defendant which obtained preemption ruling claiming fiduciary status barred from denying same in ERISA counts).

[31] *E.g., Depenbrock v. CIGNA Corp.*, 389 F.3d 78, 80-86 (3d Cir. 2004); *Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 856 (7th Cir. 2002); *Algie v. RCA Global Communications, Inc.*, 60 F.3d 956, 960 (2d Cir.1995); *Warren v. Cochrane*, 235 F.Supp.2d 1, 6-7 (D. Me. 2002); *Lowney v. Genrad, Inc.*, 925 F.Supp. 40, 47-48 (D. Mass. 1995).

[32] Plan § 13.01 does not literally say "by action of [the] Board" means legally valid action as defined by the DCBCA and RSPA but it did not have to.  *See Curtiss-Wright,* 514 U.S. at 80 ("principles of corporate law provide a ready-made set of rules" for providing definitions for undefined term in plan provision's amendment procedure).

"action" in order to effectively amend the Plan. More specifically here, by deciding to attempt action amending the Pension Plan without a meeting via the DCBCA's unanimous consent statute, Amtrak was bound to comply with it.

The facts show, however, it did not. Three of the seven members of the Board did not sign a consent that the VERP be amended. The Board was thus not unanimous and did not therefore take action within the meaning of the DCBCA, Plan § 13.01 or ERISA to amend the Plan, with the result that the Railroad Retirement Supplement was never eliminated from the Plan.[33]

### A.    Mr. Warrington did not sign a consent.

As noted, Amtrak failed to obtain a signed consent from Mr. Warrington, believing that because he lacked voting power at Board meetings his consent to take action without a meeting was unnecessary. The statute, however, clearly requires the consent of "all" directors, not just those with voting power generally or on the matter at hand.[34]

---

[33]As required by the Court's Order of August 5, 2005, Plaintiffs filed and exhausted this claim through the Plan's internal claims process. *See* Ex. 76 (claim, denial, appeal and appeal denial letters). Plaintiffs' claim was denied by the Plan's "designated officer on review," Plan § 15.01, Lorraine Green (who declined to recuse herself when requested to do so). Her decision that the Board did take valid action on September 14 to amend the Pension Plan should be reviewed *de novo* and was in any event arbitrary and capricious as a matter of law. Among the many reasons why review should be *de novo*, Plaintiffs here address two. First, Plan § 15.01 did not confer Ms. Green with discretion to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989) (a benefits denial must be reviewed *de novo* unless the plan confers such discretion). Second, even if it did satisfy *Firestone,* this Court obviously owes no deference to a plan official's legal conclusion. *E.g., Holt v. Winpisinger,* 811 F.2d 1532, 1536 (D.C. Cir.1987). Finally, even assuming deference, the finding that the Board took valid "action" is unreasonable and, therefore, arbitrary and capricious, because it ignored the clear language of the Plan, the DCBCA and ERISA.

[34] To be clear, although of course Mr. Warrington lacked voting power he was in all other respects, including for purposes of the unanimous written consent statute, a Board member like any other. 49 U.S.C. § 24302(a)(2)(D) ("The President of Amtrak shall serve as an ex officio, nonvoting **member** of the Reform Board") (emphasis added). Amtrak's Bylaws make this point emphatically: "[f]or all purposes of these Bylaws and applicable law, **including the D.C. Business Corporation Act**, the President shall be a Director **like any other Director** except that he shall have no power to vote as a Director, nor shall his presence be counted toward determination of whether a quorum exists at a meeting." Bylaws § 4.02 (emphasis added).

This is confirmed by the statute's distinctly different treatment of shareholders who wish to attempt action without a meeting:  they can do so as long as all shareholders "entitled to vote" on the subject matter is issue consent.  No such modifier limits "all of the members of the board," precluding any notion that Congress perhaps did not really mean "all" when it said "all." In fact, Congress reaffirmed the distinction in 1962, when it came time to enacting provisions for nonprofit corporations.  Congress at that time, obviously aware of its options, essentially replicated DCBCA § 29-101.136, insisting that "all" of the nonprofit's directors consent to action without a meeting while permitting such action so long as all of the nonprofit's "members" (the equivalent of a for-profit corporation's shareholders, *see* DCBCA § 29-301.12) who were "entitled to vote with respect to the subject matter thereof" provided signed written consents.  DCBCA § 29-301.99.

In 1954, the year of the DCBCA § 29-101.136's enactment, in 1962, the year of its nonprofit analogue, and ever since, Congress has refused to lower the procedural bar to action without a directors' meeting as some states have done by restricting the required consents to those directors entitled to vote on the matter at issue.  *See, e.g., Village of Brown Deer v. City of Milwaukee*, 114 N.W.2d 493, 497-98 (Wisc. 1962) ("The legislature having specified the means whereby corporations could function informally, by written consent of those [directors] <u>entitled to vote</u> on a particular matter, it becomes incumbent on the courts to enforce such legislative pronouncements") (emphasis added).  A largely random sampling of the 50 states shows today that while most, like Delaware, Massachusetts, Mississippi and D.C., continue to insist on all members of the board signing consents before permitting action without a meeting, some, like Wisconsin as early as 1962, and Alaska and South Dakota today, *see* Ala. Stat. 10.15.185, S. Dak. Stat. 47-23-6, ask for no more of directors than they do of shareholders – all board members entitled to vote suffices.  That Congress (or the D.C. Council) has seen fit not to modify DCBCA § 29-101.136 to lower the standard in 50 years compels the conclusion that the statutory text was purposefully adopted and maintained.

Conceivably Amtrak could avoid application of the statute's "plain and unambiguous terms," *EAW Group, Inc., infra,* by showing that the statute if read literally would lead to absurd results.  But of course it is not absurd to give a nonvoting director a veto over the taking of action without a meeting.  At a meeting such a director may not have a vote but she could have her *say,* and attempt to persuade her fellow members to reach a different decision.  A nonvoting member is put on a board for a reason – surely this might be one of them.  So too a consent given by a nonvoting director to action without a meeting is an important confirmation that there is really no need for dialogue (or further dialogue if the matter has been discussed before) since the matter at issue is so clear:  else the nonvoting member would presumably not have given up her right to be heard.  Empowering the nonvoting member, then, is a uniquely effective means of ensuring that meetings remain the rule and the unanimous written consent procedure the limited exception it is meant to be.

That is how the court in *Solstice Capital II, Ltd. P'Ship v. Ritz,* 2004 WL 765939 (Del. Ch., April 6, 2004), saw the matter, when it construed Delaware's similarly worded unanimous consent statute, Del. Code Ann. Tit. 8 (General Corporation Law) § 141(f), to indeed mean "all" directors even in the case of a director disentitled to vote on the matter in the context of an actual meeting.  In *Solstice,* the CEO and a director of a company sued for, among other things, a declaration that the directors of the company had failed to remove him as CEO and director because not all of them had signed written consents purporting to take that action.  Defendants argued that consents from the non-signing directors were unnecessary because they had disabling conflicts of interest that would have barred them from voting on the removal issue had the board convened a meeting.  The court found that argument "meritless," saying the statute required unanimity of the entire board, not just those directors empowered to vote:

> Section 141(f) is explicit; "action required or permitted to be taken at any meeting of the board of directors ... may be taken without a meeting if *all* members of the board ... consent thereto in writing."  . .  .. There is no exception to this rule, even if a director has an interest in the transaction at issue. This comports with the notion that directors should participate actively and engage in discussion before voting at meetings. The policy

underlying board action by written consent is that "meetings should be required except where the decision is so clear that the vote is unanimous and in writing."

*Id.* The Court concluded that because the board's action was invalid, the purportedly removed CEO and director was still the company's CEO and a director. *Id.*

Here, as in *Solstice,* the failure of all Board members to consent, including one disentitled to vote such as Mr. Warrington, renders the purported September 14 VERP amendment invalid. *See also Albedyll v. Wisconsin Porcelain Co. Revised Retirement Plan,* 947 F.2d 246, 250, 255 (7th Cir. 1991) (pension plan amendment which had to be signed by all partners ineffective where only active partners signed).

The fact that Bylaw § 4.12 ("Unanimous Written Consent") purports to loosen the statutory requirements for effective board action by limiting the consents required for action without a meeting to be taken by only those directors with "voting power" is of no assistance to Amtrak. The Corporation is restricted to enacting bylaws that are not inconsistent with the DCBCA or its articles of incorporation. DCBCA §§ 29-101.04, 101.24. Bylaw § 4.12 is invalid insofar to the extent that it purports to set the procedural bar to action without a meeting lower than that set by statute. *E.g.,* 8 *Fletcher Cyclopedia of the Law of Private Corporations* § 4190 (Current through 2006 Supp.) (where the articles of incorporation or the bylaws conflict with the statute under which the corporation was established, the statute controls).

### B.    Mr. Mineta did not sign a consent.

The fact that Mr. Mineta did not sign a consent separately renders the Board's purported September 14 action ineffective. As explained above, the RSPA does not relieve a sitting Secretary of Transportation from compliance with the DCBCA generally but only when it comes to his presence at meetings (in person or telephonically). As an exception to the DCBCA's rule that the duties of a director are non-delegable, it should be strictly construed. It is one thing to relieve the Secretary of the requirement to attend meetings – meetings at which minutes are kept and numerous additional procedural safeguards must be observed. It is something entirely different to say he no longer has the obligation to personally perform the distinct duty of

determining when the Board should dispense with a meeting and take action summarily, a setting in which the sole safeguard *is* the direct involvement of all directors.

      **C.**    <u>**Governor Holton did not sign a consent.**</u>

      Even if "authorized" by him, the cutting-and-pasting version of Governor Holton's "signature" on a document the Governor never received or read cannot be deemed to have satisfied the express requirement of both the DCBCA and Bylaws § 4.12 that the written consent have been actually "signed by" Governor Holton himself.

      The statute is clear. There is nothing ambiguous about the requirement that the consent be "signed by" each member of the board. Especially because the unanimous consent procedure is in derogation of the common law requirement of board action only through a meeting, it should be enforced as written. *See, e.g., Tansey v. Trade Show News Network,* 2001 WL 1526306, *4 (Del. Ch. Nov. 27, 2001) (construing Delaware's similarly worded unanimous consent statute; corporate merger of privately held companies invalid where although all directors were clearly in agreement, one director failed to sign a unanimous consent).

      There is no cause for assuming Congress placed the signature requirement in the statute absent-mindedly. As outlined in the Introduction, Congress imposed the "signed by" requirement even on shareholders, who are permitted in every other respect to act by proxy or through third-parties. That the statute denies <u>a shareholder</u> entitled to vote the ability to sign off impersonally on an otherwise required meeting is a strong signal that it must be considered a non-delegable duty personal to each board member. If Congress wanted a third-party to be able to sign *for* a director it could have easily said so. Numerous other D.C. statutes involving a broad range of topics illustrate the frequency with which Congress has said that a third-party, in the right set of circumstances, may sign for another person when so authorized. D.C. statutes concerning (1) partnership formation, amendment or dissolution; (2) decedents' estates; (3) guardianship; (4) workers' compensation; and (5) assisted living arrangements all specify

circumstances under which this is permitted.[35]  The absence of such provision in the unanimous consent statute says that signature-by-proxy is never appropriate in that setting.[36]

Nor can the signature requirement be dismissed as ministerial, as Defendants tried to do in the claims process, or some sort of quaint anachronism.  The signature requirement goes to the heart of a director's duties as a director and ensures the integrity of the decision making process. The signature requirement bring home to the individual director his personal responsibility to decide to forego the otherwise required give-and-take meeting of the Board and assent to the action set forth in the written consent.

The facts of this case illustrate how despite good intentions the failure to insist on a personal signature can undermine the integrity of board action.  Because proper procedure was not followed, Governor Holton was uncharacteristically uninformed if not misinformed. *Compare* Ex. 77, Stmnt. of John Robert Smith ("In board meetings, [Governor Holton] will press

---

[35] *See* D.C. Code § 33-202.04(a)-(b) ("Execution of certificate"; limited partnership formation) (certificate of limited partnership "shall be signed by all general partners," certificate of amendment "shall be signed by at least 1 general partner and by each other general partner," certificate of cancellation "shall be signed by all general partners or, if there is no general partner, by a majority of the limited partners" but "[a]ny person may sign a certificate <u>by an attorney in fact</u>"); D.C. Code § 18-704(a) (decedent's estates) (The signatures shall be placed at the end of the will. If the will consists of several sheets, each sheet shall be signed by the testator <u>or, if he or she is unable to sign, by the person signing on his or her behalf or, if there is no such person, by the authorized person</u>"); D.C. Code § 16-4803(c) ("Designation of a standby guardian") ("The designation shall be signed by the designator.  <u>Another adult may sign</u> the designation on behalf of the designator if the designator is physically unable to do so, the designator expressly requests that the adult sign the designation, and the adult signs the designation in the presence of the designator"); D.C. Code § 32-1513(b) (Notice of injury or death) ("notice of injury or death shall be signed by the employee <u>or by some person on his behalf</u>, or, in case of death, by any person claiming to be entitled to compensation for such death <u>or by a person on his behalf</u>"); D.C. Code § 44-106.04(5) ("Individualized Service Plans") ("The ISP shall be signed by the resident, <u>or surrogate</u>, and a representative of the ALR") (emphasis added); *id.,* § 44-106.05 ("Shared responsibility agreements") (same).

[36] Indeed, on this basis, Governor Holton's consent should be deemed invalid under Amtrak's own Bylaws as well as under DCBCA § 29-101.136, since they too specify in other provisions when it is permissible for a third-party to sign a required writing "for" another person.  Thus, in the case of the Corporation's Treasurer, the Bylaws specify that he or she "shall be responsible for all receipts and disbursements of the Corporation" and thus "shall sign <u>or delegate the signing of</u> all checks, notes and drafts" relating to the Corporation's business.  Bylaw § 6.11 (emphasis added).  Board members are not permitted by the Bylaws' unanimous consent provision, Bylaw § 4.12, to similarly delegate their "signed by" responsibilities.  Again, the absence of such option should be presumed intentional.

the staff to get the best possible information and will often give me a wink to let me know that he's testing the staff to see if they have really thought through every angle or idea"). He cannot in this instance be said to have discharged his responsibilities in the manner required by law and befitting his position as a director of a federally-chartered corporation appointed by the President and confirmed by the Senate.

<u>**CONCLUSION**</u>

Compliance with procedure is critical to the legitimacy of a board's actions. Absent compliance with the unanimous written consent statute, Plaintiffs, the proposed Class and the public were entitled to a decision taken only at an actual meeting, after group discussion and deliberation. At such a meeting, views may have changed. The outcome may have been different. In any event, ERISA recognizes as valid only those plan amendments enacted in accordance with the procedure set forth in the plan. Because that procedure was not followed here, the purported amendment eliminating the Railroad Retirement Supplement from the Plan's VERP should be declared null and void. The Court should also declare that the VERP as described in the Board's official records of July 26 did indeed become a part of the Amtrak Pension Plan that day in accordance with the Plan's amendment procedure.

Dated: January 16, 2007            Respectfully submitted,


                                   s/Eli Gottesdiener
                                   Eli Gottesdiener (D.C. Bar 420764)
                                   Gottesdiener Law Firm, PLLC
                                   1025 Connecticut Avenue, N.W.
                                   Suite 1000
                                   Washington, D.C. 20036
                                   Telephone: (202) 243-1000
                                   Facsimile: (202) 243-1001
                                   eli@gottesdienerlaw.com

                                   *Attorney for Plaintiffs and the proposed Class*