**Exhibit 14A**

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

1 (Pages 1 to 4)

1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLUMBIA
 3       - - - - - - - - - - - - - -x
 4    WADE F. HALL, et al.,       :
 5         Plaintiffs,       : Civil Action
 6         v.          : No. 1:03CV01764 (GK)
 7    NATIONAL RAILROAD PASSENGER  :
 8    CORPORATION, et al.,       :
 9         Defendants.        :
10       - - - - - - - - - - - - - -x
11
12
13          Videotaped Deposition of JOHN CARTEN
14               Washington, D.C.
15             Monday, April 12, 2004
16                8:39 a.m.
17
18
19    Job No. 2-33073
20    Pages 1 - 156
21    Reported by:  Vicki L. Forman
22
```

3

```
 1             A P P E A R A N C E S
 2         ON BEHALF OF THE PLAINTIFFS:
 3            ELI GOTTESDIENER, ESQUIRE
 4            Gottesdiener Law Firm
 5            3901 Yuma Street, Northwest
 6            Washington, D.C.  20016
 7            (202) 243-1000
 8
 9
10
11         ON BEHALF OF THE DEFENDANTS:
12            JOHN R. WELLSCHLAGER, ESQUIRE
13            Piper Rudnick, LLP
14            6225 Smith Avenue
15            Baltimore, Maryland  21209-3600
16            (410) 580-4281
17
18
19
20         ALSO PRESENT:  Desmond T. McIlwain,
21              Amtrak General Counsel
22              Scott Forman, Videographer
```

2

```
 1          Videotaped Deposition of JOHN CARTEN, held
 2    at the offices of:
 3         L.A.D. Reporting Company, Inc.
 4         Suite 850
 5         1100 Connecticut Avenue, Northwest
 6         Washington, D.C.  20036
 7         (202) 861-3410
 8
 9
10         Pursuant to agreement, before Vicki L.
11    Forman, Court Reporter and Notary Public in and for
12    the District of Columbia.
13
14
15
16
17
18
19
20
21
22
```

4

```
 1              C O N T E N T S
 2    EXAMINATION OF JOHN CARTEN          PAGE
 3    By Mr. Gottesdiener          6
 4
 5
 6
 7              E X H I B I T S
 8                (None)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

5

1    PROCEEDINGS
2        THE VIDEOGRAPHER: Here begins tape
3    number one in the deposition of John Carten in the
4    matter of Wade F. Hall, et al. versus National
5    Railroad Passenger Corporation, et al. pending in
6    the United States District Court for the District of
7    Columbia, Case Number 1:03CV01764. Today's date is
8    April 12, 2004. The time is 8:39 a.m.
9        The video operator is Scott Forman of
10   Visual Connections contracted by L.A.D. Reporting.
11   This video deposition is taking place at the office
12   of L.A.D. Reporting Company, 1100 Connecticut
13   Avenue, Northwest, Washington, D.C. and was noticed
14   by Eli Gottesdiener, counsel for the plaintiffs.
15       Would the counsel please identify
16   themselves and state whom they represent.
17       MR. GOTTESDIENER: Eli Gottesdiener on
18   behalf of the plaintiffs.
19       MR. WELLSCHLAGER: John Wellschlager on
20   behalf of all defendants. With me today as well is
21   Desmond McIlwain, Amtrak in-house counsel.
22       THE VIDEOGRAPHER: The court reporter

6

1    today is Vicki Forman of L.A.D. Reporting.
2        Would the reporter please swear in the
3    witness.
4        THE REPORTER: Would you raise your right
5    hand, please.
6            JOHN CARTEN
7    having been sworn, testified as follows:
8        EXAMINATION BY COUNSEL FOR PLAINTIFFS
9    BY MR. GOTTESDIENER:
10   Q    Good morning, Mr. Carten.
11   A    Good morning.
12   Q    Could you tell me what your position is
13   with Amtrak?
14   A    I'm the director-board liaison and
15   assistant corporate secretary.
16   Q    And could you explain what those
17   positions entail?
18   A    As director-board liaison I'm a liaison
19   between management and the board of directors at
20   Amtrak. As assistant corporate secretary I handle
21   the official duties such as sealing documents and
22   preserving records and so forth in connection with

7

1    the corporation and the board of directors.
2    Q    Are there currently any other assistant
3    corporate secretaries?
4    A    Yes, there's one other one at this time.
5    Q    And who is that?
6    A    Medaris Oliveri.
7    Q    And how long have you been an assistant
8    corporate secretary?
9    A    Since 1992.
10   Q    How long has Ms. Oliveri been an
11   assistant corporate secretary?
12   A    I don't know when she started but it was
13   before I started.
14   Q    When you started in 1992 you're saying
15   that she already was an assistant corporate
16   secretary?
17   A    Correct.
18   Q    And who is the corporate secretary now?
19   A    Alicia Serfaty.
20   Q    And when did Ms. Serfaty become corporate
21   secretary?
22   A    She became corporate secretary in 2001.

8

1    Q    When?
2    A    I believe it was the summer of 2001.
3    Q    Can you get anymore specific than that?
4    A    All I can recall is sometime in 2001 that
5    we made that transition.
6    Q    Sometime in the summer of 2001?
7    A    As I recall.
8    Q    And when you say "we made that
9    transition," how did Ms. Serfaty become corporate
10   secretary?
11   A    Well, the corporate secretary at that
12   time resigned the corporation, went to another
13   position, another organization.
14   Q    Okay. That actually wasn't exactly my
15   question. Though now that you've given that answer,
16   who is the person you were just referring to?
17   A    Stewart Simonson.
18   Q    And when did Mr. Simonson resign?
19   A    He resigned in the summer of 2001.
20   Q    And how long was it before Ms. Serfaty
21   became corporate secretary between the time he
22   resigned and she became corporate secretary?

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

9

1    A    It was a short period of time.

2    Q    Was there a period of time that there was

3 not a corporate secretary but rather an acting

4 corporate secretary or no corporate secretary?

5    A    I think there was always a corporate

6 secretary.

7    Q    And who was that?

8    A    Well, Stewart Simonson was a corporate

9 secretary until he left and then Alicia became the

10 corporate secretary.

11    Q    So you believe that there was no space or

12 gap between his leaving and her becoming corporate

13 secretary?

14    A    No.

15    Q    And my question before I think was

16 phrased how did she become corporate secretary and

17 you gave the answer you gave.

18    My question as posed now and posed then

19 is mechanically or in terms of the procedural

20 logistics how did she become corporate secretary?

21    A    She was elected by the board of

22 directors.

10

1    Q    And were you present when she was elected

2 by the board of directors?

3    A    I -- I don't recall if I was or not.

4    Q    How did the election occur in terms of

5 again procedurally or mechanically?

6    A    Well, the -- procedurally how it happens

7 is one of the board members makes a motion. The

8 other board member seconds that motion. If there's

9 any discussion it takes place generally at that

10 point and then if the discussion is satisfied then

11 the board votes and elects the person.

12    Q    And what you were just describing was

13 something that occurs at a board meeting?

14    A    Yes.

15    Q    My question was how did Ms. Serfaty

16 become corporate secretary? You said that she was

17 elected by the board.

18    A    Yes.

19    Q    And I'm now specifically talking about

20 her election. How did that occur?

21    A    I don't specifically recall how it

22 occurred.

11

1    Q    And how long was Mr. Simonson corporate

2 secretary?

3    A    As I recall he was corporate secretary

4 for about two years.

5    Q    And why did he resign?

6    A    He resigned to take a new position.

7    Q    What position?

8    A    He was working for the united -- going to

9 go to work for the United States Government outside

10 the corporation.

11    Q    He was going to? He didn't do that?

12    A    He did.

13    Q    Where did he go?

14    A    He went to the Department of Health and

15 Human Services.

16    Q    Which division?

17    A    I don't know.

18    Q    What kind of position did he take?

19    A    I really don't know what kind of position

20 he took.

21    Q    Who was corporate secretary prior to

22 Mr. Simonson?

12

1    A    Prior to Mr. Simonson it was Barbara

2 Richardson.

3    Q    What was the first name?

4    A    Barbara.

5    Q    Richardson. And where is Ms. Richardson

6 today?

7    A    She still works for Amtrak.

8    Q    And what position or positions does she

9 hold?

10    A    She's vice-president of marketing.

11    Q    How long was she corporate secretary?

12    A    She was corporate secretary for I believe

13 about a year and a half.

14    Q    And why did she cease being corporate

15 secretary?

16    A    Well, at that time she was -- I believe

17 she was executive vice-president which included

18 marketing and included public affairs and included a

19 number of different things and -- as well as

20 corporate secretary so I think in order to reduce

21 some of her responsibilities that's why Stewart

22 became corporate secretary.

Case 1:06-cv-01539-GK    Document 20-6    Filed 01/16/2007    Page 5 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

4 (Pages 13 to 16)

13

1    Q    And did Mr. Simonson while he was about
2    two years corporate secretary -- did he hold any
3    other positions at Amtrak?
4    A    No.
5    Q    And prior to Ms. Richardson who was
6    corporate secretary?
7    A    Let's see, prior to Ms. Richardson it was
8    Ann Linnertz.
9    Q    Prior to Ms. Linnertz?
10   A    I'm having to scratch my memory here on
11   the spot here. Prior to Ann Linnertz it was -- I
12   believe it was Anne Hoey.
13   Q    Okay. Prior to Ms. Hoey?
14   A    Okay, prior to Anne Hoey it was Elyse
15   Wander.
16   Q    Elyse Wander?
17   A    Uh-huh.
18   Q    How many of the people that you've
19   mentioned as corporate secretary are attorneys?
20   A    Let's see, Stewart Simonson is an
21   attorney. Barbara Richardson is not. Ann Linnertz
22   is not. Anne Hoey is not. Elyse Wander is.

14

1    Q    And Ms. Serfaty is?
2    A    Yes.
3    Q    How about before Ms. Wander? Who was
4    corporate secretary?
5    A    I don't know. That was before I was
6    involved in that function.
7    Q    So if I understand, in 1992 you become
8    assistant corporate secretary and at that time Elyse
9    Wander is the corporate secretary?
10   A    Yes.
11   Q    And there is also at that time Medaris
12   Oliveri as an assistant corporate secretary?
13   A    Yes.
14   Q    Has Ms. Oliveri been an assistant
15   corporate secretary since the time you came on the
16   scene in 1992 on a continuous basis between whatever
17   period -- I'm excluding the period before you were
18   there. Right now I'm just talking about when you
19   arrived in 1992 she's assistant corporate
20   secretary.
21       Has there been any period of time during
22   which between then and today she has not been an

15

1    assistant corporate secretary?
2    A    She's always been an assistant corporate
3    secretary.
4    Q    Now, you are saying you don't know when
5    Ms. Oliveri became an assistant corporate secretary?
6    A    Correct. All I know is it was before --
7    before me.
8    Q    How long did -- had Ms. Oliveri been at
9    Amtrak prior to you becoming an assistant corporate
10   secretary in 1992?
11   A    I don't know the exact date she started
12   but I know it was somewhere in the -- I believe it
13   was in the early 1980s.
14   Q    Okay. And how soon after, as far as you
15   understand her joining Amtrak, did she become an
16   assistant corporate secretary?
17   A    I couldn't say. I just don't know when
18   that took place.
19   Q    Do you know whether there was --
20   withdrawn.
21       Who was the assistant corporate secretary
22   along with Ms. Oliveri in 1992 when you -- just

16

1    before you became an assistant corporate secretary?
2    A    Jane Bass.
3    Q    And how long was she an assistant
4    corporate -- how long was she an assistant corporate
5    secretary?
6    A    I don't know for sure but it was I
7    believe for several years.
8    Q    And how did it come to pass that you
9    became an assistant corporate secretary in 1992?
10   A    Jane Bass was getting ready to go on to a
11   new position at Amtrak and so there was an opening
12   in that position and that's — that's when I was
13   asked to take on that position.
14   Q    Who asked you?
15   A    Elyse Wander.
16   Q    And at that time what was your position
17   or positions at Amtrak?
18   A    I was — at that time I was working in
19   the corporate planning department and I was working
20   as a manager in corporate planning.
21   Q    And were you asked in 1992 to perform any
22   other function other than assistant corporate

Case 1:06-cv-01539-GK    Document 20-6    Filed 01/16/2007    Page 6 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

5 (Pages 17 to 20)

17

1  secretary?
2  **A   As -- I don't understand the question.**
3  Q   Did you maintain your position as a
4  manager in corporate planning and take on the added
5  responsibility of assistant corporate secretary in
6  1992?
7  **A   Initially I did.**
8  Q   How long did that last for?
9  **A   As I recall not very long and then I took**
10 **on the assistant corporate secretary position**
11 **full-time.**
12 Q   Okay.  And then my question is once you
13 take that position on full-time do you have any
14 other position that you're fulfilling sometime in
15 1992?
16 **A   No.**
17 Q   When did you next take on any other
18 function, performance of duty, title other than
19 assistant corporate secretary?
20 **A   I don't think there was another time.**
21 **I've always maintained that title.**
22 Q   I'm sorry, you introduced yourself as

18

1  also being director-board liaison.
2     My question is when did you take on
3  either that, some other position in addition to
4  assistant corporate secretary?
5  **A   Well, at the same time I became the**
6  **assistant corporate secretary in 1992 on a full-time**
7  **basis, I had a dual title and at that time it was**
8  **manager, board liaison so it was manager, board**
9  **liaison and assistant corporate secretary.**
10 Q   Okay.  So the discussion we've been
11 having for the past 20 minutes about assistant
12 corporate secretary, is it fair to say that every
13 time you've used the term in response to questions
14 that you are including a second unstated title that
15 is either manager, board liaison or director-board
16 liaison?
17 **A   That's correct.**
18 Q   Is there any other title that I'm missing
19 that manager or director-board liaison has gone by
20 in the years we've been discussing?
21 **A   No.**
22 Q   How -- how is this position with this

19

1  dual title -- how is this classified for employment
2  purposes within the corporation?
3  **A   For employment purposes most of the time**
4  **I think they just refer to me as the manager or the**
5  **director-board liaison and then, you know, they'll**
6  **indicate that I'm a corporate officer and assistant**
7  **corporate secretary as well.**
8  Q   And does this position have its own pay
9  grade or does it share a pay grade with another
10 category of position at Amtrak?
11 **A   This -- Amtrak has generic pay grades and**
12 **so it's part of a generic pay grade.**
13 Q   Which is?  Which pay grade is that?
14 **A   Well, it's -- I forget what they call it**
15 **at this point but it's a, you know, standard**
16 **category of pay.**
17 Q   A denom --
18 **A   I can't tell you exactly what it is**
19 **because it's changed through the years.**
20 Q   But it's denominated by numbers, letters?
21 **A   It's been denominated by numbers and**
22 **letters in the past.**

20

1  Q   Well, when people are somewhat informally
2  sitting around talking about, you know, positions
3  and so forth, how is this position referred to other
4  than how you've referred to it here?  You know, GS
5  something.  Are there any kinds of letters and
6  numbers that this generic position is referred to by
7  you or others as?
8  **A   No.**
9  Q   And in a procedural or mechanistic way
10 how does one become an assistant corporate
11 secretary?
12 **A   Well, you become one by being elected by**
13 **the board of directors to that position.**
14 Q   And when was your election?
15 **A   My election was -- I believe it was in**
16 **1992.**
17 Q   What are the requirements for this
18 position?
19 **A   Well, generally the requirements are a**
20 **knowledge of the corporation and then there's some**
21 **basic requirements probably like bachelor's, you**
22 **know, degree and then it's a willingness and ability**

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

6 (Pages 21 to 24)

21

1  to work with people at all levels in the
2  corporation.
3      Q    Anything else?
4      A    It's -- you know, and then
5  recommendations from, you know, the people that
6  you've worked for as being somebody that would be
7  good for the position.
8      Q    How about for the position of corporate
9  secretary? What are the requirements for that
10 position?
11     A    The requirements for that position -- it
12 works a little bit higher level so the primary
13 requirements seem to be, you know, recommendation by
14 a vice-president or executive vice-president for
15 that position, or the president.
16     Q    How many directors does Amtrak currently
17 have?
18     A    Okay, currently there are eight positions
19 on the board of directors. Right now there are only
20 three of those -- four of those positions that are
21 filled.
22     Q    And what do you mean by the word

22

1  "position"?
2      A    Well, there -- when you say -- when I say
3  "position" I mean that Congress has set out eight
4  positions or eight directors for the National
5  Railroad Passenger Corporation.
6      Q    And when did they do that?
7      A    This current -- the current requirements
8  were done I believe in 1998.
9      Q    And those eight positions include one
10 position for the president and CEO that's a
11 nonvoting position?
12     A    Correct.
13     Q    Has there ever been seven voting members
14 of the board of directors since 1998?
15     A    Yes.
16     Q    When?
17     A    Let's see, I have to think back here. I
18 think in September of 1998 we -- I'm sorry, I take
19 that back. I think it was July of 1999 we ended up
20 with a full board of directors.
21     Q    And that lasted only that month?
22     A    No, it started in July of 1999 and it

23

1  lasted until -- let me recall here. I believe it
2  was May of 2001 when one of the board members
3  resigned.
4      Q    Who was that?
5      A    That was Governor Thompson.
6      Q    And from that point forward there were
7  only six voting directors?
8      A    That's correct.
9      Q    And when was the next time that number
10 changed?
11     A    Let me think back here. That -- that
12 number changed as I recall in November -- I believe
13 it was November of 2002 with the appointment of
14 David Laney who took Governor Thompson's place.
15     Q    With the result that in November of 2002
16 there were again seven directors?
17     A    Yes.
18     Q    How long did that situation last?
19     A    Again, I'm working from memory so bear
20 with me. That lasted until June of 2003 when the
21 terms of two board members expired.
22     Q    Which board members?

24

1      A    It was Mayor Smith and Governor Dukakis.
2      Q    Which left the board with only five
3  voting members in June of 2003?
4      A    Correct.
5      Q    And then when was the next time that
6  changed?
7      A    The next time that changed was in
8  September as I recall. September 2003 two -- the
9  terms of two more board members expired which left
10 us at three.
11     Q    And which were the board members that
12 expired, the terms?
13     A    It was Amy Rosen and Governor Holton.
14     Q    And any change since then?
15     A    There hasn't been any change since then.
16     Q    So there -- your earlier answer was three
17 then four. The reference to four is including the
18 nonvoting director?
19     A    Yes.
20     Q    And the current directors are?
21     A    Current directors are Secretary Mineta,
22 Sylvia de Leon and David Laney.

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

7 (Pages 25 to 28)

25

1    Q    And tell me -- prior to July '99 when you
2    said there were seven directors, if you could take
3    me from the period under the new statutory scheme or
4    the most recent statutory scheme up until July '99.
5    If you could tell me how many directors there were.
6    A    Can you rephrase that question?
7    Q    Sure. You said in 1998 Congress set out
8    a new requirement for the board of directors.
9    A    Yes.
10   Q    Is that correct?
11   A    Uh-huh.
12   Q    Prior to Congress setting that out in
13   1998 how many board of directors had Congress
14   required?
15        MR. WELLSCHLAGER: Object to the extent
16   it seeks a legal conclusion. Go ahead and answer.
17   A    Okay. I believe it was seven but I --
18   I'd have to look back at my documents and -- to find
19   out for sure because I don't have all this
20   information memorized.
21   BY MR. GOTTESDIENER:
22   Q    Let's then take 1998, the new requirement

26

1    whether it was the same number or not. If you could
2    tell us how many directors there were from that
3    period until July '99 when you said there was in
4    fact a full complement of seven.
5         How many were there in the interim?
6    A    In June of 1998 we had a board that was
7    composed of the Secretary of Transportation. We had
8    Governor Thompson. We had Governor Dukakis and we
9    had Mayor Smith so starting in June we had -- under
10   the new scheme there were four board members
11   appointed.
12   Q    Now, why did you start in June?
13   A    Because that's -- that's when the new
14   board took over.
15   Q    And the new board took over in June. Was
16   that the time that they were supposed to take over?
17   A    Yes.
18   Q    Until that time the old board was
19   functioning?
20   A    Correct.
21   Q    Any of the people you just mentioned,
22   were they on the old board?

27

1    A    The Secretary of Transportation was on
2    the old board.
3    Q    And the old board and new board, are they
4    now or have they been at any time since 1998
5    referred to in shorthand in any other way? Reform
6    board, any other kinds of phrases to describe the
7    board?
8    A    They've been referred to as the reform
9    board.
10   Q    The current board?
11   A    Yes, since 1998 it's been referred to as
12   the reform board.
13   Q    And why is that?
14   A    Because Congress enacted what it felt was
15   some reform legislation creating a different board
16   of directors and that's what they -- I believe
17   that's what they called it in the legislation.
18   Q    And so around the board and colloquially
19   inside the corporation this current board is
20   referred to as the reform board?
21   A    Most people just refer to them as the
22   board of directors.

28

1    Q    But you would agree that in addition --
2    this is how I'm understanding your answer from
3    before. Is that -- am I misunderstanding?
4    A    Some people refer to them as the reform
5    board.
6    Q    Okay. And what happened on or about
7    July '99 to get the complement up to the full seven?
8    A    Well, it was at that time that the
9    president had nominated Sylvia de Leon and then it
10   was -- it took Congress a long time to act on that
11   nomination so they finally -- the Senate voted on it
12   and she became a board member at that time.
13   Q    At what time? July 1999?
14   A    As I recall it was July of 1999.
15   Q    Okay. Did anyone else become a board
16   member in July '99?
17   A    No.
18   Q    So maybe my math is wrong but that would
19   get us to five, not seven.
20   A    Well, I think maybe your math is wrong.
21   Q    Okay. You told us that in June '98 there
22   were four directors and then in July '99 there were

29
1  seven, is that right, just talking about what you
2  testified to?
3    A    Okay. Let's see, in June there were four
4  directors.
5    Q    June of '98?
6    A    June of '98 there were four directors so
7  let's go back through it here. Four directors and
8  then September of 1999 Governor Holton, Amy Rosen
9  became board members. That takes us up to six and
10  then July -- and for Amy Rosen and Governor Holton
11  that was September 1998.
12        Is that what I said?
13    Q    No, you said '99 but now you're
14  saying '98.
15    A    Okay, I'm sorry. It's September of --
16  I'm sorry, it's September of 1998 was Amy Rosen and
17  Governor Holton.
18    Q    Okay, that brings us to six.
19    A    Okay. And then in July of '99 it was
20  Sylvia de Leon.
21    Q    Thank you. Are there any procedures that
22  the corporate secretary and/or the assistant

30
1  corporate secretary are to follow in the discharge
2  of their duties?
3    A    Yes, there are.
4    Q    Tell me what those are.
5    A    Well, in discharge of our duties it's --
6  it's making sure that all the board of directors
7  have the necessary materials that they need for a
8  meeting, taking the minutes at the meetings. It's
9  making sure that those minutes are written up
10  following the meeting and then presented for
11  approval by the board of directors usually at the
12  following meeting and then it's safeguarding other
13  information that takes place at board meetings in
14  addition to the minutes, any actions that the board
15  take.
16    Q    Anything else?
17    A    The corporate -- the assistant corporate
18  secretaries and the secretary are involved with
19  sealing official corporate documents.
20    Q    And why is that done?
21    A    That's done because outsiders often, you
22  know, want a certification that the board has

31
1  approved a certain action item, resolution or other
2  matter and so it's -- part of our role is to do
3  that.
4    Q    Any other procedures?
5    A    That's generally the procedures and then
6  some of it's -- a lot of what we do is as needed as
7  directed by the board of directors or as needed for
8  other reasons.
9    Q    Is there anywhere that the procedures
10  you've described and how to perform these functions
11  is in writing?
12    A    Well, the -- the bylaws talk about the
13  duties of the secretary and the assistant corporate
14  secretary.
15    Q    Anywhere else?
16    A    Our job descriptions describe some of,
17  you know, the duties that we're supposed to do.
18    Q    Your written job description?
19    A    Yes.
20    Q    And where would one get a copy of your
21  written job description?
22    A    Well, our personnel department maintains

32
1  the job descriptions.
2    Q    Have you ever had or do you have now in
3  your possession, and I don't mean on your person, a
4  copy of your written job description?
5    A    I've had it from time to time.
6    Q    Do you have it now?
7    A    I don't have it on me now.
8    Q    Not on you. Do you have it like in your
9  office or someplace that is what you consider in
10  your immediate domain?
11    A    I probably have one in my office.
12    Q    Have you ever been asked to review, edit,
13  modify, comment on a written description of your job
14  or Ms. Oliveri's job?
15    A    Yes, I have on mine.
16    Q    When?
17    A    It's been a long time. I couldn't say
18  exactly when.
19    Q    And why were you asked to do that at that
20  time?
21    A    Well, Amtrak has gone through a lot of
22  reorganizations and as -- as part of those

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

9 (Pages 33 to 36)

33

1  reorganizations they've often looked at every --
2  every position, every job description and, you know,
3  looking for -- making sure that jobs complement each
4  other and not redundant and that sort of thing so
5  it's been -- happened from time to time as they've
6  reviewed the organization.
7      Q    And in the case of your position or I'm
8  presuming that it would be fair based on your
9  testimony to say your dual position -- is that right
10  by the way? Do you consider yourself having -- you
11  said a dual title. Do you consider these to be two
12  different positions?
13     A    As I look at it I consider it to be one
14  position but with two titles.
15     Q    At any point in time since 1992 through
16  today has the job description, job duties changed in
17  any way whether you consider it, you know, material
18  or relevant or an important change but have they
19  changed in any way?
20     A    There have been some small refinements.
21     Q    Tell us about those.
22     A    When I say "small," you know, there have

34

1  been some -- sort of some ancillary things I've done
2  in the past and so in an environment -- in the
3  corporate world today where everybody is always
4  trying to do -- do more with less, it's been the
5  nature of that sort of thing.
6      Q    So please provide us with the for
7  instance.
8      A    Okay, for instance, an example is we have
9  a boardroom at our corporate headquarters and so
10  I've picked up the additional responsibility of
11  keeping an eye on it more so than I had to in the
12  past when there were other people that assisted me
13  with some of the projection equipment.
14     Q    And just while you're on that what is in
15  the boardroom? Projection equipment, big desk.
16  What else?
17     A    There's a boardroom table with chairs
18  around it. There's chairs around the outside of the
19  room.
20     Q    You mean on the inside of the room but --
21     A    Against the wall.
22     Q    Yes.

35

1      A    There's a table that's used for the
2  assistant corporate secretaries to sit at during the
3  meetings.
4      Q    That's off to the side?
5      A    Yes. And then there's projection
6  equipment in the room for presentations and so
7  forth.
8      Q    What kind of projection equipment?
9      A    There's an overhead projector. There's
10  also rear projection equipment in the room at the
11  front of the room.
12     Q    And does that equipment hook into laptops
13  or other forms of computers?
14     A    It hooks into a computer which is right
15  there in the room.
16     Q    Do you ever operate that computer?
17     A    Yes.
18     Q    Does Ms. Oliveri ever operate that
19  computer?
20     A    She does it very infrequently. I'm
21  usually the one that does it.
22     Q    Why is that?

36

1      A    Because I'm more technically -- have a
2  better technical understanding of it and the
3  equipment.
4      Q    When there is a meeting and minutes are
5  kept, who keeps the meetings typically as between
6  you and Ms. Oliveri?
7      A    We both take notes.
8      Q    Is there an agreement before or at the
9  meeting as between you and Ms. Oliveri as to who is
10  the official person taking the minutes?
11     A    We actually both go in there taking notes
12  and we both try and listen to everything.
13     Q    But in terms of who is responsible for
14  taking the minutes is it -- is it a joint
15  responsibility as far as you see it?
16     A    It's a joint responsibility.
17     Q    And have you ever yourself or Ms. Oliveri
18  taken minutes in any form whatsoever other than
19  using a writing instrument and a pad of paper?
20     A    I think that's the only way we've taken
21  them.
22     Q    You have never audiotaped a board meeting

Case 1:06-cv-01539-GK   Document 20-6   Filed 01/16/2007   Page 11 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

10 (Pages 37 to 40)

37

1  or any portion of a board meeting?
2  **A   Well, I take that back. There was one**
3  **time when we did some audiotaping that I was -- that**
4  **I'm aware of and that was when one of our -- when**
5  **our longest serving board member passed away and**
6  **then at the following meeting the board wanted to --**
7  **each of the board members wanted to make a tribute**
8  **to this board member who passed away so we did -- as**
9  **I recall we recorded those tributes.**
10  Q    And when was that?
11  **A   I believe that was 1993.**
12  Q    And were the tributes the only thing that
13  were recorded or was the rest of the meeting
14  recorded?
15  **A   No, just the tributes.**
16  Q    Apart from that has there ever been an
17  audiotaping or a videotaping of a meeting of the
18  board of directors?
19  **A   I don't recall there being one.**
20  Q    Are you aware of any time a member of the
21  public or a non-Amtrak employee or officer has been
22  present at a board meeting and has audiotaped the

38

1  proceedings?
2  **A   I don't -- I don't recall anybody doing**
3  **that.**
4  Q    Did you ever make any form of
5  announcement or give notice or notification to
6  people outside of the corporation of the existence
7  of a scheduled board meeting?
8          MR. WELLSCHLAGER: Objection to the form
9  of the question. Go ahead.
10  **A   Okay. We used to -- we used to have a**
11  **public session that was -- that we offered on a**
12  **regular basis and we used to announce that to the**
13  **public.**
14  **BY MR. GOTTESDIENER:**
15  Q    So the answer is yes, you were the one
16  who announced that to the public or Ms. Oliveri
17  or --
18  **A   Well, we would give it to our public**
19  **affairs people and they would disseminate it.**
20  Q    Tell me how that worked.
21  **A   The way it worked was we would take an**
22  **agenda and we'd give it to our public affairs**

39

1  **department and they would just announce that the**
2  **next meeting of the Amtrak board of directors is on**
3  **such and such a date and such and such a time.**
4  Q    And why did you do that when you did
5  that?
6  **A   Why do we do that?**
7  Q    Why did you do that when you did that?
8  **A   That was -- that was part of our**
9  **procedures at that time was to do that.**
10  Q    And what do you mean by that? That was
11  part of the procedures as you understood them, as
12  they were written down?
13  **A   Well, in our bylaws at that time it**
14  **called for having a public session from time to time**
15  **and so after most meetings at that time at the**
16  **conclusion of the meeting there would be a short**
17  **public session so we announced it -- the public**
18  **affairs people announced it to the people --**
19  **interested people that they were aware of.**
20  Q    And then what happened? The board would
21  have a meeting that would not be public and then at
22  the end they would allow in the public?

40

1  **A   That's correct.**
2  Q    And how long did that go on for?
3  **A   That went on until about 1998.**
4  Q    And what changed?
5  **A   Well -- yeah, somewhere around 1998.**
6  Q    What changed in that period?
7  **A   I guess what changed -- well, first of**
8  **all, the board was -- debated it. You know, what**
9  **they wanted to do and then they ultimately changed**
10  **the bylaws to do away with the public session.**
11  Q    And was there any discussion among board
12  members as to legal requirements for keeping the
13  board meetings open or possibly open to the public?
14          MR. WELLSCHLAGER: Mr. Carten, that's a
15  yes or no question and I would caution you to be
16  careful about divulging conversations amongst board
17  members where an attorney was present in his or her
18  capacity as an attorney and rendering legal advice
19  or responding to legal inquiries but the question
20  posed right now is did conversations of that nature
21  take place and you can answer that.
22  **A   I'd have to say yes.**

Case 1:06-cv-01539-GK    Document 20-6    Filed 01/16/2007    Page 12 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

11 (Pages 41 to 44)

41

1  BY MR. GOTTESDIENER:
2      Q    What were the conversations?
3      A    I don't recall --
4          MR. WELLSCHLAGER:  Same caution.
5      A    Okay.  I don't recall any specific
6  conversations.
7  BY MR. GOTTESDIENER:
8      Q    But you do recall that the board
9  discussed hey, maybe we are or are not required by
10  law to have these sessions open to the public?
11     A    In any -- in any consideration of
12  something like that the board would always seek
13  direction from legal counsel.
14     Q    That's not my question.  You were there
15  and you recall there was a discussion as to whether
16  or not this had to be public or did not require to
17  be public?
18     A    I recall that there --
19          MR. WELLSCHLAGER:  Objection to the form
20  of the question and I think he's asking you a yes or
21  no question.
22     A    Can you restate the question?

42

1  BY MR. GOTTESDIENER:
2      Q    The question came up while this was being
3  debated are we required to have board meetings
4  public.  This was just asking as to the topic.  That
5  was discussed among board members.  The legality of
6  closing the board meetings for all purposes to the
7  public, whether they had to be open for some or all
8  purposes to the public, that was discussed?
9      A    Okay.
10          MR. WELLSCHLAGER:  Objection to the form
11  of the question.
12  BY MR. GOTTESDIENER:
13     Q    Right?  When you said "okay" your answer
14  is yes, right?
15     A    Yes, but I would like to explain.
16     Q    Please explain.
17     A    Okay.  I'm sure it was discussed but I
18  can't -- I really don't remember any specifics of
19  the discussion.  I just know generally that in
20  any -- any change like that there will always be
21  proper legal consideration.
22     Q    Who is the lawyer for the board?

43

1      A    The general counsel.
2          MR. WELLSCHLAGER:  Objection to the form
3  of the question.
4  BY MR. GOTTESDIENER:
5      Q    Who, if anyone, was present in a capacity
6  as lawyer for the board when the conversation among
7  the board was had as to whether or not board
8  meetings had to be public?
9      A    I don't recall specifically who it was.
10     Q    But you're also not recalling that there
11  necessarily was a lawyer present advising the board
12  while they had that conversation?
13          MR. WELLSCHLAGER:  Objection to the form
14  of the question.
15  BY MR. GOTTESDIENER:
16     Q    Isn't that right?
17     A    Can you repeat the question?
18     Q    You are not saying to us that you know
19  for a fact that there was the general counsel or
20  some other person present when this conversation was
21  taking place?
22     A    I can't say for sure that there was and

44

1  who it was.
2      Q    If such a person were present?
3      A    Correct.
4      Q    Does the general counsel attend all board
5  meetings?
6      A    Generally the general counsel does.
7      Q    But not all board meetings?
8      A    Well, the general counsel as I recall
9  attends all the board meetings so -- but there are
10  times when the board members just have a discussion
11  by themselves short periods of time.
12     Q    That are outside of the meeting as such?
13     A    They're still part of the meeting but
14  there are times when they meet without the general
15  counsel or any member of management present.
16     Q    And have these kinds of discussions?
17     A    They have discussions.
18     Q    Have you or Ms. Oliveri ever --
19  withdrawn.
20          When you take notes at meetings of the
21  board how -- how do you do that?  Mechanically
22  describe that process.

45

1    A    We just -- we have a pad of paper and
2    then we write them down longhand.
3    Q    And she and you sit next to each other?
4    A    Yes.
5    Q    And how long roughly is the typical board
6    meeting? How long does it last?
7    A    Typical meeting usually starts 8:00 in
8    the morning and finishes 3, 4:00 in the afternoon.
9    Q    And tell us on such a day typically your
10   responsibilities during the day and what you do
11   immediately after the board meeting with respect to
12   the board.
13   A    With respect to the board?
14   Q    Yes.
15   A    Immediately after the meeting we focus
16   on, first of all, where the board members need to
17   go, where they need to be, that we take care of
18   their transportation or any requirements that they
19   have following the meeting, you know, as long as
20   they're there with us and then we clean up the room
21   and --
22   Q    I mean are you ever ordering lunch?

46

1    A    Not during the meeting.
2    Q    No, are you ever responsible for ordering
3    lunch?
4    A    Yes.
5    Q    That's one of your job duties?
6    A    Yes.
7    Q    Coffee?
8    A    Yep.
9    Q    During the day as a meeting progresses
10   you're responsible also for maintaining, operating
11   any projection equipment?
12   A    Yes.
13   Q    And you're also expected to be taking
14   notes at the same time?
15   A    Yes.
16   Q    Now -- and there -- how many breaks would
17   you say there typically are apart from lunch when
18   there's a board meeting?
19   A    Probably a couple of breaks.
20   Q    Of what length?
21   A    10, 15 minutes.
22   Q    And during these breaks what are you

47

1    typically doing?
2    A    Well, I'm thinking ahead to what the
3    board needs to do next in terms of making sure that
4    if there are people that need to be in there to
5    brief the board on the next agenda item or there's
6    some information that we need to have for them that
7    we're ready when they're ready to convene next.
8    Q    As the meeting progresses do you and
9    Ms. Oliveri ever exchange notes, look at each
10   other's notes, confer about, you know, whether or
11   not you caught something that she may not have
12   caught?
13   A    We do confer from time to time.
14   Q    During the meeting?
15   A    Yes.
16   Q    And tell us what you do after the meeting
17   with respect to the notes that you've taken.
18   A    After the meeting she and I will talk
19   about writing up the minutes. I usually will give
20   her a copy of my notes and then we'll talk about in
21   our initial write-up who has primary responsibility
22   for each part of the meeting then we'll -- we'll

48

1    start on that and then we'll combine our minutes
2    into one set of minutes and then once we're
3    satisfied -- once we're comfortable with what we've
4    written up then we distribute it to certain people
5    around the company that -- for their review, usually
6    the presenters on a particular -- particular item
7    and then we come up with a final draft which is
8    presented to the board for approval.
9    Q    Now, you give her a copy of your notes
10   but she doesn't typically give you a copy of her
11   notes?
12   A    No, and the reason being is she takes
13   shorthand and I don't so she can read my handwriting
14   but I can't -- I can't read most of hers.
15   Q    And what do you know as to her training
16   in shorthand?
17   A    Well, all I know is that she seems to be
18   very proficient at it and that she's had some
19   training in it.
20   Q    Is it the typical case that when you're
21   both present taking notes, that after the meeting
22   you have a division of labor as to various parts of

Case 1:06-cv-01539-GK    Document 20-6    Filed 01/16/2007    Page 14 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

13 (Pages 49 to 52)

49

1  the meeting?
2      A    Yes.
3      Q    Is there ever a time that you can recall
4  where you and she both worked up the same portion of
5  a meeting?
6      A    Not that I recall.
7      Q    Did that ever happen by accident?
8      A    Not that I recall.
9      Q    And what is it that you do?  When you go
10  away and you do your part and she goes away and she
11  does her part, how do you then -- what is it that
12  you're doing and how is it that you exchange the
13  product of what you had just done?
14      A    We -- what we do is we draft up a set of
15  minutes.  She has a set of the items she's looking
16  at or writing up.  I've got the ones that I do and
17  then she will either give me hers or I'll give her
18  mine and then we'll cut and paste and make it into
19  one document.
20      Q    And there is -- just on this point and
21  generally is there -- in any matter that touches on
22  your duties is there any hierarchy between you and

50

1  Ms. Oliveri?  Is it -- is it you're responsible
2  generally for one function, the minutes, she's
3  responsible for other functions or is it a complete
4  50/50 sort of setup?
5      A    Well, she and I work together on the
6  minutes and I'm the full-time assistant corporate
7  secretary and she's the part-time so most of the --
8  most of the things I'm really responsible for.
9      Q    So --
10      A    So she's assisting me in that role.
11      Q    Okay.  So is it fair to say that as to
12  the minutes you're effectively equal partners in
13  this job but otherwise it's basically your job?
14      A    That's correct.
15      Q    You said "draft up a set of minutes."
16  What do you mean?  Do you mean type up?
17      A    Type up.
18      Q    So you take notes and then physically
19  what do you do?  You take the notes and then you go
20  to a computer and type?
21      A    Yeah, I go -- take the notes, go to a
22  computer and type and, you know, type them up based

51

1  on what took place in the meeting.
2      Q    And when you say "type them up," do you
3  type up your notes verbatim or are you doing a
4  transposition of your notes into minutes?
5      A    I'm summarizing what took place in the
6  meeting.
7      Q    As reflected in your notes?
8      A    Yes.
9      Q    But your notes are in the form of a
10  verbatim rendition of what you're hearing?
11      A    Yes.
12      Q    And so when you take notes you're not as
13  you're taking the notes summarizing, you're
14  attempting to capture what's being said?
15      A    I'm trying to capture the gist of what's
16  going on in the meeting without being able to write
17  down every -- every word and every phrase that
18  everybody says.
19      Q    But you will in fact write down words and
20  phrases and exact things you're hearing for the
21  purpose of later recalling what it was that
22  transpired?

52

1          MR. WELLSCHLAGER:  Objection to the form
2  of the question.  Go ahead.
3      A    Well, what I do is -- I'm not sure I
4  understand that question.
5          MR. GOTTESDIENER:  Okay.
6      A    Do you want to rephrase it?
7  BY MR. GOTTESDIENER:
8      Q    Sure.  You will at times be literally
9  trying to write something that's being said word for
10  word if you think it's an important statement that
11  someone is making?
12      A    That's correct.
13      Q    Have you ever taken your notes and typed
14  up your notes more or less verbatim?
15      A    No, I have not.
16      Q    Has Ms. Oliveri ever done that?
17      A    She may have.  You know, I couldn't say
18  for sure.
19      Q    Have you ever seen a typed version of
20  what appear to be notes of a meeting that you were
21  present at that have sort of entries where they'll
22  be someone's name and a colon and a statement that

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

14 (Pages 53 to 56)

53
1  they make and someone else's name and a colon or
2  initials, something that would resemble a typed
3  version of notes that you or she took?
4      **A    I don't recall seeing a typed version**
5  **like that.**
6      Q    And that's with respect to her but for
7  you you know you don't do that? You don't take the
8  notes and then type them up?
9      **A    Correct.**
10     Q    How about any third person that has acted
11 as a note taker or minute taker at any meeting when
12 maybe you or she was not present?
13     **A    Well, the corporate secretary sometimes**
14 **serves as a note taker as well.**
15     Q    Okay. So the question is have you ever
16 seen the corporate secretary's notes typed up in a
17 verbatim fashion?
18     **A    No.**
19     Q    And are you the custodian of all the
20 notes taken by assistant corporate secretaries
21 and/or the corporate secretary at meetings?
22     **A    I'm the custodian of my own notes and**

54
1  **they keep theirs themselves separately.**
2      Q    Don't you consider those board materials?
3      **A    I consider the minutes to be the board**
4  **materials.**
5      Q    Not the notes that the corporate
6  secretary or another assistant corporate secretary
7  take?
8      **A    Correct.**
9          MR. WELLSCHLAGER: Eli?
10         MR. GOTTESDIENER: Yep.
11         MR. WELLSCHLAGER: Can we break for 40
12 seconds so I can just run to the men's room?
13         MR. GOTTESDIENER: Sure.
14         THE VIDEOGRAPHER: We're going off the
15 record. The time is 9:40 a.m.
16         (A brief recess was taken.)
17         THE VIDEOGRAPHER: We're back on the
18 record. The time is 9:46 a.m.
19 BY MR. GOTTESDIENER:  .
20     Q    Did the board ever discuss the fact that
21 it had fewer board directors than Congress required?
22         MR. WELLSCHLAGER: Same caution as before

55
1  concerning any attorney-client communications but as
2  to the question asked which is a yes or no question,
3  go ahead and answer.
4      **A    I believe they, you know, addressed that**
5  **at some point.**
6  BY MR. GOTTESDIENER:
7      Q    Tell us everything you know about what
8  they said and how they addressed it.
9          MR. GOTTESDIENER: Either you instruct
10 him not to answer or you stop interrupting. It's
11 yes or no.
12         MR. WELLSCHLAGER: No, that's -- that's
13 not what the rules contemplate, Mr. Gottesdiener.
14         MR. GOTTESDIENER: Go ahead.
15         MR. WELLSCHLAGER: And I'll instruct the
16 witness as I see appropriate. You can answer the
17 question to the extent it doesn't call for
18 communications amongst the board members where
19 counsel was present and rendering legal advice. If
20 there were those kind of discussions without
21 attorneys then you can answer the question. If
22 there weren't, don't reveal the contents of any of

56
1  those discussions and if you don't remember any of
2  it you can say that too.
3      **A    Well, as I recall there were probably --**
4  **probably an attorney was present when they discussed**
5  **it.**
6  BY MR. GOTTESDIENER:
7      Q    When they discussed what?
8      **A    When they discussed the composition of**
9  **the board.**
10     Q    The composition of the board? I'm asking
11 you about the fact that the board had fewer
12 directors than Congress required.
13         You were present for conversations that
14 the board had about that subject, right?
15     **A    From time to time they discussed it.**
16     Q    Okay. How many times separately? I want
17 you to count up in your mind how many times
18 separately that you recall that conversation being
19 had in one form or another.
20     **A    I -- I can't really recall specifically**
21 **all the discussions they had about it.**
22     Q    I'm not asking for all of them. I'm

Case 1:06-cv-01539-GK    Document 20-6    Filed 01/16/2007    Page 16 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

15 (Pages 57 to 60)

57

1  asking for you to try to recall as many as you can.
2      How many times did it come up?
3  **A    I can just give you a general answer**
4  **which is, you know, several times.**
5  Q    Many times?
6  **A    I'd have to say more -- several times.**
7  Q    Would you say it was a topic of concern
8  to the directors?
9      MR. WELLSCHLAGER: Objection. Objection
10 to the form of that question.  You can answer it
11 if --
12 BY MR. GOTTESDIENER:
13 Q    Would you say it was a topic of concern
14 to the directors?
15 **A    Certainly it was a topic of concern.**
16 Q    And what was the concern that the
17 directors had?
18     MR. WELLSCHLAGER: Objection. Answer
19 that question only if the concern as expressed by
20 board members was not being relayed to an attorney
21 or for purposes of receiving legal advice.
22 **A    Okay.  I'm going to decline to answer**

58

1  **that one.**
2  BY MR. GOTTESDIENER:
3  Q    Why?
4  **A    Because it was with an attorney present**
5  **and may have involved legal advice.**
6  Q    Did the board ever do anything about the
7  fact that it didn't have the required number of
8  directors?
9  **A    The board wasn't really able to do**
10 **anything about it.**
11 Q    That's not my question.  Did the board
12 ever do anything about it?
13 **A    About what?**
14 Q    That it didn't have the required number
15 of directors.
16     MR. WELLSCHLAGER: Objection to the form
17 of the question.  You can answer.
18 **A    Well, I don't think the board can do**
19 **anything about it.**
20 BY MR. GOTTESDIENER:
21 Q    I'm not asking if you think they can or
22 not.  Did they?

59

1      MR. WELLSCHLAGER: Same objection.
2  **A    I don't -- you know, they couldn't take**
3  **any action.**
4  BY MR. GOTTESDIENER:
5  Q    Didn't the board pass more than one
6  resolution regarding the fact that they didn't have
7  the required number of directors and might not be
8  able to meet a quorum?
9  **A    The board of directors did pass a**
10 **resolution which -- which they passed to take care**
11 **of not having enough directors, that's correct.**
12 Q    When did they do that and what was the
13 resolution?
14 **A    Okay, I believe they did it in September**
15 **of 2003.  That's my recollection.**
16 Q    What did they do in September of 2003?
17 **A    They appointed a board management**
18 **committee made up of three board members.**
19 Q    And how many board members were there in
20 September of 2003 that appointed a board management
21 committee?
22 **A    There were five board members as I**

60

1  **recall.**
2  Q    And has this board management committee
3  been in existence on a continuous basis since
4  September of 2003?
5  **A    Yes.**
6  Q    And what has it done since September
7  2003?
8  **A    It has held meetings from time to time.**
9  Q    When?
10 **A    You want me to try and tell you the**
11 **specific dates?**
12 Q    Yes, since September 2003, last six to
13 nine months.
14 **A    Okay.  As I recall there was a -- there**
15 **was a September meeting.  There was a November**
16 **meeting.  There was a December meeting.  There was a**
17 **January meeting, a February meeting and a March**
18 **meeting.**
19 Q    When is the next scheduled meeting?
20 **A    April the 28th.**
21 Q    28th?
22 **A    Yes.**

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

16 (Pages 61 to 64)

61

1    Q    And how do these meetings relate to
2    meetings of the full board?
3    A    Well, this is -- this is -- at this time
4    what they're having is board of directors'
5    management committee meetings because there's not a
6    full four people on the board of directors so -- and
7    they have the power to take any necessary actions to
8    carry on the business of the corporation.
9    Q    My question, sir, was how do these
10   meetings relate to board of directors meetings?
11   A    Well, they're -- they're separate from a
12   board of directors meeting.
13   Q    So none of these meetings are board of
14   directors meetings?
15   A    This is the management committee of the
16   board of directors meeting.
17   Q    The board of directors has not met as a
18   board of directors since September of 2003?
19   A    Since September 2003 it's been the
20   management committee of the board of directors that
21   has been meeting.
22   Q    The board of directors has not met since

62

1    September 2003, right?
2    A    Well, it's been the management committee
3    of the board of directors that has been meeting.
4    Q    I appreciate that part of your answer.
5    If you would answer my question.
6         The board of directors has not met since
7    September 2003, correct?
8         MR. WELLSCHLAGER: Objection. Go ahead.
9    A    The board of directors has -- has not met
10   as a board of directors meeting. It's been the
11   management committee of the board of directors
12   meeting instead since September of 2003.
13   BY MR. GOTTESDIENER:
14   Q    And that is because the board of
15   directors cannot form a quorum of four, correct?
16   A    That's correct.
17   Q    And the quorum of four is based on the
18   requirement that there be a majority of the board of
19   directors present for there to be a quorum?
20   A    Correct.
21        MR. WELLSCHLAGER: Objection to the
22   extent it seeks a legal conclusion. Go ahead.

63

1    BY MR. GOTTESDIENER:
2    Q    What's the source of your information for
3    that?
4    A    What's the source of my information?
5    Q    Yes.
6    A    It's my understanding that a quorum for
7    the board of directors is four people.
8    Q    And where is that established?
9    A    That's established under the revised
10   legislation that created the reform board of
11   directors.
12   Q    And what does the revised legislation say
13   about that?
14        MR. WELLSCHLAGER: Objection to form.
15   A    It says a quorum is four people for the
16   Amtrak board of directors.
17   BY MR. GOTTESDIENER:
18   Q    That's the legislation enacted by
19   Congress that you were discussing that took effect
20   in 1998?
21   A    As I understand it, that's correct.
22   Q    Is that requirement set forth any other

64

1    place?
2         MR. WELLSCHLAGER: Objection to the form
3    of the question.
4    A    I think that's where it's set forth.
5    BY MR. GOTTESDIENER:
6    Q    Is that requirement set forth in any
7    other place?
8         MR. WELLSCHLAGER: Same objection.
9    A    Not that I recall.
10   BY MR. GOTTESDIENER:
11   Q    Have you ever seen a requirement that
12   there be five directors for a quorum?
13   A    It's possible it could have been
14   earlier. Prior to this legislation when we had more
15   members it may have been five. I can't recall right
16   now.
17   Q    Have you ever heard anyone discuss that
18   the Articles of Incorporation state that five
19   members of the board are required for a quorum?
20   A    No, I haven't.
21   Q    Have you ever been involved in any
22   amendment review or editing of the Articles of

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

17 (Pages 65 to 68)

65

1    Incorporation?
2        **A    I think I was involved once.**
3        Q    When?
4        **A    It was -- I believe it was 1999.**
5        Q    Okay.  Tell us what you were involved in
6    in 1999.  What happened?
7        **A    I believe we had to restate the Articles**
8    **because of certain -- because of a stock requirement**
9    **that had been changed by legislation, congressional**
10   **legislation.**
11       Q    And so you did what in 1999?  What did
12   you do?
13       **A    What did I do?  Actually I don't recall**
14   **specifically what I did in 1999.**
15       Q    But you did something with the Articles?
16       **A    I just recall we did something with it.**
17       Q    But you personally?  You did something
18   with the Articles of Incorporation in 1999?
19       **A    I recall that we made a change to it.**
20       Q    You.  You may be using the word "we" as
21   referring to you but I'd ask that you use I.
22           I'm asking you did something personally

66

1    physically?  Yes, no, you don't recall?
2        **A    I recall that something was done to it.**
3    **I can't remember specifically what it was.**
4        Q    Okay.  I'm not asking for a discussion in
5    the passive voice.  I'm asking you.
6            Do you remember that you did something
7    with the Articles of Incorporation in 1999, you,
8    John Carten?
9        **A    I can't recall specifically.**
10       Q    How about generally?  Do you have in your
11   mind's eye a recollection of sitting down with the
12   Articles of Incorporation or on the phone with
13   somebody and doing something?
14       **A    I just recall there was a change that was**
15   **made, something to do with the Articles.**
16       Q    And your role in that change as you
17   recall it sitting here was what?
18       **A    I can't recall specifically what it was.**
19       Q    You're responsible for maintaining the
20   Articles of Incorporation, right?
21       **A    It's -- it's one of the documents that I**
22   **work with, yes.**

67

1        Q    Okay.  What do you -- where is it right
2    now?  Where is the Articles of Incorporation?
3        **A    We have it in our storage room.**
4        Q    Where is that?
5        **A    It's at our corporate headquarters.**
6        Q    Where in your corporate headquarters?
7        **A    On the fourth floor.**
8        Q    Where on the fourth floor?
9        **A    It's -- it's a room near the board of**
10   **directors' office near the boardroom on the fourth**
11   **floor.**
12       Q    How is it denominated or numbered, the
13   storage room?
14       **A    It's -- it's actually a very nondescript**
15   **room that doesn't have a name or anything on it.**
16   **It's just a locked room.**
17       Q    How large is it?
18       **A    It's probably -- I don't know, 12 feet by**
19   **25 feet, something like that.**
20       Q    What's in it?
21       **A    In it we keep the minutes from the board**
22   **of directors meetings.  We keep our record of**

68

1    meeting books.
2        Q    You're what?
3        **A    Record of meeting books.**
4        Q    What else?
5        **A    We keep -- any other official documents**
6    **that we have for the corporation we keep them locked**
7    **up there.**
8        Q    What else?
9        **A    I think that encompasses pretty much it.**
10       Q    What years of materials are in this room?
11       **A    We have materials from the beginning of**
12   **the inception of the corporation and we have -- the**
13   **minutes go through about the year 1999.**
14       Q    The minutes -- are you saying the minutes
15   go from 1970 or '71 until 1999?
16       **A    Yes.**
17       Q    Hard copy of these minutes?
18       **A    These are a hard copy of the minutes.**
19       Q    In binders?
20       **A    Yes.**
21       Q    And are these the official set of
22   minutes?

69

1   A    Yes.
2   Q    And are these minutes on microfiche or
3   microfilm or scanned or in some way in existence in
4   some other format other than in this room in these
5   binders?
6   A    **We have -- some of them are microfiched**
7   **and then we also have -- keep them electronically.**
8   Q    How are they kept electronically?
9   A    **We have a shared server that we keep them**
10  **on.**
11  Q    When I mean how are they kept
12  electronically my question is are they stored in one
13  or more than one format?
14  A    **They're stored in one format.**
15  Q    Which is what?
16  A    **WordPerfect.**
17  Q    For what years?
18  A    **We have them electronically from 1971**
19  **forward.**
20  Q    When was that created?
21  A    **When was that database of information**
22  **created?**

70

1   Q    When was this information put in the
2   WordPerfect format?
3   A    **I believe it was in the mid 1990s that we**
4   **put it in WordPerfect format.**
5   Q    Do you today use WordPerfect yourself to
6   type on?
7   A    **Yes.**
8   Q    And who has access to the WordPerfect
9   version of the board minutes?
10  A    **There are three people, myself, Medaris**
11  **Oliveri and then my secretary, Sharron Hawkins.**
12  Q    And where exactly on the computer system
13  is this?
14  A    **It's what we call the S drive.**
15  Q    What is the S drive?
16  A    **It's a drive which is maintained on the**
17  **corporate computer system on a mainframe.**
18  Q    Which is where?
19  A    **Which is -- I don't know where it is at**
20  **this point. It's changed locations.**
21  Q    Last you knew it was where?
22  A    **All I know is the computer department has**

71

1   it located either here in Washington or at one of
2   their remote sites.
3   Q    And are you saying that the S drive as a
4   whole is only available to those three people or
5   just the minutes are only available to those three
6   people?
7   A    **The S drive that we have there is just**
8   **available to the three of us.**
9   Q    And is that a -- when you say it is --
10  implicitly saying it's not available to other
11  people, is your access dependent on some sort of
12  pathways that are only available to you or is your
13  access dependent on a password, a combination
14  log-in, something like that that if someone else had
15  from some other location they could get to?
16  A    **It's a log-in and password.**
17  Q    As far as you know how long has the S
18  drive been in existence?
19  A    **Since sometime in the 1990s.**
20  Q    So as far back as you can recall when
21  these minutes were created in the mid '90s there's
22  been this S drive?

72

1   A    **Yes.**
2   Q    And has anyone ever other than
3   Ms. Oliveri, yourself or your secretary had this
4   log-in information?
5   A    **No, I think it's just been the three of**
6   **us.**
7   Q    So you or Ms. Oliveri or your secretary
8   are the ones that have created the log-in
9   identification user, password, all that sort of
10  thing?
11  A    **Yes.**
12  Q    And has there ever been a time that
13  anyone has asked you for access to the S drive?
14  A    **You know, there's been time to time where**
15  **the computer people have had to look at something on**
16  **the S drive. That's the only -- only people I can**
17  **think of.**
18  Q    And then what -- what has happened when
19  that has occurred?
20  A    **Well, they'll usually say do it right at**
21  **my machine. I'll log in for them and they'll look**
22  **at it right there.**

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

19 (Pages 73 to 76)

73

1    Q    So you've never had to give this out to
2  anyone other than those two other people who have
3  it?
4    **A    Right.**
5    Q    So what else is on the S drive other than
6  the minutes?
7    **A    Well, we also have some files supporting**
8  **each of the meetings, executive summaries,**
9  **information like that that supports each meeting**
10 **that we keep on the S drive.**
11   Q    Okay.  I need to know the details when
12 you say "like that."  I mean executive summaries,
13 I've heard you say that.
14   **A    Executive summaries, resolutions,**
15 **attachments to the -- to those, presentations.**
16   Q    Attachments to those what?  Those
17 resolutions, those executive --
18   **A    Well, attachments -- sometimes it's an**
19 **executive summary, it's a resolution and it's an**
20 **attachment which make up an item that the board is**
21 **going to be considering.**
22   Q    And --

74

1    **A    So generally it's our practice to keep**
2  **those items on the S drive.**
3    Q    And these items that you're just
4  describing, executive summaries, resolutions,
5  attachments, when typically do you receive these?
6  Before or after the meeting?
7    **A    Before the meeting.**
8    Q    And what do you do with them when you
9  receive them?
10   **A    Well, when I receive them -- I receive**
11 **them and then I save them to the shared drive for a**
12 **particular meeting.**
13   Q    Is the shared drive another way of
14 calling the S drive?
15   **A    Yes.**
16   Q    Okay.
17   **A    We'll save them to the S drive and then**
18 **we'll review them for accuracy and spelling and**
19 **content and, you know, other things.**
20   Q    And who is "we" that you just referred
21 to?
22   **A    It's usually myself, Medaris or my**

75

1  **secretary, Sharron Hawkins.**
2    Q    And where do you receive these materials
3  from?
4    **A    Many times they'll come in through**
5  **e-mail.**
6    Q    Other times they'll come in how?
7    **A    Sometimes somebody will bring us a disk**
8  **with a file on it.**
9    Q    And these are -- the people who are
10 providing this to you on e-mail or on disk are
11 management employees of the corporation?
12   **A    Yes.**
13   Q    Anyone else provide you with these kinds
14 of materials that you share -- that you save to the
15 shared drive?
16   **A    Occasionally it will be an outsider that**
17 **will provide us with something.**
18   Q    You were starting to say something
19 about -- maybe I misheard the word -- presentations?
20   **A    Uh-huh.**
21   Q    And we got off on another topic.  What
22 were you referring to there, things that are of a

76

1  nature that they support the meeting?  You said
2  something about presentations.  Could you explain
3  that?
4    **A    Well, depending on an agenda some of the**
5  **agenda items that the board will be briefed on**
6  **include presentations that we'll present to them,**
7  **put up on the computer, be a power point**
8  **presentation describing whatever the particular item**
9  **is.**
10   Q    And so those are also on the S drive?
11   **A    Yes.**
12   Q    And agendas themselves are on the S
13 drive?
14   **A    Yes.**
15   Q    And you prepare a packet of information
16 for each director prior to the board meeting,
17 correct?
18   **A    Yes.**
19   Q    And that would include these executive
20 summaries and resolutions and attachments?
21   **A    Yes.**
22   Q    And how are these provided to each

Case 1:06-cv-01539-GK   Document 20-6   Filed 01/16/2007   Page 21 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

20 (Pages 77 to 80)

77

1  director?
2  **A   We put together what we call a board**
3  **briefing book and then we send those to each of the**
4  **directors.**
5  Q   And how long in advance of the meeting do
6  you typically send them the board briefing book?
7  **A   Typically it's about a week in advance.**
8  Q   And this will be essentially in a black
9  binder that's Fed Ex'd to each board member,
10  wherever they are?
11  **A   Correct.**
12  Q   And you typically send these to their
13  office location if they're currently engaged in some
14  sort of employment?
15  **A   Yes.**
16  Q   And that you've been doing on a
17  continuous basis since 1992?
18  **A   Yes.**
19  Q   And I presume keep a copy or copies
20  of the briefing book in this storage room?
21  **A   Yes.**
22  Q   And how many additional briefing books do

78

1  you prepare for each meeting such that you have some
2  left over?
3  **A   Each meeting we prepare somewhere around**
4  **25 or 30 books.**
5  Q   And typically how many are left over
6  after a meeting has concluded?
7  **A   You mean that people leave behind?**
8  Q   Yeah, or that you had made in addition
9  that you never even distributed to anyone.
10  **A   Typically there's just one book that's**
11  **left over unless any of the directors leave their**
12  **books behind and say, you know, they don't want them**
13  **anymore.**
14  Q   So each director typically keeps their
15  book, takes it with them, brings it to the meeting
16  and takes it away with them?
17  **A   Yeah.**
18  Q   And the books are also distributed to --
19  who else gets a briefing book?
20  **A   The executive committee of — management**
21  **executive committee.**
22  Q   Each member of the executive committee?

79

1  **A   Yes.**
2  Q   And the executive committee has on a
3  typical -- typical day they have how many members?
4  **A   Probably somewhere around 15, 16.**
5  Q   And does the executive committee ever get
6  a version of the briefing book that's different than
7  the version that the directors get?
8  **A   Yes, some of the confidential information**
9  **is not put in the executive -- the management**
10  **executive committee books.**
11  Q   Anyone else get a copy of the briefing
12  book before the meeting?
13  **A   Well, there's some staff at the Federal**
14  **Railroad Administration that get it and there's also**
15  **some -- at least one staff member usually at the**
16  **Department of Transportation gets a book.**
17  Q   Anyone else?
18  **A   Our head of corporate communications**
19  **usually gets a book.**
20  Q   Anyone else?
21  **A   I think that pretty well covers it.**
22  Q   And so how -- withdrawn.

80

1       When I was asking you what's in the
2  storage room you said minutes and then the next item
3  I have is record of meeting books.
4  **A   Uh-huh.**
5  Q   Is the record of meeting books any
6  different than these binders we've been discussing?
7  **A   No, it's the same thing.**
8  Q   Okay. You just call it record of meeting
9  book?
10  **A   Yeah.**
11  Q   And those cover what years, the ones that
12  are in the storage room? Do they go back to 1971?
13  **A   The ones that are in the storage room do**
14  **not go back to 1971.**
15  Q   How far back do they go?
16  **A   They go back to about -- I believe about**
17  **1992, somewhere in there.**
18  Q   And they are up to the current time?
19  **A   Yes.**
20  Q   Now, the record of meeting books --
21  without getting too far into this subject at this
22  time, there are committees of the board of directors

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

21 (Pages 81 to 84)

81

1    or have been committees over the years that you've
2    attended the meetings of, correct?
3        A    Yes.
4        Q    Are there -- and I'm talking now like
5    throughout the '90s, for example.
6            Are there books prepared in anticipation
7    of those meetings as well that are in this storage
8    room?
9        A    Yes.
10       Q    Are there anywhere kept in this storage
11   room or elsewhere any other kinds of binders or
12   books of documents that you consider official
13   documents of the board?
14       A    We have what we call our resolution books
15   that are kept in the storage room.
16       Q    They're kept in the storage room?
17       A    Right, and in my office.
18       Q    And in your office?
19       A    Uh-huh.
20       Q    Why two places?
21       A    The current ones are kept in my office
22   because we refer to them regularly.

82

1        Q    And is that the case with the minutes as
2    well?
3        A    Yes.
4        Q    And that's the case with the record of
5    meeting books or no?
6        A    Some of the most recent will be in my
7    office.
8        Q    You don't have a personal set and
9    Ms. Oliveri doesn't have a personal set no matter
10   how incomplete of your own record of meeting books?
11       A    I just -- I just maintain one record --
12   set of record of meeting books which is the official
13   one.
14       Q    Do you have any what you consider to be
15   working or John Carten minutes, record of meeting
16   books, resolution books or binders, anything that
17   may be the exact same thing as the official version
18   or a copy of the official version but you consider
19   to be your working set such that you could write on
20   it and make notes and really is for your own
21   personal use?
22       A    For the most recent meetings I will

83

1    have -- I get a board book as well.  For the most
2    recent meeting I'll have one with my name on it that
3    I'll make some notes in it but do not keep it for
4    any length of time.
5        Q    What do you do with it?
6        A    We take the contents out of it and then
7    get rid of the contents.
8        Q    How do you get rid of the contents?
9        A    We get it shredded.
10       Q    And do you recycle the binders?
11       A    Yes.
12       Q    Meaning reuse the binders?
13       A    Yes, we reuse the binders.
14       Q    And who does that?  Do you do it, your
15   secretary does it, some combination of both?
16       A    It's some combination of both.
17       Q    Does Ms. Oliveri get her own record of
18   meeting book that has her name on it?
19       A    She gets her own board book with her name
20   on it.
21       Q    Board book, is that different than what I
22   was just saying?

84

1        A    Well, the record of meeting book is what
2    we call the one that we keep as our official
3    document from that meeting.  We call that the record
4    of meeting book.
5        Q    Okay.
6        A    And the others we just refer to as board
7    books.
8        Q    But they're otherwise identical?
9        A    Yes.
10       Q    So that's a denomination that is to
11   reflect that it's the official version?
12       A    Yes.
13       Q    Is there another denomination for the
14   minutes that is different than the way you would
15   discuss another set of the minutes that is otherwise
16   identical but you call it something else?  You add a
17   word, you subtract a word to also indicate that this
18   is the official set?
19       A    We just call it the -- you know, the
20   minute books contain the official minutes of the
21   meeting.
22       Q    The minute books?

Case 1:06-cv-01539-GK    Document 20-6    Filed 01/16/2007    Page 23 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

22 (Pages 85 to 88)

85

1    **A    Yeah, we call them the minute books.**
2    Q    Where -- we've established that there's a
3    copy on WordPerfect from '71 to the present on the S
4    drive of all the minutes, correct?
5    **A    Yes.**
6    Q    And you said that there is a -- there's a
7    hard copy or some of these are kept in some other
8    location, another set of minutes that are not the
9    minute books and are not the WordPerfect version?
10    **A    Well, there's -- there's one set of**
11    **minutes, the minute books and we keep -- either have**
12    **those in the storage room on the fourth floor or we**
13    **have the most recent ones in my office.**
14    Q    And your office is where?
15    **A    It's on the third floor.**
16    Q    And Ms. Oliveri is where?
17    **A    She's on the third floor.**
18    Q    And so you have in your office some of
19    the official minutes, the minute books; is that
20    right?
21    **A    Yes.**
22    Q    You have in your office. You do not have

86

1    in your office record of meeting books?
2    **A    I have a few of -- typically a few of**
3    **them from the most recent meetings.**
4    Q    But then you would also, if I understand,
5    have the exact same thing with your name on it and
6    some of your notes?
7    **A    Yes.**
8    Q    So you have two binders and in some cases
9    more than two binders of the same materials as to a
10    meeting?
11    **A    Usually just two binders.**
12    Q    And how are these -- how large is your
13    office?
14    **A    My office is maybe 17 by 12, something**
15    **like that.**
16    Q    And is it -- on how many different walls
17    do you have bookcases filled with binders?
18    **A    I've got two -- two walls that have**
19    **bookcases with binders.**
20    Q    Do you keep binders any other place than
21    in these bookcases?
22    **A    Sometimes right next to my desk.**

87

1    Q    Any other place in your office where you
2    keep hard copies of board materials other than that
3    location near your desk or in these bookcases?
4    **A    That's -- you know, near my desk or on**
5    **top of my desk.**
6    Q    Do you have filing cabinets inside your
7    office?
8    **A    I do have filing cabinets.**
9    Q    What are inside your filing cabinets?
10    **A    I have some notes from -- on a variety of**
11    **subjects. You know, some of it is personal, some of**
12    **it is administrative. There are also -- in the**
13    **filing cabinets I have some of my notes, handwritten**
14    **notes from meetings.**
15    Q    Some of them? Where else do you keep
16    your handwritten notes relative to the meetings?
17    **A    The rest of them are -- would be up on**
18    **the fourth floor.**
19    Q    In the storage room?
20    **A    In the storage room.**
21    Q    And how -- how are they divided? I mean
22    are there certain years that are in the storage room

88

1    and certain years that are in your office?
2    **A    Generally divided chronologically.**
3    Q    In the sense that the most recent ones
4    are in your office?
5    **A    Yes.**
6    Q    Are they -- do you take them on legal
7    pads or how do you take the notes?
8    **A    8 and a half by 11 paper, similar to that**
9    **pad right there.**
10    Q    But just individual sheets of paper?
11    **A    Yes.**
12    Q    And are they filed in files that are
13    labeled in any way?
14    **A    Yeah, they're usually filed with a date**
15    **and -- you know, say board meeting and a date.**
16    Q    And how -- how much room do your minute
17    notes -- board meeting notes rather take up in your
18    filing cabinets? Just a drawer, half a drawer, five
19    drawers?
20    **A    Probably more on the order of five**
21    **drawers, something like that.**
22    Q    So would it be fair to say that you have

Case 1:06-cv-01539-GK    Document 20-6    Filed 01/16/2007    Page 24 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

23 (Pages 89 to 92)

89

1  a whole filing cabinet that just pertains to the
2  notes that you've taken at meetings since 1992?
3  **A    Well, they're actually -- they're split**
4  **up between the ones that are up on the fourth floor**
5  **and then the ones I have on the third floor.**
6  Q    So when you said "five drawers" are you
7  combining --
8  **A    Yes.**
9  Q    Are the ones in the storage room kept in
10 filing cabinets?
11 **A    Yes.**
12 Q    And how many -- why don't you just divide
13 it for me. How many drawers are in the filing
14 cabinets in the storage room and how many drawers in
15 the filing cabinets in your office?
16 **A    I'll estimate that on the fourth floor**
17 **there's probably about two drawers and maybe three**
18 **drawers in my office and there's also a cabinet**
19 **that's just outside of my office that's locked that**
20 **I think has some in it as well.**
21 Q    And what year if you know is the cutoff
22 point for where they are in the storage room or your

90

1  office or right outside your office?
2  **A    Between the fourth floor and my office**
3  **it's probably somewhere around 1999 I would guess is**
4  **the cutoff point.**
5  Q    1999 forward is on the third floor?
6  **A    Yes.**
7  Q    And this cabinet outside your office,
8  what else, if anything, does it contain?
9  **A    It just -- it contains some information**
10 **that I have relating to other projects I work on.**
11 Q    What projects?
12 **A    Well, I work some with foreign railroads**
13 **so often we'll have a -- some information about**
14 **different foreign railroads that have visited**
15 **Amtrak.**
16 Q    Okay. Anything else?
17 **A    I think that's about it.**
18 Q    Do you have just one cabinet outside your
19 office?
20 **A    Yes.**
21 Q    What about your secretary, does she
22 maintain in cabinets, filing cabinets or other

91

1  locations any of your documents or materials that
2  you consider your documents or board documents?
3  **A    She maintains some board documents.**
4  Q    What board documents does she maintain?
5  **A    She has a file which is background**
6  **information on the board members for each board**
7  **member.**
8  Q    Anything else?
9  **A    She has information about compensation**
10 **for the board of directors.**
11 Q    When you say "information about," I mean
12 is she the keeper of information relating to checks
13 being cut for them, reimbursements?
14 **A    Yes, she keeps that documentation.**
15 Q    Okay. Would you say that that's a
16 considerable portion of the duties that she has as
17 secretary is to handle those matters
18 administratively?
19 **A    Yeah, that's part of it.**
20 Q    Part of it? My question is is this a
21 significant -- does this take up a lot of her time,
22 processing --

92

1  **A    Well, it takes up some of her time.**
2  Q    Okay. What's the rest of her time spent
3  with?
4  **A    The rest of her time she covers the**
5  **telephones so that when the board members call she's**
6  **there to get a call if I don't and then she, you**
7  **know, tries to handle those as best she can. She**
8  **also covers Alicia Serfaty's phone and then she does**
9  **other administrative things around the office and**
10 **supports me and the board of directors in any other**
11 **way that we need.**
12 Q    I appreciate that last part but what I'm
13 trying to do is ask you to please be specific. I'm
14 hearing that she answers the phone when board
15 members call or I guess anyone calls for you and
16 other people call for Ms. Serfaty; is that right?
17 **A    That's correct.**
18 Q    And does she answer the phone for anyone
19 else?
20 **A    I think there's one other attorney that**
21 **she covers — covers the phone for.**
22 Q    Who is that?

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

24 (Pages 93 to 96)

93

1    A    **Christine Lanzon.**
2    Q    Last name?
3    A    **Lanzon.**
4    Q    Lanzon?
5    A    **Yeah.**
6    Q    So the phone -- your phone number,
7    Ms. Serfaty's and Ms. Lanzon's phone all rings at
8    her desk?
9    A    **Yes.**
10   Q    And it's her job unless you tell her
11   otherwise to pick up the phone and answer for the
12   three of you?
13   A    **If we're not picking up then she will**
14   **often pick up for us.**
15   Q    When you say "often," I mean is this her
16   job to do that?
17   A    **That's part of her job.**
18   Q    Right.  Is there some dedicated phone
19   number that just board members call in on?
20   A    **Board members usually call in either on**
21   **my extension or they call in or Alicia Serfaty's**
22   **extension.**

94

1    Q    And Ms. Serfaty has been corporate
2    secretary since 2001.  Has she held any other
3    position or positions during that time?
4    A    **You mean since she's been with the**
5    **corporation?**
6    Q    No, since 2001.
7    A    **She's also general counsel.**
8    Q    Has she been general counsel on a
9    continuous basis since she became corporate
10   secretary?
11   A    **She became general counsel I think at the**
12   **beginning of 2002 when the -- when the then general**
13   **counsel retired.**
14   Q    Who was that?
15   A    **That was Jim -- I forget his last name**
16   **now.**
17   Q    Okay.
18        MR. WELLSCHLAGER:  Do you want me to tell
19   you?
20        THE WITNESS:  Yeah.
21        MR. WELLSCHLAGER:  I'm asking him.
22        MR. GOTTESDIENER:  Sure.

95

1        MR. WELLSCHLAGER:  Lloyd.
2        THE WITNESS:  Lloyd, yeah.
3    BY MR. GOTTESDIENER:
4    Q    And physically is Ms. Serfaty's office
5    next to yours?
6    A    **It's just around the corner from my**
7    **office.**
8    Q    And what board materials, if any, does
9    Ms. Serfaty maintain or have?
10   A    **The only thing she typically has is**
11   **she'll have the most recent board book.**
12   Q    That's -- you said "typically."  On other
13   occasions she --
14   A    **Well, she might have one or two board**
15   **books from the most recent meetings in her office**
16   **and then if there's any particular matters dealing**
17   **directly with the board of directors that she's**
18   **involved in she may have some -- some material**
19   **connected with that.**
20   Q    And is Ms. Lanzon someone you work with
21   on board matters?
22   A    **No.**

96

1    Q    Is Ms. Hawkins Ms. Serfaty's secretary
2    too?
3    A    **Ms. Serfaty's secretary is Yvette Jones.**
4    Q    Does Ms. Jones have any other title other
5    than secretary?
6    A    **I think -- I think it's administrative**
7    **assistant.**
8    Q    Okay.  But does she have any other title
9    other than that?  Does she do any --
10   A    **No.**
11   Q    Why does Ms. Hawkins answer Ms. Serfaty's
12   phone if Ms. Jones is her administrative assistant?
13   A    **Well, sometimes Ms. Jones steps away from**
14   **her desk or is involved in other things and the**
15   **telephone will ring and it will ring on Sharron**
16   **Hawkins' desk as well so if it's not getting picked**
17   **up then Sharron will take care of it.**
18   Q    But with respect to you and with respect
19   to Ms. Lanzon, Ms. Hawkins is the one who is
20   supposed to answer the phone?
21   A    **Right, if we're not there.**
22   Q    And does Ms. Jones work for anyone other

Case 1:06-cv-01539-GK   Document 20-6   Filed 01/16/2007   Page 26 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

25 (Pages 97 to 100)

97

1  than Ms. Serfaty?
2  **A    She has a couple of other people that she**
3  **works for.**
4  Q    Who?
5  **A    Bud Luby is one.**
6  Q    Who's that, Bud Luby?
7  **A    He's the senior director of**
8  **administration for the law department.**
9  Q    The what?
10 **A    Senior director of administration for the**
11 **law department.**
12 Q    Law department, okay.
13 **A    And then she -- she has one or two other**
14 **attorneys she probably assists.**
15 Q    And who are they?
16 **A    I can't say who they are.  I just -- I**
17 **don't keep up with that.**
18 Q    Okay.  And back to the storage room.
19 What else is in there other than the minute books
20 excepting the ones that you have in your immediate
21 possession because they're more recent, the record
22 of meeting books with the same exception that you

98

1  have some of those in your office, notes that you've
2  taken of meetings?  What else is in there?
3  **A    We have resolution books up there as**
4  **well.**
5  Q    The resolution books.  What years do the
6  resolution books cover, please?
7  **A    They start out in 1971 and the ones we**
8  **have up there go to I think the late 1980s.**
9  Q    And then where are the rest of them?
10 **A    The rest of them are in my office.**
11 Q    Now, why do you keep resolution books
12 from the late '80s forward and not these other books
13 from the late '80s forward in your office?
14 **A    Well, the resolution books take up a lot**
15 **less space so it's easier to just keep those -- you**
16 **know, some of the more recent ones in my office.**
17 Q    How much space do they take up?
18 **A    They're in notebooks that are about so**
19 **wide.**
20 Q    Right.  How much space is took up?
21 **A    And one of those would probably take up**
22 **about this much space, something like that on a**

99

1  **shelf (indicating).**
2  Q    You're measuring about two feet?
3  **A    Maybe a foot and a half.**
4  Q    Foot and a half?
5  **A    Yeah.**
6  Q    And that's the entirety of the resolution
7  books?
8  **A    Of the ones that are in my office.**
9  Q    And then the rest --
10 **A    The rest are up on the fourth floor.**
11 Q    So that foot and a half of books takes up
12 15 years, 10 to 15 years?
13 **A    Yeah.**
14 Q    And what is the relation between the
15 materials that are in the resolution books and the
16 materials that are in the minute books?
17 **A    Well, the resolution books contain**
18 **resolutions that were approved by the board of**
19 **directors that are also in the minutes but it's the**
20 **resolution -- page of the resolution just by**
21 **itself.  Sometimes it will have the executive**
22 **summary backing it up and then it will -- you know,**

100

1  **that's pretty much it although any -- anything that**
2  **was passed by the board of directors will be in that**
3  **resolution book so it will be -- the resolution --**
4  **it will be dated and it will be -- and we keep it in**
5  **chronological order.**
6  Q    Resolutions, and I mean documents that
7  have the word "resolutions" on them that are in the
8  resolution book, are also contained in the minute
9  books?
10 **A    Most of them are.**
11 Q    Tell me when they're not or why do you
12 say just most of them.
13 **A    Well, from time to time we'll have a**
14 **meeting or we will -- the board will consider an**
15 **item say by unanimous written consent resolution and**
16 **those -- those resolutions will be in the resolution**
17 **book but not in the minute book.**
18 Q    Any other difference between the two?
19 **A    Well, the minute books contain all -- you**
20 **know, a narrative description of the meeting, a**
21 **narrative of actions that took place at the meeting**
22 **in addition to the resolution itself so there's a**

101

1  lot more narrative that's in the minute books.
2  Q   Putting aside that point though do the
3  resolutions that are in the resolution book differ
4  in any way than the resolutions that appear in the
5  minute book? Physically is there any difference?
6  A   No, they're -- they look the same.
7  Q   You just mentioned something about
8  unanimous written consent resolutions?
9  A   Uh-huh.
10  Q   Tell me about those.
11  A   Well, from -- when the board meets it
12  conducts business but from time to time there's a
13  need for the corporation to have the board approve
14  something without the board actually meeting all
15  together so -- so we're able to use a unanimous
16  written consent and have the board members sign off
17  on the resolutions and approve it without having to
18  all be together in one meeting or one conference
19  call.
20  Q   And when did you first become aware of
21  this unanimous written consent resolution process
22  that you've just described?

102

1  A   Well, it's been going on for -- you know,
2  I've been aware of it for a fairly long period of
3  time.
4  Q   How did you first become aware of it?
5  A   Well, when I first became assistant
6  corporate secretary, you know, it's one of the
7  things that was explained to me as an option where
8  the board's able to approve things.
9  Q   Who explained that to you?
10  A   One of our counsels there at Amtrak.
11  Q   Who?
12  A   I think it was William Erkelenz.
13  Q   Erkins?
14  A   Erkelenz.
15  Q   Erkelenz. And that would have been in
16  1992?
17  A   Uh-huh.
18  Q   And has anyone else ever explained this
19  process to you?
20  A   I think we've talked about it from time
21  to time in the past.
22  Q   Who is we?

103

1  A   Well, with the corporate secretary,
2  whoever was the incumbent corporate secretary at the
3  time.
4  Q   Okay. Tell me every conversation that
5  you can recall with the corporate secretary or
6  anyone other than the gentleman you just mentioned
7  concerning unanimous written consent resolutions
8  prior to this morning.
9      MR. WELLSCHLAGER: I'm sorry, could I
10  hear the question again?
11  BY MR. GOTTESDIENER:
12  Q   Tell me every conversation whether with a
13  corporate secretary or not other than the gentleman
14  you just told us about from 1992 -- every
15  conversation that you've heard discussed unanimous
16  written consent resolutions putting aside this
17  morning.
18      MR. WELLSCHLAGER: You want him to tell
19  you the conversations --
20  BY MR. GOTTESDIENER:
21  Q   Let's go through every conversation and
22  we'll take them one by one after you've told us

104

1  every one that you can remember.
2  A   Okay. That's been a long time so --
3  Q   Well, let's start in reverse order. When
4  was the last time you talked with anyone about
5  unanimous written consent resolution before this
6  morning?
7  A   Before this morning?
8  Q   Yes.
9  A   Let's see, I've talked, you know,
10  recently with my own counsel here at Amtrak about
11  unanimous written consent.
12  Q   Right. Okay. How recently?
13  A   Within the last month.
14  Q   Okay. In preparation for testifying
15  here?
16  A   Yes.
17  Q   Before that tell me the last person you
18  ever spoke with about the unanimous written consent
19  resolution process or a unanimous written consent
20  resolution between 1992 and the last month when
21  you've been preparing for this deposition?
22  A   Okay, in --

105

1    MR. WELLSCHLAGER:  At this stage you just
2  want the times he had these discussions and the
3  persons with whom he had them?
4    MR. GOTTESDIENER:  Yes.
5    A    Okay.  I believe it was spring of 2003 we
6  had several matters that we needed the board to
7  approve.  There was a time lag between meetings and
8  it appeared that time was of the essence so we
9  discussed approving an agreement.  I believe it was
10  a real estate agreement in Chicago and then there
11  was a personnel agreement that had to do with chief
12  mechanical officer positions, getting those
13  positions approved so that was in the spring of
14  2003.
15  BY MR. GOTTESDIENER:
16    Q    Those were two different issues?
17    A    But we had -- we had them -- we sent them
18  both to them I believe at the same time.
19    Q    We sent -- we sent what to whom?
20    A    We sent a resolution and then an
21  executive summary describing what it was that we
22  were asking them to approve and then had a -- had a,

106

1  you know, cover note as well.
2    Q    And who is "we"?
3    A    This was Alicia Serfaty and myself.
4    Q    Anyone else?
5    A    I think it was just -- just the two of us
6  were working on it.
7    Q    And how was this sent?
8    A    We faxed them out to the board members as
9  I recall although --
10    Q    And -- go ahead.
11    A    Although, you know, we might have
12  overnighted one or two.
13    Q    You might have?
14    A    Might have.
15    Q    And you've reviewed the documents
16  pertaining to what you're testifying about in the
17  anticipation of testifying here today, right?
18    A    No, I have not.
19    Q    How did you get their response, the
20  individual directors to the proposal?
21    A    I believe most of them faxed their
22  responses.

107

1    Q    Some of them didn't though?
2    A    I think one of them probably called me up
3  and said it was okay or mailed me a response.
4    THE VIDEOGRAPHER:  This marks the end of
5  tape one in the deposition of Mr. Carten.  We're
6  going off the record.  The time is 10:44 a.m.
7    (A brief recess was taken.)
8    THE VIDEOGRAPHER:  This marks the
9  beginning of tape two in the deposition of
10  Mr. Carten.  We're back on the record.  The time is
11  10:52 a.m.
12  BY MR. GOTTESDIENER:
13    Q    Any other unanimous consent resolution
14  discussions with any person that you have had since
15  1992?
16    A    Let's see, I think we did a unanimous
17  consent in connection with a real estate sale.  I
18  believe it was in 1999.
19    Q    Okay.  Tell me what you recall about
20  that.
21    A    Well, it was a property that was near
22  Wilmington, Delaware that a school wanted to

108

1  purchase.  It was some surplus right-of-way property
2  that Amtrak had and so the school wanted to purchase
3  it and build a school and it was surplused to the
4  corporation's need and -- needs and would provide
5  some -- some money for the sale of the property and
6  it was one that was a timely matter that needed to
7  get done between meetings.
8    Q    So tell me what happened physically.
9  Actually what happened?
10    A    Okay.  Well, it was -- it was the real
11  estate department, Sally Bellet who I was working
12  with who -- she wrote up an executive summary
13  describing the sale of this property to a private
14  school up in Wilmington.  They had reviewed the
15  property, talked with the various Amtrak departments
16  to determine that it was not a parcel of real estate
17  that the corporation would need.  It was surplused
18  to our railroad requirements so she recommended it
19  as something -- a property -- a piece of property
20  that the corporation sell.  She wrote up a
21  resolution that I recall, an executive summary and I
22  reviewed it and then we sent it out to the board of

Case 1:06-cv-01539-GK   Document 20-6   Filed 01/16/2007   Page 29 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

28 (Pages 109 to 112)

109

1  directors for their approval.
2      Q    Well, that's what I want to focus on,
3  sir. What did you do mechanically?
4      A    **What did I do mechanically?**
5      Q    Yes.
6      A    **Okay, got the material from Sally Bellet,**
7  **reviewed the material and then we faxed it out to**
8  **the board.**
9      Q    When you say you faxed it out to the
10 board you mean you?
11     A    **Or maybe Fed Ex'd part of it.**
12     Q    Okay. Have you reviewed anything about
13 this incident in connection with your testimony here
14 today?
15     A    **No.**
16     Q    So you think that the executive summary
17 and a resolution was sent by fax or Fed Ex to
18 individual board members?
19     A    **Yes.**
20     Q    And they received this material and then
21 sent it back to you in some form?
22     A    **They received it, reviewed it and signed**

110

1  **the resolution and sent it back to us.**
2      Q    And any other time that the matter has
3  come up in conversation or otherwise, these
4  unanimous consent resolutions or the process
5  concerning these resolutions?
6      A    **There's one other one I can think of at**
7  **this time. It was -- it was a communications**
8  **agreement. I think it took place in 1997 and it**
9  **was -- I think it was a right-of-way communications**
10 **agreement that was also time sensitive. I worked**
11 **with Sally Bellet on that one as well working up the**
12 **executive summary and resolution materials and then**
13 **we faxed it out to the board for their -- or fax/**
14 **Fed Ex'd it to the board for their approval.**
15     Q    And what are you recalling about actually
16 doing that, the Fed Exing or the faxing the receipt
17 of the response?
18     A    **Actually as I think about that one, we**
19 **had considered unanimous consent and I think instead**
20 **we were able to get the board members together on a**
21 **conference call and do it more quickly. I think**
22 **that's the way we resolved that one.**

111

1      Q    Okay. Now, given what you just recalled
2  do you still have the same recollection of the other
3  two incidents, the first involving the real estate
4  in Chicago and the personnel matter and the second
5  involving the Delaware real estate?
6      A    **Yes.**
7      Q    Those you believe were by this unanimous
8  consent procedure?
9      A    **Yes.**
10     Q    But you say that in this one involving
11 the right-of-way it was discussed but it actually
12 wasn't used?
13     A    **It was discussed as a possibility but we**
14 **ended up scheduling a conference call meeting of the**
15 **board. We were able to do that instead.**
16     Q    Okay. So here is what I have so far:
17 Apart from within the past month discussions with
18 counsel in anticipation of testifying here, I've got
19 four times that you have spoken about with anyone or
20 done anything with this process or the procedures
21 surrounding this process. One was in 1992 when you
22 were getting initiated you say someone spoke with

112

1  you about it and then the real estate Chicago
2  personnel matter when in 2003, spring you employed
3  this procedure and then in '97 it was discussed but
4  not employed and in '99 it was discussed and
5  employed with respect to the Delaware transaction?
6      A    **Yes.**
7      Q    Any other time at all where this has come
8  up at all, conversation, you had e-mail exchanges
9  with someone about it, you read about it and thought
10 about it, you instituted some process for making
11 sure the correct steps were followed, anything
12 between '92 and the last month when you've been
13 talking about it for preparing to testify?
14        MR. WELLSCHLAGER: Object to the form of
15 the question. Go ahead.
16     A    **Well, from time to time it comes up as a**
17 **topic of conversation in terms of if materials are**
18 **not ready in time to present to a board for an**
19 **upcoming board meeting, that there's still some**
20 **question marks and things aren't ready to present to**
21 **the board. It comes up as -- you know, sometimes**
22 **gets discussed as a possible way to handle it if it**

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

29 (Pages 113 to 116)

113

1   needs to be done between board meetings.
2       Q   Can you tell me -- you say it gets
3   discussed. Can you tell me any time that it's been
4   discussed and who are you discussing it with?
5       A   Well, I can think of a time we were
6   discussing it with our corporate contracts
7   department on a -- I believe it was a state
8   agreement that they needed to have -- that they
9   wanted to have approved by the board and was not
10  going to be ready in time for the board meeting so
11  they were asking about it as an option.
12      Q   Any other time you can recall?
13      A   I can't recall any others specifically.
14      Q   When was that, the last one you told us
15  about?
16      A   That one was prior to the March 2004
17  board meeting.
18      Q   Well, there was no March 2004 board
19  meeting, was there?
20      A   Yes, there was.
21      Q   Okay. Who were the directors that were
22  present at the March 2004 board meeting?

114

1       A   It was Sylvia de Leon, David Laney and
2   Alan Rutter.
3       Q   And that's the board of directors of
4   Amtrak?
5       A   Yes. That's the executive committee of
6   the board of directors.
7       Q   Oh, that last sentence you just added
8   because you then realized that that couldn't be the
9   board of directors of Amtrak because there wouldn't
10  be a quorum, correct?
11      A   No.
12          MR. WELLSCHLAGER: Objection to the form
13  of the question.
14  BY MR. GOTTESDIENER:
15      Q   No?
16          MR. WELLSCHLAGER: You can answer.
17  BY MR. GOTTESDIENER:
18      Q   That's not true? You didn't --
19      A   No.
20      Q   You didn't go along for the last three
21  questions and say, even though you were questioned
22  about it, that that was the board of directors and

115

1   then you didn't just change your answer because you
2   realized that couldn't be the board of directors
3   because there's not enough people to constitute the
4   board of directors?
5          MR. WELLSCHLAGER: Objection.
6   BY MR. GOTTESDIENER:
7       Q   That's not what just happened?
8          MR. WELLSCHLAGER: Objection to the form
9   of the question.
10      A   I wanted to be clear which board members
11  were at the meeting.
12  BY MR. GOTTESDIENER:
13      Q   You know that my questions had nothing to
14  do with the board members. You were the one who
15  said prior to the March 2004 board meeting; isn't
16  that right?
17      A   Isn't that right what?
18      Q   Isn't that what you said, that this was
19  considered prior to the March 2004 board meeting?
20      A   Yes.
21      Q   Okay. And isn't it a fact that you in
22  your mind basically think that since September of

116

1   2003 when you're dealing with this executive
2   committee that that's the board of directors of
3   Amtrak?
4          MR. WELLSCHLAGER: Objection to the form
5   of the question. Go ahead.
6       A   Well, the executive committee of the
7   board of directors has been the ones who have been
8   having meetings since September 2003.
9   BY MR. GOTTESDIENER:
10      Q   And you consider that the board of
11  directors of Amtrak, right?
12      A   Well, it's the executive committee of the
13  board of directors.
14      Q   Okay. Let me try it again. You consider
15  that to be the board of directors of Amtrak, don't
16  you?
17      A   Well, it's --
18          MR. WELLSCHLAGER: Objection to the form
19  of the question.
20      A   It's the executive committee of the board
21  of directors.
22  BY MR. GOTTESDIENER:

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

30 (Pages 117 to 120)

117

1    Q      There is no board of directors of Amtrak,
2    is there?
3           MR. WELLSCHLAGER: Objection to the form
4    of the question.
5    A      There is a board of directors.
6    BY MR. GOTTESDIENER:
7    Q      Who's on it?
8    A      The board of directors is the Secretary
9    of Transportation. It's David Laney and Sylvia de
10   Leon.
11   Q      So it's comprised of three people?
12   A      Currently it is.
13   Q      And there's no one else that constitutes
14   the board of directors or its members, those three
15   people?
16   A      Those are the three members of the board.
17   Q      And that is the board of directors of
18   Amtrak?
19   A      Yes.
20   Q      But it cannot meet?
21          MR. WELLSCHLAGER: Objection to the form
22   of the question. Go ahead and answer.

118

1           THE WITNESS: Okay.
2    BY MR. GOTTESDIENER:
3    Q      It cannot meet; is that correct?
4           MR. WELLSCHLAGER: Same objection.
5    A      The board of directors -- I'd like to
6    explain. The board of directors cannot meet with a
7    quorum but the -- but the executive committee of the
8    board of directors can meet.
9    BY MR. GOTTESDIENER:
10   Q      The board of directors cannot act as the
11   board of directors, can it?
12          MR. WELLSCHLAGER: Objection to the form
13   of the question.
14   A      The board of directors cannot act but the
15   management committee of the board of directors can
16   act.
17   BY MR. GOTTESDIENER:
18   Q      The board of directors cannot meet as a
19   board of directors, can it?
20          MR. WELLSCHLAGER: Objection to the form
21   of the question.
22   A      The board of directors cannot meet with a

119

1    quorum for the board of directors.
2    BY MR. GOTTESDIENER:
3    Q      The board of directors cannot meet if it
4    doesn't have a quorum, correct?
5           MR. WELLSCHLAGER: Same objection.
6    A      That's correct.
7    BY MR. GOTTESDIENER:
8    Q      What is required for a unanimous consent
9    resolution to be valid as board action?
10          MR. WELLSCHLAGER: Object to the form of
11   the question. You can answer.
12   A      Okay. Well, each of the board members
13   has to sign -- all the board members need to sign a
14   resolution that's placed before them approving an
15   action.
16   BY MR. GOTTESDIENER:
17   Q      So that's the requirement, that all board
18   members sign a resolution placed before them to take
19   action?
20   A      That's right. They approve a resolution
21   that's put before them.
22   Q      And other than that that's it? Then it's

120

1    valid?
2    A      Yes.
3    Q      And when you were discussing --
4           MR. WELLSCHLAGER: Belated objection to
5    form to that last question. Sorry.
6    BY MR. GOTTESDIENER:
7    Q      When you were discussing what was
8    discussed prior to the March 2004 board meeting and
9    then we got off on that there couldn't have been a
10   board meeting but it's called the 2004 meeting, you
11   talked about this with whom?
12   A      I was talking with -- with management
13   staff.
14   Q      Okay, who?
15   A      Who -- let's see, I believe I was talking
16   with -- let's see, I think I was talking with Gil
17   Mallery and one of his staff people up there whose
18   name escapes me right now.
19   Q      Up there meaning where?
20   A      Meaning in his department.
21   Q      Which is?
22   A      On the fourth floor.

Case 1:06-cv-01539-GK    Document 20-6    Filed 01/16/2007    Page 32 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

31 (Pages 121 to 124)

121

1  Q   Which is named what?
2  A   **It's corporate contracts department.**
3  Q   And that's part of what larger
4  department, corporate contracts?
5  A   **That's -- that's the department.**
6  Q   That's the whole department?
7  A   **Yeah.**
8  Q   And you were speaking with Gil Mallery
9  and some other person whose name escapes you?
10 A   **Robin McCarthy.**
11 Q   Robin McCarthy?
12 A   **Yeah.**
13 Q   And the discussion was what? That you
14 might -- that the company might need or want to act
15 prior to this meeting and how that would occur?
16 A   **The discussion was if the item -- the**
17 **agenda item that they wanted to have approved at the**
18 **March meeting was not available -- was not ready to**
19 **be presented to the board for their approval, what**
20 **else could we do to get it approved in a more timely**
21 **manner rather than waiting until the next board**
22 **meeting after that.**

122

1  Q   Which is scheduled or was scheduled for
2  when?
3  A   **April the 28th.**
4  Q   Okay. And what's the current status of
5  this issue?
6  A   **They have decided to go ahead and wait**
7  **and do it at the April 28th meeting.**
8  Q   Okay. Now, in '99 when you dealt with --
9  it's Sally Bellet?
10 A   **Bellet, B-E-L-L-E-T.**
11 Q   E-T, Bellet. And she's in real estate,
12 right?
13 A   **Yes.**
14 Q   Were you also dealing with her in spring
15 of 2003 about the Chicago real estate matter?
16 A   **Yes.**
17 Q   Anyone else in real estate that you dealt
18 with in addition to Ms. Bellet?
19 A   **No, I think she was the one.**
20 Q   And the personnel matter, who did you
21 deal with about that?
22 A   **The personnel matter I was dealing with**

123

1  **Warren Reisig.**
2  Q   And so in that instance it was Mr. Reisig
3  who got you an executive summary and proposed
4  resolution?
5  A   **Yes.**
6  Q   And in the '97 matter that you first
7  thought was done via fax or Fed Ex but then you
8  thought about it and realized that it wasn't done
9  that way, was that also Ms. Bellet?
10 A   **Yes.**
11 Q   So what -- tell me what was the exchange
12 with Mr. Mallery and Robin -- I'm sorry, the last
13 name was?
14 A   **Robin McCarthy.**
15 Q   McCarthy. What was -- what did you
16 explain to them about this procedure? What did you
17 tell them?
18 A   **Well, they were concerned because their**
19 **item was not ready to go to the March meeting.**
20 Q   Right.
21 A   **So they said you know, what are our**
22 **options here and I said well --**

124

1  Q   Did they approach you on this matter by
2  the way or how did this come up -- first come to
3  your attention?
4  A   **The way it came up -- because it was**
5  **getting towards the end of the day when we were**
6  **getting ready to send the materials out and the**
7  **materials were not ready.**
8  Q   I see. This was a specific day in
9  March. Do you remember what day it was?
10 A   **It was about a week before the March 18**
11 **meeting so that would make it approximately March 10**
12 **or 11.**
13 Q   Okay. And they -- take it from there,
14 please. What happened? You get a call? What
15 happens?
16 A   **Well, I went up to see where their**
17 **material was and they -- there was one of the**
18 **vice-presidents that wasn't comfortable with what**
19 **they had in their material so they said you know,**
20 **this may not be ready for the meeting. You know, we**
21 **might have to do this by a conference call or, you**
22 **know, getting written consent so I said well, you**

125

1  know, if it's not ready we don't want to send it to
2  the board and we'll just have to deal with it
3  otherwise so it turned out that they later decided
4  to go ahead and wait for the April the 28th meeting.
5    Q  I'm sorry, this may be my fault. What is
6  it that you said to them about this -- the
7  availability because I thought you said at one point
8  somebody said what are our options?
9    A  Right.
10    Q  Tell me how that went again. Who asked
11  you that?
12    A  I think Gil Mallery asked what are our
13  options.
14    Q  Okay. And what did you tell him?
15    A  So I told him we can wait until the April
16  28 meeting. We could do a board conference call or
17  we could do unanimous written consent.
18    Q  And what did you tell him about each one
19  of those options?
20    A  I said -- I just -- we didn't spend a lot
21  of time talking about the options but I told him,
22  you know, these are options. In the meantime they

126

1  were working just as hard as they could to try and
2  get the thing ready for that evening to send out but
3  then it turned out ultimately it was not ready.
4    Q  Right, but I'm Gil Mallery. I mean tell
5  me what it is -- what you specifically told him. I
6  mean if it was brief say that.
7    A  I just told him those are options. Those
8  are your three opposites.
9    Q  But he's asking you and he doesn't know.
10  I'm asking you to tell me literally verbatim as you
11  can recall what is it that you said about these
12  things. Gil, here is what we could do.
13    A  He didn't press me for a lot of detail.
14    Q  Well, I'm trying to press you to recreate
15  the conversation. Just recreate the conversation.
16  I'm Gil Mallery. What are my options, Mr. Carten?
17    A  We can wait until the April 28 meeting.
18  We could have a board conference call meeting or we
19  could do written consent.
20    Q  And then that's it? You just said
21  written consent?
22    A  Yeah, unanimous written consent.

127

1    Q  You said unanimous written consent?
2    A  Uh-huh.
3    Q  And his response was to ask you a
4  question or what?
5    A  His response was he says I think we're
6  going to have this ready. He kept pressing on it.
7  It turned out they didn't -- they were not
8  comfortable with it and did not have it ready for
9  that meeting and ultimately decided to wait until
10  the April the 28th meeting.
11    Q  Okay. So when you gave him these
12  options, these were the three options that you saw
13  to get board approval for his agreement?
14    A  Yes.
15    Q  Was anyone else from, you know, the
16  corporate secretary office involved in that,
17  Ms. Serfaty or Ms. Oliveri?
18    A  I don't -- I don't believe they were.
19    Q  There is an Office of Corporate
20  Secretary, right? I'm talking about the formal
21  title. Am I correct that it's Office of Corporate
22  Secretary?

128

1    A  Yeah, uh-huh.
2    Q  And the office is comprised then of the
3  corporate secretary and the full-time and the
4  part-time assistant corporate secretaries?
5    A  Right.
6    Q  And a secretary. Is Ms. Hawkins assigned
7  to the Office of Corporate Secretary?
8    A  Yes, she is.
9    Q  Okay. And then board liaison is also an
10  office? Office of Board Liaison? How is it
11  denominated?
12    A  It's -- you know, to some degree it's
13  interchangeable there. If somebody is bringing
14  something to us they're not thinking differently
15  between the corporate secretary and the board
16  liaison office. They're thinking of one in the
17  same.
18    Q  Right, but now I'm kind of getting
19  technical. Technically is there an Office of Board
20  Liaison that you're the director of?
21    A  That's my position, director-board
22  liaison.

129

1    Q    Okay. So I'm hearing you implicitly
2 saying there's not really an Office of Board
3 Liaison. There's just board liaison and you're the
4 director of that? I withdraw that.
5         Is there anyone else assigned,
6 Ms. Hawkins, anyone else to the board liaison
7 function?
8    A    Well, Sharron Hawkins would be assigned
9 to that.
10   Q    Okay. But it sounds like you're saying
11 it would be a little artificial to say that there's
12 an office of board liaison that you're the director
13 of and that Ms. Hawkins is the secretary to?
14   A    Well, it's -- you know, it's gray between
15 what's different between that and what's different
16 between the corporate secretary's office. I mean
17 it's one in the same thing.
18   Q    Has anyone in your presence in writing or
19 otherwise discussed the need to have these two
20 different titles and these two different divisions
21 linguistically between these functions?
22   A    Well, I guess as I understand it is I

130

1 have the management title of director-board liaison
2 but in addition to that there's also the corporate
3 title of assistant corporate secretary.
4    Q    So one is a management job and the other
5 is effectively attached to the board as a secretary
6 to the board separate from management?
7    A    I guess you could say that.
8    Q    I'm just trying to understand the way you
9 make this division in your own mind.
10        Is that fair, that there's a division
11 between management and the board?
12   A    I think of the two as -- the two
13 positions are really one position. The two titles
14 describe one position. I don't consciously think
15 about, you know, there being a separation of my
16 day-to-day activities.
17   Q    So you've recommended that there just be
18 one position?
19   A    I have not made any recommendations about
20 it.
21   Q    Well, then why wouldn't you have made a
22 recommendation that there just be one position?

131

1    A    It's been the corporate practice to have
2 two titles there for that position and I've just
3 continued with that practice. I haven't --
4    Q    You haven't what?
5    A    I haven't, you know, brought up -- made
6 it an issue to bring up.
7    Q    Isn't it part of your job
8 responsibilities to make things like that an issue
9 and raise issues like that?
10   A    I just -- I haven't considered it to be a
11 significant issue that I want to pursue.
12   Q    Do you think you will at any point in the
13 future?
14   A    Probably not.
15   Q    Because it's an issue but not a
16 significant issue?
17        MR. WELLSCHLAGER: Objection to the form
18 of the question.
19   A    I don't -- I don't see it as an issue.
20 BY MR. GOTTESDIENER:
21   Q    Oh, it's not an issue so it's not an
22 issue to you even though it's just one job but two

132

1 different titles?
2    A    It's not an issue to me.
3    Q    Now, what do you know about September 14,
4 2001 as regards Amtrak and a proposal that
5 management put to Amtrak directors on that date?
6    A    Well, we sent out information to the
7 board of directors to approve a resolution on that
8 day.
9    Q    Do you know anything else about it other
10 than that -- what you just told me?
11   A    Well, we prepared the information and we
12 sent it out to them and then they gave us their
13 concurrence.
14   Q    Is that all you remember?
15        MR. WELLSCHLAGER: Objection to the form
16 of the question.
17   A    I'm not sure what more you want to know
18 about it.
19 BY MR. GOTTESDIENER:
20   Q    I want to know everything you know. 1
21 want to know all of your recollections. It's April
22 of 2004. This occurred in September 2001. I want

133

1  you to tell me from the minute the first -- this
2  came to your attention, I want you to tell me all
3  the thoughts and recollections you have about what
4  happened that day.
5      A    Well, we had an item that we needed to
6  take to the board for their approval.
7      Q    How did it come to your attention first?
8  I'm asking you to give me a step-by-step narrative
9  of every single thing you remember about this from
10 the beginning to the end, all the detail. I want
11 you to take the contents of your recollection and
12 put it out here so the court reporter can get it
13 down and we can walk through all of your memories,
14 who was involved, how it came to your attention,
15 what you did, what was said to you so with that
16 would you please tell us everything you remember
17 about September 14, 2001?
18         MR. WELLSCHLAGER: If that's the question
19 I'd ask, counsel, that you not interrupt him until
20 he's finished.
21         MR. GOTTESDIENER: I've given him four
22 times to answer the question.

134

1          MR. WELLSCHLAGER: And you've interrupted
2  him every single time.
3          MR. GOTTESDIENER: No, I've gotten very
4  short answers that I'm sure he has more information
5  to disclose to us.
6  BY MR. GOTTESDIENER:
7      Q    Would you please answer the question?
8      A    Well, it came to my attention that
9  morning that we had a personnel action that we
10 needed to have approved in a very timely fashion so
11 we sent out information to the board of directors
12 and then we worked with them to see if they had any
13 questions or concerns about the information and then
14 asked them to respond that day with their approval
15 if they agreed with it.
16     Q    Okay. Now, I'm going to ask you again
17 for probably the third time. Are you telling us
18 that that's all that you can possibly remember about
19 that day? That's it? That's your entire answer?
20         MR. WELLSCHLAGER: Objection to the form
21 of the question. Vague and argumentative. You can
22 answer.

135

1      A    Okay. What I -- what I remember is what
2  I just told you. You know, there was -- there was
3  a -- something -- it was something that we needed to
4  get done that day in a timely fashion and so we -- I
5  went to work, got the material out and then talked
6  with some of the directors to, you know, see if they
7  had any questions or concerns, make sure they got
8  the material and then we got their -- got their okay
9  on it.
10
11 BY MR. GOTTESDIENER:
12     Q    That's it? That's all you remember?
13     A    You know, at this point I can't say I
14 remember anything -- you know, I certainly worked
15 with people in the H.R. department on this and
16 worked with my secretary to get this accomplished
17 and that's what we did.
18     Q    That's all you remember?
19     A    Well, I remember that we sent them all
20 out and then we worked with each of the board
21 members to see if they had any questions on it and
22 then they sent us back their approvals.

136

1      Q    That's all you remember?
2      A    I'm not sure what more you want.
3      Q    You don't remember anything else about
4  this other than what you've testified to; is that
5  right?
6      A    I'm not sure what you're looking for.
7      Q    I'm asking you a question, sir. Have you
8  given us the sum total of all of your memories of
9  that day?
10         MR. WELLSCHLAGER: Objection to the
11 vagueness of the question.
12         I mean are you asking him what color
13 shirt he wore?
14 BY MR. GOTTESDIENER:
15     Q    Can you answer my question, sir?
16         MR. WELLSCHLAGER: Same objection.
17 BY MR. GOTTESDIENER:
18     Q    Have you told us everything you remember
19 about that day?
20     A    Well, I told you in a summarized format.
21     Q    I didn't ask for a summarized format and
22 you know I didn't ask for a summarized format and I

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

35 (Pages 137 to 140)

137
1  made that clear minutes ago repeatedly. I want to
2  know step-by-step. I want to know -- from the
3  moment you first became aware of this I want to know
4  all the details.
5      Now, I'm going to give you another
6  opportunity to answer it in the way I've asked the
7  question because your counsel over there has asked
8  me to do that and I've done it several times and
9  you've told us that's all you remember. I think you
10 remember a lot more and I'm going to ask you a lot
11 of specific questions if you don't answer the
12 question as I've posed it.
13     MR. WELLSCHLAGER: Just give him every
14 detail you can remember.
15     THE WITNESS: Okay.
16     MR. WELLSCHLAGER: Everything.
17     MR. McILWAIN: Yeah.
18     A   Okay. I can remember we got a resolution
19 for this personnel matter. We had an executive
20 summary that was written by their H.R. department.
21 We got it together. I got it together, put a fax
22 cover sheet on it, sent it out to the board members

138
1  then we faxed it out to them individually. We made
2  sure that each of them received it and followed up
3  with them to see if they had any questions about it
4  and then we received their confirmations back. Some
5  were faxed. At least one was a phone call and we
6  were able to get all of their approval -- reach all
7  of them and get all their approvals that day.
8  BY MR. GOTTESDIENER:
9      Q   What do you mean one was a phone call?
10     A   Well, one of our board members -- his
11 practice was -- he did not have -- wasn't into a lot
12 of -- he was an older gentleman. Wasn't into a lot
13 of electronic things so he would -- he would read an
14 executive summary and a resolution and then he would
15 call me up, Governor Holton and tell me it was okay
16 to apply his name to it.
17     Q   I don't know -- I'm sorry, I don't want
18 to know what he would do. I want to know what
19 happened with Governor Holton that day, all the
20 details.
21     A   Well, we sent him the resolution.
22     Q   How?

139
1      A   Faxed it to him.
2      Q   Where?
3      A   To his office.
4      Q   In Richmond?
5      A   In Richmond.
6      Q   Yeah. What time?
7      A   All I can recall is it was I think
8  sometime in the morning that we faxed it to him.
9      Q   And who is we? You've used that word
10 repeatedly. Does that just mean you or does that
11 mean you and Ms. Hawkins?
12     A   It could have been me and Ms. Hawkins.
13     Q   But you don't know?
14     A   Well, generally when we have something
15 like this we share in the work and if we're both
16 there usually we'll both be doing it. Sometimes
17 it's just me faxing it. Sometimes it's just her
18 faxing it.
19     Q   I'm all ears. What happened?
20     A   Okay. So we faxed it out to all the
21 board members.
22     MR. WELLSCHLAGER: Talking about Governor

140
1  Holton now.
2      A   Okay, Governor Holton. We faxed it to
3  his office, gave him a chance to read it and then he
4  called us back and said he agreed with it and was
5  okay to apply his signature to the resolution.
6  BY MR. GOTTESDIENER:
7      Q   And what time did he -- what time did --
8  did you talk to him or did someone else talk to him?
9      A   I talked to him.
10     Q   How do you know that?
11     A   Because I talk with him regularly.
12     Q   Sir, the fact that you talk with him
13 regularly doesn't tell you as a logical matter that
14 you talked to him on September 14, 2001, does it?
15     A   Well, every time we applied his
16 signature -- before I applied it I talked with him
17 personally to see if he was okay.
18     Q   Do you have any proof of that?
19     A   I just -- I can remember that's my
20 practice with him.
21     Q   That's your practice with him. Do you
22 have any proof that that's what occurred on

DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

36 (Pages 141 to 144)

141

1    September 14, 2001?
2              MR. WELLSCHLAGER:  Objection to the form
3    of the question.
4    BY MR. GOTTESDIENER:
5        Q    Do you have any written proof that that's
6    what happened on September 14, 2001?
7              MR. WELLSCHLAGER:  Same objection. You
8    can answer it.
9        A    I can't point to anything other than the
10   resolution itself where I applied the signature.
11   BY MR. GOTTESDIENER:
12       Q    Did he call you or you call him?
13       A    He called me.
14       Q    How do you know that?
15       A    That's my recollection. He was typically
16   one that would be one of our first ones to respond
17   back.
18       Q    Why?
19       A    Because he was very matter of fact and
20   didn't -- didn't -- you know, if a matter needed to
21   be decided he was ready to act on it if he agreed
22   with it.

142

1        Q    Has he ever disagreed with it when you've
2    been sending him a unanimous consent resolution?
3        A    I don't recall him disagreeing with the
4    unanimous consent resolution.
5        Q    Has anyone ever disagreed with the
6    unanimous consent resolution proposed to them?
7        A    I don't recall anybody.
8        Q    Has anyone ever abstained from a
9    unanimous consent resolution that's been proposed to
10   them?
11       A    I don't recall if anybody has abstained
12   either.
13       Q    Do you recall anyone who ever made any
14   suggested changes to a proposed unanimous consent
15   resolution?
16       A    They have had -- I believe -- you know,
17   there probably have been some comments in the past.
18       Q    Tell us about those.
19       A    Well, we had one director who was on the
20   board prior to 1998 that liked to wordsmith about
21   anything you would give her so --
22       Q    Who was that?

143

1        A    Celeste Pinto McLain.
2        Q    Okay. Tell me about your recollections
3    about --
4        A    My general recollection is that it was
5    probably at least one of those that she wordsmithed
6    on us.
7        Q    But you said she left the board what
8    year?
9        A    She left in 1998.
10       Q    But the unanimous consent resolutions and
11   the conversations you had about them, other than
12   your orientation in 1992, didn't have anything to do
13   with the period of time while she was a board
14   member.
15            Have you not told us everything?
16       A    There was one in 1997 we discussed.
17       Q    The one with Ms. Bellet? Are you saying
18   that that got all the way to actually discussing it
19   with board members?
20       A    We were originally -- as I recall we
21   originally were going to do that as unanimous
22   consent and then we ended up doing a conference call

144

1    on it and that's the one I think she may have
2    wordsmithed on us.
3        Q    So she was wordsmithing on a resolution
4    in a telephonic meeting, not as part of a unanimous
5    consent resolution?
6        A    I think she may have done it when we were
7    considering doing a unanimous consent on that one.
8        Q    Okay. Well, then we need to revisit this
9    1997 incident because the way you presented it was
10   there was never a presentation to the board of a
11   unanimous consent resolution, there was a meeting
12   instead.
13            Are you now recalling that there was the
14   presentation of a proposed resolution which was
15   rejected by one or more members?
16       A    No, I'm not.
17            MR. WELLSCHLAGER:  Objection to the form
18   of the question.
19   BY MR. GOTTESDIENER:
20       Q    Well, tell us what you're telling us.
21       A    I'm just telling -- what I'm telling you
22   is I remember she was persnickety about things and

Case 1:06-cv-01539-GK   Document 20-6   Filed 01/16/2007   Page 38 of 39
DEPOSITION OF JOHN CARTEN
CONDUCTED ON MONDAY, APRIL 12, 2004

37 (Pages 145 to 148)

145

1   it may have been on that one when we were
2   considering going unanimous consent that she may
3   have wanted to wordsmith it but we ended up doing a
4   conference call to approve that particular
5   resolution.
6       Q    Was this director and the board presented
7   with a unanimous consent resolution with respect to
8   this right-of-way issue? Yes or no?
9       A    I can't remember for sure. My
10  recollection is that we were considering doing it
11  that way and had discussed it with her and she was
12  making some -- some -- raising some concerns with it
13  and that's when we decided to go with a conference
14  call.
15      Q    And what was her position on the
16  conference call?
17      A    I think she ultimately voted for it.
18      Q    Did anyone ultimately abstain or vote
19  against it?
20      A    No, not that I recall.
21      Q    In spring of 2003 did any of the
22  directors raise questions about the resolution put

146

1   to them as to the real estate and the personnel
2   matter?
3       A    I don't think they did.
4       Q    What about in 1999 with respect to the
5   Delaware real estate matter?
6       A    I don't think anybody had a problem with
7   it.
8       Q    And returning to Governor Holton you're
9   saying the material was faxed to his office; is that
10  right?
11      A    That's my recollection.
12      Q    Who faxed it?
13      A    It was either me or my secretary.
14      Q    And after it was faxed what was done with
15  respect to Governor Holton?
16      A    As I recall he gave us a call and said he
17  was okay with it and was okay to apply his signature
18  to the resolution.
19      Q    And how many times did that come up with
20  Governor Holton where he called you and says put his
21  signature on it -- on anything?
22      A    It would come up from time to time.

147

1       Q    I want to know every time this happened.
2   When else has it happened?
3       A    Well, as I recall we had some -- some
4   letters that we would send out sometimes to states
5   that -- or other government agencies and they would
6   have the board -- want to have the whole board sign
7   the letter individually and so Governor Holton would
8   review the letter and then tell us it's okay to
9   apply his signature.
10      Q    These are letters, not contracts, right?
11      A    These are letters.
12      Q    About what?
13      A    Deal with some issue that had to do with
14  whatever the governor -- government entity was,
15  Congress or the states.
16      Q    Like what? Give me an example. I want
17  to know every time that you signed for Governor
18  Holton and I want to know what you signed.
19      A    Well, as I recall letters sent over to
20  Congress sent by the board.
21      Q    About what?
22      A    About -- could be Amtrak funding.

148

1       Q    Could be?
2       A    I can't recall all the specifics that was
3   in a letter.
4       Q    Recall one for us. Give us one example
5   of when you signed for Governor Holton.
6       A    We had a letter that we had signatures of
7   all the board members. We weren't able to get them
8   all to sign it individually there in front of us, a
9   letter going to Congress and so we would call around
10  and Governor Holton would give us his okay to sign
11  for him -- apply his signature.
12      Q    I'm sorry, you keep saying would. I'm
13  asking for a specific example.
14           What letter are you talking about that
15  went to Congress?
16      A    It was a letter to Congress and I can't
17  remember exactly what the date was. I can just
18  remember doing it.
19      Q    What year was it, sir?
20      A    I can't say specifically what year it
21  was.
22      Q    What years has Governor Holton served?

149

1  **A    He served from September of 1998 through**
2  **2003.**
3  Q    What month 2003?
4  **A    September 2003.**
5         MR. WELLSCHLAGER: Eli?
6         MR. GOTTESDIENER: What?
7         MR. WELLSCHLAGER: I need a 30 second
8  personal break.
9         MR. GOTTESDIENER: What?
10        MR. WELLSCHLAGER: I need a personal
11 break. I'm getting multiple calls from my wife.
12        MR. GOTTESDIENER: Okay.
13        THE VIDEOGRAPHER: We're going off the
14 record. The time is 11:38 a.m.
15        (A brief recess was taken.)
16        (Discussion off the video record.)
17        MR. GOTTESDIENER: John, could you
18 just -- sorry to do this to you with your family
19 matter but could you just state for the record what
20 it is that you said that you learned with the phone
21 call and then I'll make a statement? That's not on
22 the record. I want this on the record. You got a

150

1  phone call from your wife.
2         MR. WELLSCHLAGER: I'm sorry. Yeah, I
3  just received a phone call from my mother-in-law.
4  My son has a fever of 105 and a half and has been
5  taken away in an ambulance and so I need to go meet
6  my wife and son in Annapolis at the hospital near
7  our house.
8         I'm also appreciative of the fact that
9  we're at a critical point in testimony, at least
10 critical in the eyes of Mr. Gottesdiener as I see
11 his view of the case and so I'm opening up ideas as
12 to ways we can reach a more logical breaking point
13 in the next two to three minutes but if it's going
14 to take longer than that I'm sorry, I just have
15 to -- I have to break.
16        MR. GOTTESDIENER: Okay. We were
17 scheduled to go to 12:30 and I'd like to go to 12:30
18 and short of going through to 12:30, I'd like with
19 Mr. McIlwain to go for as long as I can and so the
20 question is how long are you willing to let me go?
21        MR. WELLSCHLAGER: Well --
22        MR. McILWAIN: That's my point. I'd

151

1  rather have our counsel here to deal with this. I
2  understand your point but I would rather have --
3         MR. GOTTESDIENER: Then I want now a
4  representation on the record, including from the
5  witness under oath, that this matter -- that nothing
6  will be discussed and I mean nothing between now and
7  when we resume tomorrow morning about his testimony.
8         MR. WELLSCHLAGER: Are we resuming
9  tomorrow morning?
10        MR. GOTTESDIENER: Yes.
11        MR. WELLSCHLAGER: Okay. I can make a
12 representation to you, and I think Desmond will
13 probably join it --
14        MR. McILWAIN: Right.
15        MR. WELLSCHLAGER: -- that we will not
16 discuss Mr. Carten's testimony at all between now
17 and tomorrow morning.
18        MR. GOTTESDIENER: And I want that from
19 the witness.
20        THE WITNESS: Okay. I agree to that.
21        MR. GOTTESDIENER: Okay, then --
22        MR. WELLSCHLAGER: That's fine.

152

1         MR. GOTTESDIENER: What time are we going
2  to resume tomorrow?
3         MR. WELLSCHLAGER: We said 9:00.
4         MR. McILWAIN: Yeah.
5         MR. GOTTESDIENER: Okay.
6         MR. WELLSCHLAGER: And I have everyone's
7  cell phones. I mean I'll get Mark to jump in or
8  something if there's an emergency that lasts longer
9  than half a day.
10        MR. GOTTESDIENER: So we're going off the
11 record?
12        MR. WELLSCHLAGER: Yes.
13        (Signature having not been waived, the
14 deposition of JOHN CARTEN was adjourned at 11:43
15 a.m.)