**<u>Exhibit 14B</u>**

1 (Pages 157 to 160)

157

2          FOR THE DISTRICT OF COLUMBIA
3    -------------------------------x
4    WADE F. HALL, et al.,        )
5              Plaintiffs, )
6        v.               ) No.
7    NATIONAL RAILROAD PASSENGER    ) 1:03CV01764(GK)
8    CORPORATION, et al.,        )
9              Defendants.  )
10   -------------------------------x
11
12
13
14        Videotaped Deposition of JOHN CARTEN
15            Washington, D.C.
16          Tuesday, April 13, 2004
17              9:40 a.m.
18
19
20   Job No.: 2-33076
21   Pages 157 - 447, Volume 2
22   Reported By: Joan V. Cain

158

1        Videotaped Deposition of JOHN CARTEN, held at
2    the offices of:
3
4            L.A.D. REPORTING COMPANY, INC.
5            Suite 850
6            1100 Connecticut Avenue, Northwest
7            Washington, D.C. 20036
8            (202) 861-3410
9
10        Pursuant to Notice, before Joan V. Cain,
11   Certified Court Reporter and Notary Public in and
12   for the District of Columbia.
13
14
15
16
17
18
19
20
21
22

159

1              A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFFS:
4        ELI GOTTESDIENER, ESQUIRE
5        GOTTESDIENER LAW FIRM
6        3901 Yuma Street, Northwest
7        Washington, D.C.  20016
8        Telephone:  (202) 243-1000
9
10
11
12   ON BEHALF OF DEFENDANT:
13       JOHN R. WELLSCHLAGER, ESQUIRE
14       PIPER RUDNICK
15       6225 Smith Avenue
16       Baltimore, Maryland  21209-3600
17       Telephone:  (410) 580-3000
18
19
20
21
22

160

1        A P P E A R A N C E S   C O N T I N U E D
2
3    ALSO PRESENT:
4        Desmond T. McIlwain, Esquire
5        Scott Forman, Videographer
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

2 (Pages 161 to 164)

161

1          C O N T E N T S

2

3    EXAMINATION OF JOHN CARTEN          PAGE

4      By Mr. Gottesdiener          163

5

6          E X H I B I T S

7        (Retained by Counsel.)

8    DEPOSITION EXHIBITS          PAGE

9    4   Documents          210

10   5   Plain Manilla File Folder     215

11   6   President's Report to the Board     364

12       of Directors

13   7   Board of Directors' Record of     364

14       Meetings

15   8   President's Records          364

16   9   Committee Minutes          364

17   10  Minutes of the Meeting of the Board     364

18       of Directors

19   11  Documents          364

20   12  Resolution and Executive Summary     338

21   13  Mr. Carten's Handwritten Notes     376

22   14  Document Prepared by Mr. Carten     386

162

1          E X H I B I T S

2        (Retained by Counsel.)

3    DEPOSITION EXHIBITS          PAGE

4    15  Document Bates Stamped AMT 6105     392

5        and 6106

6    16  Documents Maintained by John Carten     398

7        RE: Board Minutes and Resolutions re

8        VERP

9    17  Documents Bates Stamped AMT 14877     411

10       through 14885

11   18  Documents Bates Stamped AMT 014930     431

12       through 014942

13   19  Documents Bates Stamped AMT 014917     438

14       through 014925

15

16

17

18

19

20

21

22

163

1          P R O C E E D I N G S

2        THE VIDEOGRAPHER:  Here begins Tape No. 1,

3    Volume No. 2, in the continuing deposition of John

4    Carten.  Today's date is April 13, 2004.  We are

5    back on the record.  The time is 9:40 a.m.

6          JOHN CARTEN

7      having been sworn, testified as follows:

8        CONTINUED EXAMINATION BY COUNSEL FOR PLAINTIFFS

9    BY MR. GOTTESDIENER:

10   Q   Mr. Carten, after yesterday's deposition

11   adjourned, what did you -- what did you do after you

12   left the building here?

13   A   Went back to the office and worked on

14   normal things I work on every day.

15   Q   And what was that yesterday that you worked

16   on?

17   A   Yesterday I'd been out of the office for a

18   few days, so I -- I had some e-mails to catch up on,

19   so I caught up on those, returned some phone calls,

20   checked on the status of some of our materials for

21   the upcoming April board meeting, reviewed those

22   materials.

164

1    Q   Anything else?

2    A   That's pretty much it.

3    Q   And so what time did you get back to the

4    office?

5    A   We got back to the office probably around

6    12:30.

7    Q   And the we you're referring to, you and

8    Mr. McIlwain?

9    A   Yes.

10   Q   And how did you travel from here to the

11   office?

12   A   We took the subway.

13   Q   And what time did you leave work last

14   evening?

15   A   Probably about 6 o'clock.

16   Q   Do you have any form of remote access from

17   home or any other location to any information,

18   electronic or computerized, that is located in your

19   office or in the building or in Amtrak's general

20   information store?

21   A   I'm able to go to my -- check my e-mail

22   from home.

Case 1:06-cv-01539-GK    Document 20-7    Filed 01/16/2007    Page 4 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

3 (Pages 165 to 168)

165

1    Q    And how do you do that?
2    A    I sign on to my Internet provider, and then
3    there's some commands I put in and it connects me to
4    the Amtrak e-mail.
5    Q    And what -- what is the nature of that
6    connection?  Are you -- are you accessing Amtrak
7    e-mail on Web mail or --
8    A    It's on Web mail.
9    Q    It's Web mail?
10   A    Uh-huh.
11   Q    And in your office you use Microsoft
12   Outlook to receive and view and send e-mail?
13   A    Yes.
14   Q    And when you access your e-mail remotely,
15   are you able to see a facsimile of an Outlook-type
16   screen, or is it in some other format?
17   A    It doesn't look like Outlook.  It's more of
18   a generic sort of screen with fewer options.
19   Q    In your Outlook that you have in your
20   office, do you have, under your in box, do you have
21   subfolders with subject matters created?
22   A    Under my in box?

166

1    Q    Or any place along your list along the
2    left-hand panel.
3    A    There -- well, I have in box, I have sent
4    items, calendar, those sorts of things, but I don't
5    think I have any subfolders.  I just work out of the
6    in box and out box and so forth.
7    Q    So you don't like take e-mails and
8    categorize them as they're coming from different
9    people or relating to different subjects or anything
10   of that nature?
11   A    No.
12   Q    How is your -- how is your -- you said you
13   use WordPerfect?
14   A    Yes.
15   Q    Do you use Word as well?
16   A    Yes.
17   Q    How is your document system set up on your
18   computer in your office?
19   A    The document system I have a C drive which
20   is on my computer, and then I also have an S drive,
21   a shared drive, which store things.  The C drive has
22   several subdirectories on it, as does the -- my S

167

1    drive has subdirectories as well.
2    Q    And the subdirectories on the C drive, do
3    any of them serve to hold WordPerfect or Word
4    documents that relate to work?
5    A    Yes.  They both would have Word and
6    WordPerfect documents on them.
7    Q    And is there yet another drive that you use
8    that is connected to a more general internally
9    available place where documents can be created,
10   stored, worked on, and/or shared?
11   A    It's just the C drive and the S drive that
12   I use.
13   Q    So are you saying that you do not use or
14   access any drive that anyone in the company or
15   anyone, not Ms. Hawkins, not Ms. Oliveri has access
16   to?
17   A    State that again.
18   Q    Sure.
19   A    Okay.
20   Q    The C drive is -- no one can get to the C
21   drive on your machine unless they're sitting at your
22   machine?

168

1    A    Correct.
2    Q    And no one, except for Ms. Hawkins and
3    Ms. Oliveri, can get to the S drive unless, you
4    know, you let them?
5    A    Yes.
6    Q    You use no other drives ever to do anything
7    in Word or WordPerfect?
8    A    Those are the two drives that I use, the C
9    drive and the S drive.
10   Q    Okay.  My question is just one step
11   further.  You don't use any other drive?  I
12   understand you're saying that this is what you do --
13   A    Mm-hmm.
14   Q    -- but I'm asking do you ever go out to an
15   I drive, an H drive?  Do you ever go out to drives
16   where other employees go and inhabit and either find
17   a document that you might want for some reason,
18   create a document, put a document there for other
19   people to access?  Do you ever do that?
20   A    The only other drive I can recall using is
21   there's a default drive on my machine when I receive
22   things in e-mail, and if I don't save it to C or

Case 1:06-cv-01538-GK    Document 20-7    Filed 01/16/2007    Page 5 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

4 (Pages 169 to 172)

169

1  S -- that's the default drive, but my practice is to
2  always save things to C or to the S drive.
3      Q   But that default drive is really also just
4  on your hard drive on your computer?
5      A   Yeah. As far as I know, that's where it
6  is.
7      Q   Okay. Just to make sure we're -- we're
8  both on the same page, you never leave the S drive
9  or your hard drive on your PC to do anything with
10  Word documents or WordPerfect documents?
11     A   No.
12     Q   You don't have any reason to think that you
13  don't have the physical capability or the software
14  setup currently to do that if you wanted to?
15     A   To visit other drives?
16     Q   Yes.
17     A   You know, I wouldn't know how to visit them
18  at this point.
19     Q   But you don't have any reason to think that
20  you can't?
21     A   You know, I would need -- I think I would
22  need some assistance to access them.

170

1      Q   Speaking of that, in the past few years,
2  are there any people that you call on routinely or
3  have called on in a nonroutine basis, like once,
4  from the IT department, or I think you call it AT
5  department, to assist you in anything with respect
6  to electronic data, e-mails, creating, saving,
7  preserving, modifying WordPerfect or Word documents?
8      A   There's -- there's one person that I call
9  on if I need technical assistance from our AT
10  department.
11     Q   And that is?
12     A   That's Robert Peck.
13     Q   P-e-c-k?
14     A   Yeah.
15     Q   And where is he located physically?
16     A   His office is at 10 G Street.
17     Q   And how -- over the past few years, how
18  have you used Mr. Peck to assist you in your duties?
19     A   Well, if I'd had questions about using
20  documents or saving documents or if I've experienced
21  problems with my computer, I call him up and get his
22  assistance. He's -- he is responsible in part for

171

1  maintaining this shared drive. So if we have any
2  problems with that, then that's who we go to.
3      Q   When you say he maintains it, what does
4  that mean?
5      A   Well, if we experience problems with it,
6  you know, our practice is to call him up, and then
7  he goes and, you know, takes a look at it and see
8  what the problem is, you know, what's -- what --
9  what's causing it not to function at any given point
10  in time.
11     Q   What percentage of the time that you use
12  him and he works on things for you does he actually
13  physically come to your office and get on your
14  machine or talk to you in person?
15     A   I'd say maybe 20 percent of the time.
16     Q   How long have you had the remote e-mail
17  access that you told us about?
18     A   I've only had it for a short period of
19  time, like last couple of months.
20     Q   And do you have a high-speed connection in
21  your home?
22     A   No. It's dial-up.

172

1      Q   And how do you employ this access? I mean,
2  how -- when you're accessing your e-mail from home,
3  why are you doing so on a typical basis?
4      A   Typically, it's because I'm -- I'm trying
5  to get a jump on the day. Like, I might look at it,
6  say, on a Sunday evening to see what's -- what's out
7  there for Monday, or if I've been out of the office,
8  I will do it just to see if there's any e-mails that
9  I should be aware of that, you know, are time
10  sensitive.
11     Q   Do you on occasion send e-mails from this
12  Web mail access as opposed to just read what's there
13  in your box?
14     A   So far I think I've just used it to read.
15     Q   What was the first you ever heard of this
16  lawsuit?
17     A   The first I ever heard of it?
18         MR. WELLSCHLAGER: And I just caution you
19  not to divulge things that an attorney might have
20  said to you. I'm not sure if the question's asking
21  for when or exactly the content of what you heard
22  first about the lawsuit, but with that caution in

173

1  mind, you can answer the question.
2      THE WITNESS: First I heard about it was --
3  was last fall.
4  BY MR. GOTTESDIENER:
5      Q   How?
6      A   Mr. McIlwain came to me.
7      Q   Okay. Without telling us what he said
8  specifically, when you say he came to you, did he
9  physically come to your office?
10     A   I believe he did.
11     Q   That's the first that you learned of the
12 existence of this lawsuit?
13     A   Yeah.
14     Q   And when you say fall, could you help us
15 out with more specificity when he showed up in your
16 office?
17     A   I'd say it was in November.
18     Q   In November?
19     A   Yeah.
20     Q   Okay.
21     A   That's what I recall.
22     Q   Okay. Now, without telling us anything he

174

1  said to you, how much time did he spend in your
2  office?
3      A   He didn't spend a lot of time.
4      Q   Okay. How much time did he spend in your
5  office?
6      A   Maybe 15 minutes.
7      Q   Did he sit down?
8      A   I think he -- yeah, I think he probably sat
9  down in there.
10     Q   Okay. After he left -- did you do anything
11 relative to this case with respect to finding,
12 looking for documents or making any notes or
13 creating any documents after he left?
14     A   I don't believe I did.
15     Q   After that day in November, what was the
16 next time you heard anything about this lawsuit?
17     A   It was probably later in the month that,
18 you know, he approached me again saying --
19     MR. WELLSCHLAGER: Don't --
20     THE COURT REPORTER: Okay.
21     MR. WELLSCHLAGER: -- reveal what any
22 attorney said to you.

175

1      THE WITNESS: Okay.
2  BY MR. GOTTESDIENER:
3      Q   The saying part for now -- I'm not agreeing
4  that that's privileged, but the saying part for now
5  I'm not asking you about. He approached you again.
6  Did he do it via e-mail, the phone, in-person, or in
7  some other manner?
8      A   I think he came in person.
9      Q   Okay. And if he did come in person -- you
10 say you think he did -- how much time did you and he
11 spend together on that occasion?
12     A   You know, I'd say roughly maybe 10 minutes.
13     Q   Okay. And that would be later in the month
14 of November?
15     A   I think that's right.
16     Q   Is there anything anywhere that you're
17 aware of in any form, memorialized, written, jotted
18 down that would provide someone with the dates of
19 either of those two exchanges between you and
20 Mr. McIlwain?
21     A   Not that I'm aware of.
22     Q   Okay. After you and he spent that 10

176

1  minutes together, did you do something then with
2  respect to this case?
3      A   I don't believe that I did.
4      Q   Okay. What's the next time that you heard
5  anything about this lawsuit?
6      A   It's probably -- probably in December.
7      Q   Okay. What did you hear and how?
8      MR. WELLSCHLAGER: Well, if it was an
9  attorney, don't answer the what did you hear part.
10     THE WITNESS: Okay.
11     MR. WELLSCHLAGER: But you can try to
12 answer the question --
13     THE WITNESS: Okay.
14     MR. WELLSCHLAGER: -- as best you can with
15 that caution.
16     THE WITNESS: At some point somewhere
17 during that period of time, I was approached by some
18 staff members, Amtrak staff members, that said, you
19 know, we need to collect some information in
20 connection with this case, and I can't tell you
21 exactly when that was.
22 BY MR. GOTTESDIENER:

VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

6 (Pages 177 to 180)

177

1    Q    How about approximately?

2    A    It was probably, I'd say, sometime in

3    December.

4    Q    And what staff members approached you?

5    A    The person that approached me was

6    Christine -- I believe it was Christine Turnblaser.

7    Q    How did she approach you?

8    A    She said we need to collect some

9    information in connection with this -- with this

10   lawsuit.

11   Q    And anything else?

12   A    And, you know, she said, you know, we just

13   need to take a look at board minutes or anything

14   else in connection with -- with this lawsuit.

15   Q    And how did she approach you?

16   A    Initially, I think she contact -- she

17   approached me in person and then -- yeah, that's how

18   she did it.

19   Q    Okay.  And what else did she say about, you

20   know, board minutes?

21   A    She said we just need to collect, you know,

22   board minutes or anything that are, you know, in

178

1    connection with this case, the subject at hand.

2    Q    Okay.  And what did you do in response, if

3    anything?

4    A    Well, she was -- I think at that point she

5    was basically putting me on notice.

6    Q    Why do you say that?

7    A    Because, you know, things tend to be, you

8    know, pretty busy around our office, and people, you

9    know, often want to give you a heads-up that this is

10   coming, but realizing that, you know, you're going

11   to have to factor it in with everything else you're

12   doing in terms of collecting information.

13   Q    Who is Christine Turnblaser?

14   A    Christine is a legal assistant in the law

15   department.

16   Q    Who is she an assistant to?

17   A    She -- she works for Bud Luby.

18   Q    Okay.  And she's on the same floor you are?

19   A    Yes.

20   Q    And how long did she spend with you?

21   A    Not -- not very long.

22   Q    And she didn't get any more specific than

179

1    you've told us?

2    A    No.

3    Q    And did she get any more specific about,

4    you know, when you were going to be asked to do what

5    she said you were being asked to do?

6    A    I think it was more a matter of, you know,

7    we're going to need this information in the near

8    future.

9    Q    Okay.  And she described -- but she said

10   nothing about wanting anything at that point in

11   time?

12   A    I think she was just putting me on notice.

13   Q    Okay.  What, if anything, did you do as a

14   result of her coming by your office?

15   A    Well, I just did a -- made some quick

16   mental notes, you know, that we'll have to collect

17   this information, and kind of left it at that.

18   Q    What were your mention notes?  What did you

19   think?

20   A    Well, it's just, you know, thinking about

21   the time period and, you know, where the minutes

22   would be and so forth.

180

1    Q    I'm kind of missing something because I'm

2    not hearing that she told you what the lawsuit was

3    about.  Did she give you any information about that,

4    or did you know that from some other source?

5    A    No.  She just told me that there was a

6    lawsuit in connection with the retirement plan that

7    had been put out there in summer of 2001.

8    Q    Did you at that point in time know anyone

9    who was an eligible participant who was not allowed

10   to receive the benefit that's at issue in the

11   lawsuit?

12        MR. WELLSCHLAGER:  Objection to the form of

13   the question.  Go ahead and answer.

14        THE WITNESS:  Okay.  Can you repeat the

15   question?

16   BY MR. GOTTESDIENER:

17   Q    Did you know, when Ms. Turnblaser came to

18   you, anyone who you believe to be eligible for the

19   benefit that's at issue in this lawsuit?

20        MR. WELLSCHLAGER:  Same objection.

21        THE WITNESS:  Well, as I understood it, the

22   key requirement was -- I think you had to be 55

VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

7 (Pages 181 to 184)

181
1    years of age, so I could speculate as far as people
2    that were there who were 55 or older, but I really
3    don't know people's ages.
4    BY MR. GOTTESDIENER:
5        Q    The question was did you know anyone who
6    you believed to be eligible for the benefit that's
7    at issue, and I'd ask you if you can try to answer
8    that question.
9        A    I'd say yes.
10       Q    At any time up until today, have you
11   discussed with anyone at Amtrak this case in the
12   context of an actual person who you believe may be
13   eligible for the benefit that's at issue in this
14   case?
15       A    No.
16       Q    Other than make those mental notes, you
17   didn't -- at the time Ms. Turnblaser came and left,
18   you didn't do anything to gather any of the
19   information that you understood was being requested
20   in this suit?
21       A    No.
22       Q    Did Ms. Turnblaser -- withdrawn.

182
1            By the time Ms. Turnblaser left, you did
2    understand that the information that was being
3    requested was at least in part being requested by
4    the company's adversary in the litigation?
5        A    Yes.
6        Q    What was the next time that you heard about
7    this lawsuit?
8        A    I believe she later -- Christine Turnblaser
9    later may have sent me an e-mail indicating, you
10   know, that I needed to start collecting the
11   information.
12       Q    Okay.  And when did she send you this
13   e-mail?
14       A    My best recollection would be sometime in
15   December.
16       Q    2003?
17       A    Yes.
18       Q    And in the e-mail, what did she say?
19       A    She -- I think she reiterated what she'd
20   said in person, and that was that she'd need minutes
21   in -- board minutes in connection with this and --
22       MR. WELLSCHLAGER:  Hold on a second,

183
1    Mr. Carten.
2        THE WITNESS:  Yeah.
3        MR. WELLSCHLAGER:  I have to caution you.
4    If there was an attorney on the e-mail, you
5    shouldn't be revealing the contents of the e-mail.
6    BY MR. GOTTESDIENER:
7        Q    Was there an attorney on the e-mail that
8    she sent you?
9        A    I believe there was.
10       Q    Who?
11       A    Mr. McIlwain.
12       Q    And are you saying that this e-mail did no
13   more than essentially put in writing what she put
14   you on notice of when she came by earlier?
15       A    That's my recollection.
16       Q    Okay.  And what did you do after you
17   received this e-mail?
18       A    At that time I just continued with what I
19   was doing because, as I recall, it was a busy time
20   during the month and --
21       Q    Okay.  Did you ever do anything about her
22   e-mail?

184
1        A    Eventually -- I think it was later in the
2    month -- I collected some information for her.
3        Q    Later in the month of December?
4        A    Yeah.
5        Q    Okay.
6        A    That's my recollection.
7        Q    Did her e-mail provide any deadline by
8    which you were to act?
9        A    I don't recall if it did or not.
10       Q    Have you ever been given a deadline in this
11   case other than that you had a deposition scheduled
12   starting yesterday?
13       A    People have, you know, told me we need
14   information by such and such a date.
15       Q    Who's told you, and by what date?
16       MR. GOTTESDIENER:  If you think that's
17   privileged, then you've got a --
18       MR. WELLSCHLAGER:  Hold on a second.
19   Well, I don't really have a problem with
20   him answering the question, Counsel.
21       MR. GOTTESDIENER:  So let him answer.
22       MR. WELLSCHLAGER:  If you -- if you believe

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 9 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

8 (Pages 185 to 188)

185
1  it's not privileged, then there's not a waiver
2  issue.
3      MR. GOTTESDIENER: I take the position that
4  that is not seeking, nor would it reveal privileged
5  information.
6      MR. WELLSCHLAGER: Okay. And so I take it
7  from that that you would not turn it around and
8  argue that he has waived any attorney-client
9  privilege by answering?
10     MR. GOTTESDIENER: I couldn't do that based
11 on what I just stated. I would be unable to do that
12 because I'm taking the position if --
13     MR. WELLSCHLAGER: Fair enough.
14     MR. GOTTESDIENER: Okay.
15     MR. WELLSCHLAGER: You can answer that
16 question, sir.
17 BY MR. GOTTESDIENER:
18     Q   Who told you and what deadlines did they
19 give you?
20     A   Let's see. I believe Christine gave me a
21 deadline in December to meet.
22     Q   What was it?

186
1      A   And I can't recall what it was. I just
2  remember, I think, it was sometime in December.
3      Q   And when did she give you that deadline?
4  In that e-mail?
5      A   It was either that first e-mail or maybe a
6  second e-mail.
7      Q   And on the second e-mail, what -- what was
8  the content of the second e-mail?
9      A   It's just reiterating that we need this
10 information.
11     Q   Because you haven't provided it to her?
12     A   Right.
13     Q   And what did you do after you got the
14 second e-mail and this deadline?
15     A   I started -- as I recall, I started
16 collecting the information for her.
17     Q   Have you ever been given a deadline by any
18 other person in this case other than notification as
19 to the date of your deposition?
20     A   Yes, I have.
21     Q   By whom and what deadline?
22     A   Well, Mr. McIlwain's given me some

187
1  deadlines.
2      MR. WELLSCHLAGER: Before we get into that,
3  same -- same issue.
4      MR. GOTTESDIENER: Same statement. It's
5  the same questions. There's no reason to spend time
6  on this.
7      MR. WELLSCHLAGER: I have to -- I have to
8  be careful.
9      MR. GOTTESDIENER: I'm trying to get the
10 same answer.
11 BY MR. GOTTESDIENER:
12     Q   What were the deadlines that he gave you?
13     A   There were some -- there were some
14 deadlines probably in January, and I believe he was
15 asking for some information in this case.
16     Q   What information?
17     A   Asking --
18     MR. WELLSCHLAGER: Hold on a second. Now,
19 we're not talking about deadlines. We're talking
20 about attorney-client communications, so unless the
21 question's rephrased, don't answer that question.
22 BY MR. GOTTESDIENER:

188
1      Q   Did Mr. McIlwain ever ask you to provide
2  documentary information?
3      MR. WELLSCHLAGER: That's a yes-or-no
4  question.
5      THE WITNESS: Yes.
6  BY MR. GOTTESDIENER:
7      Q   What documents did he ask you to provide
8  and what deadline did he give you for providing
9  them?
10     A   He asked me to provide minutes, board
11 minutes. He also asked for the record of meeting
12 books.
13     Q   This is in January?
14     A   He's asked me more than once, so, you know,
15 whether it spills over into February, I can't say
16 for sure.
17     Q   But we're definitely not talking about the
18 two visits you told us about in November of 2003,
19 right?
20     MR. WELLSCHLAGER: Object to the form of
21 the question.
22 BY MR. GOTTESDIENER:

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 10 of 77
VIDEOTAPED DEPOSITION OF JOHN ALLISON, VOLUME I
CONDUCTED ON TUESDAY, APRIL 13, 2004

9 (Pages 189 to 192)

189

```
1    Q   Can you answer the question?
2    A   The ones -- the ones in 2003, I think, were
3   more putting me on notice that we're going to need
4   this information.
5    Q   So he's asking you to provide minutes and
6   the record of --
7    A   Recall a record of meeting book.
8    Q   -- record of meeting book, that's occurring
9   in January or February or both of 2004?
10   A   Yes.
11   Q   And the deadline he gives you is what
12  deadline?
13   A   The deadline is, you know, within the next
14  week or so, something like that.
15   Q   Anything else that he sought from you?
16   A   He also sought copies of our resolution
17  books.
18   Q   Anything else?
19   A   I think that's all that he sought at that
20  time.
21   Q   Okay. And what did you do, if anything, in
22  response to what he asked you?
```

190

```
1    A   Well, I talked with him about how we could
2   meet this requirement, and then -- then we went
3   forward from there to get him the information.
4    Q   That's the question, sir. What did you do?
5    A   What did I do?
6    Q   Yeah. Tell me, physically, what did you
7   do? You walked over to a bookshelf, you --
8    A   Okay. Well, I went to the -- to the rooms
9   where we stored this information.
10   Q   The rooms?
11   A   Room --
12   Q   Okay, the storage room --
13   A   -- where we store it.
14   Q   -- you told us about yesterday --
15   A   Yeah. Okay.
16   Q   -- on the fourth floor?
17   A   Collected the necessary information from
18  that room and also from my office.
19   Q   Let's take it step at a time. Did you do
20  that the same day that he gave you these deadlines?
21   A   I don't recall.
22   Q   And I'm sorry if I missed this. This time
```

191

```
1   with Mr. McIlwain, is this in person he comes to
2   your office? Is this on the phone? Through e-mail?
3   How does he communicate this request?
4    A   I believe he came in person.
5    Q   And did he come a second time? You were
6   talking about January spilling over into --
7    A   Yeah, I think he came more than once.
8    Q   Because you hadn't responded to his first
9   entreaty?
10   A   Well, there was some give-and-take on
11  exactly what he needed, you know, make sure we're
12  clear.
13   Q   However, the give-and-take didn't take the
14  form of you giving him any physical documents and
15  him coming back with additional requests. It was
16  you hadn't provided him with anything. He had to
17  ask you a second time to get what it was that you
18  then did provide him with?
19   A   I can't recall if it was or not.
20   Q   Well, do you recall going to the storage
21  room --
22   A   I do recall.
```

192

```
1    Q   I didn't finish my question -- on more than
2   one occasion in a direct response to something that
3   Mr. McIlwain asked you to provide?
4    A   I recall going there more than once.
5    Q   Okay. Tell us all the times you went to
6   the storage room to retrieve documents in connection
7   with this lawsuit.
8    A   What we -- what I did was I'd go up there
9   and collect the information.
10   Q   Is there any log or procedure or security
11  process that you or someone else who has access to
12  this room goes through to check out material or to
13  keep an inventory of what has been taken from the
14  room?
15       MR. WELLSCHLAGER: Objection. Counsel, I
16  don't think you let him finish his answer to the
17  previous question.
18  BY MR. GOTTESDIENER:
19   Q   Please answer my question, with that
20  objection. Is there such a process?
21   A   There's a log that we use sometimes.
22   Q   Okay. What do you mean by "sometimes"?
```

VIDEOTAPED DEPOSITION OF JOHN CARTER FULLER
CONDUCTED ON TUESDAY, APRIL 13, 2004

10 (Pages 193 to 196)

193

1    A   We've used it in the past.  I don't think
2  we used it in this instance.
3    Q   Why?
4    A   I was keeping track of it mentally myself.
5    Q   Why didn't you use the log?
6    A   Because I felt I could trust Mr. McIlwain.
7    Q   What is the purpose of the log?
8    A   The log is to keep track of materials.
9    Q   And is the log premised on distrust of
10 anyone?
11   A   We've used the log in the past if --
12 actually, we've used it more than we have in the
13 recent past.  We used to use it quite a bit.  We
14 haven't used it much recently.
15   Q   Why was it used quite a bit in the past?
16   A   Just it was our -- it was our procedure
17 then because I think we -- we seemed to have more
18 requests for minutes than we had recently.
19   Q   Where is this log kept?
20   A   We have a log which is kept in the storage
21 room.
22   Q   Describe physically where one would see it

194

1  when one enters the room.
2    A   It's sitting on top of one of the filing
3  cabinets that the minutes are in.
4    Q   And what form is the log in?  What is it?
5    A   It has some columns showing date and items
6  checked out, describing what the item is, who took
7  it, and then when it's returned.
8    Q   And the log is sitting there now?
9    A   As I recall, it is.
10   Q   And how many -- or what time period does
11 the log that's sitting there right now cover?
12   A   I'd have to look at it and see.
13   Q   If you can approximate.
14   A   I'd say -- well, I know it covers at least
15 times in the 1990s.
16   Q   So it goes back into the 1990s?
17   A   Mm-hmm.
18   Q   And who are the people who have access to
19 that room?
20   A   Well, it's myself; it's Sharron Hawkins,
21 the secretary.  It's really just the two of us that
22 have the access to it.

195

1    Q   No one else?
2    A   Well, the maintenance -- the facility
3  maintenance person has a key to it.
4    Q   You mean the cleaning people?
5    A   No.  This is a maintenance person that
6  actually helps us with problems like changing
7  lightbulbs or heating and ventilation problems,
8  things like that.
9    Q   Who's that?
10   A   Earl Beckwith.
11   Q   And access is through a physical key?
12   A   Yes.
13   Q   And how many keys are you aware of are in
14 existence?
15   A   There are three keys that I'm aware of.
16   Q   One that you, Ms. Hawkins, and Mr. Beckwith
17 have?
18   A   Yes.
19   Q   Have you ever given your key to anyone
20 else?
21   A   No.
22   Q   Even to use for a brief visit to the room?

196

1    A   Not that I recall.
2    Q   How about Ms. Hawkins, do you know if she's
3  ever given the key to anyone?
4    A   I don't believe she has either.
5    Q   How often does Ms. Hawkins go or do you
6  send her to the room?
7    A   Maybe once a week.
8    Q   To do what?
9    A   It's usually to retrieve some supplies
10 or -- in connection with board books or something
11 we're doing there in the office.
12   Q   Now, when Mr. McIlwain came to you twice in
13 the January/February time period -- now that we've
14 had this discussion, I want to ask you again -- did
15 you get anything for him between the first and the
16 second time he came to you?
17   A   I don't -- I don't believe I did.
18   Q   Okay.  Now the log -- when was the last
19 time that you used the log?
20   A   Last time I think I've used the log was
21 sometime in the 1990s.
22   Q   And when was the last time that Ms. Hawkins

197

1 used the log?

2 **A I'm not sure that Ms. Hawkins has ever used**

3 **the log.**

4 Q Is there an inventory of the contents of

5 the storage room?

6 **A Well, the inventory is a chronological one**

7 **in that it's a -- it's the minutes books starting**

8 **from 1971 going forward.**

9 Q Are you done with your answer?

10 **A And we do have a document up there which**

11 **shows -- shows those minutes up until a certain**

12 **date, and I'm not sure how recently it's been**

13 **updated.**

14 Q Okay. Are you done with your answer?

15 **A Yes.**

16 Q If I understood your answer, you seem to be

17 saying that there is a document that is an

18 inventory, but that this document is both out of

19 date and incomplete in that it only lists the

20 minutes that are in the storage room as opposed to

21 the actual contents that include things other than

22 the minutes; is that correct?

198

1 MR. WELLSCHLAGER: Objection to the form of

2 the question.

3 THE WITNESS: It -- it also includes record

4 of meeting books.

5 BY MR. GOTTESDIENER:

6 Q Okay. So my understanding of your answer

7 was incorrect and -- withdrawn.

8 Your answer only referred to minutes of

9 meetings; is that correct?

10 **A This inventory also has -- lists record of**

11 **meeting books on it.**

12 Q But I was asking you about your answer,

13 sir, but I'll withdraw the question. Is there an

14 inventory of what's in the storage room?

15 **A Yes, there is.**

16 Q Where is it?

17 **A It's up in the storage room.**

18 Q Is it in electronic form as well as hard

19 copy form?

20 **A It's -- right now it's -- I know it's hard**

21 **copy. I'm not sure where it exists electronically.**

22 Q Well, if it's in hard copy form, if it was

199

1 created after a certain date, wouldn't it

2 necessarily have been created through use of Word or

3 WordPerfect?

4 **A It probably was.**

5 Q Did you create the inventory or did someone

6 else?

7 **A Somebody else created it.**

8 Q Ms. Hawkins?

9 **A It was somebody prior to Ms. Hawkins.**

10 Q Who?

11 **A And I'm not even sure -- you know, there**

12 **have been a number of secretaries prior to**

13 **Ms. Hawkins.**

14 Q How long has Ms. Hawkins been with you?

15 **A She's been -- been with me since about**

16 **1999.**

17 Q And who was her predecessor?

18 **A Her predecessor was Pauline Pandonie.**

19 Q How long was Ms. Pandonie there?

20 **A She was there from about 1994 to 1999.**

21 Q And before her?

22 **A Before her -- let's see. There was a woman**

200

1 **whose first name was Betty. I can't think of her**

2 **last name right now.**

3 Q Was she there when you arrived in '92?

4 **A No. She was just there for a short time.**

5 Q Who was there when you arrived in '92?

6 **A When I arrived in '92, it was Linda --**

7 **Linda in HR, and her last name escapes me now.**

8 Q She's in HR now?

9 **A Yes.**

10 Q There's Linda and then there's Betty. Was

11 there anyone in between Linda and Betty?

12 **A Yes. There was Brenda Zangas.**

13 Q Anyone else who we've not spoken about who

14 has been your secretary during your tenor -- tenure

15 from '92 to the present?

16 **A No.**

17 Q Who created that inventory?

18 **A I think the inventory was created either by**

19 **Brenda Zangas or her predecessor, Linda.**

20 Q At your direction or as a result of their

21 own initiative, or do you know?

22 **A It's either my initiative or -- actually, I**

12 (Pages 201 to 204)

201
1    think it was my predecessor had it initiated.
2        Q    So you didn't have any role in having the
3    inventory created or updated?
4        A    I don't believe so.
5        Q    Is there anything else on the inventory
6    other than the record of meeting books and the
7    minutes of meetings?
8        A    I think there's one other thing on there,
9    and that's the president's report -- reports.
10       Q    Okay. And this inventory, you believe,
11   right now if we went to the facility, we would find
12   it in the storage room?
13       A    Yes.
14       Q    Would -- where would we find it in the
15   storage room?
16       A    You'd find it in a drawer of one of the
17   file cabinets.
18       Q    Would we find it anywhere else in the
19   building, in a file you have, Ms. Hawkins has,
20   Ms. Oliveri has, Ms. -- how do you pronounce her
21   name? Is it Serfaty or --
22       A    Serfaty.

202
1        Q    Serfaty is how she pronounces it. Serfaty.
2    Would you find it there, any of these places?
3        A    I don't think you would.
4        Q    Okay. So you think the only copy -- hard
5    copy currently in existence is in the room there?
6        A    Yes.
7        Q    And the last time it was updated would have
8    been the early 1990s?
9        A    Somewhere in the 1990s.
10       Q    Did you ever update it?
11       A    I can't recall if I did or not.
12       Q    When was the last time you even saw it,
13   looked at it?
14       A    I've seen it within the -- seen it within
15   the past year.
16       Q    Just in going and doing something else or
17   because you wanted to see something that was or may
18   have been noted on it?
19       A    We -- we've been doing some cleaning out in
20   that room, and so, as a part of that, we've been
21   through all those drawers, and I think it was part
22   of that that I saw it.

203
1        Q    So as part of a cleaning, you came across
2    it?
3        A    Yes.
4        Q    What did you do with it when you came
5    across it, if anything?
6        A    Just looked at it.
7        Q    And why the cleaning?
8        A    Well, recently our president's been on a
9    cleaning binge, and he is imploring everybody to go
10   through everything that they have and see what needs
11   to be saved and what can be disposed of. So as part
12   of that, we were going through that room and looking
13   at what we had and cleaning it.
14       Q    Okay. When did you do that?
15       A    We did it -- did some of it back in the
16   fall.
17       Q    Of 2003?
18       A    Yeah.
19       Q    Okay. Any other time?
20       A    And then did some more along about
21   January/February.
22       Q    Of 2004?

204
1        A    Yeah.
2        Q    And what did your cleaning of that room
3    consist of specifically?
4        A    Well, we had -- we store some of our tabs
5    up there that we use in our board books. We store
6    old board books up there in terms of just the
7    binders themselves, we store old binders up there.
8    So we went through those and see -- saw which ones
9    we could recycle and which ones we could just get
10   rid of.
11           There were some other computer supplies up
12   there, some other just miscellaneous documents,
13   things like annual reports, timetables --
14       Q    Annual reports?
15       A    Annual reports.
16       Q    You called them an reports?
17       A    Annual.
18       Q    But the first time you said it, did you say
19   annual reports?
20       A    That's what I tried to say.
21       Q    Okay. So what did you do with the annual
22   reports?

13 (Pages 205 to 208)

205

1    A    Well, we -- we kept some of them, and then
2  the surplus ones we threw away.
3    Q    What years did the annual reports cover?
4    A    The annual reports, we had them, I think,
5  back until -- I saw some back into the late 1980s.
6    Q    Is this room used for purposes other than
7  storing the official records of the corporation and
8  the board of directors?
9    A    The only other thing it's used for is just
10 storing miscellaneous supplies connected with our
11 mailings and other administrative things that we do.
12   Q    As board liaison or --
13   A    As board liaison.
14   Q    Well, I was going to add corporate
15 secretary.  Would you include that in your answer as
16 also there to -- to store things that are related to
17 those functions as well?
18   A    Yes.
19   Q    The corporate secretary has never had
20 physical access to that room?
21   A    The corporate secretary?
22   Q    The corporate secretary.

206

1    A    Talk -- well, the corporate secretary has
2  access as needed.
3    Q    But going through you?
4    A    Yeah.
5    Q    I mean physical access.
6    A    Right.  Physical access, you know, the
7  corporate secretary has to go through me.
8    Q    Has the corporate secretary ever, as far as
9  you know, requested to see the room or anything in
10 the room since 1992?
11   A    From time to time they have.
12   Q    Okay.  Tell me every time you know a
13 corporate secretary went to that room.
14   A    Okay.  That particular room was -- was
15 built around 1998.  Okay?
16   Q    Okay.  When you say it was built --
17   A    Because we did some remodeling.
18   Q    Was there some predecessor room?
19   A    There were -- as I recall, there were two
20 predecessor rooms.  We did some remodeling in the
21 building.
22   Q    Okay.

207

1    A    And so as -- and there was moving of
2  offices among people.
3    Q    Okay.
4    A    And as a result of that, our room has been
5  moved twice.
6    Q    Have the contents of the room changed as a
7  result of any of those moves?
8    A    No, it's been the same contents.
9    Q    Okay.  Could you tell me every time you're
10 aware a corporate secretary visited that room,
11 meaning the current physical room and its
12 predecessors.
13   A    Okay.  As I recall, I think Elyse Wander
14 visited the storage room maybe once or twice.
15   Q    For what purpose?
16   A    I think to -- maybe to look at some
17 minutes.
18   Q    Okay.  Would she have signed the log?
19   A    She was just looking at things in the room,
20 so she wouldn't sign the log.
21   Q    Has there ever -- just to interrupt that
22 thought and just ask you very briefly.  Has there

208

1  ever been any kind of log or itemization or running
2  resume or any kind of document maintained as to
3  things that are being put into the storage room?
4    A    Put into it?  I don't think we maintain a
5  log like that.
6    Q    Okay.  If you'd continue with other visits
7  by other corporate secretaries, if any, to that room
8  or its predecessors, I'd be much obliged.
9    A    Okay.  Anne Hoey, I think she visited the
10 room probably once to see what was in it.
11   Q    Were you with her?
12   A    Yes.
13   Q    The times that her predecessor went, you
14 went with her and opened --
15   A    Yes.
16   Q    -- physically the room, right?
17   A    Yes.
18   Q    Okay.  If you'd continue, please.
19   A    Okay.  Ann Linnertz, she probably visited
20 the room once or twice accompanied by me.
21   Q    Okay.
22   A    Barbara Richardson, I'm not sure that she

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 15 of 77
VIDEOTAPED DEPOSITION OF JOHN E. CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

14 (Pages 209 to 212)

209

1  ever visited the room. Stuart Simonson visited it
2  at least once accompanied by me.
3      Q    And why did he visit when he visited it?
4      A    I think just to see what was there.
5      Q    Okay.
6      A    And Alicia Serfaty, I can't recall if she's
7  visited or not.
8      Q    Now, Mr. Simonson was the corporate
9  secretary in July of 2001, wasn't he?
10     A    Yes.
11     Q    Who was the corporate secretary on
12 September 14, 2001?
13     A    It was Alicia Serfaty.
14     Q    Was she the corporate secretary or was she
15 acting corporate secretary?
16     A    I believe she was the corporate secretary.
17     Q    And who was the general counsel on
18 September 14, 2001?
19     A    Jim Lloyd.
20     Q    Let me show you what I'm going to mark as
21 Exhibit 4 and ask you if you have ever seen these
22 pages before.

210

1          (Deposition Exhibit Number 4 was
2  marked for identification and was retained by
3  counsel.)
4  BY MR. GOTTESDIENER:
5      Q    And take whatever time you need to look at
6  anything that I'll hand you. I'll have that as a
7  standing invitation. And whenever you're done
8  reviewing something to the satisfaction that you see
9  fit, you can just let me know by looking up and
10 telling me.
11         For purposes of the coming question and for
12 most questions, I'm not seeking you to reread every
13 portion of it, but only become so familiar with it
14 that you feel comfortable entertaining a question.
15 If you then feel the need to then look at the
16 document, we would discuss that at that time.
17     A    Okay.
18     Q    Okay. Have you ever seen these pages
19 before?
20     A    Yes, I have.
21     Q    When and where?
22     A    These pages I saw in my office.

211

1      Q    When?
2      A    I think it was January/February.
3      Q    Of 2004?
4      A    Yes.
5      Q    And what were the circumstances under which
6  you saw them in January/February 2004?
7      A    I was looking back, you know, at exactly
8  what had taken place in connection with this
9  particular action that the board approved.
10     Q    And where did you find these and --
11     A    It was in a file that was sitting in my
12 office in connection with -- with this particular
13 date of this event.
14     Q    A file sitting in your office in connection
15 with this particular date of this event?
16     A    Yeah.
17     Q    What does that mean? How is it filed?
18     A    It was -- I have a running -- I have a
19 running chronological file with folders in it in
20 connection with all -- most all the board events.
21 So like for instance, you know, if there's a board
22 meeting, then it's got board meeting and it's got a

212

1  date on it. If there was some kind of board
2  conference call meeting, it has a separate file
3  folder.
4          If there was a board event such as press
5  conference or something like that, there's a folder
6  generally that goes with it, and this was filed --
7  it's dated in a file September the 14th in
8  connection with this resolution.
9      Q    And what kind of file was it in?
10     A    It's a manila folder.
11     Q    Are we looking at the first page being AMT
12 7283, at a Xerox of the actual folder that you say
13 was in your running chronological file?
14     A    Yeah. This was a Xerox of what was in
15 there.
16     Q    Well, that's not exactly my question. The
17 way you answered, I'm not sure you understood my
18 question. There is a tab that has information on it
19 that I'm going to ask you about in a second.
20     A    Mm-hmm.
21     Q    Putting that aside, is this a Xerox copy of
22 the actual folder that you found in your running

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 16 of 77
VIDEOTAPED DEPOSITION OF JOHN F. ARITE
CONDUCTED ON TUESDAY, APRIL 13, 2004

15 (Pages 213 to 216)

213

1  chronological file in January/February 2004?
2  A  This first page?
3  Q  Correct.
4  A  No, it's not.
5  Q  Okay. What is this first page, and how did
6  it get created?
7  A  This first page was created by somebody
8  else other than me.
9  Q  I inferred that. How did it get created?
10 A  I don't know.
11 Q  Okay. Have you ever seen this page before,
12 with or without the number and letters at the bottom
13 right-hand corner that henceforth I'll refer to as
14 Bates labeling?
15 A  I haven't seen this page before.
16 Q  Okay. So you don't have any information at
17 all as to why it says what it does in the place
18 where there appears to be a label?
19 A  No.
20 Q  Okay. Where is the actual folder right
21 now, the physical folder and its original contents?
22 A  It's sitting in my office.

214

1  Q  It was returned to you?
2  A  I don't think I ever released that folder.
3  Q  Okay. Tell me the story of how it came to
4  pass that -- walk it through and tell me if there
5  are places where you don't know, but how did it come
6  to pass that you're looking at a folder that's
7  arranged chronologically, and you're looking at it
8  in January or February of 2004, and we're sitting
9  here today in April of 2004 and I have some sort of
10 photocopy of some aspect of what you found in
11 January/February. Walk me through what you did and
12 how we got to this point.
13 A  I believe Mr. McIlwain came to me and asked
14 me --
15 Q  Don't tell me what he --
16 A  Okay.
17 Q  Don't tell me anything he said. I want to
18 know what people did. He came to you, and did he
19 leave your office with anything? Did you give him
20 anything?
21 A  I copied this information.
22 Q  How?

215

1  A  On the Xerox machine.
2  Q  Okay. Tell me that story. He came to your
3  office, and at some point while he was there or
4  after he left, you got up and you personally made a
5  photocopy?
6  A  Yes.
7  Q  Okay. What did you photocopy? What did
8  you make a copy of?
9  A  The pages that you see right here.
10 Q  The contents of the folder and not the
11 folder itself?
12 A  Correct.
13 Q  Okay. The folder itself is still in your
14 office?
15 A  Yes.
16 Q  And as far as you know, it's never been
17 copied, the folder itself, the physical folder
18 itself?
19 A  No.
20 Q  Okay. Is the folder itself in any way
21 similar to what I'm marking as No. 5?
22    (Deposition Exhibit Number 5 was

216

1  marked for identification and was retained by
2  counsel.)
3  BY MR. GOTTESDIENER:
4  Q  And if it's different, please tell us how
5  it differs.
6  A  No, this looks like a similar sort of
7  folder.
8  Q  How, if it differs, does it differ from the
9  actual folder in question?
10 A  This -- the actual folder may not have this
11 indentation right there. I can't say for sure.
12 Q  Which indentation?
13 A  See this, how this goes down like that
14 (indicating)?
15 Q  Does the folder have any sort of raised
16 portion so one could put a tab or write?
17 A  It has a raised portion like this on it
18 (indicating).
19 Q  Yes. Oh, it may not have that indentation.
20 A  It may not have this indentation part.
21 Q  Thank you. Is it 8.5x11 like that?
22 A  Yes.

Case 1:06-cv-01539-GK    Document 20-7    Filed 01/16/2007    Page 17 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

16 (Pages 217 to 220)

217

1    Q   Do you know whether there's any writing on
2   it whatsoever?
3    A   It has writing on it right here
4   (indicating).
5    Q   Handwritten?
6    A   Yes.
7    Q   By you?
8    A   Yes.
9    Q   What does it say?
10   A   I think it says VERP, September 14, 2001.
11   Q   You didn't copy that?
12   A   I didn't copy it?
13   Q   Yeah.
14   A   No.
15   Q   You didn't make a photocopy of it, right?
16   A   Right.
17       MR. WELLSCHLAGER: Asked and answered.
18  BY MR. GOTTESDIENER:
19   Q   Is there any writing anywhere else on the
20  folder?
21   A   I don't believe so.
22   Q   When did you write that on the folder?

218

1    A   Back there in 2001.
2    Q   And what did you do with the photocopies
3   that you made after you made the photocopies?
4    A   What did I do with them?
5    Q   Yeah.
6    A   I believe I gave them to Mr. McIlwain.
7    Q   Did you make one copy or more than one
8   copy?
9    A   It was just one copy.
10   Q   And the originals are now sitting back in
11  your office?
12   A   Yes.
13   Q   And did you look to see whether or not you
14  had any other documents that were similar in nature
15  to the documents that you copied and gave him?
16       MR. WELLSCHLAGER: Objection to the form of
17  the question. Go ahead and answer.
18       THE WITNESS: As I recall, I just -- I
19  copied everything that was in the folder.
20  BY MR. GOTTESDIENER:
21   Q   That's not my question. Did you look to
22  see whether there were somewhere else additional

219

1   documents that were similar to the kinds of
2   documents that were in the folder?
3        MR. WELLSCHLAGER: Objection to the
4   vagueness of the question.
5        THE WITNESS: Can you repeat the question?
6        MR. GOTTESDIENER: I'm going to withdraw
7   the question.
8        MR. WELLSCHLAGER: Or better define the
9   word "similar."
10       MR. GOTTESDIENER: I'm going to withdraw
11  the question and ask you to look at Exhibit 4,
12  please, along with me.
13  BY MR. GOTTESDIENER:
14   Q   If you would turn to the second page, which
15  is 7284, and then flip to 7288, and then flip to
16  7293, all of which I will ask you to confirm are fax
17  cover sheets of one form or another.
18   A   Yes.
19   Q   How did these fax cover sheets get
20  generated?
21   A   They're generated on my computer.
22   Q   How did these fax cover sheets get

220

1   generated that day?
2    A   On my computer.
3    Q   Who did it?
4    A   I did.
5    Q   Did you type out the information that's
6   contained in the to in the fax and the from and the
7   fax phone --
8    A   Yes.
9    Q   -- portions?
10   A   Yes.
11   Q   Is -- does your computer have any kind of
12  automatic fax creation software such that some of
13  this you didn't type out, such as the date?
14   A   Well, I keep a -- I keep a saved document,
15  which is a fax cover sheet.
16   Q   It's just a WordPerfect document?
17   A   Yes.
18   Q   So it's not really software. It's your own
19  typing has -- it defaults to some date and you make
20  a change to make sure it's the right date?
21   A   Right.
22   Q   And did you save any of the fax cover

Case 1:06-cv-01539-GK Document 20-7 Filed 04/16/2007 Page 18 of 77
VIDEOTAPED DEPOSITION OF JOHN C. NETTELS, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

17 (Pages 221 to 224)

221

1 sheets or any of the documents that were faxed to
2 board members on your C drive or in the S drive?
3    A  I think I saved them to the C drive.
4    Q  Okay. And how many documents did you save
5 there and which documents?
6    A  Well, as I recall, I had -- I had a generic
7 fax cover sheet here that I then modified for each
8 board member to put in their name and fax number and
9 so forth.
10    Q  Okay. I'm not sure that answered my
11 question. Was that the answer to my question? How
12 many documents did you save and which documents? Of
13 these that we're looking at --
14    A  Uh-huh. Yeah.
15    Q  -- how many of the documents did you save?
16 Whether they're there now or not is not my question.
17 How many of them did you save to the C or S drive,
18 either fax cover sheets or the actual documents that
19 are after the fax cover sheets?
20    A  I saved at least one.
21    Q  Okay. Which one?
22    A  Well, can I explain?

222

1    Q  Are you going to just say that you kept
2 overwriting it and that that document doesn't exist
3 anymore because you only used one fax cover sheet
4 for all purposes?
5    A  I believe that's what I did, but it's
6 possible that I may have saved a separate one for
7 some of these people.
8    Q  Do you have folders on your C or S drive
9 that are dedicated to individual board members?
10    A  No.
11    Q  Do you have -- how are your folders
12 organized on your C and S drive, the WordPerfect and
13 the Word folders?
14    A  On the C drive, I have some folders. I
15 have BOARD; I have FORRAIL, for foreign railroads; I
16 have -- and then I have a very large one called
17 WPDOC.
18    Q  What's that?
19    A  Which contains most of the WordPerfect
20 documents and some Word documents where --
21    Q  That's a folder?
22    A  It's a folder, right.

223

1    Q  And the name of it is?
2    A  WPDOC.
3    Q  Which is just a collection of all
4 WordPerfect and Word documents that you choose to
5 put in that folder?
6    A  Right.
7    Q  Is there any method beyond that to
8 categorizing the contents of that folder?
9    A  Well, the file names have -- some of them
10 have triggers. Like, for instance, a fax cover
11 sheet would start out with FAX, and then it may have
12 some other -- FAXRBD would be fax cover sheet going
13 to the entire reform board. In this case I either
14 used that one or I used -- I could have used
15 individual ones for board members.
16    Q  So you'd have an individual fax for Holton
17 or Rosen or -- with that sort of name on the --
18    A  It's possible.
19    Q  Okay. But you don't have separate
20 folders -- you never had separate folders and don't
21 today have separate folders for individual board
22 members?

224

1    A  Correct.
2    Q  And you don't have any folder or any
3 document that is dedicated in whole or in part to
4 unanimous written consent resolutions?
5    A  No.
6    Q  You receive resolutions from various
7 sources before meetings to then prepare and provide
8 to board members, as you told us yesterday, right?
9    A  Yes.
10    Q  When you receive them in a form such as an
11 e-mail, where do you save them to, to edit them and
12 work on them and finalize them?
13    A  Well, typically I'll save them
14 chronologically on my S drive. I will have separate
15 subdirectories for each month.
16    Q  Okay. Let me just finish with the C drive,
17 and then we'll go to the S drive. You said you
18 have -- right now I have three folders. I've got
19 BOARD, foreign rail, and WordPerfect?
20    A  WPDOC.
21    Q  Yes. Are there any other folders that
22 are -- this is a Microsoft Office Windows Explorer

Case 1:06-cv-01530-GK Document 20-7 Filed 01/16/2007 Page 19 of 77
VIDEOTAPED DEPOSITION OF JOHN ARTHUR JUMPER
CONDUCTED ON TUESDAY, APRIL 13, 2004

18 (Pages 225 to 228)

225

1  application; is that right?
2     A   Yeah.
3     Q   So you know what I mean by folder?
4     A   Mm-hmm.
5     Q   It actually in fact looks like the Exhibit
6  No. 5?
7     A   Yeah. Yeah. Mm-hmm.
8     Q   Inside of those there are documents,
9  WordPerfect and Word, correct?
10    A   Right.
11    Q   Are there any Excel spreadsheets, Access
12 Database forms, any other kind of documents that are
13 stored there?
14    A   There may be a few Excel sheets in there.
15    Q   Okay. Anything else?
16    A   I can't think of anything else.
17    Q   Are there -- are there any other folders on
18 the C drive that contain Word or WordPerfect
19 documents?
20    A   There are some other folders. I think
21 there's one that's marked "Committee."
22    Q   Okay. And what committee does that refer

226

1  to?
2     A   It's just things relating to committees.
3     Q   But it's entitled Committee with a
4  singular?
5     A   I think it's either committee or it's just
6  comm, c-o-m-m.
7     Q   Anything else?
8     A   There are some other folders but I can't
9  recall right now what their titles are.
10    Q   Do you have any documents in the comm or
11 committee file folder pertaining to the executive
12 committee that we were discussing briefly yesterday?
13    A   I don't think I do.
14    Q   Where do you have, if you do, any of those
15 documents?
16    A   I think I usually keep them on the S drive.
17    Q   Okay. What's in the BOARD folder on the C
18 drive?
19    A   It used to contain some agendas, so there's
20 some agendas on there. It has a file of meetings.
21    Q   What do you mean a file of meetings?
22    A   What it is, is I've got one for each year,

227

1  each calendar year, and in that file with -- it's
2  basically a chronological file on that one file
3  documents. So like, for instance, the most recent
4  board meeting will have various things that relate
5  to that board meeting like, for instance, board
6  members' travel for the meeting, board members'
7  attendance at the meeting, what's projected, things
8  like that.
9     Q   And what are those documents called? You
10 said file. Is this a document or a folder inside of
11 a folder?
12    A   It's a file. It's one big file. So
13 like --
14    Q   Do you mean one big document that --
15    A   One big document.
16    Q   Okay. One big document. And you have a
17 document for each year?
18    A   Yes.
19    Q   Did you or did anyone go into the year 2001
20 in connection with this case and print out or make a
21 copy of that file?
22    A   Not that I'm aware of.

228

1     Q   And the file -- the purpose of the file is
2  what in addition to -- it sounds like some of it's
3  for making arrangements.
4     A   Making arrangements. When we put out the
5  board books, we'll do -- one page in there will list
6  everybody getting a board book, and it will also
7  list whether we need to FedEx it to them or whether
8  we can hand deliver it.
9     Q   Anything else that you haven't told me
10 that's contained in the BOARD folder on the C drive?
11    A   Some other miscellaneous files, which I
12 just can't recall what they are.
13    Q   How's the S drive organized, starting with
14 folders?
15    A   The S drive has a folder for each month.
16 So typically I look at things in month. Like for
17 instance for a meeting that would take place in
18 January of '04, there'd be a sub -- there'd be a
19 subdirectory there or folder called BD0401.
20    Q   Okay. Other than that kind of organization
21 and those monthly folders, are there any other kinds
22 of folders in the S drive?

Case 1:06-cv-01539-GK    Document 29-7    Filed 01/16/2007    Page 20 of 77
VIDEOTAPED DEPOSITION OF JOHEE CARTER, VOLUME 3
CONDUCTED ON TUESDAY, APRIL 13, 2004

19 (Pages 229 to 232)

229
1    A    There's -- there's some folders that have
2 to do with president's report that we used to
3 publish.
4    Q    There's more than one folder about the
5 president's report?
6    A    Yeah.
7    Q    Could you tell us what that is?
8    A    Well, we used to publish it once a month,
9 and so any of the documents associated with that
10 president's report, we'd put in that folder so that
11 we could have all the information in one place to
12 work with.
13    Q    But why is there more than one folder?  Is
14 it because --
15    A    Because of different months.
16    Q    -- they're different by year?
17    A    Different months.
18    Q    So you actually have different -- how many
19 years does that cover?
20    A    It's several years.
21    Q    So you have -- right away you have dozens
22 of folders just about what we've been talking about,

230
1 president's reports and board -- you said board 0401
2 as an example.  Already you have dozens of these
3 folders in the S drive?
4    A    Yes.
5    Q    Are they organized in any other way than
6 that?  I mean, you open up your S drive and if
7 you're using Windows Explorer you see dozens and
8 dozens of folders?
9    A    Right.
10    Q    And the folders that are BD --
11    A    Mm-hmm.
12    Q    -- tell me again what's -- what's inside of
13 those folders.
14    A    It's things that relate to the --
15 principally the board meeting that was going to take
16 place that month, but it could be other events that
17 the board will be participating in that month.
18    Q    Well, before trying to get into any more
19 detail on that, are there other folders that are in
20 the S drive that we haven't mentioned other than
21 these two categories?
22    A    There's some other folders that -- I think

231
1 there's one that relates to compensation.
2    Q    Of the directors?
3    A    Yeah.
4    Q    Okay.
5    A    There's one that relates to policy.
6    Q    Policy?
7    A    Mm-hmm.
8    Q    What does that mean?
9    A    Board statement of policy.  There's one
10 that --
11    Q    Just one?
12    A    Yeah.  There's one that relates to the
13 bylaws.
14    Q    Just one?
15    A    Mm-hmm.
16    Q    Okay.
17    A    There's one that has my name on it,
18 C-a-r-t-e-n, that I put some miscellaneous things
19 in.
20    Q    Okay.  Any others?
21    A    And there's a few more, but I just can't
22 recall what they are right now.

232
1    Q    Well, I asked you earlier about like saving
2 resolutions that someone in the company sends you
3 that is going to be presented to the board for
4 action.
5    A    Mm-hmm.
6    Q    Where do you save those?
7    A    We save them in the month that the action
8 is expected to take place.
9    Q    Okay.  And so that's where you would go to
10 find those resolutions?
11    A    Right.
12    Q    And the -- the statement of policy in the
13 bylaw folders and these board folders -- is that the
14 way you refer to it?  The BD folders --
15    A    Mm-hmm.
16    Q    -- you would call them the board folders?
17    A    Yeah.
18    Q    Those folders, has anyone in connection
19 with this case ever gone in to look at what's in
20 there to see if any of it should or could be
21 produced to the plaintiffs or could or should be
22 looked at for Amtrak's own purposes in connection

Case 1:06-cv-01538-GK Document 20-7 Filed 01/16/2007 Page 21 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

20 (Pages 233 to 236)

233

1  with the case?
2     **A    Repeat the question.**
3     Q    Has anyone gone in there and looked at
4  these things in connection with this case, these
5  folders, the S drive?
6     **A    Not that I'm aware of.  Now, there is --**
7  **let me mention.  There is another folder in there**
8  **which has -- it's S drive which has minutes on it --**
9     Q    Okay.
10    **A    -- that we talked about earlier.**
11    Q    Now, is this where you and Ms. Oliveri save
12 your drafts of your -- what eventually become the
13 official minutes?
14    **A    Yes.**
15    Q    And when you and Ms. Oliveri want to
16 exchange drafts -- I think I've seen e-mails where
17 you are sending each other drafts?
18    **A    Yes.**
19    Q    Explain to me why you wouldn't just say,
20 you know, here -- this is -- this is the document
21 and here it is, and, you know, describe it?  You
22 just attach it even though she has access to the

234

1  same location?
2     **A    Yes.**
3     Q    Okay.  And that's just for ease of -- so
4  there's no confusion?
5     **A    Yes.**
6     Q    Okay.  So basically you're -- in those
7  e-mails you're just exchanging documents from that
8  folder from that drive that only the two of you and
9  Ms. Hawkins have access to?
10    **A    Yes.**
11    Q    What is Ms. Hawkins' role in the drafting
12 of -- the physical typing, drafting, editing process
13 in these minutes?
14    **A    It's actually very limited.  She really**
15 **doesn't get involved in the editing of the minutes.**
16    Q    And what -- what do you do with drafts
17 of -- of minutes that are later changed and worked
18 on and so forth that take some other form?  They
19 would be there in the S drive in that folder,
20 correct?
21    **A    Yes.**
22    Q    And the statement of policy and the bylaws,

235

1  are there separate documents in there reflecting the
2  document's content as of certain dates?
3     **A    Yes.**
4     Q    And is that intentionally done to preserve
5  a record in electronic form of what the document
6  said as of a particular date?
7     **A    Yes.**
8     Q    Other than iterations of the statement of
9  policy, iterations of the bylaws, are there any
10 other documents of any kind that are in those
11 folders that relate to the changing of them, the
12 drafting on them, memos about how bylaws should be
13 changed?
14    **A    No.**
15    Q    The -- and have you told us all the folders
16 that you can think of right now?  There's no others?
17 You said the minutes.  We left off with that, you
18 remember?
19    **A    On the S drive?**
20    Q    Yeah.
21    **A    Yeah, I think that's it.**
22    Q    What -- what's in the Carten folder?

236

1     **A    Carten folder is miscellaneous things.**
2     Q    Like what?
3     **A    Well, an example is there's a file in there**
4  **that relates to incumbency certificates.**
5     Q    Okay.
6     **A    So I get asked to produce those on a**
7  **regular basis, so I keep that file right there.**
8     Q    Okay.  Where is the chron. file, the
9  historical chron. file that has the hard copies that
10 you found the 9/14/01 documents in, where is that in
11 your office?
12    **A    It's in one of my file cabinets in the**
13 **office.**
14    Q    And how much space does that take up in
15 terms of drawers, and how long of a period of time
16 does your chron. file cover?
17    **A    Well, this -- that particular file where I**
18 **have folders for each board meeting --**
19    Q    Yeah.
20    **A    -- it covers, I think, from about 1992**
21 **forward.**
22    Q    So how much space does that take up?

Case 1:06-cv-01539-GK   Document 20-7   Filed 01/16/2007   Page 22 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

21 (Pages 237 to 240)

237
1   A   I think it's four or five file drawers.
2   Q   And -- I'm sorry?
3   A   Four or five file drawers.
4   Q   Is this something that Ms. Hawkins has any
5   role in helping maintain, or is this something that
6   you personally and physically do exclusively
7   yourself?
8   A   I do it myself.
9   Q   So these folders, these are -- would it be
10  fair to say they're miscellaneous papers and
11  documents that are related to each board meeting
12  that you just keep a record of for one reason or
13  another?
14  A   Yes.
15  Q   Okay. Does Ms. Oliveri maintain anything
16  similar, do you know?
17  A   I don't know.
18  Q   Do you maintain any documents that you have
19  ever considered to be required to be made regularly
20  available to the public in connection with the
21  Freedom of Information Act?
22  A   No.

238
1   Q   Have you ever discussed that issue with
2   anyone prior to the past month or so?
3   A   Discussed the Freedom of Information Act?
4   Q   Discussed whether you have or are custodian
5   of any documents that are required to be made
6   regularly available for public inspection under the
7   Freedom of Information Act.
8   A   What time period?
9   Q   Any time period prior to your immediate
10  preparation for this deposition.
11  A   Yes.
12  Q   Tell us who you've discussed that with and
13  when.
14  A   Well, Mrs. Oliveri came to me and said that
15  there's some things we needed to make public and put
16  in a public reading room.
17  Q   And when did she do that?
18  A   She did that either February or March.
19  Q   Anyone else, other than that time, come to
20  you and talk to you about this issue at all?
21  A   No. It's just her.
22  Q   And I mean since 1992.

239
1   A   I don't recall anybody else talking about
2   that specifically.
3   Q   How about anyone talking about, and I
4   include in written form as well, making board
5   minutes, resolutions, votes regularly available for
6   public inspection under the Freedom of Information
7   Act?
8   A   There have been requests that have come in
9   for that information, and it's the FOIA people who
10  have handled those requests.
11  Q   And they've handled them by coming to you
12  and asking for the specific materials that were
13  requested and you providing them and them going away
14  and handling it as a FOIA issue?
15  A   I don't recall that we ever handed -- gave
16  any out.
17  Q   Do you recall any requests for them being
18  denied?
19  A   I can't say specifically.
20  Q   But you do recall that there were requests,
21  and you do recall that you don't think any were
22  handed out?

240
1   A   Correct.
2   Q   So what do you remember about the
3   disposition of those requests?
4   A   I don't -- I can't recall that any of them
5   have been honored.
6   Q   Okay. How many are we talking about that
7   you're thinking of since 1992 to the present?
8   A   You know, I can't say specifically, but,
9   you know, I'd say less -- five or less.
10  Q   Okay. And were you involved in the process
11  of deciding whether or not the request should be
12  honored?
13  A   Not directly.
14  Q   Okay. Indirectly, you had some role?
15  A   Well, indirectly I had some role.
16  Q   What role?
17  A   I think I was -- I was asked about the
18  board statement of policy and what it -- what it
19  talks about in the minutes, and the board statement
20  of policy says they're confidential.
21  Q   How did it come about that the board
22  statement of policy changed, if it did, from having

Case 1:06-cv-01539-GK Document 29-7 Filed 01/16/2007 Page 23 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

22 (Pages 241 to 244)

241

1  those minutes be available to some degree and then
2  confidential as a blanket matter?
3      MR. WELLSCHLAGER: Objection to the form of
4  the question. You can answer it if you can.
5      THE WITNESS: Okay. Repeat the question.
6  BY MR. GOTTESDIENER:
7      Q  Are you aware that the board statement of
8  policy has changed over time with respect to the
9  confidential nature of board minutes?
10     A  As I recall, it's always held them as being
11  confidential.
12     Q  Okay. The -- so I was asking about your
13  role in the -- these failures to honor requests for
14  these minutes on the basis that they're
15  confidential, and if I understand what you're
16  saying, Ms. Oliveri would come to you and ask you
17  about this, and you would remind her that the
18  statement of policy says they're confidential and
19  that would essentially be --
20     A  Well, she would --
21     Q  -- the end of the matter?
22     A  She would come to me and just say, you

242

1  know, somebody's looking for board minutes --
2      Q  Okay.
3      A  -- and then -- but she would handle it
4  herself or with other members of the department.
5      Q  Okay. And do you know what basis upon
6  which under the Freedom of Information Act these
7  requests have been denied?
8      A  No, I don't.
9      Q  Are you familiar with the Freedom of
10  Information Act?
11     A  Not very much.
12     Q  Have you ever been specifically tasked with
13  responding to a request?
14     A  Yes.
15     Q  When?
16     A  I can think of a request within the last
17  year.
18     Q  Okay. Tell us about that.
19     A  It was a request for information about
20  Haley Barbour --
21     Q  Okay.
22     A  -- who used to be a member of our board of

243

1  directors.
2      Q  Okay. Mm-hmm.
3      A  And so I collected information on it, and I
4  think there was an estimate made of what it would
5  cost to reproduce that information and make it
6  available.
7      Q  And where did you go to get that
8  information on Mr. Barbour?
9      A  In our files upstairs.
10     Q  Upstairs meaning the storage room?
11     A  In the storage room.
12     Q  And where did you go in the storage room?
13     A  We have a file cabinet in there that
14  contains compensation information, historic
15  compensation information.
16     Q  And was that the sole interest of the
17  requester, or were there other topics pertaining to
18  Mr. Barbour that the requester sought information
19  on?
20     A  I think it was just compensation.
21     Q  Okay. Can you think of any other time
22  you've been tasked to respond to a Freedom of

244

1  Information Act request?
2      A  Well, I can think of one that had to do
3  with route information. Somebody was looking for
4  route financial performance information.
5      Q  And did you supply that information?
6      A  So I supplied the -- I collected the
7  information that the board had been showed about
8  route performance and supplied it to Mrs. Oliveri
9  for her to then determine whether it was something
10  that we would provide or not.
11     Q  How long ago was that?
12     A  I think it's been a year or two.
13     Q  Now, where did you go to get that route
14  information?
15     A  I went up to our record of meeting books.
16     Q  Because that was part of a presentation
17  that someone made to the board and that would be
18  kept in --
19     A  Yes.
20     Q  -- such a book?
21     A  Yes.
22     Q  So turning to the document in front of you,

245

1  No. 4 --
2       MR. WELLSCHLAGER: Eli, before we do
3  that --
4       MR. GOTTESDIENER: Yeah.
5       MR. WELLSCHLAGER: -- can we break for five
6  minutes?
7       MR. GOTTESDIENER: Sure.
8       MR. WELLSCHLAGER: It's been an hour and a
9  half.
10      MR. GOTTESDIENER: Okay.
11      THE VIDEOGRAPHER: This marks the end of
12  Tape 1 in the deposition of Mr. Carten. We're going
13  off the record. The time is 11:15 a.m.
14          (Recess.)
15      THE VIDEOGRAPHER: This marks the beginning
16  of Tape 2 in the deposition of Mr. Carten. We're
17  back on the record. The time is 11:26 a.m.
18  BY MR. GOTTESDIENER:
19   Q   So turning to Exhibit 4, was it yourself
20  who typed out the information contained on the three
21  different fax cover sheets that are contained in
22  Exhibit 4?

246

1   A   Yes.
2   Q   And why did you put that it was from Alicia
3  Serfaty?
4   A   Well, many of the -- many of the
5  communications with the board, we put her on the fax
6  cover sheet.
7   Q   But, in fact, she didn't speak with any of
8  the board members that day?
9   A   No, I think she did speak with them.
10  Q   She did speak with them?
11  A   (Nodding.)
12  Q   Okay. When did she speak with them?
13  A   I believe it was sometime that morning.
14  Q   Well, did you speak with board members?
15  A   Yes.
16  Q   Who did you speak with?
17  A   I spoke with Governor Holton.
18  Q   Did you speak with anyone else other than
19  Governor Holton?
20  A   I think I spoke with Governor Dukakis.
21  Q   But you're not sure?
22  A   I'm pretty sure I spoke with him that

247

1  morning.
2   Q   Are you more sure that you spoke with
3  Governor Holton than you are sure that you spoke
4  with Governor Dukakis?
5   A   Yes.
6   Q   There's some question in your mind as to
7  whether or not you did speak with Governor Dukakis,
8  but none as to Governor Holton?
9   A   Correct.
10  Q   Did you speak with Governor Holton from
11  your physical office?
12  A   Yes.
13  Q   And did you speak with him once or more
14  than once?
15  A   I believe I spoke with him once.
16  Q   Did you speak with him the previous day?
17  A   I don't recall if I did or not.
18  Q   You don't recall if you did or not?
19  A   Speak with him the previous day.
20  Q   About this matter?
21  A   Correct.
22  Q   You really don't recall? You can't say

248

1  that -- you know, that in fact it was that morning
2  that this all came to your attention for the first
3  time?
4   A   I think I spoke with him that morning.
5   Q   Right. And I'd asked you, can't you say
6  that all of this came to your attention for the
7  first time that morning on September 14th?
8   A   Now, I speak with a lot of our board
9  members on a regular basis.
10  Q   Okay. Please try to focus on my question.
11  Can't you say that you spoke with these board
12  members that day about this matter only that day
13  because it just came to your attention that morning
14  for the first time?
15      MR. WELLSCHLAGER: Objection. Counsel, he
16  started to answer the exact same question --
17      MR. GOTTESDIENER: Fine.
18      MR. WELLSCHLAGER: -- and you cut him off.
19      MR. GOTTESDIENER: Fine. That's not at all
20  what happened.
21  BY MR. GOTTESDIENER:
22  Q   Do you understand my question?

249

1    A    Can you repeat your question?
2    Q    I'll repeat it again for, like, the fourth
3    time. You testified yesterday -- and I'll ask a
4    different question.
5        Didn't you testify yesterday that the first
6    time this came to your attention was that morning,
7    September 14th?
8    A    I believe that's right.
9    Q    Okay. You weren't working on this issue
10   ever before other than being present and taking
11   notes at meetings of the board; is that right?
12   A    I was aware that this issue was coming to a
13   head.
14   Q    Okay. Well, let's go back and do this
15   again and find out every memory you have, because
16   that's what I was trying to do with you yesterday,
17   every memory you have of this issue that resulted in
18   the signature by these directors on this resolution.
19   When did that first come to your attention that
20   there was going to be some request made or possibly
21   made of the directors to reach some sort of
22   resolution that they did?

250

1    A    I believe it was a few days before this
2    date.
3    Q    What happened in detail? I'll just keep
4    asking the questions if you want. It's up to you.
5    I can keep asking the questions or I can ask you, as
6    I've been asking you, please provide us all the
7    details you can.
8        So who told you? Where were you? What did
9    they say? Was it by e-mail? In person? That kind
10   of detail.
11   A    I believe it was in person. Warren Reisig
12   told me that they were modifying this retirement
13   program.
14   Q    Okay. Tell me the story of how Warren
15   Reisig comes to be in person telling you this. Did
16   he go to your office? Did you go to his office?
17   Did you run into him in the hallway?
18   A    I think he came up to my office.
19   Q    And what happened?
20   A    He said that, you know, we're working on
21   some changes to this early retirement program, and
22   he and I worked together quite a bit on personnel

251

1    matters because he -- he handles producing executive
2    summaries and background materials and resolutions
3    and so forth in connection with them.
4    Q    Okay.
5    A    And he works on -- he's director of -- I
6    think it's compensation and benefits.
7    Q    Okay.
8    A    So he told me, you know, we're working on
9    something that's going to modify what the board
10   approved earlier.
11   Q    Okay.
12   A    So putting me on notice that we'd need to
13   go to the board.
14   Q    Okay. And when was that?
15   A    That was, you know, two or three days
16   before this date.
17   Q    Okay. And what floor is his office on?
18   A    His floor is on the -- his office is on the
19   second floor.
20   Q    Okay. And how often is it that he comes to
21   your office to put you on notice about something
22   like this?

252

1    A    Fairly regularly.
2    Q    Okay.
3    A    We'll talk about things that are coming
4    before the board on a personnel -- on personnel
5    matters.
6    Q    Okay. And so on those occasions, he will
7    routinely appear in your office to have these
8    discussions?
9    A    He'll either come to my office or I'll go
10   to his or sometimes just telephone conversations.
11   Q    Okay. Did he express to you that there was
12   any time sensitivity to what it was that he was
13   seeking to accomplish?
14   A    He did indicate it was time sensitive.
15   Q    And what did he say about the time
16   sensitivity?
17   A    He said, you know, we're going to have to
18   do it soon.
19   Q    Did he say that there was a deadline?
20   A    He just indicated we'd have to do it soon.
21   Q    That's all?
22   A    That's what I recall.

VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

25 (Pages 253 to 256)

253

1  Q    Did anyone else from his department at any
2  point in time get involved in this process
3  including, for example, Ms. Green, Lorraine Green?
4      A    Well, I'm sure she was involved in it, but
5  I don't believe I had any discussions with her about
6  it.
7      Q    What about exchanges of any e-mails or
8  anything like that with anything else -- that's what
9  I'm -- with anyone else? That's what I'm seeking
10  from you.
11      Did you have any interaction with anyone or
12  do you know of their specific involvement beyond
13  Mr. Reisig from that department, human resources?
14      A    I think he was the only one.
15      Q    Okay. And did he -- when he came to your
16  office, did he tell you what it was that was going
17  to be modified?
18      A    Well, he just said that they were going to
19  be modifying the program and, you know, there'd be
20  some changes that were significant and that, you
21  know, the board would need to approve those changes.
22      Q    And what did he say about the significant

254

1  changes?
2      A    He just said the benefit would be reduced
3  and, you know, it was a change to it.
4      Q    Did he ever comment then -- since then?
5  Have you ever had any discussion with him about this
6  matter other than the time that he came to your
7  office and told you that there would be this
8  significant change to the benefit?
9      A    Well, he -- I think he asked me later on
10  the day of the 14th if the board had approved it.
11      Q    Okay. Other than that, any time else have
12  you ever discussed this with him, directly or
13  indirectly, through e-mail or phone conversation, in
14  person ever?
15      A    I don't believe so.
16      Q    How about Ms. Green, have you ever talked
17  to her about this at all?
18      A    I don't think I talked with her directly
19  about it.
20      Q    No, I'm not saying did you ever talk with
21  her directly. I'm saying have you ever up -- until
22  this morning, have you ever had any conversation

255

1  with Ms. Green about this matter?
2      A    No.
3      Q    Have you talked to anyone about this matter
4  other than the two counsel who are sitting here and
5  the people who were associated directly with your
6  office such as Ms. Hawkins, such as Ms. Oliveri, or
7  anyone on the board and Ms. Serfaty? Have you
8  talked to anyone else about this?
9      A    I talked with Mrs. Serfaty about it.
10      Q    Okay. When did you speak with her about
11  it?
12      A    I spoke with her the morning of the 14th.
13      Q    Did you speak with her about it before the
14  14th?
15      A    I think she also indicated to me that
16  it's --
17      MR. WELLSCHLAGER: Hold on. There's some
18  privilege issues. He hasn't even asked you what the
19  content of the communication was. I think it was
20  any other conversations.
21  BY MR. GOTTESDIENER:
22      Q    Yeah, right now I'm just saying did you

256

1  speak -- yes or no, did you speak with her, e-mail,
2  any other communication with her prior to the 14th
3  about this matter?
4      A    Yes.
5      Q    Okay. When?
6      A    I believe it was the 13th.
7      Q    Okay. And what was the -- without
8  necessarily disclosing the substance of it, what
9  happened? Did she come to your office? Did she
10  send you an e-mail? Was there a meeting? Was there
11  a telephone conference?
12      A    I think I was in her office and she told me
13  about it.
14      Q    Okay. And how long did you spend with her
15  on that day?
16      A    Not very long.
17      Q    Was anyone else present?
18      A    No. Just the two of us.
19      Q    And other than speaking with Mr. Reisig who
20  came to your office, as I understand it several days
21  before the 14th, did you have any conversations with
22  anyone prior to September 14th about this issue, the

257

1  modification of the plan?
2  A  No. I think those were the two people that
3  talked to me about it.
4  Q  What about Ms. Oliveri, did you talk to her
5  about it at all?
6  A  No.
7  Q  Ms. Hawkins?
8  A  Yeah, I did talk to Sharron about it.
9  Q  Okay. What did you talk to her about?
10  A  Well, I told her -- where we talked about
11  it the morning of the 14th, I told her that we have
12  a resolution and executive summary that we're going
13  to need to fax to the board, and so as I recall she
14  helped me do it.
15  Q  Okay. And helped you do it means what?
16  A  Well, I generated the materials, and then
17  she helped me work the fax machine.
18  Q  She helped you work the fax machine? What
19  does that mean? Did she push the buttons and you
20  fed the paper? What does this mean? I mean, did
21  you send it or did she send it or --
22  A  I think it was a combination of both of us

258

1  sent it.
2  Q  A combination on each fax or you faxed some
3  and she faxed some?
4  A  I faxed some; she faxed some.
5  Q  Why were some faxed by you and some by her?
6  A  Well, we get interruptions. You know,
7  people call up. You know, we try to get something
8  done -- trying to get something done right away --
9  Q  Okay. I'm not asking -- just to interrupt
10  you, I'm not asking like a general thing. I'm
11  asking, this day why weren't all the faxes just sent
12  all at once by one person? I'm not -- like, kind of
13  like things that could have happened. What happened
14  this day?
15  A  Well, we work together to accomplish, you
16  know, tasks at hand, and I think she -- we worked
17  together to get this done.
18  Q  Well, can you amplify your answer at all?
19  A  Well --
20  Q  Who was the first recipient of a fax, and
21  why was that person the first recipient?
22  A  I don't recall who was the first recipient.

259

1  Q  How was an order created as to who should
2  get faxes first, second, third, fourth, fifth, or
3  sixth?
4  A  It's no particular order.
5  Q  It was random?
6  A  Yeah.
7  Q  And determined by you?
8  A  Yes.
9  Q  And are you aware whether or not Mr. Reisig
10  or Ms. Serfaty or anyone else, not a member of the
11  board of directors, spoke with or communicated with
12  any member of the board of directors prior to the
13  14th about this issue, the modifications sought on
14  the 14th?
15  A  Well, Mrs. Serfaty spoke with board members
16  about it.
17  Q  When?
18  A  It was either that morning or the day
19  before.
20  Q  I'm focused on prior to 12:01 a.m.,
21  9/14/01. I'm talking about the 13th and before.
22  A  13th and before. Okay. Mrs. Serfaty I

260

1  think spoke with them the morning of the 14th, spoke
2  with board members.
3  Q  She did not speak with any board member
4  prior to September 14th?
5      MR. WELLSCHLAGER: Objection,
6  mischaracterizes his previous testimony.
7  BY MR. GOTTESDIENER:
8  Q  This is a question. Did she speak with any
9  board member prior to September 14th about this
10  proposed modification?
11  A  I can't say for sure.
12  Q  You have no reason to think that she did,
13  however?
14  A  No reason to believe she didn't either.
15  Q  Okay. Well, the record will reflect what
16  it reflects. Didn't you say that she spoke with the
17  board members the morning of the 14th?
18  A  Yes.
19  Q  Okay. How do you know she spoke with board
20  members the morning of the 14th?
21  A  I believe she told me that she was going to
22  call each of them to talk with them about this.

VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

27 (Pages 261 to 264)

261

1    Q    When did she tell you that?
2    A    That morning.
3    Q    The 14th --
4    A    Yeah.
5    Q    -- she told you that she was going to call
6    them and speak with each of them about this?
7    A    Yes.
8    Q    Was there any discussion at all by anyone,
9    with anyone, whether you were party to it or not, of
10    having a telephonic meeting over this issue?
11    A    I'm not aware of any discussion about that.
12    Q    So, for example, you didn't ask
13    Ms. Serfaty, hey, why don't we just convene a
14    telephonic meeting?
15    A    No, I did not.
16    Q    And no one told you that a telephonic
17    meeting could be arranged?
18    A    Repeat that.
19    Q    No one told you that such a telephonic
20    meeting could not be arranged?
21    A    No one told me that.
22    Q    How far is Ms. Serfaty's office from your

262

1    office?
2    A    It's probably about a hundred feet.
3    Q    And --
4         MR. WELLSCHLAGER: And you're talking about
5    then, right?
6         MR. GOTTESDIENER: Yeah. Why? Has it
7    changed?
8         MR. WELLSCHLAGER: Well, you said -- you
9    said it in the present tense. I don't know if it's
10    changed or not.
11    BY MR. GOTTESDIENER:
12    Q    Is it in the same place?
13    A    Same place.
14    Q    Okay. And did you hear or otherwise become
15    aware through any number of your senses that she was
16    having a phone conversation with any board member at
17    any time on the 14th?
18    A    Well, she told me she was going to be
19    talking to the board members about this.
20    Q    Okay. And what time was that?
21    A    That was in the morning.
22    Q    What time was that?

263

1    A    I'd say -- seemed like it was first thing
2    in the morning. You know, 8:30, something like
3    that.
4    Q    Now, the question about had anyone told the
5    board members that this issue was going to be
6    presented to them before the 14th, what is your
7    answer as to that? Do you have any information that
8    any board member knew that they were going to be
9    asked to vote on this or sign a resolution prior to
10    the 14th?
11    A    I don't have any specific information about
12    that.
13    Q    The information that you have causes you to
14    believe that no board member was aware of this prior
15    to the 14th; isn't that right?
16         MR. WELLSCHLAGER: Objection to the form of
17    the question.
18         THE WITNESS: And, you know, I don't -- I
19    can't -- I don't know for sure if they were spoken
20    to or not --
21    BY MR. GOTTESDIENER:
22    Q    Well --

264

1    A    -- prior to that.
2    Q    But you don't have any indication that
3    anyone was spoken to prior to that, correct?
4    A    Correct.
5    Q    And, in fact, the way Ms. Serfaty told you
6    that she was going to call them and tell them about
7    this and discuss it with them caused you to believe
8    that this was something that was going to be
9    presented to them for the first time that morning,
10    correct?
11    A    I can't recall that it was that -- you
12    know, that it eliminated any -- any -- any prior
13    conversations.
14    Q    That wasn't my question. Can you answer my
15    question?
16    A    Can you repeat your question?
17         MR. WELLSCHLAGER: Objection to the form of
18    your question.
19    BY MR. GOTTESDIENER:
20    Q    She didn't say, when she said that she was
21    going to call them and talk to them about this, and
22    she didn't indicate that she had spoken with any of

VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

28 (Pages 265 to 268)

265

1 them prior to that morning about this?
2  A  Yeah, I don't recall her saying she'd
3 spoken to any prior.
4  Q  And it was your impression -- and this is
5 the nub of my question. It was your impression
6 hearing her telling you what she was going to do, in
7 the context of what you were doing based on what you
8 were told by her and Mr. Reisig, that this was going
9 to be the first time they had been presented with
10 the issue that morning; isn't that correct? That
11 was your impression at the time?
12  A  I can't say for sure that was -- that's the
13 case.
14  Q  I'm not asking for certainty. I'm asking
15 for a reasonable degree of certainty. With a
16 reasonable degree of certainty you can tell us today
17 that on September 14, '01, by the time and after she
18 told you what she was going to do, it was your
19 impression that this was an issue that was going to
20 be presented for the first time to the board members
21 that morning?
22  A  That's likely.

266

1  Q  At the point in time that Ms. Serfaty said
2 to you what she said, had you or Ms. Hawkins faxed
3 anything to anyone?
4  A  I don't think we had at that point.
5  Q  Are you sure?
6  A  I'm sure we had not faxed anything.
7  Q  How can you be sure?
8  A  Well, we normally wouldn't fax anything to
9 the board until, you know, we had the okay from
10 Alicia Serfaty, that that's what we should do.
11  Q  Okay. Well, was there some point in time
12 that we haven't discussed or you haven't told us
13 about yet where she gave you that okay?
14  A  Well, it was during my discussion with her
15 that she said, you know, we need to get this
16 information out to the board.
17  Q  But was that the same discussion when she
18 said, I'm about to call them?
19  A  I believe it was.
20  Q  Okay. Well, try to help me out here with
21 this. Did she say I'm about to call them and I want
22 you to simultaneously be faxing this information to

267

1 them or I'm going to call them and, you know, make
2 sure no one's fishing in Minnesota and you need to
3 direct the fax to some other place so wait to hear
4 back from me? I mean, how did this go?
5  A  As I recall, she said go ahead and fax this
6 out to the board and then I'll be talking with them
7 about this.
8  Q  Okay. And where was Mr. Reisig when you
9 had that conversation with Ms. Serfaty?
10  A  He wasn't there with us.
11  Q  Where was he?
12  A  Probably down in his office.
13  Q  Had you been in contact with him that day
14 up to that point, when you were speaking with
15 Ms. Serfaty?
16  A  I'm not sure that I had been that day.
17  Q  How about the previous day?
18  A  Well, the previous day or the day before
19 that we had talked about this.
20  Q  Is that when he came to your office?
21  A  Yes.
22  Q  Was there any other time that you spoke

268

1 with him in between him coming to your office and
2 apprising you for the first time of this matter and
3 later in the day, when you and he spoke and you
4 satisfied his curiosity as to whether or not the
5 board had been reached?
6  A  I don't think so.
7  Q  Where did you get the resolution and the
8 executive summary and any other material that was
9 faxed to the board members?
10  A  I got them from Mrs. Serfaty.
11  Q  When?
12  A  That morning.
13  Q  How?
14  A  She handed them to me.
15  Q  And how did she have them? Do you know how
16 she came to be holding them in her hand, how that
17 came about?
18  A  I believe she handed them to me.
19  Q  Right. How were they generated to the
20 point where they were handed to you? Do you know if
21 she typed them, if she edited them, if she got them
22 from Mr. Reisig and she worked on them? How do

28 (Pages 265 to 268)

265

1    them prior to that morning about this?
2    **A    Yeah, I don't recall her saying she'd**
3    **spoken to any prior.**
4    Q    And it was your impression -- and this is
5    the nub of my question.  It was your impression
6    hearing her telling you what she was going to do, in
7    the context of what you were doing based on what you
8    were told by her and Mr. Reisig, that this was going
9    to be the first time they had been presented with
10   the issue that morning; isn't that correct?  That
11   was your impression at the time?
12   **A    I can't say for sure that was -- that's the**
13   **case.**
14   Q    I'm not asking for certainty.  I'm asking
15   for a reasonable degree of certainty.  With a
16   reasonable degree of certainty you can tell us today
17   that on September 14, '01, by the time and after she
18   told you what she was going to do, it was your
19   impression that this was an issue that was going to
20   be presented for the first time to the board members
21   that morning?
22   **A    That's likely.**

266

1    Q    At the point in time that Ms. Serfaty said
2    to you what she said, had you or Ms. Hawkins faxed
3    anything to anyone?
4    **A    I don't think we had at that point.**
5    Q    Are you sure?
6    **A    I'm sure we had not faxed anything.**
7    Q    How can you be sure?
8    **A    Well, we normally wouldn't fax anything to**
9    **the board until, you know, we had the okay from**
10   **Alicia Serfaty, that that's what we should do.**
11   Q    Okay.  Well, was there some point in time
12   that we haven't discussed or you haven't told us
13   about yet where she gave you that okay?
14   **A    Well, it was during my discussion with her**
15   **that she said, you know, we need to get this**
16   **information out to the board.**
17   Q    But was that the same discussion when she
18   said, I'm about to call them?
19   **A    I believe it was.**
20   Q    Okay.  Well, try to help me out here with
21   this.  Did she say I'm about to call them and I want
22   you to simultaneously be faxing this information to

267

1    them or I'm going to call them and, you know, make
2    sure no one's fishing in Minnesota and you need to
3    direct the fax to some other place so wait to hear
4    back from me?  I mean, how did this go?
5    **A    As I recall, she said go ahead and fax this**
6    **out to the board and then I'll be talking with them**
7    **about this.**
8    Q    Okay.  And where was Mr. Reisig when you
9    had that conversation with Ms. Serfaty?
10   **A    He wasn't there with us.**
11   Q    Where was he?
12   **A    Probably down in his office.**
13   Q    Had you been in contact with him that day
14   up to that point, when you were speaking with
15   Ms. Serfaty?
16   **A    I'm not sure that I had been that day.**
17   Q    How about the previous day?
18   **A    Well, the previous day or the day before**
19   **that we had talked about this.**
20   Q    Is that when he came to your office?
21   **A    Yes.**
22   Q    Was there any other time that you spoke

268

1    with him in between him coming to your office and
2    apprising you for the first time of this matter and
3    later in the day, when you and he spoke and you
4    satisfied his curiosity as to whether or not the
5    board had been reached?
6    **A    I don't think so.**
7    Q    Where did you get the resolution and the
8    executive summary and any other material that was
9    faxed to the board members?
10   **A    I got them from Mrs. Serfaty.**
11   Q    When?
12   **A    That morning.**
13   Q    How?
14   **A    She handed them to me.**
15   Q    And how did she have them?  Do you know how
16   she came to be holding them in her hand, how that
17   came about?
18   **A    I believe she handed them to me.**
19   Q    Right.  How were they generated to the
20   point where they were handed to you?  Do you know if
21   she typed them, if she edited them, if she got them
22   from Mr. Reisig and she worked on them?  How do

26 (Pages 257 to 260)

257

1 modification of the plan?

2    A    No. I think those were the two people that

3 talked to me about it.

4    Q    What about Ms. Oliveri, did you talk to her

5 about it at all?

6    A    No.

7    Q    Ms. Hawkins?

8    A    Yeah, I did talk to Sharron about it.

9    Q    Okay. What did you talk to her about?

10    A    Well, I told her -- where we talked about

11 it the morning of the 14th, I told her that we have

12 a resolution and executive summary that we're going

13 to need to fax to the board, and so as I recall she

14 helped me do it.

15    Q    Okay. And helped you do it means what?

16    A    Well, I generated the materials, and then

17 she helped me work the fax machine.

18    Q    She helped you work the fax machine? What

19 does that mean? Did she push the buttons and you

20 fed the paper? What does this mean? I mean, did

21 you send it or did she send it or --

22    A    I think it was a combination of both of us

258

1 sent it.

2    Q    A combination on each fax or you faxed some

3 and she faxed some?

4    A    I faxed some; she faxed some.

5    Q    Why were some faxed by you and some by her?

6    A    Well, we get interruptions. You know,

7 people call up. You know, we try to get something

8 done -- trying to get something done right away --

9    Q    Okay. I'm not asking -- just to interrupt

10 you, I'm not asking like a general thing. I'm

11 asking, this day why weren't all the faxes just sent

12 all at once by one person? I'm not -- like, kind of

13 like things that could have happened. What happened

14 this day?

15    A    Well, we work together to accomplish, you

16 know, tasks at hand, and I think she -- we worked

17 together to get this done.

18    Q    Well, can you amplify your answer at all?

19    A    Well --

20    Q    Who was the first recipient of a fax, and

21 why was that person the first recipient?

22    A    I don't recall who was the first recipient.

259

1    Q    How was an order created as to who should

2 get faxes first, second, third, fourth, fifth, or

3 sixth?

4    A    It's no particular order.

5    Q    It was random?

6    A    Yeah.

7    Q    And determined by you?

8    A    Yes.

9    Q    And are you aware whether or not Mr. Reisig

10 or Ms. Serfaty or anyone else, not a member of the

11 board of directors, spoke with or communicated with

12 any member of the board of directors prior to the

13 14th about this issue, the modifications sought on

14 the 14th?

15    A    Well, Mrs. Serfaty spoke with board members

16 about it.

17    Q    When?

18    A    It was either that morning or the day

19 before.

20    Q    I'm focused on prior to 12:01 a.m.,

21 9/14/01. I'm talking about the 13th and before.

22    A    13th and before. Okay. Mrs. Serfaty I

260

1 think spoke with them the morning of the 14th, spoke

2 with board members.

3    Q    She did not speak with any board member

4 prior to September 14th?

5          MR. WELLSCHLAGER: Objection,

6 mischaracterizes his previous testimony.

7 BY MR. GOTTESDIENER:

8    Q    This is a question. Did she speak with any

9 board member prior to September 14th about this

10 proposed modification?

11    A    I can't say for sure.

12    Q    You have no reason to think that she did,

13 however?

14    A    No reason to believe she didn't either.

15    Q    Okay. Well, the record will reflect what

16 it reflects. Didn't you say that she spoke with the

17 board members the morning of the 14th?

18    A    Yes.

19    Q    Okay. How do you know she spoke with board

20 members the morning of the 14th?

21    A    I believe she told me that she was going to

22 call each of them to talk with them about this.

27 (Pages 261 to 264)

261

1    Q    When did she tell you that?
2    A    That morning.
3    Q    The 14th --
4    A    Yeah.
5    Q    -- she told you that she was going to call
6    them and speak with each of them about this?
7    A    Yes.
8    Q    Was there any discussion at all by anyone,
9    with anyone, whether you were party to it or not, of
10   having a telephonic meeting over this issue?
11   A    I'm not aware of any discussion about that.
12   Q    So, for example, you didn't ask
13   Ms. Serfaty, hey, why don't we just convene a
14   telephonic meeting?
15   A    No, I did not.
16   Q    And no one told you that a telephonic
17   meeting could be arranged?
18   A    Repeat that.
19   Q    No one told you that such a telephonic
20   meeting could not be arranged?
21   A    No one told me that.
22   Q    How far is Ms. Serfaty's office from your

263

1    A    I'd say -- seemed like it was first thing
2    in the morning.  You know, 8:30, something like
3    that.
4    Q    Now, the question about had anyone told the
5    board members that this issue was going to be
6    presented to them before the 14th, what is your
7    answer as to that?  Do you have any information that
8    any board member knew that they were going to be
9    asked to vote on this or sign a resolution prior to
10   the 14th?
11   A    I don't have any specific information about
12   that.
13   Q    The information that you have causes you to
14   believe that no board member was aware of this prior
15   to the 14th; isn't that right?
16        MR. WELLSCHLAGER:  Objection to the form of
17   the question.
18        THE WITNESS:  And, you know, I don't -- I
19   can't -- I don't know for sure if they were spoken
20   to or not --
21   BY MR. GOTTESDIENER:
22   Q    Well --

262

1    office?
2    A    It's probably about a hundred feet.
3    Q    And --
4        MR. WELLSCHLAGER:  And you're talking about
5    then, right?
6        MR. GOTTESDIENER:  Yeah.  Why?  Has it
7    changed?
8        MR. WELLSCHLAGER:  Well, you said -- you
9    said it in the present tense.  I don't know if it's
10   changed or not.
11   BY MR. GOTTESDIENER:
12   Q    Is it in the same place?
13   A    Same place.
14   Q    Okay.  And did you hear or otherwise become
15   aware through any number of your senses that she was
16   having a phone conversation with any board member at
17   any time on the 14th?
18   A    Well, she told me she was going to be
19   talking to the board members about this.
20   Q    Okay.  And what time was that?
21   A    That was in the morning.
22   Q    What time was that?

264

1    A    -- prior to that.
2    Q    But you don't have any indication that
3    anyone was spoken to prior to that, correct?
4    A    Correct.
5    Q    And, in fact, the way Ms. Serfaty told you
6    that she was going to call them and tell them about
7    this and discuss it with them caused you to believe
8    that this was something that was going to be
9    presented to them for the first time that morning,
10   correct?
11   A    I can't recall that it was that -- you
12   know, that it eliminated any -- any -- any prior
13   conversations.
14   Q    That wasn't my question.  Can you answer my
15   question?
16   A    Can you repeat your question?
17        MR. WELLSCHLAGER:  Objection to the form of
18   your question.
19   BY MR. GOTTESDIENER:
20   Q    She didn't say, when she said that she was
21   going to call them and talk to them about this, and
22   she didn't indicate that she had spoken with any of

28 (Pages 265 to 268)

265

1    them prior to that morning about this?
2      A   Yeah, I don't recall her saying she'd
3    spoken to any prior.
4      Q   And was your impression -- and this is
5    the nub of my question. It was your impression
6    hearing her telling you what she was going to do, in
7    the context of what you were doing based on what you
8    were told by her and Mr. Reisig, that this was going
9    to be the first time they had been presented with
10   the issue that morning; isn't that correct? That
11   was your impression at the time?
12     A   I can't say for sure that was -- that's the
13   case.
14     Q   I'm not asking for certainty. I'm asking
15   for a reasonable degree of certainty. With a
16   reasonable degree of certainty you can tell us today
17   that on September 14, '01, by the time and after she
18   told you what she was going to do, it was your
19   impression that this was an issue that was going to
20   be presented for the first time to the board members
21   that morning?
22     A   That's likely.

266

1      Q   At the point in time that Ms. Serfaty said
2    to you what she said, had you or Ms. Hawkins faxed
3    anything to anyone?
4      A   I don't think we had at that point.
5      Q   Are you sure?
6      A   I'm sure we had not faxed anything.
7      Q   How can you be sure?
8      A   Well, we normally wouldn't fax anything to
9    the board until, you know, we had the okay from
10   Alicia Serfaty, that that's what we should do.
11     Q   Okay. Well, was there some point in time
12   that we haven't discussed or you haven't told us
13   about yet where she gave you that okay?
14     A   Well, it was during my discussion with her
15   that she said, you know, we need to get this
16   information out to the board.
17     Q   But was that the same discussion when she
18   said, I'm about to call them?
19     A   I believe it was.
20     Q   Okay. Well, try to help me out here with
21   this. Did she say I'm about to call them and I want
22   you to simultaneously be faxing this information to

267

1    them or I'm going to call them and, you know, make
2    sure no one's fishing in Minnesota and you need to
3    direct the fax to some other place so wait to hear
4    back from me? I mean, how did this go?
5      A   As I recall, she said go ahead and fax this
6    out to the board and then I'll be talking with them
7    about this.
8      Q   Okay. And where was Mr. Reisig when you
9    had that conversation with Ms. Serfaty?
10     A   He wasn't there with us.
11     Q   Where was he?
12     A   Probably down in his office.
13     Q   Had you been in contact with him that day
14   up to that point, when you were speaking with
15   Ms. Serfaty?
16     A   I'm not sure that I had been that day.
17     Q   How about the previous day?
18     A   Well, the previous day or the day before
19   that we had talked about this.
20     Q   Is that when he came to your office?
21     A   Yes.
22     Q   Was there any other time that you spoke

268

1    with him in between him coming to your office and
2    apprising you for the first time of this matter and
3    later in the day, when you and he spoke and you
4    satisfied his curiosity as to whether or not the
5    board had been reached?
6      A   I don't think so.
7      Q   Where did you get the resolution and the
8    executive summary and any other material that was
9    faxed to the board members?
10     A   I got them from Mrs. Serfaty.
11     Q   When?
12     A   That morning.
13     Q   How?
14     A   She handed them to me.
15     Q   And how did she have them? Do you know how
16   she came to be holding them in her hand, how that
17   came about?
18     A   I believe she handed them to me.
19     Q   Right. How were they generated to the
20   point where they were handed to you? Do you know if
21   she typed them, if she edited them, if she got them
22   from Mr. Reisig and she worked on them? How do

Case 1:06-cv-01539-GK Document 20-7 VIDEOTAPED DEPOSITION OF JOHN CARTER VOLUME 2 Page 34 of 77
CONDUCTED ON TUESDAY, APRIL 13, 2004

29 (Pages 269 to 272)

269
1   you -- how did you get to the point where you were
2   receiving that from her?
3       A   I think she handed them to me, and she said
4   I got these from HR, and I'm going to e-mail --
5   e-mail them to you as well.
6       Q   Okay. And did she do that?
7       A   Yes.
8       Q   And have you been tasked with getting a
9   copy of that e-mail to counsel or to anyone in the
10  company in connection with this lawsuit?
11      A   Have I been tasked with that?
12      Q   Yeah.
13      A   I don't believe I have.
14      Q   Are you aware if anyone has gone to your
15  computer and seen if you have any e-mails relating
16  to this issue?
17      A   My computer has been looked at.
18      Q   When?
19      A   Sometime within the last month.
20      Q   By who?
21      A   By somebody from our IT department.
22      Q   Who?

270
1       A   You know, I -- I don't know the fella's
2   name, but it was a male who came.
3       Q   Not Mr. Peck?
4       A   No, it wasn't Mr. Peck.
5       Q   Okay. That was in the last month?
6       A   Yeah.
7       Q   And prior to that you're not aware that
8   anyone checked your computer?
9       A   There was one time within about the last
10  month that somebody has checked it.
11      Q   And you were there for that?
12      A   I was there. They came and told me why
13  they were there.
14      Q   Uh-huh.
15      A   And then I let them do their thing.
16      Q   Did you have any advance warning as to they
17  wanted to do their thing?
18      A   No.
19      Q   At any point in time prior to that day, had
20  you received any communication from any source that
21  it was desired to look at your computer?
22      A   That day?

271
1       Q   Prior to that day. Had you heard from
2   anybody in all the months before since you became
3   aware of this lawsuit? Since September/October of
4   '93 -- since August of '93, did you ever get any
5   inkling, sense, statement that your computer needs
6   to be looked at to see if you have documents on
7   there relative to this lawsuit?
8       A   Well, Mr. McIlwain told me that --
9           MR. WELLSCHLAGER: Well --
10          THE WITNESS: Okay.
11          MR. GOTTESDIENER: I don't think --
12          MR. WELLSCHLAGER: I don't want you to go
13  into these statements that are prefaced by an
14  attorney told me X, Y, Z.
15          THE WITNESS: Okay.
16          MR. WELLSCHLAGER: The question is, before
17  the date when someone came by your office to look at
18  your computer --
19          THE WITNESS: Mm-hmm.
20          MR. WELLSCHLAGER: -- did you have any
21  reason to believe that that was going to happen?
22  Just answer that question for starters.

272
1           THE WITNESS: Yes.
2   BY MR. GOTTESDIENER:
3       Q   Okay. Did you get that reason to believe
4   once or more than once before the past month's
5   incident?
6       A   I think I got it once.
7       Q   Okay. And the source of that was
8   Mr. McIlwain?
9       A   Yes.
10      Q   And was that in person? On the phone?
11  Through an e-mail?
12      A   I think it was in person.
13      Q   Okay. Was it the -- one of the November
14  in-person visits that we've discussed already?
15      A   No. It was -- it was -- it was after the
16  first of the year.
17      Q   Was it one of the January or February
18  spillover visits?
19      A   One of those visits --
20      Q   Okay.
21      A   -- he told me about it.
22      Q   Okay. You can't tell us if it was the

30 (Pages 273 to 276)

273

1  first or the second?
2  A  No.
3  Q  And, by the way, just to pick up on that,
4  after the second time when you still hadn't given
5  him anything, did you then go and pull documents and
6  then provide him with documents?
7  A  Yes.
8  Q  When was that?
9  A  I can't recall the specific date.
10  Q  Approximately.
11  A  I'd say it was sometime in February.
12  Q  And what materials did you provide him
13  with?
14  A  Board minutes, resolution books, record of
15  meeting books, and then also copies of -- some of my
16  notes.
17  Q  Did you -- with respect to the notes, you
18  were the one who went to your notes and physically
19  took them and made copies of them? The last part
20  maybe somebody else made copies of them, but you
21  went in to a file and pulled notes?
22  A  Yes.

274

1  Q  There were some notes that you didn't pull.
2  Some notes that you did, correct?
3  A  Yes.
4  Q  How did you determine which notes to pull
5  and which notes not to pull?
6  A  Well, he just asked for ones in certain --
7  during certain time periods.
8  Q  Okay. And were you ever provided with a
9  copy of what you understood to be a document
10  production request from plaintiffs?
11  A  This document?
12  Q  Yes.
13  A  No, I was never provided with this.
14  Q  Were you provided with any kind of written
15  summary of what it was that the plaintiffs wanted?
16  A  No.
17  Q  Were you provided with any oral summary of
18  what it was that the plaintiffs wanted?
19  A  The information that they wanted?
20  Q  Yeah.
21  A  Yes.
22  Q  What -- and let me make my question clear.

275

1  When I say "provided with an oral summary," I mean
2  somebody said to you I am now going to summarize
3  what the plaintiffs are seeking, and then began to
4  itemize several categories of documents that the
5  plaintiffs sought. Is your answer still the same?
6  A  Yes.
7  Q  When was that done for you?
8  A  Well, I think the first time was back in
9  December by Christine Turnblaser.
10  Q  Okay. So the thing that we talked about
11  before, we'd have to go back and put what you just
12  said back there when we talked about it before, that
13  she actually told you in summary fashion what she
14  understood to be the plaintiffs' requests for
15  information?
16  A  Well, I think the way she put it was we're
17  going to need to pull this information in connection
18  with this case.
19  Q  Right. But what I'm asking for, and it may
20  not be something that you're really focusing on.
21  I'm asking you to focus on this. I want to know
22  when was the first time that anybody said -- not,

276

1  you know, we're going to need minutes about this
2  and, you know, there was this issue with the VERP
3  and we need things from 2001.
4  I'm saying when was the first time, if it
5  ever occurred, where someone said to you the
6  plaintiffs in this case, however they were said --
7  the lawyer for the plaintiffs, our adversaries, our,
8  you know, opponents, whatever -- want these kinds of
9  documents one, two, three, four, just going down
10  some even brief list but a list where you understood
11  that you were given a summary of something that must
12  be in writing that was specific as to what was
13  desired. Has that ever occurred?
14  MR. WELLSCHLAGER: Objection to the form of
15  the question.
16  BY MR. GOTTESDIENER:
17  Q  I'll withdraw the question and make sure
18  it's a clean question. Has anyone ever given you a
19  specific summary of what it was that they understand
20  that the plaintiffs had asked for in discovery?
21  A  Yes.
22  Q  Who and when?

Case 1:06-cv-01538-GK APP Document 20-7 OF JOHN CROME Filed 01/16/2007 Page 36 of 77
CONDUCTED ON TUESDAY, APRIL 13, 2004

31 (Pages 277 to 280)

277

1    A    Put that way, I believe it was
2    Mr. McIlwain.
3    Q    When?
4    A    In February.
5    Q    In February?
6    A    Mm-hmm.
7    Q    In the second one of these meetings?
8    A    Yeah.
9    Q    After you had not produced anything from
10   his January visit to you?
11   A    Right.
12   Q    Okay. And has that been done on any other
13   occasion by anyone else?
14   A    Put that way? I don't believe it's been
15   put that way.
16   Q    Okay. By anyone else at any other time?
17   A    Not specifically the plaintiffs' request.
18   Q    Okay. What way has it been put that --
19   it's not specifically that way but it's somewhat
20   akin to that way, where you would think that you
21   were being given some summary of what the other side
22   wants in the case? Ms. Turnblaser?

278

1    A    Well, Ms. Turnblaser gave me an indication
2    of, you know, what they were looking for the case.
3    Q    And they being Amtrak or the plaintiffs?
4    A    Well, that Amtrak was looking for.
5    Q    Okay. Anybody else give you an indication
6    of what Amtrak or the plaintiffs were looking for in
7    the case?
8    A    I don't think so.
9    Q    Okay. And she gave you that indication in
10   December of 2003, when she was giving you another
11   one of these heads-up, you know, be on notice that
12   this is going to be sought from you visits?
13   A    Yes.
14   Q    And how specific did she get in terms of
15   itemizing categories of different information that
16   Amtrak sought? She didn't say anything about the
17   plaintiffs, right?
18   A    No.
19   Q    She -- she said Amtrak?
20   A    Mm-hmm.
21   Q    How specific did she get as to the
22   categories of information that she said Amtrak

279

1    sought?
2    A    Well, they were general categories, you
3    know, like minutes, materials related to -- to
4    the -- the board materials related to this item.
5    That's what she was looking for.
6    Q    Okay. I've heard two. Did she say
7    anything more, or did she sort of stop there and say
8    that's kind of what we want?
9    A    I think it's just -- it was more general,
10   that's kind of what we want.
11   Q    Okay. So she wouldn't have even given a
12   third specific category?
13   A    I don't think so.
14   Q    Okay. And then you've told us the
15   waterfront of times that things have been summarized
16   for you in detail or generally? Ms. Turnblaser in
17   December and Mr. McIlwain in February, right? No
18   other time?
19   A    Well, that they've been summarized?
20   Q    Yeah.
21   A    You know, there may have been one or
22   another discussion about it at some point.

280

1    Q    Okay. With who? When?
2    A    Well, you know, Mr. McIlwain and I probably
3    discussed it, you know, at least twice.
4    Q    At least twice?
5    A    Yeah.
6    Q    Okay. Thus far we've only identified once.
7    So can we identify the twice and the maybe third
8    time?
9    A    Well, I think I said twice in February --
10   Q    Oh, I didn't hear twice in February.
11   A    -- he and I talked about it.
12   Q    I'm sorry if that's what you said.
13   A    I think that's what I said.
14   Q    Twice in February he summarized for you
15   what it was that the plaintiffs wanted?
16   A    No. That -- what was -- well, what was
17   being requested in this case.
18   Q    Okay. He didn't say that it was from
19   plaintiffs or Amtrak, just what was being requested?
20   A    I think it was what was being requested.
21   Q    Okay. That happened twice in February?
22   A    I believe so.

Case 1:06-cv-01539-GK    Document 20-7    Filed 01/16/2007    Page 37 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

32 (Pages 281 to 284)

281

1    Q    And he went down an itemized list?
2    A    Yeah, we talked about specific things.
3    Q    Twice?
4    A    I think that's right.
5    Q    How many days separated these two
6    discussions in February?
7    A    I don't know. Ten days maybe.
8    Q    And in the interim you hadn't gotten him
9    any of the items that had been summarized the first
10   time for you?
11   A    Well, in the interim I was, you know,
12   thinking about what we needed to pull in order to be
13   responsive to this.
14   Q    And was there maybe yet another time that
15   you and he had a discussion of what was specifically
16   sought in this case?
17   A    Well, as we go through time, you know,
18   there's been sort of fine tuning of, you know,
19   what's needed so --
20   Q    Well, you give me an answer like that, I
21   have to ask follow-up questions. Fine-tuning times?
22   I need to know all the times that there's been

282

1    fine-tuning of the information that has been
2    provided to you as to what the plaintiffs seek in
3    this case.
4    A    Okay. In that case, I would say it's --
5    what the plaintiffs seek, two times in February.
6    Q    Okay. Since February have there been
7    fine-tunings made of what is sought in a passive
8    way, passive voice where there's no indication of
9    who specifically wants it, but that it's required or
10   desired in connection with this case? I need to
11   know about those fine-tunings.
12   A    Okay. I'd say that there's probably one
13   time that that's happened.
14   Q    When?
15   A    In March.
16   Q    Tell me about it.
17   A    Mr. McIlwain came to me and said he'd like
18   some copies of my notes.
19   Q    And that's the note part that you told us
20   about earlier?
21   A    Mm-hmm.
22   Q    And the notes that he desired were

283

1    described in terms of time periods; is that right?
2    A    Yes.
3    Q    What time periods?
4    A    He was asking for some time periods in 1994
5    and also for 2001.
6    Q    Any other discussions of what is
7    specifically sought by plaintiffs or Amtrak or just
8    generally in this case that we haven't discussed?
9    A    I don't recall any others.
10   Q    Okay. So returning to the 14th, did you
11   participate in any way in any of the conversations
12   Ms. Serfaty had with any board members?
13   A    No.
14   Q    Did Ms. Serfaty tell you or did you
15   otherwise learn from any source whatsoever on any
16   occasion the content of anything that she said to
17   any specific board member or anything any board
18   member said to her?
19   A    No.
20   Q    Did anyone other than Ms. Serfaty or
21   yourself speak with any board member about this
22   issue on the 14th?

284

1    A    Repeat that question.
2    Q    Did anybody other than you or Ms. Serfaty
3    speak with any board member about this issue on the
4    14th?
5    A    Not that I'm aware of.
6    Q    Did Ms. Hawkins play any role in locating,
7    finding, dialing, paging, e-mailing any director at
8    all on the 14th?
9    A    Not that I'm aware of.
10   Q    Were you yourself dialing Governor
11   Holton -- I'm sorry. You said Governor Holton
12   called you?
13   A    Yes.
14   Q    With Dukakis you're not sure, but if you
15   did speak with him, did he call you or you call him?
16   A    I think I called him just to make sure he
17   was there.
18   Q    Before the fax was sent or after the fax
19   was sent?
20   A    I think it was after the fax was sent, just
21   to make sure he got it.
22   Q    And did you -- we'll just put aside that

Case 1:06-cv-01539-GK   Document 20-7   Filed 01/16/2007   Page 38 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

33 (Pages 285 to 288)

285

1 there is some question in your mind whether this
2 occurred. Assuming it occurred -- that's all these
3 questions that are going to follow. Just assume
4 that it's occurred -- what happened? Did you reach
5 him directly? Did he pick up his own phone? How
6 did this conversation go?
7    A   I think he picked up his own phone.
8    Q   Okay. Was this at the place he teaches or
9 where was this?
10   A   Yeah, where he teaches.
11   Q   Okay. So he picks up the phone and he says
12 whatever he says when he picks up the phone, and
13 what happened then?
14   A   And I just wanted to make sure he -- he'd
15 gotten our resolution and would be able to execute
16 it that day.
17   Q   Okay. And what did he say?
18   A   He said he'd gotten it and he'd fax it back
19 to me.
20   Q   That he would or he did?
21   A   He would.
22   Q   Okay. And did you at any time attempt to

286

1 call any other member of the board that day?
2    A   I believe I called over to Mr. Jackson's
3 office just to check with his secretary to make sure
4 that they had received it.
5    Q   Okay. And who did you speak with in his
6 office?
7    A   Barbara Lucas.
8    Q   And what did she say?
9    A   She said, yes, we received it. I'll bring
10 it to his attention.
11   Q   Okay. And who is Mr. Jackson and why were
12 you sending it to him as opposed to the Secretary of
13 the Treasury -- of Transportation?
14   A   He was the Deputy Secretary of
15 Transportation that time and served as an alternate
16 for the Secretary of Transportation on the board.
17   Q   How was it that -- withdrawn.
18       You say he served as an alternate?
19   A   Mm-hmm.
20   Q   What does that mean?
21   A   Well, the Secretary of Transportation is
22 not able to attend very many Amtrak board meetings,

287

1 so the secretary designated two alternates to serve
2 in his place when he's not at the meetings and to
3 vote for him, and one is the Deputy Secretary of
4 Transportation and the second is the Federal
5 Railroad Administrator.
6    Q   And with respect to September 14, 2001,
7 when -- withdrawn.
8       With respect to the year 2001 -- first of
9 all, who was the Secretary of Transportation in
10 2001?
11   A   2001 it was Secretary Slater.
12   Q   Until such time as he was replaced by a
13 Republican appointee?
14   A   Right.
15   Q   And who was that?
16   A   Secretary Mineta.
17   Q   And when was Mineta confirmed as Secretary
18 of Transportation?
19   A   Let me take this back. It was -- actually,
20 I think Mineta was in office at that time.
21   Q   Actually I wasn't asking at that time.
22 Here I'm just literally starting at 2001. I thought

288

1 you were as well. Slater until the Inauguration is
2 Secretary of Transportation?
3    A   Yeah. Right. Right.
4    Q   Mineta is -- takes his place --
5    A   Right.
6    Q   -- at some point after the Inauguration
7 he's confirmed --
8    A   Right.
9    Q   -- and I certainly recall that he was
10 swiftly confirmed?
11   A   Right.
12   Q   Do you remember when that was?
13   A   I believe it was -- he was confirmed in
14 April or May of 2001.
15   Q   Okay. Is it then generally the practice
16 that since you've been there when there's a new
17 Secretary of Transportation, that there's a new
18 designation, or is this just sort of an understood
19 designation that continues with the position of the
20 designees?
21   A   It continues with the designees, as I
22 understand it.

289

1    Q   Okay.  And is it your understanding that
2  this is as a matter of the discretion of each
3  Secretary of Transportation, or is this a matter of
4  Congressional statute or do you know?
5    A   I don't know.
6    Q   Okay.  Have you ever seen any document or
7  any memorialization of any designation of designees
8  or alternates for the Secretary of Transportation?
9    A   I have not.
10   Q   Do you know if they exist?
11   A   I don't.
12   Q   In this case -- and is it your
13 understanding that either designee, in effect, will
14 do, that either can attend and it's just sort of as
15 between them who's available?
16   A   It's who's available and generally it's the
17 Deputy Secretary that in practice has taken
18 precedence over the Federal Railroad Administrator.
19   Q   And what do you mean by "precedence"?  Like
20 meaning if the Deputy Secretary is available, that's
21 who's going to be there?
22   A   Yes.

290

1    Q   Okay.  Is there any other process that's
2  used or that was ever discussed about using when a
3  unanimous written consent resolution was sought?
4    A   Not that I'm aware of.
5    Q   So no discussion?  You're not aware of any
6  discussion or concern by anyone that the unanimous
7  consent resolution was something that had to be
8  signed by the secretary him or herself as opposed to
9  a designee?
10   A   No.
11   Q   On the date in question, how was it
12 determined to send this to the Deputy Secretary as
13 opposed to someone else, the administrator of the
14 Federal -- what's it called?
15   A   Railroad Administration?
16   Q   Yeah.  Thank you.
17   A   Well, the Deputy Secretary was attending
18 all of our meetings and was up to speed on all of
19 the issues involved with Amtrak, and so for board
20 members, as far as a board member connected with
21 DOT, he was the one that we were always dealing
22 with.

291

1    Q   Okay.  And was this Deputy Secretary, as of
2  September 14, 2001, confirmed in his position as
3  Deputy Secretary?
4    A   Yes.
5    Q   Did anyone -- what you typed in the -- I
6  would say comments section, but it doesn't have a
7  specific word that says "comments section."  What
8  you typed there beginning with, "Per our
9  discussion" --
10   A   Mm-hmm.
11   Q   You, first of all, are the person that
12 typed that, right?
13   A   Yes.
14   Q   And was it you exercising your discretion
15 to put what it was that you put there, or did you
16 show this to Ms. Serfaty or Mr. Reisig before you
17 sent it?
18   A   Ms. Serfaty and I had a discussion about
19 it, as I recall, and she said, you know, put this in
20 there per our discussion.
21   Q   She told you to put this in there.  What
22 does that mean "this"?  Did she orally tell you?

292

1  Did she e-mail you this passage for cut-and-paste
2  into the fax?
3    A   She told me orally.
4    Q   Did she dictate it orally, or did she give
5  you a gist and leave it to you to fashion the
6  appropriate verbiage?
7    A   She dictated the language to me.
8    Q   Okay.  And you were where and she was where
9  when she dictated this to you?
10   A   This was in her office.
11   Q   Okay.  And how did you take down what she
12 was telling you?
13   A   I believe I had a pad of paper with me, and
14 I jotted it down.
15   Q   Okay.  And where are your notes from
16 September 14, 2001?
17   A   I don't know that I saved that note.
18   Q   Where are your notes -- not just that note,
19 where are your notes, your jottings, your writings
20 from that day?
21   A   Well, anything that I had would be in that
22 folder back in my office.

Case 1:06-cv-01539-GK   Document 20-7   Filed 01/16/2007   Page 40 of 77
VIDEOTAPED DEPOSITION OF JOHN E. CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

35 (Pages 293 to 296)

293

1    Q    You didn't produce anything from September
2    14, 2001; isn't that right?
3    A    I didn't produce anything?
4    Q    Yeah.
5    A    I don't think I understand the question.
6    Q    You didn't give that to Mr. McIlwain?  You
7    didn't give anything from September 14, 2001, notes?
8    A    No.
9    Q    You don't have any notes left, right?
10   A    I'd have to look back in that folder and
11   see if there are any notes.
12   Q    Well, that was -- thank you.  That was
13   going to be my next question.  You would look back
14   in the folder from which you --
15   A    Okay.
16   Q    Go ahead.
17   A    The notes that I gave Mr. McIlwain -- may I
18   explain?
19   Q    Yeah, sure.
20   A    -- were notes from board meetings.
21   Q    Yeah.
22   A    Notes that I took in the meetings.

294

1    Q    There was no board meeting on September 14,
2    right?
3    A    Correct.  Correct.  So those were the notes
4    I gave him.
5    Q    No, I understand that, sir.  But I'm asking
6    where are your notes from this unanimous consent
7    resolution process that you were engaged in and you
8    spearheaded?  Where are your notes from that?
9    A    Any notes that I have would be in that
10   folder that I saved.
11   Q    Where are the faxes that went to the other
12   three directors?
13   A    For some reason, we didn't save those.
14   Q    For what reason?
15   A    I don't know.
16   Q    Did you talk to Ms. Hawkins about that?
17   A    No.
18   Q    Did you talk to Ms. Serfaty about that?
19   A    I did talk to Ms. Serfaty.
20   Q    When?
21   A    Sometime within the -- in, you know, a
22   month or so ago.

295

1    Q    And about like where these other documents
2    are?
3    A    Right.
4    Q    And after that conversation, you still
5    didn't come up with those documents?
6    A    This -- these were the only documents that
7    I had.
8    Q    Do you have documents from -- withdrawn.
9         The -- you said that she handed you -- she
10   handed you what it was that she wanted you to fax to
11   the directors, right?
12   A    As I recall, she handed to me a copy of
13   what we were going to fax to the directors, the
14   executive summary and the resolution attached to it.
15   Q    Okay.  I mean, you gave a long answer when
16   it was I thought a yes-or-no question.  Were you
17   intending to answer in some way yes but?  I don't
18   get it.  She handed you what you faxed, right?
19   A    Yes.
20   Q    Okay.  Did she hand you anything on some
21   other occasion to fax to anyone about this?
22   A    About this?

296

1    Q    Yeah.
2    A    I don't think she handed me anything else
3    at another time.
4    Q    Okay.  Did she dictate anything to you
5    about what you were to put on this fax cover page
6    any other time than the one time you were telling us
7    about?
8    A    I think that was the only time.
9    Q    And were you sitting in her office at the
10   time?
11   A    I was in her office either standing or
12   sitting.
13   Q    And was that the same time she handed you
14   the documents to fax?
15   A    Yes.
16   Q    So, in essence, it was here's what I want
17   you to send them; here's what I want you to say in
18   the fax cover sheet?
19   A    Right.
20   Q    Okay.  How was it that you came to be
21   talking to Governor Holton about this instead of
22   her?

297

1    A    Well, she -- she may have called him as
2    well, but as I recall, he called me back to tell me
3    that he was okay with it.
4    Q    Did anyone else call you that was a
5    director?
6    A    I don't believe so.
7    Q    Do you know if -- so you don't know whether
8    or not she ever spoke with Governor Holton?
9    A    As far as I know, she spoke with all the
10   directors.
11   Q    Wait a minute.  How do you know that?
12   A    Because she'd indicated she was going to
13   call the directors.
14   Q    She just told you that that was her
15   intention?
16   A    Mm-hmm.
17   Q    You have no basis to know that she reached
18   any of these people?
19         MR. WELLSCHLAGER:  Objection,
20   argumentative.
21   BY MR. GOTTESDIENER:
22   Q    Did she tell you that she reached any of

298

1    these people?
2    A    I think she told me she reached them.
3    Q    Okay.  Tell us about that conversation.
4    When did Ms. Serfaty tell you she reached the
5    directors, and what did she say about reaching the
6    directors?
7         MR. WELLSCHLAGER:  I assume you're asking
8    this in the context of a conversation between
9    corporate secretary and Mr. Carten and not general
10   counsel?
11        MR. GOTTESDIENER:  Yes.
12        MR. WELLSCHLAGER:  And if the conversation,
13   as you understood it, was an attorney-client
14   conversation, please say so, but I'm assuming that
15   it was a -- you know, corporate secretary talking to
16   her assistant corporate secretary.
17        THE WITNESS:  As I understand it, she was
18   the corporate secretary talking to the assistant
19   corporate secretary that, you know, she'd reached
20   the board members.
21   BY MR. GOTTESDIENER:
22   Q    I mean, what happened?  She came out of her

299

1    office and ducked her head in and said, I was able
2    to reach everybody.  Thank goodness.  I mean, what
3    happened?
4    A    I think she did -- I think I was in my
5    office and she came by and said, you know, I reached
6    the board members and told them this was coming.
7    Q    How many times had you done this procedure
8    with Ms. Serfaty?  Never, right?
9    A    Prior to that?
10   Q    Yeah.
11   A    Yeah, I don't recall that I had ever done
12   it with her prior to that.
13   Q    Isn't it fair to say, based on what you've
14   told us, that it's a fairly rare procedure at all?
15   You've told us about maybe four times in 12 years
16   that you've employed this procedure; is that right?
17   A    Those are specific ones I can think
18   about -- I can recall, but there may well be others
19   as well.
20   Q    Would it be fair to say that this is a
21   fairly rarely invoked procedure?
22        MR. WELLSCHLAGER:  Objection to the form of

300

1    the question.
2         THE WITNESS:  It's not something we do
3    every day, every week, every month.
4    BY MR. GOTTESDIENER:
5    Q    It's not something you do every month,
6    right?  That was your answer?
7    A    Right.
8    Q    Okay.  And it's not something you do
9    routinely, right?
10   A    We do it from time to time.
11   Q    You do it when time is of the essence and
12   there's no way to convene a physical meeting or a
13   telephonic meeting of the board, correct?
14   A    Correct.
15   Q    And that's fairly rare in your experience
16   in the past dozen years, correct?
17   A    Correct.
18   Q    In this case, did you have any discussion
19   with Ms. Serfaty as to the requirements that needed
20   to be met, honored, observed to make sure that the
21   action would be valid?
22   A    Well, we talked about what we were going to

Case 1:06-cv-01539-GK    Document 20-7    Filed 01/16/2007    Page 42 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

37 (Pages 301 to 304)

301

1   do that morning.
2   Q   Yes?
3   A   And -- you know, so we talked about sending
4   them the resolution, sending them the executive
5   summary describing it --
6   Q   Right.
7   A   -- and having everybody sign it and get it
8   back to us.
9       MR. WELLSCHLAGER:  Before you go any
10  further, this is probably unnecessary, but same
11  caution.  If your conversations with Ms. Serfaty or
12  anyone else turned into one where you were talking
13  to an attorney for the company and he or she was
14  rendering legal advice or receiving legal inquiries
15  or requests for legal advice about validity of board
16  action or things of that nature, don't divulge those
17  communications, but as far as I understand, these
18  conversations were between assistant corporate
19  secretary and corporate secretary and were not
20  involving legal advice.
21      THE WITNESS:  Correct.
22      MR. WELLSCHLAGER:  So with that caution, go

302

1   ahead and answer.
2   BY MR. GOTTESDIENER:
3   Q   And that is correct?  When you just said
4   correct, you were taking the last part of John's
5   statement as a question, that this was not legal
6   advice that you were seeking in discussing what you
7   were doing.  You didn't ask Ms. Serfaty her opinion
8   as a lawyer as to, like, what's required to make
9   this valid, right?
10  A   Correct.
11  Q   And she was not giving you legal advice as
12  to what's required to make this valid in what you
13  were doing?
14  A   Correct.
15  Q   The question just didn't come up as to how
16  to make sure that this was going to be legally
17  valid, right?
18  A   Yes.
19  Q   You just did what you thought should be
20  done in this situation?
21  A   Yes.
22  Q   Now, with respect to Governor Holton, how

303

1   soon after the facts were sent to him did you
2   receive a call from him?
3   A   You know, somewhere middle part of the day.
4   Q   When was the fax sent to him?
5   A   The fax was sent to him in the morning.
6   Q   What time?
7   A   I think it was sent somewhere around 8:45,
8   9 o'clock, something like that, 8:30.
9   Q   Is there any way to tell, from any source
10  whatsoever, as to when the faxes went out?  Is there
11  any sort of log that's kept?  Is this just a fax
12  machine, by the way, you know, sitting by your
13  office?
14  A   Just a fax machine that's outside my
15  office.
16  Q   And is this also Ms. Serfaty's fax machine,
17  or is it your fax machine?
18  A   She uses it sometimes as well.
19  Q   I mean, does she have another fax number?
20  A   There is another fax machine that she uses
21  too.
22  Q   Is that in her office or outside of her

304

1   office?
2   A   Outside of her office.
3   Q   So does she use that in a different
4   capacity, like as a lawyer as opposed to corporate
5   secretary?
6   A   It's a matter of convenience.  If she's
7   sending it and her secretary is sending it, then
8   they'll often use the machine that's closer to her
9   office.
10  Q   Which is not this machine?
11  A   Correct.
12  Q   The 2921 is more your machine?
13  A   Yes.
14  Q   And also the machine that Ms. Hawkins uses?
15  A   Yes.
16  Q   Now remind me.  Ms. Oliveri is not on your
17  floor -- she is on your floor?
18  A   She's on our floor.
19  Q   How far away is her office?
20  A   Her office right now is probably -- I don't
21  know -- a hundred feet, 120 feet away from me right
22  now.

Case 1:06-cv-01539-GK TAPED Document 20-7 OF JOHN CARTER, VOLUME 2 Filed 01/16/2007 Page 43 of 77
CONDUCTED ON TUESDAY, APRIL 13, 2004

38 (Pages 305 to 308)

305

1    Q    Back then was it the same distance?
2    A    Back then it was closer.
3    Q    Did she use, as of this date, the same fax
4    number? Is there anything --
5    A    I think she used a different machine
6    actually.
7    Q    Is there anything communal about this fax
8    number, people outside of the corporate secretariat?
9    A    No. It's pretty much our machine.
10   Q    Okay. So did Ms. Serfaty tell you before
11   or after what kinds of conversations she had with
12   the board members?
13   A    All she told me was that she'd talked with
14   them.
15   Q    And?
16   A    And they seemed to be okay with it.
17   Q    At any point in time up until the end of
18   the day on the 14th, did anyone tell you, did you
19   hear, was it in any way communicated to you that
20   possibly some number of employees might be very
21   upset at this action when and if they learned about
22   it, if it was adopted?

306

1    A    No.
2    Q    Was there anything communicated to you by
3    any source as to any -- withdrawn.
4         Well, can you with certainty tell us what
5    it was that was faxed to the other three board
6    members for whom we don't have fax cover sheets or
7    the faxes?
8    A    I'm certain it was the same information.
9    Q    You're certain?
10   A    Mm-hmm.
11   Q    And you're certain that these three board
12   members got the same information?
13   A    Yes.
14   Q    Well, if you would turn to page 7288 and
15   examine that cover sheet and examine the documents
16   that follow it and examine what is typed in that
17   cover sheet, you would have to agree that your last
18   answer was flat wrong and that Ms. Rosen received
19   different information than the other two directors;
20   would you not?
21        MR. WELLSCHLAGER: Objection to the form of
22   the question.

307

1         THE WITNESS: Yeah, that's correct.
2    BY MR. GOTTESDIENER:
3    Q    That your last answer was flat wrong?
4    A    Well, that she --
5         MR. WELLSCHLAGER: Objection.
6         THE WITNESS: She did get another piece of
7    information.
8    BY MR. GOTTESDIENER:
9    Q    She got another piece of information in
10   your fax cover sheet, and she got a whole other
11   piece of information as an attachment in a letter
12   that appears 7292, right?
13   A    Mm-hmm.
14   Q    How could you have forgotten that and been
15   so sure that everyone got the same information and
16   now be confronted with this?
17        MR. WELLSCHLAGER: Objection to the form of
18   the question.
19   BY MR. GOTTESDIENER:
20   Q    I mean until -- I will withdraw that.
21        Until I just directed your attention to
22   that, you were certain that everyone got the same

308

1    information, right?
2    A    Well, what I was focusing on was the
3    executive summary and the resolution.
4    Q    Before I just directed your attention to
5    this, you were certain and answered questions based
6    on the understanding that everyone got the exact
7    same information, right?
8    A    Everyone got the cover sheet, the executive
9    summary, and the resolution, and it appears here
10   that Ms. Rosen got one other page that she -- you
11   know, the others did not get.
12   Q    Well, that's not all that there is. You
13   wrote something different for Ms. Rosen, didn't you?
14   A    Right.
15   Q    Okay. And you didn't remember that until
16   you were just confronted with it, right?
17   A    Correct.
18   Q    Okay. So you can't exclude the possibility
19   that if we're to find these other fax cover sheets,
20   that there's going to be a lot different information
21   that was sent to those board members than was sent
22   to Mr. Jackson and that was sent to Governor Holton,

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 44 of 77
DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

39 (Pages 309 to 312)

309
1  right?
2       MR. WELLSCHLAGER: Objection to the form of
3  the question.
4       THE WITNESS: I don't think there's going
5  to be much difference.
6  BY MR. GOTTESDIENER:
7    Q  You don't think so, but you certainly can't
8  exclude that possibility, right?
9    A  I can't exclude it.
10   Q  Okay. Well, tell me exactly how it came to
11 pass that you wrote Ms. Rosen a different cover
12 sheet and attached an additional document.
13   A  Well, I believe what happened was in my
14 discussions with Ms. Serfaty she said include this
15 for Amy Rosen as well, and so that's what I did.
16   Q  But you don't have an actual present sense
17 recollection of Ms. Serfaty saying that. You're
18 just assuming that's what must have happened,
19 right?
20   A  I'm assuming that's what happened.
21   Q  So it's correct that you do not have a
22 present sense memory that that's what happened?

310
1    A  Correct.
2    Q  Now, all of the faxes that we have, which
3  is three of six say, "Per our discussion, attached
4  is the amended executive summary and resolution for
5  voluntary early retirement program"; is that
6  correct?
7    A  Yes.
8    Q  Is that what Ms. Serfaty dictated to you?
9    A  I believe so.
10   Q  Verbatim?
11   A  As far as I know, that's what she told me.
12   Q  Okay. Yesterday you told us that you were
13 unaware of any other time that unanimous consent
14 resolutions had been adopted and yet a board member
15 had not physically signed their resolution; is that
16 correct?
17   A  I think there'd been more than one case
18 where Governor Holton has told me on these to apply
19 his name.
20   Q  Okay. This is what I want to talk about.
21 So you think that there are other unanimous consent
22 resolutions that have been adopted, not rejected or

311
1  not --
2    A  Right.
3    Q  -- tabled --
4    A  Right.
5    Q  -- or not transformed into telephonic
6  meetings --
7    A  Right.
8    Q  -- where they've been adopted, it's gone
9  through, and they're considered to be approved
10 resolutions where Governor Holton has not physically
11 signed his resolution?
12   A  Correct.
13   Q  Now between yesterday and today, have you
14 done anything to update yourself or refresh your
15 recollection or familiarize yourself with anything
16 about this case? I mean, in particular I'm
17 interested in this obviously because I'm asking for
18 it here.
19       But have you done anything to, like, go
20 back and look through things and think about things
21 and see if something's here or something's there?
22   A  No.

312
1    Q  Not at all?
2    A  (Shaking head.)
3    Q  You have to say no for her.
4    A  Okay. No.
5    Q  So you told us about the times that you
6  told us about yesterday when you can tell us that
7  there were these unanimous consent resolution
8  processes set in place, and I thought we'd
9  established that there was no other time that
10 Governor Holton was serving as a director. Maybe I
11 miss -- maybe I misunderstood that.
12       What of the resolutions -- which of the
13 resolutions that we discussed yesterday also
14 involved Governor Holton and may have involved him
15 approving the resolution or purporting to approve
16 the resolution without signing it?
17   A  Okay. I think we talked about one in 2003.
18   Q  Okay. Tell me about that one and tell me
19 what happened.
20   A  And that may have been another one where
21 he, you know, called and told us it was okay to --
22 to sign his name.

Case 1:06-cv-01539-EGKT-APP Document 20-7 OF JOHN Filed A04/18/2007 VOLUME Page 45 of 77
CONDUCTED ON TUESDAY, APRIL 13, 2004

40 (Pages 313 to 316)

313

1     Q    And that one was the one that concerned?
2          MR. WELLSCHLAGER:  Chicago real estate?
3  BY MR. GOTTESDIENER:
4     Q    Is that right, Chicago real estate?
5     A    Yeah.  Yeah.
6     Q    Was the Chicago real estate the one where
7  there was -- indulge me here.
8          The Delaware real estate was '99.  The
9  right-of-way was '97, but that didn't result in a
10 resolution, right?
11    A    Correct.
12    Q    It resulted in a telephonic meeting?
13    A    Right.
14    Q    Because there was a persnickety board
15 member?
16    A    Right.
17    Q    There was spring 2003 where there was two
18 things, there was real estate in Chicago and there
19 was a personnel matter; is that right?
20    A    Yes.
21    Q    Okay.  And that was spring 2003, and
22 Governor Holton was still in office because he was

314

1  in office until the fall of 2003?
2     A    Right.
3     Q    Okay.  Other than that, has there ever been
4  any occasion when you or anyone else connected with
5  the secretariat or the board of directors or Amtrak
6  has considered a resolution adopted or board action
7  taken outside of a physical in-presence meeting with
8  a quorum or a telephonic meeting with a quorum where
9  one or more consents have been obtained orally
10 through a director saying you can sign my name for
11 me?
12    A    The one that took place in 1999, that's
13 another one where he may have given us his consent
14 to sign for him.
15    Q    Other than that, are you aware of any
16 others that involved anyone doing anything other
17 than manifesting their consent by physically
18 assigning their name to a piece of paper?
19    A    I can't think of any other right now, but
20 there may in fact be others that I'm just not
21 remembering.
22    Q    Can you think of any board member during

315

1  the years that you've served since 1992 who has ever
2  been polled for his or her consent in either a
3  resolution context or something that might feel like
4  it's similar to a resolution, maybe delaying of a
5  meeting or something that required some sort of
6  decision where you're recalling that there was one
7  or more times that person essentially purported to
8  authorize their signature being applied to a
9  document?
10    A    Since I've been here?
11    Q    Yeah.
12    A    There was a board member, Dan Collins,
13 who -- who I think we've done that before with.
14    Q    Okay.  Tell me about what things that has
15 been done for with respect to Mr. Collins.
16    A    Well, he -- he used to put out I think a
17 monthly letter to some of the union people, and so
18 he had us do a signature stamp for him so he
19 could -- he'd tell us what he wanted to say in the
20 letter, and then we would stamp the letter and send
21 it with his signature applied in that manner.  There
22 were also other letters that we used that stamp for.

316

1     Q    But were any of those documents that his
2  stamp signature was affixed to documents that
3  purported to be from the board of directors as a
4  whole, what you've described as material that's sent
5  solely under his signature, as I understand it?
6     A    There were --
7     Q    Is that correct?  Is that correct?
8     A    Yeah.
9     Q    Okay.
10    A    I think there were other letters that we'd
11 send to Congress that we'd have all the board
12 members sign, and I think we'd used his stamp before
13 for those.
14    Q    Okay.  And you used his stamp for those,
15 but in the case of Governor Holton, it was you who
16 physically affixed his signature with your own
17 longhand?
18    A    No.  With Governor Holton, we would cut and
19 paste his signature.
20    Q    I see.  So when did that process start of
21 cutting and pasting his signature?
22    A    Well, I think it started -- you know, it

Case 1:06-cv-01538-GK Document 29-7 Filed 01/16/2007 Page 46 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

41 (Pages 317 to 320)

317

1   was sometime after he came on the board for his
2   signature.
3        Q   Okay.  Did you at any point apprise
4   Governor Holton that you were cutting and pasting
5   his signature as opposed to signing for him?
6        A   Yeah, I think we told him that.
7        Q   When?
8        A   When he would have us do it, we'd tell him
9   we'd apply his signature, and I believe we told him
10  we cut and paste it on there.
11       Q   Okay.  But is this something that you
12  talked about each time that it happened, or did he
13  say, why don't you just do it this way, or you came
14  up with this as a suggestion and -- how many times
15  did that happen?
16       A   Did it happen?  It happened --
17       Q   I'm sorry.  Let me withdraw all that.  How
18  many times did it happen that you had a conversation
19  with him about the fact that you were cutting and
20  pasting his signature in lieu of him signing the
21  document?
22       A   Well, we told him we'd -- you know, I'd say

318

1   probably two or three times.
2        Q   Okay.  When was the first time?
3        A   All I can say is it was sometime after he
4   came on the board.  You know, he came on the board
5   in June of 1998.
6        Q   Okay.  And --
7        A   I'm sorry.  He came on in September of
8   1998.
9        Q   Okay.  And so there would have been at
10  least the '99 Delaware real estate issue that would
11  have been put to resolution before our issue here --
12       A   Mm-hmm.
13       Q   -- and do you remember how it came to pass
14  that that resolution was signed by him in the sense
15  of you cut and paste his signature?
16       A   I don't remember the specifics on that --
17  that one.
18       Q   How about the specifics on the 2003 one?
19       A   I can't recall the specifics, how we did
20  his signature that time.  I'd have to look at it and
21  see.
22       Q   Well, I don't mean, sir, how you did the

319

1   signature.  I mean, if I'm understanding, you're
2   saying you didn't sign -- you didn't attempt to do a
3   facsimile of his signature or just sign his name and
4   put some notation that it was an authorized
5   signature.  This is what you did for Governor
6   Holton.  You cut and paste his signature, right?
7        A   With his permission.
8        Q   Understood.  But you cut and paste a
9   signature that he himself had made in person
10  vis-a-vis a piece of paper that was photocopied.
11  You would then cut and paste that photocopied
12  signature?
13       A   Right.
14       Q   And the question is, do you recall any of
15  the specifics of the conversation that you first had
16  with him as to, hey, why don't we do it this way,
17  meaning whether you said that, whether he said that,
18  whether someone else said that?
19           Do you recall anything about how it came to
20  pass that you apprised him or he apprised you of
21  this methodology and it was agreed that this would
22  be employed?

320

1        A   Well, as I recall, we talked about it since
2   he, you know, was not in Washington, was not in
3   Washington very often on business, did not have a
4   home fax machine.  You know, I told him that we can
5   apply your signature with your permission.
6        Q   You told him this?
7        A   Pardon me?
8        Q   You are remembering --
9        A   I said one of the options here is we can
10  apply your signature, you know, with your
11  permission.
12       Q   To what?  When did you have this
13  conversation, and what were you talking about when
14  this first came up?
15       A   Well, it was sometime -- you know, I can't
16  recall specifically.
17       Q   Can you recall anything?  That's kind of
18  what I'm getting to.
19       A   I can remember having a conversation with
20  him about it.
21       Q   Okay.  How long was it after he joined the
22  board, and was it in the context of a unanimous

321

1  consent resolution or a letter going to Congress or
2  something that needed to be signed but that wasn't
3  as official as a resolution?
4      A   I can't remember which --
5          MR. WELLSCHLAGER: Objection to the form of
6  the question. Go ahead.
7          THE WITNESS: I can't remember specifically
8  what it was, but I can remember generally having a
9  conversation with him about it.
10 BY MR. GOTTESDIENER:
11     Q   Okay. Tell me everything you can recall.
12 Understanding that you're not a tape recorder, tell
13 me everything you can recall about that
14 conversation: where you were, where he was, was
15 anyone else present, what time of year it was, how
16 it came up.
17     A   He and I were talking on the phone --
18     Q   Okay.
19     A   -- and we talked about getting some sort of
20 document signed and that we needed to do it in a
21 timely manner, and I told him, you know, one option
22 is we can apply your signature for you with your

322

1  permission. So he said, well, that's fine with me.
2      Q   What other options did you present him
3  with?
4      A   Well, the other options are that we have to
5  send him something that he receives and then he has
6  to sign and then he has to send back to us.
7      Q   That was considered not a good option?
8      A   Well, it's not one that could be done in an
9  expeditious manner.
10     Q   Because that would require overnight mail?
11     A   Overnight, but he preferred first class
12 mail.
13     Q   Is this something he stated to you?
14     A   He told us, you know, that he often
15 preferred us just to send him stuff -- just put
16 stuff in the mail to him.
17     Q   Okay. But please don't lose your own first
18 class point. You said he preferred first class
19 mail?
20     A   Right.
21     Q   Then I said did he tell you that, and then
22 we trailed off into he said put it in the mail?

323

1      A   He told me that.
2      Q   He told you what? I have a thing for first
3  class mail? Is this what he said to you?
4      A   He said he prefers first class mail.
5      Q   Over?
6      A   Over FedEx'g.
7      Q   Over FedEx'g or faxing?
8      A   FedEx'g.
9      Q   Okay. What about UPS, how did he feel
10 about that?
11     A   He considered UPS to be like same as FedEx.
12     Q   How did he feel about overnight U.S. Post
13 Office mail?
14     A   He considered that the same as FedEx'g
15 because of the cost of it.
16     Q   And your last clause, was this his stated
17 reason to you why he didn't want to receive
18 materials in this fashion was that it was too
19 costly?
20     A   Yes.
21     Q   And so he preferred just a regular first
22 class mailing to reduce costs to the corporation?

324

1      A   Yes.
2      Q   And what was his position as to faxing?
3      A   He was okay on faxing, but we couldn't fax
4  it to him at home.
5      Q   He was okay on it?
6      A   Mm-hmm.
7      Q   Well, you couldn't fax it to him at home
8  because he didn't have a fax in his home?
9      A   Right.
10     Q   Did he have a computer in his home?
11     A   He did not have a computer.
12     Q   But you faxed these materials to him on
13 this day; did you not?
14     A   We faxed them to his office.
15     Q   And where does he live in relation to his
16 office?
17     A   His office is in Richmond, and he lives in
18 Weems, Virginia.
19     Q   Weems being W-e-e-m-s?
20     A   Yes.
21     Q   And Weems, Virginia, is what distance from
22 Richmond?

VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

43 (Pages 325 to 328)

325

1    A    It's an hour or so from Richmond.
2    Q    And so how is it that he received these
3    materials that were faxed to his office in Richmond?
4    A    Well, as I recall, that was a day he was
5    going to be in the office, so he -- we faxed them to
6    the office where he looked at them.
7    Q    Okay. Now I'm required to ask you, like,
8    how did you know in advance -- because you haven't
9    told us about any phone call that you placed before
10   you faxed anything to him -- that he was going to be
11   in the office that day? You told us about him
12   calling you and saying it was okay, but have I
13   missed some earlier communication to him or from
14   him?
15   A    Well, I believe what happened was I talked
16   with his secretary, who usually knew his schedule
17   there in Richmond.
18   Q    Before or after you faxed something?
19   A    Before we faxed it.
20   Q    Okay. Who's his secretary?
21   A    Her name was Susan.
22   Q    Do you know her last name?

326

1    A    I forget her last name.
2    Q    Was she his secretary throughout the period
3    he was a director?
4    A    He's had, I believe, two secretaries.
5    Q    Susan and someone else?
6    A    Yeah.
7    Q    And you've spoken with both of them?
8    A    Yes.
9    Q    What's the name of the other secretary?
10   A    I forget the name of the other one now.
11   Q    But you believe it was Susan at the time?
12   A    Yes.
13   Q    And you called Susan to find out where he
14   was?
15   A    Yeah.
16   Q    Did you or did anyone else call any
17   director before, during, or after anything was faxed
18   to the director to find out where they were?
19   A    I believe what we did was we called their
20   offices to see if they were going to be in the
21   office and spoke with their secretaries.
22   Q    Before anything was sent?

327

1    A    Well, we faxed it and then we followed up
2    to make sure that they were going to be around and
3    would be able to get to it.
4    Q    Okay. I mean, we've gone over this, and
5    we're going to keep going over it. I asked you
6    yesterday and today, before something was sent who
7    was contacted and by whom, and if you don't
8    remember, just let me know.
9        I'm hearing Governor Holton's office
10   received a phone call before anything was faxed; is
11   that correct?
12   A    I think what we did was we called him,
13   called his office to see if he was going to be
14   there, and then we faxed it.
15   Q    Okay. Called his office; Susan picks up
16   the phone. What happens step by step? Hello,
17   Susan, this is John Carten. This is what I'm
18   looking for. What conversation did you have with
19   her?
20   A    You know, I asked her is Governor Holton
21   going to be in the office today.
22   Q    You didn't ask to speak with him?

328

1    A    No.
2    Q    Why not?
3    A    Because he's often busy and not able to
4    come to the phone.
5    Q    Did you speak with Ms. Serfaty before you
6    did this, to find out what she was doing about
7    talking to Governor Holton?
8    A    I don't recall if I spoke with her or not
9    before I called up his office.
10   Q    In fact, now that you think of it and now
11   that you're seeing this and now that you're
12   remembering more details than you had before we
13   started into this yesterday, you don't think that
14   Ms. Serfaty spoke with Governor Holton at all. You
15   found out where he was, you sent the fax, and he
16   just picked up the phone and told you it's okay with
17   him. Isn't that about it?
18       MR. WELLSCHLAGER: Objection to the form of
19   the question.
20       THE WITNESS: Repeat the question.
21   BY MR. GOTTESDIENER:
22   Q    Now that you have heard everything you've

**329**

1  heard out of your own mouth looking at the
2  documents, remembering the sequence of events, you
3  don't think, do you, that Ms. Serfaty actually did
4  speak with Governor Holton about this matter. You
5  found out where he was, you faxed the stuff to him
6  and, as you said yesterday, he was an informal guy,
7  and he picked up the phone, and he said, John, you
8  can go ahead. It's okay with me, right?
9       MR. WELLSCHLAGER: Objection to the form of
10  the question.
11      THE WITNESS: I think he called us back
12  with his okay.
13  BY MR. GOTTESDIENER:
14   Q   He called you back?
15   A   He called me back.
16   Q   He called you on your line and you picked
17  up, right?
18   A   Right.
19   Q   Okay. He didn't make any reference to I
20  spoke with Alicia or I spoke with the new corporate
21  secretary. He didn't say anything like that, did
22  he?

**330**

1   A   I don't recall if he did or not.
2   Q   So you're speaking with Susan to try to
3  find out if he's going to be in; is that right?
4   A   Correct.
5   Q   Now, what were you going to do if she said
6  he's not going to be in; he's in Weems? What were
7  you going to do?
8   A   Well, we'd do our best to, you know,
9  respond to that piece of information when we get it.
10   Q   Had that ever occurred before?
11   A   Yes.
12   Q   Tell me when and what you did about it.
13   A   Well, I can't give you a specific time, but
14  I know there's -- sometimes he's in the office and
15  sometimes he's not.
16   Q   And when he's not and you need action from
17  him, what do you do?
18   A   We try and get to him the best we can.
19   Q   What do you do specifically? What have you
20  ever done in that situation?
21   A   Well, I'd talk with Susan and see if she
22  has a phone number for him, see if I can get in

**331**

1  touch with him and see how we can handle the matter.
2   Q   Did you ever do that?
3   A   Yes.
4   Q   Okay. Give me an example of when you did
5  that and how did you get things to him, if that was
6  what was required, or on that occasion was that not
7  required and you just needed to talk to him?
8   A   Usually it was a matter of just talking
9  with him.
10   Q   Was that also in the context of any of
11  these resolutions that you've told us about?
12   A   No.
13   Q   And you say that because you're certain
14  that in the context of a resolution, he would have
15  been provided with something in written form before
16  his consent was solicited?
17   A   Correct.
18   Q   And is that in your mind a requirement for
19  a written consent to be valid, that it has to be
20  preceded by some writing and a proposal?
21   A   Not in my mind.
22   Q   Where? Where then if not in your mind --

**332**

1   A   Well --
2   Q   -- if at all? Your inflection caused me to
3  think that it's somewhere else, that your mind
4  doesn't have that, but you think it's somewhere
5  else, something in writing or something like that.
6   A   Ask me the question again.
7   Q   Do you believe in your own system of
8  beliefs or in any written form in someone else's
9  system of beliefs or in law or in regulation that it
10  is a requirement that prior to a consent to a
11  resolution to be valid, it has to be preceded by
12  written matter, written materials being provided to
13  the decision-maker in advance of their consent?
14   A   Do I think that's necessary?
15   Q   Yes.
16      MR. WELLSCHLAGER: Objection to the extent
17  it seeks a legal conclusion, but you can answer as
18  to your own understanding.
19  BY MR. GOTTESDIENER:
20   Q   I'm asking you as an assistant corporate
21  secretary approved by the board of directors of
22  Amtrak who's been functioning for 12 years in that

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 50 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

45 (Pages 333 to 336)

333
1 position and as director of board liaison. I'm not
2 asking a legal opinion.
3 A I don't know.
4 Q You don't know?
5 A I can't say for sure.
6 Q How about for a reasonable degree of
7 certainty, can you say?
8 MR. WELLSCHLAGER: Same objection.
9 THE WITNESS: I can't say for sure.
10 BY MR. GOTTESDIENER:
11 Q Can you say one way or another which way
12 you would lean? Well, it's probably not required,
13 or 51/49 probably is required?
14 A No.
15 MR. WELLSCHLAGER: Same objection.
16 BY MR. GOTTESDIENER:
17 Q You can't? It's just in complete
18 equipoise?
19 MR. WELLSCHLAGER: Objection.
20 BY MR. GOTTESDIENER:
21 Q Right?
22 A I don't know.

334
1 Q You don't know. You've never thought about
2 it before; is that fair?
3 A I can't say I've never thought about it.
4 Q Okay. When you've thought about it before,
5 what did you think?
6 A I'm not sure I came to a conclusion.
7 Q When have you thought about it before?
8 A I don't know.
9 Q How many times have you thought about it
10 before?
11 A I don't know. Several times.
12 Q Have you discussed it with anyone before
13 during these several times that you've thought about
14 it?
15 A Okay. Give me the question again.
16 Q What did Susan tell you, when you spoke
17 with Susan, as to Governor Holton's plans or
18 whereabouts?
19 A She said he was going to be in the office
20 that day.
21 Q But that he wasn't there right then?
22 A Well, I said, you know, is he in the office

335
1 because we have something we want to fax to him, so
2 she said yes, and so we went ahead and faxed it.
3 Q Okay. And it was not until some hours
4 later that you received a call from him?
5 A Yes.
6 Q And how did it go with Dukakis? Did you
7 make some call first before faxing?
8 A I think we went ahead and faxed and just
9 called to make sure he was in the office.
10 Q Okay. And did you do that because -- now,
11 did you fax his materials or did Sharron Hawkins fax
12 his material?
13 A I don't recall which one of us it was.
14 Q So you can't say as to any of these six who
15 faxed what?
16 A I can't say for certain whether it was her
17 or whether it was me.
18 Q As to any of the six, right?
19 A Correct.
20 Q And you can't say in what order they were
21 faxed, right?
22 A Correct.

336
1 Q And you can't say how it was determined --
2 no. Withdrawn.
3 You can't say -- you can't tell us at what
4 time the faxing began and what time the faxing
5 ended?
6 A I can't say with certainty.
7 Q How about generally?
8 A Well, I think we did the faxing first thing
9 in the morning.
10 Q But over what period of time? You said
11 something about being interrupted.
12 A I think we did it, you know, starting
13 somewhere around 8:30 in the morning.
14 Q And when was the last fax concluded?
15 A Probably within a half an hour.
16 Q And did -- are you aware of any notes that
17 Ms. Serfaty has of any of her conversations with any
18 of these directors?
19 A I'm not aware of any.
20 Q Did you make any notes?
21 A I don't believe that I did.
22 Q Did you in any way memorialize anything

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 51 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

46 (Pages 337 to 340)

337

1  that you were told by Governor Dukakis, if you had
2  this conversation with him, and Governor Holton?
3  A  I'm not aware of anything right now.
4  Q  Have you looked?
5  A  I don't recall seeing anything in the
6  folder.
7  Q  Have you looked?
8  A  I have looked.
9  Q  Specifically for any writings of yours from
10 September 14, 2001?
11 A  Yes.
12 Q  Where have you looked?
13 A  I looked in that VERP folder that I told
14 you about these were in.
15 Q  Okay.  That's the chron. folder?
16 A  Yes.
17 Q  Okay.  And that's where the faxes were in,
18 right?
19 A  Yes.
20 Q  Okay.  And you didn't see anything in
21 there?
22 A  No.

338

1  Q  But the tab where you wrote something, that
2  we don't have a copy of.  That's still there where
3  you wrote VERP?
4  A  Right.
5  Q  And it says what else besides VERP?
6  A  It says VERP and it gives the date.
7  Q  Okay.  Now, did there ever come a time
8  where you didn't cut and paste Governor Holton's
9  signature but you affixed it in some other fashion?
10 A  No, I think -- I think we always cut and
11 paste it.
12 Q  Have you ever signed for any other director
13 in longhand?
14 A  I don't believe I have.
15 Q  Are you aware of anyone else who's ever
16 signed for any other director in long hand?
17 A  No, not that I can think of.
18 (Deposition Exhibit Number 12 was
19 marked for identification and was retained by
20 counsel.)
21 BY MR. GOTTESDIENER:
22 Q  Could you please identify Exhibit 12 for

339

1  us, please?
2  MR. WELLSCHLAGER:  Eli --
3  MR. GOTTESDIENER:  Yeah.
4  MR. WELLSCHLAGER:  -- before we get into
5  any new areas, I just wanted to raise the issue of a
6  break.  We've been going an hour and a half or an
7  hour and 35, and Ms. Oliveri's going to be here at
8  2:00 and I --
9  MR. GOTTESDIENER:  Well, I told her to be
10 ready at 2:00.
11 MR. WELLSCHLAGER:  She's going to be ready
12 at 2:00, and there's the issue of lunch, which I'd
13 like to take before 2:00.
14 MR. GOTTESDIENER:  That's great.  We'll do
15 that if we could just get this identified and ask a
16 couple quick questions.
17 MR. WELLSCHLAGER:  Okay.
18 BY MR. GOTTESDIENER:
19 Q  Can you tell us what this is, please?
20 A  This is the resolution, and it has
21 executive summary behind it and it has the signature
22 pages for each of the board members.

340

1  Q  This document starting with AMT 7270.  You
2  didn't prepare this 7270 document, did you?
3  A  No.
4  Q  Do you know who prepared that?
5  A  I don't.
6  Q  Do you know where these documents were when
7  they were pulled and copied in this fashion and put
8  together?
9  A  Where they were?
10 Q  Yeah, where were they?
11 A  They were in that VERP folder.
12 Q  This was in --
13 A  Okay.  I'm sorry.  I'm sorry.  These were
14 in my -- in the resolution book.
15 Q  This was in the resolution book?
16 A  Yes.
17 Q  And where in the resolution book were they?
18 A  They were filed under a tab that says
19 September 14, 2001.
20 Q  And is the tab copied here anywhere?
21 A  No, it's not.
22 Q  So this is another tab we don't have?

Case 1:06-cv-01539-GK Document 20-7 Filed 04/16/2007 Page 52 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER RUMP
CONDUCTED ON TUESDAY, APRIL 13, 2004

47 (Pages 341 to 344)

341

1    A   Correct.
2    Q   And how is the tab created? Is it --
3        MR. WELLSCHLAGER: Well, objection. That's
4    an untrue statement. You have a resolution binder
5    that's been produced with the tabs copied, as I
6    understand it. I don't have it in front of me
7    but --
8        MR. GOTTESDIENER: Like two days ago.
9    BY MR. GOTTESDIENER:
10   Q   It's not produced with these documents,
11   correct?
12   A   Correct.
13   Q   The -- how did this "Adopted September
14   14th" on the second page get there?
15   A   How did it get there?
16   Q   Yeah.
17   A   I typed it there.
18   Q   Well, did you type it by going in and
19   taking -- would you copy and create a new document
20   after you've had the resolutions document and then
21   take out the "approved" and the "board member" line
22   and the date and then type that in --

342

1    A   Yes.
2    Q   -- and then print that out?
3    A   Yes.
4    Q   So I just described the mechanical way you
5    did that?
6    A   Yes.
7    Q   And you waited to do that until actually
8    getting some notification that it had been approved?
9    A   Yes.
10   Q   Okay. And the -- so to look at 7276, this
11   says Linwood Holton on it if one reads the longhand,
12   correct?
13   A   Right.
14   Q   And it has September 14, 2001, right?
15   A   Right.
16   Q   But actually that signature by Linwood
17   Holton was not affixed there by him on September 14,
18   2001, right?
19   A   I put the signature there.
20   Q   It was not affixed by Linwood Holton on
21   September 14, 2001, right?
22   A   That's correct.

343

1    Q   And he also did not write those words that
2    appear here, "Linwood Holton," on September 14,
3    2001?
4    A   Correct.
5    Q   And it's your testimony that this --
6    withdrawn.
7        It's your testimony that there's more than
8    one instance where one would find that Mr. Holton's
9    purported approval has been memorialized in just the
10   fashion that is represented here on 7276, with a
11   cut-and-paste version of his signature?
12   A   Yes.
13   Q   Did you ever obtain authorization from the
14   corporate secretary to proceed in that fashion?
15   A   Yes.
16   Q   From which corporate secretary and when?
17   A   I'm trying to think when first would have
18   been.
19   Q   You've been pausing now for --
20   A   Well --
21   Q   -- quite some time. I'd estimate a good 30
22   seconds.

344

1    A   Mm-hmm.
2    Q   Is that a yes? Is that a fair estimate?
3    A   Something like that.
4        MR. WELLSCHLAGER: Objection. We have a
5    vide -- we have a videotape right here.
6        MR. GOTTESDIENER: Well, you know, not
7    everyone's going to pull out the videotape. We have
8    a transcript.
9    BY MR. GOTTESDIENER:
10   Q   Is that a fair estimation of how long you
11   were pausing and thinking, 30 seconds?
12   A   Something like that.
13   Q   Now tell me, would this have come up at any
14   other time than the time you were telling us about
15   with Governor Holton when you suggested this option?
16       MR. WELLSCHLAGER: Hold on. Has he
17   answered the previous question, or are you
18   withdrawing it?
19   BY MR. GOTTESDIENER:
20   Q   No. No. I'm trying to help him answer it.
21   Have you given us an answer? You still don't know,
22   right?

48 (Pages 345 to 348)

345

1    A    Well, I'm trying to -- I'm having trouble
2  remembering exactly when it was the first time.
3    Q    Right, and I'm just -- I'm just -- if I
4  can, I'm just offering this as an attempted
5  refreshment of your recollection, which is wouldn't
6  it have been the time you were telling us that
7  Mr. Holton was given by you the option of doing the
8  cut-and-paste thing, authorizing that, that you
9  would have been interested in seeking, if you were,
10 approval of this methodology by someone higher up?
11 Just a suggestion.
12   A    Okay.  Well, it -- you know, we may have
13 had a conversation about it, say, back in 1999.
14   Q    We being who?
15   A    Me and the corporate secretary.
16   Q    And in '99 was it Simonson?
17   A    Simonson, yeah.
18   Q    And --
19   A    And then, you know --
20   Q    But why '99?  Why is that --
21   A    Well, I'm thinking -- thinking about
22 because we did the real estate transaction up in

346

1  Wilmington, so we probably would have discussed it
2  at that time.  I probably had discussions like this
3  with some of the other corporate secretaries as
4  well.
5    Q    Why do you say that though?  I mean, I've
6  heard about Governor Holton, but I thought you
7  weren't --
8    A    Well, we --
9    Q    -- you weren't able to tell us who else did
10 this?
11   A    Well, we also applied the signature for Dan
12 Collins from time to time.
13   Q    But I didn't think that that was in the
14 context of board action.  I thought that was for
15 individual action as an individual board member.  I
16 thought we --
17   A    You know, it's -- we may well have done it
18 on a board action as well for him.  I just can't
19 remember.
20   Q    But you're certainly not sitting here
21 remembering any -- what years did he serve?  I'm
22 sorry.

347

1    A    He served from 1993 until about 1998.
2    Q    But you didn't tell us about anything --
3    A    I can't recall one specifically during his
4  time, but that was a long time ago.
5    Q    But -- I'm sorry.  But you seem to be
6  indicating that you think that you talked to other
7  corporate secretaries about that, and I'm just
8  asking you why you would --
9    A    And I think I may have.
10   Q    Right.  But based on the dates that you've
11 given us of the only resolution -- unanimous written
12 consent resolutions that you can think of, I'm not
13 sure I understand why you think you spoke to anyone
14 about this.
15   A    Well, those are the only specific ones I
16 can think of.
17   Q    So you're speculating that you may have
18 spoken to other corporate secretaries other than
19 Stewart Simonson about this?
20   A    Yes.
21   Q    As to Mr. Simonson, are you speculating, or
22 do you have a present recollection that you had a

348

1  conversation and received approval from him to
2  proceed in this fashion?
3    A    I'm speculating.
4    Q    Anyone else that you may have actually had
5  a conversation that you have a present recollection
6  receiving authorization from?
7    A    I can't think of a specific conversation I
8  had with him about that.
9           MR. GOTTESDIENER:  If you want to break
10 here, that's fine.
11          MR. WELLSCHLAGER:  Okay.
12          MR. GOTTESDIENER:  So you want how much
13 time?  I mean, at least a half hour.
14          MR. WELLSCHLAGER:  Joan wants at least half
15 an hour.
16          THE VIDEOGRAPHER:  This marks the end of
17 Tape 2 in the deposition of Mr. Carten.  We're going
18 off the record.  The time is 1:14 p.m.
19          (Whereupon, at 1:14 p.m., the
20 above-entitled matter was recessed until 1:59 p.m.)
21          THE VIDEOGRAPHER:  This marks the beginning
22 of Tape 3 in the deposition of Mr. Carten.  We are

Case 1:06-cv-01590-GK Document 20-7 Filed 01/16/2007 Page 54 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME II
CONDUCTED ON TUESDAY, APRIL 13, 2004

49 (Pages 349 to 352)

349

1 back on the record. The time is 1:59 p.m.
2 CONTINUED EXAMINATION BY COUNSEL FOR PLAINTIFFS
3 BY MR. GOTTESDIENER:
4 Q Mr. Carten, when you got that call from
5 Governor Holton later in the day, you hadn't been in
6 contact with either him or his secretary between the
7 time you chatted with her and when you finally heard
8 from him, right?
9 A I don't believe so.
10 Q So she had told you that he was expected in
11 the office that day?
12 A He was in the office that day.
13 Q She said that he was in the office?
14 A Mm-hmm.
15 Q But you didn't ask to speak with him at
16 that time?
17 A No.
18 Q And you said to her that you were going to
19 send or you hadn't yet sent the fax?
20 A I think we were getting ready to send the
21 faxes.
22 Q Okay. And so you informed her that a fax

350

1 would be coming, right?
2 A Yes. Yes.
3 Q Okay. But when you spoke with him, you
4 don't know where he was calling you from?
5 A No.
6 Q And you don't know for a fact what it was
7 that he looked at, if anything, of what it was that
8 you had sent him?
9 A Well, he indicated he'd looked at the
10 materials and he was okay with them.
11 Q He indicated that?
12 A Mm-hmm.
13 Q How did he indicate that?
14 A He said, you know, something to the effect
15 that I'm okay with this resolution.
16 Q Did he say anything else?
17 A And he said, you know -- you know, I think
18 I said, you know, can I apply your signature to it,
19 and he said sure, that's fine.
20 Q Anything else that he said to you; you said
21 to him?
22 A I don't recall anything else.

351

1 Q So right there we have the sum total of
2 what that conversation was?
3 A Yes.
4 Q Okay. Have you spoken with him or are you
5 aware of anyone on Amtrak's behalf having spoken
6 with him since that day about this issue, his
7 authorization on this resolution?
8 A No.
9 Q And to this day, he has not personally
10 physically signed that resolution or a resolution
11 that states what that resolution states?
12 A Correct.
13 Q Nor did he send back, nor was he asked to
14 send back to verify that he reviewed all those
15 materials that were provided to him, initialed pages
16 of what had been faxed to him?
17 A No.
18 Q Meaning that didn't occur?
19 A Correct.
20 Q And would you just take a moment to what we
21 call in the business authenticate the Exhibits 4 --
22 putting the microfilm exhibits aside for a second,

352

1 No. 12 and No. 4, could you just verify that what
2 you have in front of you, apart from the first page
3 which you indicate is not a creation of yourself,
4 that those other pages are a true and accurate copy
5 of what it is that -- with respect to Exhibit 4 you
6 have now in your folder, your chron. folder in your
7 office, and with respect to 12, if you'd flip
8 through that, that that is a true and accurate copy
9 of what is in the resolution binder with respect to
10 September 14, 2001?
11 A Yes.
12 Q As to both?
13 A Yes.
14 MR. GOTTESDIENER: Did you have something,
15 John?
16 MR. WELLSCHLAGER: Well, I just thought as
17 framed the question was a little bit too compound to
18 be fair.
19 MR. GOTTESDIENER: Well --
20 MR. WELLSCHLAGER: I would have preferred
21 that he took them one by one.
22 MR. GOTTESDIENER: Well, you didn't object

CONDUCTED ON TUESDAY, APRIL 13, 2004

50 (Pages 353 to 356)

353

1   in a timely fashion and to do it -- I don't have any
2   problem doing it. It's just I'm trying to save
3   time.
4          MR. WELLSCHLAGER: I understand. Let's
5   move on. It's not a big enough issue.
6          MR. GOTTESDIENER: So you don't have a
7   dispute as to the authenticity as to those two
8   records as described?
9          MR. WELLSCHLAGER: Now you're asking for a
10  representation from me on the record. Can I hear
11  the question again?
12         MR. GOTTESDIENER: I'm asking do you have
13  any issue as to --
14         MR. WELLSCHLAGER: I know, but I've got to
15  hear it as you -- you said "as described."
16         MR. GOTTESDIENER: Well then, we're just
17  wasting time because then I just might as well go
18  and start -- do it all over again.
19  BY MR. GOTTESDIENER:
20     Q    Take No. 4 please. Putting aside the first
21  page of Exhibit No. 4, are the pages that you see
22  there true and accurate Xerox copies of what it is

354

1   that you have in your folder in the chron. file in
2   your office? Can you answer that?
3     A    Yes.
4     Q    Are they also true and accurate copies of
5   the documents that you prepared and faxed to the
6   three recipients indicated on the fax cover sheet or
7   that you caused your secretary to fax?
8     A    Yes.
9     Q    Are the attachments to the fax true and
10  accurate copies of the documents that you told us
11  that Ms. Serfaty handed you to fax?
12    A    Yes.
13    Q    As to No. 12, putting aside the first page
14  of No. 12, can you confirm that the pages there are
15  true and accurate copies of documents that are found
16  in the resolution binder that encompasses the date
17  September 14, 2001?
18    A    Yes.
19    Q    Who put the documents in the resolution
20  binder and when, that are in No. 12?
21    A    In No. 12?
22    Q    Yeah.

355

1     A    I put them there.
2     Q    When?
3     A    I think it was that same day.
4     Q    And are those documents anywhere else other
5   than the resolution binder?
6     A    These signed resolutions? These documents
7   here?
8     Q    The resolution as you retyped it -- that's
9   the second page, right?
10    A    Mm-hmm.
11    Q    -- that's not signed by anyone. That's
12  essentially your creation, correct?
13    A    Correct.
14    Q    Then subsequent to that there are six
15  resolutions that bear a signature in one case, a
16  cut-and-paste signature, in the other cases
17  facsimiled signatures, correct?
18    A    Yes.
19    Q    Are those originals of what was received by
20  Amtrak in the resolution binder?
21    A    Yes.
22    Q    And those are true and accurate Xerox

356

1   copies of those, quote, originals?
2     A    Yes.
3     Q    And just so we're on the same page, I used
4   the word "quote" around originals because they're
5   facsimiled in all cases other than the cut-and-paste
6   Governor Holton resolution; is that correct?
7     A    Correct.
8     Q    Are any of the -- did you ever receive the
9   original signatures of any of the directors?
10    A    The original signatures?
11    Q    Yeah. The original signed resolutions, not
12  facsimiled?
13    A    No, I did not.
14    Q    Did you seek the original signed
15  resolutions from anyone?
16    A    I did not seek them.
17    Q    Did anyone offer to send their original
18  signed resolution to you?
19    A    I don't think anyone offered to send it.
20    Q    Are photocopies of the documents contained
21  in Exhibit 12, putting aside the first page, are
22  they collected in any other location in your office

357

1  or in the storage room or in the board room, those
2  six signed resolutions?
3  **A    I think that's the only place, is in the**
4  **resolution book.**
5      Q    And just to recap because some of this
6  escapes my recollection, the resolution book for
7  that time period covering 2001 is currently in your
8  office, or is it in the storage room?
9  **A    In my office.**
10     Q    And there is one or more than one copy of
11 the resolution book?
12 **A    There's one copy of it.**
13     Q    And is there an electronic copy of the
14 resolution book anywhere?  Before -- let me just
15 specify.  Before this litigation and somebody may
16 have made photocopies and scanned and so forth,
17 before this litigation, outside of this litigation,
18 are you aware of any electronic copy in any format
19 of the resolution book?
20 **A    Of the resolution book?**
21     Q    Yeah.
22 **A    I don't believe so.**

358

1      MR. WELLSCHLAGER:  I'm sorry.  I didn't
2  hear the answer.
3      THE WITNESS:  No.
4  BY MR. GOTTESDIENER:
5      Q    And just, again, why is that in your office
6  as opposed to the storage room?
7  **A    Well, the recent ones are in my office**
8  **because we tend to refer to some of these actions**
9  **that the board takes, first of all, to look up and**
10 **see what they approved; and, secondly, look up, see**
11 **the format that's been used for a particular type of**
12 **agreement or action.**
13     Q    And this being September 2001 is considered
14 relatively recent?
15 **A    Right.**
16     Q    Is there any place, not being facetious
17 here, where it's more or less formally designated
18 where official corporate records are supposed to be
19 kept and how they are supposed to be kept?  Meaning,
20 is there something official or that you consider
21 official that tells the corporate secretary and the
22 corporate secretary's assistant or assistants where

359

1  things are supposed to be kept?
2  **A    Not that I'm aware of.**
3      Q    Is there sort of a common practice
4  understood as to where official things are supposed
5  to be kept or not?
6  **A    Well, official things are -- the practice**
7  **is to keep them either up in the storage room or**
8  **down in my office.**
9      Q    And the practice of keeping a separate
10 resolutions binder, I thought you said, has its
11 antecedence or originance before 1992?  When you
12 arrived, there were already resolution --
13 **A    Yes.**
14     Q    -- binders?
15 **A    Yes.**
16     Q    And do you know when that practice began?
17 **A    I think it began with the beginning of the**
18 **corporation.**
19     Q    And the minutes, obviously, go back that
20 far as well?
21 **A    Yes.**
22     Q    Now, is a copy of anything in 12 contained

360

1  in any book of official minutes of the board?
2  **A    No.**
3      Q    So the resolution and the individual signed
4  consents or what -- well, they don't even purport to
5  be consents, but the documents that are signed that
6  say resolutions, those are not in the minutes, nor
7  is the document that you prepared that says adopted
8  September 14, 2001, those are not contained in any
9  of the official minutes of the board?
10 **A    Correct.**
11     Q    The -- if you'd just take a moment, the --
12 if you look at the third and subsequent pages that
13 have signatures on them -- this is of Exhibit 12.
14 **A    Okay.**
15     Q    -- is there any place on that where the
16 signer consents to acting without a meeting of the
17 board of directors?
18     MR. WELLSCHLAGER:  On the signed pages, is
19 that what you're saying?
20     MR. GOTTESDIENER:  Yes.
21     THE WITNESS:  No.
22 BY MR. GOTTESDIENER:

361
1    Q    Does there appear anywhere on that page the
2    word "consent"?
3    A    No.
4    Q    Has there ever been any consideration given
5    by anyone at Amtrak to drafting proposed resolutions
6    submitted to directors in connection with seeking
7    unanimous written consent to proceed without a
8    meeting and to act as stated in the resolutions to
9    using the word "consent" or spelling out that the
10   director in question agrees that the board can act
11   without actually having a meeting?
12   **A    Not that I'm aware of.**
13   Q    Have you ever thought about that prior to
14   me putting that question to you?
15   **A    No.**
16   Q    How does your job performance get
17   monitored, if it does, by the corporate secretary?
18   **A    We have -- Amtrak has annual evaluations,**
19   **and in addition to that, the corporate secretary**
20   **will, you know, make comments to me from time to**
21   **time about things.**
22   Q    Have you ever received any criticism from

362
1    any corporate secretary as to the method or
2    timeliness or fashion in which you perform any
3    aspect of your job?
4    **A    I wouldn't say "criticism."**
5    Q    Would you say helpful suggestions as to how
6    to better your performance?
7    **A    I can't -- can't think of any right**
8    **offhand.**
9    Q    Forgive me if I seem to sense that you were
10   thinking of something where someone said something
11   that was maybe less than a hundred percent glowing.
12   Am I mistaken?
13   **A    Well, nothing comes to my mind.**
14   Q    So you weren't thinking about anything?
15   **A    No.**
16   Q    Okay.  Now, the condition of your office,
17   would you describe it as being very neat and
18   orderly, or would you describe it as being something
19   other than very neat and orderly?
20   **A    I would describe it as -- I never thought**
21   **how I'd describe my office, but I'd say it's**
22   **organized.**

363
1    Q    Has anyone ever criticized or joked about
2    the condition of your office?
3    **A    Not that I can recall.**
4    Q    Has anyone ever commented in a jocular
5    fashion as to the hazard that might be created by
6    all the papers lying around and the inquiries that
7    may be made by a fire marshal?
8    **A    No.**
9    Q    You're sure of that?
10   **A    Yes.**
11   Q    And you're sure you've never received any
12   comments from anyone about piles of paper in various
13   locations of your office appearing to be
14   unorganized?
15   **A    No.**
16       MR. WELLSCHLAGER:  No, you're not sure
17   or --
18       THE WITNESS:  I haven't received any
19   comments like that.
20   BY MR. GOTTESDIENER:
21   Q    But -- and you're sure of that?
22   **A    Mm-hmm.**

364
1    Q    Mm-hmm means yes.  You have to say yes for
2    her, though she's very good at writing mm-hmm too.
3    If you would just hand me those documents --
4    **A    Right here?**
5    Q    -- right there, yes.  Thank you.  If you
6    would take a look at these documents that I think
7    you'll acknowledge you had some ability to look at
8    in time before we went on the record.  These are
9    Exhibits 6, this first one pertaining to president's
10   report to the board of directors; seven, pertaining
11   to board of directors' record of meetings; eight,
12   president's records; nine, committee minutes; ten,
13   minutes of the meeting of the board of directors.
14       (Deposition Exhibits Numbers 6 through
15   11 were marked for identification and were retained
16   by counsel.)
17   BY MR. GOTTESDIENER:
18   Q    Have you ever seen those documents or
19   documents that appear substantially identical to
20   those documents?  Recognizing that you can note at
21   the bottom of each document that it appears to have
22   the date of March of this year, March 25th, when

365

1  they were printed out from some source in some
2  location.
3      With that in mind, have you ever seen
4  documents that are substantially identical to the
5  ones in front of you?
6  A  The only one I haven't seen is this
7  president's records.
8  Q  The other ones you have seen --
9  A  Yeah.
10  Q  -- substantially identical --
11  A  Yeah.
12  Q  -- versions of?
13  A  Yeah.
14  Q  And in what context have you seen those
15  documents?
16  A  Well, as an inventory of the information
17  that we have on microfilm.
18  Q  But if you could be more descriptive, it
19  would be helpful to tell us what work if any you've
20  done with those kinds of documents when you see
21  them.
22      Are you trying to pull records? Are you

366

1  trying to do some analysis of what's there and --
2  A  It's usually pulling records.
3  Q  That are sought for what kinds of purposes?
4  A  Sought in connection with things the board
5  has done in the past.
6  Q  And do you pull them, or do you direct
7  Ms. Hawkins or some other person to pull them in
8  those circumstances?
9  A  I direct Ms. Hawkins or someone else to
10  pull the records.
11  Q  And prior to that, would a common scenario
12  be she bring you or you access your own copy of
13  those -- those indices?
14  A  Yes.
15  Q  And how does that occur? Do you have
16  access to wherever it is that those are online or on
17  computer, for want of a better term?
18  A  Well, for the microfilm index, we'll pull
19  the appropriate tape for the meeting that's in
20  question and then get somebody to print out what's
21  needed from the -- from the particular tape.
22  Q  That's helpful. You're a step ahead of me.

367

1  I'm just asking how do you actually access that
2  document, the index itself? Do you have a set of
3  them in your office? Do you ask Ms. Hawkins to get
4  them for you? Do you go to a computer and go to
5  some drive somewhere?
6  A  I typically go up to the fourth floor
7  storage room and look at our list up there.
8  Q  And is there someone tasked with keeping
9  the list up there as current as it is anywhere else?
10  A  Yes. Well, we -- that's the most current
11  list is up there. That's where we keep it.
12  Q  But it derives from something that's on a
13  computer. Is that not correct?
14  A  Yes.
15  Q  And who maintains that?
16  A  I believe it's our AT people keep the list
17  on their computer.
18  Q  Before the break there was some discussion
19  in the room about records management and a Patricia
20  Lusk.
21  A  Mm-hmm.
22  Q  Did you hear any of that?

368

1  A  Yeah, she's the person I would go to.
2  Q  But is she in the AT department?
3  A  She's in AT.
4  Q  She is in AT?
5  A  Yes.
6  Q  What's the relation between AT and records
7  management?
8  A  Well, she supports the records management
9  people on data inquiries and things like --
10  information that they need that may be -- that may
11  be microfilmed or may need to be.
12  Q  So you go to her for what purpose then?
13  A  If -- if, for instance, we have certain
14  information that we need to access on microfilm, we
15  will take a tape, identify which tape it is, and
16  then we'll talk with her about, you know, what's the
17  best place to look at this on the machine, microfilm
18  machine.
19  Q  And where's her office?
20  A  Her office is over at 10 G Street.
21  Q  And who is Ruby and what does she do?
22  A  Ruby?

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 59 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTIER JUMP, 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

54 (Pages 369 to 372)

369

1   Q  Ruby, yeah.

2   A  I don't know Ruby.

3   Q  No? Did you ever work with a Laura Howell

4 on matters relating to documents for the board or

5 for the corporation?

6   A  Not directly.

7   Q  How about indirectly?

8   A  Well, Patricia Lusk used to work for Laura

9 Howell, so, you know, any matters that we had, Laura

10 would always refer us to Patricia.

11   Q  Bill Herman, do you work with him on any

12 sort of routine basis, or did you back in 2001 with

13 respect to any matter at all?

14   A  I work with Bill Herman on a variety of

15 things.

16   Q  Tell us what things you've worked with him

17 on.

18   A  Well, it's --

19      MR. WELLSCHLAGER: Without divulging

20 attorney-client communications, just the nature of

21 the things you did with him.

22      THE WITNESS: Okay. Personnel actions that

370

1 are coming before the board.

2 BY MR. GOTTESDIENER:

3   Q  Anything else?

4   A  Some budget matters.

5   Q  Anything else?

6   A  I think that's about it.

7   Q  Any litigations, lawsuits, ever deal with

8 him on any of those?

9   A  I don't believe I've dealt with him.

10   Q  Anyone in the law department you've dealt

11 with on lawsuits other than this one?

12   A  I've dealt with other people in the law

13 department on lawsuits.

14   Q  What lawsuits and what people?

15   A  Let's see. There's high speed train set.

16   Q  Who did you deal with on that?

17   A  Met with -- with Donna -- with Donna -- her

18 name -- last name escapes me.

19      MR. McILWAIN: McCafferty?

20      THE WITNESS: McCafferty. McCafferty.

21 Let's see. Electrification and --

22 BY MR. GOTTESDIENER:

371

1   Q  Who have you dealt with in that case?

2   A  Let's see. I'm trying to remember who it

3 was on electrification. Might have been Larry

4 Steffas.

5   Q  And he is in the law department?

6   A  Yeah.

7   Q  In what section of the law department? Do

8 you know?

9   A  He's in -- I guess it's corporate.

10   Q  How about outside law firms, have you ever

11 dealt with the law firm of Piper Rudnick prior to

12 this case?

13   A  I don't -- that name doesn't ring a bell.

14   Q  It's had a lot of different iterations.

15 Piper Marbury Rudnick -- I don't know.

16      MR. GOTTESDIENER: What's the other?

17 Rudnick Wolf --

18      MR. WELLSCHLAGER: Piper Marbury Rudnick &

19 Wolf.

20      MR. GOTTESDIENER: Yeah, but even before

21 that. That was --

22      MR. WELLSCHLAGER: Before that it was Piper

372

1 and Marbury.

2      MR. GOTTESDIENER: Piper and Marbury, but

3 wasn't Rudnick and Wolf running around somewhere?

4      MR. WELLSCHLAGER: That was a Chicago firm.

5 BY MR. GOTTESDIENER:

6   Q  Oh. So none of these names are bringing

7 back --

8   A  They don't ring a bell with me.

9   Q  Okay. So any -- you talked about I guess

10 it would be Mr. Gun's penchant for cleanliness?

11   A  Cleaning up.

12   Q  Cleaning up. Was there any cleaning up

13 that led you to want to explore doing microfiching

14 or somehow reducing to electronic form documents

15 that are now kept in hard copy or some other form in

16 the recent past?

17   A  Repeat that question.

18   Q  I don't think I possibly could. I'll ask

19 it again.

20   A  Okay.

21   Q  You mentioned that Mr. Gun likes to have

22 things cleaned up --

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 60 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTER, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

55 (Pages 373 to 376)

373
1   A   Mm-hmm.
2   Q   -- and that you participated in a recent
3   cleaning-up job.
4   A   Mm-hmm.
5   Q   Did you recently, in the past few years
6   say, do anything to update the materials that are on
7   microfilm to take materials that are in hard copy
8   form or in other forms and have them put on
9   microfilm or put in some other fashion in an
10  electronic format via scanning or anything like
11  that?
12  A   Well, I've got some ready that are ready to
13  go right now.
14  Q   Oh. How did that come about and what
15  materials are there?
16  A   Well, it's some record of meeting
17  materials --
18  Q   Okay.
19  A   -- and some board minutes.
20  Q   Okay. And so these are both going to be
21  things that are in binders now?
22  A   They're in binders now, right.

374
1   Q   Right. And they're -- these are official
2   minutes and record of meeting binders?
3   A   Right.
4   Q   And you're going to do what with them and
5   why?
6   A   Well, we're going to get them microfiched.
7   Q   Why?
8   A   So that we can continue with our record
9   here and make it more current.
10  Q   But why? I mean, why is that a good thing?
11  A   Well, it's been our practice to microfilm
12  the materials that we have and then some of those
13  materials, once they get microfilmed, the record of
14  meeting books, you know, we may well send to storage
15  to make room for future materials.
16  Q   And do you have any familiarity with modern
17  storage via electronic reproduction? Do you keep
18  current on any of those issues?
19  A   Well, I know there's always improvements in
20  those areas. So before doing it, you know, we'll
21  talk with the records management people about what
22  we're doing and make sure that, you know, it's still

375
1   the recommended way to do it.
2   Q   And has anyone indicated to you directly or
3   indirectly why they are using what some might
4   consider an outmoded technique of microfilming as
5   opposed to something that might have a flashier
6   title like scanning or something like that?
7   A   No.
8   Q   Do you know on your own, like, why they're
9   still microfilming?
10  A   No.
11  Q   Do you know -- withdrawn.
12      Have you ever seen anyone or you yourself
13  taken a microfilm and attempted to view it or print
14  out from it?
15  A   Yes.
16  Q   And is it something you yourself have done
17  or something that you've seen other people do or
18  both?
19  A   Both.
20  Q   And do you have a machine for that purpose
21  close to your office or in your office?
22  A   There's a machine in the law department

376
1   that's used for it.
2   Q   And how old is this machine?
3   A   I don't know. Several years.
4   Q   I mean, is it a process that you think is
5   an efficient and modern process?
6       MR. WELLSCHLAGER: Objection to the form of
7   the question.
8       THE WITNESS: I don't know.
9   BY MR. GOTTESDIENER:
10  Q   Don't know, okay. It's not something you
11  can do from your desktop though, right?
12  A   Correct.
13  Q   If you would be so kind as to -- this is
14  also something I don't have a set made of.
15      MR. WELLSCHLAGER: This is all going to be
16  one?
17      MR. GOTTESDIENER: Yeah. I'll try to find
18  a binder in a second. If you'd take a look at that.
19      (Deposition Exhibit Number 13 was
20  marked for identification and was retained by
21  counsel.)
22  BY MR. GOTTESDIENER:

Case 1:06-cv-01539-GK Document 20-7 VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2 Filed 01/16/2007 Page 61 of 77
CONDUCTED ON TUESDAY, APRIL 13, 2004

56 (Pages 377 to 380)

377

1    Q   I'm going to be showing you, after your
2  counsel takes a look, a set of what I represent was
3  produced to us that appear to be your handwritten
4  notes and from your description would appear to
5  encompass the time periods that you've told us you
6  pulled your notes for.
7       So what I'm seeking from you essentially is
8  confirmation that those are a true and accurate
9  reproduction of your notes and, more specifically,
10  the notes that you copied and produced to one or
11  more people inside of Amtrak in connection with this
12  case.
13       MR. WELLSCHLAGER: So is this 13?
14       THE WITNESS: 13, yeah.
15  BY MR. GOTTESDIENER:
16    Q   Anytime you're ready, just let us know.
17    **A   Okay.  Some of these are stapled and some**
18  **of them aren't.**
19    Q   Did you affix staples to any of the
20  documents that you handed over when you did?
21    **A   I don't think I did.**
22    Q   Well, I'll represent to you, as you're

378

1  looking at them, that this is the fashion in which
2  they were received, and I certainly know that at
3  least in one and maybe two instances, the staples
4  seem to be less than expertly applied and may have
5  jogged loose.
6    **A   Okay.**
7    Q   So can you answer the question as to
8  whether you can confirm that those are your notes,
9  those are an accurate reproduction of your notes,
10  those are an accurate reproduction of the notes
11  that -- in fact that you pulled at the behest of
12  Mr. McIlwain?
13    **A   Yes.**
14    Q   And are those all of the notes that you
15  pulled at his behest?
16    **A   They appear to be.**
17    Q   And they appear to be -- withdrawn.
18       They are the entirety of the notes that you
19  have pertaining to board meetings from 1994 and
20  2001?
21    **A   Encompassing --**
22       MR. WELLSCHLAGER: Objection. Objection to

379

1  the form of the question.
2       MR. GOTTESDIENER: What's wrong with it?
3  I'll try to fix it.
4       MR. WELLSCHLAGER: Well, I think it
5  suggests, if I heard it correctly, that he's
6  testified to that effect earlier, and to that extent
7  it definitely mischaracterizes his earlier
8  testimony.
9  BY MR. GOTTESDIENER:
10    Q   I don't know if you said that before or
11  not, but the question is, are those all of your
12  notes as to board meetings for '94 and 2001?
13    **A   Well, there were additional meetings in**
14  **2001.**
15    Q   That we don't have the notes for?
16    **A   Yes.**
17    Q   What meetings?
18    **A   Well, the only ones that are here are the**
19  **July and -- looks like July and September.**
20    Q   There was a meeting in August, wasn't
21  there?
22    **A   Yes, there was.**

380

1    Q   Do you see any of your notes from August?
2    **A   I don't see any from August.**
3    Q   Do you have any from August?
4    **A   I'm pretty sure that I do.**
5    Q   Okay. Where would they be right now?
6    **A   Should be back in my office.**
7    Q   Where?
8    **A   In -- should be in the chron. file listed**
9  **under the August meeting.**
10    Q   Did you -- did you intend to pull August
11  and not include it, or did you exclude it because
12  it --
13    **A   I think I intended to include it so --**
14    Q   What about 1994, did you include all of the
15  notes from 1994 or just some of them?
16    **A   I think 1994 has got all the notes.**
17    Q   Do you recall or know of the fact that
18  there was another plan amendment in that time frame
19  1994 that was also referred to sometime commonly as
20  the VERP?
21    **A   Yeah, I do remember one during 1994.**
22    Q   What board meeting was that VERP discussed

Case 1:06-cv-01539-GK Document 20-7 of Filed 01/16/2007 Page 62 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

57 (Pages 381 to 384)

381

1  at?
2  **A    I don't know. I'd have to look back and**
3  **see.**
4  Q    Can you tell from looking at your notes?
5        MR. GOTTESDIENER: By the way, if either of
6  you know and want to chime in, I'd be happy to hear
7  it.
8        MR. WELLSCHLAGER: I'm trying to figure
9  that out ourselves. There's nothing that's been
10 withheld, in contrast to what I thought was the
11 suggestion in one of your e-mails that there were
12 missing documents from the '93 to '95 binder. So I
13 guess that's all I can say but --
14       MR. GOTTESDIENER: You mean the binder of
15 minutes?
16       MR. WELLSCHLAGER: Yeah. You sent me an
17 e-mail referring to a bind -- you know, a set of
18 minutes from '93 to '95, and you said there appeared
19 to be missing minutes relating to any plan amendment
20 in 1994, and it's not the case that anything was
21 pulled or withheld or any of that.
22       MR. GOTTESDIENER: I'm not currently

382

1  suggesting that. I'm just currently asking do you
2  know at what meeting --
3        MR. WELLSCHLAGER: I don't.
4        MR. GOTTESDIENER: -- this was discussed?
5        MR. WELLSCHLAGER: If it was at all.
6        MR. GOTTESDIENER: Okay.
7        MR. McILWAIN: Right.
8        MR. GOTTESDIENER: So you don't know how
9  that became part of the plan? How/when/what method?
10       MR. McILWAIN: Well, you have the amendment
11 I believe for the 1994 action. You have that.
12       MR. GOTTESDIENER: Yeah, I have a formal
13 plan amendment, reduced to plan language.
14       MR. McILWAIN: Right, so but to answer your
15 question do I have knowledge how that became part of
16 the plan, that is how it became part of the plan.
17 Now whether there are some other discussions -- I
18 mean, your other question was whether there were
19 some discussions in the minutes in 1994. I don't
20 believe so.
21       MR. GOTTESDIENER: My question is one step
22 further in terms of precision is, at what point in

383

1  '93 or '94 did the board consider this? Because the
2  amendment that you're referring to, I think you'll
3  acknowledge, is not signed by the board of
4  directors.
5        MR. McILWAIN: Well, it's not, and it is
6  not signed in 1994 or 1993 either, so I can
7  represent that as well.
8        MR. GOTTESDIENER: You mean that it wasn't
9  reduced to plan language until 2001?
10       MR. McILWAIN: Correct.
11       MR. GOTTESDIENER: Everyone knows all that.
12 I think it sounds like all of us at this point don't
13 know when the board --
14       MR. McILWAIN: Considered the -- in 1993 or
15 1994 a similar voluntary early retirement program or
16 plan, right.
17 BY MR. GOTTESDIENER:
18 Q    And maybe it's probably taxing Mr. Carten
19 unfairly, but to the extent that he was monitoring
20 any of this highly interesting colloquy among
21 counsel, do you have any idea when it was, if it
22 was, that the board of directors of Amtrak in a

384

1  meeting, in a telephonic meeting, in a unanimous
2  consent resolution, in their daydreams considered a
3  VERP in the '93-94 time period?
4  **A    I'd have to look back and see.**
5  Q    And you're doing that now by going through
6  your notes; is that correct? You're looking through
7  your notes?
8  **A    I'm trying to. I'm trying to.**
9  Q    I appreciate that, but just for the record,
10 you're looking through your '94 notes, and you've
11 thus far not seen any indication of board action or
12 discussion on the topic; is that correct?
13 **A    So far.**
14 Q    Thank you. If you'd continue to do that,
15 I'd be very much obliged.
16       MR. WELLSCHLAGER: While there's a pause,
17 Eli --
18       MR. GOTTESDIENER: Yeah.
19       MR. WELLSCHLAGER: -- the August notes, as
20 we read your requests, are not called for, but
21 you've asked a number of questions about them.
22       MR. GOTTESDIENER: August 2001?

Case 1:06-cv-01539-GK   Document 20-7   Filed 01/16/2007   Page 63 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

58 (Pages 385 to 388)

385

1    MR. WELLSCHLAGER: Yeah. So let me know if
2  you're -- if that -- if you disagree. If you
3  think --
4    MR. GOTTESDIENER: I definitely disagree.
5    MR. WELLSCHLAGER: Well, okay.
6  BY MR. GOTTESDIENER:
7    Q   If you'd just continue to look at '94 a
8  couple more moments, and then I'd like to move on.
9  I mean there's more than one place where --
10    MR. WELLSCHLAGER: Only because there's
11  nothing in the minutes or the notes that have
12  anything to do with the plan.
13    MR. GOTTESDIENER: But that's not true.
14    MR. WELLSCHLAGER: And virtually -- what?
15  The notes?
16    MR. GOTTESDIENER: It was discussed at the
17  August meeting.
18    MR. WELLSCHLAGER: Well, I'll have to take
19  a second look at that.
20    MR. McILWAIN: What was discussed at the
21  August meeting?
22    MR. GOTTESDIENER: The VERP.

386

1    MR. McILWAIN: It was discussed at the July
2  26th meeting, right?
3    MR. GOTTESDIENER: And it's discussed -- it
4  was enacted in July and it was discussed on August
5  30th.
6    MR. WELLSCHLAGER: I have to take a second
7  look at that before further comment.
8    MR. GOTTESDIENER: I love telling you guys
9  stuff.
10  BY MR. GOTTESDIENER:
11    Q   Okay. Well, why don't we have you
12  continue -- whenever you'd like, to continue to look
13  at those notes and tell us if you might see anything
14  that pertains to the VERP, but for now I'd like to
15  show you what I'm going to first show counsel as
16  Exhibit 14, and I only currently have one copy of
17  that.
18    (Deposition Exhibit Number 14 was
19  marked for identification and was retained by
20  counsel.)
21  BY MR. GOTTESDIENER:
22    Q   This is a document that was produced to us

387

1  in the exact form that it appears now, a one-page
2  typewritten document that has a slash running
3  through it and an X at the bottom and the word
4  "withdrawn" also at the bottom underlined, and I'd
5  ask you to identify that as a true and accurate copy
6  of a document that you prepared and that you made
7  those marks on.
8    A   Yes, this looks accurate.
9    Q   And can you tell us, in a succinct fashion,
10  the reason why you put a slash through this
11  resolution and wrote the word "withdrawn"?
12    A   When the -- as I recall, when the board
13  members considered the July 23rd minutes at the
14  September meeting, they decided to withdraw this at
15  that time.
16    Q   Why, sir?
17    A   It was -- it was following their
18  discussion. They decided they wanted to modify this
19  a little bit and enact it at the September meeting.
20    Q   Okay. And how was it modified, with
21  specificity?
22    A   I would have to compare this with the

388

1  September version to --
2    Q   You don't have that in your head?
3    A   I don't have it in my head.
4    Q   You don't have any idea what I'm asking you
5  to tell us was different from July and September?
6    MR. WELLSCHLAGER: Objection to the form of
7  the question.
8  BY MR. GOTTESDIENER:
9    Q   Sir, I'll ask it again. After yesterday's
10  discussion about the executive committee and the
11  absence of a quorum and the absence of a board of
12  directors currently with any ability to even hold a
13  meeting, is it your testimony that you don't have
14  any idea without studying it what was different
15  between the July resolution and the September
16  resolution?
17    A   I'd rather not speculate on it.
18    Q   So your answer is that's right? You don't
19  have any idea and it would just be pure speculation
20  on your part?
21    A   I have some idea, but I would want to
22  compare the two.

59 (Pages 389 to 392)

389

1    Q    And I appreciate that and we may do that.
2    Tell us right now, what is your idea?
3    A    Right, I'd rather not speculate on it.
4    Q    I understand it's not your preference, but
5    I'm asking you a question. Please answer my
6    question.
7    A    I'm telling you I'd rather not speculate on
8    it.
9    Q    Please answer my question. I direct you to
10   answer the question unless your counsel directs you
11   not to answer it. It's not a privileged matter.
12   You have an idea, and it is currently your
13   obligation to answer questions.
14       MR. WELLSCHLAGER: Can someone read the
15   question to me so I can consider it one more time?
16   BY MR. GOTTESDIENER:
17   Q    The question is, I want you to tell us
18   please, if you will, what is your idea as to the
19   difference between the July and September
20   resolutions without studying it any further at this
21   time?
22   A    Okay. A difference is I believe the

390

1    September one specified the three people that would
2    be on the board executive committee, which this one
3    does not.
4    Q    That's the entire difference that you have
5    in mind as being between July and September of 2003,
6    that in September the three individuals were
7    specified?
8    A    Yes.
9    Q    I'll take that back. Thank you.
10       What was said about this at the July and
11   September meetings, with specificity, as best you
12   recall sitting here now? Who said what at these
13   meetings?
14       MR. WELLSCHLAGER: Let me ask you this,
15   Mr. Carten.
16       THE WITNESS: Yeah.
17       MR. WELLSCHLAGER: Was there an
18   attorney-client conversation relating to any of
19   these issues?
20       THE WITNESS: Yes, there was.
21   BY MR. GOTTESDIENER:
22   Q    Who was there that was an attorney acting

391

1    as an attorney?
2    A    Alicia Serfaty.
3    Q    How do you know she was acting as an
4    attorney?
5    A    Because she's general counsel as well as
6    corporate secretary.
7    Q    How do you know she was acting as an
8    attorney as to this matter?
9        MR. WELLSCHLAGER: Well, if you --
10   BY MR. GOTTESDIENER:
11   Q    I'm asking a question. Do you know that
12   she was acting as an attorney to this matter? Did
13   she speak and provide legal advice at this meeting?
14   A    She did.
15   Q    Which meeting?
16   A    Both meetings.
17   Q    You're positive of that?
18   A    Yes.
19       MR. WELLSCHLAGER: Well, given that
20   testimony, I'd instruct the witness not to divulge
21   the content of discussions in which legal advice was
22   rendered on this issue.

392

1        (Deposition Exhibit Number 15 was
2    marked for identification and was retained by
3    counsel.)
4    BY MR. GOTTESDIENER:
5    Q    Showing you what I'm marking as 15, this is
6    a two-page document that I represent is produced
7    from a set of documents -- showing it to counsel --
8    entitled "From PST files of Warren Reisig," and
9    there is a printout of what appears to be an e-mail.
10   The next page may or may not be the attachment to
11   the e-mail. The e-mail is otherwise blank. I
12   presume it's not redacted, and I'd like to show that
13   to you and ask you a question or two, if I could.
14       MR. WELLSCHLAGER: Could you ask the
15   witness just to read the Bates number in since we
16   don't have multiple copies of it?
17       MR. GOTTESDIENER: I'll handle it.
18       THE WITNESS: Read him what?
19   BY MR. GOTTESDIENER:
20   Q    Yeah, I'll handle it. Just you read the
21   substance of it --
22   A    Okay.

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 65 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

60 (Pages 393 to 396)

393

1    Q    -- and I'll handle it in the question.
2         This is AMT 6106 and 6105, '05 being the
3    e-mail and 6106 being what appears to be a one-page
4    attachment.
5         MR. WELLSCHLAGER: Thank you.
6    BY MR. GOTTESDIENER:
7    Q    Have you taken enough time that you feel
8    comfortable fielding a question or two about those
9    two pages?
10   A    Give me just a minute.
11   Q    Sure.
12   A    Okay.
13   Q    The e-mail appears to be from Mr. Simonson
14   to Warren Reisig --
15   A    Right.
16   Q    -- July 24, 2001?
17   A    Mm-hmm.
18   Q    And that would be two days before the VERP
19   was taken up by the board?
20   A    (Nodding.)
21   Q    You have to say yes or no.
22   A    Yes.

394

1    Q    Do you know what Mr. Simonson was sending,
2    if the document attached is what he was sending,
3    what he and Mr. Reisig were discussing with respect
4    to this issue on that date?
5    A    I don't know.
6    Q    That doesn't refresh your recollection at
7    all?
8    A    No.
9    Q    Were you included in any of the premeeting
10   discussions as to presenting resolutions to the
11   board as to the VERP on July 26, 2001?
12   A    No.
13   Q    You say that with some conviction such that
14   you're confident that you weren't working with
15   Mr. Reisig on those resolutions as, for example, you
16   were on or about September 14th?
17   A    I was working with him on the finals, but
18   the changes -- I wasn't aware of the changes that
19   were being made.
20   Q    That was being done with Mr. Simonson?
21   A    Yes.
22   Q    Was anyone else involved between -- besides

395

1    Mr. Simonson and Mr. Reisig on the changes to the
2    resolutions before they got into final form?
3    A    I'm not aware of anybody, but it doesn't
4    mean there wasn't somebody.
5    Q    And do you mean final form as to final form
6    prior to being presented to the board or final form
7    after they've voted on them?
8    A    Final form being presented to the board.
9    Q    Okay. So it would be fair to say that your
10   involvement in the resolutions pertaining to the
11   VERP that were acted on by the board on July 26th
12   consisted solely of a final edit or production that
13   had no content in terms of process as to changing
14   things substantively?
15   A    Correct.
16   Q    And is that something you specifically
17   remember, or is it something that has been refreshed
18   for you recently through conversation or looking at
19   documents and so forth?
20   A    That's something I remember.
21   Q    Is there any particular thing that stands
22   out in your mind about that? Was it unusual for you

396

1    not to be involved more than you were?
2    A    You know, it wasn't unusual. Some things I
3    was heavily involved and some things I wasn't.
4    Q    But is there anything about this that you
5    can tell us causes you to have a firm recollection
6    of that?
7    A    I don't remember seeing this document with
8    the changes summarized like this.
9    Q    As to the content of the July 26th meeting
10   at which you were present, can you tell us all of
11   your recollections about the VERP and the discussion
12   that was had about the VERP at that meeting?
13   A    Well, it was introduced as a way to
14   hopefully save the corporation some money by
15   reductions in force. It was a voluntary program,
16   and so it was presented, you know, about here are
17   the -- you know, here's the voluntary program and
18   here's the estimated benefit of it and --
19   Q    I guess what I'm looking for, not to
20   interrupt you, but I'll interrupt you. I'm looking
21   for, do you have any recollections about any
22   director making any comments or Mr. Warrenton saying

Case 1:06-cv-01539-GK   Document 20-7   Filed 01/16/2007   Page 66 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

61 (Pages 397 to 400)

397

1  anything in particular or Ms. Finer saying anything
2  about the plan, any questions raised, any comments
3  made that wouldn't be reflected in euphemistic
4  meeting minutes that have been produced to us?
5      MR. WELLSCHLAGER: Objection to the form of
6  the question. Go ahead and answer.
7      THE WITNESS: Okay. I don't have any
8  recollection of any particular items.
9  BY MR. GOTTESDIENER:
10     Q   Could you turn to your notes from that
11  meeting and see if there's anything that you can
12  read into the record and/or use to refresh your
13  recollection as to any specific observations or
14  comments or questions that anyone asked at the
15  meeting?
16     A   I don't see anything in particular.
17     Q   Could you turn and read into the record the
18  pages that pertain to that meeting of your notes?
19     A   Pertain to that meeting?
20     Q   Yeah. You should have some notes there
21  that are dated July 26th, unless I'm much mistaken.
22  Do you see those?

398

1      A   Yeah.
2      Q   Okay. Could you tell us its AMT number?
3      A   017466.
4      Q   Okay. And how many pages do they continue
5  for that --
6      A   Go through 017475.
7      Q   Okay. And is there anything in there that
8  references the VERP or providing an early retirement
9  benefit to participants to encourage them to leave
10  the corporation?
11     A   I don't see anything.
12     Q   I will represent to you that Exhibit 16,
13  which I've showed to counsel, beginning AMT 1 was
14  produced to us with the cover sheet that has a
15  caption that I'd ask under the case number you read
16  into the record. If you could just read that,
17  please.
18         (Deposition Exhibit Number 16 was
19  marked for identification and was retained by
20  counsel.)
21         THE WITNESS: Wade Hall, et al. versus
22  NRPC.

399

1  BY MR. GOTTESDIENER:
2      Q   Right. I actually meant the next lines.
3      A   Okay. "Docs maintained by John Carten, re:
4  Board Minutes and Resolutions re VERP."
5      Q   If you look through those, I'll ask you to
6  confirm that these appear to be a sampling of a
7  variety of different board materials beginning as
8  early as 1975 and running through 2002 or, rather,
9  2001. If you would take a minute to confirm that.
10         What I want to ask you is, did you have any
11  role in selecting from board materials documents
12  that fit, Mr. Carten, the description that these
13  documents have been given on AMT 1 as you read it
14  into the record? And I'll further represent that
15  that set of materials was produced to us in late
16  December of 2003, before you took the actions that
17  you told us that you did.
18     A   Okay. And what's your question?
19     Q   The question is first, did you have any
20  role in assembling in December 2003 or earlier that
21  set of documents as being documents maintained by
22  you that pertain to the VERP or a VERP?

400

1      A   Yeah, these look like the documents I
2  produced.
3      Q   Okay. That wasn't my question. My
4  question was, did you personally play any role in
5  assembling those documents or directing that those
6  documents be assembled such that they would have
7  been produced to the plaintiffs by the end of
8  December 2003?
9      A   Well, these look like the documents I
10  provided to Ms. Turnblaser.
11     Q   Okay. Well, then I missed something
12  because I didn't hear you testify that you provided
13  Ms. Turnblaser with anything other than a congenial
14  expression when she put you on notice that you were
15  going to have to provide such materials at some
16  later point, and if I misunderstood, I apologize,
17  but please tell me when it is that you provided her
18  with anything.
19         MR. WELLSCHLAGER: Well, can he use your
20  representation that that set of documents was
21  produced on December -- or late December 2003, to
22  help him clarify his memory?

Case 1:06-cv-01539-GK   Document 20-7   Filed 04/16/2007   Page 67 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

62 (Pages 401 to 404)

401

1    MR. GOTTESDIENER: Yeah, but the problem is
2  that we've got his testimony and then we've got
3  these documents being produced, and, you know, I
4  don't want to slip into him now saying that he
5  produced these things when that's contrary to what
6  he said before. He can use the representation that
7  those were produced.
8    MR. WELLSCHLAGER: Well, I'll represent to
9  you that he produced them.
10    MR. GOTTESDIENER: You will?
11    MR. WELLSCHLAGER: Yeah.
12    MR. GOTTESDIENER: Well, then tell me --
13    MR. WELLSCHLAGER: He produced those
14  documents to Ms. Turnblaser as --
15    MR. GOTTESDIENER: When?
16    MR. WELLSCHLAGER: In December 2003.
17    MR. GOTTESDIENER: So then his --
18    MR. McILWAIN: It was actually before that.
19  It was actually before that.
20    MR. WELLSCHLAGER: Before that.
21    MR. GOTTESDIENER: When was the -- when did
22  he produce them?

402

1    MR. McILWAIN: Those documents were
2  gathered as early as 9/12/2003. They may have also
3  been supplemented in October of 2003.
4    MR. GOTTESDIENER: When you say "gathered,"
5  are you saying gathered by Mr. Carten, the witness?
6    MR. McILWAIN: Yes.
7    MR. GOTTESDIENER: Okay.
8  BY MR. GOTTESDIENER:
9    Q   Well, does that -- does that accord with
10  your recollection? Because I mean this in no
11  disrespect. This does not accord with the testimony
12  you've given. I understood your testimony to be
13  that you heard from her and you heard from
14  Mr. McIlwain twice and at that point, sometime in
15  March, you produced documents. So I'm wondering
16  whether or not maybe somebody with access and
17  authority and inclination gathered those materials
18  maybe on your behalf or at your request, but that
19  you yourself didn't do that.
20    A   These look like materials that were
21  collected by me.
22    Q   Well, what caused you to go to a binder in

403

1  1988 and pull the 1988 document or pull the 1975
2  document?
3    A   I think the question that was posed to me
4  was they wanted to look at documents in -- anything
5  to do with Amtrak's pension plans, and so that's why
6  some of these date back that far.
7    Q   And it was left to you to determine what,
8  in your view, fit that description?
9    A   Yes.
10    Q   And could you -- now hearing
11  representations by your lawyers and my questions,
12  can you now tell us how and what was communicated to
13  you earlier than December of 2003 about what was
14  desired? Was it simply please get us materials on
15  board materials relative to the pension plan? Was
16  it no more specific than that?
17    A   Well, as I recall, it was the VERP --
18  anything to do with pension plans and retirement
19  plans including the VERP.
20    Q   And who gave you that instruction or put
21  that request to you?
22    A   Well, initial instruction was by Christine

404

1  Turnblaser.
2    Q   When?
3    A   Well, I was thinking it was November, but
4  must have been earlier than that.
5    Q   Okay. When?
6    A   You know, I'll say sometime in the fall.
7    Q   Okay. And was this the same meeting where
8  she came to you in person, or did she communicate in
9  some other way? Telephone? E-mail?
10    A   I think she came to me in person asking for
11  this information.
12    Q   Okay. So those materials are materials
13  that you gathered?
14    A   Yes.
15    Q   And you did so at the direction of a
16  paralegal?
17    A   At the request of the paralegal.
18    Q   At the request of a paralegal, and you had
19  no other guidance or assistance other than what the
20  paralegal told you?
21    A   Right.
22    Q   And you sought no assistance or guidance

Case 1:06-cv-01539-GK   Document 20-7   Filed 01/16/2007   Page 68 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

63 (Pages 405 to 408)

405

1  from anyone other than this paralegal as to what it
2  is that you should pull?
3      **A    Right.**
4      Q    And you produced those documents to her?
5      **A    Yes.**
6      Q    And it was not until you heard from
7  Mr. McIlwain in January that you were ever asked to
8  look again or look for additional materials?
9      **A    Well, it was later in the fall there that**
10  **they were asking me for more materials.**
11     Q    Okay. But here's the problem. I represent
12  that those were --
13         MR. GOTTESDIENER: And this is
14  well-documented, as counsel knows.
15  BY MR. GOTTESDIENER:
16     Q    -- those materials were only provided to us
17  in the end of December. That's got No. 1 on it.
18  That's the first thing that was produced. Do you
19  see that?
20     **A    Mm-hmm.**
21     Q    AMT 1?
22     **A    Mm-hmm.**

406

1      Q    We didn't get that until the end of
2  December, and we didn't get any more documents until
3  some later period of time.
4         MR. WELLSCHLAGER: Well, if you're going to
5  ask that question and put that on the record it's so
6  highly misleading that I have to correct it. You
7  received many more documents than just those 30
8  pages that are in front of the witness on December
9  24th and because --
10         MR. GOTTESDIENER: That were pulled by him?
11         MR. WELLSCHLAGER: And because --
12         MR. GOTTESDIENER: That were pulled by him?
13  That's where we're going to.
14         MR. WELLSCHLAGER: Because -- just because
15  that particular set was produced to you on the 24th
16  doesn't mean that he didn't round it up, you know,
17  in October before there was ever a document request
18  at issue.
19         MR. GOTTESDIENER: This is terrific but we
20  need to understand.
21  BY MR. GOTTESDIENER:
22     Q    First of all, did you gather -- and I'm

407

1  asking you.
2         MR. GOTTESDIENER: But if you have a
3  representation, I'll accept that.
4  BY MR. GOTTESDIENER:
5      Q    Did you gather anything more than those
6  documents the first time you gathered and gave
7  documents to Christine Turnblaser.
8      **A    I think this is -- this is what I gathered.**
9      Q    And then you gave those to her?
10     **A    Yes.**
11     Q    And then --
12         MR. GOTTESDIENER: What are you saying that
13  I've got? What am I missing?
14         MR. WELLSCHLAGER: What I'm suggesting is
15  that there is wide open --
16         MR. GOTTESDIENER: Yeah.
17         MR. WELLSCHLAGER: -- the possibility that
18  Christine or Mr. McIlwain came back in November or
19  December and Mr. Carten gathered more documents and
20  that his memory is -- you know, is as clear as mine
21  might be if you ask me what I did --
22         MR. GOTTESDIENER: That's not --

408

1         MR. WELLSCHLAGER: -- in February or
2  January or December.
3         MR. GOTTESDIENER: I'm not quibbling about
4  memories at this point. I'm just trying to
5  understand what was done when. She comes to him and
6  she asks him to gather materials. He gathers these
7  materials, he says. Are you saying that you know
8  that he gathered additional materials in November or
9  at some other point in time?
10         MR. WELLSCHLAGER: I personally am not
11  comfortable saying anything because I wasn't within
12  the Amtrak walls gathering this stuff up, but I'm
13  just saying that your questions are sort of
14  suggestive of an accusation that he wasn't gathering
15  anything other than those 30 pages until January,
16  and I don't think that's --
17         MR. GOTTESDIENER: In this case I blame him
18  for nothing. I blame Amtrak.
19         MR. WELLSCHLAGER: -- and I don't think
20  that's fair.
21  BY MR. GOTTESDIENER:
22     Q    My question is, do you know of anything

Case 1:06-cv-01539-GK    Document 20-7    Filed 01/16/2007    Page 69 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

64 (Pages 409 to 412)

409

1    else you gathered during the year 2003 and gave to
2    anyone about this case, pension plans, the VERP,
3    other than what's in front of you in that exhibit?
4        A    As far as I can recall, this was probably
5    it.
6        Q    Okay. Well, I hope your counsel heard that
7    answer.
8        MR. McILWAIN: Well, again --
9        MR. WELLSCHLAGER: You've noted the
10   deposition of a corporate designee to answer all
11   these questions about when documents were rounded up
12   and --
13       MR. GOTTESDIENER: I did?
14       MR. WELLSCHLAGER: -- you will be -- yes,
15   you did.
16       MR. GOTTESDIENER: Yeah, it was interfered
17   with.
18       MR. WELLSCHLAGER: It's noted for Thursday.
19       MR. GOTTESDIENER: It was interfered with.
20       MR. WELLSCHLAGER: And so, you know, you'll
21   get all those answers. I don't know why we need to
22   waste Mr. Carten's time.

410

1        MR. GOTTESDIENER: Because Mr. Carten was
2    pulling documents.
3    BY MR. GOTTESDIENER:
4        Q    Let me show you what I will mark as -- did
5    you keep your own set of what you produced for your
6    own records, or did you otherwise --
7        A    I think I did keep a set.
8        Q    Okay. Where is that set?
9        A    Well, I think I kept a set -- I think I
10   kept a set of this.
11       Q    Of what?
12       A    Of what was produced --
13       MR. WELLSCHLAGER: Just refer to the
14   exhibit number.
15       THE WITNESS: To Exhibit No. 16.
16   BY MR. GOTTESDIENER:
17       Q    And where is that set now?
18       A    I think it's in my office.
19       Q    And where in your office?
20       A    It's in a folder on my desk.
21       Q    Okay. And is it -- is it part of any other
22   materials that you have in one location that are

411

1    copies of what you've provided to people at Amtrak
2    in connection with this case?
3        A    I think the folder includes -- I think it
4    just includes this.
5        Q    Okay. So do you have -- do you have any
6    record that you kept, a memorialization, a note to
7    yourself, e-mail to yourself, notepad, anything that
8    would document when you collected what records you
9    did in connection with this case?
10       A    I don't think I have anything.
11       Q    You didn't keep any record of that?
12       A    No.
13       Q    Okay.
14           (Deposition Exhibit Number 17 was
15   marked for identification and was retained by
16   counsel.)
17   BY MR. GOTTESDIENER:
18       Q    Let me show you what I've marked as 17, and
19   these are, as they were sequentially produced to us,
20   AMT 14883 -- no, my mistake -- 14877 continuing
21   through 14885. And what this appears to be are
22   Xerox copies of a resolution, or a purported

412

1    resolution, from the year 2003 February, February
2    14th, that pertains to an FY '04 --
3        MR. WELLSCHLAGER: There's a clip right
4    there.
5        MR. GOTTESDIENER: Thanks.
6    BY MR. GOTTESDIENER:
7        Q    -- grant and legislative request --
8        MR. WELLSCHLAGER: 878.
9    BY MR. GOTTESDIENER:
10       Q    -- relative to a meeting that had been held
11   in January, on January 23, 2003, but the resolutions
12   were not, for one reason or another, presented or
13   acted upon at that meeting, but rather appear to
14   have been acted upon in February following that
15   meeting.
16           Does that description refresh your
17   recollection as to that there was such a resolution
18   sought by management outside of a regular meeting?
19       A    Yeah, I think I remember this.
20       Q    Okay. Well, tell us what you remember
21   about it, if you'd hand that back to me. I want
22   your recollections now as opposed to just reading

413

1  from a document. Tell us everything you remember
2  about that.
3      A  Well, the date of that was February -- what
4  was the date of that? February?
5      Q  Well, the day that I believe you put down
6  as it being adopted was February 14th --
7      A  Okay.
8      Q  -- Valentine's day --
9      A  Okay.
10     Q  -- 2003.
11     A  The January meeting, just prior to that,
12  January 2003 there was discussion of Amtrak's
13  capital and operating grant which we provide to
14  Congress each year. And at that meeting the board
15  wasn't ready to adopt it at that meeting, so they
16  provided some guidance to management to rework it,
17  and then management went back to them to get their
18  approval -- approval of it prior to February the
19  15th.
20         MR. WELLSCHLAGER: By the way, Eli, the
21  document I notice is at least in part marked
22  confidential and would be subject to the written

414

1  confidentiality understanding we have in place. I'd
2  just like you to say on the record that we'll treat
3  this portion of the transcript and this exhibit in
4  the same manner.
5         MR. GOTTESDIENER: Well, we'll treat this
6  exhibit in whatever way I agreed to treat the
7  document, but thus far --
8         MR. WELLSCHLAGER: Fair enough.
9         MR. GOTTESDIENER: -- you know, we've not
10  revealed any of the content of this highly secret
11  resolution.
12  BY MR. GOTTESDIENER:
13     Q  So what occurred was -- you mentioned the
14  date February 15th?
15     A  Yes.
16     Q  Why was that an important day?
17     A  Because that's -- that's the day that our
18  grant request is due to Congress.
19     Q  So action was needed by February 15th?
20     A  Yes.
21     Q  How many board members were there in
22  February of 2003?

415

1      A  February 2003?
2      Q  Yeah.
3      A  I'd say I believe we had seven.
4      Q  And tell us what happened in terms of the
5  effort to get board directors to agree to
6  management's grant and legislative request.
7      A  Well, there were -- following the January
8  meeting, management revised the grant request, had
9  some conversations with the board members about the
10  changes they were making.
11     Q  Who did?
12     A  Joe McHugh.
13     Q  Joan who?
14     A  Joe McHugh.
15     Q  McHugh had conversations with board
16  members --
17     A  Mm-hmm.
18     Q  -- after the January 23rd meeting?
19     A  Yeah.
20     Q  Where did he have these conversations?
21  Over the phone?
22     A  Over the phone.

416

1      Q  Did he have any conversations with more
2  than one director on the line in a conference call?
3      A  No. Just one at a time.
4      Q  How do you know?
5      A  My recollection is that he's told me that's
6  what he was doing. He's talking with each of them,
7  telling them what he was doing, and then changing
8  the grant and legislative request accordingly.
9      Q  And who is he?
10     A  He's the vice president of government
11  affairs.
12     Q  And so he told you that he was talking with
13  the directors on a one-to-one basis about what
14  management was doing to make their request amenable
15  to all of the directors?
16     A  Correct.
17     Q  And then what happened?
18     A  Then they made -- made changes to the
19  documents.
20     Q  Who is they made changes?
21     A  His staff made changes to the grant
22  request.

66 (Pages 417 to 420)

417

1   Q   Based on his conversations with individual
2 board members?
3   A   **Mm-hmm.**
4   Q   Because they had comments as to what he was
5 proposing to them?
6   A   **Right.**
7   Q   And they made changes -- further changes to
8 management's proposal?
9   A   **Right.**
10   Q   Okay.  Then what happened?
11   A   **Then -- and as I recall, I think we faxed**
12 **the -- I think we sent out the grant request along**
13 **with these resolutions for them to sign.**
14   Q   Okay.  When did the grant request as
15 finally put together and agreed by management with
16 the input of individual directors through phone
17 calls get sent out to the individual directors to
18 review?
19   A   **I don't recall the specific date.**
20   Q   You sent them out?
21   A   **Well, my office would have -- you know, as**
22 **I recall, we sent it out to them, but I can't give**

418

1 **you the exact date that we sent it out to them.**
2   Q   Okay.  I'm not looking for the exact date,
3 but I'm looking for like what happened, much the way
4 I was looking for what happened on September 14th.
5 Is it more or less the same sort of thing you did in
6 September of 2001 that you did in February 2003?
7   A   **We faxed out the resolutions for them to**
8 **sign.**
9   Q   With any sort of summary of what the grant
10 proposal was going to be or just they were going to
11 take it on faith?
12   A   **I can't recall at this point if we put**
13 **anything else with it.**
14   Q   And you don't now, having this discussion,
15 recall ever having a view as to whether or not it
16 would be valid to seek approval from a director on a
17 remote basis without submitting something to them in
18 writing?
19   A   **We sent them the resolutions for them to**
20 **sign and get back to us.**
21   Q   Right.  But the resolutions make reference
22 to a request, and it makes reference to

419

1 modifications, but is there an indication that the
2 final version was ever sent to the directors to
3 review, to make sure that it accurately reflected
4 what they were willing to agree to?
5   A   **Well, we -- we sent -- we sent them the**
6 **final request so that they -- what we finally ended**
7 **up with so that they would have one to refer to.**
8   Q   Thanks for that, but my question is, is
9 that reflected in those resolutions?  If you look
10 at --
11      MR. WELLSCHLAGER:  I'm sorry.  Is what
12 reflected?
13 BY MR. GOTTESDIENER:
14   Q   That they have a copy of the final version.
15 You drafted those resolutions, didn't you, or you
16 finalized them and sent them out; is that right?
17   A   **Yeah, I assisted -- I assisted in**
18 **finalizing these resolutions.**
19   Q   Who did you assist?  Is this one where you
20 weren't primarily responsible?
21   A   **This is one where I drafted it up and then**
22 **had it -- had it reviewed.**

420

1   Q   By?
2   A   **Either -- probably either Larry Steffas or**
3 **Alicia Serfaty and then we sent it out.**
4   Q   Okay.  And in that resolution does it make
5 reference to the directors having been supplied with
6 a copy of the final version?
7   A   **No, it doesn't.**
8   Q   Now you -- on that top page, you went back,
9 as we discussed you did in 2001 September 14, and
10 modified the resolution that was sent for their
11 signature by wiping out the signature line and the
12 date and then you put in that it was adopted on
13 February 14, 2003, right?
14   A   **Correct.**
15   Q   That was you who did that?
16   A   **Yes.**
17   Q   Now, how did you do that conceptually given
18 the information that was conveyed to you as
19 reflected on all those following pages?  Please
20 refer to the following pages --
21   A   **Okay.**
22   Q   -- and refer to everything on the following

Case 1:06-cv-01539-GK    Document 20-7    Filed 01/16/2007    Page 72 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

67 (Pages 421 to 424)

421

1  pages as regards to signatures and dates and
2  notations and tell me how it is that you were able
3  to write on there that the board of directors on
4  February 14, 2003, adopted those resolutions.
5  **A   Well, they -- each of them signed it that**
6  **they're either in agreement with it or abstained.**
7  Q   You're sure of that?
8  **A   Yes.**
9  Q   Did Mr. Holton sign that, or is that a
10  cut-and-paste, or don't you know?
11  **A   I believe this was a cut-and-paste.**
12  Q   And you can tell that because looking at
13  the L there's a slight break in the lower right-hand
14  bar that suggests that that's another one of those
15  cut-and-pastes?
16  **A   Correct.**
17  Q   Now, there are -- if you'd hand that back
18  to me. There are two -- he signs on the 11th via
19  this cut-and-paste. Mr. Dukakis on the 11th. This
20  you're going to have to help me with. Who is that,
21  please?
22  **A   Okay. This is -- let's see here.**

422

1  Q   Oh, you're doing it by process of
2  elimination.
3  **A   This -- okay.**
4  Q   That signature is of what board member?
5  **A   Let me see. I'm trying to figure out which**
6  **one that is. Okay. That's David Laney.**
7  Q   Okay. A recent edition to the board,
8  right?
9  **A   Yeah.**
10  Q   Okay. So Mr. Laney signs on what? The
11  12th?
12  **A   Yes.**
13  Q   And he faxes his back, right?
14  **A   Mm-hmm.**
15  Q   Then who's next?
16  **A   The next one is John Robert Smith.**
17  Q   Okay. And he signed on the 11th?
18  **A   Mm-hmm.**
19  Q   Okay. And does he -- he's followed by who?
20  **A   Followed by Michael Jackson.**
21  Q   Okay. Now, Mr. Jackson, the purported
22  designee of the Secretary of Transportation, he

423

1  signs that resolution on the 14th, doesn't he?
2  **A   Yes.**
3  Q   He doesn't agree with it, does he?
4  **A   He abstained on it.**
5  Q   He doesn't agree with it, does he?
6  **A   He chose to abstain.**
7  Q   Sir, he doesn't agree with it, does he?
8        MR. WELLSCHLAGER: Objection, asked and
9  answered. Abstained does not mean disagree.
10  BY MR. GOTTESDIENER:
11  Q   He does not agree with the resolution, does
12  he?
13  **A   He abstained on it.**
14        MR. WELLSCHLAGER: Same objection.
15  BY MR. GOTTESDIENER:
16  Q   He does not adopt the resolution, does he?
17  **A   He abstained on it.**
18  Q   He does not authorize the resolution to
19  take force and effect as an act of the board of
20  directors, does he?
21  **A   He abstained on it.**
22  Q   Can you not answer the last question?

424

1        MR. WELLSCHLAGER: He has answered it.
2  BY MR. GOTTESDIENER:
3  Q   He does not --
4        MR. WELLSCHLAGER: He's answered it,
5  Counsel.
6  BY MR. GOTTESDIENER:
7  Q   He does not authorize the proposed
8  resolution to take force and effect as an act of the
9  board of directors, does he?
10  **A   He abstained on the matter.**
11  Q   You refuse to answer the question yes or
12  no?
13        MR. WELLSCHLAGER: He's answered it,
14  Counsel.
15  BY MR. GOTTESDIENER:
16  Q   Right? Do you refuse to answer the
17  question yes or no, other than by keep repeating
18  that he abstained as to the resolution?
19  **A   I answered the question.**
20        MR. GOTTESDIENER: Okay. The record will
21  reflect that the witness, aided by counsel, refuses
22  to answer a very clear question that calls for a yes

Case 1:06-cv-01539-GK Document 20-7 Filed 01/16/2007 Page 73 of 77
VIDEOTAPED DEPOSITION OF JOHN MARTIN COLUMBO
CONDUCTED ON TUESDAY, APRIL 13, 2004

68 (Pages 425 to 428)

425

1   or no response.
2        MR. WELLSCHLAGER:  The record will reflect
3   what it reflects.
4   BY MR. GOTTESDIENER:
5     Q   If you would be so kind --
6        MR. WELLSCHLAGER:  You can put whatever
7   spin you want on it.
8        MR. GOTTESDIENER:  There is no spin on the
9   fact that he has refused to answer a yes-or-no
10  question.
11  BY MR. GOTTESDIENER:
12    Q   Sir, would you also please --
13       MR. WELLSCHLAGER:  All he's told you is
14  what the document says.
15  BY MR. GOTTESDIENER:
16    Q   Would you also please make reference to
17  another resolution page and tell us what is written
18  by that board member?  First of all, who is that?
19    A   That's Sylvia de Leon.
20    Q   And Ms. de Leon was a member of the board
21  of directors at that time; was she not?
22    A   Yes.

426

1     Q   And Ms. de Leon did not agree with the
2   resolution as it was submitted to her, does she?
3     A   She signed it.
4     Q   Okay.  Sir, we're going to be here a long
5   time.  She does not agree with the resolution as it
6   was submitted to her, does she?
7     A   She wrote down here that there's some
8   suggested edits.
9     Q   Hand me the document if you would.  Did she
10  ever in writing or otherwise authorize you to put
11  down that she agreed with the resolution as it was
12  presented to her and as everyone else signed it?
13    A   Can you repeat the question?
14    Q   Do you have anything from her in writing or
15  otherwise that tells you that she doesn't care about
16  any of the edits that she made to this resolution?
17    A   I'd have to look back in my file and see.
18    Q   You would agree that you didn't put
19  anything in writing other than this from her in the
20  resolution book, right?
21    A   Right.
22    Q   One of the edits that she makes -- you

427

1   would agree first of all that the words "suggested
2   edits" are alongside only one of the two edits that
3   appear on that page; is that correct?
4     A   It's up here to the left and a little above
5   the first one.
6     Q   So it's only to the side of one of the
7   edits.  Lower on the page is a separate edit that
8   does not have anything next to it such as suggested
9   edits, and it also doesn't have any line or arrow
10  going from the words "suggested edits" to that
11  second edit either that would clearly demark it as
12  being a suggested edit, correct?
13       MR. WELLSCHLAGER:  Objection to the form of
14  that question.  I don't understand it.
15  BY MR. GOTTESDIENER:
16    Q   You understood my question, sir?
17    A   I'm not sure I do.
18    Q   Okay.  The first appearing edit where she
19  makes changes to the language of one of the
20  resolutions or one of the sentences has next to it
21  to the left suggested edits with a colon, correct?
22    A   Yes.

428

1     Q   And it's collocated with the edit that
2   follows immediately after it, correct?
3     A   Yes.
4     Q   There is subsequent to that below -- after
5   space there is more edits with a line showing where
6   she wants those edits to go, correct?
7     A   Yes.
8     Q   That is not preceded by the words
9   "suggested edits" with a colon, correct?
10    A   I don't believe that's necessarily correct.
11    Q   Okay.  The -- if you'd hand this back to
12  me.  The second appearing edits state that, "The
13  board has reviewed these modifications"; is that
14  correct?
15    A   Yes.
16    Q   That didn't make it into any of the
17  resolutions that anyone else signed in -- in
18  agreement as opposed to abstaining, right?
19    A   That's correct.
20    Q   So she's the only one who put in there
21  that, hey, we reviewed these modifications before we
22  signed this thing, right?

Case 1:06-cv-01539-GK   Document 20-7   Filed 01/16/2007   Page 74 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTON, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

69 (Pages 429 to 432)

429

1     A    Mm-hmm. Yeah.

2     Q    Okay. No one was presented with a

3   photocopy of her edited resolutions, isn't that

4   right, for them to review her edits and decide

5   whether or not they also joined in those edits or

6   maybe wanted to even know that she wanted the

7   resolution written in that fashion; is that correct?

8     A    That's correct.

9          MR. WELLSCHLAGER: Objection to the form of

10  the question.

11  BY MR. GOTTESDIENER:

12    Q    Did I get your answer? That's correct? No

13  one was presented with a photocopy of what she

14  wrote, correct?

15    A    Correct.

16    Q    And isn't it a fact, sir, if you look again

17  at all those resolutions -- if you'd turn to the

18  last page, did she fax that back to you the same day

19  that she dated it?

20    A    She dated it February 10th. She faxed it

21  back February 12th.

22    Q    And yet while other board members still had

430

1   not signed that by that date, you nor no one else

2   thought it important to get to them a copy of what

3   it was that she would agree to; is that correct?

4          MR. WELLSCHLAGER: Objection to the form of

5   the question. Go ahead and answer.

6          THE WITNESS: We did not. As I recall, we

7   did not send her -- send them her edits.

8   BY MR. GOTTESDIENER:

9     Q    Did you ask anybody what you should do with

10  this when a director in a unanimous consent

11  procedure doesn't agree to the proposal as it was

12  sent and puts edits on it and sends it back to you?

13    A    I can't recall at this point if I did or

14  not.

15    Q    And would you look at the way the

16  resolution appears as you said it was adopted and

17  tell me whether or not anything that she appears to

18  have conditioned her signature on is included in

19  what you say is the resolution that the board

20  adopted?

21    A    It's not included in there.

22    Q    If you'd hand that back to me, please.

431

1          (Deposition Exhibit Number 18 was

2   marked for identification and was retained by

3   counsel.)

4   BY MR. GOTTESDIENER:

5     Q    Showing you 18 --

6          MR. WELLSCHLAGER: Can we -- I want to make

7   sure the exhibits are kept organized. So can we

8   leave the ones that have been marked and used in the

9   same pile?

10         MR. GOTTESDIENER: I'll do my best.

11         MR. WELLSCHLAGER: Because I need copies of

12  them because you haven't provided me copies.

13         MR. GOTTESDIENER: We can make copies at a

14  break.

15         MR. WELLSCHLAGER: What's this? 18?

16         MR. GOTTESDIENER: Yep.

17         MR. WELLSCHLAGER: I'm sorry. Hand it

18  back.

19         MR. GOTTESDIENER: If you want to read into

20  the record the numbers, that's fine.

21         MR. WELLSCHLAGER: Sure. Exhibit 18 begins

22  with AMT 014930 and ends at AMT 014942.

432

1   BY MR. GOTTESDIENER:

2     Q    Can you tell us what 18 is, please? And if

3   it refers to any events that you were involved in,

4   we would appreciate knowing everything you recall

5   about it.

6          How many directors were there in August of

7   2002?

8     A    August of 2002? Let's see. August of 2002

9   I believe we had six.

10    Q    Okay. If you'd go through these

11  resolutions and tell us what you can recall about

12  this.

13    A    Okay. It was -- first one was a resolution

14  electing vice president planning and business

15  development.

16    Q    And why did this have to proceed other than

17  through some form of meeting?

18    A    Because I think they wanted to get

19  Mr. Mallery in this position, and there wasn't a

20  meeting coming up anytime soon.

21    Q    Okay. And what about the other resolution

22  that is signed by several members of the board?

Case 1:06-cv-01539-GK     Document 20-7     Filed 01/16/2007     Page 75 of 77
VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

70 (Pages 433 to 436)

433

1    A    This was hiring two E band positions
2    reporting to Mr. Mallery in his department.
3    Q    Okay.  Could you tick down for me the
4    directors who signed those resolutions?
5    A    The directors that signed them?
6    Q    Yeah.
7    A    Okay.  What do you want me to do?
8    Q    Tell us who they were.
9    A    Okay.
10   Q    Let's start with the first one.  Governor
11   Holton, right?
12   A    Yes.
13   Q    Now here we find out the guy can affix his
14   own signature to a document, right?
15   A    Mm-mm.
16   Q    Now how did that come about?
17   A    He may have been in town.
18   Q    Okay.  But you don't remember?
19   A    I can't recall specifically.
20   Q    Okay.  Who's the next director that signed?
21   A    Amy Rosen.
22   Q    Okay.  Now, Holton's page doesn't appear

434

1    that it was faxed, but Rosen's does, correct?
2    A    Mm-hmm.
3    Q    Okay.  After Rosen?
4    A    Was John Robert Smith.
5    Q    Okay.  After Smith?  Now his also appears
6    to be faxed, right?
7    A    Uh-huh.
8    Q    Okay.
9    A    Dukakis.
10   Q    Okay.  Also appears to be faxed, right?
11   A    Mm-hmm.
12   Q    Correct?
13   A    Yes.  Yes.
14   Q    Yeah.  Who's next?
15   A    Sylvia de Leon.
16   Q    Hers also appears to be faxed?
17   A    Yes.
18   Q    She's local by the way?  She's in
19   Washington, D.C.?
20   A    Right.
21   Q    Okay.  But it does appear to be faxed?
22   A    Yes.

435

1    Q    And then?
2    A    Michael Jackson.
3    Q    And also faxed?
4    A    Yes.
5    Q    And then -- that adds up to six and then
6    you go through, and these same six signed in similar
7    fashion the other resolution.  If you'd just go
8    through and verify that.
9    A    Okay.  All right.
10   Q    Is that right?
11   A    Yes.
12   Q    Okay.  Now, where are the -- where are the
13   fax cover sheets and the things that were sent to
14   these people, if anything was sent, along with the
15   resolution page that they got back?  Where are
16   those?
17   A    The fax cover sheets that we sent to them?
18   Q    Yeah.  The fax cover sheets and any
19   executive summary or any background materials that
20   they might want or need to decide whether or not to
21   act as a board of directors in that fashion.
22   A    Probably there's a copy of it in my chron.

436

1    file.
2    Q    And if there's not a copy in your chron.
3    file, it's not going to be anywhere else, right?
4    A    Probably not.
5    Q    And do you remember doing all this?  Do you
6    remember getting anything to these people to give
7    them the information that they needed or wanted or
8    could use to render a judgment as to those
9    resolutions?
10   A    Yeah, I remember we sent out some
11   information to them.
12   Q    You remember talking to any of them?
13   A    Not specifically about -- about these.
14   Q    Do you remember anybody talking to them
15   about it?
16   A    I think it -- it's possible at the July
17   meeting or the June meeting it may have been
18   mentioned that we were searching for people for
19   Mr. Mallery's position.
20   Q    Right, but I mean I'm talking about, like,
21   you remembering what happened and who placed a call.
22   Stewart Simonson was the corporate secretary at the

VIDEOTAPED DEPOSITION OF JOHN CARTEN, VOLUME 2
CONDUCTED ON TUESDAY, APRIL 13, 2004

71 (Pages 437 to 44

437

1 time, right?
2    A    Mm-hmm.
3    Q    Well, did he get on the phone and talk
4 about Mr. Mallery's credentials to the directors
5 or --
6    A    I don't recall.
7    Q    How about on the other issue, the other
8 people?
9    A    I don't recall about those either.
10       MR. WELLSCHLAGER:  May I?
11       THE WITNESS:  Sure.
12       MR. GOTTESDIENER:  You said Simonson was
13 corporate secretary in August '02?  I don't think
14 that's right.
15       MR. GOTTESDIENER:  I'm asking him.
16 BY MR. GOTTESDIENER:
17    Q    Who was corporate secretary in August of
18 '02?
19    A    That was right at the transition time, and
20 I think he may still have held the position.
21    Q    Serfaty wasn't the corporate secretary?
22       MR. WELLSCHLAGER:  I think you're confusing

438

1 '01 and '02 but --
2       THE WITNESS:  Yeah, that's right.  That's
3 right.
4 BY MR. GOTTESDIENER:
5    Q    It was Serfaty?
6    A    It was Serfaty.
7    Q    Serfaty.  Sorry.
8       (Deposition Exhibit Number 19 was
9 marked for identification and was retained by
10 counsel.)
11 BY MR. GOTTESDIENER:
12    Q    No. 19, this is AMT 14917 through 14925
13 pertaining to a lease for retail space in
14 Philadelphia.  Does that ring a bell in 2002?
15    A    I'll have to look at it and see.
16    Q    Okay.
17       MR. GOTTESDIENER:  What time is it?
18       MR. McILWAIN:  It's five till 4:00.
19       MR. GOTTESDIENER:  Is she outside?
20       MR. McILWAIN:  She is.
21 BY MR. GOTTESDIENER:
22    Q    If you could just tell us everything you

439

1 remember about getting purported authorization for
2 this lease.  Do you remember this one?
3    A    The only thing I remember about this one is
4 it was time sensitive in terms of being able to
5 complete this deal in Philadelphia.
6    Q    Okay.  How about talking to the directors,
7 did you do that?
8    A    I don't recall if I talked with them or
9 not.
10    Q    Do you recall anyone talking to them?
11    A    I don't specifically remember what we did
12 on this one.
13    Q    Now take a look at the last two pages of
14 that set of documents.  What are the last two pages
15 of that set of documents?
16    A    There's an executive summary and a
17 resolution.
18    Q    And there's something about the resolution
19 that's at the last page of those documents that's
20 different from all the other resolutions that we've
21 seen, isn't there?
22    A    It says confidential.

440

1    Q    No.  Look at the signature line.
2    A    The signature line?  Oh, I see.  Concur
3 versus approve?
4    Q    No.
5    A    What?
6    Q    Isn't it blank, the last page?
7    A    This page (indicating)?
8    Q    Yeah.
9    A    Okay.
10    Q    It's not signed by anybody.  It's not dated
11 by anybody, right?  Correct?
12    A    Correct.
13    Q    Okay.  Take that page where there's no
14 director signing --
15    A    Mm-hmm.
16    Q    -- and count up the number of other pages
17 with a signature line where there is somebody
18 signing and tell us what the entire number adds up
19 to, where there's somebody signing and where there's
20 that one where nobody's signing.
21    A    Okay.  That's seven pages including the
22 blank one.

72 (Pages 441 to 444)

441

1  Q   Including the blank one, how many total are
2  there?
3  A   Seven.
4  Q   How many directors does Congress say Amtrak
5  is supposed to have?
6       MR. WELLSCHLAGER:  Objection to the form of
7  the question.
8       THE WITNESS:  Congress authorizes us to
9  have eight board members.
10 BY MR. GOTTESDIENER:
11 Q   How many voting members does Congress
12 direct Amtrak to have?
13      MR. WELLSCHLAGER:  Objection to the form of
14 the question.
15      THE WITNESS:  Seven.
16 BY MR. GOTTESDIENER:
17 Q   How many directors signed that resolution?
18 A   Six.
19 Q   The number four is the agreed number --
20 according to Amtrak and all of its directors, you,
21 the corporate secretary, everyone you know who's
22 connected with the board of directors agrees that

442

1  four is the required quorum for a meeting of the
2  board of directors; isn't that correct?
3  A   Yes.
4  Q   And the number four is derived from the
5  bylaws that require that there be a majority of the
6  required seven board members, correct?
7       MR. WELLSCHLAGER:  Objection to the form of
8  the question.
9       THE WITNESS:  I believe that's correct.
10      MR. GOTTESDIENER:  I don't -- I have a lot
11 more to do with this witness, but I think we should
12 probably bring in Ms. Oliveri.
13      MR. McILWAIN:  Okay.  Are you sure you want
14 to do that?  Do you want to go ahead and finish with
15 him and maybe switch Ms. Oliveri to another day?
16      MR. GOTTESDIENER:  I'm not going to finish
17 with him because I don't have all his documents.
18      MR. McILWAIN:  Well, as you said, you have
19 some more questions now I assume, but that -- that
20 was my only comment.
21      MR. GOTTESDIENER:  Indulge me one second.
22      THE VIDEOGRAPHER:  Five minutes on the

443

1  videotape.
2       MR. GOTTESDIENER:  Oh, is that right?
3  Yeah, why don't we -- why don't you change tapes
4  here.
5       THE VIDEOGRAPHER:  The marks the end of
6  Tape 3 in the deposition of Mr. Carten.  We're going
7  off the record.  The time is 3:53 p.m.
8       (Signature having not been discussed,
9  the deposition of John Carten was concluded at 3:53
10 p.m.)
11      (The following Acknowledgement of
12 Deponent Page is included in the event at the
13 conclusion of John Carten's deposition he elects to
14 read and sign his deposition transcript.)
15
16
17
18
19
20
21
22

444

1            * * *
2       ACKNOWLEDGMENT OF DEPONENT
3  I, John Carten, do hereby acknowledge that I have
4  read and examined the foregoing testimony, and the
5  same is a true, correct and complete transcription
6  of the testimony given by me, and any corrections
7  appear on the attached Errata sheet signed by me.
8
9  _____      _____
10  (DATE)            (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22