**Exhibit 15**

Case 1:06-cv-01539-GK   Document 20-8   Filed 01/16/2007   Page 2 of 66
DEPOSITION OF ALICIA M. SERFATY
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

I (Pages 1 to 4)

1

1      IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3      - - - - - - - - - - - - - -x
4    WADE F. HALL, et al.,        :
5        Plaintiffs,       : Civil Action
6        v.          : No. 1:03CV01764 (GK)
7    NATIONAL RAILROAD PASSENGER :
8    CORPORATION, et al.,      :
9        Defendants.      :
10     - - - - - - - - - - - - - -x
11
12
13       Videotaped Deposition of ALICIA M. SERFATY
14              Washington, D.C.
15            Wednesday, April 14, 2004
16               1:31 p.m.
17
18
19   Job No. 1-33525
20   Pages 1 - 269
21   Reported by: Vicki L. Forman
22

3

1          A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS:
3       ELI GOTTESDIENER, ESQUIRE
4       Gottesdiener Law Firm
5       3901 Yuma Street, Northwest
6       Washington, D.C. 20016
7       (202) 243-1000
8
9
10
11     ON BEHALF OF THE DEFENDANTS:
12       JOHN R. WELLSCHLAGER, ESQUIRE
13       Piper Rudnick, LLP
14       6225 Smith Avenue
15       Baltimore, Maryland 21209-3600
16       (410) 580-4281
17
18
19
20     ALSO PRESENT: Desmond T. McIlwain,
21            Amtrak General Counsel
22            Scott Forman, Videographer

2

1        Videotaped Deposition of ALICIA M.
2    SERFATY, held at the offices of:
3        National Railroad Passenger Corporation
4        60 Massachusetts Avenue, Northeast
5        Washington, D.C. 20002
6        (202) 906-3104
7
8        Pursuant to agreement, before Vicki L.
9    Forman, Court Reporter and Notary Public in and for
10   the District of Columbia.
11
12
13
14
15
16
17
18
19
20
21
22

4

1          CONTENTS
2    EXAMINATION OF ALICIA M. SERFATY        PAGE
3    By Mr. Gottesdiener          6
4
5
6
7          E X H I B I T S
8              (None)
9
10
11
12
13
14
15
16
17
18
19
20
21
22

DEPOSITION OF ALICIA M. SERFATY
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

2 (Pages 5 to 8)

5

1  P R O C E E D I N G S
2  THE VIDEOGRAPHER: Here begins tape
3  number one in the deposition of Alicia Serfaty in
4  the matter of Wade F. Hall, et al. versus National
5  Railroad Passenger Corporation, et al. pending in
6  the U.S. District Court for the District of
7  Columbia, Case Number 1:03CV01764. Today's date is
8  April 14, 2004. The time is 1:31 p.m.
9  The video operator is Scott Forman of
10  Visual Connections contracted by L.A.D. Reporting.
11  This video deposition is taking place at the office
12  of National Railroad Passenger Corporation, 60
13  Massachusetts Avenue, Northeast, Washington, D.C.
14  and was noticed by Eli Gottesdiener, counsel for the
15  plaintiffs.
16  Would the counsel please identify
17  themselves and state whom they represent.
18  MR. GOTTESDIENER: Eli Gottesdiener on
19  behalf of the plaintiffs.
20  MR. WELLSCHLAGER: John Wellschlager and
21  Desmond McIlwain on behalf of Ms. Serfaty and all
22  named defendants.

6

1  THE VIDEOGRAPHER: The court reporter
2  today is Vicki Forman of L.A.D. Reporting.
3  Would the reporter please swear in the
4  witness.
5  THE REPORTER: Would you raise your right
6  hand, please.
7  ALICIA M. SERFATY
8  having been sworn, testified as follows:
9  EXAMINATION BY COUNSEL FOR PLAINTIFFS
10  BY MR. GOTTESDIENER:
11  Q    Good afternoon, Ms. Serfaty. Could you
12  state your full name for the record?
13  A    Alicia, middle initial M, Serfaty.
14  Q    And what does the M stand for?
15  A    Myara, M-Y-A-R-A.
16  Q    Could you give us a brief rundown of your
17  employment history with Amtrak?
18  A    I came to Amtrak in November of 1997 as
19  an associate general counsel for litigation. In
20  July of 1999 I was asked to serve as acting general
21  counsel which I did for a period of six months until
22  December of 1999. Subsequent to that time I served

7

1  as senior deputy general counsel until January of
2  2002 at which time I served as acting general
3  counsel until June of 2002 when I assumed the
4  position on a permanent basis. In late August of
5  2001 I also assumed the function of the corporate
6  secretary and continue to serve in that function
7  today.
8  Q    Prior to late August 2001 what
9  involvement, if any, did you have as a corporate
10  secretary and assistant corporate secretary or any
11  deputy corporate secretary, anything like that?
12  Any?
13  A    I had no responsibilities with regard to
14  the corporate secretarial function.
15  Q    Did you have any legal interaction with
16  the corporate secretary, corporate secretariat,
17  assistant corporate secretaries during the period
18  November '97 to late August 2001?
19  A    Yes, I did.
20  Q    Could you describe those for us, please?
21  A    Very often I would review executive
22  summaries and resolutions from a legal perspective

8

1  and provide guidance to the corporate secretary
2  about legal issues that might arise in connection
3  with their function.
4  Q    Very often you would review, I'm sorry,
5  executive summaries and what else?
6  A    And resolutions.
7  Q    Of? Resolutions of the board of
8  directors or --
9  A    Yes, executive summaries and resolutions
10  that were being prepared to be sent to the board of
11  directors for action.
12  Q    Any other responsibilities that had you
13  interacting with the corporate secretariat or --
14  A    Other than that and providing answers to
15  legal questions if they had any in connection with
16  certain of the issues that arose. Other than that,
17  no.
18  Q    Would you not include in your answer
19  executive summaries and resolutions that were
20  presented to committees of the board as well as the
21  board or were those not presented to?
22  A    Well, to the extent that there might have

9
1  been they could have been. I think it would have
2  depended on the subject matter or -- at that time
3  the committees were not necessarily functioning on a
4  regular basis and so there probably were very few of
5  them if any.
6     Q    And I actually wanted to get to that.
7  What -- could you just amplify that statement and
8  explain why or how the committees functioned during
9  that period of time and how that differs from today?
10    A    At that -- when you say at that time what
11 are you talking about?
12    Q    The time that I had asked you about from
13 November '97 to late August of 2001 when you were
14 not corporate secretary.
15    A    I can't give you specifics about how they
16 were functioning or I don't recall there being
17 meetings of committees of the board at that time
18 although there may very well have been. I just
19 wasn't that involved at that time.
20    Q    Are you aware whether or not during that
21 period of time there were committees?
22    A    I believe that committees had been set

10
1  up. I don't know if individuals were assigned to
2  various committees. I don't know the answer to
3  that.
4     Q    You came to Amtrak you said as -- was it
5  assistant or associate?
6     A    Associate general counsel.
7     Q    And if you'd just briefly take down your
8  educational experience?
9     A    Sure. Prior to law school or you're just
10 interested in law school experience?
11    Q    Start with high school.
12    A    You want high school, okay.
13    Q    Yeah.
14    A    Graduated from high school in, God help
15 me, 1982, Great Neck North Senior High School in New
16 York, got a bachelor of arts in political science
17 from McGill University in 1985 and a J.D. from
18 Georgetown University Law Center in 1988.
19    Q    And your career after '88 up to
20 November '97, if you would just tell us what you
21 did.
22    A    First an associate and then a partner at

11
1  the law firm of Hopkins & Sutter. It's now part of
2  Foley & Lardner and I handled litigation as well as
3  regulatory work.
4     Q    Did any of your work -- would that have
5  been between '88 and '97?
6     A    Excuse me?
7     Q    Would that have been between 1988 and
8  1997?
9     A    Yes. Yes. Yes.
10    Q    Was any of your work in any way connected
11 to Amtrak or railroads?
12    A    Yes, to railroads. We represented a
13 number of freight railroads as well as commuter
14 authorities.
15    Q    And how is it that you found yourself
16 going from a position at that law firm as a partner
17 to joining Amtrak?
18    A    I don't understand your question.
19    Q    Why did you -- why did you leave your
20 partnership and join Amtrak?
21    A    Because at the time I had two small
22 children at home and I didn't -- I wanted a change

12
1  of lifestyle so I came in-house.
2     Q    And from -- from November '97 to July
3  of '99 could you describe generally what it was that
4  you were doing?
5     A    I handled -- I was within a smaller group
6  in the law department that deals with commercial
7  litigation. I worked on a number of pieces of
8  commercial litigation involving contract disputes,
9  other issues. I also was the primary person
10 responsible for providing guidance on compliance
11 with the ADA for station, railcar and accessibility
12 issues and passenger accommodation issues as well
13 and I also dealt with some corporate issues with the
14 general counsel.
15    Q    And what were the nature -- again, high
16 level of generality what were the corporate issues
17 that you dealt with with general counsel?
18    A    Looked at various conflict of interest
19 issues, assisted her on changes to the bylaws to the
20 extent they were necessary, those kinds of issues.
21    Q    This was Ms. Duggin?
22    A    Sarah Duggin, yes.

Case 1:06-cv-01539-GK    Document 20-3    Filed 01/16/2007    Page 5 of 66
DEPOSITION OF ALICIA SERFATY
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

4 (Pages 13 to 16)

13

1    Q    Where is she today?
2    A    I believe she's teaching at Catholic
3  University.
4    Q    And when did she leave -- she was general
5  counsel from when to when?
6    A    I don't know when she started but when I
7  got here in November of '97 she was here and she
8  left in July of 1999. I believe she started
9  sometime in 1997.
10    Q    And what bylaw issues did you work on
11  with her?
12        MR. WELLSCHLAGER:  Generally speaking.
13    A    Generally speaking. There were some
14  revisions to the bylaws that took place in 1999 and
15  I worked on helping her with those issues.
16  BY MR. GOTTESDIENER:
17    Q    Did you work on a change to the bylaws
18  that involved the public or nonpublic nature of
19  meetings of the board of directors?
20    A    Yes.
21    Q    And tell us what you did in connection
22  with that.

14

1    A    I worked with her to help redraft the
2  language in the agreement and worked with her on the
3  question of whether or not the Appendix A should
4  be -- needed to be included going forward in any
5  revision of the bylaws.
6    Q    Anyone else other than yourself and
7  Ms. Duggin work on that issue as counsel?
8    A    I don't have specific recollections. I
9  think there were some outside counsel that we worked
10  with as well and there may have been some other
11  in-house folks. The deputy general counsel for
12  corporate affairs would likely have worked on some
13  of those as well.
14    Q    In July of '99 Ms. Duggin left and you
15  became acting general counsel?
16    A    Yes.
17    Q    How did that occur? Did the president
18  appoint you?
19    A    The board had to approve that appointment
20  as acting.
21    Q    And following that who became general
22  counsel in I guess December of '99?

15

1    A    It was either late November or early
2  December of '99. James Lloyd.
3    Q    And was he brought in from the outside or
4  was --
5    A    He was brought in from the outside. He
6  was with a law firm in town.
7    Q    What law firm?
8    A    I believe it was Bryan Cave.
9    Q    And where is he today?
10    A    He's retired.
11    Q    So at that point you are named a senior
12  deputy general counsel?
13    A    Yes.
14    Q    How many deputy general counsels were
15  there at the time that you were senior deputy
16  general --
17    A    There were three.
18    Q    Who were those three?
19    A    As they are today. The deputy general
20  counsel for labor and employment and that position I
21  don't believe was filled at the time. It was filled
22  subsequently. We had an individual depart prior to

16

1  that point in time and that position is now filled
2  by William Herrmann.
3    Q    Was that filled by him around --
4    A    Yes, it was filled by him in I believe
5  June of 2000 -- 2000.
6    Q    Okay.
7    A    A deputy general counsel for corporate
8  affairs and again he filled that position. It was
9  vacant because about the same time that Sarah Duggin
10  left the deputy general counsel for corporate
11  affairs left as well.
12    Q    And the designation senior is -- of the
13  three there's one senior and then there's two --
14    A    There were three. There's also a deputy
15  general counsel for tort claims and litigation.
16  That's Charlie Mandolia and he's held that position
17  for a number of years.
18    Q    Okay, I may have -- I may have missed
19  something you were trying to explain to me but is --
20  on a permanent basis are there three deputy general
21  counsels and then there's a senior?
22    A    Currently there no longer is that senior

17
1  position. Jim created that position and put me in
2  that position. It didn't exist prior.
3    Q    And it doesn't exist now?
4    A    No, it does not.
5    Q    You have three deputies?
6    A    Yes.
7    Q    And so today the three deputies are
8  William Herrmann and help me out with the other
9  two.
10   A    Larry Steffes for deputy general counsel
11  for corporate affairs and Charlie Mandolia, deputy
12  general counsel for tort claims and litigation.
13   Q    And attorneys are assigned, and I mean I
14  guess associate general counsels -- that's your
15  staff line of attorneys?
16   A    Yes, there are senior associate general
17  counsels too.
18   Q    Those positions are a result of years of
19  service or are they more discretionary in terms of
20  how someone becomes a senior associate general
21  counsel?
22   A    Those are on a case by case basis.

18
1    Q    How many total associate general counsels
2  are there including senior associates?
3    A    Oh no, now I've got to start counting. I
4  think there are about 26 lawyers total in the
5  department so if you take the four of us away
6  there's probably about 22. I may be off give or
7  take one or two but associate and senior associate
8  general counsels.
9    Q    And how many -- are there a rough number
10  of half of them are senior or not that many?
11   A    Not half. Maybe about ten, eight or ten.
12   Q    So did you at any point between
13  November '97 and July '99 carry the moniker of
14  senior associate or you just --
15   A    No, I did not.
16   Q    You just rocketed right to acting general
17  counsel?
18   A    Right. Well, the litigators reported
19  directly to the general counsel. There was no
20  deputy for the commercial litigators.
21   Q    And they would be under the -- well,
22  where would they be under?

19
1    A    Right now they still report directly to
2  the general counsel.
3    Q    So their direct report is the general
4  counsel?
5    A    Yes.
6    Q    And -- but everything else is funneled
7  through the deputy general counsels?
8    A    Yes, that's right.
9    Q    I would imagine that's somewhat
10  unwieldy. You have people just reporting to you on
11  a case by case basis?
12   A    Well, it's not just a case by -- I mean
13  it's a function of history. There was -- ever since
14  I came there was no deputy in that -- in that slot.
15  The slot had always existed but I guess prior to my
16  time one of the general counsels was promoted from
17  that deputy slot and it never got -- and it never
18  got filled and so those folks are fairly senior and
19  need very little supervision so they report directly
20  to me and come to me when they need to.
21   Q    How many -- if you break it down how many
22  attorneys are assigned to each of these --

20
1    A    Each of those groups?
2    Q    Groups.
3    A    There are three commercial litigators.
4  There are -- Desmond can help me out on labor and
5  employment.
6       MR. McILWAIN: Three.
7    A    Three and a deputy for labor and
8  employment. There are three and a deputy for tort
9  claims and litigation and the remainder, probably
10  ten or so, in corporate affairs.
11  BY MR. GOTTESDIENER:
12   Q    You were -- in November '97 I think you
13  said that you came on board doing commercial --
14  well, you said before you came on board you were
15  doing litigation and regulatory work.
16       When you came on board here were you
17  specifically assigned to a group or did you straddle
18  litigation and --
19   A    I was in the commercial litigators.
20   Q    And then just on an ad hoc basis you'd
21  work on something that wasn't litigation?
22   A    Yes.

21

1    Q    And that would just come about by
2  somebody pulling you into --
3    A    By the general counsel calling me next
4  door and saying can you work on this so --
5    Q    And when you went back to the prosaic
6  title of senior deputy general counsel, no longer
7  being acting --
8    A    Yes.
9    Q    -- you were -- you were over those three
10  other groups?
11   A    Yes.
12   Q    But not over litigation or --
13   A    No, over the litigation.
14   Q    Okay.
15   A    And frankly, they reported directly to
16  me. I mean in a lot of ways I served as the deputy
17  of litigation but also had oversight over -- over
18  the others as well.
19   Q    Okay. So tell me how it comes about in
20  August of 2001 you are senior deputy general counsel
21  and somehow it comes about that you find yourself
22  now corporate secretary.

22

1    A    The corporate secretarial function was
2  always separate at Amtrak. It held a position,
3  obviously an officer by law, but also a separate
4  position on the Corporation's management committee
5  prior to that time and when the then current
6  corporate secretary announced they were going to
7  leave, it was recommended that I take on that
8  responsibility and that it be brought into the law
9  department and so I was asked if I would assume that
10  position and I agreed.
11   Q    I want to ask you a couple questions
12  about your answer. That went a little too fast for
13  me, I'm sorry.
14       The corporate secretary you mentioned
15  sits on the management committee?
16   A    Yes.
17   Q    Could you tell me what the management
18  committee is?
19   A    What's an executive -- it used to be
20  called the management committee. It's an executive
21  committee comprised of the direct reports to the
22  president and CEO.

23

1    Q    Is it also called the executive
2  committee?
3    A    Yes, it currently is called the executive
4  committee.
5    Q    But at another point in time it was --
6    A    At that point in time it was called the
7  management committee.
8    Q    Is that a creature of bylaws or --
9    A    No, don't know.
10   Q    -- some resolution of the board of
11  directors?
12   A    No.
13   Q    So it's a --
14   A    I don't know how it was created.
15   Q    And does it have -- accepting that it is
16  not such a creature, does it have a set or
17  understood number of slots or --
18   A    I don't know if it's fixed. It generally
19  is comprised of the direct reports of the president
20  and CEO.
21   Q    And that is -- could you tick down who
22  those people are or rather what titles --

24

1    A    What titles. The VP of human resources,
2  the VP of diversity, the VP of labor relations, the
3  VP of government affairs, the chief financial
4  officer, the senior vice-president of operations,
5  the inspector general. I may have missed a few
6  but --
7    Q    I count up seven.
8    A    Seven.
9    Q    Does that sound right?
10   A    That sounds about right.
11   Q    And they -- or rather the committee that
12  they sit on interacts with the board of directors
13  how?
14   A    Not directly. This is a committee
15  intended to provide guidance and a forum for
16  discussion for the president and CEO.
17   Q    And how long has it been in existence?
18   A    Don't know.
19   Q    When you arrived it was called management
20  committee?
21   A    Yes, it was called the management
22  committee.

25

1    Q    And at what point did its name change?
2    A    I believe it may have changed around the
3    time that many of our titles changed in 1990 -- no,
4    in -- yeah, in 1999 I believe. No, in 2001. I
5    believe there was an effort to restructure a lot at
6    that level and there were some resolutions that were
7    presented to the board changing titles and I believe
8    at that point there was an executive committee
9    created, the direct reports.
10   Q    Do you believe that it was created by a
11   resolution of the board of directors?
12   A    Well, I don't know that the committee
13   itself was created. I think we -- in order to --
14   the members of the management committee or the
15   executive committee, any -- their titles and
16   compensation, et cetera have to be approved by the
17   board and so I believe as a result of that that it
18   went to the board for approval simply because of the
19   title changes that were going on for the members of
20   the executive committee.
21   Q    Well, did it occur after you became
22   corporate secretary that the corporate secretary was

26

1    given a seat on the executive committee or was
2    that --
3    A    It was already -- it was already existed
4    prior.
5    Q    So this would be someone we would add to
6    this list of seven, the corporate secretary?
7    A    Well, right now it's me as general
8    counsel and corporate secretary so it's one seat.
9    Q    That was actually the next question. Is
10   the --
11   A    Prior to my assuming the function there
12   was a separate corporate secretary seat on the
13   management committee.
14   Q    Okay, but I just also wanted to ask
15   you -- of the seven I didn't have as part of my list
16   general counsel so --
17   A    Sorry, general counsel and corporate
18   secretary as well.
19   Q    So general counsel and corporate
20   secretary?
21   A    Yes.
22   Q    Those were two separate seats and you get

27

1    to sit in two seats? That's not changed -- well,
2    I'll withdraw that.
3         When you took over this function --
4    before you took over that function there was a
5    separate seat?
6    A    For the corporate secretary, yes.
7    Q    And today you're on that in both
8    capacities?
9    A    Both capacities, yes.
10   Q    And how regularly and in what manner does
11   the executive committee report directly to the
12   president and CEO?
13   A    Currently?
14   Q    Yes.
15   A    We have executive committee meetings once
16   a week.
17   Q    And how long has that been the practice?
18   A    Since David Gunn's arrival in 2002.
19   Q    And prior to that?
20   A    Prior to that they were a lot more -- a
21   lot less frequent.
22   Q    Were they regular?

28

1    A    Not necessarily. When called by the
2    president and CEO.
3    Q    And sorry not to have all these dates
4    memorized but Mr. Warrington left --
5    A    I believe he left in April of 2002.
6    Q    And Mr. Gunn arrived in?
7    A    May of 2002.
8    Q    The original question that got us into
9    those areas just now was about how it came about
10   that you became corporate secretary and some of the
11   way you answered which was perfectly fine was in the
12   passive voice. I'm actually interested in what
13   individuals were involved in recommending or
14   suggesting either to the board or to you to seek the
15   position or -- if you could flesh that out a bit.
16   A    The discussions were had between the
17   general counsel and the CEO about who should take
18   over that function and I gather between the two of
19   them they recommended me for it and that
20   recommendation was made to the board at one of the
21   board meetings and I imagine it was the president
22   and CEO that offered the recommendation.

29
1    Q    And the general counsel and CEO at the
2  time were?
3    A    **George Warrington was the president and**
4  **CEO and Jim Lloyd was the general counsel.**
5    Q    And the -- the then current corporate
6  secretary was Stewart Simonson?
7    A    **Yes.**
8    Q    Did he have any role in your appointment,
9  recommendation, anything like that?
10   A    **Not that I'm aware of.**
11   Q    Had you worked with him during the times
12  that you were working on resolutions and executive
13  summaries?
14   A    **Yes.**
15   Q    And you became corporate secretary after
16  the board of directors approved you as such?
17   A    **I believe that's right. I don't have the**
18  **dates specifically. I know there were resolutions**
19  **that were put there. Perhaps I served in an acting**
20  **function for -- until the approval took place. I**
21  **don't have a recollection of the timing of -- of the**
22  **events because right around that time was the title**

30
1  **change. There were a lot of title changes going on.**
2    Q    The other title changes that you
3  mentioned were -- you said that there was a
4  restructuring?
5    A    **Yes.**
6    Q    And could you just tell us what was that
7  about?
8    A    **Well, in terms of the committee there**
9  **were title changes so, for example, my title changed**
10  **from senior deputy general counsel to senior**
11  **vice-president - law and corporate secretary. As a**
12  **result of that change the general counsel's title**
13  **had previously been senior vice-president and**
14  **general counsel was changed to executive**
15  **vice-president and general counsel and there created**
16  **some committees, the executive committee I believe**
17  **and an operations committee that were intended to**
18  **over -- for oversight of the operations of the -- of**
19  **the corporation.**
20   Q    In the years of -- I guess we're looking
21  at three and a half years approximately that you
22  were a lawyer with Amtrak before you became

31
1  corporate secretary.
2         How regularly would you say that you
3  worked on issues pertaining to executive summaries
4  and resolutions being presented to the board of
5  directors?
6    A    **In the beginning probably not at all and**
7  **then increasing during that period of time and**
8  **towards the end probably on a regular basis.**
9    Q    Given your commercial litigation
10  background and work, was there some specific reason
11  why you were gravitating towards more and more work
12  in this area?
13   A    **I don't think there was any specific**
14  **reason.**
15   Q    Well, how would you account for it?
16   A    **Well, I suspect that probably a couple of**
17  **the executive summaries pertained to issues that I**
18  **was dealing with and then as a result of working**
19  **with the corporate secretary on that, he came back**
20  **to me for other things and the relationship worked**
21  **out that way so that he would pick up the phone and**
22  **give me a call if he had an issue to raise with me.**

32
1    Q    And you're referring to Mr. Simonson?
2    A    **Yes.**
3    Q    When did he begin his tenure as corporate
4  secretary?
5    A    **I don't have a specific date but he came**
6  **on after the new board was put in place in June**
7  **of '98 so either sometime in 1998 or early 1999 I**
8  **suspect.**
9    Q    And who was the corporate secretary prior
10  to Mr. Simonson?
11   A    **I believe that Barbara Richardson served**
12  **in that function.**
13   Q    Do you know how long she served?
14   A    **I don't have specific dates. When I**
15  **arrived in 1997 she was not serving in that function**
16  **so it had to have been subsequent to that time.**
17   Q    Is she -- what did she do after
18  Mr. Simonson took that position?
19   A    **She is currently our vice-president of**
20  **marketing.**
21   Q    So I'm sorry, Richardson -- when you
22  arrived who was the corporate secretary?

33

1    A    Her name was Ann Linnertz.
2    Q    And is she still here?
3    A    No, she's not. She left the company.
4    Q    And was she your -- Ms. Richardson an
5    attorney?
6    A    Are you talking about Ann Linnertz or
7    Barbara Richardson?
8    Q    Both of them. I'm asking are they
9    attorneys?
10    A    Barbara is not. Ann I don't know.
11    Q    And Simonson, is he an attorney?
12    A    Yes.
13    Q    And he left to go with Governor Thompson
14    to HHS?
15    A    Yes.
16    Q    And why is it that he came in at the time
17    he did after the reform board was put in place?
18    A    I don't know.
19    Q    But was it requested -- are you aware of
20    any requests by the reform board or members of the
21    reform board for a new corporate secretary?
22    A    No, I'm not aware of any.

34

1    Q    Who was the corporate secretary when the
2    reform board was installed?
3    A    I believe Barbara Richardson was in that
4    position at that time.
5    Q    You've twice with respect to her said in
6    that position as opposed to --
7    A    Well, because she's currently the
8    vice-president of marketing right now so when I say
9    in that position, serving as the corporate
10    secretary. I also believe she had other duties at
11    the time.
12    Q    While she was serving as corporate
13    secretary?
14    A    Yes.
15    Q    Did Mr. Simonson have any other duties
16    while he was serving as corporate secretary?
17    A    No, he didn't. I believe he did serve as
18    counsel on occasion to the president and CEO but his
19    primary function was the corporate secretarial one.
20    Q    During the time that you were acting in
21    this '97 to late 2001 time frame in let's say a --
22    through a legal capacity with respect to corporate

35

1    secretariat matters, who was acting in the corporate
2    secretariat under Mr. Simonson?
3    A    John Carten who is the assistant
4    corporate secretary and Medaris Oliveri who's also
5    the assistant corporate secretary.
6    Q    Anyone else?
7    A    There was an administrative assistant as
8    well that supported them.
9    Q    And who was that?
10    A    I don't know if -- it depends on the time
11    frame. I don't know who would have served in the
12    function at any given point in time but Sharron
13    Hawkins who currently works in the law department at
14    one point in time served as the administrative
15    person for Mr. Simonson and John Carten.
16    Q    But she's no longer serving in that
17    capacity?
18    A    She does support the board office as well
19    as some administrative functions in the law
20    department.
21    Q    But has there been a shift from what she
22    had done previously in terms of the concentration of

36

1    her duties?
2    A    No.
3    Q    Okay. Well, then I misunderstood. I
4    thought --
5    A    Prior when she supported Stewart Simonson
6    she was the only AA and they were a separate
7    office. When she -- when the corporate secretarial
8    function came under me, she still supports John but
9    also supervises our legal assistants in the law
10    department because I have an executive assistant
11    that supports me as well. She serves as backup also
12    to that person so it's a little bit of a different
13    setup but for the most part, the work that she does
14    for the board is the same in terms of administrative
15    work.
16    Q    And who is your assistant?
17    A    My assistant is Yvette Jones.
18    Q    And how long has she been your assistant?
19    A    Probably since a couple of months after
20    arriving to Amtrak in probably sometime in '98, in
21    early '98.
22    Q    And is she -- she's an administrative

37

1  assistant?
2  **A   Yes.**
3  Q    Is she an administrative assistant or any
4  sort of assistant to any other person or group?
5  **A    She supports some other attorneys in the**
6  **law department.**
7  Q    And what do you mean by support? Is she
8  assigned to other attorneys?
9  **A   Yes.**
10  Q    How many other attorneys?
11  **A    Two others I believe, two or three**
12  **others.**
13  Q    And she is assigned to you as the
14  principal person she's supporting, is that fair?
15  **A   Yes.**
16  Q    And you said today Ms. Hawkins
17  vis-a-vis -- I'm going to try to keep this
18  straight. Vis-a-vis your legal functions what
19  Ms. Hawkins does for you is she supervises legal
20  assistants in the entire law department?
21  **A    The administrative assistants, the**
22  **secretaries, right.**

38

1  Q    I thought I heard legal assistants.
2  **A    No, not the paralegals or clerks or**
3  **anything like that.**
4  Q    She supervises all of the administrative
5  assistants assigned to the law department?
6  **A    To the lawyers, yes.**
7  Q    How many administrative assistants are
8  there in the law department approximately obviously?
9  **A    Four, five. Four.**
10  Q    For the entire law department?
11  **A   Yes.**
12  Q    To support all those attorneys?
13  **A    To support 25 attorneys there are about**
14  **four or five, uh-huh.**
15  Q    Is there some category of like -- dare I
16  use the word "secretaries."
17       Are there secretaries or are there other
18  people who support --
19  **A    Well, there are lots of nonlawyers in the**
20  **law department who do work.**
21  Q    I mean I would assume --
22  **A    But in terms of clerical work you mean,**

39

1  no, there aren't any others.
2  Q    So what are the other kinds of people
3  supporting lawyers? Legal assistants?
4  **A    There are legal assistants. In the**
5  **summertime we have law clerks. Within the law**
6  **department there is a whole claims group. There are**
7  **the EO group, the hearing officer group. Our real**
8  **estate function is housed in the law department, the**
9  **board office. Did I miss anybody? RIM, records and**
10  **information management folks.**
11  Q    How many people are in RIM?
12  **A    In RIM three people.**
13  Q    And RIM stands for records --
14  **A    Records and information management.**
15  Q    And that's part of the law department?
16  **A   Yes.**
17  Q    How long has it been part of the law
18  department?
19  **A    Since the corporate secretarial function**
20  **came to the law department.**
21  Q    And that year again was?
22  **A    2001.**

40

1  Q    Now, again excuse me if I missed
2  something but the coming to the law department of
3  the secretarial function, was that timing
4  coincidental with your taking this position or was
5  this --
6  **A    Well, it made sense because if I was**
7  **going to assume the position then the functions that**
8  **fell within that group needed to be divided because**
9  **I believe that the corporate secretary's office also**
10  **supervised the mail room and some other functions**
11  **that were broken off when the corporate secretarial**
12  **and records function came to the law department.**
13  Q    Okay, but -- not to put too fine a point
14  on it but if I'm hearing correctly the functional
15  change or allocation of responsibility followed the
16  personnel action?
17  **A   Yes.**
18  Q    Not the other way around?
19  **A   No.**
20  Q    Must be great being so important. Okay,
21  so you said there were four people in RIM and that
22  was -- I'm sorry?

41

1    **A    Three people in RIM.**
2    Q    Then that group was not part of the law
3    department prior?
4    **A    No, uhn-uhn.**
5    Q    Where were they prior?
6    **A    Under the corporate secretary.**
7    Q    Was there any other function under the
8    corporate secretary other than records and
9    information management and mail room prior to the
10   change over?
11   **A    I think there were some administrative**
12   **type functions that were transferred over or split**
13   **off.**
14   Q    But the corporate secretary shed when the
15   function came to the law department?
16   **A    Yes.**
17   Q    But they're not coming to mind, any of
18   them?
19   **A    I don't know what they're called.  I**
20   **think the person who you go to for administrative**
21   **lighting and --**
22        MR. McILWAIN:  Maintenance.

42

1    **A    You know, services, administrative**
2    **services I think.  I don't know what they're**
3    **called.  Building services maybe.**
4    BY MR. GOTTESDIENER:
5    Q    Okay, so back to Ms. Hawkins she
6    supervises the handful of administrative assistants?
7    **A    Yes.**
8    Q    And she herself is classified as an
9    administrative assistant?
10   **A    Her title -- I believe she's an executive**
11   **assistant.**
12   Q    And as to the corporate secretary she
13   does support work?
14   **A    She does support work.**
15   Q    Is there anyone else during the period
16   from the change over to today that in any way
17   supports the corporate secretary or function of the
18   corporate secretary including the --
19   **A    Other than Sharron Hawkins, John Carten**
20   **and Medaris Oliveri, no.**
21   Q    And if we could spend a few moments on
22   Ms. Oliveri and place her in the various boxes

43

1    that --
2    **A    Sure.**
3    Q    -- we've been talking about she is -- as
4    I understand it she's considered -- I don't know if
5    this is a title -- part-time assistant corporate
6    secretary?
7    **A    Yes.**
8    Q    Is that a title or is that --
9    **A    The title is an assistant corporate**
10   **secretary but she only functions in that capacity**
11   **part-time.**
12   Q    And how long has that been the case?
13   **A    For as long as I can remember.**
14   Q    And where else is she situated in --
15   **A    She serves as our FOIA officer and she**
16   **also supervises our records folks.**
17   Q    Okay, so let's take those one at a time.
18   With the second, supervises our records folks, does
19   that mean she is over the three people in RIM?
20   **A    Yes.**
21   Q    She is not one of the three RIM people?
22   **A    No.**

44

1    Q    And does she have a title like
2    supervisor-RIM?
3    **A    I don't -- I'm trying to think about her**
4    **title.  I think her title is director of RIM-FOIA.**
5    **I don't know.  We actually just changed her title**
6    **fairly recently.  She used to be the director of**
7    **corporate -- of litigation support and we rearranged**
8    **some of the administrative functions in the law**
9    **department recently and assigned her directly --**
10   **she's always served as the FOIA officer but limited**
11   **some of her functions to the RIM and the FOIA in**
12   **order to allow her to focus on those two areas.**
13   Q    Previously she had also been litigation
14   support?
15   **A    She had some -- some legal assistants**
16   **that reported to her.**
17   Q    Was she giving out legal assignments or
18   was she --
19   **A    No, they reported directly up to her but**
20   **it was really the attorneys that were giving out the**
21   **legal assignments.**
22   Q    And this was a function that she had for

45

1  a long time?
2    **A    She had for a long time even before I**
3  **came to Amtrak.**
4    Q    So -- but what would -- what would the
5  content of that function be if she's not giving out
6  legal assignments?
7    **A    Well, that's part of the reason why we**
8  **changed it was because it didn't really make a lot**
9  **of sense and so we created another position to**
10  **directly supervise the legal assistants that would**
11  **in fact supervise them, give out work, serve as**
12  **liaison with some of the attorneys who needed work**
13  **and have Medaris focus on the RIM and the FOIA work**
14  **as well.**
15    Q    Is that a function that's now being
16  handled by a lawyer?
17    **A    Excuse me?**
18    Q    Is that now a function that's being
19  handled by a lawyer?
20    **A    No.**
21    Q    Who handles that?
22    **A    The supervising legal assistants?**

46

1    Q    Yes.
2    **A    One of the most senior legal assistants**
3  **that we have and her name is Christine Turnblazer.**
4    Q    Still is that a separate title or that's
5  just something that she does?
6    **A    Separate title.**
7    Q    And that title is?
8      MR. WELLSCHLAGER:  I'm sorry,
9  Ms. Turnblazer's title?
10      MR. GOTTESDIENER:  Yes.
11    **A    Manager-litigation support I think or**
12  **something along those lines.**
13  BY MR. GOTTESDIENER:
14    Q    As FOIA officer where does Ms. Oliveri
15  and where has Ms. Oliveri figured in the
16  organizational scheme that we're talking about?
17    **A    She up until January reported directly to**
18  **me as FOIA officer.**
19    Q    Reported to you as general counsel?
20    **A    As general counsel and corporate**
21  **secretary I guess in my -- she reported directly to**
22  **me.**

47

1    Q    Well, let's try it this way:  Before you
2  came along --
3    **A    Yes.**
4    Q    -- where --
5    **A    She reported directly to the general**
6  **counsel.**
7    Q    Okay, so she -- not to the corporate
8  secretary?
9    **A    No.**
10    Q    In the FOIA capacity?
11    **A    Right.  She always in the FOIA capacity**
12  **reported to the general counsel.**
13    Q    And then in January there was a change?
14    **A    Yes.**
15    Q    And tell us about that.
16    **A    We hired a new director of administration**
17  **and records and he now supervises the administrative**
18  **functions in the law department; finance, litigation**
19  **support, RIM, FOIA and the administrative**
20  **assistants.**
21    Q    I thought I was following along with
22  this --

48

1    **A    You thought.**
2    Q    -- until then.
3    **A    All of those folks reported directly to**
4  **me and I needed somebody who I could rely on to**
5  **supervise all of those functions.  The finance**
6  **person reported to me.**
7    Q    The finance inside of legal?
8    **A    Right, handling the budget and all of the**
9  **budget issues associated with the law department.**
10  **The litigation support reported to me.  FOIA**
11  **reported to me.  It all reported directly up to me**
12  **and I needed somebody to manage that.**
13    Q    But you said -- and maybe you misspoke or
14  I misheard.  You said also administrative assistants
15  are now reporting to this --
16    **A    Well, Sharron in her capacity as**
17  **supervising the legal assistants also reported**
18  **directly to me prior to January so now I put one**
19  **person in who could deal with all of the**
20  **administrative functions for the law department.**
21    Q    Okay, so Sharron doesn't report to you on
22  that?

Case 1:06-cv-01539-GK    Document 20-8    Filed 01/16/2007    Page 14 of 66
DEPOSITION OF ALICIA MOSLEY REATON
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

13 (Pages 49 to 52)

49

1    A    Right.
2    Q    She reports to this new fellow?
3    A    That's correct.
4    Q    Whose name is?
5    A    Bud Luby, Bernard Luby.
6    Q    And that's L-O --
7    A    L-U-B-Y.
8    Q    L-U-B-Y. And Mr. Luby came from in-house
9    or somewhere else?
10   A    No, he came from the outside from a law
11   firm.
12   Q    And he just started in January?
13   A    In January.
14   Q    So now he -- and then he reports directly
15   to you?
16   A    Correct.
17   Q    So your direct reports are director of
18   administrative and records?
19   A    Yes.
20   Q    Mr. Luby. You've got three deputies?
21   A    Yes.
22   Q    You have -- this is in your capacity as

50

1    general counsel?
2    A    Yes.
3    Q    And then you have on an ad hoc basis
4    litigators reporting directly to you?
5    A    Yes, and the VP of commercial development
6    real estate reports directly to me as well.
7    Q    Commercial development real estate?
8    A    Yes.
9    Q    Is that person a lawyer?
10   A    She happens to be.
11   Q    And that functions inside the law
12   department?
13   A    Yes, it does.
14   Q    Has that always been inside the law
15   department?
16   A    No, it wasn't. It was a separate entity
17   and became part of the law department I think around
18   the same time that the corporate secretariat
19   function came into the law department.
20   Q    And so Luby has finance, administrative
21   assistants?
22   A    Yes.

51

1    Q    RIM, FOIA?
2    A    Uh-huh.
3    Q    Meaning Ms. Oliveri reports to him?
4    A    Yes.
5    Q    And did I have something correctly here,
6    litigation support?
7    A    Yes.
8    Q    And who heads that up?
9    A    Christine Turnblazer.
10   Q    That's Turnblazer?
11   A    Yes.
12   Q    Now, is there now or has there ever been
13   any sort of handbook or guidelines or standards for
14   the discharge of the corporate secretariat function?
15   A    Not that I'm aware of.
16   Q    Has that been something that's ever been
17   explored or discussed as far as you know?
18   A    Not that I'm aware of.
19   Q    Does the corporate secretariat subscribe
20   to publications or periodicals that update people
21   who serve in these capacities?
22   A    Well, other than the general periodicals

52

1    and things that I get which deal -- in many
2    corporations the general counsel happens to also be
3    the corporate secretary and so a lot of the general
4    counsel publications and things that I get deal with
5    those issues as part of that but --
6    Q    Could you tell us what publications you
7    or your office regularly subscribes to and which of
8    those, if any, you review on a regular basis?
9    A    I can't go into all of them right now. I
10   don't recall but certainly the American Corporate
11   Counsel Association has a number of publications and
12   we receive those and I review them.
13   Q    Could you provide any of the names of
14   these publications?
15   A    I don't -- I don't -- I can't think of
16   any offhand right now off the top of my head.
17   Q    Did you receive in any form any type of
18   training to be corporate secretary?
19   A    Other than the work that I had had with
20   the corporate secretary at the time and my review of
21   the bylaws, the Board Statement of Policy, et
22   cetera, no.

53

1    Q    How long after you became acting
2 corporate secretary or corporate secretary and I
3 make that -- I say that because as I understand your
4 testimony you don't know if you like were the
5 corporate secretary officially when you began the
6 function or whether you were acting as such?
7    A    No.
8    Q    And maybe we can find that out but when
9 you -- when you became -- when you took on that role
10 there was Ms. Oliveri, Mr. Carten and Ms. Hawkins
11 and --
12    A    Yes.
13    Q    -- no one else assigned to that group?
14    A    That's right.
15    Q    And where were -- where was everybody
16 physically situated?
17    A    The corporate secretary's office was
18 upstairs on the fourth floor with John right next
19 door. Medaris was downstairs in the law department
20 with us.
21    Q    And the board of directors' conference
22 room is where?

54

1    A    The boardroom is on the fourth floor
2 upstairs.
3    Q    And Mr. Simonson's office was situated
4 near the boardroom?
5    A    Yes. Well, upstairs on the fourth floor.
6    Q    What, if anything, did you do -- let me
7 back up and say when you took on this function or
8 assumed this office the other changes that we were
9 talking about, things coming into the law
10 department --
11    A    Yes.
12    Q    -- was that simultaneous? Was that --
13 did that go on for some period of time after you
14 took on the duties?
15    A    If I recall correctly the resolution to
16 the board was around the same time, maybe a little
17 bit subsequent and so things occurred. I believe
18 the effort was to try to make the changes by
19 October 1.
20    Q    Of 2001?
21    A    Yes.
22    Q    Now, did you -- when you became corporate

55

1 secretary did you request or order or institute any
2 sort of housecleaning or review or report of what's
3 been going on and how things could function better,
4 anything like that?
5    A    Well, obviously I worked with John Carten
6 very closely. He moved his office downstairs to the
7 third floor so that he could be much closer
8 proximity to me. Sharron as well moved downstairs
9 so that she could be much closer to me and we work
10 together on a very regular basis and I did make some
11 changes about doing things only because as with any
12 individual we all have certain ways of doing things
13 and I worked with John very closely. We have a lot
14 of board meetings a year and so we had a lot of time
15 to talk about things and work through things.
16    Q    Can you point to anything specific that
17 you changed that Mr. Simonson had not done or had
18 done in a different way that you changed things?
19    A    Well, there are certain things that I put
20 in place that didn't exist previously. I can't
21 think of all of them offhand. One of them, for
22 example, in the board books we now include action

56

1 items when the board requests for us to do
2 something. We prepare an action item list that we
3 include as part of the board book so that the board
4 understands what happened to their request, whether
5 it's in process, whether it's been completed and who
6 is responsible for completing it so that was one of
7 the things that we instituted.
8    Q    Some definitions. Board books. Are
9 board books the same thing as record of meeting
10 books?
11    A    No, the board books are the books that we
12 send out to the board in advance of a board meeting
13 that will include executive summaries and
14 resolutions as well as presentations, et cetera,
15 anything that we want them to take a look at in
16 advance of a board meeting pertaining to issues that
17 we will raise at the board meeting including an
18 agenda.
19    Q    And these are -- are they in binders
20 typically?
21    A    Yes.
22    Q    And are they one or more than one binder

57
1 typically?
2    A    One binder for each board member.
3    Q    And these are distributed to board
4 members again typically how far in advance of a
5 regularly scheduled meeting?
6    A    We do -- we mail a week in -- usually so
7 that they can receive it a week in advance of a
8 board meeting.
9    Q    Any meeting?  Would that include meetings
10 other than regular meetings?
11    A    No, we would generally not do a full book
12 because if there was a meeting called for a special
13 purpose, we might send them something in advance for
14 that which we would fax or overnight but the book is
15 generally reserved for the regularly scheduled
16 meetings.
17    Q    How many kinds of meetings does the board
18 have or could the board have?
19    A    Can have committee meetings.  We could
20 have regularly scheduled board meetings and special
21 meetings and telephone meetings.
22    Q    The last two you mentioned, special and

58
1 telephone, are those in your view different,
2 telephone and special?
3    A    Well, a special meeting of the board
4 could possibly be in person but not otherwise
5 scheduled in advance.  We generally have board dates
6 at the beginning of the year, agreed to dates so if
7 something occurs that we need to schedule an
8 additional meeting for, I would consider that to be
9 a special meeting.
10    Q    Right, and I'm trying to understand.
11 What is a telephone meeting then?
12    A    When we get the board members on the
13 phone.  We could have a special meeting in person or
14 we could have a special meeting by telephone.
15    Q    Could you have a regular meeting by
16 telephone?
17    A    We generally wouldn't do that.
18    Q    Could you?
19    A    I suppose we could.  I've never -- I've
20 never done it so --
21    Q    And what device or devices is employed to
22 make sure that a telephone meeting is compliant with

59
1 any requirements to make such a meeting a valid
2 meeting?
3    A    We would schedule the meeting, provide
4 each of the directors with the appropriate call-in
5 number and the time and ensure that -- and take
6 minutes just like we would for a regular meeting.
7    Q    And is there -- when a telephone meeting
8 happens is it typical that there are some people who
9 still meet in the boardroom and -- like, for
10 example, the note takers for taking minutes?
11    A    Well, we could meet -- we would be
12 together and the board members could be on the
13 phone.
14    Q    And at the typical board meeting that is
15 held, the regular meeting that's in person, who are
16 the typical attendees, almost invariable attendees
17 other than whatever members of the board there are?
18    A    Myself, John Carten, Medaris Oliveri and
19 various members of the executive committee.
20    Q    And the various members of the executive
21 committee, is that -- is that just a floating --
22 depending on the subject matters?

60
1    A    Sometimes.  I think it depends on the
2 subject matter.  They're not there all the time.
3 They're there sometimes.
4    Q    And before your joining of these two
5 functions in one person, would you say that
6 invariably it was the corporate secretary or the
7 general counsel or both that would also typically be
8 there?
9    A    Sometimes it would be both.  It was
10 not -- the general counsel did not necessarily --
11 although at a certain point Jim did start to attend
12 all of the board meetings but prior to him the
13 general counsel would only go in if it was something
14 that was pertaining to her function but obviously
15 the corporate secretary was there all the time.
16    Q    What then is a record of meeting book if
17 you know?
18    A    I don't refer to it as that.  I'm
19 assuming what you're talking about are the books of
20 minutes and the -- and the resolutions that we keep.
21    Q    You said you didn't refer to it that
22 way.  Have you ever -- prior to me articulating this

61
1  in a question have you ever heard the phrase "record
2  of meeting book"?
3  **A    I have heard the phrase but we don't use**
4  **it. We don't use that term to refer to our official**
5  **records.**
6  Q    And we in this case means who?
7  **A    Me and John, Medaris.**
8  Q    John Carten and --
9  **A    Yes.**
10 Q    -- Ms. Medaris Oliveri?
11 **A    Yes.**
12 Q    Where have you heard the term "record of
13 meeting book"?
14 **A    I don't have any specific recollection**
15 **that I can tell you where.**
16 Q    Is it a term that you've heard recently?
17 **A    No, not necessarily.**
18 Q    Is it a term that you've heard very
19 infrequently?
20 **A    Yeah.**
21 Q    And you, if I understood your answer,
22 think that it probably refers to books of minutes

62
1  and the resolutions that you keep?
2  **A    If what you're trying to ask me is what**
3  **our official records are, our official records are**
4  **the minutes as well as the resolutions of the**
5  **corporation -- of the board of directors.**
6  Q    I intended to ask you that question but
7  that wasn't my question.
8  **A    Okay.**
9  Q    My question is the record of meeting
10 books, did I understand your answer to be that you
11 assume that what that is is a reference to -- not a
12 term that you would use but when it is used it is a
13 reference to books of minutes and the resolutions
14 that you keep?
15 **A    Yes.**
16 Q    And could you tell me what you mean by
17 books of minutes and the resolutions that you keep?
18 **A    We maintain official minutes of the board**
19 **meetings as well as the resolutions and John**
20 **maintains them in books that we keep which are our**
21 **official records when we need to go back and look**
22 **for official resolutions or minutes of the board.**

63
1  Q    Are the -- you said that we maintain
2  official minutes as well as resolutions.
3  Are they maintained in the same fashion
4  together? Do you know how they're maintained?
5  **A    The minutes are in one binder and the**
6  **resolutions I believe are in another.**
7  Q    And you say you believe. Is there any
8  doubt in your mind or --
9  **A    I don't look at them on a daily basis so**
10 **my assumption is that they are maintained that way**
11 **because we've talked about them in the past but I**
12 **don't review them on a daily basis to see how**
13 **they're -- where they are and how they're being**
14 **kept. That's John's responsibility.**
15 Q    Is it part of his responsibility to
16 report to you as to how he is carrying out his
17 responsibilities?
18 **A    In our discussions on a daily basis I**
19 **understand what he's doing because he reports to me**
20 **about his actions and when there are issues in**
21 **connection with his responsibilities. He's been**
22 **doing this a long time so he knows what he's doing.**

64
1  Q    How do you supervise Mr. Carten's
2  discharge of his duties?
3  **A    Virtually on a daily basis he will come**
4  **to me, ask me questions, substantive questions about**
5  **things that are going on with the board. We sit**
6  **together and talk about agendas in terms of**
7  **substantive matters that are on there. When he has**
8  **memos or things that need to go out to the board he**
9  **will come to me, have me review it in advance and**
10 **then send it out to them so I am constantly**
11 **supervising him because he comes to me on a very**
12 **regular basis to ask me about -- questions about**
13 **things that need to be done for the board.**
14 Q    When you assumed the duties of corporate
15 secretary you didn't ask for any specific report as
16 to how the official records of the corporation are
17 kept?
18 **A    I'm not sure what you mean a specific**
19 **report.**
20 Q    What did you do, if anything, when you
21 became corporate secretary to be informed and learn
22 how, with specificity, the official records of the

65

1  corporation were kept?
2     A    I spoke with John and I worked with him
3  to understand exactly what it is he was doing in
4  order to maintain our books and -- but I didn't
5  request any specific written report or anything like
6  that. Our conversations on a regular basis and on a
7  daily basis provided me with that input.
8     Q    But to be fair you're not saying that you
9  recall that when you were given this title and
10 dubbed corporate secretary that you said John, let's
11 sit down. Now that I'm corporate secretary I want
12 you to download me on exactly how these things are
13 kept. I want you to show me this and that. I mean
14 that didn't happen, did it?
15       MR. WELLSCHLAGER: Objection to the form
16 of the question. Go ahead.
17    A    On a regular basis he and I worked on
18 issues and so I don't feel like I needed to sit
19 down and have him go through all of those things.
20 On a daily basis we go through them automatically so
21 it was a given that within a very short period of
22 time I would understand what was going on and if

66

1  there was something that came up and I didn't
2  understand it, I asked him where is this, where are
3  these kept, how do we do this, how do you normally
4  do this. All of those were regular questions as far
5  as our dialogue was concerned.
6  BY MR. GOTTESDIENER:
7     Q    And I understand and appreciate your
8  answer. I just want to know if you have any
9  recollection of learning upon assuming the duties of
10 corporate secretary of specifically requesting a
11 written or oral report from him or Ms. Oliveri or
12 Ms. Hawkins as to how things were maintained?
13    A    Maybe I could parse your question a
14 little bit. Did I ask for a written report? No.
15 Did I ask for an oral on the spot report? No, but
16 by virtue of the questions that went back and forth
17 everyday, yes, I did request of him to understand
18 exactly how the functions worked on a regular basis,
19 on an as needed and regular basis in terms of our
20 working relationship.
21    Q    It would be fair to say that your thought
22 process at the time as to that issue was you would

67

1  learn that as issues came up?
2     A    And to the extent I wanted to know
3  something I would ask the question. I was familiar
4  enough with the operation that I wasn't starting
5  from scratch.
6     Q    Have you ever requested a tour of the
7  storage room where records are kept?
8     A    I have taken a tour of the storage room
9  where the records are kept.
10    Q    You say you've taken a tour. Is that
11 something you did on your own or with someone else?
12    A    I went with John up there.
13    Q    And when was that?
14    A    I don't recall. Early on.
15    Q    And what did you find when you got there?
16    A    Lots of paper.
17    Q    You say "early on." Was there any
18 specific reason why you took the tour when you did
19 take the tour?
20    A    I don't recall.
21    Q    Do you recall -- withdrawn.
22       How long did you spend on this tour?

68

1     A    I don't recall.
2     Q    Did anyone else go with you?
3     A    Not that I recall.
4     Q    Did you take any notes?
5     A    No.
6     Q    Did John take any notes?
7     A    Not that I recall.
8     Q    Did he show you -- withdrawn.
9       Could you describe what you saw in the
10 storage room?
11    A    Well, I saw the binders of where the --
12 the minutes are being kept and any other papers and
13 things that he had up there. I mean I didn't -- you
14 know, I don't have a specific recollection of what
15 exactly I saw.
16    Q    Did you see if there were -- well, how
17 did you see the binders kept in the storage room?
18 How were they kept as appeared to you visually?
19    A    I believe they were on file -- you know,
20 on a shelf in binders.
21    Q    A bookshelf?
22    A    Yes, I believe. I don't have specific

Case 1:06-cv-01539-GK   Document 20-8   Filed 01/16/2007   Page 19 of 66
DEPOSITION OF ALFRED J. MILLER
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

18 (Pages 69 to 72)

69

1  recollection of the furniture that was in there. I
2  know they were in there.
3  Q   Do you recall anything other than book
4  shelves and binders and general paper?
5  A   Not that I can speak to right now.
6  Q   Do you recall there being any filing
7  cabinets in there?
8  A   I'm assuming there were but I can't
9  visualize them right now.
10  Q   Did Mr. Carten show you anything specific
11  once you were inside?
12  A   I don't recall.
13  Q   Did you make inquiry as to the then
14  current security arrangements for that room?
15  A   We did talk about them and access to the
16  room.
17  Q   Okay. You talked about it and tell us
18  what the conversation was.
19  A   I don't recall specifically the
20  conversation.
21  Q   Do you currently have access to that
22  room?

70

1  A   I would generally ask John to open it if
2  I needed access to it.
3  Q   And do you know how that room is secured
4  if it is?
5  A   I believe it is secured. He does have a
6  key. It's locked at all times and if I need
7  something I would ask for him to go get it for me.
8  Q   Do you know if anyone else has access to
9  the room?
10  A   I don't believe anybody else has access
11  to the room. Maybe Sharron but I don't think
12  anybody else.
13  Q   As to the -- you told us a few moments
14  ago about -- that you believed that there was
15  minutes in one binder and resolutions in another.
16  A   Uh-huh.
17  Q   Is there -- what is the relation between
18  the minutes and the resolutions?
19  A   The resolutions effectively are part of
20  the minutes. Generally the minutes will have the
21  resolutions in them but we do have the resolutions
22  as separate pages and he keeps a book of that and if

71

1  there are unanimous consent resolutions, those are
2  kept with the official resolutions as well but those
3  are not part of the minutes.
4  Q   Has there ever been any time as far as
5  you're aware that those unanimous consent
6  resolutions have been kept with the minutes?
7  A   Not that I'm aware of.
8  Q   Has there ever been any discussion as to
9  the possible need to keep them with the minutes?
10  A   No, there hasn't been any discussion.
11  Q   Did you as a lawyer prior to becoming
12  corporate secretary from November '97 to August 2001
13  ever do any legal work in connection with any
14  resolution that was enacted or sought to be enacted
15  via a unanimous consent resolution?
16      MR. WELLSCHLAGER: Objection to the form
17  of the question, vague. You can answer if you can.
18  A   I don't recall whether or not there were
19  any unanimous consents that were used prior to my
20  serving as corporate secretary.
21  BY MR. GOTTESDIENER:
22  Q   How about once you became corporate

72

1  secretary?
2  A   We have used it on occasion.
3  Q   And apart from any possible use in
4  connection with the subject matter of the litigation
5  in which this deposition is being taken, what time
6  or times did the unanimous consent resolution
7  procedure -- did it be employed while you have been
8  corporate secretary?
9  A   I can't tell you now how many times it's
10  been used. On occasion we have used it when we have
11  been unable to get the full board together either in
12  person or by telephone.
13  Q   Have you at any point up until the
14  present time asked for any kind of review or
15  yourself undertaken any kind of review as to the
16  method, procedure, methodology by which unanimous
17  consent resolutions are sought and obtained?
18  A   Well, other than looking at the bylaws as
19  they relate to D.C. law which we have looked at on a
20  couple of occasions, I'm not sure what you're
21  asking. A review. There's never been any need for
22  us to undertake a review of it so we haven't

77

1    Q    But you worked on the revision --
2    A    Yes.
3    Q    -- and the deletion of Appendix A?
4    A    Yes.
5    Q    And at this point without getting into
6    the substance, I would imagine you would be able to
7    answer the question that presumably came up why is
8    this here if we didn't think --
9    A    The question that you asked was whether
10   or not I was aware of us holding open meetings in
11   recognition of our obligation to do so separate and
12   apart from the bylaws and my answer is no.
13   Q    As a matter of policy as I understand it
14   returning to the unanimous consent resolution --
15   A    Yes.
16   Q    -- this procedure is used because there's
17   an inability to get the full board together for some
18   form of meeting?
19   A    Correct.
20   Q    Is that -- has that ever been
21   memorialized or in any way adopted in any official
22   way, that policy?

78

1    A    Our bylaws provide us with the
2    opportunity to seek unanimous consent. Our
3    preference is to have a meeting obviously and when
4    we're unable to do that then we will use a unanimous
5    consent.
6    Q    And how frequently has the unanimous
7    consent been used since you've become corporate
8    secretary?
9    A    I can't tell you how many times.
10   Q    What has your involvement been when the
11   unanimous consent procedure has been used since you
12   became corporate secretary?
13   A    When we've done it I have obviously given
14   final sign-off to an executive summary as well as a
15   resolution. To the extent that we have used it we
16   will on a regular basis talk to the board members in
17   advance to let them know what is coming and to let
18   them know that it is coming, confirm with them that
19   they will be available to review and then John will
20   fax them out for me on my behalf and upon receipt he
21   would advise me whether or not we had received all
22   of the signatures and if we had then we would be

79

1    free to move forward with the resolution.
2         MR. WELLSCHLAGER: Eli, it's been about
3    an hour and 40 minutes so when you get to a logical
4    stopping point in the next few minutes I think it's
5    fair to take a five minute break.
6         MR. GOTTESDIENER: It's more than fair.
7    Any time -- please if there's any time --
8         MR. WELLSCHLAGER: Well, I don't want to
9    interrupt your flow but -- because I don't have any
10   urgency --
11        MR. GOTTESDIENER: Thank you for the
12   compliment but I'm not sure this is the deposition
13   that is one that I would say is flowing.
14   BY MR. GOTTESDIENER:
15   Q    You said obviously you would review an
16   executive summary. I'm not sure I understand your
17   use of the word "obviously" with respect to the
18   executive summary.
19   A    Well, the corporate -- I am the corporate
20   secretary and so all of the executive summaries are
21   reviewed by me before they go either into the book
22   or get sent out to the board members.

80

1    Q    But sorry to be thick about this but
2    why? I mean it's not -- the executive summary is --
3    is not that simply the statement by management of
4    why it thinks the board should do what it's asking
5    the board to do?
6    A    Exactly, and it's -- at least certainly
7    in my view it's my responsibility to make sure that
8    it is in proper form and substantively correct
9    before it gets sent out to the board.
10   Q    Okay. I'd like to maybe -- I won't go
11   into this for too much longer and we'll take a break
12   but proper form and substantive, I'd like to have
13   you break those down.
14   A    Sure.
15   Q    Proper form. I could understand if --
16   you know, if it's a messy document and doesn't look
17   nice you're the corporate secretary, you want
18   everything to look appropriate but substantively I'm
19   not sure I understand.
20        Why is that your bailiwick to be passing
21   on, you know, a proposed lease or some substantive
22   matter?

81

1    A    Well, in terms of the underlying
2    substance I will look at things because I will see
3    whether things are missing, additional information
4    is required, whether I believe certain other
5    information is required for the board members'
6    review and so I look at things before they go to the
7    board to make sure that they are appropriate for the
8    board to review and complete.
9    Q    Okay. We just have different definitions
10   of form and procedure and substance.
11        You consider substance what you just
12   described and not like whether something is a good
13   idea?
14        MR. WELLSCHLAGER: Object to the form of
15   the question.
16        MR. GOTTESDIENER: I'll withdraw that
17   question and ask another one.
18   A    I don't understand what you're asking.
19   BY MR. GOTTESDIENER:
20   Q    When I -- you made a distinction and I
21   asked you about -- I think you used the word "form"
22   but you definitely used the word "substance."

82

1    Substance as I understood your answer meant you will
2    look at things to see if there are gaps in
3    descriptions, information needed, whether to support
4    the decision that's being requested to be made,
5    additional materials or information should be
6    provided and I just -- I'm asking that's what you
7    mean by substance?
8    A    When I talk -- I'm not sure the
9    distinction that you're making. I mean the bottom
10   line is I wear a lot of hats in terms of looking at
11   these things not only as corporate secretary but
12   also as general counsel and so when I review these
13   things, there may be various and assorted issues
14   that come up with each one and I feel that it's my
15   responsibility to look at them.
16   Q    Okay. Well, that I understand when --
17   corporate secretary is not the only function you're
18   performing when you're looking.
19   A    Correct.
20   Q    But I thought you were just talking about
21   the corporate secretary function.
22   A    No, we aren't.

83

1        MR. GOTTESDIENER: Okay, this is a fine
2    time to take a break.
3        THE VIDEOGRAPHER: This marks the end of
4    tape one in the deposition of Ms. Serfaty. We're
5    going off the record. The time is 3:02 p.m.
6        (A brief recess was taken.)
7        THE VIDEOGRAPHER: This marks the
8    beginning of tape two in the deposition of
9    Ms. Serfaty. We're back on the record. The time is
10   3:16 p.m.
11   BY MR. GOTTESDIENER:
12   Q    What are the official records of the
13   corporation? You mentioned those before. Could you
14   tell us what those are?
15   A    You mean for the board of directors?
16   Q    Let's start with the corporation as a
17   whole.
18        MR. WELLSCHLAGER: Object to the form of
19   the question.
20   BY MR. GOTTESDIENER:
21   Q    What are the official --
22   A    I don't understand what you mean.

84

1    Q    What are the official records of the
2    corporation as a whole?
3    A    I think it depends on what you look at.
4    I mean obviously contracts are official in the sense
5    that they govern relationships that we have with
6    third parties and vis-a-vis the board, the official
7    records in my view are the minutes and the
8    resolutions.
9    Q    Anything else?
10        MR. WELLSCHLAGER: Same objection.
11   A    Not that I'm -- I mean in response to
12   your question which is not that clear, yes, that's
13   all.
14   BY MR. GOTTESDIENER:
15   Q    I'll ask it again just to make sure.
16   What part about my question is unclear? I'm asking
17   do you consider that there are other things other
18   than the minutes and the resolutions that are
19   official records of the board of directors?
20        MR. WELLSCHLAGER: No, that's not what
21   your question was.
22   A    That's not what your question was.

85

1  BY MR. GOTTESDIENER:
2      Q    You answered -- okay, let's --
3      A    We can take a step back.
4      Q    We can take a step back and get along.
5      A    For the board of directors --
6      Q    First you said corporation and then you
7  said basically you consider contracts to be official
8  records and then you moved on your own to the
9  board.
10     A    Okay.
11     Q    So let's just talk about the board for
12  now, okay?
13     A    Fair enough.
14     Q    The board.  That's what I thought my
15  question was specifically directed to.
16     A    Okay.
17     Q    What are the official records of the
18  board?
19     A    In my view --
20         MR. WELLSCHLAGER:  Objection to the form
21  of the question.
22     A    In my view the minutes as well as the

86

1  resolutions are the official records of the actions
2  of the board of directors.
3  BY MR. GOTTESDIENER:
4      Q    Are there any other records or documents
5  that you believe are official records of the board
6  of directors?
7      A    That reflect their actions, no.
8      Q    Official records in any way.
9         MR. WELLSCHLAGER:  Object to the form of
10  the question.
11     A    No.
12  BY MR. GOTTESDIENER:
13     Q    What is the Board Statement of Policy?
14     A    The Board Statement of Policy is
15  effectively a compilation over the years of various
16  resolutions that -- the first part talks about the
17  structure committees, assistance to the board,
18  travel plans, et cetera but the meat of the Board
19  Statement of Policy are effectively a compilation of
20  resolutions that deal with delegations of authority
21  to the president and CEO and what the board reserves
22  for itself in terms of authority.

87

1      Q    Are there any resolutions contained
2  within the Board Statement of Policy that are not
3  separately enacted as separate resolutions?
4      A    I have not gone back and done a
5  comparison.  I believe that the second part which
6  deals with the delegations of authority or the
7  authority that the board reserves for itself, that
8  there are resolutions that correspond to virtually
9  everything that's in that document and certainly
10  that's what it's intended to be.
11     Q    Do you consider the Statement of Policy
12  to be an official record of the board?
13     A    In the sense that it is a compilation of
14  the resolutions themselves, yes.  It is not a source
15  document.  The resolutions are the source.
16     Q    Why did the board change its position as
17  to the nature of the minutes as to their
18  confidential or arguably nonconfidential nature when
19  they made such a change in the 1980s?
20         MR. WELLSCHLAGER:  Objection to the
21  form.
22     A    I don't understand what you're asking.

88

1  BY MR. GOTTESDIENER:
2      Q    Are the board minutes confidential?
3      A    There are certain aspects of the board
4  minutes that are confidential.
5      Q    And certain aspects that are not
6  confidential?
7      A    Correct.
8      Q    How has -- as long as you've been
9  corporate secretary how have the minutes been
10  treated in terms of whether or not they are
11  available for public inspection?
12     A    To the extent that we have received FOIA
13  requests that ask for board minutes, if there is
14  information in there that is subject to disclosure
15  under FOIA then they have been disclosed.  If there
16  are exemptions that are appropriate for portions of
17  those then those exemptions have been invoked.
18     Q    Let me step back and try to give you in
19  my question a better sense of what it is that I'm
20  looking for.  I don't mean necessarily with respect
21  to even members of the public.  I mean even
22  internally from employees, low level, mid level

89

1  employees of Amtrak.
2      Has the board kept the minutes
3  confidential as against the entire population, not
4  just third parties outside of Amtrak?
5  **A    Generally, yes. I mean they are kept and**
6  **are not -- if you're asking are they distributed**
7  **like employee notices are distributed, no, they are**
8  **not.**
9  Q    Well, I'm not asking about distribution.
10 I'm asking about are they held in confidence as a
11 matter of policy, the entirety of the minutes?
12 **A    The entirety of the minutes. If an -- if**
13 **a particular individual has a need to have access to**
14 **the minutes because of something that they're**
15 **working on or a need to review it then those**
16 **individuals have been provided with access to it but**
17 **for the most part, yes, they are treated as**
18 **confidential.**
19 Q    You just said "for the most part." Could
20 you tell me what you mean by for the most part?
21 **A    The minutes are not the kind of thing**
22 **that we go about distributing or handing out or**

90

1  **leaving in places that people can just simply peruse**
2  **them. If somebody has a need to have access to a**
3  **nonconfidential portion of the minutes then those**
4  **people will have access to it and if they don't need**
5  **it then it's not necessarily available for general**
6  **review.**
7  Q    I'm sorry, what I was trying to get at
8  and it's my fault for not having this all lined up,
9  I assumed that you might at the tip of your tongue
10 know the history of this and it's my fault for not
11 having it available. What I wanted to represent,
12 and I will represent as I'm trying to find these, is
13 that there was a position that the board took that
14 was changed with respect to -- and contained in the
15 Board Statement of Policy as to the minutes and
16 there were changes that I had that I will have again
17 briefly but in a moment.
18     In 1988 there was a change and at that
19 point in time the minutes were deemed by this Board
20 Statement of Policy to be confidential.
21 **A    1988 you said?**
22 Q    1988.

91

1  **A    Okay.**
2  Q    And that I can represent to you. I just
3  can't find it. This was obviously before you joined
4  the company so assuming that that representation is
5  accurate -- if it's not then your answer would be
6  nonoperative.
7      My question is do you know what is the
8  position of the company as to why and how the
9  minutes of the company can be on a blanket basis
10 deemed confidential?
11 **A    Let me --**
12     MR. WELLSCHLAGER: Objection to the form
13 of the question.
14 **A    Let me understand correctly. Are you**
15 **saying that currently the policy says that all of**
16 **the minutes are deemed confidential? I don't**
17 **believe that's correct but I don't have the policy**
18 **in front of me to be able to so if you have a copy I**
19 **can show you. I don't think that's the current**
20 **policy of the board.**
21 BY MR. GOTTESDIENER:
22 Q    Okay. And I think it is. There are

92

1  provisions made for exceptions when there is a need
2  to know but that's --
3  **A    I don't believe that's correct.**
4  Q    That's fine. That's fine.
5  **A    I don't believe that that's what -- I**
6  **know the language you're referring to. I don't**
7  **believe that's correct.**
8  Q    We'll take a break and I'll find them,
9  okay?
10 **A    Okay.**
11     MR. WELLSCHLAGER: Do you want to do it
12 now?
13     MR. GOTTESDIENER: No.
14 BY MR. GOTTESDIENER:
15 Q    With respect to your statement as to
16 Appendix A and the position that -- that there's no
17 requirement based on the statute, the face of the
18 statute, to understand your position specifically
19 that would be that because the FOIA is specifically
20 referenced in the statute but the government and The
21 Sunshine Act is not, therefore the government and
22 The Sunshine Act does not apply?

93

1    MR. WELLSCHLAGER: Objection to the form
2 of the question.
3    A    Our statute --
4    MR. WELLSCHLAGER: If you feel
5 comfortable answering it.
6    A    Our statute specifically says that we are
7 not an agency or instrumentality of the federal
8 government and so we are governed -- absent anything
9 in our statute that says otherwise, we are a private
10 corporation governed by D.C. law and so absent
11 anything in our statute that references application
12 of that as it does in FOIA, it's not applicable to
13 us.
14 BY MR. GOTTESDIENER:
15    Q    And that -- and that would still be the
16 position notwithstanding the fact that the
17 corporation satisfies the test set forth in The
18 Sunshine Act for the definition of an agency?
19    MR. WELLSCHLAGER: Objection and if
20 you'll --
21    MR. GOTTESDIENER: I just want to know --
22    A    I'm not going to opine on that because I

94

1 can't speak to that at this point in time. I
2 haven't had a chance to look at it but, you know,
3 I'm not prepared to debate that with you right now.
4 BY MR. GOTTESDIENER:
5    Q    I'm not looking for a debate. I'm
6 actually just looking for the company's official
7 position as to whether or not they satisfy the
8 definition there but because of some other reason
9 because it's not mentioned in the statute, they
10 don't have to apply those standards.
11    MR. WELLSCHLAGER: Objection to the form
12 of the question.
13    A    I'm -- I'm not prepared to negotiate
14 that. We have our position and --
15    MR. GOTTESDIENER: I'm not asking you to
16 negotiate it.
17    THE WITNESS: Okay.
18 BY MR. GOTTESDIENER:
19    Q    Was this not something that you worked on
20 in 1999?
21    A    I did work on it and as we said, I'm not
22 prepared to go into attorney-client territory in

95

1 dealing with the substance.
2    Q    I'm just --
3    MR. WELLSCHLAGER: Counsel, let me
4 clarify. You're asking for the company's legal
5 position. There's a couple problems with the
6 question. The witness is not here as a company
7 representative first of all. Second of all, this is
8 an individual deposition in which you're entitled to
9 inquire of the witness's personal knowledge on
10 factual matters. If you want to know the company's
11 legal position on something you can -- you can ask
12 for its legal position in an interrogatory. You can
13 glean it from whatever papers have been filed in
14 court. You can talk to counsel about it.
15    MR. GOTTESDIENER: John, you're going
16 well beyond the judge's order. I got your point.
17    MR. WELLSCHLAGER: Fair enough.
18 BY MR. GOTTESDIENER:
19    Q    I'm asking you as corporate secretary --
20    A    Yes.
21    Q    -- you do not -- you do not follow the
22 government and The Sunshine Act?

96

1    A    Correct.
2    Q    Why as corporate secretary?
3    A    As corporate secretary our bylaws don't
4 now require us to do it and my understanding, based
5 on discussions with others which I'm not at liberty
6 to reveal at the moment, is that we are not required
7 to follow it.
8    MR. GOTTESDIENER: And I guess this is as
9 good as place as any to put on the record that there
10 have been times at which I have not followed through
11 with questions and I would want to and here is an
12 example of a time, that it's our position that the
13 production to us last Thursday night of 9,000 pages
14 of documents that contain attorney-client privilege
15 matter and work product privilege matter has worked
16 a waiver of the privilege as to all of the matters
17 that we would like to inquire into and I think
18 rather than clutter the record, I just want to state
19 that I wish to explore all of those matters with the
20 witness and I'm assuming that you would be
21 instructing the witness not to answer on the grounds
22 that the corporation has not waived those

97

1  privileges?
2       MR. WELLSCHLAGER: Well, I can certainly
3  state on the record that the corporation takes the
4  position that no privilege has been waived and as
5  to -- you know, I'm not going to answer your
6  question as to whether I'm instructing the witness
7  in some abstract -- on some abstract basis to
8  questions you haven't asked yet but yes, generally
9  speaking we will conduct the remainder of today's
10 deposition on the basis that we believe no privilege
11 has been waived and I will instruct the witness if
12 that's appropriate accordingly on a question by
13 question basis.
14      MR. GOTTESDIENER: So we're going to take
15 the time for me to ask all the questions?
16      MR. WELLSCHLAGER: No, I think -- I think
17 I've given you a pretty good indication, Eli, of
18 where those questions would lead if you were to ask
19 them but, you know, you can't trap me into saying
20 I'm instructing the witness not to answer questions
21 that you haven't even asked yet.
22      MR. GOTTESDIENER: I'm just trying to

98

1  create a record so --
2       MR. WELLSCHLAGER: And I think we've done
3  that. I think we've done that.
4       MR. GOTTESDIENER: -- I can come back if
5  I get any of these materials and you can't say that
6  I didn't try to ask the questions at the time.
7       MR. WELLSCHLAGER: I think we've done
8  that. I will not -- you know, I will not take the
9  position that you've waived something because you
10 haven't actually asked the questions. We've made
11 the record here.
12      MR. GOTTESDIENER: Perfect. That's
13 another way of doing it, that's fine. Thank you.
14 BY MR. GOTTESDIENER:
15 Q   Back to the unanimous consent
16 resolution.
17 A   Yes.
18 Q   The unanimous consent resolution that's
19 at issue in this case, could you tell us everything
20 that you did in connection with a resolution that
21 was purportedly adopted on September 14, 2001?
22 A   You want me to take you back and walk you

99

1  through some of the steps?
2  Q   I want to know everything you know.
3  A   Okay. Well, in July we went to the
4  board. I do not believe I was present at the July
5  board meeting. I was not functioning either as
6  general counsel or as corporate secretary at the
7  July board meeting. They adopted a resolution
8  providing management with the authority to implement
9  a voluntary early retirement plan as part of an
10 overall package to reduce numbers of employees at
11 Amtrak at the time.
12      Subsequent to that time in late August we
13 learned from the actuary that a mistake had been
14 made and that in fact the numbers that we had been
15 basing the plan on were incorrect and that if we did
16 go ahead and implement the voluntary early
17 retirement plan as set forth to the board that we
18 would -- the holiday that we had been enjoying from
19 making contributions to the pension plan would have
20 been cut short dramatically and that we would have
21 actually had to contribute -- the fund would be
22 depleted much earlier than we had indicated and that

100

1  rather than being overfunded that we would have to
2  begin contributing money much earlier than
3  expected.
4       We had a number of discussions among a
5  number -- a few -- a certain -- I don't want to say
6  committee but a smaller group of executive committee
7  members, a series of meetings to discuss how to deal
8  with this issue and what to do about it and there
9  were a number of options that were proposed that
10 would permit us to continue along the path of
11 offering an early retirement plan without having the
12 adverse consequences that would have resulted had we
13 implemented the plan as originally proposed to the
14 board so we discovered this error -- I don't recall
15 the exact date but it was towards the end of August
16 and in early September we held a series of meetings
17 to try to figure out what exactly to do about it and
18 what -- if there were any other options that we
19 could potentially offer.
20      A decision was made to offer a different
21 program, one that we believed could help us carry
22 out the early retirement plan but yet that wouldn't

Case 1:06-cv-01539-GK   Document 20-8   Filed 01/16/2007   Page 26 of 66
DEPOSITION OF ALLEN MUSIKANTOW
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

26 (Pages 101 to 104)

101

1  have the same adverse consequences to the -- to the
2  pension fund originally envisioned. There was a
3  board meeting that was scheduled on September the
4  12th. At the meeting on August 30th we indicated to
5  the board that there would be certain items that
6  would be presented. We did not yet talk about the
7  early retirement plan because at that point in time
8  my recollection was that it was too soon. We didn't
9  know what we were going to do. We had discovered an
10  error from our actuary and we weren't prepared yet
11  to raise it with the board. We did not raise it
12  with them then. We anticipated at the September
13  12th meeting providing them with an executive
14  summary and resolution and obviously explain the
15  situation.
16       On September 11th after the terrorist
17  attacks we had to cancel that board meeting and I
18  participated that afternoon in the phone calls to
19  the various board members to let them know that
20  the -- that the meeting would be canceled. We then
21  had to figure out how to raise the early retirement
22  issue with the board because in the absence of the

102

1  board meeting, we had not enough time to be able to
2  reschedule a board meeting in advance of the
3  September 15th date that we had anticipated for
4  opening the window for election of the early
5  retirement program and so in the absence of holding
6  a meeting, we decided that we could in fact use the
7  unanimous consent provision to gain the consent of
8  all of the board members and so we finalized the
9  executive summary and the resolution and we faxed it
10  to the board members.
11       We did in fact speak with them although I
12  don't have very specific recollections given what
13  was going on at the time in the aftermath of
14  September 11th of the very specific conversations
15  but we did in fact talk with them and let them know
16  what was coming. We would have never sent them a
17  board item like that without giving them any kind of
18  advance notice of it and all of them signed it,
19  faxed it back and we were able to implement the
20  program as amended by the board.
21  Q    Governor Holton signed it?
22  A    What I have learned subsequent is that

103

1  Governor Holton gave John permission to sign his
2  name and so we have Governor Holton's consent but
3  Governor Holton not just on that occasion but on
4  some others, I believe, gave John the authority to
5  put his signature on documents when he was unable to
6  be in a position to fax back a signature.
7  Q    That fact is a fact that you've only
8  learned very recently, right?
9  A    I was not -- I don't recall being aware
10  of it at the time.
11  Q    That fact is a fact that you've only
12  learned very recently, correct?
13  A    Yes.
14  Q    In fact, it's a fact that you've only
15  learned within the last couple of weeks?
16  A    I don't recall when I learned of it but
17  it is recent.
18  Q    It's a fact that you've learned only
19  within the past month or so?
20  A    Yes.
21  Q    Were you aware prior to yesterday that a
22  unanimous consent resolution has been employed and a

104

1  resolution deemed adopted in a case in which one of
2  the directors sent back a unanimous consent
3  resolution form and signed it I abstain?
4  A    I am aware --
5       MR. WELLSCHLAGER: Objection to form. Go
6  ahead.
7  A    I am aware of the circumstances.
8  BY MR. GOTTESDIENER:
9  Q    The question was before yesterday were
10  you aware that that happened?
11  A    Do I have a -- yes, I.was aware of it.
12  Do I have a specific recollection before yesterday?
13  No, but I was aware of it because I was here and
14  functioning as corporate secretary at the time.
15  Q    So how is it that as corporate secretary
16  you allowed that abstention to be counted as a part
17  of a unanimous consent?
18       MR. WELLSCHLAGER: Objection to the form
19  of the question.
20  A    There are couple of reasons I think
21  around that one. First of all, the board voted to
22  approve the legislative and grant request in concept

105
1  and asked for us to come back in terms of the final
2  wording of it but that approval was actually given
3  to us and so I think in reality, yes, we needed to
4  go back to them to look at the final words.
5      I'm not necessarily sure that in order to
6  effectuate our obligations we would have even needed
7  to have that second resolution. I think with the
8  first approval subject to us sending them the
9  wording, we could have filed that legislative and
10 grant request. I think we were trying to be careful
11 by sending around that unanimous consent along with
12 the language.
13     The Secretary of Transportation's
14 designee abstained from the first vote and abstained
15 from the second obviously and so number one, I think
16 we believed that the second one was effectively belt
17 and suspenders because we had received approval to
18 go forward with the legislative and grant request,
19 and there were -- we can look at the language of the
20 unanimous consent provision and in a situation where
21 someone abstains for a conflict of interest reason,
22 I think there is argument to be made that because of

106
1  the conflict they would then not have the ability to
2  vote on any particular matter in any event and the
3  unanimous consent provision could be upheld in those
4  circumstances as well so I think there are various
5  reasons in connection with that particular one that
6  I think we felt we could go ahead and -- and file
7  the legislative and grant request.
8  BY MR. GOTTESDIENER:
9      Q   I've heard two. Is there anymore than
10 two?
11     A   Excuse me?
12     Q   I've heard two.
13     A   Two what?
14     Q   Reasons, ma'am.
15     A   Yes.
16     Q   You just said various.
17     A   Not that I -- no, other than those two at
18 the moment I'm -- I can't -- I can't articulate
19 others.
20     Q   And was this reason, the first reason and
21 the second actually contemplated at the time when
22 the abstention was received?

107
1      A   I don't have specific recollection of
2  what was contemplated at the time. We did look at
3  it obviously.
4      Q   Who is we?
5      A   Myself and John Carten.
6      Q   Anyone else?
7      A   I don't know. Possibly.
8      Q   Did you seek any sort of legal opinion,
9  written or otherwise from anyone else?
10     A   Certainly not a legal written opinion.
11     Q   How about an oral opinion from any source
12 whatever as to --
13     A   Not that I can recall.
14     Q   We can't both talk at the same time.
15     A   Okay.
16     Q   Not that you recall is an answer to the
17 question that you didn't seek any opinion of any
18 kind?
19     A   I can't recall right now what in fact we
20 did at the time.
21     Q   Is there anything that would refresh your
22 recollection to allow you to recall whether or not

108
1  you did anything like that?
2      A   I don't have anything in front of me that
3  would refresh my recollection.
4      Q   Not that's in front of you. Anything at
5  all?
6          MR. WELLSCHLAGER: Objection to the form
7  of the question.
8      A   I don't have anything that I can point to
9  that would refresh my recollection.
10 BY MR. GOTTESDIENER:
11     Q   The first reason that you gave you would
12 agree does not address the issue of the validity of
13 the unanimous consent resolution. If I understand
14 you it basically says assuming the unanimous consent
15 resolution is not valid, the action of the board at
16 the meeting was sufficient for the purposes of
17 submitting this proposal to Congress?
18     A   Correct.
19     Q   As to the second --
20     A   Yes.
21     Q   -- that's what I'm interested in right
22 now.

109

1   **A    Yes.**
2   Q    The second you talked about abstention by
3   virtue of -- or reason of conflict of interest?
4   **A    Yes.**
5   Q    First of all, again I want to ask you at
6   the time was the issue -- withdrawn.
7        You are -- you are saying that you were
8   aware at the time that Mr. Jackson had sent in to
9   Amtrak a physical resolution that he stated on it I
10  abstain?
11  **A    I don't have specific recollection but I**
12  **would have been aware given my role.**
13  Q    Meaning to spin it one step further, John
14  Carten would not have in the ordinary course
15  changed -- withdrawn.
16       He would not in the ordinary course have
17  written on a form that a resolution had been adopted
18  that day by the board of directors and put it in the
19  resolution binder had that not been something that
20  you would have personally approved?
21  **A    He would have come and talked to me about**
22  **it certainly if he had gotten something back that**

110

1   **said someone abstained.**
2   Q    And you're saying that you have
3   absolutely no recollection at the time of being
4   presented with this abstention?
5   **A    I don't have a recollection.**
6        MR. WELLSCHLAGER: Objection to the form
7   of the question.
8   BY MR. GOTTESDIENER:
9   Q    I'm sorry?
10  **A    I don't have a recollection.**
11  Q    Okay. Just so we're covering the
12  waterfront here on this, is there any other time
13  that any board member has sent in anything other
14  than a signed resolution in a unanimous consent
15  resolution setting that just has their signature
16  with whatever word of concurrence or approval or
17  authorization has been pretyped and sent to them
18  that you're aware of that you were ever shown?
19  **A    What do you mean pretyped?**
20  Q    I'll restate the question.
21  **A    Please.**
22  Q    This is a case in which you've seen this

111

1   document recently, correct?
2   **A    Yes.**
3   Q    In preparation for testifying here today,
4   right?
5        MR. WELLSCHLAGER: Objection to that
6   question. I don't think that's appropriate.
7   **A    I can't -- it's not appropriate.**
8   BY MR. GOTTESDIENER:
9   Q    It's not appropriate?
10  **A    In the context in which -- I've seen it**
11  **recently.**
12  Q    Ma'am, let me ask you this question: I'm
13  not asking who showed you something.
14  **A    Okay.**
15  Q    I'm not asking what conversations you
16  had. In preparation for testifying here today you
17  looked at the resolution that we've been discussing
18  that Mr. Jackson signed where he wrote I abstain,
19  did you not?
20  **A    I looked at the resolution recently.**
21  Q    In preparation for testifying here?
22       MR. WELLSCHLAGER: Mr. Gottesdiener --

112

1        MR. GOTTESDIENER: If you're instructing
2   the witness not to answer --
3        MR. WELLSCHLAGER: I'll instruct her not
4   to answer that question. She's answered your
5   question.
6        MR. GOTTESDIENER: On what grounds? On
7   what grounds?
8        MR. WELLSCHLAGER: Because it --
9   answering it one way or the other necessarily
10  reveals --
11       MR. GOTTESDIENER: No, it doesn't. I
12  don't know -- I'm not asking if you showed it to
13  her.
14       MR. WELLSCHLAGER: Are you going to let
15  me finish?
16       MR. GOTTESDIENER: No, I'm going to move
17  on.
18       MR. WELLSCHLAGER: Okay, good. The
19  record will reflect that I was asked for the
20  grounds --
21       MR. GOTTESDIENER: I'm going to move on.
22       MR. WELLSCHLAGER: -- and then

113

1  interrupted.
2        MR. GOTTESDIENER: The grounds? You
3  asked me for the grounds?
4        MR. WELLSCHLAGER: You asked me for the
5  grounds for my instruction. I started and you
6  interrupted me.
7        MR. GOTTESDIENER: You're saying --
8  you're saying attorney-client, right? That's how
9  you say it. That's what the Judge's order says.
10  State your objection --
11        MR. WELLSCHLAGER: You asked for the
12  grounds. Do you want them or not?
13        MR. GOTTESDIENER: Okay, we're going to
14  go to the Judge on this because she has written
15  instructions that you're supposed to say
16  attorney-client, not give a speech.
17        MR. WELLSCHLAGER: You asked for the
18  grounds, Mr. Gottesdiener.
19  BY MR. GOTTESDIENER:
20    Q     What documents have you reviewed in
21  preparation for testifying here today?
22        MR. WELLSCHLAGER: Objection,

114

1  attorney-client.
2        MR. GOTTESDIENER: Are you instructing
3  the witness not to answer?
4        MR. WELLSCHLAGER: I am.
5        MR. GOTTESDIENER: Okay. Just as a
6  friendly suggestion I'm going to state that prior to
7  us leaving today, if there's any hope of us not
8  reconvening on another occasion I would ask that
9  everyone on the other side of the table on a break
10  think about that because we'll be back.
11  BY MR. GOTTESDIENER:
12    Q     Returning to your statement about the
13  conflict of interest as being a basis for, if I
14  understand it, disregarding his abstention, is that
15  a fair characterization of your position as
16  corporate secretary when presented with that
17  abstention, that it was an abstention, not a consent
18  but in this case because there was a conflict of
19  interest it could be disregarded?
20        MR. WELLSCHLAGER: Objection to the form
21  of the question.
22    A     **That's not a fair characterization of**

115

1  **what I said because I --**
2  **BY MR. GOTTESDIENER:**
3    Q     No, I'm not asking what you said.
4    A     **Okay.**
5    Q     I'm not asking what you said at all.
6    A     **I would not view it as disregarding,**
7  **however, for purposes of implementing the -- the**
8  **unanimous consent provisions, the fact -- the**
9  **unanimous consent provision says that it has to be**
10  **board members with voting power and one could argue**
11  **that by virtue of a conflict that that individual**
12  **does not have voting power with regard to that issue**
13  **and therefore, that as long as we had the unanimous**
14  **consent of all the other members who did have the**
15  **ability to vote, that we would be able to implement**
16  **that.**
17    Q     And your statements just now regarding
18  power and conflict of interest, what is the basis
19  upon which you state that voting power would not
20  exist for an otherwise duly appointed board member
21  or designee of a board member, in this case the
22  Secretary of Transportation, because of a conflict

116

1  of interest?
2    A     **Our conflict of interest rules and the**
3  **way that we function would require a board member to**
4  **recuse him or herself if in fact he or she had a**
5  **conflict with regard to any particular -- any**
6  **particular issue.**
7    Q     I'd like to break that down. Rules and
8  you said also the way we function?
9    A     **Correct.**
10    Q     The board of director conflict of
11  interest rules?
12    A     **Yes.**
13    Q     And what -- where are those and what are
14  they -- how are they denominated? Are they passed
15  by a resolution?
16    A     **They were passed by a resolution of the**
17  **board. They are fairly recent. Prior to that the**
18  **board members adhered to the conflict of interest**
19  **policies that we have in our employee policies and**
20  **our corporate policy.**
21    Q     Okay. If you would indulge me I really
22  want to understand this and walk through it.

117

1    In September of 2001 what conflict of
2 interest concepts or rules or provisions governed
3 the conduct of board of directors' directors?
4    **A    The conflict of interest policies that**
5 **governed our employees were voluntarily adhered to**
6 **by our board of directors --**
7    Q    If you could just take them one by one
8 and let me ask a question if you would.
9    **A    Sure.**
10    MR. WELLSCHLAGER:  Well, let her finish
11 her answer.
12 BY MR. GOTTESDIENER:
13    Q    I said if you want to keep going we'll
14 just come back.
15    **A    Go ahead.**
16    Q    I wanted to ask you a question about what
17 you just said.
18    **A    Please go ahead.**
19    Q    Thank you.  You said that there was a
20 policy that applied to employees?
21    **A    Yes.**
22    Q    Directors are not employees, correct?

118

1    **A    Correct.**
2    Q    You also then said that the directors
3 voluntarily adhere to them?
4    **A    Yes.**
5    Q    When you say that they voluntarily adhere
6 to them, are you referring to any resolution or
7 official action of the board of directors by which
8 they stated that they would voluntarily adhere to
9 this conflict of interest policy?
10    **A    Our employee conflict of interest policy**
11 **specifically references the fact that the board of**
12 **directors would voluntarily adhere to it.  I did not**
13 **go back and check.  I would imagine there is a**
14 **resolution, however, in addition each of these board**
15 **members has to go through a vetting policy -- a**
16 **vetting process when they get appointed prior to**
17 **getting appointed to deal with conflict issues and**
18 **we go through a very extensive process for**
19 **evaluating conflicts, and the general counsel has to**
20 **send a letter to the Office of Government Ethics**
21 **opining about conflict issues with regard to each**
22 **board member and also attaching a copy of the policy**

119

1 **to which the board members will adhere.**
2    Q    On a voluntary basis?
3    **A    On a voluntary basis.**
4    Q    And is there any -- so if I were to want
5 to read something that is memorialized as to what
6 policies applied to the directors in September of
7 2001 I would go where?  What would I -- what would I
8 be looking at?
9    **A    In terms of the conflict of interest**
10 **policy it would be the employee policy on the**
11 **conflicts question.**
12    Q    And that's contained in what?  The
13 employee handbook?
14    **A    It's contained in our policy manual which**
15 **is currently being revised.**
16    Q    But I'm talking about September of 2001.
17    **A    Right.**
18    Q    What is this document called?
19    **A    It's called our -- I don't know what the**
20 **document itself is called.  It's our policy manual**
21 **and there are specific policies and the one in**
22 **particular on conflicts is called The Conflict of**

120

1 **Interest Policy.**
2    Q    And what does the policy state?
3    **A    The policy deals with situations in terms**
4 **of disclosure of conflicts and in particular**
5 **circumstances with individual board members, we have**
6 **had to have them abstain or recuse themselves from**
7 **particular incidents -- particular votes and that**
8 **has been a process that has been ongoing for as long**
9 **as I can remember.**
10    Q    Has that ever occurred in the unanimous
11 consent resolution process or setting before or
12 after this abstention that we're talking about?
13    **A    Don't know.  Don't know.**
14    Q    Is there any other written policy or rule
15 or regulation that you contend applied in September
16 of 2001?
17    **A    There may very well be.  I haven't had a**
18 **chance to look -- look through it and review it.**
19    MR. WELLSCHLAGER:  Belated objection to
20 the form of the question.
21 BY MR. GOTTESDIENER:
22    Q    But this is something that you looked at

121

1  at the time?
2  **A    I don't understand your question.**
3  Q    At the time that this occurred when
4  Mr. Jackson --
5  **A    Yes.**
6  Q    -- abstained, this was presented to you
7  by Mr. Carten, right?
8  **A    I told you earlier that I don't have any**
9  **specific recollection of it.**
10  Q    What's your general recollection?
11  **A    My general recollection is that I would**
12  **have looked at it and we would have talked about it**
13  **but I don't have any specific recollection of it.**
14  Q    So the two reasons that you gave me, when
15  did you formulate those reasons?
16  **A    I don't have any specific time frame for**
17  **formulating any reasons. I think these are --**
18  Q    When is the first time that you thought
19  of the concept of -- you don't like the word
20  "disregard" but putting off to the side a
21  nonconsent of a board of directors' director? When
22  is the first time that you thought this idea that

122

1  you're telling us about that if such a person has a
2  conflict of interest and they abstain -- I think
3  it's your contention abstained because of the
4  conflict of interest -- that they won't be counted?
5         MR. WELLSCHLAGER: Objection to the form
6  of the question. You can answer.
7  **A    This is not a question about when was the**
8  **first time we thought about it. I mean the bottom**
9  **line is --**
10  **BY MR. GOTTESDIENER:**
11  Q    But that's my question, ma'am.
12  **A    I don't know when we first thought about**
13  **it. We have talked about abstentions and issues all**
14  **throughout our discussions about board members**
15  **because these issues about abstaining and conflicts**
16  **come up all the time with these board members so I**
17  **don't have a specific recollection on this one**
18  **particular issue.**
19  Q    Let me put it to you this way: You just
20  told us that you're not aware of any other time when
21  a board member abstained because of a conflict of
22  interest; is that right?

123

1         MR. WELLSCHLAGER: Objection.
2  **A    No, that's not what I said.**
3  **BY MR. GOTTESDIENER:**
4  Q    Tell me --
5  **A    That's not what I said.**
6  Q    I'm sorry. I'm sorry. In the unanimous
7  consent resolution context, I'm sorry?
8  **A    Yes.**
9         MR. WELLSCHLAGER: Objection.
10  BY MR. GOTTESDIENER:
11  Q    You are unaware sitting here now of any
12  other time in a unanimous consent resolution context
13  when any board member abstained?
14         MR. WELLSCHLAGER: Objection.
15  BY MR. GOTTESDIENER:
16  Q    Is that correct?
17  **A    I'm not aware.**
18  Q    Right?
19  **A    Yes.**
20  Q    And as far as you know sitting here today
21  having prepared to testify, you are of the belief
22  that there is this one incident and one incident

124

1  only?
2  **A    I don't know. There may very well be**
3  **others and there could be -- I'm certain there are**
4  **others. I just don't have any specific knowledge of**
5  **them right now.**
6  Q    But you're confident that on your watch
7  there were no others?
8         MR. WELLSCHLAGER: Objection.
9  **A    I'm not confident on my watch there were**
10  **no others. You asked me if I recalled and I said**
11  **no.**
12  **BY MR. GOTTESDIENER:**
13  Q    You certainly have no reason to think
14  specifically that there is any other such resolution
15  in a unanimous context resolution where someone
16  wrote I abstain?
17         MR. WELLSCHLAGER: Objection.
18  **A    And by the same token I don't have any**
19  **reason to think that there isn't so --**
20  **BY MR. GOTTESDIENER:**
21  Q    And I'm asking you when is the first time
22  that you have come to have in your mind the concept

125

1  that in the unanimous consent resolution context
2  that a conflict of interest would cause that
3  person's vote to not count?
4        MR. WELLSCHLAGER: Objection to the
5  characterization.
6     A    Again, I don't have any specific
7  recollection. We have talked about issues and I am
8  certain with John that we talked about the question
9  of abstaining and conflict of interest. I don't
10 have any specific recollection of it so I can't sit
11 here and tell you when is the first instant that we
12 talked about this or thought about it or looked at
13 it.
14 BY MR. GOTTESDIENER:
15    Q    Why wasn't this topic the subject of some
16 sort of written guidance or guidelines for the
17 adoption or nonadoption of the unanimous consent
18 resolution?
19    A    Because up until --
20       MR. WELLSCHLAGER: Objection to the
21 form.
22    A    Up until now nobody has ever raised it as

126

1  an issue and we have progressed and done what we
2  needed to do in order to carry out the functions of
3  the board. If an issue is raised we'll deal with
4  it. Up until now it's never been raised. It's not
5  anything that we had ever looked at or had cause to
6  look at.
7  BY MR. GOTTESDIENER:
8     Q    Are you aware of any unanimous consent
9  resolutions that were obtained by in part receiving
10 an oral authorization from one or more board of
11 directors?
12    A    Well, other than the one we talked about
13 which was Governor Holton providing his -- let me
14 say this: Oral authorization, no, but the oral
15 authorization to affix his signature on the one that
16 we just talked about, yes, with regard to Governor
17 Holton and the September 14 unanimous consent.
18    Q    But you didn't know about that until very
19 recently?
20    A    I did not. I don't have a recollection
21 of knowing about it until recently.
22    Q    And you didn't know that that occurred on

127

1  other occasions until recently with Governor Holton?
2     A    I can't specifically recall. I do know
3  with Governor Holton that this question of fax and
4  sending things back and forth was always an issue
5  with him. He's 80 years old. He's not always, you
6  know, available for a fax. He would very often call
7  and ask can you read us something, you know, tell me
8  about this, tell me about that. He -- you know,
9  just in terms of his manner of working, you know, we
10 had to deal with him very often in a different way
11 than others who would have access to computers and
12 e-mail and faxes a lot more easily than he did so,
13 you know, is it something that is brand-new? No.
14       We clearly had to deal with him in a
15 different way prior to it and do I have any
16 recollection of him, you know, specifically -- has
17 he ever called me and said put my name? No, but,
18 you know, that's consistent with our practices with
19 him that he would have done that with John
20 previously.
21    Q    But you never approved that method of
22 procedure with respect to Governor Holton and a

128

1  unanimous consent resolution?
2     A    What method of procedure?
3        MR. WELLSCHLAGER: Object to the form of
4  the question.
5  BY MR. GOTTESDIENER:
6     Q    By him calling John Carten and supposedly
7  saying you can affix my signature.
8        You didn't approve it in advance, did
9  you?
10    A    I never felt like I needed to approve
11 it. If I give somebody the authority to sign my
12 signature -- we do that at Amtrak all the time for
13 many purposes. When David Gunn is out and he gives
14 me authority to sign his name, I sign his name so
15 it's a common practice.
16    Q    That's not my question. Thank you. My
17 question is you did not authorize John Carten to
18 accept that as a valid signature in advance of
19 Governor Holton asking John Carten to do that? I
20 really would like to have you focus on my question.
21    A    Did I authorize him? No, I didn't
22 authorize him. I didn't need to authorize him. The

129

1   only person to authorize was Governor Holton in
2   terms of his signature. It was irrelevant whether I
3   would --
4       Q   Thank you for the argumentative answer.
5   I'm asking you a question.
6           Did you or did you not approve that
7   method of doing things as corporate secretary?
8           MR. WELLSCHLAGER: Objection to the form
9   of the question.
10      A   I don't recall being asked or being put
11  in a position where I needed to approve it so no.
12  If the fact of not having addressed it means that I
13  didn't approve it, you're right, I didn't approve
14  it.
15  BY MR. GOTTESDIENER:
16      Q   Thank you. You mentioned oral was not
17  something also that you were aware had ever occurred
18  before if it did occur.
19          I'm just asking you are you aware of any
20  time where a unanimous consent resolution was
21  proposed, offered to members of the board and one or
22  more members of the board were permitted to give

130

1   their consent orally?
2       A   I'm not aware of that.
3       Q   And you similarly would not have ever
4   approved that if you weren't aware of it?
5       A   From a -- from a unanimous consent
6   perspective we would have -- if there was an oral
7   like it was with Governor Holton it would have been
8   permission to put a signature because we would have
9   needed to have the unanimous consent, you know,
10  signed.
11      Q   Why?
12      A   Because if we had a telephone
13  conversation where it was oral, we could have
14  minutes and we would note that but we didn't have
15  minutes for unanimous consent and so there wouldn't
16  have been any other way to know that the oral
17  consent had been given other than to in the face of
18  an oral consent get permission to sign a signature.
19      Q   Any other reason?
20      A   Not that I'm aware of.
21      Q   So receiving just an oral consent would
22  not be valid?

131

1           MR. WELLSCHLAGER: Objection to the form
2   of the question.
3       A   Certainly from the practice of the
4   written unanimous consent an oral -- if you're
5   asking me if somebody called me up on the phone and
6   said I'm fine with it, would that have been enough?
7   No, but if somebody had said I'm fine with it and
8   was not in a place where they could send it back,
9   permission would have been asked or they would have
10  given permission to sign it and we would have had a
11  document that would have had a signature so if
12  you're asking whether somebody can just pick up the
13  phone and say yeah, it's fine and that would have
14  sufficed, no, I don't believe it would have for
15  purposes of unanimous consent.
16  BY MR. GOTTESDIENER:
17      Q   Are you aware of any time where someone
18  has, as a director, sent back a unanimous consent
19  that is signed but that has notations in which the
20  director has made changes to the resolution that was
21  sent to the director?
22      A   I believe in connection with the one we

132

1   were discussing there may have been some edits to
2   the whereas clauses by one of the board members.
3       Q   And when did you first become aware of
4   that?
5       A   Just recently when I reviewed the
6   documents.
7       Q   Yesterday is when you first became aware
8   of that?
9       A   I -- recently.
10      Q   You can't say that it was yesterday?
11      A   I looked at them this morning.
12      Q   Okay. So it was this morning that you
13  first became aware of that?
14      A   Yes.
15      Q   And it was this morning that you first
16  became aware that Governor Holton had given
17  authorization in at least two instances for John
18  Carten to affix his signature?
19      A   No, it was not this morning.
20      Q   When was that?
21      A   It was prior to this morning. I don't
22  recall exactly when.

137

1  thinking anything at the time?
2      **A      With regard to that board resolution?**
3      Q     September 14, 2001 or the day before.
4      **A      Other than discussions about the process**
5  **of sending it to them I don't have any specific or**
6  **general recollection of reviewing, editing, changing**
7  **the resolution.**
8      Q     Perfect. Just what I was looking for.
9      **A      Okay.**
10     Q     What about -- tell me what conversations
11 you had with John Carten about sending materials to
12 the board in connection with this resolution.
13         MR. WELLSCHLAGER: And obviously same
14 caution applies in terms of dividing or making a
15 distinction in your mind when answering this between
16 your role as corporate secretary and your role as
17 general counsel.
18         THE WITNESS: Okay.
19 BY MR. GOTTESDIENER:
20     Q     I'm talking about what you're sending to
21 the board members. I'm not talking about anything
22 other than that.

138

1         MR. WELLSCHLAGER: I haven't instructed
2  the witness not to answer. I'm just cautioning her
3  to keep that distinction in mind.
4         MR. GOTTESDIENER: I just didn't know why
5  this witness needs to be cautious in this
6  circumstance.
7  BY MR. GOTTESDIENER:
8      Q     If you can answer the question.
9      **A      General recollection because I don't have**
10 **specific recollections of that day or specifically**
11 **what was being done. There were a lot of things**
12 **going on at the same time particularly in light of**
13 **September 11 but I have a general recollection of**
14 **instructing him to fax them to the board members so**
15 **that they could get it signed so that we could in**
16 **fact get their approval.**
17     Q     Could you walk me through with
18 specificity what happened in terms of how board
19 members were contacted, what role you had in that,
20 what role you had in telephoning or speaking with
21 board members?
22     **A      I can't walk you through with specificity**

139

1  **on that. I have a general recollection of talking**
2  **with them. I can't give you specifics about who**
3  **initiated the call and where we were and what**
4  **exactly was said. We would have briefed them on**
5  **what was in the executive summary and what we were**
6  **asking them to do and clearly would have spoken with**
7  **them about it but I don't have specifics.**
8         **I don't have any specific recollection of**
9  **the conversations because during that period of time**
10 **we were talking with them a lot, doing a lot of**
11 **things with regard to September 11, post September**
12 **11 activities, preparing for a revised board meeting**
13 **that was going to take place on the 20th as well as**
14 **my other responsibilities in the law department so I**
15 **don't have any specific recollection of -- of the**
16 **communications although I do have a very general**
17 **recollection of them having taken place.**
18     Q     And beyond that you can't say anything?
19     **A      Beyond that I can't be very specific, no.**
20     Q     Were you in e-mail contact with any of
21 the directors in September of 2001?
22     **A      I don't believe so. I don't believe so.**

140

1  **I don't think I would have sent e-mails back and**
2  **forth.**
3      Q     Well, that's sort of a different answer
4  to a different question.
5         I'm asking were you generally in e-mail
6  contact with directors in September of 2001?
7         MR. WELLSCHLAGER: Well, objection to the
8  form of the question then.
9      **A      I would have to see if I had e-mails. I**
10 **don't think so because at that point in time I had**
11 **only been in the corporate secretarial function for**
12 **a couple of weeks so I don't think at that point in**
13 **time I would have been sending e-mails back and**
14 **forth.**
15 BY MR. GOTTESDIENER:
16     Q     Subsequent did you become in e-mail
17 contact with any of the directors?
18     **A      When you say "subsequent" do you mean**
19 **currently?**
20     Q     Subsequent to September -- well, up --
21     **A      Up 'til the present?**
22     Q     Yes.

Case 1:06-cv-01539-GK    Document 20-8    Filed 01/16/2007    Page 35 of 66
DEPOSITION OF ALICE M. SERPAY
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

36 (Pages 141 to 144)

141

1   A   Yes.
2   Q   And when I say "directors" in this case I
3   don't mean Mr. Gunn as a nonvoting --
4   A   Correct.
5   Q   And how many of the directors -- well,
6   actually how many directors are there today?
7   A   Currently there are three directors.
8   Q   How many of the three are you in e-mail
9   communication with?
10  A   I would probably only send e-mails to two
11  of them.
12  Q   At what point did you become, now going
13  back in time, in e-mail contact with one or more
14  directors?
15  A   I can't tell you when.
16  Q   Approximately.
17  A   At some point since becoming corporate
18  secretary I would have sent -- certainly during the
19  time from late August of 2001 to the present I have
20  sent e-mails to a number of the board members back
21  and forth on information, on travel, all sorts of
22  issues I would have sent e-mails because sometimes

142

1   that's the easiest way to communicate.
2   Q   The directors, are any of them other than
3   Mr. Gunn -- do they have now or have they ever had
4   an Amtrak e-mail, Amtrak.com or Amtrak --
5   A   My recollection is only one board member
6   would have had an Amtrak e-mail.
7   Q   Who?
8   A   Amy Rosen.
9   Q   And why her as opposed to --
10  A   I don't know.  I have no idea.
11  Q   How long did she have an Amtrak e-mail
12  address?
13  A   Don't know.  Don't know.
14  Q   And how do you know that she had an
15  Amtrak e-mail address?
16  A   Because I sent her a couple things to
17  that Amtrak e-mail address.
18  Q   When did she cease becoming -- when did
19  she stop being a director?  Was that in 2003?
20  A   She -- her last board meeting was in
21  September of 2003.
22  Q   On September 14 -- you, I presume, have

143

1   reviewed in preparation for testifying here fax
2   cover sheets of items that were sent to directors on
3   September 14; is that correct?
4   A   I saw --
5       MR. WELLSCHLAGER: Objection.
6   Objection. Now, we've gone over this a few times.
7   I think you're doing this deliberately, Eli.
8       MR. GOTTESDIENER: Yeah, I'm doing it
9   deliberately to ask questions.
10      MR. WELLSCHLAGER: Please ask -- please
11  ask just when. Why does it have to -- why do you
12  have to determine whether it was in preparation for
13  testifying?
14      MR. GOTTESDIENER: Stop. John, stop.
15  You're violating the Judge's order.
16      MR. WELLSCHLAGER: Well, I'm instructing
17  the witness not to answer that question as posed.
18      MR. GOTTESDIENER: Fine.
19  A   Without disclosing anything with regard
20  to my preparation, I did review the fax cover sheets
21  that were sent on September 14 accompanying the
22  executive summary and resolution.

144

1   BY MR. GOTTESDIENER:
2   Q   The materials that would be sent to a
3   member of the board in order to obtain their written
4   consent to a resolution, those would be considered
5   important materials, would they not?
6       MR. WELLSCHLAGER: Objection to the form
7   of the question.
8   A   I'm not sure what you're asking.
9       MR. GOTTESDIENER: I'll withdraw the
10  question.
11  BY MR. GOTTESDIENER:
12  Q   The faxes that were sent, did you review
13  them before they were sent, the fax cover sheet and
14  the attachments?
15  A   I don't have specific recollection of
16  reviewing them but I certainly would have.
17  Consistent with my practice I review all faxes
18  before they go out to the board members.
19  Q   Including the fax cover sheet?
20  A   Including the fax cover sheet.
21  Q   And in this case are you -- are you aware
22  that one fax that was sent to Ms. Rosen has a cover

145

1  sheet that differs in substance and has attachments
2  that differ in substance from the other two that are
3  in existence?
4     A    Yes, I am aware of that.
5     Q    And can you tell us the reason for the
6  difference?
7     A    The reason for the difference is
8  because -- and again, I don't have very specific
9  recollection but consistent with her behavior in the
10 past she would have asked for the letter to
11 employees so that she could take a look at it. She
12 was interested in those kinds of things and the
13 others in our conversation would not have asked for
14 it. That letter to the employees was not part of
15 the package to be sent to the board but I would
16 imagine in my conversation or in our conversations
17 with her that she asked about it and we said sure,
18 we'll send you a copy so --
19    Q    How did you get the copy of the letter
20 that was sent to her?
21    A    I don't have a specific recollection of
22 how I got it. I probably asked H.R. for it.

146

1     Q    How would you have done that?
2     A    How would I have done that? I would have
3  either picked up the phone and called Lorraine
4  Greene or I would have asked Warren or I would have
5  asked Bill Herrmann to get it for me. I mean there
6  are a whole host of ways of getting those kinds of
7  things so I don't have a specific recollection of
8  how I got that particular letter.
9     Q    But I mean mechanically the options would
10 include asking someone in your immediate office such
11 as John or Ms. Hawkins to get it in some fashion --
12    A    Or Bill Herrmann.
13    Q    Right. If you'd just allow me because
14 I'd like to save time to itemize the various ways.
15    A    Correct, uh-huh.
16    Q    Another way that you could do it would be
17 to send an e-mail to any of the people who you've
18 identified? That would be one way?
19    A    Potentially.
20    Q    Well, are any of those people -- other
21 than John Carten and Ms. Hawkins at the time, were
22 they collocated right next to your office?

147

1     A    Excuse me?
2     Q    Were any of those people next door to you
3  at the time?
4     A    No.
5     Q    One way you may have gotten that letter
6  would have been to call them, right?
7     A    Correct.
8     Q    Have you done a search of your files to
9  find, if any exist, e-mails, notes, any other kinds
10 of records that might reflect anything that you did
11 or said or anyone else did or said on September 14?
12    A    I did a search of my paper files and did
13 not recover anything because I didn't keep
14 anything. I looked at the general counsel's files
15 to see if Jim Lloyd had left anything as part of the
16 documents that he left for me and our electronic
17 records were -- I don't know the specifics of it.
18 I'm not going to speak to it but someone came and
19 took a -- did whatever they're supposed to do
20 vis-a-vis my computer to make sure that everything
21 that might have been on there was -- was looked at.
22    Q    As to what you personally did, when did

148

1  you do what you personally did?
2     A    I did it when I was asked to do it.
3     Q    Ma'am, when?
4     A    I don't have a specific recollection of
5  the date. In the past -- probably in the past three
6  months at some point. I don't have a specific
7  recollection of the date.
8     Q    Who asked you to do it?
9     A    I received either an e-mail or a hard
10 copy memo. I think it was an e-mail and it came
11 from either Desmond or Bill asking for us to search
12 through our records which we did.
13    Q    Bill meaning Bill Herrmann?
14    A    Bill Herrmann, right. I can't recall who
15 the e-mail came from. It came from one of them I
16 think.
17    Q    And the request putting aside anything
18 extraneous to the request, the request itself was to
19 do what?
20    A    Was to review all of our files to see if
21 we had anything relevant to the lawsuit that was
22 filed or to the events that surrounded the lawsuit.

149
1    Q    And that last part --
2    **A    Yes.**
3    Q    -- relevant to the lawsuit --
4    **A    I don't remember what the exact language**
5    **was.**
6          MR. WELLSCHLAGER: Hold on, he hasn't
7    asked a question yet.
8    BY MR. GOTTESDIENER:
9    Q    But what you're recalling in your mind's
10   eye is reading an e-mail that was a brief e-mail
11   that said we'd like you to look for this and
12   defining what you should look for in that --
13   **A    Yes.**
14   Q    In roughly the words that you gave?
15   **A    I wouldn't count on the words that I**
16   **gave. It was an e-mail that laid out the specific**
17   **things that we were supposed to look for and I don't**
18   **recall the specifics of what was said but based on**
19   **reading that e-mail I understood that I needed to**
20   **search all of my records to see if I could find**
21   **anything relating to the events that are at issue**
22   **here.**

150
1    Q    Thank you. When you said the specific
2    things were laid out, that was something that I just
3    heard for the first time so my question there is how
4    many -- was this in the form of a list?
5    **A    I don't know.**
6    Q    You don't know?
7    **A    I don't know.**
8    Q    But you don't think it was as brief as
9    just -- as you initially described it, things
10   relevant to the lawsuit?
11   **A    I don't believe so.**
12   Q    Were you provided at any time then or
13   subsequent with for the purpose of doing a search a
14   copy of the document production request that the
15   defendants received from the plaintiffs last fall?
16   **A    No, I was not.**
17   Q    In this e-mail were you told that the
18   purpose or one of the purposes was to --
19   **A    Wait, can I go back and correct?**
20   Q    Absolutely.
21   **A    It's possible I may have gotten a copy of**
22   **the -- of the discovery request. I don't recall.**

151
1    Q    In connection with being asked to search,
2    not in some other connection?
3    **A    Yeah, I don't recall. I don't recall,**
4    **yeah.**
5    Q    The July 2001 meeting was one that you
6    were not present for?
7    **A    I don't believe I was and certainly to**
8    **the extent that I was, I was not there as general**
9    **counsel or as corporate secretary if I was there but**
10   **I don't think I was. I don't have a recollection.**
11   Q    What capacity would you have been there
12   in?
13   **A    Well, as senior deputy but I don't**
14   **believe that I was there.**
15   Q    You said that -- that -- had you been
16   involved in any way in the proposed plan to provide
17   employees with a severance or separation package
18   prior to July 26?
19   **A    Yes.**
20   Q    How -- what was your involvement?
21   **A    I participated in meetings at which these**
22   **issues were discussed and how we were going to go**

152
1    **about accomplishing the goals of reducing the work**
2    **force and what tools were available to us and how we**
3    **could structure it.**
4    Q    Okay. And how many such meetings did you
5    attend?
6    **A    I can't say. I mean there were -- the**
7    **meetings that I recall more specifically were the**
8    **ones that took place in early September where we**
9    **were trying to figure out an alternative early**
10   **retirement plan but I do recall early on a much more**
11   **general level the -- having discussions and**
12   **attending discussions where the question of how to**
13   **implement our goal of reducing the work force could**
14   **be -- could be accomplished.**
15   Q    Where were those meetings held?
16   **A    In this building probably.**
17   Q    Exclusively or were any of them somewhere
18   else?
19   **A    I believe there were some meetings that**
20   **were held up in Wilmington but I don't believe I**
21   **attended any of those.**
22   Q    Did you -- that would include attend by

Case 1:06-cv-01539-GK   Document 20-8   Filed 01/16/2007   Page 38 of 66
DEPOSITION OF ALICE M. STRINGER
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

39 (Pages 153 to 156)

153

1 phone?
2   **A    Yeah, I don't -- I don't believe I**
3 **attended any of the Wilmington meetings.**
4   Q    When you looked for responsive records
5 did you look for any documents pertaining to any of
6 these meetings either before or after July 26?
7   **A    Yes.**
8   Q    And you came up with not a single
9 document?
10   **A    Didn't keep notes of any of the meetings.**
11   Q    Or hard copy documents?
12   **A    No.**
13   Q    You said we learned from the actuary that
14 a mistake had been made?
15   **A    Yes.**
16   Q    Who is we and what was the mistake?
17   **A    I don't know how it was communicated**
18 **directly to us. I know that Warren Reisig had been**
19 **in contact and either communicated it directly to**
20 **Jim and myself or through Bill Herrmann. We learned**
21 **of it. When I say "we" I mean Jim and I and the**
22 **mistake that we had understood was that when the**

154

1 **original plan was proposed, we obviously were quite**
2 **concerned about the pension fund and how much money**
3 **was in it and what the plan -- the impact on the**
4 **fund of effectuating the plan would be and so all of**
5 **that was looked at very carefully and at the end of**
6 **August given market conditions and what had been**
7 **going on, we learned that rather than what we**
8 **thought the impact would be that it would be a lot**
9 **more adverse than we had anticipated and as I said**
10 **earlier, that we all knew and understood that we**
11 **would not have to make a contribution into the**
12 **pension fund until either late '04 or '05 and**
13 **implementing the plan -- what we were being told**
14 **towards the end of August was that that holiday from**
15 **contribution would be curtailed significantly if we**
16 **went forward with the plan as originally proposed**
17 **and that it would be adverse to the corporation if**
18 **we did that.**
19   Q    I'm sorry, I'm missing what was the
20 mistake. Who made a mistake first of all?
21   **A    My understanding is that the -- and I may**
22 **be wrong about this. My understanding is the**

155

1 **actuary made the mistake.**
2   Q    What was the actuary's mistake?
3   **A    Because when we developed the plan to**
4 **begin with we evaluated the status of the fund,**
5 **the -- and what the impact of paying out these early**
6 **retirement benefits were plan -- whatever paying out**
7 **the plan if we were to effectuate it would -- the**
8 **impact that it would have on the pension fund.**
9     **We evaluated all of that and the actuary**
10 **gave us information with regard to that upon which**
11 **we relied and what we went to the board for approval**
12 **for and only later to discover that a mistake had**
13 **been made because either -- and I don't know the**
14 **specifics of it but perhaps at the point in time**
15 **when the information was available, that they were**
16 **looking at levels in the pension fund that were not**
17 **the actual levels based on what was occurring in the**
18 **marketplace and that we were projected to incur**
19 **additional losses in our pension fund and that**
20 **basically in simple terms we couldn't afford the**
21 **plan that was there.**
22     **Somebody told us we could afford it and**

156

1 **then in August we were told we really couldn't**
2 **afford it and so all of us looked at it and felt as**
3 **a fiduciary obligation to the corporation that we**
4 **couldn't carry out the plan as originally envisioned**
5 **and that we had an obligation to take another look**
6 **at it before we effectuated it.**
7   Q    Okay. I'm sorry, but I mean no
8 disrespect but all of that just -- you just keep
9 begging the question.
10     What was the mistake?
11   **A    The mistake was that the information**
12 **provided us to the actuary in the first instance**
13 **about the impact on the fund was wrong.**
14   Q    What information was in error?
15   **A    I did not receive the information. This**
16 **is secondhand.**
17   Q    Whether you received it or not.
18   **A    What I was told is that the level of the**
19 **pension fund provided to us or the impact of the**
20 **payouts under the plan as originally envisioned in**
21 **terms of the level of the pension fund was incorrect**
22 **and that if we were to effectuate the plan as**

157
1  originally envisioned that we would have a lot
2  less -- we couldn't afford it. We would have a lot
3  less money in the pension fund than originally
4  envisioned.
5      Q    I'm sorry, I understand the --
6      A    I'm not articulating it the right way.
7  I'm not a -- you know, I don't deal with these kinds
8  of issues on a daily basis. The bottom line is the
9  mistake that was made was that we were told that
10 there were certain facts and certain assumptions on
11 which this plan could be effectuated and that those
12 assumptions were wrong.
13     Q    Who told you that the actuary made a
14 mistake?
15     A    I understood that it -- I don't know who
16 told me that. I had understood it that it was an
17 actuarial mistake.
18     Q    You had understood it?
19     A    I understood based on conversations that
20 I had or that our discussions in our meetings
21 that -- and I don't know who said it. I can't
22 attribute it to any one particular person but we had

158
1  in our conversations talked about it and the issue
2  of the actuary came up and the discussions with the
3  actuary came up. Now, whether that's correct or not
4  I don't know because as I said earlier, I'm not the
5  one who talked with them so --
6      Q    Are you -- are you aware that others
7  besides yourself are of the view or of the
8  understanding that a mistake was made by Amtrak's
9  actuary?
10     A    I can't speak to others' understanding of
11 the situation.
12     Q    You could if someone had told you that.
13     A    But based on conversations that I had
14 that was how I understood it so I would imagine
15 others understood it that way since that was what
16 was represented to me.
17     Q    You've heard other people, some of the
18 names of which you've mentioned in the course of
19 this deposition --
20     A    Yes.
21     Q    -- make statements that state or
22 otherwise indicate that it is their either opinion

159
1  or their understanding or their view that Amtrak's
2  actuary made a mistake; is that correct?
3      A    Yes.
4      Q    How many different people can you think
5  of that you would put in that category? Bill
6  Herrmann? I mean if we could just tick some of them
7  off.
8      A    I can't -- I can't speculate right now
9  about how many people.
10     Q    I'm not asking you to speculate, ma'am.
11 I wouldn't want you to speculate. I'd want you to
12 give us your best recollection.
13     A    I don't have a recollection of how many
14 people would have had that view.
15     Q    Let's go through some of the people and
16 find out if you can recall whether or not you've
17 heard that from any of these people.
18     A    Okay.
19     Q    Lorraine Green, Bill Herrmann, Warren
20 Reisig. How about any of those three?
21     A    I don't think I had a direct conversation
22 with Warren about it or with Lorraine. In my

160
1  conversations with Bill we may have discussed it but
2  I can't --
3      Q    And you may have --
4      A    I'm not going to talk further about any
5  conversations that I might have had with him in any
6  event because I can't distinguish between my role as
7  a lawyer and not as a lawyer.
8      Q    I'm talking about a fact, whether a
9  certain person has a view about a fact, a nonlegal
10 fact as to whether it was the actuary who made a
11 mistake and what that mistake was.
12         Can you tell us anyone who you know or
13 believe based on conversations with them, reading
14 things and so forth that has the same understanding
15 that you have?
16         MR. WELLSCHLAGER:  Before you answer --
17 before you answer, Ms. Serfaty, I think
18 Mr. Gottesdiener makes a helpful distinction. The
19 only one I would add is that you limit your answer
20 to facts --
21         THE WITNESS:  Right.
22         MR. WELLSCHLAGER:  -- relayed

161

1  contemporaneous with this time period, not something
2  you talked about with someone six months ago.
3      **A    Right. Let me also put it in context for
4  you. There may have been other issues going on that
5  I'm not aware of. This was not my role at the
6  time. I was not involved in developing the plan. I
7  was not involved in validating the plan or in
8  assessing the underlying assumptions of the plan so
9  there may very well have been other reasons. The
10  question of the actuary and the input of the actuary
11  was clearly an issue and the question of a mistake
12  was clearly -- was discussed.
13      Whether or not there may have been other
14  issues as well, I can't speak to those so I just
15  want to make that clear that I was not involved in
16  those discussions. I didn't play a role in those
17  discussions so I don't have a complete
18  understanding. It might have been very easy to just
19  simply say okay, this is one of the issues. The
20  bottom line is we knew there was a problem and we
21  knew we had to deal with it and that we couldn't
22  carry the plan forward as originally envisioned**

162

1  **so --**
2  **BY MR. GOTTESDIENER:**
3      Q    The executive committee people that you
4  spoke with during the month of August and September,
5  did anyone voice the opinion or the view that there
6  had been no mistake made by anyone?
7      MR. WELLSCHLAGER: And I would just
8  caution you to exclude conversations in which legal
9  advice is being sought or you were providing legal
10  advice.
11  BY MR. GOTTESDIENER:
12      Q    Was there any legal advice being sought
13  in any of these executive committee discussions that
14  you've told us about?
15      **A    I would imagine certainly with the
16  lawyers present that there were legal issues that we
17  discussed in connection with the entire matter. Do
18  I --**
19      Q    A business meeting where a lawyer was
20  present but the question was how was the company
21  going to pay for the benefit wasn't legal advice,
22  was it?

163

1      **A    Well, but as with everything else --**
2      MR. WELLSCHLAGER: Objection to the form
3  of that question.
4      **A    -- I can't -- you know, I can't tell you
5  today that we didn't discuss legal issues that might
6  have come up or that were related so we --**
7  BY MR. GOTTESDIENER:
8      Q    With your counsel's admonition can you
9  tell me whether anyone indicated or stated the view
10  or opinion that no mistake had been made or maybe no
11  mistake had been made?
12      **A    I don't recall anybody making those
13  statements.**
14      Q    Same question but that a mistake was made
15  or may have been made by someone at Amtrak?
16      **A    I don't specifically recall.**
17      Q    Who was the actuary at the time that all
18  of the relevant stuff was done to determine --
19      **A    I don't know. I wouldn't have had
20  contact with them.**
21      Q    Do you know if it's still an actuary that
22  Amtrak still uses?

164

1      **A    I don't believe so but I don't know.**
2      Q    In your role as general counsel or acting
3  general counsel when you're acting general counsel,
4  did you ever have any participation in any
5  discussions or analysis or legal advice pertaining
6  to ERISA issues?
7      **A    What time frame are you talking about? I
8  was acting --**
9      MR. WELLSCHLAGER: Objection to the form
10  of the question.
11  BY MR. GOTTESDIENER:
12      Q    Any time you were acting general counsel,
13  any time you have been general counsel.
14      MR. WELLSCHLAGER: Objection to the form
15  of the question.
16      **A    I don't understand your question.**
17  BY MR. GOTTESDIENER:
18      Q    Whether you've been involved in the
19  rendering of legal advice on ERISA issues? I don't
20  understand what you don't understand.
21      **A    Can you just repeat the question because
22  I didn't -- the first time you said it it wasn't**

165

1 clear.
2    Q    Okay.  You were acting general counsel
3 for a time and you've been general counsel for a
4 time?
5    A    Yes.
6    Q    At any time that you were holding either
7 of those jobs have you ever participated in any
8 legal work relative to ERISA?
9         MR. WELLSCHLAGER: Objection to the form
10 of the question.
11    A    I would -- personally, no, that is not my
12 area of expertise and I wouldn't pretend to try to
13 be an ERISA lawyer.
14         MR. GOTTESDIENER: I didn't ask you if it
15 was your area of expertise.
16    A    Did the company deal --
17         MR. WELLSCHLAGER: Mr. Gottesdiener,
18 please stop interrupting.
19         MR. GOTTESDIENER: I'm trying to save
20 time because I'm looking at the clock because I'm
21 trying to do this deposition in one sitting but
22 we're not going to be able to if we have those kind

166

1 of answers.
2 BY MR. GOTTESDIENER:
3    Q    Go ahead, ma'am.
4         MR. WELLSCHLAGER: Objection to the
5 editorials.
6    A    As I said earlier, I personally would not
7 have done the work because that is not my area of
8 expertise.  Has the company during that period of
9 time dealt with ERISA issues?  Yes.  And have we
10 looked and -- I don't understand your question.
11 BY MR. GOTTESDIENER:
12    Q    I'm giving you a big shaking of the head
13 because that's not the question I asked.
14    A    Then please rephrase your question.
15    Q    You've done this again and again and I
16 have not said anything because I'm not trying to get
17 in a dispute with anyone here but this has gone on
18 throughout the deposition.
19         My question is did you work on any ERISA
20 issues yourself, you personally?
21    A    No.
22    Q    Thank you.  Have you worked personally

167

1 other than as a witness here today on this lawsuit
2 in any way?
3    A    No, I have not.
4    Q    As corporate secretary from August of
5 2001 forward, what has your role been in the
6 creation of the official minutes of board meetings?
7    A    I will generally -- I do not have a role
8 in the initial creation of those minutes.  I don't
9 do the first draft.  When a draft is complete I
10 will -- my role is to review it, to edit it, to add
11 recollections to the extent I have recollections
12 that are in addition to those that are in the
13 minutes and I also obviously look at it for level of
14 detail that may or may not be appropriate,
15 attorney-client issues, et cetera and I do a final
16 edit on the minutes before they are provided to the
17 board for an approval.
18    Q    And that's been your invariable practice
19 as corporate secretary?
20    A    Yes.
21    Q    What about as general counsel or acting
22 general counsel?  Did you have any involvement?  The

168

1 easiest, I guess, time period would be when you were
2 not corporate secretary.
3    A    Right.
4    Q    What involvement, if any, did you have in
5 the creation of the minutes?
6    A    I would not have had any involvement in
7 the creation of the minutes.  I would have reviewed
8 minutes or portions of the minutes at which I may
9 have either presented something to the board or I
10 participated in a discussion on a particular issue
11 with the board.  I would have reviewed that portion
12 of the minutes that related to something I was
13 working on to make sure that the representations
14 were accurate.
15    Q    And that would have been also an
16 invariable practice?
17    A    Yes.
18    Q    As corporate secretary what is your
19 policy as to the creation of the minutes from start
20 to finish?  I've used the word -- just as an aside
21 here I've used the word "creation."  I think you
22 heard it sort of a little different than the way I

169

1    mean it. I mean it in its fullest sense as opposed
2    to just sort of a first draft so with that
3    definition when I say the word "creation" I mean
4    from there's a meeting --
5        A    Yes.
6        Q    -- and then there's an approval at the
7    next meeting or some other meeting that that's our
8    minutes.
9        A    Yes.
10       Q    What is your policy -- what has been your
11   policy as to the creation of minutes of the meetings
12   of the board of directors of Amtrak?
13       A    The minutes are created -- John, Medaris
14   and I -- all three of us attend board meetings.
15   There are some points in time where one of us may
16   have to leave the room and there's why there are
17   three of us there. Particularly with John and
18   Medaris they will take notes. I generally do not
19   take verbatim notes. I will write notes of issues
20   and things that the board would like us to look at
21   but I don't take verbatim notes. Medaris does.
22   John as well takes notes and the two of them will

170

1    subsequent to a board meeting generate a first draft
2    of minutes and I do not know what the division of
3    responsibility is amongst the two of them. What I
4    do know is at some point a draft is provided to me
5    that has been worked on.
6        Those minutes have been drafted that way
7    for years and years so when I took over I didn't
8    feel the need to change the way that they were done,
9    and a draft is provided to me and then I will review
10   it and edit it as I said earlier and we will prepare
11   it for the book that we send out to the board in
12   advance of the board meeting for their approval.
13       Q    What is your policy as corporate
14   secretary as to the preservation or nonpreservation
15   of the notes that you describe that participants
16   take at the meeting?
17       A    Generally once the minutes are approved
18   all the notes will -- will get destroyed. We don't
19   keep the notes.
20       Q    The question is your policy.
21       A    I don't have an official policy on it.
22       Q    Do you have an unofficial policy?

171

1        A    Well, I destroy my notes. I believe John
2    destroys his notes. I don't -- I'm not sure if
3    Medaris does but I don't believe that we keep notes
4    once the board minutes are actually approved.
5        Q    So your policy on the preservation of
6    notes is, would it be fair to say, you don't have an
7    official policy?
8        A    I don't have an official policy.
9            MR. WELLSCHLAGER: Eli, it's been about
10   an hour and a half so when you get to a point.
11           MR. GOTTESDIENER: It's a good point
12   right here.
13           MR. WELLSCHLAGER: Great.
14           MR. GOTTESDIENER: You seem to pick them
15   very well, John.
16           THE VIDEOGRAPHER: This marks the end of
17   tape two in the deposition of Ms. Serfaty. We're
18   going off the record. The time is 4:43 p.m.
19           (A brief recess was taken.)
20           THE VIDEOGRAPHER: This marks the
21   beginning of tape three in the deposition of
22   Ms. Serfaty. We're back on the record. The time is

172

1    4:53 p.m.
2    BY MR. GOTTESDIENER:
3        Q    We were talking before the break about
4    the conflict of interest issue as impacting the
5    unanimous consent resolution issue and I wanted to
6    understand.
7            Was it your position that -- that
8    Mr. Jackson personally had a conflict of interest or
9    that the Secretary of Transportation had a conflict
10   of interest in voting on the resolution in question?
11       A    With regard to budget issues the conflict
12   of interest isn't a personal one. It's a conflict
13   of interest vis-a-vis the administration because the
14   administration's budget proposal for Amtrak is
15   always different than Amtrak's own budget and so on
16   a consistent basis the administration representative
17   will recuse themselves from any votes on budget.
18       Q    And why is that a conflict of interest?
19       A    Because --
20           MR. WELLSCHLAGER: Object to the form of
21   the question.
22           MR. GOTTESDIENER: Actually let me

173

1  withdraw the question.
2         THE WITNESS:  Right.
3  BY MR. GOTTESDIENER:
4      Q    Who says that that's a conflict of
5  interest other than your opinion that that's a
6  conflict of interest?
7      **A    They themselves articulate that they will**
8  **abstain because of their role as representative of**
9  **the administration that takes a differing view than**
10 **Amtrak on budget -- on Amtrak budget.**
11     Q    Didn't Congress put the Secretary of
12 Transportation on the board of directors?
13     **A    The Secretary of Transportation was not**
14 **put on the board of directors by Congress but the**
15 **president appointed the Secretary of Transportation.**
16     Q    Is there not a statute enacted by both
17 houses of Congress and signed into the present bylaw
18 that puts the Secretary of Transportation
19 statutorily on the board of directors?
20     **A    No, there is not.**
21     Q    No?
22     **A    No.  The statute says that the president**

174

1  **may appoint the Secretary of Transportation and if**
2  **the president does so that the secretary does not**
3  **have to go through the Senate approval process as**
4  **the other board members do so the president may just**
5  **appoint the secretary without the formal process.**
6      Q    And yet --
7      **A    But he's not required to do so.**
8      Q    Understood and thank you for that.
9  However, you would have to agree with me that
10 Congress envisioned that the Secretary of
11 Transportation might be a member of the board of
12 directors?
13        MR. WELLSCHLAGER:  Object to the form of
14 the question.
15     **A    I haven't gone back through the**
16 **legislation.  Obviously by naming it they envision**
17 **that they could potentially -- a representative of**
18 **the secretary or the secretary himself could sit**
19 **or -- as one of the board members but if the**
20 **president chose not to do it then Congress couldn't**
21 **step in and require it based on the legislation**
22 **that's there.**

175

1  **BY MR. GOTTESDIENER:**
2      Q    And you also are familiar enough with the
3  statute to have noted that Congress provides that
4  when the president puts the Secretary of
5  Transportation on the board of directors that the
6  Secretary of Transportation does not have to go
7  through any confirmation process?
8      **A    Correct.  That's what I just said.**
9      Q    Well, you seem to suggest you weren't
10 familiar with the statute so you would agree that
11 Congress in the statute envisions both that the
12 Secretary of Transportation may be a member of the
13 board of directors and that if the president wants
14 the Secretary of Transportation, Congress says that
15 the Secretary of Transportation does not have to go
16 through any approval process by Congress?
17     **A    Absolutely I'd agree.**
18        MR. WELLSCHLAGER:  Objection to the form
19 of the question.
20        MR. GOTTESDIENER:  Thank you.
21     **A    Yes.**
22

176

1  BY MR. GOTTESDIENER:
2      Q    Now, you would also agree that there's
3  nothing in the statute that strips the Secretary of
4  Transportation of voting power as a member of the
5  board of directors under any circumstances?
6        MR. WELLSCHLAGER:  Objection to the form
7  of the question.
8      **A    Actually as holder of the preferred**
9  **shares the Secretary of Transportation no longer has**
10 **voting power as a shareholder.**
11 **BY MR. GOTTESDIENER:**
12     Q    No longer?
13     **A    Yes.**
14     Q    Is this as a result of --
15     **A    Of the 1997 legislation, that's correct.**
16     Q    The Secretary of Transportation has no
17 voting power?
18     **A    Yes, as a preferred shareholder as a**
19 **result of that legislation so it's not under any**
20 **circumstance.  Not as a board member but you said**
21 **under any circumstance so I just wanted to clarify**
22 **it.**

177

1    Q    Thank you for that. I'm looking as a
2    board member.
3    A    Okay.
4    Q    If that wasn't exactly my question that
5    certainly was the implication.
6    A    Okay. Just to clarify.
7    Q    Thank you for that. In fact, that's a
8    very good argument that I'm going to be using, that
9    Congress made the distinction.
10        With your additional legal argument could
11   you please tell me if Congress has said that the
12   Secretary of Transportation loses voting power when
13   appointed to the board of directors under any
14   circumstances?
15   A    Congress doesn't speak to that issue.
16   Q    So you would agree that it's not in the
17   statute that there is a circumstance under which the
18   secretary loses voting power?
19   A    It is not in the statute.
20        MR. WELLSCHLAGER: Objection to the form
21   of the question.
22

178

1    BY MR. GOTTESDIENER:
2    Q    And is it written anywhere that the
3    Secretary of Transportation loses voting power where
4    in the view of one or more persons, including the
5    Secretary of Transportation perhaps, he has an
6    institutional conflict of interest or other conflict
7    of interest?
8        MR. WELLSCHLAGER: Objection to the form
9    of the question.
10   BY MR. GOTTESDIENER:
11   Q    Is it written anywhere?
12   A    Is it written anywhere?
13   Q    Yeah.
14   A    Not that I'm aware of.
15   Q    And how do you know if you do that
16   Mr. Jackson abstained in February of that year, 2003
17   because of a conflict of interest or a perceived
18   conflict of interest?
19   A    My understanding based on having
20   witnessed his abstention on budget issues on other
21   occasions for that very reason, that that would have
22   been the reason in that circumstance.

179

1    Q    But beyond that you don't have any other
2    basis of knowledge, correct?
3    A    Correct.
4    Q    He didn't tell you, correct?
5    A    Not that I'm aware of.
6    Q    And he didn't write it on the resolution
7    that he signed when he said I abstain, correct?
8    A    Correct.
9    Q    He just said I abstain, correct?
10   A    Correct.
11   Q    And just so I really understand because I
12   honestly don't, the conflict of interest is that the
13   Secretary of Transportation thinks that the budget
14   should be one thing but you say invariably Amtrak
15   believes the budget should be something else and
16   that creates a conflict?
17   A    Our legislative and grant request always
18   differs from the amount that the administration
19   proposes for Amtrak as part of the budget process.
20   Q    Is that by law?
21   A    No, but it has happened every single year
22   where the administration will propose an amount less

180

1    than what Amtrak has requested and in those
2    circumstances the secretary, as part of the
3    administration, has chosen to recuse himself because
4    of a conflict of interest.
5    Q    Isn't that a difference of opinion as
6    opposed to a conflict of interest?
7    A    No —
8        MR. WELLSCHLAGER: Objection to the form
9    of the question.
10   A    -- it's not.
11   BY MR. GOTTESDIENER:
12   Q    Why not?
13   A    Because as the representation of the
14   administration that advocates a certain amount of
15   money for Amtrak when you are sitting on Amtrak's
16   board as a fiduciary in terms of looking at what
17   amounts could potentially or need to be requested to
18   support Amtrak's operations, there could be a
19   conflict of interest there.
20   Q    There could be but not necessarily is?
21   A    And they have perceived of one, otherwise
22   they would not have abstained and recused

Case 1:06-cv-01539-GK    Document 20-8    Filed 04/16/2007    Page 45 of 66
DEPOSITION OF: ALICE M. SERGEANT
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

46 (Pages 181 to 184)

181

1    themselves.
2        Q    In 1997 -- does anyone have a copy of the
3    statute with them?
4        MR. WELLSCHLAGER: (Counsel shakes
5    head.)
6        A    No.
7    BY MR. GOTTESDIENER:
8        Q    In 1997 do you know -- I'll withdraw that
9    question.
10        If you would be so kind to review, if you
11    haven't fully to your satisfaction, the three
12    documents I put in front of you which I don't
13    think -- I hope not -- will have to be marked as
14    exhibits.
15        I wanted to ask you whether or not it
16    wasn't the case that a change was made in 1988 that
17    made the board minutes as a blanket matter
18    confidential and then provided a mechanism for
19    disclosure if certain standards were met by those
20    seeking the disclosure.
21        MR. WELLSCHLAGER: Can I hear that
22    question one more time?

182

1        MR. GOTTESDIENER: Sure. I'll rephrase
2    it or restate it.
3    BY MR. GOTTESDIENER:
4        Q    Isn't it the case that in 1988 the
5    corporation made a change to its policy as to the
6    minutes and made them as a blanket matter
7    confidential with disclosure available to certain
8    persons if certain standards were met for
9    disclosure, whereas prior aspects of the board
10    minutes were automatically releasable without any
11    other standard being met nor with any limitation as
12    to the persons who could receive the minutes had
13    they met that standard?
14        MR. WELLSCHLAGER: Objection to the form
15    of the question.
16        A    Let me try to answer it in two parts
17    because it's very long and very winded but there
18    appears --
19    BY MR. GOTTESDIENER:
20        Q    Thank you for the winded. It was a --
21    it's a yes or no question and it's yes.
22        A    No, it's not a yes or no question.

183

1        Q    Okay, fine.
2        A    It appears --
3        MR. WELLSCHLAGER: Are you withdrawing
4    the question?
5        MR. GOTTESDIENER: No, I want to hear the
6    answer. I'm fascinated.
7        A    It appears that in 1988 there was a
8    change. I was not party to it. I can't speak to
9    the circumstances around the change but it appears
10    based on the documents that you've provided which I
11    have not seen before that there was in fact a change
12    to the Board Statement of Policy in connection with
13    what is confidential, but if you look at the current
14    Board Statement of Policy which I think you
15    characterized as a blanket policy regarding
16    confidentiality of minutes, I don't agree because
17    the language specifically says the minutes of board
18    committee meetings, closed portion of board meetings
19    and all attachments to the minutes shall be deemed
20    confidential. That's not the minutes of the board
21    meetings.
22        The committee meetings presumably are

184

1    all -- and the closed portion of board meetings and
2    all the attachments are presumably subject to the
3    exemptions under FOIA for deliberative process and
4    so this does not say that the board minutes are all
5    confidential. These are very specific into what
6    they refer to and all of those things are subject to
7    the deliberative process privilege because they lead
8    up to the final minutes and resolutions that are in
9    the board so that's how I read that language and
10    would characterize it.
11    BY MR. GOTTESDIENER:
12        Q    Well, what's -- what is said, if
13    anything, in your reading of this as to the status
14    of the minutes themselves?
15        A    The status of the minutes themselves are
16    governed by law and by FOIA so if there's a
17    attorney-client privilege information in there,
18    those would be withheld but for the most part if
19    there are board minutes that contain information
20    that are either not subject to legal privileges or
21    not subject to exemptions under FOIA then those
22    would be released and in fact, in the past we have

Case 1:06-cv-01539-GK   Document 20-8   Filed 04/16/2007   Page 46 of 66
DEPOSITION OF: ALICE M. OBERFIELD
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

47 (Pages 185 to 188)

185
1  released board minutes when appropriate.
2     Q    So you would be in agreement that those
3  portions that you just identified that would be
4  released should be and should have been throughout
5  the past 20 years sitting in a public reading room?
6        MR. WELLSCHLAGER: Objection to the form
7  of the question.
8     A    I don't know that I would agree with that
9  because I think that there are different standards
10 for what's in the public reading room versus what
11 would be releasable under FOIA.
12 BY MR. GOTTESDIENER:
13    Q    Such as?
14    A    Such as the public reading room -- and I
15 don't have the language in front of me so I can't
16 speak to it but in general deals with policies that
17 affect the public and the minutes themselves may or
18 may not affect the public would be a circumstance
19 that affects the public such that they shouldn't be
20 in the reading room themselves.
21       Now, you know, obviously there are
22 resolutions which again are, quote, policy because

186
1  again that's what the public reading room looks to.
2  It doesn't speak to minutes. It talks about
3  policies and final actions. It doesn't actually
4  speak to minutes so I think we would have to
5  evaluate what's in the minutes, what the resolutions
6  are, what the substance of them is and see whether
7  or not we would be obligated to put them in there so
8  there are certain minutes or resolutions that should
9  be in the -- in the reading room and to the extent
10 that they are appropriately to be put in there they
11 will be and if they aren't --
12    Q    Why haven't they been?
13    A    My understanding is that over the past 32
14 years we've had one or two requests for a public
15 reading room and so given Amtrak's lack of resources
16 that we have not -- we've not culled everything that
17 needs to be in there.
18    Q    But you're creating a public reading room
19 now?
20    A    Now that the issue has been raised and
21 somebody has demanded it we will do it.
22    Q    And when will that be done?

187
1     A    We're in the process of evaluating what
2  needs to be in there and to the extent that we're
3  able to review everything and make determinations,
4  we will put things in there.
5     Q    Are you aware that for many years Amtrak
6  has represented in the Code of Federal Regulations
7  that there is a public reading room at Amtrak?
8        MR. WELLSCHLAGER: Objection to the form
9  of the question.
10    A    The bottom line is if somebody requested
11 something we would offer it to them. People haven't
12 requested it.
13 BY MR. GOTTESDIENER:
14    Q    Ma'am, please focus on the Code of
15 Federal Regulations. That's what the question is
16 about.
17    A    Okay. We haven't had a public reading
18 room up until now so whether I'm aware of it or not
19 is irrelevant. We have not had a public reading
20 room up until now.
21    Q    That's great. You're arguing with me.
22 I'm asking --

188
1        MR. WELLSCHLAGER: You're arguing with
2  the witness.
3  BY MR. GOTTESDIENER:
4     Q    You're a witness, okay?
5     A    Okay.
6     Q    Please, you're a nice person. I don't
7  want to argue with you, okay? You're just not
8  answering my question.
9     A    Okay.
10    Q    Are you aware that the Code of Federal
11 Regulations represents that Amtrak has a public
12 reading room?
13       MR. WELLSCHLAGER: Objection to the
14 editorial. Objection to the characterization.
15 Objection to the form of the question.
16    A    I have not reviewed that particular
17 regulation with regard to what's required of us.
18 BY MR. GOTTESDIENER:
19    Q    So the answer is no, you're not aware
20 that Amtrak represents in the Code of Federal
21 Regulations that there is a public reading room?
22       MR. WELLSCHLAGER: Objection to the form

189

1 of the question.
2 BY MR. GOTTESDIENER:
3    Q    Is that fair?
4    A    I am told that --
5         MR. WELLSCHLAGER: Same objection.
6    A    -- we need to have a reading room and
7 that we will -- we will establish one.
8 BY MR. GOTTESDIENER:
9    Q    Okay. Do you see how we need to have a
10 reading room and will establish one has nothing to
11 do with the question as to whether you as general
12 counsel are aware that Amtrak is representing
13 through the Code of Federal Regulations and has been
14 doing so for years that there is a public reading
15 room?
16        MR. WELLSCHLAGER: Objection to the form
17 of the question.
18 BY MR. GOTTESDIENER:
19    Q    Do you see that there's a difference
20 between your answer and the question that I've been
21 asking for the past five minutes?
22        MR. WELLSCHLAGER: Objection,

190

1 argumentative.
2    A    Because I don't have the regulation in
3 front of me I don't want to answer the question the
4 way you phrased it so if the regulation --
5    Q    Well, let me try it --
6         MR. WELLSCHLAGER: Sir, let the witness
7 finish her answer.
8    A    If the regulations specifically require
9 that then yes, I am aware that we have not had a
10 reading room and that the regulations have said it
11 but I don't have the regulations in front of me
12 so --
13 BY MR. GOTTESDIENER:
14    Q    That the regulations have said it? I'm
15 sorry, I don't want that to go missed.
16    A    I don't have the regulations in front of
17 me to verify that what you're saying corresponds
18 with what's in the regulations and so I don't want
19 to answer the question the way you phrased it.
20    Q    Well, then just say I don't know what the
21 Code of Federal Regulations say --
22        MR. WELLSCHLAGER: Objection to the form

191

1 of the question.
2 BY MR. GOTTESDIENER:
3    Q    -- if that's true.
4    A    Well, I said that and you weren't happy
5 with that answer.
6    Q    You didn't say that, ma'am, and you know
7 what, I'm going to ask you again.
8         Have you ever read the Code of Federal
9 Regulations section that pertains to Amtrak's public
10 reading room or has anyone ever told you under any
11 circumstances prior to today that the Code of
12 Federal Regulations section that Amtrak promulgated
13 states in substance that Amtrak has a public reading
14 room?
15        MR. WELLSCHLAGER: Objection.
16 BY MR. GOTTESDIENER:
17    Q    Is this something that you were aware of
18 directly because you read it or because somebody
19 told you that?
20        MR. WELLSCHLAGER: Objection to the form
21 of the question.
22    A    I'm going to say it again.

192

1         MR. GOTTESDIENER: I withdraw the
2 question. I withdraw the question because I'm not
3 going to get an answer.
4         THE WITNESS: Okay.
5         MR. WELLSCHLAGER: Objection to the
6 commentary.
7 BY MR. GOTTESDIENER:
8    Q    What role have you personally played in
9 the issues raised by Jonathan Blank and myself with
10 respect to the absence of a public reading room, the
11 absence of public reading room materials being made
12 available to persons who appear at Amtrak to review
13 such materials and related public reading room
14 questions since March 3 of 2004?
15        MR. WELLSCHLAGER: Obviously you can
16 answer parts of that question but don't divulge
17 attorney work product or attorney-client
18 communications.
19    A    Correct. I have been advised of the
20 issue and I have had discussions about the issue
21 with our folks but I'm not at liberty to discuss the
22 substance of those conversations.

Case 1:06-cv-01539-GK    Document 20-8    Filed 01/16/2007    Page 48 of 66
DEPOSITION OF ALICIA M. SERFATY
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

49 (Pages 193 to 196)

193

1  BY MR. GOTTESDIENER:
2    Q    I didn't ask that question. I asked what
3  your role was and you said that you have been
4  advised --
5    A    Yes.
6    Q    -- of -- you have been advised -- and I'm
7  not asking for anything that -- because though I
8  believe the privilege has been waived, I'm not
9  seeking to ask you these questions.
10        I'm asking you have been advised of what
11  with respect to this issue? Just that there is this
12  issue?
13    A    I've been advised that the issue exists,
14  that we will --
15        MR. WELLSCHLAGER: Well, hold on. He's
16  asking you for now --
17    A    My role.
18        MR. WELLSCHLAGER: Your role.
19        MR. GOTTESDIENER: Thank you.
20    A    Up until this point I have been consulted
21  on the substance of documents that need to be put
22  into the reading room, my opinion on what our

194

1  obligations are and I will likely to be continued to
2  be consulted as those documents and issues come up.
3  BY MR. GOTTESDIENER:
4    Q    So you have been asked your opinion on
5  what the company's obligations are?
6    A    Yes.
7    Q    You have been asked to pass on particular
8  documents and whether they are required to be put in
9  the public reading room?
10    A    Categories of documents.
11    Q    Have you been asked to -- or have you
12  otherwise decided to take the role of rendering a
13  view, if not a final decision, either as to all
14  categories of documents that are to be put in the
15  public reading room?
16        MR. WELLSCHLAGER: I'm sorry, can I hear
17  that question again?
18  BY MR. GOTTESDIENER:
19    Q    The point of the question is your role
20  to pass on all decisions made with respect to all
21  categories or is it some categories because somebody
22  wants your input or you asked -- do you understand

195

1  the distinction?
2    A    I think I understand what you're saying.
3  The bottom line is that there are certain categories
4  where it's going to be pretty clear as to whether it
5  should be in or should be out and I'm not going to
6  go over every single category of documents. To the
7  extent that there's some question as to whether
8  something should be put in there and they need
9  advice on -- or a decision about whether or not
10  something should be put in there, it will likely get
11  raised to my level but there are other folks who
12  deal with FOIA issues as well in the department
13  so --
14    Q    So you will become involved and have been
15  involved to the extent that others, to whom you've
16  delegated this decision, deem it appropriate to
17  involve you?
18        MR. WELLSCHLAGER: Objection to the
19  characterization. I think her answer speaks for
20  itself.
21  BY MR. GOTTESDIENER:
22    Q    I'm not trying to fight. I'm just trying

196

1  to understand. You're getting involved not because
2  you're making sure that you pass on every category.
3  You're telling the people who are doing this in
4  essence that if they feel that this is something
5  that's controversial or difficult or something that
6  you might want to know about, that's when you'll be
7  involved?
8        MR. WELLSCHLAGER: Well, objection and
9  don't answer the question to the extent the question
10  is asking you what you tell people. I mean
11  that's -- that's how you phrased it,
12  Mr. Gottesdiener. If the question is are you making
13  yourself available --
14        MR. GOTTESDIENER: It's not legal
15  advice. It's a role. It's structural. There's
16  nothing about that that is --
17        MR. WELLSCHLAGER: You asked her does she
18  tell people in essence X.
19  BY MR. GOTTESDIENER:
20    Q    How is it determined what role you have
21  in the decision as to what categories of documents
22  go in and do not go in the public reading room?

197

1    **A    The discussions that we've had, and I**
2    **can't characterize the content of them, provide**
3    **enough guidance to our folks to be able to determine**
4    **when they need to come to me and when they don't**
5    **need to come to me in terms of the parameters for**
6    **making decisions.**
7        Q    Have you thus far reviewed personally,
8    physically any document or documents in the context
9    of making a decision in terms of this question?
10        MR. WELLSCHLAGER: Hold on, Alicia.
11    Objection to the form of the question. You can
12    answer it if you understand it.
13        **A    Okay. There are a number of documents**
14    **where we've had discussions where I have either**
15    **looked at them or know what they are without having**
16    **to look at them on the spot in terms of having**
17    **discussions so if you're asking --**
18    **BY MR. GOTTESDIENER:**
19        Q    So yes? The answer is yes?
20        **A    -- whether or not I've gotten to the**
21    **level of understanding whether particular documents**
22    **or particular -- certain kinds of documents need to**

198

1    be in there, yes.
2        Q    That wasn't my question but you answered
3    it along the way. Thank you.
4        Has a decision been made with respect to
5    what board minutes or resolutions will be put in the
6    public reading room?
7        **A    My understanding is that that decision**
8    **is -- or that review is ongoing at the moment.**
9        Q    But has a decision been made as to --
10    when you say the review is ongoing it sounds like
11    you're talking about particular things.
12        Has a decision been made as to what the
13    definition will be to guide the people making that
14    decision as to what goes in and what does not go in
15    the public reading room?
16        **A    Without disclosing the content of our**
17    **conversations, we have had discussions about the**
18    **parameters of board resolutions that should or**
19    **shouldn't be part of a reading room.**
20        Q    And is it your position that the
21    parameters as to what goes in and does not go in the
22    public reading room are confidential or privileged,

199

1    can't be disclosed?
2        **A    No, those are the obligations that are**
3    **set forth in the -- in the statute, in the**
4    **regulations about what needs to be in there and we**
5    **have talked about them in the context of our**
6    **situation and how they might apply in our context.**
7        Q    Are any minutes of the board of directors
8    going to be put in the public reading room?
9        **A    To the extent --**
10        Q    Not resolutions.
11        **A    Well, but resolutions are part of the**
12    **minutes.**
13        Q    I understand but in my definition just
14    for the purpose of this question are any minutes
15    without the -- without regard to the resolution
16    portion of the minutes, are any minutes, narratives
17    of what occurred and so forth going to be put in the
18    public reading room?
19        **A    A final decision on that issue has not**
20    **yet been made.**
21        Q    When do you anticipate such a decision to
22    be made?

200

1        **A    When the folks who are reviewing it bring**
2    **it to me for a decision.**
3        Q    Pending the creation of a public reading
4    room and the -- withdrawn.
5        Pending the creation of a public reading
6    room is Amtrak going to issue any modification to
7    the Code of Federal Regulations' representations
8    with respect to Amtrak's public reading room?
9        MR. WELLSCHLAGER: Objection to the form
10    of the question.
11        **A    I would have to go look at the regulation**
12    **and see in light of what we're doing whether or not**
13    **any -- any modifications need to be made.**
14    **BY MR. GOTTESDIENER:**
15        Q    Pending. Right now.
16        **A    I don't understand pending.**
17        Q    Pending the final outcome of whatever it
18    is that you're doing.
19        **A    Yes.**
20        Q    Let me ask you this: Pending the outcome
21    of whatever it is that you're going to finally do,
22    is Amtrak going to take any action with respect to

Case 1:06-cv-01539-GK    Document 20-8    Filed 01/16/2007    Page 50 of 66
DEPOSITION OF ALICIA M. SERFATY
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

51 (Pages 201 to 204)

201

1  what is currently out there as to what Amtrak says
2  about its public reading room?
3      MR. WELLSCHLAGER: Objection to the form
4  of the question.
5      A    Given my understanding of what has
6  occurred to date in terms of the information that
7  has already been provided and the process that we're
8  undergoing, I'm not sure that it's necessary right
9  now.
10 BY MR. GOTTESDIENER:
11     Q    That wasn't my question. Can you just
12 say no?
13     A    It hasn't been raised to me at this point
14 in time.
15     Q    Can you tell me the history of the
16 adoption and then the withdrawal and then the
17 adoption of resolutions pertaining to the creation
18 of an executive committee in 2003 for the board of
19 directors?
20     A    Can you please be more specific about
21 what you're talking about in terms of adoption,
22 withdrawal, adoption, withdrawal? What are you --

202

1  what are you referring to?
2      Q    I'm referring to July 2003.
3      A    Yes.
4      Q    There was a resolution enacted then in
5  September of 2003 there was another resolution
6  enacted and in the interim yesterday I showed
7  Mr. Carten a document where he had written the word
8  "withdrawn" and put a slash through the July
9  resolution. I'm wondering if you could tell us the
10 history of that and your participation.
11     A    Well, if you could show me. I did
12 participate significantly in the issues around
13 that. If you could show me the different --
14     Q    For right now I'm asking you the question
15 without showing you documents.
16     A    Okay, without showing me documents.
17     MR. WELLSCHLAGER: You're interrupting
18 the witness. Were you done with your answer?
19     A    No. Without showing me documents what I
20 can tell you about the situation is that we in the
21 spring of last year anticipated the expiration of
22 certain board members' terms and without knowing

203

1  whether or not the White House would act to appoint
2  new members, we started to look at how we could deal
3  with the question of potentially losing a quorum in
4  September of 2003 and we prepared and looked at
5  resolutions that would number one, modify our bylaws
6  to make them consistent with D.C. law which permits
7  an executive -- which permits the delegation of
8  authority from a full board to an executive
9  committee to make sure that our bylaws were
10 consistent with that because even though prior to
11 those changes to the bylaws we did have provision
12 for an executive committee, it was slightly
13 different than what was in the D.C. code and so we
14 revised the bylaw.
15 BY MR. GOTTESDIENER:
16     Q    How so?
17     A    Our executive committee provision -- if I
18 recall correctly there were two issues. One is that
19 ours provided for three members of an executive
20 committee and D.C. law allowed for two, a minimum of
21 two. If I recall correctly there was also some
22 language in our agreement that talked about

204

1  executive committees acting between board meetings
2  and given that the D.C. law didn't have that
3  language in there, we felt just to avoid any
4  confusion to eliminate that language as well so we
5  prepared resolutions that would make those changes
6  to the D.C. law and also --
7      Q    You don't mean the D.C. law.
8      A    To the bylaws in order to conform them to
9  the D.C. law and also establish a -- also establish
10 an executive committee to act in the event that we
11 fell below a quorum.
12         I would like to look at those two
13 resolutions but if I recall correctly there were two
14 resolutions, one of which was conditional. If board
15 membership falls below a quorum then the executive
16 committee gets established. The second was much
17 cleaner and it said the executive committee is
18 established, here are the members and I think we
19 felt that the second one was more appropriate and
20 cleaner in the event that there was some question
21 that might be raised about holdover status, about
22 other issues in connection with board members and we

Case 1:06-cv-01539-GK   Document 30-8   Filed 01/16/2007   Page 51 of 66
DEPOSITION OF ALFRED WOOLVER
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

52 (Pages 205 to 208)

205

1  didn't want there to be any issue about the question
2  of when we lost a quorum and when the executive
3  committee would come into effect and so if I
4  remember correctly, that was the issue with the two
5  resolutions and that's why there were two. One was
6  a little more conditional. The other was a lot
7  cleaner and just basically established the executive
8  committee.
9  Q    How would it be consistent with the
10 federal statute that requires there be seven voting
11 directors to operate the activities of the
12 corporation with two?
13      MR. WELLSCHLAGER: Objection to the form
14 of the question.
15 A    I don't have the federal statute in front
16 of me but the federal statute doesn't speak to an
17 executive committee or any committees of the board
18 and the statute does say that, you know, D.C. law
19 can govern except to the extent inconsistent and
20 so -- the statute doesn't say it can only operate
21 with seven. It says the board shall consist of
22 seven so there's nothing in there that precludes

206

1  any -- either committee structure or an executive
2  committee to function in the course of our board
3  activities because if you read it that way then we
4  couldn't even have committees I suppose and --
5  BY MR. GOTTESDIENER:
6  Q    Explain that. I don't understand that.
7  A    Because if you read it so narrowly that
8  says only a seven committee member can function then
9  we wouldn't even be able to have committees to -- in
10 accordance with D.C. law which permits us to have
11 committees to carry out certain functions which we
12 do so --
13 Q    But aren't the functions --
14 A    The statute doesn't preclude us from
15 having an executive committee. We looked at this
16 issue exhaustively.
17 Q    You did?
18 A    Yes.
19 Q    Do you have written legal opinions on the
20 subject?
21 A    Yes, I do.
22 Q    And you mentioned that the federal

207

1  statute says that the D.C. statute can apply as long
2  as it's not inconsistent with the federal statute?
3  A    Correct.
4  Q    That's your understanding?
5  A    Correct.
6  Q    And that's the basis upon which you think
7  that there's not a problem having an executive
8  committee of two running the affairs of the
9  corporation?
10 A    Well, it's a lot more complicated than
11 that.
12      MR. WELLSCHLAGER: Object to the form of
13 the question.
14 A    But there's a whole legal analysis that
15 goes into that which I'm not prepared to share with
16 you at the moment but the reality is after
17 exhaustive --
18 BY MR. GOTTESDIENER:
19 Q    Are you prepared to share it with me at
20 any time?
21 A    The reality is we have looked into this
22 issue exhaustively.

208

1  Q    But is there anything wrong with the way
2  I summarized the company's position?
3  A    The -- the company's position is that
4  given the statute and what's in there as well as
5  D.C. law which governs, that we are permitted to
6  carry out board functions through an executive
7  committee.
8  Q    Of two people?
9  A    Of -- right now there are three but if
10 necessary of two people.
11 Q    And is it -- is it also -- withdrawn.
12      How is it consistent with the federal
13 statute to permit a committee of three people or two
14 people to run the affairs of the corporation when
15 the board resolution that enacted -- the board
16 resolution that enacted this regime was enacted when
17 the board did not have the required seven
18 directors?
19      MR. WELLSCHLAGER: Objection to the form
20 of the question.
21 A    I don't understand.
22

209
1  BY MR. GOTTESDIENER:
2    Q    At the time this occurred in July and
3  September of 2002 --
4    A    Correct, yes.
5    Q    -- how many directors were there?
6    A    We had a quorum.
7    Q    How many directors were there?
8    A    In July there were -- we lost two so
9  there were -- there were five.
10   Q    And how many in September were there?
11   A    At the September meeting there were five.
12   Q    How is it consistent with the federal
13 statute to permit a board of directors of less than
14 seven to act by unanimous consent?
15        MR. WELLSCHLAGER: Objection to the form
16 of the question.
17   A    The bylaw as well as -- well, first of
18 all, the federal statute doesn't deal with the
19 question of unanimous consent and therefore we would
20 look to D.C. law to deal with the question of
21 unanimous consent, and our bylaw provision which
22 mirrors D.C. law says that written unanimous consent

210
1  of all board members with voting power then in
2  office and so as far as I'm concerned, the fact that
3  the White House and the Congress didn't affirm the
4  seventh member meant that we didn't have a voting
5  member then in office so the unanimous consent on
6  the face of the bylaw language which is consistent
7  with D.C. law governs.
8  BY MR. GOTTESDIENER:
9    Q    The -- withdrawn.
10        The materials that were sent to the board
11 members in September of 2001 -- I'll show you what
12 has been previously marked as Exhibit Number 4.
13        Take your time taking a look at that but
14 the pending question will be these are the fax and
15 fax cover sheets that were sent at your direction to
16 the board members --
17   A    Yes.
18   Q    -- are they not?  You don't have to
19 answer until you're ready to answer but that's the
20 question.
21        (Pause in the proceedings.)
22   A    Okay.  What's your question, I'm sorry?

211
1    Q    The question was what you have in front
2  of you is a true and accurate reproduction by
3  facsimile or Xerox apart from the first cover page
4  which you can take a look at -- this is a true and
5  accurate copy of the faxes that you authorized and
6  directed John Carten to send to three of the six
7  then existing board of directors?
8    A    Based on my review of them I have no
9  reason to believe that they are not.
10   Q    And if you would turn to the first page
11 which you're -- which you're on -- well, the first
12 page I just want to make sure we're talking about
13 with the sticker on it, the AMT 7283.  This I'm
14 excluding as --
15   A    Correct.
16   Q    That's not something that you've seen
17 before or if you saw it before it's not something
18 that you saw in September of 2001?
19   A    Correct, I have not seen it.
20   Q    The other documents are a copy of what
21 you did see, correct?
22   A    Correct.

212
1    Q    Did you type the fax cover sheet
2  yourself?
3    A    No.
4    Q    How did the fax cover sheet -- looking at
5  the first one there that is directed to Mr. Jackson,
6  how does that passage about -- starting with per our
7  discussion, how did that come to be there?
8    A    I would have told John what to put on the
9  fax sheet and he would have typed it up and had me
10 take a look at it to see if it reflected what I
11 asked him to put on it.
12   Q    And do you have a memory of doing that?
13   A    I don't have a specific memory of it.
14   Q    At the time he was -- his office was
15 adjacent to yours or close by yours?
16   A    He may not have moved down at this point
17 in time given that it was so close to the transition
18 so his office may still have been up on the fourth
19 floor.
20   Q    Then I guess because you're saying you
21 don't have a recollection or you say a specific
22 recollection, how in the ordinary course -- if

213
1  that's the only way you can answer how is it that
2  you would have conveyed the content of that cover
3  sheet to him?
4        MR. WELLSCHLAGER: In your capacity as
5  corporate secretary I assume is implicit in the
6  question.
7     A   Certainly. Well, he either would have
8  walked down the steps and come to my office and we
9  would have talked about it which is probably what
10 would have happened or I would have picked up the
11 phone and called him, but in all likelihood he would
12 have come to my office because generally that's how
13 we work.
14 BY MR. GOTTESDIENER:
15    Q   And if you'd look at the fax number that
16 shows where it came from -- does it have that fax
17 and phone number there?
18    A   This one?
19    Q   Yes.
20    A   Yes.
21    Q   Where was -- where was the machine that
22 sent or was intended to send that fax vis-a-vis your

214
1  office?
2     A   This phone number -- I mean this fax
3  number is a fax machine that's located in the law
4  department.
5     Q   Where vis-a-vis your office?
6     A   Where in the law department? Vis-a-vis
7  my office.
8     Q   Not the law department, your office.
9     A   Vis-a-vis my office it would have been
10 down the hallway.
11    Q   Okay. I mean down the hallway --
12 depending on how long the hallway that could be --
13    A   How long the hallway.
14    Q   That could be close, that could be far.
15        Is it close? Is it far?
16    A   I guess it depends. You would walk out
17 my office, turn right, pass the kitchen, pass the
18 entryway and then to the right there's a little area
19 where we have fax machines. It would have been
20 there.
21    Q   Is this a fax number that at the time you
22 were using as either corporate secretary or general

215
1  counsel?
2     A   Yes, it was. Yes, it was.
3     Q   Was it a fax number that John Carten was
4  using as assistant corporate secretary also?
5     A   I don't know the answer to that because
6  he may very well have had a fax upstairs in his
7  office or in his area that he might have used.
8     Q   But you would agree that that fax is
9  local to you?
10    A   Yes.
11    Q   Thank you. That's what I was trying to
12 get to.
13    A   Okay.
14    Q   Now, the content per our discussion and
15 so forth --
16    A   Yes.
17    Q   -- if I understood you correctly before,
18 I don't want to put words in your mouth, you would
19 not have allowed this to go to the board of
20 directors had you not personally reviewed it
21 physically before it went out?
22    A   That's right, I would have reviewed it.

216
1     Q   And so the one that happens to be on top
2  is the one to Mr. Jackson, right?
3     A   Yes.
4     Q   And you would have -- per your entry
5  there you would have -- because it says per our
6  discussion --
7     A   Yes.
8     Q   -- you would have spoken with
9  Mr. Jackson?
10    A   Yes.
11    Q   But why did you bother sending it to him
12 if he told you he was going to abstain and he had a
13 conflict of interest that stripped him of voting
14 power?
15    A   He wouldn't have abstained from this.
16        MR. WELLSCHLAGER: Objection to the form
17 of the question.
18    A   This is not something that he would have
19 had a conflict of. We were talking about a
20 completely different and frankly irrelevant subject
21 matter when we were talking about the conflict of
22 interest. This is the early retirement plan that he

Case 1:06-cv-01539-GK   Document 20-8   Filed 04/16/2007   Page 54 of 66
DEPOSITION OF ALICE FROM RIVKIN
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

55 (Pages 217 to 220)

217
1   never indicated that he had a conflict and in fact,
2   not this copy but signed the resolution.
3   BY MR. GOTTESDIENER:
4       Q     But doesn't this have to do with funding
5   of Amtrak because the whole issue there was millions
6   of dollars was going to have to be added to --
7       A     No, when we were talking about the other
8   thing we were talking about our legislative and
9   grant request which is what goes up on the Hill.
10      Q     No, I understand what you were talking
11  about the other time but why isn't that a conflict
12  of interest?
13      A     You know what, I --
14          MR. WELLSCHLAGER: Objection to the form
15  of the question.
16      A     -- would let him deal with his counsel on
17  what his conflicts are so --
18  BY MR. GOTTESDIENER:
19      Q     Turn to the Amy Rosen fax.
20      A     Yes. This one, yes.
21      Q     Looking at that does it refresh your
22  recollection at all as to the content of the

218
1   conversation that you had with her that you were
2   providing her with this additional information?
3       A     Based on my review of this I -- only to
4   the extent that I wouldn't have sent it to her if
5   she didn't ask me for it if I wasn't sending it to
6   everybody else so all it does is it just shows me
7   that during our conversation we likely raised the
8   issue of the employee communication and she probably
9   asked for it but I don't -- it doesn't help me to
10  specifically remember the context of the
11  conversation.
12      Q     And if you turn to the -- any of the
13  executive summaries, all of which I think are
14  identical --
15      A     Yes.
16      Q     Executive summary please, not the fax
17  cover sheet.
18      A     Excuse me. Yes.
19      Q     You carefully reviewed that executive
20  summary both for, as you distinguished before, form
21  as well as substance?
22      A     Yes.

219
1       Q     What did you do, if anything, to assure
2   yourself as general counsel and corporate
3   secretary? You said form and substance of corporate
4   secretary but then we discussed that you also said
5   well hey, I'm general counsel.
6       A     Sure.
7       Q     What did you do to assure yourself that
8   this proposal did not run afoul of federal pension
9   law?
10      A     Well, let me clarify something. I was
11  not general counsel when this was faxed to the board
12  members. I was senior deputy general counsel and so
13  in terms of the board I was only functioning in my
14  capacity as the corporate secretary but there
15  were -- I was aware, and I can't speak specifically,
16  of a lot of discussion and review of this issue by
17  those who had knowledge of what was going on and
18  what was important so substantively even though we
19  do look these over, we do rely on people who are
20  more expert than we to give us advice on substance.
21      Q     What -- what are the discussions that
22  you're talking about?

220
1          MR. WELLSCHLAGER: I don't think he's
2   asking you for the content of those discussions.
3          MR. GOTTESDIENER: No, I'm not.
4       A     I'm not going to speak to the content. I
5   was aware obviously we were dealing with the actuary
6   yet again and we dealt with counsel. We dealt
7   with -- and when I say "we" I don't mean me. I mean
8   Amtrak because I was not involved in the specifics
9   of those and I can't speak to those but I do know
10  that there were others at Amtrak who did look at the
11  plan and who did evaluate it and propose it and so
12  that was not within my area of responsibility at the
13  time and as I said earlier, I wasn't general counsel
14  at the time so the ultimate responsibility for that
15  was not mine from that perspective.
16  BY MR. GOTTESDIENER:
17      Q     Can you identify one, just one person who
18  you knew considered the specific question as to
19  whether or not the proposal might run afoul of
20  federal pension law?
21      A     Again, I can't reveal --
22      Q     If you say again it concerns me because

Case 1:06-cv-01539-GK   Document 20-8   Filed 03/16/2007   Page 55 of 66
DEPOSITION OF ALICE M. HERRMANN
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

56 (Pages 221 to 224)

221

1   you didn't answer the question the first time.
2       A    Okay.
3       Q    I'm asking you just identify anything,
4   not about actuaries and mistakes. I want to know
5   when you approved that to go out to the board
6   members --
7       A    Yes.
8       Q    -- tell me if you were aware, if you
9   were, of any person who had specifically looked at
10  the specific question of whether or not that
11  proposal might violate federal pension law.
12      A    Your use of the word "specific" -- I mean
13  I'm not sure that anybody looked at it in quote,
14  does it violate but obviously anything that we were
15  going to do we needed to make sure was within the
16  bounds of the law and so we --
17      Q    Identify somebody, please.
18      A    Our -- Warren Reisig and I believe Bill
19  Herrmann and others. We dealt with outside counsel
20  on this issue. We received advice from outside
21  counsel. Again, I was not involved in the specifics
22  so I'm not -- I may be not the right person to ask

222

1   but you're asking me if I'm aware. I am aware that
2   there were actions that were done by folks within
3   Amtrak to make sure that this was compliant with the
4   law but I can't give you specifics with that.
5       Q    Okay. Wait, wait, you're aware --
6       A    Yes.
7       Q    -- that somebody made sure that it was
8   compliant with federal pension law?
9       A    Yes.
10      Q    Federal pension law? I'm not talking
11  about, you know, good policy or funding.
12      A    We employ outside counsel and lots of
13  folks who --
14      Q    It's really a simple question. It's
15  really simple. I'm just asking you --
16          MR. WELLSCHLAGER: Objection.
17  Objection. You're interrupting her now.
18          MR. GOTTESDIENER: I want to go off the
19  record --
20      A    Am I aware? Yes, I'm aware.
21          MR. GOTTESDIENER: -- because I don't
22  want to spend 20 minutes on this.

223

1       A    Yes, I'm aware.
2   BY MR. GOTTESDIENER:
3       Q    Okay. What I want you to do is focus
4   with me on this, okay?
5       A    Certainly.
6       Q    I want you to tell me who looked at the
7   question of whether this was consistent with or
8   possibly not consistent with federal pension law and
9   so it's a compound question so we get it all out,
10  specifically who was it that looked at it and how
11  did you learn that that person or persons
12  specifically looked at that and concluded there's no
13  problem or there's not enough of a problem to not
14  make this proposal?
15      A    Well, this is --
16          MR. WELLSCHLAGER: As to the first part
17  of the question, if you have a name give it. As to
18  the second part of the question, I don't -- I think
19  it calls for privileged material and I think it
20  needs to be rephrased.
21      A    Well, you and I are having a problem here
22  and obviously you're getting quite frustrated

224

1   because either you don't like the answer or you're
2   not listening to what I'm saying.
3          MR. GOTTESDIENER: No, I don't have any
4   problem with any of the answers because they're all
5   in my favor. What I have a problem with is spending
6   20 minutes just asking a simple question.
7       A    Well, maybe if you --
8          MR. WELLSCHLAGER: The record and the
9   tape are going to show that the reason we're
10  spending 20 minutes here is because you keep
11  interrupting the witness. She's actually --
12          MR. GOTTESDIENER: I didn't interrupt the
13  witness for two or -- two and a half, three hours.
14  I didn't say anything because I was trying to be
15  polite and I'm not trying to make this anymore
16  painful than it is for everyone.
17          MR. WELLSCHLAGER: That's laughable.
18  You've interrupted almost every answer.
19          MR. GOTTESDIENER: Yeah, at some point
20  I'm interrupting because I think this is a very
21  smart witness and we can work together to have her
22  focus on what I'm looking for. I'm not looking for

225

1  the other things that the witness is answering.
2  Here I'm looking for --
3      MR. WELLSCHLAGER: It's just
4  inappropriate to interrupt the answer.
5  BY MR. GOTTESDIENER:
6      Q    Did you come to have specific knowledge
7  that somebody analyzed that question?
8      A    And I think I answered you prior and if
9  you'll give me a moment I'll be happy to answer you
10  again.
11     Q    Okay.
12     A    You asked me if I was aware and I said
13  yes but what I also said was given that it wasn't my
14  area of responsibility, given that I was not
15  involved I can't give you specifics about who
16  exactly it was but I was aware that there were lots
17  of folks around here who were looking at the issue
18  of this plan and how it impacted us and whether or
19  not it was lawful for us to do it so -- but I can't
20  give you specifics so there's my answer.
21     Q    I just want to take the only part that
22  was responsive which was whether or not we could do

226

1  this, okay?
2      A    Yes.
3      Q    That's all I want. As best you can
4  recall when was it that you learned that someone had
5  looked at the question of whether or not we could do
6  it?
7      A    Throughout this entire period, and I
8  think I said this earlier, there were folks like
9  Warren Reisig and Bill Herrmann who were looking at
10  these issues and who were evaluating them and
11  working with outside folks including our actuary and
12  outside counsel on this issue so I can't give you
13  specifics about who looked at what and who said what
14  but they were reviewing it so from that perspective
15  I was aware.
16     Q    Okay.
17         MR. WELLSCHLAGER: I think you've
18  exhausted the witness's knowledge on this.
19         MR. GOTTESDIENER: Absolutely not. The
20  last question the record will reflect was completely
21  nonresponsive. I said when. You never in your
22  entire passage addressed the question of when.

227

1          MR. WELLSCHLAGER: Except when she
2  said -- except when she said throughout the time.
3          MR. GOTTESDIENER: Then the answer is I
4  can't tell you when because it's a blur to me.
5  That's the end of it then we move on to the next
6  question.
7      A    Well, let me -- I can't tell you when.
8  BY MR. GOTTESDIENER:
9      Q    Thank you. Because it's a blur to you,
10  right?
11         MR. WELLSCHLAGER: Objection, form.
12     A    No, not because it was a blur to me.
13  BY MR. GOTTESDIENER:
14     Q    Can you identify anything in terms of
15  time as to when throughout this period of time which
16  you said was sometime in August and early September
17  the date at which you authorized that as September
18  14?
19     A    Yes.
20     Q    Those are a period of some weeks. Can
21  you give us any indication as to when during that
22  period of time you came to have the understanding

228

1  that someone had looked at the question of whether
2  this was consistent with federal pension law?
3          MR. WELLSCHLAGER: Object to the form of
4  the question.
5      A    I indicated to you earlier that there
6  were a number of meetings that were held during this
7  time frame and during the course of those meetings
8  where there were a number of us gathered, we talked
9  about issues and so I suspect it was during one of
10  those meetings but I can't give you a specific
11  recollection because I was not the person who was
12  working with those people so --
13  BY MR. GOTTESDIENER:
14     Q    Did anyone ever state to you that I have
15  looked at the question of whether or not this is
16  consistent with federal pension law or words to that
17  effect?
18     A    No.
19         MR. WELLSCHLAGER: If it -- fine.
20  BY MR. GOTTESDIENER:
21     Q    Is Warren Reisig a lawyer?
22     A    Nobody spoke to me.

233

1        MR. GOTTESDIENER: Yeah.
2     A   Yes.
3   BY MR. GOTTESDIENER:
4     Q   What are the subject matters of those
5   discussions?
6     A   I can't -- number one, I'm not going
7   to --
8     Q   The subject matter?
9     A   Number one, I'm not going to speak to all
10  of those issues because a lot of the discussions we
11  may have had were privileged and number two, I can't
12  recall it as I sit here today what issues those
13  were.
14    Q   You think the subject matter of what the
15  conversation is about or a meeting is about is a
16  privileged matter?
17    A   I think it depends on what the issues
18  were.
19        MR. WELLSCHLAGER: Objection to the form
20  of the question.
21  BY MR. GOTTESDIENER:
22    Q   Can you think of anything -- do you have

234

1   any issue in mind where you've ever participated as
2   a lawyer in a discussion of a proper interpretation
3   of the ERISA statute?
4     A   I need to think about it. They have come
5   up from time to time. I mean obviously in
6   connection with the issues in this case in
7   considering what we were thinking about here, I did
8   participate in some discussions. I'm trying to
9   think --
10    Q   I'm not sure I understood your last
11  answer.
12    A   Well, I participated in discussions in
13  the -- in meetings that preceded these early
14  retirement plans.
15    Q   Okay. And are you remembering though
16  that the question was raised as to whether this is
17  compliant with ERISA to reduce or alter a benefit
18  that was --
19    A   You asked me about issues and --
20    Q   I'm just now asking you based on your
21  answer are you remembering that during some of the
22  discussions that you were a participant in that the

235

1   question was raised, you know, does this comply with
2   ERISA to modify something that the board of
3   directors did that's a benefit to reduce it?
4        MR. WELLSCHLAGER: Objection to the form
5   of the question.
6     A   Well, let me say this: What you're
7   saying right now is a legal argument that you are
8   currently making. At the time we were looking at
9   the facts of what we were actually doing and so that
10  issue did not come up frankly because we never
11  believed that what the board approved for us was any
12  amendment to the plan or anything other than the
13  authority as we get from the board in any other case
14  to go ahead and do something as management that we
15  think is appropriate and when we found out the
16  mistake, we decided not to implement the authority
17  that the board had given us so as far as we were
18  concerned, what the board did was just simply give
19  us the authority to carry something out which we
20  ultimately chose not to and that is typical --
21  BY MR. GOTTESDIENER:
22    Q   Now, are you making a legal argument now

236

1   or was it discussed in these meetings that this was
2   not an amendment to the plan?
3     A   First of all, I'm not going to
4   characterize any discussion of any meetings that
5   we've had.
6     Q   You've given an answer and I'm just
7   asking. You said we were talking about this. I'm
8   saying was this --
9        MR. WELLSCHLAGER: No, that's not what
10  she said.
11    A   No, that's not what I said. That's not
12  what I said at all. I said -- you characterized the
13  meetings about talking about --
14  BY MR. GOTTESDIENER:
15    Q   You said what we thought.
16    A   -- amendments to plan and reducing and I
17  said --
18    Q   Did you say what we thought?
19    A   -- it never even occurred to us to go to
20  that -- to go to those kinds of discussions
21  because --
22    Q   This is what we thought? Didn't you tell

Case 1:06-cv-01539-GK    Document 20-8    Filed 03/16/2007    Page 58 of 66
DEPOSITION OF: ALICE RM OLSERPATO
CONDUCTED ON WEDNESDAY, APRIL 14, 2004

60 (Pages 237 to 240)

237

1  us --
2        MR. WELLSCHLAGER: Well, a moment ago you
3  said this is what was discussed. Those are two
4  wildly different things.
5    A    You said this is what was discussed and
6  so in my view --
7        MR. GOTTESDIENER: We'll see -- we'll see
8  what the transcript says.
9        MR. WELLSCHLAGER: Why don't you see
10  right now.
11  BY MR. GOTTESDIENER:
12    Q    So when you say this is what we
13  thought -- you did say that? You would agree with
14  that?
15    A    I think that with -- any time the board
16  gives management authority to do anything so --
17    Q    I just want to know why you said we
18  thought. I mean you can only speak for yourself
19  unless someone is telling you what they thought.
20    A    No.
21    Q    No?
22    A    I'm not saying that.

238

1    Q    You're not saying what?
2    A    When I speak I speak for Amtrak and so
3  whether it's me or it's Amtrak -- you tried to
4  characterize the context of certain discussions and
5  what I'm telling you --
6    Q    Can I withdraw the pending question? Can
7  I withdraw it, please?
8    A    Absolutely.
9    Q    Here is my question.
10    A    Okay.
11    Q    In discussions where you as a human being
12  were present with five senses speaking, hearing,
13  listening --
14    A    Yes.
15    Q    -- you said that in those discussions we
16  thought --
17    A    Never said that.
18    Q    Okay.
19    A    And if I did I made a mistake.
20    Q    Would it then be appropriate to say that
21  at least from your point of view there would not
22  have been a federal pension issue if you thought

239

1  there had never been an amendment to the plan so
2  there would have been nothing to have changed to see
3  if it was consistent with federal pension law?
4        I'll withdraw that question.
5    A    I don't understand your question.
6    Q    I'll withdraw that too.
7    A    I don't understand that.
8    Q    What role -- in the -- withdrawn.
9        What role, if any, did you have in the
10  appointment of a retirement plan committee?
11    A    The issue was raised with me that the
12  retirement plan committee had not been designated
13  for a period of time, that we were required to have
14  one and the individuals who were named were
15  discussed with me and other than that -- and we
16  talked about obviously carrying out our obligation
17  and the mechanics of having the president do the --
18  do the designation of the members of the -- of the
19  plan committee.
20        MR. WELLSCHLAGER: And I would just
21  caution you beyond generalities not to go into
22  specific attorney-client communications.

240

1        THE WITNESS: Absolutely.
2  BY MR. GOTTESDIENER:
3    Q    When was this matter first brought to
4  your attention and how?
5        MR. WELLSCHLAGER: Same caution.
6    A    Same caution. It was probably -- it was
7  brought to my attention probably in early fall or
8  late summer. I don't have a specific date in mind
9  and was raised to me --
10        MR. WELLSCHLAGER: Let me stop you
11  there. I don't see how you can answer the how part
12  of the question without divulging attorney-client
13  communications other than to say you learned of it
14  through attorney-client communications.
15    A    Right. I did learn of it through
16  attorney-client communications.
17  BY MR. GOTTESDIENER:
18    Q    Who or what person or persons caused this
19  to be brought to your attention?
20        MR. WELLSCHLAGER: Well, I --
21        MR. GOTTESDIENER: The identity of who
22  told you about this, that's privileged? Who told

241

1 you about this?
2     MR. WELLSCHLAGER: You're asking for a
3 communication from one person --
4     MR. GOTTESDIENER: No, I'm not.
5     MR. WELLSCHLAGER: -- to general counsel
6 for the company.
7     MR. GOTTESDIENER: Who told you about --
8     MR. WELLSCHLAGER: You're assuming in
9 your question the communication.
10     MR. GOTTESDIENER: She disclosed --
11 without you objecting she disclosed that she knew
12 that we had not designated a committee for some
13 period of time, that we were required to do so and
14 that you were going to go about the business of
15 having one named.
16     MR. WELLSCHLAGER: So she has an
17 understanding. She's told you that and she's told
18 you that she learned of it through attorney-client
19 communications and now you're asking for the
20 specifics of those communications. On that basis I
21 object and instruct the witness not to answer the
22 pending question.

242

1     MR. GOTTESDIENER: Okay.
2     MR. WELLSCHLAGER: I think there are ways
3 to rephrase it.
4 BY MR. GOTTESDIENER:
5     Q    Well, first of all, the question is who
6 brought whatever it is that was brought to your
7 attention that there was an issue with this
8 committee? I'm not asking at what point you learned
9 all this other information and came to believe all
10 these other things.
11     When was the first time that you
12 understood that there was some issue with this
13 retirement plan committee? When was it first
14 brought to your attention?
15     MR. WELLSCHLAGER: That's a when
16 question.
17     MR. GOTTESDIENER: Yes.
18     A    Right. Again, late summer, early fall I
19 think.
20 BY MR. GOTTESDIENER:
21     Q    Who brought it to your attention without
22 disclosing what was brought to your attention in any

243

1 substance whatsoever? Just who brought to your
2 attention that there was something to do with the
3 committee?
4     A    Bill Herrmann, my deputy general counsel
5 for labor and employment.
6     Q    Tell me how that happened. Did he walk
7 into your office, pick up the phone, send you an
8 e-mail?
9     MR. WELLSCHLAGER: Just the nature of the
10 communication medium?
11     A    I don't have a specific recollection but
12 I suspect he walked into my office.
13 BY MR. GOTTESDIENER:
14     Q    Okay. And how long did you and he spend
15 talking about that issue when he walked into your
16 office?
17     A    I don't recall.
18     Q    What did you do -- do, not say, not
19 content? What did you physically do next about the
20 issue, if anything?
21     A    We began the process of identifying the
22 members and designating the committee and putting

244

1 into the place the process to designate the
2 committee.
3     Q    That may be a summary but I'm not looking
4 for that. I want to know step-by-step what you
5 physically did.
6     Did you pick up the phone and call an
7 individual? Did you start, you know, looking
8 through a directory? What did you do step-by-step?
9     A    What we did step-by-step --
10     Q    Not we, ma'am, I'm sorry.
11     A    Well, what did I do step-by-step?
12     Q    Yes, you personally.
13     A    What I did step-by-step -- number one, I
14 can't disclose all of that to you because that was
15 in the context of attorney-client in terms of
16 discussions that we had.
17     Q    I'm not asking the content. I'm not
18 asking the content. I want to know what -- after
19 you and Bill Herrmann had whatever conversation you
20 had, I want to know your role and I want to know it
21 with specificity and that's not privileged.
22     MR. WELLSCHLAGER: Well, that's a fair

245
1 clarification of the question.
2   A   Okay. My role after -- and I can't
3 disclose the content of the discussion.
4 BY MR. GOTTESDIENER:
5   Q   I don't want you -- I don't want you to
6 characterize the role.
7   A   But my role subsequent --
8   Q   I want to go through it step-by-step
9 because we're just not going to get anywhere if you
10 want to characterize things. I want to know what
11 steps you took, what things you did.
12   A   I'm not going to be able to give you
13 step-by-step what occurred but what I can tell you
14 is that through direction certain steps were taken
15 to put the plan in place and my role was to review
16 documentation, effectuating that and talking about
17 it with the appropriate people and making sure that
18 it got done.
19   Q   After Mr. Herrmann left your office and
20 you were first apprised of the issue what was the
21 next thing you did about the issue? Did you -- I'll
22 give you some examples so you have concrete things

246
1 that will get you out of the characterization mode.
2   A   Okay.
3   Q   Did you next receive a phone call and an
4 update? Did you write a memo? Did you read an
5 e-mail? Did you participate in a meeting? I want
6 to know that kind of detail and I want to know who
7 you did it with, whatever it was that you did.
8     MR. WELLSCHLAGER: If --
9   A   Well, I can't give you that level of
10 detail. I don't know if I ran to my desk and picked
11 up the phone and, you know, sounded the alarm
12 bells. I don't know exactly what I did
13 BY MR. GOTTESDIENER: --
14   Q   You know I'm asking your approximate
15 recollection of your role.
16   A   -- but after giving direction to Bill he
17 did what I asked him to do. We put the plan in
18 place and we provided --
19   Q   Not we put the plan in place. What was
20 the next thing you did? Did you receive a report
21 from him at any point?
22   A   We -- I don't recall specifics but

247
1 whatever documentation was necessary in order to put
2 the plan in place he prepared and we provided it to
3 the appropriate people and talked with David Gunn
4 about it and explained to him what the situation was
5 and that was it.
6   Q   Who explained to David Gunn what the
7 situation was?
8   A   I don't have a specific recollection but
9 I suspect it was -- I don't have a specific
10 recollection. I know we would have talked about it
11 with him because obviously he was the one that
12 needed to do the designating.
13   Q   Did you meet with him?
14   A   I believe that we did.
15   Q   Did you meet with him?
16   A   I don't have a specific recollection of
17 my meeting with him.
18   Q   Did you speak with him about the issue?
19   A   I don't have a specific recollection of
20 speaking with him about the issue.
21   Q   Did you participate as a recipient, an
22 addressee, a sender of any e-mail with respect to

248
1 the issue?
2   A   I don't know. I don't remember. I don't
3 recall.
4   Q   Did you participate as a recipient,
5 addressee or author of any documents pertaining to
6 the issue?
7   A   I don't believe that I was the author of
8 any documents pertaining to the issue.
9   Q   I didn't ask just author. Recipient?
10   A   Recipient.
11   Q   Addressee?
12   A   I don't recall.
13   Q   We've got one discussion with Bill
14 Herrmann. Can you tell us about other discussions?
15 Who was participating in other discussions that
16 either you participated in or you learned about in
17 some fashion?
18     MR. WELLSCHLAGER: Just the participants,
19 the identities.
20   A   Yeah. I don't have specific recollection
21 of other discussions. I know I followed up and had
22 other discussions with Bill. I don't know if

249

1  anybody else was there.
2  **BY MR. GOTTESDIENER:**
3    Q    Okay, tell me about the follow-up
4  discussions with Bill. When did they occur? Where
5  did they occur?
6    **A    When did they occur? Subsequent to that**
7  **time probably in my office but I can't give you**
8  **specifics in terms of dates and times.**
9    Q    You can't -- in your mind's eye you don't
10  have a single time where he's in your office? You
11  can't say with --
12    **A    I mean look, the bottom line is Bill is**
13  **in my office a lot and talking about a lot of**
14  **issues. I can't with specificity tell you it was at**
15  **this time that we discussed this issue.**
16    Q    How many times do you think you met with
17  Bill Herrmann to discuss this issue?
18    **A    Probably a couple of times, maybe two**
19  **times.**
20    Q    How many times do you think you met with
21  Gordon Hutchinson to discuss this issue if you did
22  or spoke with him on the phone or spoke with him

250

1  through e-mail?
2    **A    Did I talk with Gordon about the plan? I**
3  **don't know. I don't recall.**
4    Q    Same question with respect to Warren
5  Reisig.
6    **A    I don't recall.**
7    Q    Is there anyone else who was involved in
8  this issue that we haven't discussed? How about
9  Lorraine Newman -- Lorraine --
10    **A    Lorraine Green.**
11    Q    -- Newman -- Lorraine Green.
12    **A    I don't think so. It's possible that we**
13  **may have had a conversation with Deno Bokas, our CFO**
14  **about this issue as well.**
15    Q    We meaning?
16    **A    Bill and I.**
17    Q    Now, your counsel here has interposed
18  objections to me obtaining details of what you did
19  and what other people did and what they said and so
20  forth and I take it you're following his
21  instructions not to provide what details you do know
22  about this; is that right?

251

1    A    Number -- well, let me say this --
2        MR. WELLSCHLAGER: Well, that's an unfair
3  characterization of my instruction.
4        MR. GOTTESDIENER: You've not allowed her
5  to answer some questions on the grounds of
6  attorney-client privilege; is that right?
7        MR. WELLSCHLAGER: That's a fair
8  characterization.
9        THE WITNESS: Correct.
10  BY MR. GOTTESDIENER:
11    Q    Who is the client?
12    **A    Who is the client?**
13    Q    Yes, who is the client? I mean you're
14  acting as an attorney. Who is the client?
15    **A    Who is the client?**
16        MR. WELLSCHLAGER: In what -- when in --
17        MR. GOTTESDIENER: As to this issue.
18    **A    As to this issue? There's lots of**
19  **clients.**
20        MR. WELLSCHLAGER: Hold on. When?
21    **A    It depends on when you're talking about**
22  **as well.**

252

1  BY MR. GOTTESDIENER:
2    Q    From the very moment when we were talking
3  about -- I started when you first became aware of
4  this issue. You said in the fall of 2003.
5    **A    Yes.**
6    Q    And then there were all these things that
7  were being done that I couldn't learn about. During
8  the --
9    **A    Well, let me back up a minute. Nobody**
10  **said there were lots of things that were being done**
11  **that you couldn't learn about. He was cautioning me**
12  **not to answer anything attorney-client. I don't**
13  **have specific recollections and you are not happy**
14  **with the general recollections that I had so there**
15  **weren't all these specific things that I recall that**
16  **I can't, you know, provide to you.**
17    Q    What did Bill Herrmann tell you when he
18  came to his office about the issue?
19        MR. WELLSCHLAGER: Let me caution the
20  witness. If you understood Bill Herrmann to be
21  providing or seeking legal advice or sharing with
22  you legal thoughts and impressions in his capacity

253

1  as an attorney for Amtrak, the plan sponsor, as
2  opposed to as an attorney or representative of the
3  retirement plan committee then I caution you not to
4  answer that question.
5      If you thought that Bill Herrmann came
6  into your office on behalf of plan participants and
7  as a representative of the plan committee and was
8  asking you to provide the plan committee, whether it
9  was a de facto committee or not, legal advice then I
10 guess it's fair game and I think that's the point
11 Mr. Gottesdiener is trying to make. It seems to
12 me -- well, I've said enough.
13     MR. GOTTESDIENER: You're wrong into your
14 characterization and I object to the coaching of the
15 witness.
16 BY MR. GOTTESDIENER:
17 Q   And I want to know everything you know
18 about this topic. I want to know what everyone
19 said, Bill Herrmann -- let's start with him.
20 A   **The bottom line is other than --**
21 Q   I don't want bottom line. I want
22 specifics.

254

1  A   **Well, I'll tell you -- you know what, I**
2  **can't give you specifics on a lot of this stuff. I**
3  **deal with 600 issues every single day and unless**
4  **something is something that I'm personally involved**
5  **in, I have to be able to delegate to people and**
6  **that's why I have people like my deputies who can**
7  **take responsibility and who I can delegate**
8  **responsibility because if I've got to remember every**
9  **detail of every conversation the place wouldn't run**
10 **so, you know --**
11 Q   I'm sorry --
12 A   **Unfortunately --**
13 Q   I've got your point, ma'am, okay?
14 A   **Okay.**
15 Q   My question is did Bill Herrmann tell you
16 at any point in time in words or in substance that
17 as a matter of fact there was no retirement plan
18 committee?
19 A   **Yes.**
20 Q   Did Bill Herrmann tell you and have you
21 confirmed that that is accurate, that there was no
22 retirement plan committee for some period of time?

255

1  A   **Based on his representation to me I know**
2  **that it was accurate.**
3  Q   Other than his representation have you
4  confirmed it in any way?
5  A   **Did I go and search the files to see if**
6  **there was a designation letter?**
7  Q   Have you up until now confirmed that in
8  any way?
9      MR. WELLSCHLAGER: Object to the form of
10 the question.
11 BY MR. GOTTESDIENER:
12 Q   Do you know that from any other source?
13 Has anyone else told you that, for example?
14 A   **From any other source. I think I**
15 **probably do but I can't recall who at the moment**
16 **so --**
17 Q   Okay. How long according to Bill
18 Herrmann was there no retirement plan committee?
19 A   **I think it was for a number of years.**
20 Q   How many years?
21 A   **If I recall correctly probably since '95**
22 **or something like that.**

256

1  Q   And did Mr. Herrmann say why there was no
2  such committee?
3      MR. WELLSCHLAGER: Well, objection.
4  Don't answer that question. Attorney-client.
5  BY MR. GOTTESDIENER:
6  Q   And are you going to follow his
7  instruction?
8  A   **Do you --**
9  Q   Are you going to follow his instruction?
10 A   **Well --**
11     MR. WELLSCHLAGER: Of course she is.
12     MR. GOTTESDIENER: No, I need to ask the
13 question because I have a follow-up.
14 BY MR. GOTTESDIENER:
15 Q   Are you going to follow his instruction
16 not to answer the question?
17     MR. WELLSCHLAGER: As posed?
18 A   **Why don't you rephrase it so that I can**
19 **answer your question.**
20     MR. GOTTESDIENER: Could you read back
21 the question.
22     (The record was read as follows:)

257

1    Question: "And did Mr. Herrmann say why
2  there was no such committee?"
3            MR. WELLSCHLAGER: Same instruction.
4  BY MR. GOTTESDIENER:
5    Q    Are you going to follow his instruction?
6    A    Yes.
7    Q    Did Mr. Herman tell you why it was
8  required that there be such a committee?
9            MR. WELLSCHLAGER: Same instruction.
10  BY MR. GOTTESDIENER:
11    Q    Are you going to follow that instruction?
12    A    Yes.
13    Q    Did Mr. Herrmann talk to you about the
14  requirements for such a committee?
15            MR. WELLSCHLAGER: Same instruction.
16  BY MR. GOTTESDIENER:
17    Q    Are you going to follow that?
18    A    Yes.
19    Q    Did Mr. Herrmann talk to you about what
20  should be done to get to the point that there be a
21  committee?
22            MR. WELLSCHLAGER: Same obstruction --

258

1  instruction.
2  BY MR. GOTTESDIENER:
3    Q    Are you going to follow that advice?
4    A    Yes.
5    Q    Did -- at any point in time did you have
6  conversations with -- you're saying that you don't
7  recall speaking with David Gunn about this?
8    A    I don't have a specific recollection. I
9  probably did participate in a discussion but I
10  really don't have a specific recollection of it.
11    Q    But you -- if you didn't participate, at
12  some point you learned about discussions that he
13  was --
14    A    If I did not participate I know that Bill
15  would have spoken with him.
16    Q    And you -- and you -- you would know
17  what -- from Bill, if not Mr. Gunn, you would know
18  what was discussed with Mr. Gunn?
19    A    Yes.
20    Q    What was discussed with Mr. Gunn?
21            MR. WELLSCHLAGER: Well, the question
22  that is -- just so I understand, the question is

259

1  what was discussed between Mr. Herrmann and
2  Mr. Gunn?
3  BY MR. GOTTESDIENER:
4    Q    What was discussed with Mr. Gunn on this
5  topic by Mr. Herrmann, by you, by anyone who was
6  discussing this with Mr. Gunn? That's the
7  question.
8            MR. WELLSCHLAGER: I instruct the witness
9  not to answer unless she has something responsive
10  that doesn't involve a discussion between an
11  attorney acting on behalf of Amtrak and Mr. Gunn.
12  BY MR. GOTTESDIENER:
13    Q    Are you going to follow that instruction?
14    A    Yes, I am.
15    Q    You're familiar with something called the
16  attorney-client exception, the fiduciary exception
17  to the attorney-client privilege?
18            MR. WELLSCHLAGER: In the ERISA context
19  or some other context?
20            MR. GOTTESDIENER: The ERISA context.
21            MR. WELLSCHLAGER: Object to the form of
22  the question.

260

1  BY MR. GOTTESDIENER:
2    Q    Are you or are you not?
3    A    I'm not aware of it.
4    Q    Okay. In following -- as an attorney in
5  following your attorney's advice not to answer this
6  question on the grounds of attorney-client
7  privilege, who is it that you believe in these
8  discussions that are being held with Mr. Gunn as to
9  what needs to be done and why and so forth that
10  you're not going to answer -- who is the client?
11    A    Who is the client?
12    Q    Yeah.
13    A    The client is Amtrak.
14    Q    Any other client?
15            MR. WELLSCHLAGER: Object to the form of
16  the question.
17    A    Well, in this context to the extent that
18  he was having a conversation with Mr. Gunn or I was
19  having a conversation with Mr. Gunn on this issue
20  Amtrak would have been the client.
21            (Pause in the proceedings.)
22            MR. WELLSCHLAGER: Eli?

261

1      MR. GOTTESDIENER: Yep.
2      MR. WELLSCHLAGER: I'm sure you're aware
3  of the time and our prior agreement.
4      MR. GOTTESDIENER: Well, the agreement
5  was premised on starting at 9:00.
6      MR. WELLSCHLAGER: Right, but we talked
7  about stopping at 6:00 even when you came in today
8  so I just -- I'm raising the issue to see what your
9  plans are.
10      MR. WELLSCHLAGER: Well, I was thinking
11  about just that topic if you can believe it and what
12  I was trying to do is see if there were some things
13  we could do because we are going to be coming back
14  to -- unfortunately to continue this deposition.
15      MR. WELLSCHLAGER: Well, if that's the
16  case then I think we ought to break now because it's
17  6:15 so that's my view on the subject.
18      MR. GOTTESDIENER: Well, if I could
19  have --
20      MR. WELLSCHLAGER: But if you think you
21  can wrap up so that we can avoid a return --
22      MR. GOTTESDIENER: Well, no, we -- I mean

262

1  we can't just based on what just happened because
2  you see, it's just black letter law that I can ask
3  all those questions --
4      MR. WELLSCHLAGER: You think that but
5  we've looked at it too.
6      MR. GOTTESDIENER: I know I have these
7  goofy thoughts but --
8      MR. WELLSCHLAGER: The judge will decide
9  that and if she decides in your favor we will
10  probably have to come back and answer some of those
11  questions.
12      MR. GOTTESDIENER: That's not the only
13  reason why we're going to have to come back but that
14  certainly is a clear reason with time that's going
15  to be needed.
16      MR. WELLSCHLAGER: Well, let me just be
17  very clear then since we have the benefit of a
18  record. If that's the only reason --
19      MR. GOTTESDIENER: No.
20      MR. WELLSCHLAGER: Okay. So on issues
21  where you think we need to continue the deposition
22  of Ms. Serfaty other than follow-up on areas where

263

1  she has followed my instruction not to answer, my
2  question is do you think we can tackle those in the
3  next -- well, you know what --
4      MR. GOTTESDIENER: We can't.
5      MR. WELLSCHLAGER: Hold on a second.
6  Don't you have an engagement at 6:30?
7      THE WITNESS: (Witness nods.)
8      MR. WELLSCHLAGER: We've got to break.
9      MR. GOTTESDIENER: Okay.
10      MR. WELLSCHLAGER: I'm sorry, I forgot
11  about that.
12      MR. GOTTESDIENER: All right.
13      THE VIDEOGRAPHER: This marks the end of
14  volume one in the deposition of Ms. Serfaty. The
15  number of tapes used was three. We're going off the
16  record. The time is 6:18 p.m.
17      (Discussion off the video record.)
18      MR. WELLSCHLAGER: To the extent that
19  attorney-client issues have come up particularly as
20  they relate to the retirement plan committee,
21  there's been some obvious difference of opinion
22  between myself and plaintiffs' counsel and because

264

1  we will be resuming this deposition as I understand
2  the plan, I'd invite plaintiffs' counsel to, with
3  respect to any specific question, point me towards
4  authority which he believes clearly decides the
5  issue. At this point I'm making objections in good
6  faith based on my review of the ERISA cases
7  discussing the attorney-client exception that he has
8  referenced but I'm receptive to --
9      MR. GOTTESDIENER: I thought that was --
10      MR. WELLSCHLAGER: -- any authority that
11  you point out coupled with a specific question in
12  which you think information should be forthcoming.
13      MR. GOTTESDIENER: I thought we had
14  resolved all this when this whole privilege log
15  issue came and Mark and I had a call with the judge
16  and I set forth I know at least a case or two. It's
17  just clear as day. I thought you all had, you know,
18  powwowed and realized that this is just pure
19  discoverable material vis-a-vis us because we're the
20  clients.
21      All those discussions are being had with
22  Mr. Gunn. He's a fiduciary to us, okay? He's not

265

1  wearing a hat as a plan sponsor. He's got a job to
2  appoint those people and he's got one duty and it's
3  to us to appoint the best -- the people who will
4  discharge that duty to us with a sole and exclusive
5  eye towards doing it and he has to discharge his
6  fiduciary duties, and any discussions that are had
7  with what to do about creating a committee --
8         MR. WELLSCHLAGER: See, that's just it.
9  You're assuming you know the nature of the
10  discussion and if they are having a discussion as to
11  what's in the best interest of Amtrak, the plan
12  sponsor, the exception doesn't apply so my
13  invitation stands. That's all I have to say.
14         MR. GOTTESDIENER: Okay. The way the
15  questions and the answers were coming out it was
16  absolutely clear that conversations were being had
17  with Mr. Gunn about how to get things from being no
18  committee to a committee. There had not been a
19  committee for years. There needed to be a committee
20  and how do we get from A to Z. How do we get from 0
21  to 60? That is all fiduciary.
22         MR. WELLSCHLAGER: I'm not interested in

266

1  having the argument.
2         MR. GOTTESDIENER: Conversations with
3  Gunn about what he needs to do is advising him on
4  his fiduciary responsibilities to us.
5         MR. WELLSCHLAGER: My invitation stands,
6  okay? Thank you.
7         (Signature having not been waived, the
8  deposition of ALICIA M. SERFATY was adjourned at
9  6:23 p.m.)
10
11              * * *
12         ACKNOWLEDGMENT OF DEPONENT
13         I, ALICIA M. SERFATY, do hereby
14  acknowledge that I have read and examined the
15  foregoing testimony, and the same is a true, correct
16  and complete transcription of the testimony given by
17  me, and any corrections appear on the attached
18  Errata sheet signed by me.
19
20  _____
21  (DATE)              (SIGNATURE)
22

267

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2      I, Vicki L. Forman, Court Reporter, the
3  officer before whom the foregoing deposition was
4  taken, do hereby certify that the foregoing
5  transcript is a true and correct record of the
6  testimony given; that said testimony was taken by me
7  stenographically and thereafter reduced to
8  typewriting under my direction and that I am neither
9  counsel for, related to, nor employed by any of the
10  parties to this case and have no interest, financial
11  or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal this 26th day of
14  April 2004.
15  My Commission Expires:
16  June 14, 2007
17
18  _____
19  NOTARY PUBLIC IN AND FOR THE
20  DISTRICT OF COLUMBIA
21
22

268

1         E R R A T A   S H E E T
2  IN RE: _____
3  RETURN BY: _____
4  ═══════════════════════════════════════
5  PAGE  LINE      CORRECTION AND REASON
6  ═══════════════════════════════════════
7  ___  ___  _____
8  ___  ___  _____
9  ___  ___  _____
10  ___  ___  _____
11  ___  ___  _____
12  ___  ___  _____
13  ___  ___  _____
14  ___  ___  _____
15  ___  ___  _____
16  ___  ___  _____
17  ___  ___  _____
18  ___  ___  _____
19  ___  ___  _____
20  ___  ___  _____
21  ___  ___  _____
22  (DATE)          (SIGNATURE)

269

1     ERRATA SHEET CONTINUED
2     IN RE: _____
3     RETURN BY: _____
4     ================================================
5     PAGE  LINE     CORRECTION AND REASON
6     ================================================
7     ___  ___  _____
8     ___  ___  _____
9     ___  ___  _____
10    ___  ___  _____
11    ___  ___  _____
12    ___  ___  _____
13    ___  ___  _____
14    ___  ___  _____
15    ___  ___  _____
16    ___  ___  _____
17    ___  ___  _____
18    ___  ___  _____
19    ___  ___  _____
20    ___  ___  _____
21    _____  _____
22    (DATE)         (SIGNATURE)