**<u>Exhibit 56</u>**

To:            Nick_Linsalata@Vanguard.com
From:          Helen_Reynolds@aoncons.com
Cc:            reisigw@amtrak.com
Bcc:
Received Date: 2001-09-11 10:12:06
Subject:       Re: amtrak meetings

Nick:

There have been some substantial changes to the Early Retirement Program.  Five
years will be added to an eligible employee's age and each person taking Early
Retirement will receive a lump sum of $15,000.  The lump sum will be subject to
Federal and State income taxes.  In addition, employees may roll it over into
the 401(k) Plan or an IRA.

I am in the process of updating the materials to reflect these changes.
Amtrak's Board was due to meet tomorrow to approve the changes.  However, with
the recent situation in New York and DC, everything is in a state of flux.  I'll
keep you up to date as best I can in terms of the changes, materials, etc.

Helen


Nick_Linsalata@Vanguard.com on 09/11/2001 10:34:46 AM

To:   Helen Reynolds/COM/Aon Consulting@AonNA
cc:

Subject: amtrak meetings


Hi Helen, I need to follow up on a couple of points with you about the upcoming
meetings:

1. Is it correct that there is not a lump-sum payment option on the pension plan
(other than the payout if the balance is below $5,000). In other words, can you
verify that the only payment options are various forms of annuity payments.

2. I believe the booklets you are writing and printing will be ready this week
and I'm hoping I can get four copies of them from you. My mailing address
follows:

The Vanguard Group
100 Vanguard Blvd.
Mail Stop J21
Malvern, PA 19335
610-503-4900

I think that's it, thanks for your help!

Nick Linsalata

E-AMT  0029058

**Amtrak Board of Directors**
**Agenda Item Executive Summary**

**Title**:  Amended Management Voluntary Early Retirement Plan

**Background**:

As part of Amtrak's efforts to streamline its organization, eliminate inefficiencies and reduce costs, the Board approved a Voluntary Early Retirement Program (VERP) at its meeting on July 26, 2001.  The VERP as approved had two main components: (i) five years of age added to Amtrak's pension formula; and (ii) a full supplement to the Railroad Retirement benefits that would otherwise be available until age 65.   Management planned to fund the VERP benefits through the accumulated surplus in Amtrak's Retirement Income Plan Trust (the "Fund"). Because a portion of the pension funds in this Fund are invested in the stock market and the market has experienced a recent downturn, before proceeding further with the VERP senior management requested an updated actuarial analysis to ensure that the integrity of the pension fund is preserved.

The updated analysis showed that if management proceeded with the plan as originally formulated, the surplus in the Fund would be depleted and the company would be required to make a significant contribution to the Fund as early as 2003.  According to the actuary, as a result of a combination of market conditions, additional accrued liabilities and withdrawals, the surplus in the Fund has declined from approximately $42 million in December 2000 to $18.6 million on August 31, 2001.[1]  While management expects the Fund to continue to grow over the long term, it has nevertheless determined that it would be prudent to offer a more modest VERP than originally envisioned and maintain a surplus in the Fund.  Consequently, management proposes to eliminate the second component of the plan, the more costly Railroad Retirement supplement, and instead offer a one-time lump sum payment of $15,000.

The revised VERP would provide that any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to the pension formula; and
- A one-time lump sum payment of $15,000.00

---

[1] The reduction of what appears to be $23.3 million accounts for approximately $3.1 million of pension payments, $7.5 million of accruals and $11.7 million of investment loss.  Our actuary indicates that Amtrak's investment return over the last five calendar years was 74% or 12% per annum compounded annually.

CONFIDENTIAL                    E-AMT 0023758

In order to receive benefits, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

Based on current funding and the anticipated costs of this amended plan, it is expected that Amtrak will maintain at least a $10 million surplus in the Fund and will therefore continue to enjoy a contribution holiday for several more years. Management estimates that participation in the VERP will be somewhere between 50 to 60 percent, down from 75% expected for the original plan. At these levels of participation, the VERP as revised is estimated to cost approximately $ 7.2 million at 50 percent participation and $8.6 million at 60 percent.

**Recommended Action**:

Management recommends that the Board approve the attached resolution authorizing an amendment to the Voluntary Early retirement Plan set forth above.

## RESOLUTION AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, this Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to members of this Board; therefore, be it

RESOLVED, that the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

9-12-01

**<u>Exhibit 57</u>**

Page 1

                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA

WADE F. HALL, ON BEHALF OF
HIMSELF AND ALL OTHERS
SIMILARLY SITUATED, et al.,
        Plaintiffs
v.                              Case No.
                                1:03CV01764(GK)
NATIONAL RAILROAD PASSENGER
CORPORATION, et al.,
        Defendants
------------------------------/
        The deposition of LINWOOD HOLTON was held on
Friday, November 19, 2004, commencing at 10 a.m., at
the Law Offices of Coburn & Schertler, 1140 Connecticut
Avenue, N.W., Suite 1140, Washington, D.C. 20036 before
Robert A. Shocket, a Notary Public.


APPEARANCES:
                    ELI GOTTESDIENER, ESQUIRE
                       On behalf of Plaintiffs


                    JOHN R. WELLSCHLAGER, ESQUIRE

                    CATHERINE M. SIMMONS, ESQUIRE
                       On behalf of Defendants




REPORTED BY:  Robert A. Shocket

Linwood Holton - 11/19/04

Page 2

1        P-R-O-C-E-E-D-I-N-G-S
2               ------
3   Whereupon,
4           LINWOOD HOLTON,
5   called for examination, having been first duly sworn to
6   tell the truth, the whole truth and nothing but the
7   truth, was examined and testified as follows:
8           EXAMINATION BY MR. GOTTESDIENER:
9       Q.   Governor, if you could state your name for
10  the record, please.
11      A    Linwood Holton.
12      Q.   And, could you tell us very briefly a short
13  history of your involvement with Amtrak, how you came
14  took director and what the dates of your service were
15  and so forth?
16      A    I was appointed as one of the Republican
17  representatives on the board by the Clinton
18  administration in 1998 for a five-year term subject to
19  confirmation by the Senate.
20      Q.   And, as I have seen records, does May 1998
21  sound right when you were at least nominated by

Page 3

1   President Clinton?
2       A    I don't remember the exact date.  I do
3   remember that it was '98 and that it was a five-year
4   term.  And I think I remember that it expired in
5   September of 2003.
6       Q.   And, did you have any prior experience with
7   transportation issues other than directly serving as
8   Governor of Virginia?
9       A    Yes.
10      Q.   Could you just very briefly give us some
11  information in that regard?
12      A    I don't remember that I have had any
13  business connections with rail transportation but prior
14  to the appointment to the Amtrak board, I had a
15  substantial experience with services for air
16  transportation.  That began in summertime, 1984, when I
17  was asked by then Secretary of Transportation,
18  Elizabeth Dole, to chair a commission which she had
19  appointed which was designed to figure out a way to
20  transfer the two federally-owned commercial airports,
21  Washington National and Washington Dulles International

Page 4

1   out of the federal government into some other kind of
2   an arrangement.
3           She insisted that it was not whether to
4   transfer but the commission was to determine how.  I
5   chaired that commission and reported to her within the
6   six months that she had scheduled for the commission to
7   work.  We're recommending that the airports be
8   transferred by an act of Congress to an authority
9   created by a compact between two or more of the three
10  entities that were involved, the State of Virginia, the
11  State of Maryland and the District of Columbia.
12          We recommended that it be, that that
13  transfer be effected and that the fact that such an
14  authority could borrow money on, by the issuance of
15  bonds in which the interest was tax free from the
16  District, from Maryland and from Virginia as well as
17  the federal government, and that improvements which
18  were desperately needed than at National Airport could
19  be paid for with the proceeds of that borrowing.
20          The Secretary accepted our recommendations,
21  recommended to Congress that such legislation be passed

Page 5

1   and retained me to represent the Department of
2   Transportation between 1984 and 1986 to help educate
3   the Congress to the needs for passing that legislation.
4   The legislation was passed toward the end of 1986.  And
5   in early '87, I think it was -- I'm having a problem
6   with my memory, it could have been '87 -- I was elected
7   as Chairman of the Metropolitan Washington Airports
8   Authority, which was the authority that was created as
9   a result of our recommendations of the commission.
10          And I served in that capacity for six
11  years.  That was while the improvements at National
12  Airport were made.  And during that time, traffic at
13  Dulles Airport began to increase at a very rapid rate
14  and we issued some bonds for improvements out there as
15  well as at National.  That was my only official
16  connection that I recall offhand with transportation
17  issues.
18          But, I was collaterally interested in rail
19  transportation having been born into a family in
20  Southwest, Virginia where my father was president of a
21  little coal-hauling railroad, the Interstate Railroad.

2 (Pages 2 to 5)

Linwood Holton - 11/19/04

Page 6

1  I was very interested in the work of that railroad,
2  began during the depression, continued through the war.
3  My father continued to be president of it until 1960.
4  And, having had passes as a result of that on the other
5  big railroads, I traveled a lot on railroads.
6       So, I had an interest in rail
7  transportation. We were involved during my term as
8  Governor, of course, in substantial investments in
9  highway transportation. Never had any real air
10  connections until I served on that commission and made
11  those recommendations.
12     Q.   And, what about rail, while you were
13  Governor, were you involved with rail issues on any
14  recurring basis?
15     A    The only direct connection I remember is
16  that the, what was then the, what was a predecessor of
17  what's now CSX, was chartered in Virginia and
18  headquartered in Virginia. And, there was a lot of
19  provincial interest in keeping it in Virginia. That
20  railroad during my term as Governor was, made a
21  decision to do some kind of reorganization that

Page 7

1  involved a holding company charter. They ran into a,
2  an obstacle at the State Corporation Commission, which
3  had the authority to issue a charter and one of the
4  commissioners informally told them that it wasn't legal
5  to issue such a charter to the railroads.
6       That raised a considerable problem because
7  there were several banks in Virginia that already had
8  used that same statute to authorize the creation of a
9  holding company for banks, and if the commission made
10  such a ruling with respect to railroads, there was a
11  question about whether it was going to upset the
12  legality of all the banks that had followed the same
13  statute.
14       The CSX management and their lawyers in
15  Richmond from the firm of Hunting & Williams came to me
16  as Governor and asked me if I could be helpful. I got
17  one of the commissioners to come up, the one who had
18  been principal in opposition, and tried to convince him
19  that he ought hot not to issue such a ruling. He was
20  very adamant that they would do that. And I said,
21  well, we're going to change the law. And he said,

Page 8

1  well, I'm going to fight you.
2       Well, because of all the provincial
3  interest, it didn't take very long to get the
4  legislature to make that change. So, CSX was
5  authorized to go ahead with its holding company plans.
6  And that's my only connection with rail that I
7  remember. Could I have some of that water down there,
8  John?
9       (A discussion was held off record.)
10     Q.   And, before talking about your term with
11  Amtrak, could you tell us since you've left, since your
12  term expired in September of 2003, up until the
13  present, putting aside anything directly connected with
14  your testimony today, what has been your relationship,
15  if any, with Amtrak since September of 2003?
16     A    I have had maybe three telephone
17  conversations with the CEO who was selected while I was
18  on the board.
19     Q.   Mr. Gunn?
20     A    Mr. Gunn. Just general conversations
21  about, particularly in most, most serious interest was

Page 9

1  whether the Congress was continuing to fund them in a
2  way that I felt was necessary. Amtrak has also sent me
3  public news clips, put it the other way, news clips
4  that came from a publication, that had been in the
5  public interest, I mean public circulation. They send
6  those fairly regularly and I think I'm about up-to-date
7  with them. I think I have read all that they've sent
8  me.
9     Q.   And is that a service that you understand
10  to be provided to other former directors or is it
11  something --
12     A    I have no idea.
13     Q.   Do you know who it is at Amtrak that is
14  involved in preparing whatever it is that's sent to
15  you?
16     A    No.
17     Q.   Did you just start receiving these, I take
18  it, in the mail?
19     A    They come in the mail and there is a return
20  address for Amtrak. No identification as to who sent
21  it.

GORE BROTHERS Reporting & Video Co., Inc.                    Towson Reporting
410-837-3027                                                 410-828-4148

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 10

1    Q.    So you just receive these and --
2    A    I recognize what they are.  Sometimes I
3 read them.  I mean, sometimes I read them right away.
4 Sometimes I don't get to them right away.  But, I think
5 I've read them all, so far, up-to-date now.
6    Q.    And these three telephone calls with --
7    A    Three, don't limit me to --
8    Q.    Approximately?
9    A    Yeah.
10    Q.    Approximately three telephone calls --
11    A    Better say approximate, right.
12    Q.    -- with -- thank you, with -- and by the
13 way, just for the record, you're an attorney?
14    A    Officially.
15    Q.    You still have your Bar license?
16    A    I do and I'm active.
17    Q.    And you're a member --
18    A    I've even done the CLE up-to-date.
19    Q.    You're a member of the Bar of Virginia,
20 D.C., any other place?
21    A    No.

Page 11

1    Q.    Both, both places, though?
2    A    Both places.  And, as far as I know, I'm
3 active in the District.  I know I'm active in Virginia.
4    Q.    Well, there's no CLE requirement in the
5 District, so.
6    A    Then I'm active.  I pay the dues.
7    Q.    Oh, yeah.  So, approximately three times
8 since September of 2003 you've spoken with Mr. Gunn.
9 Could you tell us to the extent you recall whether
10 those were conversations that you initiated or he
11 initiated?
12    A    I think they were all initiated by me based
13 on my curiosity about how they were getting along.
14    Q.    And, did you at any point in time, whether
15 in connection with those calls or not, undertake to
16 speak with anyone in Congress or anyone else that might
17 have any influence over funding on Amtrak's behalf?
18    A    No.
19    Q.    Now, you mentioned, you used the word
20 retained when you spoke of then Secretary Dole's
21 request of you to represent the Department of

Page 12

1 Transportation from '84 to '86 in connection with this
2 recommended legislation.  That was retained as counsel
3 or was it retained in a nonattorney-client
4 relationship?
5    A    I would say as counsel.  I was, I think
6 that for that entire period I was a member.  I use the
7 word loosely because I'm not quite sure what my status
8 was with the law firm in Washington of Zuckert, Scoutt
9 and Rasenberger.  And --
10    Q.    You said Zucker?
11    A    Zuckert, Z-U-C-K-E-R-T. He was a former
12 Secretary of the Air Force.  Scoutt was Jerry Scoutt.
13 It's S-C-O-U-T-T. And, Rasenberger,
14 R-A-S-E-N-B-E-R-G-E-R. That's a firm at the corner of
15 17th and, I think it's probably "I".
16    Q.    While we're on the question of membership
17 or not in this law firm you just referenced, could you
18 also as succinctly as you can just give us your
19 practicing law history since graduating from law school
20 until the present?
21    A    I want to go back and finish answering the

Page 13

1 question, the previous question, which was, oh, where
2 was I retained as counsel.  And I, I want to make it
3 clear that I think I was counsel for the department and
4 I think I was probably practicing law, though that
5 definition jumps around these days.  And, yet, my
6 income from that firm was dependent on whatever fees I
7 earned, I think.  And, so, I don't think I was a
8 partner in the traditional sense of that term.  I just
9 want to do make that clear.
10    Q.    Thank you.
11    A    Now, my experience practicing law, I went,
12 I graduated from the Harvard Law School in June or May
13 of 1949 and was admitted to the Virginia Bar in
14 September, or in August or early September of 1949 and
15 went to Roanoke, Virginia, from my home in Big Stone
16 Gap, which is out in the coalfields of western
17 Virginia.  But, I went to Roanoke to practice law.  I
18 practiced for twenty years there.  The practice was a,
19 I think looking back on it now, you got to say it was a
20 very elementary type of practice.
21        I first worked for a firm called Hunter and

4 (Pages 10 to 13)

b12f5e7a-908d-4b27-bf7f-598cdeeeedd9

Linwood Holton - 11/19/04

Page 14

1  Fox, believe it or not, and was there about three
2  years, did a lot of examination of titles, did some
3  subrogation work for insurance companies, left that
4  firm, and, on January the 1st, 1954, formed a firm with
5  a contemporary named Purnell Eggleston. That's
6  P-U-R-N-E-double L, E-G-G-L-E-S-T-O-N, and, stayed with
7  that firm until I was elected Governor in 1969. I did
8  a lot of varied, varied work, most of it related in
9  some way to trial work. I was the trial lawyer for
10 that two-person firm, which became a four-person firm
11 by the time I was elected. Nothing ever very
12 complicated.
13     I never did any significant corporate work,
14 for example, though I did write some minutes for some
15 little companies that were created to own grocery
16 stores for construction people who put them together
17 and leased them out to the grocery operator, retail
18 operators. The only complicated case that, well, the
19 most complicated case that I was ever involved in was a
20 criminal prosecution of mirror manufacturers, including
21 Pittsburgh Plate Glass, in which --

Page 15

1     Q.   Oh, not the case that went to the Supreme
2  Court?
3     A.   Yes. I did not represent Pittsburgh. I
4  represented Stroupe, S-T-R-O-U-P-E Mirror Company, from
5  down in North Carolina. And I was local counsel for a
6  Winston-Salem lawyer who was the regular counsel for
7  that firm. I did conduct the trial as to our client,
8  however. And, it was a fun experience for me because I
9  got to sit there and watch Pittsburgh Plate Glass spend
10 all that money defending a case in which they were very
11 obviously guilty. And, the jury so found.
12    Q.   So that would have been 1959?
13    A    Thereabouts.
14       MR. WELLSCHLAGER: I'm impressed, Eli.
15       MR. GOTTESDIENER: I'm impressed with his
16 experience.
17       THE WITNESS: He's been reading the U.S.
18 Reports.
19       MR. GOTTESDIENER: That's what I do when I
20 have insomnia.
21       BY MR. GOTTESDIENER:

Page 16

1     Q.   So, you then executed or carried out the
2  laws for the next four years and in 1974 you continue
3  your legal practice?
4     A    No. I would say that it would be hard to
5  describe what I've done since I was elected Governor as
6  law practice. I have done a couple of things such as
7  that representation of the Transportation Department
8  but that was negotiation. That wasn't any refined
9  study or research or draftsmanship of the law or legal
10 documents. It was the negotiations. To be more
11 specific, I first went from the Governor's office to
12 the U.S. State Department. I was Assistant Secretary
13 for Congressional Relations for exactly one year. I
14 did the congressional liaison for the State Department
15 between March the 1st, '74, and February 28th, '75,
16 exactly one year.
17    Q.   Did you work for Henry Kissinger?
18    A    I worked for Henry Kissinger. There was a,
19 it was a great experience. I, having come from the
20 Governor's office had a horizontal view of Henry
21 Kissinger, however, and that made it easier. Then

Page 17

1  after that, I had, well, I left because I had a
2  daughter at Dartmouth and another one getting ready to
3  go to Princeton and my salary was $35,000 a year and I
4  had to quit and go to work.
5       So, I went to Hogan & Hartson in
6  Washington, for a reasonable salary. I was something
7  called a special partner. And I never knew exactly
8  what that meant. I did a little work that could be
9  called legal, I guess, but again it was mostly
10 negotiations. And I really did not do very well. They
11 thought I was going to bring in a lot of business and I
12 knew that I wouldn't because being Governor of Virginia
13 doesn't attract federal lobbyists with any enthusiasm.
14 And I only stayed there, I think it was three or four
15 years. I don't remember. After that, I went to, in
16 '78, I think it was, I went over as general counsel and
17 vice president of the American Council of Life
18 Insurance. That was a lobbying job.
19    Q.   Life Insurers?
20    A    It is now but then it was the American
21 Council of Life Insurance. They've changed the name

5 (Pages 14 to 17)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 18

1  and I think their only change was Insurance to
2  Insurers.
3      Q.   And that, you were actually general
4  counsel?
5      A    Well, yeah, but that was, we had four
6  departments under me.  One was securities, one was tax,
7  one was state legislation and one was federal
8  legislation.  And, my job was to coordinate the
9  specialists and be the lead lobbyist.  We worked, for
10 example, during that period on the 1982 revision of the
11 Internal Revenue Code.  After --
12     Q.   When you said lobbyist, were you, you were
13 focused on federal legislation, not the fifty states?
14     A    I was.  Though, we had a department head,
15 who was concerned with the fifty states.
16     Q.   And you were responsible --
17     A    And I was responsible and I went to a lot
18 of the NAIC meetings, which is National Association of
19 Insurance Commissioners.
20     Q.   So, you were with the --
21     A    ACLI.

Page 19

1      Q.   -- ACLI from '78 until when?
2      A    I don't remember but it probably was in '82
3  or '3.
4      Q.   And then?
5      A    I did a fellowship at the Kennedy School at
6  Harvard for a semester.  And after that, there was
7  somewhere in there I went to Zuckert, Scoutt and
8  Rasenberger.  And I don't remember, that was two or
9  three years.  And then --
10     Q.   Did you go there solely or principally in
11 order to accept Secretary Dole's request that you serve
12 as counsel; I mean, was it --
13     A    I wouldn't say that was the motivation but
14 that made it possible because it was a piece of
15 business that was portable and that I could take with
16 me.
17     Q.   But you joined them at the same time that
18 you undertook that retention?
19     A    I just don't remember whether it was the
20 same time or not.  It could have, it could have begun
21 while I was still general counsel for the ACLI.  That

Page 20

1  would have been a public service that the ACLI would
2  have permitted and encouraged.  The president of the
3  ACLI at that time considered the traditional methods of
4  lobbying as somewhat abhorrent.  He didn't like the
5  idea of buying members of Congress.  His theme was we
6  do good by doing well or we do well by doing good.  And
7  he cited as an example before I went to the trade
8  association, the life insurance industry had put
9  together a hundred million dollars to be available for
10 low-cost housing.  And that was his approach and it
11 worked.
12     Bob Dole, who was chairman of the finance
13 committee when we did the work on the 1982 tax
14 legislation, commended the ACLI, under my leadership
15 during the development of that legislation, as having
16 taken a world view, a responsible view of the insurance
17 industry's responsibilities with the new tax
18 legislation, that we had done a good job considering
19 public interest as well as our own.  And that was our
20 approach.
21     And, so, if the commission part, not the

Page 21

1  pay part but the commission part of my work for the
2  transportation department, it could have come up during
3  my term at ACLI but I would not have been compensated
4  separately for that.
5      Q.   So then chronologically you then become
6  associated with that firm and then at the point in time
7  that the legislation was enacted, were you still with
8  the firm, at that point?
9      A    I think so.
10     Q.   Did you remain at the firm after
11 legislation was enacted for any substantial period?
12     A    I believe, as I said, I was elected
13 chairman of the Metropolitan Washington Airports
14 Authority in late '86 or early '87, and I left the firm
15 of Zuckert, Scoutt and Rasenberger, I know by 1888
16 (sic), by 1988 because I was at Harvard in that
17 fellowship during the '88 elections.
18     And, while I was there, in Cambridge, I
19 accepted the job as President of the Center for
20 Innovative Technology, which was a creature of the
21 State of Virginia designed to enhance the movement of

6 (Pages 18 to 21)

Linwood Holton - 11/19/04

Page 22

1  research projects that were being undertaken in
2  institutions of higher learning in Virginia to jobs in
3  the economic sector of Virginia.  It was an economic
4  development responsibility.  And, my principal job
5  there was to do the lobbying with the state legislature
6  and see that the CIT continued to receive
7  appropriations that financed its operations.
8      Q.   And was CIT solely funded by outlays from
9  the legislature?
10     A.   Yes.
11     Q.   Was it a creature of the legislature or was
12  it a nonprofit created privately?
13     A.   It was a creature -- oh, I'm not sure how
14  the charter was issued.  I expect it was a traditional
15  charter issued by the State Corporation Commission but
16  it was created at the instance of the Governor.
17     Q.   I guess my question was -- that was my
18  question.  So, you were asked by the Governor to serve
19  in that capacity?
20     A.   Yes.  Governor Robb, it was Governor Robb's
21  idea, just at the end of his term, Governor Blouse took

Page 23

1  over and both of them asked me to serve as president of
2  the CIT.  It was funded by appropriations that were
3  approved by the legislature, and I continued its
4  appropriation.  I mean, I continued its funding through
5  activities with the legislature for about six years.
6      Q.   So, if I understand your -- at the same
7  time as you are serving in that capacity, you are also
8  swerving with respect to the Washington Metropolitan
9  Airports Authority; your chairmanship of both is
10  parallel?
11     A.   Right.
12     Q.   And, in fact, they're both essentially
13  six-year terms?
14     A.   Yeah.
15     Q.   Not terms, you served for six years?
16     A.   Yeah, it was periods.
17     Q.   So these were the two principal things you
18  were doing during that period of time?
19     A.   Correct.
20     Q.   So, that would I guess bring us up to
21  approximately '93?

Page 24

1      A.   Yeah.
2      Q.   And then from there?
3      A.   Then I became associated with the Richmond
4  firm that I still maintain a connection with.  It was
5  called Missoula & McCandlish, I think at the time I
6  joined it.  And it's been through several evolutions,
7  different names, different composition.  There were as
8  many as 50 lawyers at one time.  It's now down to about
9  25 and its name is now McCandlish Holton.  And I think
10  my only real purpose, well, it's two-fold, one to raise
11  the average age of the members and supply a name.  I
12  don't do a whole lot of work there.
13     Q.   Did you do work, though, between '93 and
14  '98 for them?
15     A.   I get confused on the dates.  That was the
16  period I was at CIT, wasn't it?
17     Q.   After you left CIT, after the Washington
18  metropolitan position was, I guess --
19     A.   Yes.  I, yes, I was, quote, again member,
20  and I'm not sure what member means exactly, from a
21  legal standpoint, but I was a member of that firm and I

Page 25

1  did do some legal work.  Again, it was always with the
2  assistance of other members of the firm who did the
3  study part.  I did some of the trial work, not much.  I
4  participated in one trial, which we lost gloriously,
5  and decided then that I couldn't get back into trial
6  work without a whole lot of practice so I didn't try it
7  again.
8      Q.   Now, during this time, when you are with
9  them, they're based in Richmond?
10     A.   Yes.
11     Q.   And, you were living in McLean or --
12     A.   Yes.
13     Q.   And, are you still living in McLean?
14     A.   No.
15     Q.   Where do you live now?
16     A.   I have an apartment in McLean but my home
17  really is on the northern neck of Virginia, a little
18  town called Weems, which is about 75 miles east of
19  Richmond on a peninsula between the Rappahannock and
20  Potomac rivers.
21     Q.   And how long have you lived in Weems?

7 (Pages 22 to 25)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 26

1    A    We moved there in the summer of 2000.
2    Q.    And prior to that, you were living in
3  McLean?
4    A    Yes.
5    Q.    And, when you moved from McLean to Weems,
6  was it at the same time you got an apartment in McLean
7  or was that sometime later?
8    A    No, we got an payment so that there would
9  be continuity.
10    Q.    So, from '93 -- and understanding these are
11  approximate dates -- from when you stopped serving as
12  president of CIT and your service on the Washington
13  Metropolitan Airports Authority came to a close, while
14  you're working with the law firm in Richmond, you are
15  during that period of time living in McLean?
16    A    Up until the year 2000.
17    Q.    And, so, what, how long would it take you,
18  would you go into the office much, or would you work
19  from home?
20    A    I just don't remember that period very
21  well. I went to the office when I was needed. It was

Page 27

1  only a two-hour drive.
2    Q.    So, we get back to '98, when you're
3  nominated and then confirmed to serve as an Amtrak
4  director. What, if you could tell us globally, what
5  did your service entail in terms of what you had to do,
6  where you had to be, how you, you know, mechanically
7  and logistically functioned as a director of Amtrak.
8  And just to assist everyone, if I am understanding
9  during this period of time, we're talking '98 to 2003,
10  and at some point in the middle is when you move from
11  McLean to Weems, so at some point there may be a
12  change.
13    A    I would say there was no change in my
14  participation in the affairs of Amtrak because of the
15  move from McLean to Weems. The only physical change
16  was that it took about an hour longer to drive. But, I
17  participated equally in the affairs of Amtrak
18  regardless of where I lived.
19    Q.    And, my question, Governor, was more -- it
20  was not very well phrased. I'm trying to get a sense
21  for everyone present, for the record and for my own

Page 28

1  benefit, what does it mean to be a director of Amtrak;
2  I mean, do you go to meetings, do you participate in a
3  lot of phone calls, do you, you know, go on trips on
4  the rail and investigate, you know, about local stops
5  and so forth? I'm essentially looking for bit of a
6  narrative as to, you know, what that meant.
7    A    I saw it as a responsibility for
8  development of policy of the railroad. And its
9  principal consumption of time was for meetings of the
10  board, which I believe were monthly, at that time. I'm
11  not sure that we always met every month but I think
12  that was this, the regular schedule, and to attend some
13  trips.
14          We went once to Chicago to see the layout
15  of the real estate when there was a proposal by
16  management to either lease or sell some of the property
17  interests that Amtrak owned in downtown Chicago,
18  purpose of which would be to enhance the revenue of the
19  railroad. We also went once to Los Angeles where we
20  witnessed the dedication of a new maintenance facility.
21  I believe that was for locomotives. But, we, again,

Page 29

1  the time consumption was mostly for, with the
2  attendance of meetings and minutes that related to
3  meetings, to read the minutes, to keep up with
4  developments at the policy making level. I'm -- well,
5  that's a good place to stop.
6    Q.    How would you get the minutes that you
7  would read?
8    A    I think they came in the mail. They
9  usually did get to us before the next meeting. And, I
10  tried to read the minutes before we got to the next
11  meeting. I wouldn't say that I did that a hundred
12  percent, however.
13    Q.    Did you ever have occasion to get minutes
14  and make annotations to the minutes such that you would
15  be able when you got to a meeting to say, you know, I
16  think on this page we should raise this a little
17  differently, something like that?
18    A    If I did, I can't remember any specific
19  example of it. I know that one of the directors was
20  meticulous about little changes but I considered most
21  of the time what points she was raising were fairly

8 (Pages 26 to 29)

b12f5e7a-908d-4b27-bf7f-598cdeeeedd9

Linwood Holton - 11/19/04

Page 30

1  grammatical or clerical.
2      Q.   Which director was that?
3      A   Amy Rosen.
4      Q.   Would there be anything else that you might
5  do other than read minutes that had been sent to you
6  after a meeting to prepare yourself for the next
7  meeting?
8      A   I don't recall any.
9      Q.   Do you -- withdrawn.  The meetings that
10  we're talking about, these monthly meetings, they were
11  typically held when you weren't in Chicago or Los
12  Angeles in --
13      A   We only made one trip to Chicago and one
14  trip to Los Angeles.  Travelling was not a regular part
15  of the service on the board.
16      Q.   Understood.  So, apart from those trips,
17  the board, when the board assembled, would assemble as
18  a routine matter at Union Station in the boardroom?
19      A   That is correct.
20      Q.   Do you recall any meetings anywhere else
21  other than Union Station, the boardroom?

Page 31

1      A   I don't remember that we physically
2  gathered anywhere else.  That again is a memory
3  situation.  I do recall that we, I think we had a
4  meeting by telephone one time, conference call, but I
5  can't be certain of that.
6      Q.   And just on the subject of memory, your
7  testimony here today, did you prepare for your
8  testimony in any way?
9      A   Yes.
10      Q.   How did you do that; without getting into
11  any detailed conversations you may have had with
12  counsel, can you tell us, you know, what you did do
13  to prepare for testifying?
14      A   I spent about two and a half, possibly
15  three hours with counsel, one member of house counsel,
16  one house counsel representative and one outside
17  counsel representative, yesterday, afternoon, in which
18  we discussed in a very general way how we would, uh --
19      MR. WELLSCHLAGER:  You don't need to go
20  into the content of the discussions.
21      A   All right.  We had general discussion about

Page 32

1  the taking of this deposition.
2      Q.   Any other preparation other than?
3      A   None.
4      Q.   And, this was a meeting --
5      A   Well, I recalled as a result of reminders
6  in the conference yesterday that I had received a
7  paper, a document which you had sent to me or served on
8  me or arranged for me to receive saying that you would
9  like me to produce documents.  I had forgotten that I
10  had received that document but I was reminded that I
11  have, so, perhaps that's part of the preparation for
12  this deposition.
13      Q.   Well, I guess it would be if you answered
14  one way as opposed to another to this question.  Having
15  been reminded of that, did you read that document?
16      A   I read enough of it to realize that I was
17  being asked to produce documents related to some of the
18  business which was before Amtrak involving a lawsuit.
19  And, I knew in my mind that I didn't have any documents
20  so I did not give it --
21      Q.   Any documents, I'm sorry, any documents

Page 33

1  what, that what?  I'm not sure I understand.
2      A   Any Amtrak documents.
3      Q.   Any Amtrak documents at all?
4      A   At all.
5      Q.   I mean, you know that in Weems and in your
6  apartment in McLean you don't have, other than the
7  clippings you may get from Amtrak, you don't have
8  anything relating to Amtrak?
9      A   I do not.  I don't even have those
10  clippings.  I read the last ones within the last week
11  and they're now in the trash.
12      Q.   You served as a director, nominated by the
13  President of the United States, confirmed by the Senate
14  for five years.  And I'm not doubting you.  I'm just
15  wondering, could you explain how it is that you don't
16  have any documents at all related to your tenure as a
17  director of this corporation?
18      A   How can I explain it?
19      Q.   Yeah.  Is it a personal predilection?  Do
20  you like to recycle?  Do you not want to have things
21  from the past?  I mean, you don't have any files,

9 (Pages 30 to 33)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 34

1  photographs, recollections, mementos?
2      A    Well, I have recollections.
3          MR. WELLSCHLAGER:  I guess I'll object to
4  the form of the question.  Go ahead and answer,
5  Governor.
6      Q.    Letters from other directors, thanking you
7  for your service; you don't have anything like that?
8      A    I do not.
9      Q.    And, my question is -- and I'm sorry I'm
10  not really phrasing it very well -- is that as a matter
11  of a policy of yours or it just so happens?
12      A    I guess, I guess you'd call it policy based
13  on the fact that I saw no need to keep any of those
14  documents.
15      Q.    Did there ever come a point in time during
16  your directorship or when it ended that you focused
17  yourself or some other person or yourself and/or other
18  persons on collecting what you had, seeing if there was
19  any purpose in maintaining it and discarding what you
20  didn't see a need to maintain?
21      A    I'm sorry.  I did not follow all that

Page 35

1  question.
2      Q.    Did you come to not have any documents as a
3  result of one fell swoop of a cleaning house or would
4  this be something during five years serving if you
5  didn't have a need for a document that you had, that
6  you would get rid of it on an ongoing basis?
7      A    I got rid of it on an ongoing basis.  The
8  board books, which were carefully prepared by the
9  management before board meetings, I referred to during
10  meetings.  When I left the meeting, I left the
11  documents on the board table and somebody in the
12  management organization disposed of them.
13      Q.    These board books, when would you receive
14  them in relation to the meeting that you --
15      A    They came in the mail before the meeting.
16  That was the regular practice, that they would come in
17  the mail before the meeting.  Sometimes I forgot to
18  take them to the meeting but there would always be a
19  duplicate copy at the meeting.
20      Q.    And then if you got home and noticed that
21  you forgot to take your copy -- and just for the

Page 36

1  record --
2      A.    Dispose of them.
3      Q.    Just for the record, you motioned with your
4  thumb that out it went?
5      A    Out it went.
6      Q.    Did you receive from Amtrak personnel
7  anything other than board books prior to these
8  meetings?
9      A    Did I receive anything other than the board
10  books?  I don't remember anything but that could have
11  happened.
12      Q.    And, after meetings I'm understanding that
13  you would receive separately draft minutes or would the
14  draft minutes from the previous meeting be in the board
15  book that you were receiving for the next meeting?
16      A    I think that the regular practice was that
17  they would be in the board book for the next meeting.
18      Q.    So, we have prior to meetings do you
19  remember receiving anything -- well, I'll withdraw
20  that.  Logically they're the same thing because there's
21  always a next meeting, but, do you ever remember

Page 37

1  receiving after a meeting anything other than a board
2  book that would be both forward-looking and
3  backward-looking that would be relating to a meeting
4  that had been held such as, to give you an example, of
5  something other than the minutes, if someone had been
6  charged with doing something at a meeting, either of
7  the entire board or a committee of the board, and you
8  would be asked to review something, a contract, or a
9  proposal or something like that?
10      A    I was, for part of that time, on the board,
11  chairman of the legal, I think they called it the legal
12  committee.  And, Alicia, who ultimately became general
13  counsel, Alicia Serfaty, would send me summaries of
14  background and recommendations for settlement of
15  personal injury cases, I think, was without exception
16  what they involved.  And, the legal committee would
17  consider the recommendations of house counsel for those
18  settlements and make recommendations to the board
19  usually for approval of the recommendation for
20  settlement.
21      Q.    Who else was on the legal committee while

10 (Pages 34 to 37)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 38

1  you were a director?
2      A    Humm, I don't remember.  John Robert Smith
3  was, I believe.
4      Q.   Any other director you can recall other
5  than Mr. Smith serving at any --
6      A    I think there were three of us but I don't
7  remember who else it was.
8      Q.   Were there minutes kept of the legal
9  committee's proceedings?
10     A    I think so.
11     Q.   And did the legal committee meet the same
12 day that the full board met?
13     A    Usually.
14     Q.   Before or after the full board?
15     A    Usually before, and we would go over -- and
16 this is the regular practice.  There could have been
17 exceptions to it.  But, the regular practice was to
18 meet before the meetings, go over the background as
19 recommended by counsel, and a formal action of the
20 committee to, I think, in every instance to approve the
21 recommendation of counsel and --

Page 39

1      Q.   Were you -- go ahead.
2      A    And recommend to the board that they
3  authorize the action requested by counsel.
4      Q.   Were you, did you say you were chair or you
5  were --
6      A    I believe I was chair.  Yes, I was chair of
7  the legal committee.
8      Q.   Throughout your tenure as a director?
9      A    I don't remember that.  The minutes will
10 show that I think.
11     Q.   Sure.  Do you ever remember not being on
12 the legal committee while you were a director?
13     A    No.
14     Q.   And you said Alicia, you started off by
15 saying that Alicia Serfaty was sending you summaries
16 and recommendations with respect to these cases in
17 between meetings; would that also be in the mail?
18     A    Or Fed-Ex or UPS.
19     Q.   And, did you have conversions with her or
20 communicate with her in any way like by return mail or
21 Fed-Ex or UPS before actually showing up at a meeting?

Page 40

1      A    Did I have conversations with her?
2      Q.   In between coming to Washington and --
3      A    Not as a regular practice but I'm sure that
4  we did have some conversations.  I would not attempt to
5  describe how many such conversations because I just
6  don't remember.
7      Q.   And you noted at some point that her status
8  changed and she became general counsel?
9      A    Right.  That was while I was on the board.
10     Q.   Do you remember when that was?
11     A    No.
12     Q.   Do you remember what her position was
13 before she became general counsel?
14     A    She was a part of the professional staff at
15 the legal department of Amtrak.
16     Q.   And was she your principal contact for
17 legal affairs while you were a director?
18     A    I would say basically, yes.  There was a
19 man named Jim Lloyd, who was general counsel for a
20 while.  He came from the airline industry to Amtrak.  I
21 did not have much contact with Jim Lloyd.

Page 41

1      Q.   These legal committee meetings, would Ms.
2  Serfaty or other lawyers, either in-house or otherwise
3  for Amtrak make presentations to the committee with
4  respect to recommendations or was that all covered in
5  these mailings in between meetings?
6      A    We had at least one occasion when outside
7  counsel joined house counsel in making recommendations.
8  And I think again that was about a personal injury
9  case.  I don't remember more than one occasion.
10     Q.   At a committee meeting, you mean?
11     A    Yeah.
12     Q.   What was the purpose, as you understood it,
13 of the legal committee?
14     A    To consider the recommendation of the legal
15 department and to make a judgment about those
16 recommendations and make a decision as to whether to
17 recommend that the board, the full board act.
18     Q.   I guess my question is more along the lines
19 of, what sorts of matters were put to your committee
20 for your judgment and reference to the board?
21     A    Personal injury cases.

11 (Pages 38 to 41)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 42

1    Q.    Anything else; that was it?
2        MR. WELLSCHLAGER: And again he's asking
3  generically, not for specifics.
4    A    We had, I just can't remember whether the
5  legal committee as such as opposed to the full board
6  was asked to consider some litigation or threatened
7  litigation about discrimination, employment
8  discrimination, nor can I remember whether the legal
9  committee as opposed to the full board gave
10 consideration as such to potential litigation about
11 what we on the board considered deficiencies in the
12 performance of the contract by Bombardier, which
13 supplied the Arsella (phonetic) equipment.
14   Q.    Other than these areas, was there anything
15 else that came within the bailiwick of the legal
16 committee, as you recall it, sitting here today?
17       MR. WELLSCHLAGER: Objection to the form of
18 the question. Go ahead and answer.
19   A    I don't remember any other.
20   Q.    Do you remember the issue ever coming up
21 either at the committee level or the full board as to

Page 43

1  the number of directors serving and the issue of
2  whether the number of directors was sufficient to
3  constitute a quorum.
4    A    You want to repeat that one?
5    Q.    Do you ever remember the issue of whether
6  there were enough directors to constitute a quorum
7  coming up either in the full board or the legal
8  committee?
9        MR. WELLSCHLAGER: It's a yes or no
10 question. I don't want you to get into anything that
11 might constitute an attorney-client communication.
12   A    Okay. I think so.
13   Q.    You think you remember that?
14   A    I think I remember that there was some
15 informal discussion of it.
16   Q.    Informal?
17   A    Yeah. I say informal; I don't think we
18 took any action as a board.
19   Q.    Or --
20   A    Make a motion, second, approve, all in
21 favor, no, we did not do that. We talked about it. Is

Page 44

1  that all right?
2        MR. WELLSCHLAGER: So far.
3        THE WITNESS: I'll stop.
4    Q.    I would imagine that it would be fair to
5  say that you don't personally remember looking into the
6  issue educating yourself, you know, outside of any
7  discussion in an actual meeting about such issues?
8    A    It seems to me that -- well, that's not
9  quite the way to put it. I personally was satisfied
10 about that issue of whether we had enough participation
11 to constitute a quorum. I personally was satisfied
12 with the answer from the legal department, which
13 probably came through Alicia again. It could have been
14 Mr. Lloyd. But I, I do remember that the issue was
15 discussed and that I was satisfied with the answer from
16 legal department.
17   Q.    Do you remember in the year 2001 an issue
18 coming up as to restructuring and reorganization of the
19 organization and an effort by management to reduce the
20 workforce in order to save money?
21   A    I remember that we were all interested in

Page 45

1  reducing the workforce as far as possible in order to
2  save money and that the management was hopefully
3  constantly involved with that issue.
4    Q.    And, with more particularity, however, do
5  you remember activities in 2001, around July, in a
6  meeting where an issue came up as to management's
7  proposal, specifically a George Warrington proposing
8  reorganization of the organization and the adoption of
9  a voluntary separation agreement and voluntary
10 separation and severance plan for certain employees?
11   A    I remember that management developed and
12 presented to the board a proposal to incentivize early
13 separation of some of the management force in order to
14 benefit those individuals and reduce costs of the
15 operation of the railroad.
16   Q.    And, do you remember in particular a July
17 26, 2001 meeting at which that proposal was made?
18   A    I've looked at the, part of the minutes of
19 that meeting and yet I don't have any specific memory
20 of that meeting or of action taken at that meeting.
21   Q.    Now, let me ask you -- because I actually

12 (Pages 42 to 45)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 46

1  didn't ask you prior to this -- without saying how it
2  is that you came to be looking at such as those
3  minutes, because I don't want to know that, I just want
4  to know the answer to this question.  In preparation
5  for testifying here today, can you tell us what
6  documents, if any, other than these minutes that you
7  said you looked at part of, did you look at?
8      A   I don't remember any other documents.
9      Q.   So, it would be fair to say that the only
10 thing that you've looked at in connection with
11 testifying here today is part of the minutes from July
12 of 2001, a board meeting?
13     A   No, I don't think that's --
14         MR. WELLSCHLAGER:  Objection to the form of
15 the question.
16     A   I don't think that those are the only
17 documents.
18     Q.   Then those are the only documents that you
19 are remembering, right now, that you looked at, in
20 preparation for testifying?
21     A   Your question is directed toward a July

Page 47

1  meeting?
2      Q.   No.  I'm sorry.  Let me, maybe, maybe it's
3  been awhile since you've been questioned in a setting
4  like this.  By the way, have you ever been a witness?
5  I mean, I know you've been a lawyer a long time.  Have
6  you ever been on the other end; is this the first time
7  you have ever had your deposition taken?
8      A   No.  I was deposed in connection with a
9  suit against the management of Jefferson Pilot
10 Corporation while I was a member of that board.
11     Q.   All I'm asking is, could you just itemize
12 for us now, to the best of your recollection, what
13 documents you looked at in preparation for testifying
14 here?  I don't want to know, like, who showed them to
15 you, if you went and looked for them in some box
16 somewhere and you looked at them yourself.  I don't
17 want to know how it came to be that you were looking at
18 them.  I want to know, to the best of your
19 recollection, what those documents are.
20     A   Well, I looked at part of the meeting,
21 minutes of the meeting in July.  I looked at -- and I

Page 48

1  can't, my hesitation is based on the fact that I can't
2  remember how to describe the document.  But, there was
3  a document that was dated on or about the 14th of
4  September of 2001, that I looked at.  I don't remember
5  any others.
6      Q.   Tell me about that document.  You said you
7  can't describe what it was?
8      A   It was a, it was a piece of paper that was
9  a part of the written authorization from me as an
10 individual director to be part of a unanimous approval
11 of action taken by the board when a scheduled board
12 meeting for September the 12th, 2001 had been cancelled
13 because of the terrorist attacks in New York on the day
14 before, September the 11th, 2001.
15     Q.   You said it was written authorization from
16 you?
17     A   Yes.  As part of unanimous action, in other
18 words, I was going to sign a document saying yes, and
19 it was, it was purported to be part of similar action
20 taken by each of the other directors so that there
21 would be unanimous action as represented by those

Page 49

1  written documents.
2      Q.   And it was something that you were going to
3  sign?  I'm just using your terminology.  You said it
4  was something that you were going to sign?
5      A   I don't mean to put any emphasis on the
6  verb.
7      Q.   Well, was it something that you did sign?
8      A   Not physically but I authorized my
9  signature to go on that document.
10     Q.   And, when did you do that?
11     A   To the best of my recollection, it was on
12 the 14th of September, 2001.
13     Q.   And tell me, if you would, just stepping
14 back for a second, what do you remember possibly by
15 having your recollection refreshed by looking at some
16 of the July minutes, what do you remember in any detail
17 about what's come to be called the VERP, the Voluntary
18 Early Retirement Plan of Amtrak?
19     A   This is the first time I've heard that
20 acronym.
21     Q.   That's sort of why I phrased it by "what's

13 (Pages 46 to 49)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 50

1  come to be known as." If you could tell us, what is it
2  that you recall about the proposals that you told us
3  about occurred in July, do you remember anything of the
4  July meeting or any August meeting or any
5  conversations? Tell us anything you remember between
6  July and the authorization that you say that you gave
7  to sign that document. What do you remember, if
8  anything, about this plan?
9      A   I don't, I don't --
10         MR. WELLSCHLAGER: Objection to the form of
11  the question. Go ahead.
12     A   I don't remember that it was, there were
13  any conversations between the July meeting and the
14  September date.
15     Q.   The September date being September 14th?
16     A   Correct.
17     Q.   Well, do you remember --
18     A   There was some other conversation with
19  somebody, or communication, rather, with Amtrak because
20  the meeting that was scheduled for the 12th of
21  September was cancelled and I knew that it had been

Page 51

1  cancelled. So, somebody told me that the meeting was
2  cancelled.
3      Q.   September, the September 12th meeting was
4  cancelled?
5      A   Right.
6      Q.   But was that a communication that also
7  touched on this subject matter?
8      A   I don't know.
9      Q.   And you don't remember that communication?
10     A   I do not.
11     Q.   But, do you remember any of the July
12  meeting itself?
13     A   In the sense that I knew that the board
14  took action to authorize the management to implement a
15  plan that again had as its objective incentivize by
16  enhancing opportunities for the individual management
17  employees to retire early, the second purpose of which
18  was to reduce the operating costs of the railroad.
19     Q.   And, I think the way you phrased it is you
20  remember that, that the board authorized management to
21  implement this plan at that July meeting?

Page 52

1         MR. WELLSCHLAGER: Object to the form of
2  the question.
3      Q.   Did you -- let me restate the question if
4  it's helpful to you. I heard you to be saying, and I'm
5  asking you, is this what you did say and mean, that the
6  that board in the July meeting authorized management to
7  implement an early retirement plan?
8         MR. WELLSCHLAGER: Object to the form of
9  the question. You can go ahead and answer. Go ahead.
10     A   I have refreshed my memory by looking at
11  those minutes and I think the minutes accurately
12  reflect what we did.
13     Q.   Thank you for your answer. My question,
14  though, is you used the phrase, did you not, that the
15  board authorized management to implement this plan?
16     A   I did.
17     Q.   And is that what you mean?
18     A   I do.
19     Q.   And that's what you believe the board did
20  that day?
21     A   I do.

Page 53

1      Q.   And, you wouldn't have authorized such a
2  plan without it first having been described to you?
3      A   The answer to that is, yes, but
4  descriptions can be conceptual, as I think this was,
5  and did not include a great deal of detail, in which I
6  was not interested seriously. I relied on the
7  professionals in the management and the legal
8  department to take care of what I regarded as details.
9  The policy was my concern and I approved the policy.
10     Q.   You approved a policy in July of 2001 along
11  with other directors. Did you learn that either the
12  policy was changing or that there was some new
13  developments that would require a modification of the
14  plan in September?
15     A   Yes.
16         MR. WELLSCHLAGER: Objection to the form of
17  the question.
18     A   Yes.
19     Q.   And can you tell us how that came about and
20  what it was that you learned?
21     A   I can't tell you how it came about because

14 (Pages 50 to 53)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 54

1  I don't remember conversations but I do know that I was
2  informed that the management investigation of the
3  implementation of the plan had found it was going to
4  cost us too much and we didn't have the money to fund
5  it.
6      Q.   Who told you that?
7      A    I don't know.  I was at home or in the
8  office in Richmond.  It was not at a meeting.  But, I
9  was informed that the management decision was that the
10  plan, as they originally hoped to implement it, was too
11  expensive and that it had to be modified to reduce the
12  cost.
13      Q.   And, you learned this on the telephone?
14      A    I don't remember whether it was the
15  telephone, or, I don't know how else it could have been
16  because I don't have, I don't remember any papers about
17  it.  I didn't in those days receive any e-mails because
18  I didn't do e-mail.  I don't like faxes, so, I don't
19  think I got anything on it by fax.  So, it must have
20  been by telephone.  But, that's a conclusion that is
21  not a direct reflection of my memory.

Page 55

1      Q.   You said it couldn't have been a fax
2  because you don't like faxes?
3      A    I don't like faxes.
4      Q.   Could you explain what you mean by that?
5      A    I just don't like faxes.
6      Q.   Governor, I'm just trying to understand,
7  what is it about faxes that you do not like?
8      A    I come from another age and faxes don't
9  give you that much time to think about what you're
10  doing.  It's a silly objection to modern technology.  I
11  have a little fax machine at my home.  It doesn't
12  always work or work right.  It's not reliable.  I just
13  have an aversion to the whole concept of instantaneous
14  communication.
15      Q.   And, is that an aversion with respect to
16  faxes that extends to the both receiving and sending of
17  faxes or just receiving them or just sending them?
18      A    Oh, I don't know.  I don't know.
19      Q.   Well, when it came up just now, it seemed
20  to be in the context of how you learned about this
21  development and it seemed that you were indicating it

Page 56

1  couldn't have been by fax?
2      A    I doubt if it was.  I don't think it could
3  have been by fax because I just didn't use fax.
4      Q.   Well, and what I'm asking you is, when you
5  say you didn't use fax, that's both the receiving and
6  the sending; you didn't send faxes?
7      A    I have sent faxes but not on any regular
8  basis.
9      Q.   And you're not happy about it because you
10  don't like faxes?
11      A    I don't like faxes.
12      Q.   But, you didn't send any faxes in
13  connection with this plan?
14      A    I don't have any memory of sending a fax in
15  connection with this plan and I doubt that I did.
16      Q.   And you doubt that you did because you
17  don't like faxes?
18      A    I doubt it because I don't like faxes and I
19  don't have any recollection of sending a fax.
20      Q.   And, you don't think you received any faxes
21  in connection with this, because --

Page 57

1      A    Correct.
2          MR. WELLSCHLAGER:  Objection to the form of
3  that question.
4      Q.   I'll ask the question again.  Do you agree
5  with the question -- withdrawn.  You don't think that
6  you received any faxes in connection with this change
7  to this plan, do you?
8          MR. WELLSCHLAGER:  Objection.  You can
9  answer if you want.
10      Q.   You don't think you received any faxes in
11  connection with this plan?
12      A    I don't think I received any faxes in
13  connection with this plan.
14      Q.   Or the proposed changes to this plan?
15          MR. WELLSCHLAGER:  Objection.
16      A    Well, I thought that's what you were
17  talking about.
18      Q.   It is.  Because we're getting these
19  objections, I need to have a clean record so I have to
20  keep asking the question to make sure I have a clean
21  records.  You don't think that you received any faxes

15 (Pages 54 to 57)

Linwood Holton - 11/19/04

Page 58

1  in connection with this plan or the proposed changes to
2  this plan, do you?
3        MR. WELLSCHLAGER: Objection to the form of
4  the question.
5      A    I don't think I did.
6      Q.   When I asked you before what documents you
7  had looked at in connection with testifying here today,
8  you mentioned two documents, one were minutes, the
9  other was a document -- and I'm paraphrasing you --
10 that you said you couldn't even describe what it was;
11 you couldn't give it a name because it was in the form
12 that you then described?
13       MR. WELLSCHLAGER: Objection to the form of
14 that question.
15     Q.   Do you remember that testimony?
16     A    I do.
17     Q.   Having now talked about that document a
18 bit, do you have a name for that document that is
19 coming to mind?
20     A    Do you have a name for it?
21       MR. WELLSCHLAGER: Objection to the form of

Page 59

1  the question.
2      Q.   Is there -- Governor, I'm not sure you're
3  understanding the thrust of my question. Do you have
4  in your mind a name or is there a way that you've
5  referred to that document outside of this room in
6  preparations for testifying here today; have you called
7  it anything in your mind's eye?
8      A    It was my part of the unanimous assent to
9  the change in that separation plan that we have been
10 talking about.
11     Q.   Have you ever seen that document in any
12 other, that form of document in any other setting other
13 than the change to this plan?
14       MR. WELLSCHLAGER: Objection to form.
15     Q.   In unrelated settings?
16       MR. WELLSCHLAGER: Objection to the form of
17 the question.
18     A    That document?
19     Q.   The form of that document.
20     A    I don't know what you mean by the form of
21 the document. Sorry.

Page 60

1      Q.   You described a document that you said had
2  your written authorization?
3      A    It was a unanimous consent form.
4      Q.   That's sort of what I was getting to.
5      A    All right.
6      Q.   Unanimous consent form?
7      A    All right.
8      Q.   Is that something that you had used on any
9  other occasion when you were a director at Amtrak, or
10 authorized someone to use for you when you were a
11 director at Amtrak?
12     A    That could well be but I don't remember any
13 specific instance of it.
14     Q.   Putting aside anything you may have learned
15 or thought about or talked about yesterday or today,
16 did you have an understanding at the time in September
17 of 2001 as to the legal requirements for the use of
18 unanimous consent forms?
19     A    Read that one back to me.
20     Q.   I can just ask it. Did you at the time,
21 September of 2001, have any understanding as to any

Page 61

1  legal requirements or technicalities or formalities
2  that may have attached to the use of a unanimous
3  consent form?
4      A    It was my understanding that the law
5  permitted the board to act by unanimous consent. Does
6  that answer your question?
7      Q.   Well, my next question is, is that the sum
8  total of what your understanding was; did you
9  understand anything else about that or was that
10 essentially it?
11     A    You better call attention to what you're
12 talking about. What else?
13     Q.   Did you have at the time any understanding
14 as to whether or not there was any requirements as to
15 the form that that consent took, the wording of the
16 form, the timing of the form, any number of procedural
17 matters relating to technicalities as to how that
18 unanimous consent was manifested, did you have any
19 understanding as to whether there were any specific
20 requirements as to how that unanimous consent of the
21 board would be manifested?

16 (Pages 58 to 61)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 62

1        MR. WELLSCHLAGER: Objection to the form of
2    the question.
3        THE WITNESS: You want me to answer?
4        MR. WELLSCHLAGER: You can if you can
5    understand it.
6    Q.   I'll rephrase it so I can have a clean
7    record and maybe a clearer deponent.  Did you know of
8    any technical legal requirements that attached to that
9    form?
10       MR. WELLSCHLAGER: Objection to the form of
11   the question.  You can answer.  Go ahead.
12   A.   No.  I understood and I feel confident now
13   that the board could act by unanimous consent.
14   Q.   Well, I'm specifically excluding any
15   understanding you have after a meeting you had
16   yesterday whether it came up or not because I don't
17   want to know that.  I just want to know what your
18   understanding was in September of 2001.
19   A.   In September of 2001, I felt the board
20   could act by unanimous consent without an assembled
21   meeting.

Page 63

1    Q.   And how could the board do that?
2    A.   By --
3        MR. WELLSCHLAGER: I think --
4    Q.   Your understanding.
5        MR. WELLSCHLAGER: I think the question is
6    calling for your understanding but I'm going to object
7    to the extent it's asking for a legal opinion or
8    conclusion.
9        MR. GOTTESDIENER: You can answer, sir.
10   A.   How could that unanimous action be taken?
11   Q.   Yes.
12   A.   By individual action taken on documents by
13   each and all of the directors.
14   Q.   Individual action taken on documents by
15   each and all of the direction (sic)?
16   A.   Unanimous, resulting in unanimous assent to
17   the proposition that was presented.
18   Q.   And, you phrased it by individual action
19   taken on documents?
20   A.   Right.
21   Q.   So, you're including in that, that at that

Page 64

1    time you believed that you did not, yourself, have to
2    take action on the document, that you could have
3    someone take action on a document for you?
4    A.   That I could authorize, and I considered
5    that my action.
6    Q.   That's what you thought at the time?
7    A.   Right.
8    Q.   And, your testimony is that you're not
9    aware of any other time that you acted as an individual
10   director using one of these unanimous consent forms?
11   A.   Do I remember any?  I think there were
12   other instances of that but I don't remember any
13   specific one.  If you could remind me, maybe I could
14   recall.
15   Q.   How is it that you came to have the
16   understanding that you did as to, that individual
17   action could be taken on documents and that that
18   unanimous consent then would be valid?
19       MR. WELLSCHLAGER: If the answer, Governor,
20   is that you came to that understanding by virtue of
21   communications with your attorney or the company's

Page 65

1    attorney, then I would prefer that you simply state,
2    say that and not the content of the communications.  If
3    it came about as a result of your own experience or
4    your own research or whatever, that's fine.
5    A.   I'm sure that I got assurance from the law
6    department that the statute, I guess, of the District
7    of Columbia, authorized the board to take action by
8    unanimous consent and the affirmative response to the
9    law department was consistent with my own background
10   and knowledge.  I don't have any specific research that
11   I've done but I have always, have long, have long
12   understood that boards could act by unanimous consent
13   without having an assembled meeting.
14   Q.   I'm focussed not so much on the question of
15   unanimous consent without a meeting as the
16   responsibility of the individual director to manifest
17   that consent in some form?
18   A.   Are you talking about authorizing somebody
19   else to sign it?
20   Q.   Yes, sir.
21   A.   I understood that somebody else can sign it

17 (Pages 62 to 65)

Linwood Holton - 11/19/04

Page 66

1    with my authority.
2        Q.   How did you come to that understanding?
3            MR. WELLSCHLAGER:  Again, Governor, instead
4    of saying --
5            MR. GOTTESDIENER:  We got that.
6            MR. WELLSCHLAGER:  -- the law department
7    told me XYZ --
8            MR. GOTTESDIENER:  We got that.  John, John
9    that's enough --
10           MR. WELLSCHLAGER:  Are you interfering with
11   my instruction to my client as to an attorney-client
12   communication?
13           MR. GOTTESDIENER:  I am following -- yes, I
14   am.
15           MR. WELLSCHLAGER:  We're breaking.
16           MR. GOTTESDIENER:  Because we're not
17   calling for that.
18           MR. WELLSCHLAGER:  We're breaking.  Let's
19   go, Governor.
20           MR. GOTTESDIENER:  Excuse me.  You're not
21   leaving the deposition.

Page 67

1            MR. WELLSCHLAGER:  We are.
2            MR. GOTTESDIENER:  Judge Kessler rules are
3    very clear.
4            MR. WELLSCHLAGER:  Call him.  I would love
5    to raise this with the judge.  We're breaking.
6    Governor?
7            MR. GOTTESDIENER:  You are giving speaking
8    instructions to a witness.
9            MR. WELLSCHLAGER:  I'm counseling my client
10   as to an attorney-client issue.  You're not entitled to
11   interfere with that.  We'll be back in five.
12           MR. GOTTESDIENER:  The record will reflect
13   that the witness is leaving the room and I'm in the
14   middle of a question and the question was totally
15   appropriate and did not call for any divulgence of
16   attorney-client communications.
17           (Mr. Wellschlager, Ms. Simmons and the
18   witness left the deposition room and returned)
19           MR. WELLSCHLAGER:  Mr. Reporter, before we
20   begin, could you read back to me what was said as we
21   left the room?

Page 68

1            (The reporter read back as requested.)
2            MR. WELLSCHLAGER:  Before we begin with
3    counsel's permission, I would like to respond to that.
4    We can get back to the question and the answer.
5            COURT REPORTER:  Do you want to be on the
6    record or not?
7            MR. WELLSCHLAGER:  It depends on whether
8    Mr. Gottesdiener is agreeable to it.
9            MR. GOTTESDIENER:  Whether I'm agreeable to
10   what?
11           MR. WELLSCHLAGER:  Me responding to your
12   statement that you made on the record as we left.  You
13   made a statement.  I just want to respond and then we
14   can resume the deposition.
15           MR. GOTTESDIENER:  I don't think a lawyer
16   who walks out of a room when opposing counsel for the
17   third time asks a question that after the first time he
18   asked it didn't get an answer but that lawyer said to
19   his client the answer that was sought was completely
20   appropriate and then storms out of the room and
21   interferes with the deposition, should be able to both

Page 69

1    storm out of the room, and then comment when he comes
2    back in.  I'm going to ask the question for a fourth
3    time.
4        BY MR. GOTTESDIENER:
5        Q.   How did you come to the understanding that
6    you did --
7            MR. WELLSCHLAGER:  Don't answer that
8    question.
9        Q.   -- have as to --
10           MR. WELLSCHLAGER:  Don't answer committee.
11       Q.   -- whether there were any requirements --
12   don't answer the question?  That's your instruction to
13   him?
14           MR. WELLSCHLAGER:  Right now.
15           MR. GOTTESDIENER:  John, a word of advice
16   is to listen to what the court reporter will read.  You
17   told him to answer that exact question --
18           MR. WELLSCHLAGER:  Mr. Gottesdiener --
19           MR. GOTTESDIENER:  -- just not to divulge
20   the contents of or the details of any conversations
21   which I didn't seek.

18  (Pages 66 to 69)

Linwood Holton - 11/19/04

Page 70

1        MR. WELLSCHLAGER:  All I'm asking is for an
2   opportunity to say one sentence on the record before we
3   resume.
4        MR. GOTTESDIENER:  I don't have any
5   evidence from this witness.  I have a lot of fluff.  I
6   want to know how the witness came to have an
7   understanding as to whether there were any requirements
8   that attached to these unanimous consent forms.
9        MR. WELLSCHLAGER:  I'm sure there's a lot
10  of stuff you want to know.  I just want to make one
11  comment with respect to the privilege issues.
12       MR. GOTTESDIENER:  I don't want you to make
13  comments.  I don't want you to make the comments.
14       MR. WELLSCHLAGER:  I'm entitled, I'm
15  absolutely entitled to make a comment on the record
16  with respect to attorney-client privileged
17  communications --
18       MR. GOTTESDIENER:  You've done it.
19       MR. WELLSCHLAGER:  -- and instructions --
20       MR. GOTTESDIENER:  You've done.  You've
21  done it and you've gone beyond --

Page 71

1        MR. WELLSCHLAGER:  Mr. Gottesdiener, stop
2   interrupting me.
3        MR. GOTTESDIENER:  It's my deposition.  If
4   you want, if you want --
5        MR. WELLSCHLAGER:  It's going to be over
6   unless you let me finish this sentence.
7        MR. GOTTESDIENER:  Mr. Reporter, would you
8   please read back to the witness the witness's own
9   question to me just before the break and I will adopt
10  that question that the witness put back to me, seeking
11  clarification of my questions as my current question to
12  the witness, when he said, "do you mean."
13       (The reporter read back as requested.)
14       BY MR. GOTTESDIENER:
15   Q.   How did you come to whatever understanding
16  you had as to whether you could authorize someone to
17  sign for you?
18       MR. WELLSCHLAGER:  Don't answer that
19  question.  What I would like to say in response --
20       MR. GOTTESDIENER:  Are you going to follow
21  the instruction of counsel sitting next to you?

Page 72

1        THE WITNESS:  Yes.
2        MR. GOTTESDIENER:  So you will not answer
3   the question how you came to have whatever
4   understanding that you did as to whether or not you
5   could authorize someone to sign for you; you won't
6   answer that question?
7        MR. WELLSCHLAGER:  Don't answer any further
8   questions until I can address the privilege issue that
9   arose, what is now ten minutes ago.
10       MR. GOTTESDIENER:  You've instructed the
11  witness.
12       MR. WELLSCHLAGER:  And Mr. Gottesdiener has
13  constantly thwarted me and interrupted me --
14       MR. GOTTESDIENER:  John --
15       MR. WELLSCHLAGER:  -- as I tried to correct
16  the record, so that --
17       MR. GOTTESDIENER:  -- there is no basis in
18  the rule for what you are doing.  There is no basis in
19  Judge Kessler's rule.  The record is what it is.  Just
20  live with it.  Okay?  We're moving on.
21       MR. WELLSCHLAGER:  Mr. Gottesdiener, if

Page 73

1   there's a basis for you to make extemporaneous
2   statements for the benefit of the record, I'm entitled
3   to do the same.
4        MR. GOTTESDIENER:  No.  Just object.  You
5   don't understand.
6        MR. WELLSCHLAGER:  You don't understand.
7   I'm entitled --
8        MR. GOTTESDIENER:  You making things up.
9        MR. WELLSCHLAGER:  -- absolutely to caution
10  --
11       MR. GOTTESDIENER:  You're making things up.
12  This is --
13       MR. WELLSCHLAGER:  -- my witness when it
14  comes to attorney-client.  .
15       MR. GOTTESDIENER:  You did.  There's no,
16  there's no --
17       MR. WELLSCHLAGER:  No, I didn't.  That's
18  the whole point.  You interrupted.  You wouldn't let me
19  caution him.  Then we had to leave.
20       MR. GOTTESDIENER:  The record will reflect
21  that counsel is yelling, counsel stormed out of the

19 (Pages 70 to 73)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 74

1  room, now counsel is yelling. This is about questions
2  and answers. You've instructed him not to answer. The
3  record is what it is. If you're going to
4  un-instruct him --
5        MR. WELLSCHLAGER: We're not going to
6  resume this deposition until I can explain for the
7  benefit of the record what my caution to this witness
8  was on the privilege issue.
9        MR. GOTTESDIENER: You can't do that.
10  That's not --
11       MR. WELLSCHLAGER: Yes, I can.
12       MR. GOTTESDIENER: No, you can't.
13       MR. WELLSCHLAGER: Read the rules. Read
14  the discovery guidelines, Eli.
15       MR. GOTTESDIENER: I have.
16       MR. WELLSCHLAGER: I'm absolutely entitled
17  to instruct --
18       MR. GOTTESDIENER: I have.
19       MR. WELLSCHLAGER: -- my witness when it
20  comes to something as sacrosanct as the attorney-client
21  privilege.

Page 75

1        MR. GOTTESDIENER: Okay. John --
2        MR. WELLSCHLAGER: My instruction was
3  simply for the benefit of the record.
4        MR. GOTTESDIENER: -- he's been instructed.
5  Okay. He's been instructed and you left the room to
6  instruct him further. End of story. I have questions
7  to ask. You've instructed him.
8        MR. WELLSCHLAGER: Then just let me just
9  say one sentence.
10       MR. GOTTESDIENER: Write a brief --
11       MR. WELLSCHLAGER: No.
12       MR. GOTTESDIENER: -- and then we'll
13  resume. Write a brief and send it to the judge.
14  That's, this is -- that's --
15       MR. WELLSCHLAGER: Are you not letting me
16  make my record on this issue?
17       MR. GOTTESDIENER: Your record is what it
18  is.
19       MR. WELLSCHLAGER: That's my question.
20       MR. GOTTESDIENER: Your instruction is what
21  it is.

Page 76

1        MR. WELLSCHLAGER: Are you letting make my
2  record on this question?
3        MR. GOTTESDIENER: Your characterization is
4  just wrong. You don't understand what a deposition is.
5  It's about questions and answers. You made your
6  objection. That's it. I have a question.
7        MR. WELLSCHLAGER: You don't get it, Eli.
8        MR. GOTTESDIENER: Next question. Okay?
9        MR. WELLSCHLAGER: We're not, we're not
10  resuming.
11       MR. GOTTESDIENER: So you're stopping the
12  deposition.
13       MR. WELLSCHLAGER: Not until you give me
14  one sentence.
15       MR. GOTTESDIENER: You have taken up more
16  time than we have because you witness --
17       MR. WELLSCHLAGER: I have yet to make one
18  uninterrupted sentence.
19       MR. GOTTESDIENER: That is false. And you
20  left the room and I urged you not to leave the room.
21  And now you want to come back and you want to dominate

Page 77

1  my record.
2        MR. WELLSCHLAGER: I don't want to dominate
3  your record. I want to make one comment.
4        MR. GOTTESDIENER: We will send you the
5  bill from the court reporter service for your sentence.
6  Have your sentence.
7        MR. WELLSCHLAGER: That's fine. We'll
8  gladly pay it. All I want to say for the record --
9        MR. GOTTESDIENER: That will be on record.
10  That's where the bill is going.
11       MR. WELLSCHLAGER: For this one sentence.
12       MR. GOTTESDIENER: No, not for this one
13  sentence, for this whole ridiculous ten minutes now
14  where I have asked a question that you told him he
15  could answer and he still hasn't answered.
16       MR. WELLSCHLAGER: Are you going to give me
17  my sentence yet? All I want to say for the record, to
18  clarify the basis of the instruction before we broke,
19  was that I was simply not, I had not even instructed
20  the witness not to answer, I was simply clarifying the
21  areas on which he could answer and the areas which were

20 (Pages 74 to 77)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 78

1  privileged and in the middle of that instruction, I was
2  repeatedly interrupted in a pretty rude and obnoxious
3  manner.  And for that reason we broke.  Now, having
4  said that, I'm happy to resume and consider any
5  questions that Mr. Gottesdiener wishes to ask.  Thank
6  you.
7      MR. GOTTESDIENER:  Read Judge Kessler's
8  rules.  What you did is as inappropriate as what you
9  have done ever since I asked him the third time.  It
10  was inappropriate of you after I asked the identical
11  question a third time, and the witness had not
12  answered, and you had the first time gave him -- I was
13  very indulgent -- you gave him at length all sorts of
14  coaching about, well, you can say if you learned it
15  from an attorney but don't get into the details; now,
16  if you did it in research that's something else and
17  then you went into all that.  I didn't say a thing.  I
18  then asked the question another time and he didn't
19  answer.  He sought clarification.  He said do you mean
20  about this and I said yes.  And I just said the next
21  question was the exact same question.  So, two coaching

Page 79

1  sessions I didn't want and that's why I said you
2  already did that and that's when you stormed out of the
3  room.
4      BY MR. GOTTESDIENER:
5      Q.  How did you come to have an understanding,
6  whatever your understanding was, as to whether or not
7  you could authorize someone to sign that form for you?
8      A.  I satisfied myself by discussions with
9  counsel and reflections of my own background, of legal
10  experience, that I could authorize somebody else to put
11  my name on a unanimous consent document.
12      Q.  Without asking you to divulge the content
13  of the discussions, what counsel are you referring to?
14      A.  The name of the counsel?  I don't know.  I
15  would say that it's more than, probably more than one
16  because there was counsel who always sat at the table
17  of the board meetings.  And there were, when I referred
18  to the fact, that, my own legal background, this would
19  have been something that I would have discussed with
20  other lawyers.  It was not a shock to me to reach the
21  conclusion that I could authorize somebody else to put

Page 80

1  my signature on a piece of paper.
2      Q.  But, you're respectfully straying a bit
3  from the question of who, who this lawyer or lawyers
4  was.  And, your testimony is you don't know?
5      A.  I can't give you a name.
6      Q.  Was one of the lawyers Ms. Serfaty?
7      A.  She was one of the lawyers who was house
8  counsel, yes.
9      Q.  Well, that's not my question, whether she
10  was house counsel.  I know that.  You know that.  Was
11  she one of the lawyers who spoke to you and counseled
12  you as to whether or not you could do this?
13      A.  My problem is that I can't remember any
14  specific conversation with anybody about that.
15      Q.  That's fine.
16      A.  I satisfied myself --
17      Q.  Then that's your answer.
18      A.  I satisfied myself that counsel approved
19  it, that it was legal.  I satisfied myself that it was
20  legal for me to do that.
21      Q.  Right.  But I'm asking, I'm picking up on

Page 81

1  your statement that you had discussions with counsel
2  and --
3      A.  With other lawyers.
4      Q.  So maybe not your lawyer or lawyer for the
5  company?
6      A.  I just don't know.
7      Q.  So, the answer to that would be yes, it
8  could have been, sitting here today you're not sure
9  that you were getting like formal legal advice as a
10  client, it could have been in conversations with other
11  lawyers, sort of colleagues as opposed to going to
12  someone at the company or outside counsel?
13      A.  I guess that's a fair statement.
14      MR. WELLSCHLAGER:  Objection to the form of
15  the question but go ahead and answer.
16      A.  I guess that's a fair statement.
17      Q.  Now, when did you focus on that, did you
18  focus on that the day of this September 14th?
19      A.  I can't say that I focused on it, counsel.
20  I was satisfied when I authorized the signature to be
21  put on the document, that it was legal for me to do

21 (Pages 78 to 81)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 82

1 that.
2     Q.   Had you ever done that prior to
3 September --
4     A    I think so.
5     Q.   I have to finish my question so there's a
6 record that's clean. Had you ever done that prior to
7 September 14th, 2001?
8     A    I think so.
9     Q.   But you're not sure?
10    A    No.
11    Q.   Have you, are you, do you have any
12 recollection of doing it at any time other than
13 September 14th, 2001?
14    A    Not with any specific reference.
15    Q.   On September 14th, 2001, where were you?
16 Let me ask an easier question. Where were you on
17 September 11th?
18    A    In my office in Richmond.
19    Q.   And where were you on the 14th?
20    A    I don't know.
21    Q.   And, who is it that you authorized to do

Page 83

1 something with that document?
2     A    John Carten.
3     Q.   And how did you do that?
4     A    I don't know. I can tell you what I think.
5     Q.   Well, that would be helpful.
6     A    I know that a fax from John Carten, or no,
7 from Alicia Serfaty was received in my office in
8 Richmond, where faxes are a little more regular. So,
9 my aversion to faxes is more specifically directed to
10 faxes at home. I don't like faxes at home, more than I
11 don't like faxes. But, there was a fax that came to my
12 office in Richmond from Alicia Serfaty that -- well, I
13 think it's in the record -- that describes what I was
14 requested to do and I would rather refer to that than
15 to try to describe what it requested me to do. But
16 after receipt of that fax by the office, I learned of
17 it.
18    Q.   I'm not sure I understand. After you
19 received the fax by --
20    A    The fax was received in the office.
21    Q.   Yeah.

Page 84

1     A    In Richmond.
2     Q.   How did you learn, when did you learn of
3 that?
4     A    I don't know. And that's what my point is.
5 I know that the fax came to the office in Richmond.
6 There's a record of that.
7     Q.   Well, how do you know that; there's a
8 record of that that you learned of yesterday, in some
9 fashion?
10    A    I confirmed it yesterday.
11    Q.   Well, you don't have any documents
12 yourself?
13    A    I do not.
14    Q.   By the way, did you make any inquiry with
15 anyone at your office whether or not they might have
16 any documents responsive to our document request?
17    A    No.
18    Q.   Why not?
19    A    Because I knew they didn't.
20    Q.   Well, how about that fax?
21    A    I'm not sure they have that fax.

Page 85

1     Q.   But you didn't ask, right?
2     A    I don't know. I don't think I did.
3     Q.   You do know that you didn't ask, right; you
4 didn't ask anyone to look for documents about Amtrak at
5 that office in response to our document request?
6     A    That is correct.
7     Q.   Including telephone records and fax
8 records, right?
9     A    I think that's correct.
10    Q.   You didn't ask for those records, correct?
11    A    When? I don't know what you're getting at.
12    Q.   At any time. I'm getting at that a
13 document request was propounded and directed to you
14 putting you under a legal obligation to produce all
15 documents in your possession, custody and control and
16 you are with that law firm.
17    A    Oh, oh, oh. I did not ask for the office
18 to check that after I got, after you sent out a
19 document, requesting documents.
20    Q.   And you didn't ask for them to do it when
21 you were reminded of this request yesterday?

22 (Pages 82 to 85)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 86

1    A    I did not.
2    Q.    What methods might be available to you if
3    you, not me, but if you really wanted to know where you
4    were on September 14th, 2001, what ways would you have
5    at your disposal to figure that out?
6    A    I think the only, probably the only
7    refresher of memory would be my pocket calendar for the
8    year 2001.
9    Q.    And where is that now, in Weems?
10    A    In my office in Richmond.  And, that is not
11    a document that I considered to be part of what you
12    were requesting but if it is, it certainly is available
13    to you.
14    Q.    Do you have a secretary that's assigned to
15    you in whole or in part at that office?
16    A    Yes.  But I'm not sure she was the one who
17    was assigned to me at that time.
18    Q.    Who was assigned to you?
19    A    I do not remember.
20    Q.    What's the name of the secretary who's
21    assigned to you now?

Page 87

1    A    Susan Lawson.
2    Q.    And has Ms. Lawson been with the firm for
3    the period that --
4    A    A number of years but I don't know whether
5    she was assigned to me in September of 2001 or not.  I
6    don't remember when she was assigned to me.
7    Q.    And, so your pocket calendar is somewhere
8    in your physical office now in Richmond?
9    A    Yes.
10    Q.    So --
11    A    And you're welcome to have it.
12    Q.    Thank you.  Well, maybe on a break.
13    A    Not the original but --
14    Q.    No, I don't need the original but maybe on
15    a break we could get a fax, if it's not too
16    unobjectionable, a copy of the pages just before and
17    during and after 9/14/2001 and maybe that would help
18    refresh your recollection or otherwise identify where
19    it was that you were on the 14th of September; would
20    that be possible?
21    A    It is possible.

Page 88

1    MR. WELLSCHLAGER:  In fact, if you give me
2    a fax number, I can get that to you here at the first
3    break.
4    Q.    Great.  Maybe we should take a break soon.
5    Let's chat a bit more about this, though.  You were
6    telling us, though, about that you learned that this
7    fax was received by your office, right?  You have to
8    say yes or no for the court reporter.
9    A    Yes.
10    Q.    You were intending to convey by that among
11    other things that you weren't in the office at the time
12    that it was received because if you're sitting there in
13    your office despite your aversion to receiving faxes at
14    home, you will allow Ms. Lawson or whoever it is acting
15    as your secretary to bring you a fax that's addressed
16    to your attention when you're in your office, right?
17    MR. WELLSCHLAGER:  Objection to the form of
18    the question.
19    Q.    Withdraw the question.  Do you have an
20    aversion to receiving faxes in your office while you're
21    in your office at work in Richmond?

Page 89

1    A    No.  But I don't know that I was in my
2    office.
3    Q.    I know that.  I know that.  I'm going to,
4    we'll get to that in a second.  We might get to that
5    fact through looking at that calendar.  But, let's just
6    get some baseline testimony from you.  When you're in
7    Richmond working, you do receive faxes, correct?
8    A    Along with the regular mail, yes, I -- yes.
9    Q.    And, how is it that they come to you while
10    you're sitting in your office, through your secretary?
11    A    Yeah.
12    Q.    Do they also come to you through some
13    person wheeling around a cart with regular mail, if the
14    fax copies into some central fax location?
15    A    No.
16    Q.    You have a local fax number at work?
17    A    What do you mean local?
18    Q.    Do you have a fax number that is dedicated
19    to either yourself personally and your secretary or a
20    number of attorneys who work in an area around your
21    office or is the fax number just one fax number for the

GORE BROTHERS Reporting & Video Co., Inc.                    Towson Reporting
410-837-3027                                                 410-828-4148

b12f5e7a-908d-4b27-bf7f-598cdeeeedd9

Linwood Holton - 11/19/04

Page 90

1  entire firm?
2       MR. WELLSCHLAGER: Objection to the form of
3  the question. You can answer it if you understand it.
4     A   I think there's a fax number for several
5  lawyers.
6     Q.  So then --
7     A   But I'm not sure it goes to all of them.
8  And I know it's not directed specifically at me.
9     Q.  That, that we got. But, is there more than
10 one fax number for -- I'm sorry I can't phrase this the
11 way I want. If you're an attorney other than yourself
12 working at that firm, do all attorneys give out just
13 one number, one main number or are there --
14    A   I don't know.
15    Q.  Well, you did start to say, though, that
16 you know that there's a number for several attorneys?
17    A   I think there is a number for several
18 attorneys.
19    Q.  You think, okay. When you received faxes
20 at the office in Richmond, have they, in fact, been
21 hand-delivered by your secretary or is there some

Page 91

1  central mailroom person who has delivered faxes to you?
2     A   You must understand that I don't go to the
3  office every day.
4     Q.  How often were you going to the office
5  after --
6     A   I don't remember at that time but I don't
7  think it was every day.
8     Q.  What occurred, without getting too
9  personal, what occurred in the year 2000 to cause you
10 to move from McLean to Weems?
11    A   It was to move to a semiretirement
12 situation.
13    Q.  To a what retirement?
14    A   Semiretirement.
15    Q.  Semiretirement. And, would it be fair to
16 say that, well, the distance from McLean to Richmond,
17 that distance you said was two hours driving?
18    A   Correct.
19    Q.  What's the distance from Weems to Richmond?
20    A   About an hour and forty-five minutes.
21    Q.  And, when you moved from McLean to Weems

Page 92

1  for the purposes of semiretirement, would it be fair to
2  say that your physical presence in the office in
3  Richmond decreased somewhat?
4     A   I gradually stopped going to the office
5  with any regularity over that period since I first
6  joined the firm.
7     Q.  Over that period, you mean, are you talking
8  about the period of 2000 when you moved from McLean to
9  Weems?
10    A   No. I'm talking about when I went to the
11 firm, I went there with fair regularity, not every day
12 even then.
13    Q.  I'm sorry. I thought -- maybe I'm not
14 remembering. I thought this is a firm that you were at
15 before you worked -- I'm sorry, withdrawn. Did you
16 remain at the firm while you were a director of Amtrak?
17 My understanding is you were at that firm that went
18 through different names from '93 to '98, but, in my
19 mind, I was sort of assuming that you weren't at that
20 firm from '98 to 2003.
21    A   No. When I went to the firm, I've been

Page 93

1  with the firm ever since.
2     Q.  Since '93; you've been with them for ten
3  years?
4     A   That seems, I think that's correct. Yes.
5     Q.  That was my -- I don't know why I made that
6  assumption.
7     A   No, I haven't changed since I went to that
8  firm except to reduce my presence there.
9     Q.  Yes, and what I'm seeking from you, sir,
10 is, could you give us some indication as to when you
11 started downshifting in terms of how often you went
12 into the office?
13    A   Not really.
14    Q.  I mean --
15    A   Could I give you some indication of when I
16 started downshifting?
17    Q.  Yes.
18    A   Not really.
19    Q.  How about, let's do it this way. When you
20 became a director at Amtrak in 1998, how often were you
21 going into the office in Richmond from McLean?

24 (Pages 90 to 93)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 94

1    A    I don't know.
2    Q.    Approximately?  I mean --
3    A    I don't have any idea.
4    Q.    Well --
5    A    I went down there when they needed me.
6    Q.    That, I wouldn't know how often that was.
7  Would you go in every day?
8    A    I don't think I ever went in every day ever
9  since I joined that firm.
10    Q.    Was there ever a time that you ever at the
11  firm while you were a director of Amtrak or before --
12  I'm not saying like in the last year or so -- up until
13  you stopped being a director at Amtrak, was there ever
14  a time that you didn't go into the firm for a whole
15  week?
16    A    Sure.
17    Q.    Was that fairly regular that you would go
18  into the firm, sometimes episodically, maybe once every
19  ten days or so?
20    A    I just don't have enough recollection to
21  answer that question.

Page 95

1    Q.    And I appreciate it.  But, you need to
2  appreciate that I'm just trying to get some parameters
3  based on what memories you do have.  During the period
4  of time that you were a director at Amtrak, were there
5  times that you didn't go into the office for two weeks
6  at a time?
7    A    I don't know.
8    Q.    Did you have any standing instructions with
9  Ms. Lawson or anyone else what to do with material such
10  as mail or faxes that came for you in Richmond, when
11  you were not there that day; did you have any standing
12  instructions as to what they were to do?
13    A    Yes.
14    Q.    Which were what?
15    A    Let me know about anything important that
16  came up.
17    Q.    And in what manner did you leave the, in
18  what manner did you ask that they let you know?
19    A    Telephone me.
20    Q.    Telephone you?  You have to say yes.
21    A    Yes.

Page 96

1    Q.    And, in this case, September 14, 2001, you
2  didn't receive a telephone call from your office that
3  you had this fax from Amtrak?
4        MR. WELLSCHLAGER:  Objection to the form of
5  the question.
6    A    I, I think I probably did.
7    Q.    You think you did?
8    A    I didn't say I didn't.
9    Q.    Why do you think you did?
10    A    Because I got the communication.
11    Q.    What communication?
12    A    I got a communication that said you have a
13  fax that indicated and the communication about the fax
14  indicated to me that I should call John Carten.
15    Q.    Okay.  This is not something I've heard
16  before.  You're saying you got --
17        MR. WELLSCHLAGER:  Because you interrupted
18  him.
19        MR. GOTTESDIENER:  I'm sorry?
20        MR. WELLSCHLAGER:  It's because you
21  interrupted his answer twenty minutes ago.

Page 97

1        MR. GOTTESDIENER:  That's false.
2    Q.    You got a communication; what
3  communication, from whom and in what form that there
4  was a fax for you?  You're saying you got a
5  communication that day.  Your testimony earlier was you
6  didn't know when that, you didn't know when you learned
7  that the fax had arrived at the office.
8        MR. WELLSCHLAGER:  That's false.
9    A    I don't recall that I said that.
10    Q.    I'll withdraw whatever question may be
11  pending and ask you.  How did you learn that there was
12  a fax that had arrived in your office in Richmond?
13    A    That's simply a question that I don't know
14  the answer to.  I know from the record now, which I
15  have seen, that a fax was received in my office, and I
16  know that, from memory that the information in that fax
17  was communicated to me to the extent that I should call
18  John Carten and I did call John Carten and I think that
19  was bound to have been on the telephone but that's a
20  deduction, not a memory a specific memory.  I don't
21  remember the specific call.

GORE BROTHERS Reporting & Video Co., Inc.                    Towson Reporting
410-837-3027                                                 410-828-4148

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 98

1        But, I did authorize John Carten as a
2   result of that communication to execute that document
3   in my behalf, the document that was requested, and that
4   was the unanimous consent form that we discussed
5   earlier in this deposition.
6        Q.   Is it fair to say from everything that you
7   are testifying that you would agree that you weren't in
8   the office when you called John Carten?
9        A    I don't know whether I was in the office or
10  not.
11       Q.   But, you are talking about you got a
12  communication that there was a fax and then you called
13  John Carten.  You didn't testify that you got this fax
14  and then you called John Carten.  You're saying there's
15  some intervening communication that you are not able to
16  identify, is that correct?
17       MR. WELLSCHLAGER:  Objection to the form of
18  the question.  You can answer.
19       A    I don't --
20       Q.   Let me ask this narrow question.  You can't
21  identify what communication you're talking about that

Page 99

1   told you that there was a fax for you, right?
2        A    I cannot identify a specific conversation.
3        Q.   No.  I'm not -- conversation, your word was
4   communication.
5        A    All right.
6        Q.   You got a communication that there was a
7   fax in your office for you?
8        A    You're, we're speculating because it could
9   have been that I was in the office and that I was shown
10  the fax but I don't recall that.
11       Q.   I'm now just talking about your testimony,
12  Governor.  You said that you got the communication that
13  there was a fax for you.  I'm asking you, can you
14  identify what the communication was that informed you
15  that there was a fax for you?
16       A    I cannot.
17       MR. GOTTESDIENER:  My suggestion is that we
18  take a break now and do what we can to try to ascertain
19  if there's any documentary record as to where the
20  Governor was when that fax came in and when he spoke
21  with Mr. Carton.  And, these were things that were

Page 100

1   specifically requested and I think the record -- a word
2   that you like, John -- will clearly show that I
3   specifically asked for fax and telephone records
4   including if there's a long-distance call from that
5   office to John Carten or if there's a long-distance
6   call from your phone in Weems.
7        MR. WELLSCHLAGER:  All we've agreed to do
8   at this break is provide you with the week from his
9   calendar and we'll do that.  As to everything else
10  you're saying, I'm not having a discovery dispute in a
11  deposition.
12       MR. GOTTESDIENER:  It's not a discovery
13  dispute.  The record was very clear of what we asked
14  and what we, without being required to do, made
15  absolutely clear that we wanted under the rubric of
16  what had already been requested.
17       MR. WELLSCHLAGER:  If you want to talk
18  about discovery, that's fine.  I'm just not going to
19  litter this transcript with this discussion.
20       MR. GOTTESDIENER:  Well, we're certainly
21  not littering this transcript with records of any

Page 101

1   evidence that has been sought for one whole year.
2        BY MR. GOTTESDIENER:
3        Q.   Governor, in Weems what form of telephone
4   communication do you have --
5        MR. WELLSCHLAGER:  Objection to the form of
6   committee.
7        Q.   -- or did you have in September of 2001?
8        A    I don't know what you mean.
9        Q.   Do you have a telephone in Weems?
10       A    Yes.
11       Q.   What kind, is it a land-line; do you have a
12  cell phone?
13       A    It's a land-line.
14       Q.   Do you use a cell phone?
15       A    No.
16       Q.   Did you have a cell phone in September --
17       A    No.
18       Q.   -- of 2001?  I'm sorry?
19       A    No.
20       Q.   Do you, in Weems, who is the, what's the
21  name of the telephone company in Weems, Virginia; is it

26 (Pages 98 to 101)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 102

1  Verizon?
2      A    Our local service is provided by Verizon
3  and our long distance at that time was something called
4  World Communications, I believe.
5      Q.   WorldCom?
6      A    Huh?
7      Q.   Worldcom?
8      A    No.
9      Q.   MCI, World Communications?
10     A    World Communications, I believe.  It was a
11 nine cents a minute service for long-distance calls.
12     Q.   And, that was the service that you had in
13 2001?
14     A    I think so.
15     Q.   And, did you ever call anyone at Amtrak
16 from Weems?
17     A    Yes.
18     Q.   That would be a long-distance call, right?
19     A    No.
20     Q.   Why not?
21     A    Because they had an 800 number that was

Page 103

1  answered by a machine and I usually used that.
2      Q.   At Amtrak?
3      A    Yes.
4      Q.   And, then you called the 800 number and
5  then you dialed your way to who it was that you wanted
6  to speak with?
7      A    It was one of those crazy electronic voice
8  things and you dial in and you get an answer and it
9  tells you how you can get a ticket and then it says are
10 you trying to reach an employee or a department.  When
11 you say employee, it says state the name of the
12 employee.  You tell the name of the employee and once
13 you get through the communications problem, because
14 that machine doesn't understand human language very
15 well, you get whoever you're looking for.
16     Q.   And, so, you're certain that on this
17 occasion that you would have used that 800 number to --
18     A    I'm not certain of it.
19     Q.   Well, to a reasonable degree of certainty,
20 you used that 800 number so often when you were
21 otherwise a long-distance call away that you're pretty

Page 104

1  certain that you wouldn't have incurred a charge that
2  might be reflected on a phone bill?
3      A    Exactly.  You say pretty certain; I say
4  probable.
5      Q.   Did you ever call direct from Weems without
6  going through that 800 number?
7      A    I don't believe so.  But, if, if a record
8  showed it, I, I wouldn't be surprised.
9      Q.   Tell us what you recall specifically of the
10 conversation you had with John Carten, every specific
11 memory that you have of the actual call.
12     A    You know, specific memory is a term that I
13 don't think describes that situation.  I have a memory
14 that I learned of the need for a change in the
15 retirement plan.  I was informed of the need for the
16 change, I think in a conversation with John Carten, and
17 that because the board meeting, which was scheduled for
18 the 12th, had been postponed, and that there was a
19 deadline of the, September the 15th, that it was needed
20 to have the board act by unanimous consent.  And I
21 authorized that unanimous consent.  And I think that

Page 105

1  that was in a conversation with John Carten.  I do not
2  have specific memory of that specific telephone call.
3      Q.   It is your sense that on September 14th,
4  with respect to this needed change in the retirement
5  plan, that you spoke with somebody at Amtrak?
6          MR. WELLSCHLAGER:  Objection to the form of
7  the question.
8          THE WITNESS:  Would you repeat --
9      Q.   It is your sense, it is your sense, is it
10 not, that you spoke with somebody at Amtrak orally
11 about this need for this change?
12     A    I think that's correct.
13     Q.   And, it's your sense, well, it's your --
14 you do remember speaking with John Carten about this?
15     A    No.
16     Q.   You don't remember that?
17     A    No.  It's a better way to say it, I have a
18 sense that I communicated orally with somebody at
19 Amtrak and I suspect it was John Carten.  I think it
20 was John Carten.
21     Q.   And just to again put parameters on this,

27 (Pages 102 to 105)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 106

1  it's also your sense that you spoke with one person as
2  opposed to more than one person at Amtrak about this?
3        MR. WELLSCHLAGER: Objection to the form,
4  that there's a clarification I would ask for, if you
5  would permit me to ask for it.
6        MR. GOTTESDIENER: I don't permit it.
7        MR. WELLSCHLAGER: Okay. Objection to the
8  form.
9     Q.   It's your sense that you spoke with one
10  person as opposed to more than one person?
11    A    I think you're asking me to speculate.
12    Q.   That's fine. You can add an objection.
13  Your objection is noted. Could you please answer my
14  question?
15        MR. WELLSCHLAGER: Objection.
16    Q.   It's your sense that you spoke with one
17  person as opposed to more than one person, correct?
18        MR. WELLSCHLAGER: Objection to the form of
19  the question.
20        MR. GOTTESDIENER: Thank you.
21    A    I, I cannot answer affirmatively that

Page 107

1  question. I don't have any recollection of it.
2     Q.   I'm not asking about recollection. I'm
3  asking about your own testimony. We've gotten from
4  your testimony that you can't remember that it was John
5  Carten you spoke with but you do have the sense that
6  you spoke with somebody at Amtrak, you communicated
7  your authorization to go ahead with this change and
8  that it's your sense that it was John Carten; is that
9  fair?
10    A    That, it was John Carten that I authorized
11  to put my signature on that, that document.
12    Q.   That day?
13    A    I don't know.
14    Q.   You don't know that it was that day?
15    A    It looks clearly to me from the record that
16  it was that day.
17    Q.   But, sir, I'm really not asking --
18    A    Memory, I don't know.
19    Q.   I'm not asking to you testify from a
20  document. I'm asking you to testify from your memory.
21  And, the question that I right now have is, your memory

Page 108

1  is fairly clear that it was John Carten to whom you
2  gave this authorization, correct?
3     A    I'm certain in my own mind that I
4  authorized John Carten to affix my signature to that
5  document.
6     Q.   And, you're also certain that you spoke
7  with John Carten about the issue as opposed to just
8  called him up and given him the instruction and you
9  didn't talk to him about the issue?
10    A    Well, I don't remember what was in the fax
11  about the contents of the document or whether anybody
12  else told me about the contents of the document, I
13  mean, the fax about the document. So, I think it's
14  correct to say that John Carten described to me what
15  they were trying to do with the document. And, I know
16  that I authorized John to affix my signature to a
17  document that had indicated my participation in the
18  unanimous consent of the board to make changes in that
19  retirement plan.
20    Q.   Have you ever signed a document in your
21  office at Richmond that then you gave to Ms. Lawson or

Page 109

1  someone else to fax for you somewhere, like a letter or
2  anything like, like a letter or a brief or anything
3  like that, that you sent out and, you know, it might
4  have done hardcopy by mail but you also either directed
5  or knew that circumstances called for it to be faxed?
6        MR. WELLSCHLAGER: Objection to the form of
7  the question.
8     A    I don't know.
9     Q.   I'm sorry, sir. You don't know if you've
10  ever sent a fax from your office in Richmond in ten
11  years?
12    A    I don't know if I've ever signed a paper
13  that then was faxed somewhere.
14    Q.   A letter, you don't know that you, you
15  can't say that you know that you've sent letters out?
16    A    I can't say that I remember doing that.
17  No.
18    Q.   Well, I'm not really kind of, here I'm not
19  specifically asking do you actually have a present
20  recollection of the letter and the signing. You do
21  know, however, that you have used the facsimile

28 (Pages 106 to 109)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 110

1  services available at your firm to communicate with the
2  outside world, part of which includes you signing
3  something?
4       MR. WELLSCHLAGER: Objection to the form of
5  the question.
6    Q.   You know that's occurred, right; you've
7  sent out letters and so forth that you've signed from
8  your office?
9       MR. WELLSCHLAGER: Same objection.
10   A   I've sent out letters.
11   Q.   Through facsimile --
12   A   I don't know.
13   Q.   -- in whole or in part?
14   A   I don't remember that I have done that; I
15  don't remember that I haven't done that.
16       MR. GOTTESDIENER: Maybe now is the time to
17  take a break to get whatever it is that the defense and
18  Governor Holton are willing at this juncture to attempt
19  to do. I certainly, you know, know that the defense
20  understands the plaintiff's position that these are
21  documents that are long overdue and should not be in

Page 111

1  the position right now that we are but, so, it's up to
2  you to try to get whatever you want to get.
3       MR. WELLSCHLAGER: Is it your position that
4  you made a document request for Governor Holton's
5  calendar, is that your position?
6       MR. GOTTESDIENER: Is that my position?
7       MR. WELLSCHLAGER: Yeah. Can you show me
8  the document request?
9       MR. GOTTESDIENER: I don't have like
10  chapter and verse.
11       MR. WELLSCHLAGER: Yeah, I don't think
12  there is one.
13       MR. GOTTESDIENER: Fine.
14       MR. WELLSCHLAGER: But we'll get it for you
15  because we've agreed to do that. With respect to any
16  other documents --
17       MR. GOTTESDIENER: Well, you can't go get
18  it for me because it was propounded in our, in a
19  request over a year ago.
20       MR. WELLSCHLAGER: Which one?
21       MR. GOTTESDIENER: Our first set of

Page 112

1  document requests.
2       MR. WELLSCHLAGER: You asked for calendars?
3       MR. GOTTESDIENER: John, whatever I asked
4  for was followed up by something very specific because
5  I very much remember having it documented as well as
6  probably orally when we were talking about this
7  deposition months ago, that, you know --
8       MR. WELLSCHLAGER: We don't need to spat
9  about it. I mean, we're going to give it to you. I
10  just --
11       MR. GOTTESDIENER: Well, it sounds like you
12  know that it exists. Why don't I have it already?
13       MR. WELLSCHLAGER: I just take objection to
14  the representation --
15       MR. GOTTESDIENER: Why don't I have it
16  already?
17       MR. WELLSCHLAGER: -- and the suggestion
18  implicit or otherwise that you have ever requested his
19  calendar.
20       MR. GOTTESDIENER: But what does it matter?
21  But it was in the ambit of what I asked for a year ago.

Page 113

1       MR. WELLSCHLAGER: How so?
2       MR. GOTTESDIENER: It's relevant to this.
3       MR. WELLSCHLAGER: His calendar?
4       MR. GOTTESDIENER: That's not relevant?
5       MR. WELLSCHLAGER: It doesn't say anything,
6  Eli.
7       MR. GOTTESDIENER: Let's just stop this.
8  This is just such a waste of time. Just produce
9  whatever you're going to produce.
10       MR. WELLSCHLAGER: Fine. Are we taking a
11  break?
12       MR. GOTTESDIENER: Yeah.
13       (There was a break in the proceedings.)
14       MR. GOTTESDIENER: Are we on the record?
15       COURT REPORTER: Yes, now we are.
16       THE WITNESS: I would like to say on the
17  record that the name of that long-distance telephone
18  carrier, I think their correct name is World Exchange,
19  but I'm not sure about that either. I think what I
20  gave you before was wrong.
21       MR. GOTTESDIENER: John -- and this is in

29 (Pages 110 to 113)

Linwood Holton - 11/19/04

Page 114

1  keeping with my own statement about, you know, what a
2  deposition is and is not, it's completely up to you if
3  you want to say this on the record; if not, then we'll
4  go off the record because I want to ask you, I really
5  don't understand what is going on now. Because, you
6  just said something about Desmond's assistant. Is this
7  calendar at Amtrak, is it in Richmond, do you know that
8  it exists for sure; has it been identified?
9        MR. WELLSCHLAGER: Yeah. Here's the deal.
10  As a result of our discussions with Governor Holton,
11  the question that has been posed in this deposition was
12  posed this morning as to whether there are any calendar
13  entries. And, Governor Holton's assistant, as I
14  understand it, was able to run a copy of his pocket
15  calendar for that week, the week of September 11, 2001,
16  which would include September 14, and, was going to fax
17  it. But, this all happened as we were walking out the
18  door this morning. So, the number that we had left her
19  was Desmond's assistant's number. And, I have just
20  tried to call Desmond's assistant to get it faxed over
21  here and she must be at lunch because she's not

Page 115

1  answering her phone but I left a voicemail with the fax
2  number for this office and hopefully it will come
3  across the wire while we're here.
4        MR. GOTTESDIENER: Well, I don't want to
5  ruin any great surprise or anything, but, do you know
6  what this thing shows?
7        MR. WELLSCHLAGER: It shows very little.
8  It shows a, has an entry for a charity ball on Friday
9  the 14th. It has an entry for something relating to
10  picking up oysters or something like that. It shows,
11  there's a notation, I think, on the 12th that says
12  Amtrak meeting postponed or cancelled. There's a
13  notation on the 11th that says terrorist attack.
14  There's a notation on the 10th but I can't recall from
15  memory what that said. And all of this has just been
16  conveyed to me orally. I have not seen anything yet.
17        MR. GOTTESDIENER: And I'm presuming that
18  all of this has been conveyed to the Governor prior to
19  him sitting and listening it to like I am right now?
20        MR. WELLSCHLAGER: Yes.
21        MR. GOTTESDIENER: Having -- now I'm asking

Page 116

1  a question to the Governor.
2        BY MR. GOTTESDIENER:
3     Q.  Having heard that previously and again now,
4  does that do anything to refresh your recollection as
5  to where you were during the day on the 14th of
6  September, 2001?
7     A    The reference to the charity ball and to
8  the picking up oysters in Readville, indicate that I
9  was somewhere in the area that was bounded by Richmond
10  on the west and Readville, Virginia on the east. But,
11  it does not give me any clue of whether I was in my
12  office or at home or what parts of time I was in either
13  place during that period.
14     Q.  During this period, I have asked you some
15  questions, you've given some answers before about this.
16  I'm going to ask you maybe in a different, better way.
17  During this period, can you tell us in any fashion,
18  that, you know, that is appropriate, how regularly you
19  were in the office, whether you do it by, you know,
20  days of the month, days of the week, how frequently,
21  how infrequently, sort of what the default would be

Page 117

1  around this period of time, if, if someone was doing it
2  statistically? However you would be able to describe
3  it from whatever recollection you have, I would ask you
4  to attempt that.
5     A    First, let me say that during that week,
6  and I think I testified to this, I clearly remember
7  that I was in the office on the 11th, because I saw the
8  television telecast of the second airplane striking the
9  south tower of the World Trade Center. And that was in
10  the office.
11     Q.  And do you remember, by the way -- and I'm
12  kind of testing my own memory -- it was a Tuesday,
13  wasn't it?
14     A    Yes. That's my recollection as well.
15     Q.  It certainly is mine. Okay.
16        MR. WELLSCHLAGER: Mine as well.
17     Q.  All right. So --
18     A    Now --
19     Q.  -- continue.
20     A    -- with respect to how often I was in the
21  office, the best description is that there was no

GORE BROTHERS Reporting & Video Co., Inc.                    Towson Reporting
410-837-3027                                                  410-828-4148

b12f5e7a-908d-4b27-bf7f-598cdeeeedd9

Linwood Holton - 11/19/04

Page 118

1  regularity whatsoever when I first went there, which
2  was, didn't we say 19 --
3      Q.   '93?
4      A    -- '93, soon after that, we were preparing
5  a case for trial in Circuit Court, in one of the
6  Circuit Courts in Richmond and I was there fairly
7  frequently.  Maybe not, I don't think every day and
8  every week but with fair frequency.  That would have
9  been in the early part of that period between '93 and
10 subsequently.  Now, it's, I try to get there once a
11 week but I don't always do that.  I don't have a
12 specific day for going.
13          I said that my purpose was to raise the
14 average age of the firm -- that was somewhat facetious
15 -- but to provide a name for the firm, which was
16 desirable at the time of reorganization three or four
17 years ago; yes, I did do that.  And, I'm on a salary as
18 a result of that transaction but I'm not required to be
19 in the office.  I go when it's convenient for me or
20 when there's some occasion such as a Christmas party,
21 when it's appropriate for me to be there.  I go if

Page 119

1  there's an occasion to meet a client that they would
2  like me to discuss potential legal services with.
3  That's happened I remember at least once but that's the
4  only occasion I remember.  So, it's best to say
5  irregular attendance and has been for some time.
6      Q.   And, would there be anything about Fridays
7  being Fridays, beginning of a weekend, where you would
8  be able to say it would make it less likely that you
9  would be in the office on a Friday than some other day
10 in the middle of the week?
11     A    Just my general reaction to that question
12 would be, well, yeah, the weekend starts for my age a
13 little early but I didn't have any rule about it and if
14 there were an occasion to go in on Friday, I would do
15 that, the same as I would go in on Monday or Wednesday.
16     Q.   It's fair to say, Governor, that you do not
17 have any recollection of having a fax brought to you
18 that detailed this proposal and had that unanimous
19 written consent form with a signature line on it, and
20 then you saying, well, I just am not going to sign this
21 and fax it back, even though I'm in the office, I'm

Page 120

1  just going to call John and tell him he can affix my
2  signature even though I could affix my signature right
3  here and now and give it to Ms. Lawson or someone else
4  to fax to John; you certainly don't have that kind of
5  recollection?
6      A    I do not.
7      Q.   In as best the way I can, consistent with
8  the rules, I want to ask you, don't you think that if
9  you were in the office and you had received a fax, that
10 that communication that you talked about that a fax had
11 arrived was that somebody walked into your office and
12 handed you this fax with this unanimous consent form
13 with a line for your signature, that after you
14 satisfied yourself that you were in agreement with it,
15 you would have signed it and given it to somebody and
16 said my aversion to faxing and receiving faxes at home
17 is nothing like, you know, to impinge on me doing the
18 company's business while I'm here in this office?
19         MR. WELLSCHLAGER:  You done?
20         MR. GOTTESDIENER:  Yeah.
21         MR. WELLSCHLAGER:  Objection to the form of

Page 121

1  the question.  Go ahead and answer.
2      A    I join in your speculation that I probably
3  if that had happened would have signed it and faxed it
4  back.
5      Q.   Hearing my not well-constructed question
6  and your own answer to it having considered, and thank
7  you, because it was not the best question.  Aren't you
8  fairly confident that that's not how it happened, that
9  you learned somehow when you were out of the office
10 that the fax arrived in the office and that merely
11 caused you to call John and then you had this
12 conversation with John about the contents and then
13 authorized him?
14         MR. WELLSCHLAGER:  Objection to the form of
15 the question.
16     A    I think that, I think in spite of counsel's
17 objection, I think the, are you fairly confident and
18 that that happened, yes.
19     Q.   Yeah, and now --
20     A    I'm fairly confident that I learned that I
21 should call John Carten and then the conversation, on a

31 (Pages 118 to 121)

Linwood Holton - 11/19/04

Page 122

1  telephone, probably -- I don't know how else it would
2  have been -- I authorized him after he described what
3  was needed to put my signature on a unanimous consent
4  document.
5      Q.  So, and because I'm -- when he makes an
6  objection as to form, you know as a trial lawyer, you
7  know, conceivably I don't have my question and my
8  answer so I'm going to pick up on your answer and ask
9  this question.  You're fairly confident that --
10         MR. WELLSCHLAGER:  Tell you what, given his
11 answer, I'll withdraw the prior objection if you want
12 to move on.
13     Q.  You'll withdraw the prior two objections to
14 form?
15         MR. WELLSCHLAGER:  No, just the prior one.
16         MR. GOTTESDIENER:  Okay.
17         MR. WELLSCHLAGER:  The objection to the
18 most recent question I will withdraw.
19         BY MR. GOTTESDIENER:
20     Q.  So, then you're fairly confident that when
21 you and John were talking about -- John Carten -- about

Page 123

1  the substance of the situation and then you gave your
2  authorization, that you didn't have in front of you the
3  proposed resolution or any of the materials that had
4  been faxed to your office in Richmond?
5      A.  Again, I would say that I'm fairly
6  confident that I did not have the fax in front of me.
7      Q.  And, that you didn't have anything from
8  Amtrak in writing about the proposed change?
9      A.  All right.  That's correct.
10     Q.  In writing in front of you, right?
11     A.  Correct.
12     Q.  So, you were relying on John Carten's
13 description of the situation and the approach that
14 management wanted to take to address the situation?
15     A.  I'm fairly confident that that's the
16 situation.
17     Q.  And that you were wholly reliant on his
18 description for your understanding of both the
19 situation and the proposed remedy to the situation?
20         MR. WELLSCHLAGER:  Objection to the form of
21 the question.

Page 124

1      A.  Well, restate it or just repeat it.
2      Q.  That you were wholly reliant, and by that I
3  mean, you didn't have any, anything printed or in
4  writing or this was essentially the first you heard of
5  it, you heard of it orally, he described it, and you
6  satisfied yourself that you were in agreement with him,
7  with the proposal and you said go ahead?
8      A.  I think that's right.
9      Q.  And now that we've talked about this for as
10 long as we have, is there now any more of a
11 recollection about whether or not this was the first
12 time you had ever authorized your signature in some
13 fashion to be affixed to a document with respect to
14 Amtrak and a unanimous consent form?
15         MR. WELLSCHLAGER:  Can I hear that again
16 either from you or the court reporter?
17     Q.  Sure.  Just because we've been spending
18 time on it, your recollection may have been refreshed.
19 Do you now believe that this is the first time this
20 occurred or are you getting the sense that you had been
21 through this before with Amtrak and it wasn't the first

Page 125

1  time that this occurred?
2      A.  It -- I, I just don't know.  Did any of
3  this refresh my recollection as to whether I had done
4  it before?  It did not so refresh my recollection.
5      Q.  Do you have a memory of a point in time,
6  whenever that is, where as a lawyer you asked yourself,
7  and then maybe someone else, can this be done, can I do
8  this in what in today's language we call remotely, can
9  I authorize somebody to sign my name as a director of
10 Amtrak to a unanimous consent form?
11     A.  Yes.
12     Q.  You have the memory of that being a
13 question that you wanted to address?
14     A.  I wanted to know that I, that it was legal
15 for me to so authorize my signature to go on that
16 document.
17     Q.  And again --
18     A.  And other documents before or after.
19     Q.  As a director of Amtrak?
20     A.  Yes.
21     Q.  And just to put parameters on it, not to

32 (Pages 122 to 125)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 126

1  sound like I'm being repetitive, you don't --
2  withdrawn.  You're fairly confident that your inquiry
3  did not involve you in reviewing a legal opinion in
4  writing or some, some written explication of the issue
5  and, you know, the, quote, legal problem and its
6  resolution by some form of writing or citation to
7  authority or discussion of a principle even if there
8  was no authority cited, in sum -- and I'll withdraw all
9  that.  The question is, you're fairly confident that
10  you didn't review prior to deciding for yourself that
11  it was okay any written explanation of why it was okay?
12      A    No.  I did not see any written document
13  about that.  And, I think your use of the word in that
14  long statement of the question, referred to an inquiry,
15  is not exactly correct because the first question was
16  whether you in your mind felt any question about
17  whether it was all right to do and I did have a
18  question in my mind about whether it was all right do
19  and I satisfied myself that it was.
20      Q.   But you don't know how you satisfied
21  yourself?

Page 127

1      A    Not completely but I discussed it.  I'm
2  confident that I discussed it and reflected against my
3  own background in the law practice.
4      Q.   But then what, what's the problem with the
5  word inquiry?
6      A    Because I don't remember asking anybody
7  specifically can I sign these documents and authorize
8  unanimous consent.
9      Q.   But I thought you said maybe an hour ago
10  that you had discussions with counsel; you didn't know
11  if it was like legal counsel for the company or
12  colleague or --
13      A    Well, I just object to the word inquiry
14  because I don't remember making a specific question to
15  anybody, can I sign this unanimous consent document; I
16  don't remember doing that.  I know that I was satisfied
17  in my mind that it was legal for me to do it.
18      Q.   How long were you on this call with
19  Mr. Carton?
20      A    I don't have any idea.
21      Q.   What did he tell you as best you can

Page 128

1  recall?  And I know we've heard some of this through my
2  questions and your answers but now that we're just
3  focused on it, maybe I can move on but I do want to
4  just get, now that we've gotten to this point, what did
5  Mr. Carton tell you?  You call him through the 800
6  number in all likelihood.  You get him on the phone and
7  he tells you what?
8      A    Well, the substance of it was that that
9  authorization for the management to implement an
10  incentive plan, to urge members of the management to
11  retire early, had been found to be very expensive and
12  that an amendment was needed to cut down on the costs
13  of it somewhat and that since the meeting on the 12th
14  had had to be cancelled because of the World Trade
15  Center terrorist attacks, that we needed to do it by
16  unanimous consent of the directors and would I consent
17  to it and I said yes and I said you can put my name on
18  the document that carries out that purpose.
19      Q.   Did he say anything else as far as you
20  remember?
21      A    I don't know.  I don't recall the specific

Page 129

1  conversation.  I know that the substance of the call
2  was to that effect.
3      Q.   Did you have any questions for him, from --
4      A    I don't know.
5      Q.   Is it your sense that you were skeptical
6  about the proposal or that you, basically more in line
7  with what you said before about saving money and so
8  forth, were receiving his information in a receptive
9  mode and may not have asked him questions?
10      A    My sense is that what he told me about the
11  need for an amendment made sense and I concurred in it.
12      Q.   Without questioning him closely as to the
13  details?
14      A    I had dealt with John over a long period of
15  time and he gave me a report that I considered
16  complete, that enabled me to make a decision that I
17  thought was based on the fax and I made the decision
18  without any hesitation.
19      Q.   And, I'm sorry, I may have missed this.
20  Why did you call John as opposed to someone else?
21      A    I don't know.  I think the fax says that,

33 (Pages 126 to 129)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 130

1  I've seen it since, call me, and it was addressed from
2  Alicia Serfaty but I was used to dealing with John.
3  John was a reliable messenger as evidenced by his past
4  performance. And I don't know why I called him as
5  opposed to her but I was confident that that would be a
6  satisfactory communication. And I knew, and this
7  probably reminds me that I had authorized John to sign
8  papers like that before.
9      Q.  Did you have a discussion with him about
10 the method in which he should sign for you?
11     A.  Oh, absolutely not.
12     Q.  I mean, do you now know from any source --
13 I'm not asking how -- that he would sign by, you know,
14 cutting and pasting another signature of yours as
15 opposed to signing in his own hand and backslashing and
16 indicating that he had signed with authority?
17     A.  You're asking me if I do know that now?
18     Q.  Yeah.  Do you know that now?
19     A.  I do know that now.
20     Q.  And is it fair to say that you have learned
21 that only in the course of preparing to testify here?

Page 131

1      A.  That's correct.
2      Q.  Did you assume, let's say back in September
3  of 2001, that he would sign for you actually in a
4  fashion that would on its face indicate that you hadn't
5  physically signed and that someone had signed for you
6  with authorization?
7      A.  Did I assume that?
8      Q.  Yes.
9      A.  I didn't give it any thought as to how he
10 would sign it.
11     Q.  You have given us your memory of the
12 conversation between you and John on the 14th of
13 September 2001.  As best you can recall, the question,
14 if this may also have come up, did he mention anything
15 about a deadline, like why it might be something that
16 was time sensitive and that couldn't wait until the
17 next directors meeting?
18     A.  I know now that there was some kind of a
19 deadline on the 15th, which was the next day, and on
20 the basis of that knowledge that I have now been
21 reminded, I would assume that John told me it needed to

Page 132

1  be done by tomorrow.
2      Q.  Right.  That's precisely, Governor, in all
3  due respect, that's precisely what I don't want.  What
4  I want is, hearing that now, that there was that
5  deadline, does it jog some sense of memory that he
6  mentioned it, on your assumption that he probably would
7  because it made sense that he would, is also mine and
8  probably everyone else's, but that's, the question is,
9  did he make that statement in some fashion; do you have
10 that sense?
11     A.  If you're asking me if this jogged my
12 memory so that I can give you the result of my
13 recollection of the incident, I cannot answer yes.
14     Q.  Let me try it this way.  Do you know from
15 any source now or then as a result of September 11th
16 and the cancellation of the September 12th meeting,
17 whether there was fairly promptly soon thereafter a
18 scheduled or rescheduled meeting of the board?
19     A.  Do I know whether there was a rescheduled
20 meeting of the board soon thereafter?
21     Q.  Yes.

Page 133

1      A.  I do not know.
2      Q.  Does it refresh your recollection to hear
3  that on September 20th the board convened for a
4  meeting?
5          MR. WELLSCHLAGER:  Objection to the form of
6  the question.
7      Q.  Does it refresh your recollection?
8      A.  It does not refresh my recollection.
9      Q.  That's fine.  If I understand your personal
10 document retention and destruction policy, for want of
11 a better phrase, whenever it is that you would next be
12 in the office, if materials like a fax, the
13 substance -- withdrawn -- materials like a fax, that
14 somebody told you arrived and then you took some action
15 with, that when you got to the office that a fax like
16 that would be just discarded and you wouldn't keep a
17 copy of it, a secretary wouldn't keep a copy of it?
18     A.  That's correct.
19     Q.  And, so, whenever it was that you next went
20 to Washington, you, in fact, didn't ever sign a
21 unanimous consent form yourself, that would authorize

34 (Pages 130 to 133)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 134

1  whatever it is that it purported to authorize without
2  there being a meeting of the board?
3      A    You mean anytime or with respect to this
4  particular --
5      Q.    Yeah, anytime.  No, with respect to this
6  particular change --
7      A    Transaction?
8      Q.    -- change in plan, you never actually
9  signed it yourself, right?
10      A    I don't think so.  I never did physically
11  sign it myself.  I authorized my signature to go on the
12  document.
13      Q.    And, can I ask you, with all respect, could
14  you tell us what your understanding is of the purpose
15  of the unanimous consent requirement?
16          MR. WELLSCHLAGER:  Object to the form of
17  the question.
18      A    Could I tell you my understanding of the
19  what?
20      Q.    The purpose of why, why there needs to be
21  unanimous consent for this action to take place in the

Page 135

1  form that it does?
2      A    Because that was the only way the board
3  could act in the absence of a meeting or some kind of
4  assembly.
5      Q.    Well, you do know that the board assembled
6  does not have to act in unanimous fashion for it to
7  take action, correct?
8      A    Sure.  Majority.
9      Q.    Majority?
10      A    Majority vote.
11      Q.    Could you tell us why that same majority
12  rule doesn't apply when a situation such as occurred on
13  September 14th comes up?
14          MR. WELLSCHLAGER:  Objection to the form of
15  the question.  You can answer.
16      A    My understanding of the law was it required
17  unanimous action if you didn't have a meeting.
18      Q.    Why; what's the policy?  You talked about
19  your interest in policy.  What's the policy reason in
20  the law as to why a unanimous vote is required when
21  there's no meeting?

Page 136

1          MR. WELLSCHLAGER:  Objection to the form of
2  the question.  You can answer.
3      A    I don't know what the, behind the, the
4  policy behind the legislation.  The legislation, the
5  statute said you can do it.
6      Q.    Putting aside --
7      A    But if you wanted to do it without a
8  meeting, you had to have unanimous consent.  That was
9  the statutory requirement.
10      Q.    Right.  And my question is, why, according
11  to this policy, would that be a good idea?
12      A    I don't know.  I don't.
13      Q.    Well, could you think together with us for
14  a moment to see if, you know, you can't give us any
15  indication why you think the law would require or say
16  it was a good thing or a necessary thing for a board
17  that was not meeting to be unanimous in order to take
18  action as opposed to when they were meeting they could
19  act by majority only?
20          MR. WELLSCHLAGER:  Objection to the form of
21  the question.

Page 137

1          MR. GOTTESDIENER:  Thank you.  Can you
2  answer the question?
3      A    I don't know why the policy behind that
4  legislation would make a distinction between a majority
5  vote and a unanimous vote.
6          MR. GOTTESDIENER:  I actually would like a
7  short break, if that's okay.
8          MR. WELLSCHLAGER:  Sure.
9          (A discussion was held off record.)
10      Q.    When you are in the office, you do bill
11  time, don't you?
12      A    No.
13      Q.    Never?
14      A    I may have billed time into a distant past
15  and when I worked on litigation for Lockheed, I'm sure
16  I kept some record of time.  But that's one of the
17  things that I am entitled to by reason of age and I
18  don't keep time now.
19      Q.    But in 2001 --
20      A    I consider myself ineligible, for not
21  keeping time.  I despise it.

35 (Pages 134 to 137)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 138

1    Q.   Second only to faxes, I'm sure.  But in
2  2001, were you ever working on any matter in which it
3  would profit the firm and yourself to note that you
4  spent some time rendering legal services?
5    A    I don't think so.  And I don't know of any
6  record of time.
7    Q.   That's the only reason I was wondering.
8    A    Okay.
9      (There was a break in the proceedings.)
10      THE WITNESS:  Are we on the record?  I
11  want to clarify one statement that I made a few minutes
12  ago.  I said that the entries on that pocket calendar
13  indicated that I must have been in the area abounded on
14  the west by Richmond and on the east by Readville,
15  Virginia.  The notation on Friday, the 14th, says
16  charity ball, indicating that it's in the evening.  I
17  would like to amend the previous testimony to indicate
18  the charity ball could have been in McLean.  My wife
19  was very interested in various charities in McLean and
20  there is a bid charity ball that is conducted in McLean
21  annually, and that could have been but not necessarily

Page 139

1  was the charity ball to which that item refers.
2    BY MR. GOTTESDIENER:
3    Q.   And the oysters could have referred to a
4  separate Saturday morning?
5    A    The oysters clearly was Readville,
6  Virginia, which is down on the northern neck close to
7  my home.  The reference on Thursday, the 13th, which
8  says something that's illegible for Tim, Tim's office
9  is in Richmond.  We'll have to wait and see what the
10  clear entry was.  It might indicate something in
11  Richmond; it might indicate something somewhere else.
12    Q.   But there's nothing on the 14th noted there
13  to the contrary that suggests that you were in Richmond
14  on the 14th; the charity ball reference would suggest
15  that you were, at least at that part of the day you
16  were in McLean?
17    A    No.
18    Q.   No?
19    A    The charity ball could have been in
20  Richmond or McLean.
21    Q.   Or McLean, okay, so that's a wash?

Page 140

1    A    It doesn't, it doesn't help us.
2    Q.   And, I guess we should mark this.  We've
3  been referring to a photocopy of a page from the
4  Governor's, what do you call it, your --
5    A    Pocket calendar.
6      MR. GOTTESDIENER:  Pocket calendar?  Do you
7  know what the last exhibit --
8      MR. WELLSCHLAGER:  I think the last one was
9  18 but you might just use twenty just to be safe.
10      MR. MR. GOTTESDIENER:  Sure.  Okay.  So,
11  I'll mark this as 20.
12      (Deposition Exhibit Number 20 was marked
13  for purposes of identification.)
14      MR. WELLSCHLAGER:  Before I forget, Eli --
15      MR. GOTTESDIENER:  Yep.
16      MR. WELLSCHLAGER:  -- I don't have copies
17  of exhibits 1 through 18, I mean, other than going back
18  and pulling out the Bates --
19      MR. GOTTESDIENER:  I thought we, I sent you
20  a whole set.
21      MR. WELLSCHLAGER:  I don't think you did.

Page 141

1      MR. GOTTESDIENER:  Yeah, I made copies of
2  all of it.
3      MR. WELLSCHLAGER:  I don't think I ever got
4  them.  I remember asking for them a couple times.
5      MR. GOTTESDIENER:  I shipped them in like
6  -- okay.  We'll talk about it.  I'll get out the Fed-Ex
7  label and package and all that.
8      BY MR. GOTTESDIENER:
9    Q.   So just showing you what we have been
10  talking about, just have you identify it for the
11  record, Exhibit 20 is a photocopy, appears to be a
12  photocopy of the pocket calendar for the dates that
13  we've been discussing, is that right?
14    A    Yes.  For the period between 10 September,
15  a Monday, and 16th, in the year 2001, from my pocket
16  calendar, a substantial portion of which is basically
17  illegible.
18    Q.   The discussion we were having before the
19  break about the fact that you just learned the manner
20  in which John Carten would affix your signature, being
21  by cutting and pasting a photocopy of a signature on

36  (Pages 138 to 141)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 142

1  some other document, you know from the fact that you
2  just learned that, that you didn't until yesterday
3  actually see the thing that he affixed your signature
4  to, the resolution, right?
5      A    I think that's correct.
6      Q.   So, you didn't see this unanimous written
7  consent document until yesterday?
8      A    I think that's correct.
9      MR. WELLSCHLAGER:  The signed version?
10     Q.   Any version.  You didn't see the unsigned
11  or the signed version until yesterday?
12     A    Well, I don't know that.  I don't, I think
13  it's true that I didn't see the signed version until
14  yesterday.
15     Q.   Well, it's also, you're fairly confident,
16  true, that you didn't see the unsigned version on the
17  day that you gave him the authorization to sign?
18     A    I think that's a fair conclusion.  I may
19  have seen that document later, at which time I would
20  have looked at it and thrown in the waste basket
21  because it was done.

Page 143

1      Q.   And you wouldn't have, the day that you
2  authorized him to sign it, seen anything else that was
3  part of the fax that the unsigned resolution page had
4  on it or came with it?
5      MR. WELLSCHLAGER:  Objection to the form.
6      A    You got me all curly-cued there.
7      Q.   Sorry.  Just my point is, is that if the
8  fax had a fax cover sheet and some other documents
9  along with the one-page unanimous consent form, you
10  didn't see that on September 14th, 2001 either?
11     MR. WELLSCHLAGER:  Objection to form.
12     Q.   You didn't see any of that on 2001, 14th,
13  right?
14     MR. WELLSCHLAGER:  Objection to form.  If
15  you just add the words fairly confident --
16     MR. GOTTESDIENER:  Fairly confident, yes.
17     MR. WELLSCHLAGER:  -- I'll withdraw my
18  objection.
19     Q.   You're fairly confident you didn't see any
20  of that fax on that day?
21     A    That's a good way to state it.

Page 144

1      Q.   And, you're reasonably confident that
2  Mr. Carten on that day was the only person at Amtrak
3  that you discussed this with?
4      A    Yes.
5      Q.   And, you're very confident that you didn't
6  discuss it with any other director that day?
7      A    Very confident.
8      Q.   And, you're reasonably confident that you
9  didn't discuss it with Alicia Serfaty that day?
10     A    I don't have any recollection of any
11  conversation with Alicia Serfaty that day but I would
12  not speculate even to the extent of reasonable
13  confidence.
14     MR. GOTTESDIENER:  Okay.  Let me show you
15  what has previously been marked Exhibit 4.  And, John,
16  because I guess --
17     MR. WELLSCHLAGER:  I have it.
18     MR. GOTTESDIENER:  You do have it?
19     MR. WELLSCHLAGER:  I have it.
20     MR. GOTTESDIENER:  You don't have it marked
21  but --

Page 145

1      MR. WELLSCHLAGER:  It's just the whole set
2  of consents, right?
3      MR. GOTTESDIENER:  Well, it's the --
4      MR. WELLSCHLAGER:  I'm sorry.  I didn't
5  mean to speak out of turn.
6      MR. GOTTESDIENER:  It's the packets that
7  was produced that has faxes and attachments to three of
8  six directors.  This --
9      MR. WELLSCHLAGER:  Yeah.  That's different
10  than what I was about to pull out.  Thanks.
11     BY MR. GOTTESDIENER:
12     Q.   While you're looking, without wanting to
13  rush you at all, I'm wondering if you could be thinking
14  of the question, and maybe answer it if you can, have
15  you ever seen this, these documents assembled in this
16  manner, in this order, but, more importantly, in this
17  manner, where there are, you know, not to give evidence
18  but there are fax cover sheets to three different
19  directors with attachments, including yourself?
20     A    Have I ever seen the package?
21     Q.   Yeah.  Have you ever seen it in this form?

37 (Pages 142 to 145)

b12f5e7a-908d-4b27-bf7f-598cdeeeedd9

Linwood Holton - 11/19/04

Page 146

1    A    I don't think I have.
2    Q.    You've seen the last fax that starts with
3  Bates number AMT 7293, this cover sheet, and then an
4  executive summary of two pages, and then an unsigned
5  resolution form; that document you saw, for example,
6  yesterday?
7    A    That document is addressed to me, and I do
8  recall having seen that.
9    Q.    And, and, that document has, turning to, if
10  you would please, 7293, the one that is the fax cover
11  sheet?
12    A    All right.
13    Q.    You see that?
14    A    Yep.
15    Q.    And, that, at least on its face, is
16  addressed from Mr. Serfaty to you; you would agree with
17  that, right?
18    A    Yeah.
19    Q.    And it starts in the narrative portion per
20  our discussion?
21    A    Correct.

Page 147

1    Q.    And, then it also says please call me if
2  you have any further questions.
3    A    All right.  It does say that.
4    Q.    Now, having seen this, do you think you may
5  have had a discussion with her in which you asked her
6  questions about this proposal or do you think that that
7  may just be John Carten, or what?  I withdraw the
8  second part?
9    A    I just don't have any recollection of it.
10    Q.    Well, seeing that, do you think you may
11  have spoken with her that day?  Let me withdraw the
12  question.
13    A    Are you asking me --
14    Q.    No, let me withdraw the question.
15    A    All right.
16    Q.    Let me ask you this.  Have you ever in the
17  five years that you served at Amtrak, had you ever
18  received something in the nature of a communication
19  from Amtrak where it on its face was not exactly
20  accurate and, but, you understood generally that it was
21  properly directed, or -- that's just, I'm not even

Page 148

1  going to justify that and I haven't had any lunch.
2  Withdrawn.
3        MR. WELLSCHLAGER:  It reminds me of that
4  joke, that question ought to be taken out and shot.
5    Q.    I had it.  Certainly you don't believe
6  based on your experience generally and in particular
7  with Amtrak, you don't believe that just because this
8  fax says per our discussion it's literally addressed
9  from Ms. Serfaty and it says call me if you have
10  further questions, that you spoke with her and that you
11  had questions about the proposal; you don't think that
12  just because this says that, that that occurred?
13    A    Not necessarily, no.  But, it indicates
14  that we had some kind of a discussion.
15    Q.    So that it does indicate --
16    A    And I don't have any quarrel with that.
17    Q.    But you also don't have any recollection of
18  it?
19    A    Exactly.
20    Q.    Now, at the time do you know how many
21  directors there were on the board, September 2001?

Page 149

1    A    No.
2    Q.    I represent to you that there were six.
3    A    Okay.  I can accept that.  That would be
4  consistent with my general recollection.
5    Q.    Was there a time ever that you served where
6  there was seven directors?
7    A    I think so, yes.  I think so.  I think that
8  we had seven before Tommy Thompson was selected by the
9  President to be Secretary of Health and Human Services.
10    Q.    Do you know whether there is any
11  requirement in law as to the number of directors that
12  there must be?
13        MR. WELLSCHLAGER:  Objection to the form of
14  the question.  Go ahead and answer.
15    A    I understood that seven directors were
16  authorized and I think I understood that a quorum was
17  six.  But, those are vague recollections and those
18  would have been matters that I would have relied on for
19  counsel, not to have a specific representation but to
20  certainly see that we were acting with proper number of
21  directors and with a proper quorum.

38  (Pages 146 to 149)

Linwood Holton - 11/19/04

Page 150

1    Q.   You used the word seven as being maybe your
2  recollection as that being the number that was
3  authorized.  My question was required.  Do you have any
4  knowledge or recollection that seven was required?
5    A.   No.
6    Q.   Do you know of any inquiry that was made by
7  anyone while you served as a director as to whether
8  seven were required?
9    A.   Toward the end of my term, after John
10 Robert Smith's term expired, and maybe somebody else's
11 term expired, we got down to three or four and we
12 authorized an executive committee to act in case the
13 action of the board was questioned by anybody.  But, I
14 didn't reach any conclusion other than that the legal
15 department was discussing those numbers with lawyers at
16 the transportation department, I think, and perhaps
17 with the White House, about whether Amtrak could act
18 through an executive committee.  All that was
19 informally discussed.  I don't think any action was
20 ever taken but the conclusion was that we could act.
21 And, what was required by the statute and so forth, I

Page 151

1  don't know because I didn't look.
2    Q.   Are you aware from any source whatsoever
3  that John Carten has testified that he affixed a
4  photocopy of your signature to other of these unanimous
5  consent resolutions?
6    A.   Am I aware from any source whether John has
7  affixed my signature to other documents?
8    Q.   Actually that he has testified that he has
9  done so?
10   A.   Oh.  No, I don't know what he's testified
11 to.
12   Q.   Well, then, how about the way you phrased
13 it.  Are you aware that he has, as a matter of fact,
14 affixed your, a photocopy of your signature to other
15 unanimous consent documents?  I'm not talking about any
16 document like a letter to, you know, a Congressman --
17   A.   Yeah.
18   Q.   -- either a Congressman, I mean, but an
19 action of the board, unanimous consent resolution?
20   A.   Am I aware?
21   Q.   That he's done that?

Page 152

1    A.   I am not.  I, uh, I think that's the
2  correct answer.  I don't know of any.
3    Q.   Other than this, or --
4    A.   You're talking about how he did it, you
5  said by a photocopy?
6    Q.   Oh, no.  I'm saying the fact that --
7    A.   You said photocopy.
8    Q.   Yeah.  I was adding that in because we've
9  established that that's how it was done and you know
10 that, so withdrawn.
11   A.   Well, that was how it was done on the
12 document of September the 14th, 2001.  I'm not aware of
13 how he's done it any other time.
14   Q.   Are you, I just -- you may say that I've
15 asked this question.  I may have gotten this evidence
16 from you in response to another question.  Are you
17 aware that he has affixed your signature in some manner
18 to other unanimous consent resolutions?
19   A.   I think I would have to say that I
20 authorized him to but what he did, I don't know about.
21   Q.   How many times would you estimate he was

Page 153

1  directed by you to do that or authorized by you to do
2  that?
3    A.   To suggest a number of times would be
4  completely speculative.  My best answer would be not
5  many.  I was at practically all of the board meetings
6  that were held while I was a director.  I don't think I
7  missed more than one or possibly two.  So, there wasn't
8  occasion for this very frequently.
9    Q.   Well, your answer, Governor, though,
10 suggests we're not exactly on the same page.  I'm
11 not --
12   A.   Okay.
13   Q.   Unanimous consent resolutions are not
14 needed when there's a meeting of the board?
15   A.   Right.
16   Q.   Right?
17   A.   Right.
18   Q.   When are they needed?  When there's no
19 meeting of the board, so, your attendance was probably
20 a hundred percent.  But, I'm asking, how many times
21 when there was no meeting of the board?

GORE BROTHERS Reporting & Video Co., Inc.                    Towson Reporting
410-837-3027                                                 410-828-4148

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 154

1    A    And the best answer I can give you is not
2   many.
3    Q.    Do you remember any of the facts or
4   circumstances of any of those other not many times?
5    A    No.  And I would clarity the previous
6   answer a little bit by saying I authorized, I think I
7   authorized John to put my signature on documents, not
8   many times but whether those documents were unanimous
9   consent documents or not, is not clear in my
10  recollection.  They could have been
11  other papers that required my signature that I
12  authorized him to put my name on.
13   Q.    So, it's possible that this is the only
14  unanimous consent resolution?
15   A    Possible.  Sure, it's possible.
16   Q.    Did you make any distinction in your mind
17  between the nature of documents to which you felt
18  comfortable giving him that authority?
19   A    No.
20   Q.    Do you today make any such distinction?
21   A    No.  I guess it would depend on what those

Page 155

1   documents were.
2    Q.    Well, like a letter, like to a Congressman,
3   like we were saying or I was saying?
4    A    I would, I would think if he could, if he
5   could sign the more formal document, certainly he could
6   sign a letter to a Congressman and I would assume yes.
7    Q.    Well, okay, but how about the other way
8   around, do you make a distinction now between --
9    A    I do not.
10   Q.    If you would indulge me, please.  The fax
11  machine that you have in Weems, what kind of fax
12  machine is it?  And I know you find all this kind of
13  funny, but, I think we all do, but, you're just being
14  exposed to it now.  What is your, what is the kind of
15  machine you have in Weems or, more precisely, what was
16  the kind of machine you had in 2001?
17   A    Whatever I have now is what I had then.
18  It's a little machine about fourteen inches wide, eight
19  or ten inches deep, three or four inches high.  I don't
20  know the name of it, who made it.  It came from
21  employment I had with an organization called Leader,

Page 156

1   which was an organization designed to create a special
2   tax district in Fairfax County to raise the Fairfax
3   County's share of the cost of extending the Washington
4   subway to Dulles Airport.  It was sent to me as part of
5   that organization.  And I didn't use it very much.  It
6   doesn't work very well.  And, I would just as soon get
7   rid of it.
8    Q.    Is anybody requiring you to keep it?  What
9   is the, I mean when, what year --
10   A    My wife uses it once in awhile.
11   Q.    Oh, she does?  Okay.  What year did you
12  obtain it from them?
13   A    I don't remember.
14   Q.    What year did you work with that
15  organization, years?
16   A    To reconstruct it, the work was completed,
17  I think it was early 2004 and it took about two years
18  to do the job.  So, I probably got that fax machine in
19  early 2002.
20   Q.    So you may not have even had a fax machine?
21   A    May not have even had it in September of

Page 157

1   2001.
2    Q.    So you may not have been able to receive a
3   fax in Weems in September 2001?
4    A    May not have.  May not have.  All of it is
5   speculative.
6    Q.    Well, some of it is not.  You were living
7   in Weems, not McLean in September 2001, right?
8    A    I moved down there in 2000.
9    Q.    And, you did not own a home fax machine
10  prior to receiving this one from Leader?
11   A    Correct.
12   Q.    And, you don't have any reason to think
13  that you received that from Leader during calendar year
14  2001?
15   A    What I gave you about the dates was, as I
16  said, reconstructed from memory, and we could find out
17  when Leader started but I don't remember.
18   Q.    How could we find out; is Leader something
19  that we could, I mean, not this moment but --
20   A    We would have to go to the Corporation
21  Commission, I think, because that's been disbanded,

40  (Pages 154 to 157)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 158

1  expired by reason of not filing the final reports and
2  so forth.  It expired automatically by operation of the
3  law.
4      Q.   Who created Leader?
5      A    Who created Leader?
6      Q.   Yeah.
7      A    I would say that Chuck Robb and I did.
8  Chuck Robb was co-chairman; I was a co-chairman.  And
9  we probably signed the papers that went to the
10  Corporation Commission.
11     Q.   And that would have been filed in Richmond?
12     A    Yes.
13     Q.   And, I mean, was there somebody working on
14  a full-time basis in an office somewhere or --
15     A    It's somewhere along in there we hired an
16  executive director.
17     Q.   And rented space?
18     A    Yeah.  At, on Anderson Road in McLean.
19     Q.   And why did they require you to have a home
20  fax machine?
21     A    They didn't require it but they felt that

Page 159

1  it would facilitate communication between me and that
2  office.  It was dealing with the creation of that
3  special tax district.
4      Q.   And how long after the creation of the
5  entity and it getting space did you receive the fax
6  from them?
7      A    I don't remember.
8      Q.   Was it like right at the beginning or was
9  it after some period of time that they were having
10  difficulty communicating with you?
11     A    They didn't have any difficulty
12  communicating with me.  They could reach me always by
13  phone.  Most frequently that was the way it was done.
14  And even after the fax machine came, I didn't use it
15  very much.
16     Q.   And you said it didn't work very well.
17  What did you mean by that?
18     A    Well, just as an example, my wife and I
19  were sitting there looking at the television of a news
20  broadcast, within the last ten days, and the phone rang
21  four different times with a distinctive ring for the

Page 160

1  fax machine and nothing came out of it.
2      Q.   Is that a, when say a distinctive ring, is
3  there a separate phone line or it's a separate ring
4  or --
5      A    It's a separate ring.
6          MR. GOTTESDIENER:  I think that's about all
7  I have.  I would ask just if we could break very
8  briefly so I could review and that would be subject to
9  production of other documents but if we could take five
10  minutes, I can assure myself I'm done.
11         MR. WELLSCHLAGER:  Sure.
12         (There was a break in the proceedings.)
13     Q.   I probably got this in some other fashion
14  so I just want to just make sure.  Before authorizing
15  Mr. Carten to affix your name to the unanimous consent
16  resolution, you didn't go either that day or some other
17  day prior and personally read what provision of law
18  governed the unanimous consent procedure?
19     A    I did not.
20     Q.   And, it would be fair to say that there
21  were times where you would go to an actual board

Page 161

1  meeting where over the course of the meeting and over
2  the course of a period of time when an issue was being
3  discussed and presented to you where your thinking
4  about that issue evolved from you believing you would
5  hold one position to you coming to the conclusion that
6  you actually held a different one?
7      A    What are you saying?
8      Q.   Over the course of meetings at Amtrak that
9  the board assembled, as matters were discussed and more
10  information came out and views were exchanged, you
11  would on occasion find that a position that you thought
12  you were going to take, as you heard the matter
13  discussed initially, changed as you heard more
14  information and there was an exchange of views; that
15  occurred, did it not, not every time but it did occur?
16     A    The question is so speculative that I
17  don't --
18     Q.   It's not speculative at all.
19     A    Sure, it is.
20     Q.   It's asking in all of the meetings in five
21  years, isn't it the case that on occasion maybe a lot

41 (Pages 158 to 161)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

Page 162

1   of times, maybe not that many, but on occasion you
2   would begin at the beginning of a topic and a
3   conversation and exchange of views and think this is
4   where I'm going to come out on this but then as things
5   moved on and there was an exchange of views, more
6   information came out and you heard it back and forth
7   and you participated in it where you arrived at a
8   different place than you started at; that did occur --
9   that's not speculation -- did that not occur?
10      A    It's speculation as to whether it occurred
11  or not because I don't remember that it occurred, that
12  I had a preconceived notion when I went into a meeting
13  and changed my mind.
14      Q.   I'm sorry.  Not preconceived before you
15  went in, I mean conceived at the beginning of learning
16  information about it.  So, in the circumstance of we
17  have a proposal to build a new facility in X, Y and Z
18  place and you just hear a bit of it and you say, you
19  know, I don't think that's probably good for the
20  corporation right now, that sort of thing, not where
21  you came into the meeting with an idea, but as the

Page 163

1   topic was being discussed initially, as you learned
2   what the nature of it was, and something about it, your
3   initial impression was I am probably not going to be in
4   favor of this or I am in favor of it, but then as more
5   information came out, five, ten minutes, fifteen
6   minutes discussion, you realized that you hadn't fully
7   heard everything, you hadn't heard an exchange of
8   views, you hadn't reflected, you hadn't engaged and now
9   actually you came out differently than at the beginning
10  of the discussion at the meeting; that did occur, did
11  it not?
12         MR. WELLSCHLAGER:  I'm going to object to
13  the form of the question.  Go ahead and answer.
14      A    I don't, I just, to me the question
15  requires me to speculate whether I did go through this
16  change of mind or change of impressions.
17      Q.   How about evolution of thinking, how about
18  that?
19      A    Or evolution of thinking, you're asking me
20  to speculate --
21      Q.   No.

Page 164

1      A    -- whether I had an evolution of thinking
2   and I can't recall that I did or did not.
3         MR. GOTTESDIENER:  Okay.
4         THE WITNESS:  Is that it?
5         MR. GOTTESDIENER:  That's it subject to
6   further document production.
7         THE WITNESS:  The only document you're
8   talking about is the legible copy of that calendar,
9   desk, pocket calendar.
10        MR. GOTTESDIENER:  No.  I'm talking about
11  other documents that Amtrak is supposed to be producing
12  to us.
13        THE WITNESS:  Oh, okay.
14        MR. GOTTESDIENER:  Okay?
15        MR. WELLSCHLAGER:  We have an
16  understanding.
17        MR. GOTTESDIENER:  Thank you very much,
18  Governor.
19        THE WITNESS:  Thank you, sir.
20        MR. GOTTESDIENER:  We're off the record.
21          (A discussion was held off record.)

Page 165

1         MR. WELLSCHLAGER:  We will read and sign.
2   (Deposition concluded at 1:50 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

42 (Pages 162 to 165)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

Linwood Holton - 11/19/04

---

Page 166

1          CERTIFICATE OF DEPONENT
2          I hereby certify that I have read and
3   examined the foregoing transcript, and the same is a
4   true and accurate record of the testimony given by me.
5
6          Any additions or corrections that I feel
7   are necessary, I will attach on a separate sheet of
8   paper to the original transcript.
9
10         _____
11         Linwood Holton
12
13
14
15
16
17
18
19
20
21

---

Page 168

1                  INDEX
2          Deposition of Linwood Holton
3              November 19, 2004
4
5   Examination by:                    Page
6     Mr. Gottesdiener                  2
7
8
9   Exhibit No.                    Marked
10    20  Photocopy of Pocket Calendar        140
11
12
13
14
15
16
17
18

---

Page 167

1   State of Maryland
2   Baltimore County, to wit:
3          I, ROBERT A. SHOCKET, a Notary Public of
4   the State of Maryland, County of Baltimore, do hereby
5   certify that the within-named witness personally
6   appeared before me at the time and place herein set
7   out, and after having been duly sworn by me, according
8   to law, was examined by counsel.
9          I further certify that the examination was
10  recorded stenographically by me and this transcript is
11  a true record of the proceedings.
12         I further certify that I am not of counsel
13  to any of the parties, nor in any way interested in the
14  outcome of this action.
15         As witness my hand and notarial seal this
16  7th day of December, 2004.
17
18         ------------------
19         Robert A. Shocket, Notary Public
20  My Commission Expires:
21  November 1, 2006

---

43 (Pages 166 to 168)

b12f5e7a-908d-4b27-bf7f-598cdeeeed9

**<u>Exhibit 58</u>**

To:                ReisigW @amtrak.com
From:              Charles_M_Kramer@aoncons.com
Cc:                Kon-Kyu_Pak@aoncons.com; Ron_DeStefano@aoncons.com;
Helen_Reynolds@aoncons.com; Matt_W_Quade@aoncons.com
Bcc:
Received Date:     2001-09-11 09:37:27
Subject:           Cost factors as of August 31, 2001 [.]

---

Warren,

Per your request, the first sheets in each of the attached three workbooks show the cost factors as of August 31, 2001. They confirm the $18.6 million surplus estimated at that date that Dale Stein and I discussed yesterday. The sheets are for 50%, 60% and 75% participation with a 5 year age subsidy for early retirement and a flat $15,000 lump sum payment.

Please call if you need anything else.

Charlie

(See attached file: AonVal-IndivResultsf050PctLS15K0831.xls)(See attached file: AonVal-IndivResultsf060PctLS15K0831.xls)(See attached file: AonVal-IndivResultsf075PctLS15K0831.xls)

---

Attachments:

Microsoft Excel 97
Microsoft Excel 97~
Microsoft Excel 97~~



**Charles M Kramer**
09/11/2001 10:26 AM

To: Helen Reynolds/COM/Aon Consulting@AonNA
cc:
Subject: Re: Amtrak's VERP schedule

Warren called about half an hour ago to ask for some refinements to the cost estimates. He still believes the most likely scenario is the 5 year age subsidy coupled with a $15,000 lump sum. He has a meeting this afternoon at an unspecified time.

Helen Reynolds



Helen Reynolds
09/11/2001 09:44 AM

To:      Charles M Kramer/DB/Aon Consulting@AonNA
cc:

Subject:  Re: Amtrak's VERP schedule

Warren and I spoke on Saturday and agreed to talk on Tuesday. He also left me a voice mail message yesterday with the latest plan design. I'll be revising the materials accordingly. I don't know if we want to wait until we get approval from the Board to distribute materials to employees. I plan to talk to Warren later today.

Helen
Charles M Kramer

Charles M Kramer
09/10/2001 09:40 AM

To:      Ron DeStefano/ACG/Aon Consulting@AonNA, Matt W Quade/HW/Aon Consulting@AonNA, Kon-Kyu
         Pak/ACT/Aon Consulting@AonNA, Helen Reynolds/COM/Aon Consulting@AonNA
cc:

Subject:  Amtrak's VERP schedule

I just spoke with Roe Tana. She called on Warren's behalf asking how close we were to giving their benefit calculations final approval.

I told Roe we're still off on the 40+ people with intermittent management service (no surprise to Roe), although we should have our final calculations for them done today. The remainder look very good, except for the 10CC and 20CC options under the VERP. They may use our numbers for those.

Roe seems to know about 90% of what we know, including the possibility of a lump sum payment. Warren's meeting is scheduled for 3:00 today, and he is hoping for a resolution that will permit a mail merge to start on Wednesday.

Helen, I'm not sure Warren is fully aware of your schedule if there are changes to the program. From our conversation on Friday, it doesn't sound like they could actually get a mailing out on Wednesday. Is Thursday a possibility? Can you call Warren?

AMT(AON)000049

**Exhibit 59**

WADE HALL, ET AL. V. NRPC
9/14/01 Board Resolution re 2001 VERP and
Cover Sheet to DOT

**AMT007283**



EXHIBIT NO. _____
DATE _____
REPTR _____
**L.A.D. REPORTING**

# Fax Cover Sheet
## 4 pages, including cover

## Amtrak Board Liaison Office
### Union Station
### 60 Massachusetts Ave., N.E.
### Washington, DC 20002

**Date:** September 14, 2001

**TO:**      Mr. Michael Jackson
             Deputy Secretary, US DOT

**FAX:**     202-366-3937

**FROM:**    Alicia Serfaty

**FAX:**     202/906-2921  ATS 777-2921
**PHONE:**   202/906-2198  ATS 777-2198

Per our discussion, attached is the amended executive summary and resolution for the voluntary early retirement program. Please execute the resolution and fax to John Carten at 202-906-2921. Please call me if you have any further questions.

This facsimile transmission may contain confidential or legally privileged information that is intended only for the individual or entity named on this transmittal sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this facsimile is strictly prohibited. If you have received this facsimile transmission in error, please notify us immediately by telephone so that we can arrange for the return of the transmitted materials to us at no cost to you.

**AMT007284**

**Amtrak Board of Directors**
**Agenda Item Executive Summary**

**Title**:  Amended Management Voluntary Early Retirement Plan

**Background**:
As part of Amtrak's efforts to streamline its organization, eliminate inefficiencies and reduce costs, the Board approved a Voluntary Early Retirement Plan (VERP) at its meeting on July 26, 2001.  The VERP as approved had two main components: (i) five years of age added to Amtrak's pension formula; and (ii) a full supplement to the Railroad Retirement benefits that would otherwise be available until age 65.  Management planned to fund the VERP benefits through the accumulated surplus in Amtrak's Retirement Income Plan Trust (the "Fund"). Because a portion of the pension funds in this Fund are invested in the stock market and the market has experienced a recent downturn, before proceeding further with the VERP Senior Management requested an updated actuarial analysis to ensure that the integrity of the pension fund is preserved.

The updated analysis showed that if Management proceeded with the plan as originally formulated, the surplus in the Fund would be depleted and the company would be required to make a significant contribution to the Fund as early as 2003.  According to the actuary, as a result of a combination of market conditions, additional accrued liabilities and withdrawals, the forecasted surplus in the Fund has declined from approximately $42 million in December 2000 to $18.6 million on August 31, 2001.[1]  While Management expects the Fund to continue to grow over the long term, it has nevertheless determined that it would be prudent to offer a more modest VERP than originally envisioned and maintain a surplus in the Fund.  Consequently, Management proposes to eliminate the second component of the plan, the more costly Railroad Retirement supplement, and instead offer a one-time lump sum payment of $15,000.

The revised VERP would provide that any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to the pension formula; and
- A one-time lump sum payment of $15,000.00

---

[1] The reduction of what appears to be $23.3 million accounts for approximately $3.1 million of pension payments, $7.5 million of accruals and $11.7 million of investment loss.  Our actuary indicates that Amtrak's investment return over the last five calendar years was 74% or 12% per annum compounded annually.

AMT007285

In order to receive benefits, an employee must elect to retire from Amtrak during the window period and sign a release agreement.  The employee must also agree not to exercise seniority rights back into an agreement-covered position.

Based on current actuarial forecasts and the anticipated costs of this amended plan, the Fund will show at least a $10 million surplus and Amtrak will therefore continue to enjoy a contribution holiday for several more years.  Management estimates that participation in the VERP will be somewhere between 50 to 60 percent, down from 75% expected for the original plan.  At these levels of participation, the VERP as revised is estimated to cost approximately $ 7.2 million at 50 percent participation and $8.6 million at 60 percent.

**Recommended Action**:
Management recommends that the Board approve the attached resolutions authorizing an amendment to the Voluntary Early Retirement Plan as set forth above.

AMT007286

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:


_____            September 14, 2001
Board Member                                Date


**AMT007287**

Fax Cover Sheet
5 pages, including cover

Amtrak Board Liaison Office
Union Station
60 Massachusetts Ave., N.E.
Washington, DC 20002

**Date:** September 14, 2001

**TO:**       Amy Rosen

**FAX:**      973-744-4928

**FROM:**     Alicia Serfaty

**FAX:**      202/906-2921  ATS 777-2921
**PHONE:**    202/906-2198  ATS 777-2198

Per our discussion, attached is the amended executive summary and resolutions for the voluntary early retirement program. Please execute the resolution and fax to John Carten at 202-906-2921. I have also included the most recent draft of the letter to employees. Please call me if you have any further questions.

This facsimile transmission may contain confidential or legally privileged information that is intended only for the individual or entity named on this transmittal sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this facsimile is strictly prohibited. If you have received this facsimile transmission in error, please notify us immediately by telephone so that we can arrange for the return of the transmitted materials to us at no cost to you.

AMT007288

**Amtrak Board of Directors**
**Agenda Item Executive Summary**

**Title**: Amended Management Voluntary Early Retirement Plan

**Background**:
As part of Amtrak's efforts to streamline its organization, eliminate inefficiencies and reduce costs, the Board approved a Voluntary Early Retirement Plan (VERP) at its meeting on July 26, 2001. The VERP as approved had two main components: (i) five years of age added to Amtrak's pension formula; and (ii) a full supplement to the Railroad Retirement benefits that would otherwise be available until age 65. Management planned to fund the VERP benefits through the accumulated surplus in Amtrak's Retirement Income Plan Trust (the "Fund"). Because a portion of the pension funds in this Fund are invested in the stock market and the market has experienced a recent downturn, before proceeding further with the VERP Senior Management requested an updated actuarial analysis to ensure that the integrity of the pension fund is preserved.

The updated analysis showed that if Management proceeded with the plan as originally formulated, the surplus in the Fund would be depleted and the company would be required to make a significant contribution to the Fund as early as 2003. According to the actuary, as a result of a combination of market conditions, additional accrued liabilities and withdrawals, the forecasted surplus in the Fund has declined from approximately $42 million in December 2000 to $18.6 million on August 31, 2001.[1] While Management expects the Fund to continue to grow over the long term, it has nevertheless determined that it would be prudent to offer a more modest VERP than originally envisioned and maintain a surplus in the Fund. Consequently, Management proposes to eliminate the second component of the plan, the more costly Railroad Retirement supplement, and instead offer a one-time lump sum payment of $15,000.

The revised VERP would provide that any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to the pension formula; and
- A one-time lump sum payment of $15,000.00

---

[1] The reduction of what appears to be $23.3 million accounts for approximately $3.1 million of pension payments, $7.5 million of accruals and $11.7 million of investment loss. Our actuary indicates that Amtrak's investment return over the last five calendar years was 74% or 12% per annum compounded annually.

AMT007289

In order to receive benefits, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

Based on current actuarial forecasts and the anticipated costs of this amended plan, the Fund will show at least a $10 million surplus and Amtrak will therefore continue to enjoy a contribution holiday for several more years. Management estimates that participation in the VERP will be somewhere between 50 to 60 percent, down from 75% expected for the original plan. At these levels of participation, the VERP as revised is estimated to cost approximately $ 7.2 million at 50 percent participation and $8.6 million at 60 percent.

**Recommended Action**:
Management recommends that the Board approve the attached resolutions authorizing an amendment to the Voluntary Early Retirement Plan as set forth above.

**AMT007290**

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.


Approved:


_____          September 14, 2001
Board Member                                Date


**AMT007291**

NATIONAL RAILROAD PASSENGER CORPORATION
60 Massachusetts Avenue, NE, Washington, DC 20002



September 13, 2001

# DRAFT

Dear Amtrak Colleague:

As you know, Amtrak is offering a Voluntary Early Retirement Plan (VERP) as part of the overall restructuring of the company. The purpose of this letter is to advise you of changes that Amtrak is making to the plan.

Like other companies, Amtrak planned to fund this program from its surplus retirement funds. Since a portion of these funds are invested in the stock market, which has experienced recent fluctuations, senior management requested an updated actuarial analysis be completed to ensure the utmost integrity of the retirement fund.

The updated analysis showed that Amtrak would be able to continue to offer a VERP and maintain the surplus in the retirement fund that provides a buffer against future stock market fluctuations, as well as to ensure its integrity for future Amtrak retirees. However, in order to accomplish these objectives, a more modest VERP would need to replace the plan initially outlined last month. While not as generous as hoped, management remains committed to offering a VERP.

As previously discussed, the Voluntary Early Retirement Plan will be offered to those 55 years or older with at least 10 years of Amtrak service as of October 31, 2001. Under this plan, you will retire on November 1, 2001.

If you choose this plan, Amtrak will:

- Add five years to your age when computing your (Amtrak) Retirement Income Plan benefit.
- Allow you to enroll in Amtrak Retiree Medical coverage. The Retiree Medical options are described in the enclosed booklet describing the VERP.
- Provide a one-time lump sum payment in the gross amount of $15,000. Amtrak will not be able to provide a supplemental for those who will not yet receive full Railroad Retirement Annuity benefits, as first announced.

If you elect this plan, you must complete and return an election form during the window period of September 15th to October 31, 2001.

Sincerely,

**AMT007292**

Lorraine Green
*Vice President, Human Resources*

# Fax Cover Sheet
4 pages, including cover

## Amtrak Board Liaison Office
### Union Station
### 60 Massachusetts Ave., N.E.
### Washington, DC 20002

**Date:** September 14, 2001

**TO:**      Governor Holton

**FAX:**      804-775-3816

**FROM:**    Alicia Serfaty

**FAX:**      202/906-2921  ATS 777-2921
**PHONE:**   202/906-2198  ATS 777-2198

Per our discussion, attached is the amended executive summary and resolutions for the voluntary early retirement program.  Please call me if you have any further questions.

This facsimile transmission may contain confidential or legally privileged information that is intended only for the individual or entity named on this transmittal sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or reliance upon the contents of this facsimile is strictly prohibited.  If you have received this facsimile transmission in error, please notify us immediately by telephone so that we can arrange for the return of the transmitted materials to us at no cost to you.

AMT007293

**Amtrak Board of Directors**
**Agenda Item Executive Summary**

**Title**: Amended Management Voluntary Early Retirement Plan

**Background**:
As part of Amtrak's efforts to streamline its organization, eliminate inefficiencies and reduce costs, the Board approved a Voluntary Early Retirement Plan (VERP) at its meeting on July 26, 2001. The VERP as approved had two main components: (i) five years of age added to Amtrak's pension formula; and (ii) a full supplement to the Railroad Retirement benefits that would otherwise be available until age 65. Management planned to fund the VERP benefits through the accumulated surplus in Amtrak's Retirement Income Plan Trust (the "Fund"). Because a portion of the pension funds in this Fund are invested in the stock market and the market has experienced a recent downturn, before proceeding further with the VERP Senior Management requested an updated actuarial analysis to ensure that the integrity of the pension fund is preserved.

The updated analysis showed that if Management proceeded with the plan as originally formulated, the surplus in the Fund would be depleted and the company would be required to make a significant contribution to the Fund as early as 2003. According to the actuary, as a result of a combination of market conditions, additional accrued liabilities and withdrawals, the forecasted surplus in the Fund has declined from approximately $42 million in December 2000 to $18.6 million on August 31, 2001.[1] While Management expects the Fund to continue to grow over the long term, it has nevertheless determined that it would be prudent to offer a more modest VERP than originally envisioned and maintain a surplus in the Fund. Consequently, Management proposes to eliminate the second component of the plan, the more costly Railroad Retirement supplement, and instead offer a one-time lump sum payment of $15,000.

The revised VERP would provide that any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to the pension formula; and
- A one-time lump sum payment of $15,000.00

---

[1] The reduction of what appears to be $23.3 million accounts for approximately $3.1 million of pension payments, $7.5 million of accruals and $11.7 million of investment loss. Our actuary indicates that Amtrak's investment return over the last five calendar years was 74% or 12% per annum compounded annually.

AMT007294

In order to receive benefits, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

Based on current actuarial forecasts and the anticipated costs of this amended plan, the Fund will show at least a $10 million surplus and Amtrak will therefore continue to enjoy a contribution holiday for several more years. Management estimates that participation in the VERP will be somewhere between 50 to 60 percent, down from 75% expected for the original plan. At these levels of participation, the VERP as revised is estimated to cost approximately $ 7.2 million at 50 percent participation and $8.6 million at 60 percent.

**Recommended Action:**
Management recommends that the Board approve the attached resolutions authorizing an amendment to the Voluntary Early Retirement Plan as set forth above.

**AMT007295**

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

_____          September 14, 2001
Board Member                              Date

**AMT007296**

**Exhibit 60**

HALL, ET AL. V. NRPC
Resolutions re Amendment to 2001 VERP-
Signed by Board Members

AMT007270

**RESOLUTIONS AUTHORIZING AMENDMENT TO
2001 VOLUNTARY EARLY RETIREMENT PLAN**

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

Board Member

September 14, 2001
Date

**AMT007274**

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

_____                    September 14, 2001
Board Member                                          Date

AMT007275

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.


Approved:


*Linwood Holton*
_____              September 14, 2001
Board Member                         Date


**AMT007276**

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

Michael Jackson
Board Member

September 14, 2001
Date

AMT007277

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

_____
Board Member

September 14, 2001
Date

AMT007278

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

Board Member

September 14, 2001
Date

AMT007279

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

National Railroad Passenger Corporation
Board of Directors
Adopted September 14, 2001

AMT007271

## Amtrak Board of Directors
## Agenda Item Executive Summary

**Title**: Amended Management Voluntary Early Retirement Plan

**Background**:
As part of Amtrak's efforts to streamline its organization, eliminate inefficiencies and reduce costs, the Board approved a Voluntary Early Retirement Plan (VERP) at its meeting on July 26, 2001. The VERP as approved had two main components: (i) five years of age added to Amtrak's pension formula; and (ii) a full supplement to the Railroad Retirement benefits that would otherwise be available until age 65. Management planned to fund the VERP benefits through the accumulated surplus in Amtrak's Retirement Income Plan Trust (the "Fund"). Because a portion of the pension funds in this Fund are invested in the stock market and the market has experienced a recent downturn, before proceeding further with the VERP Senior Management requested an updated actuarial analysis to ensure that the integrity of the pension fund is preserved.

The updated analysis showed that if Management proceeded with the plan as originally formulated, the surplus in the Fund would be depleted and the company would be required to make a significant contribution to the Fund as early as 2003. According to the actuary, as a result of a combination of market conditions, additional accrued liabilities and withdrawals, the forecasted surplus in the Fund has declined from approximately $42 million in December 2000 to $18.6 million on August 31, 2001.[1] While Management expects the Fund to continue to grow over the long term, it has nevertheless determined that it would be prudent to offer a more modest VERP than originally envisioned and maintain a surplus in the Fund. Consequently, Management proposes to eliminate the second component of the plan, the more costly Railroad Retirement supplement, and instead offer a one-time lump sum payment of $15,000.

The revised VERP would provide that any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to the pension formula; and
- A one-time lump sum payment of $15,000.00

---

[1] The reduction of what appears to be $23.3 million accounts for approximately $3.1 million of pension payments, $7.5 million of accruals and $11.7 million of investment loss. Our actuary indicates that Amtrak's investment return over the last five calendar years was 74% or 12% per annum compounded annually.

AMT007272

In order to receive benefits, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

Based on current actuarial forecasts and the anticipated costs of this amended plan, the Fund will show at least a $10 million surplus and Amtrak will therefore continue to enjoy a contribution holiday for several more years. Management estimates that participation in the VERP will be somewhere between 50 to 60 percent, down from 75% expected for the original plan. At these levels of participation, the VERP as revised is estimated to cost approximately $ 7.2 million at 50 percent participation and $8.6 million at 60 percent.

**Recommended Action:**
Management recommends that the Board approve the attached resolutions authorizing an amendment to the Voluntary Early Retirement Plan as set forth above.

AMT007273

**Exhibit 61**



September 14, 2001

Dear Amtrak Colleague:

As you know, Amtrak is offering a Voluntary Early Retirement Plan (VERP) as part of the overall restructuring of the company. The purpose of this letter is to advise you of changes that Amtrak is making to the plan.

Like other companies, Amtrak planned to fund this program from its surplus retirement funds. Since a portion of these funds are invested in the stock market, which has experienced recent fluctuations, senior management requested an updated actuarial analysis be completed to ensure the utmost integrity of the retirement fund.

The updated analysis showed that Amtrak would be able to continue to offer a VERP and maintain the surplus in the retirement fund that provides a buffer against future stock market fluctuations, as well as to ensure its integrity for future Amtrak retirees. However, in order to accomplish these objectives, a more modest VERP would need to replace the plan initially outlined last month. While not as generous as hoped, management remains committed to offering a VERP.

As previously discussed, the Voluntary Early Retirement Plan will be offered to those 55 years or older with at least 10 years of Amtrak service as of October 31, 2001. Under this plan, you will retire on November 1, 2001.

If you choose this plan, Amtrak will:

- Add five years to your age when computing your (Amtrak) Retirement Income Plan benefit.
- Allow you to enroll in Amtrak Retiree Medical coverage. The Retiree Medical options are described in the enclosed booklet describing the VERP.
- Provide a one-time lump sum payment in the gross amount of $15,000. Amtrak will not be able to provide a supplemental for those who will not yet receive full Railroad Retirement Annuity benefits, as first announced.

If you elect this plan, you must complete and return an election form during the window period of September 15th to October 31, 2001.

Sincerely,

*Lorraine A. Green*

Lorraine Green
*Vice President, Human Resources*

**Exhibit 62**

| From: | Green, Lorraine |
|---|---|
| Sent: | Thursday, October 18, 2001 4:34 PM |
| To: | Reisig, Warren |
| Subject: | FW: Verp Package |

**Importance:** High

Warren, could you please respond on my behalf.  Thanks.

-----Original Message-----
| From: | H.       , F |
|---|---|
| **Sent:** | Thursday, October 18, 2001 10:35 AM |
| **To:** | Green, Lorraine |
| **Subject:** | RE: Verp Package |
| **Importance:** | High |

October 18, 2001

Lorraine:

This is a follow up on the memo regarding my question on the Verp Package. I would appreciate a response on this memo.

Thanks a lot.

P   H

-----Original Message-----
| From: | H        P |
|---|---|
| **Sent:** | Monday, October 15, 2001 4:38 PM |
| **To:** | Green, Lorraine |
| **Cc:** | Warrington, George; Bagley, Stan |
| **Subject:** | Verp Package |

October 15, 2001

Dear Lorraine:

Since I had intended to work until age 65 (age now, 62), the first package dated July 30, 2001 and the statement "there would be further reductions in non-agreement workforce", made me reconsider my position. After struggling with a decision, I decided to retire and take the package. Then the second package arrived September 18, 2001, shocking, and with the fear of jobs being cut, etc. has had me totally upset.

While I am thankful there is a package, several things have been bothering me - that we can afford:

   - Cell phone bills - just at the Bear Facility - about $1500.00 a month. I know a national contract is in process, but, until then,
      why don't they pull about half of the <u>unnecessary</u> phones here and across the Company.

   - The K Products Contract for "guest incentitives", that is a lot of money for mugs, beach towels, jackets, etc.

   - The salaries of new employees coming in our departments about $10,000.00 to $15,000.00 higher than ours. (on going  problem throughout the Company for the past several

AMT007078

years).

- The salaries of the jobs now being advertised.

These are some of the reasons that I would like my package revisited, and, hopefully, consideration to increase it in some way. I am asking confidentially, and, I know, you will say "if it is done for one it has to be done for everyone". I am so close to 65, I don't know what the others are doing, I am asking for myself - since each situation is different. I am worried about the effect the last three months has had on my health. We just got over the Profiler and now this. It has been constant for years, job cuts, no raises, and I guess it just catches up.

The statement in the letter of the second package, "company wants to maintain a surplus in the fund to ensure its integrity of future retirees". Well, we gave past retirees $75,000.00 to bridge and $25,000.00 to union people about four years ago, to leave. Even with the fluctuation of the stock market, we will still spend and fill jobs. I have 25 years here and have been a loyal, honest and conscientious employee and I would like to leave with some dignity. Aside from the fact " what a stressful way to leave a place you were dedicated too.

I know you are extremely busy and time is running out, but, I would appreciate your reviewing the package.

Sincerely,

P  H

AMT007079

CONFIDENTIAL

October 21, 2001

<u>Registered and Certified Mail</u>

Ms. Lorraine A. Green
Vice President
Human Resources
Amtrak
60 Massachusetts Avenue, N.E.
Washington, D.C.   20002

Dear Ms. Green:

     This letter acknowledges receipt of the Voluntary Early Retirement (VERP) package dated September 14, 2001 and the first Voluntary Early Retirement letter dated July 30, 2001.

     **<u>I am unable to accept the offer of September 14.</u>**

     **<u>I had planned to accept the Voluntary Early Retirement package offered in the original letter dated July 30, 2001.</u>**

Very truly yours,

Б · P. C

AMT001538

CONFIDENTIAL

October 23, 2001

2001 OCT 29 ⊃ 4: 04

CORPORATE
HUMAN RESOURCES

Lorraine A. Green
National Railroad Passenger Corporation
Vice President Human Resource
60 Massachusetts Avenue, NE
Washington, DC 20002

Dear Ms. Green,

I regret to inform you that I cannot accept Amtrak's offer for early retirement. It would be extremely
difficult to survive on the meager amount you are offering me. I could and would accept it had the original
offer not been altered.

Yours truly,

A.      V. G

AMT001550

CONFIDENTIAL

October 23, 2001

Dear: Ms. Lorraine A. Green

 I am SORRY and REGRET that I can not accept the VERP plan. I could have and would have accepted the plan that was ORIGINALLY announced (outlined).

2001 OCT 30 P 2:52
CORPORATE
HUMAN RESOURCES

AMT001554

CONFIDENTIAL

October 24, 2001

2001 OCT 30 ⊃ 2: 52

Registered and Certified Mail

CO:  ..... :::
HUMAN RESOURCES

Ms. Lorraine A. Green
Vice President
Human Resources
Amtrak
60 Massachusetts Avenue, N.E.
Washington, D.C.   20002

Dear Ms. Green:

     This letter acknowledges receipt of the Voluntary Early Retirement (VERP) package dated September 14, 2001 and the first Voluntary Early Retirement letter dated July 30, 2001.

     **I am unable to accept the offer of September 14.**

     **I had planned to accept the Voluntary Early Retirement package offered in the original letter dated July 30, 2001.**

Very truly yours,

C        R.

AMT001553

**From:** Green, Lorraine
**Sent:** Thursday, October 25, 2001 2:56 PM
**To:** Reisig, Warren; Porter, Paula
**Subject:** FW: VERP

Do either of you know why I am getting this e-mail or the next one I'm sending to you?  Do you think someone is setting me up?  (Paranoia again!)

-----Original Message-----
**From:** H      , K
**Sent:** Thursday, October 25, 2001 2:45 PM
**To:** Green, Lorraine
**Subject:** VERP

Lorraine,
I was told, that you were interested in the names of people that wanted to take the early retirement in its original
form. I was very interested in applying for it, but could not afford to, after it was changed to the lump sum value.


K·          H

**From:**          Green, Lorraine
**Sent:**          Thursday, October 25, 2001 2:57 PM
**To:**          Reisig, Warren; Porter, Paula
**Subject:**          FW: VERP
See previous e-mail.  Any idea What's going on?

-----Original Message-----
**From:**          O    , J
**Sent:**          Thursday, October 25, 2001 2:58 PM
**To:**          Green, Lorraine
**Subject:**          VERP

I was going to retire under the first offer that Amtrak made. When the offer was reduced to the
$15,000.00 lump sum payment I couldn't afford to retire.

AMT007081

CONFIDENTIAL

October 25, 2001

2001 OCT 31 P 12: 04



<u>Registered and Certified Mail</u>

Ms. Lorraine A. Green
Vice President
Human Resources
Amtrak
60 Massachusetts Avenue, N.E.
Washington, D.C.   20002

Dear Ms. Green:

This letter acknowledges receipt of the Voluntary Early Retirement (VERP) package dated September 14, 2001 and the first Voluntary Early Retirement letter dated July 30, 2001.

**<u>I am unable to accept the offer of September 14.</u>**

**<u>I had planned to accept the Voluntary Early Retirement package offered in the original letter dated July 30, 2001.</u>**

Very truly yours,

R        F

AMT001549

CONFIDENTIAL

October 25, 2001

Ms. Lorraine Green
VP Human Resources
Amtrak
60 Massachusetts Ave.
Washington, D.C.  20002

2001 OCT 30 ⊃ 2: 52
CORPORATE
HUMAN RESOURCES

Dear Ms. Green;

I received an envelope from Amtrak on or about August 1, 2001, dated July 30, 2001,
regarding the 'New voluntary separation and voluntary early retirement plan
information'. In this document I was informed I would receive the opportunity to retire
early by electing that option in an acceptance document to be mailed at a later date. This
document would list dollar amounts of three components: 'Retirement Income Plan'
pension benefit, full-unreduced Railroad Retirement Annuity, and Amtrak Retiree
Medical coverage. In specifics, one was worded as "If you choose this plan, Amtrak will:
Provide you with a supplement equal to you full-unreduced Railroad Retirement Annuity.
Amtrak will pay the supplement until you are able to receive your full Railroad
Retirement Annuity benefit." In the documents mailed on September 15, 2001 the
component of the 'full-unreduced Railroad Retirement Annuity' was eliminated from this
option. This action is preventing me from acting on my desire to accept the Voluntary
Early Retirement Plan.

Sincerely;

T    Ċ

AMT001551

CONFIDENTIAL

October 25, 2001

Ms. Lorraine Green
VP Human Resources
Amtrak
60 Massachusetts Ave.
Washington, D.C. 20002

2001 NOV -5  P 5: 06

CORPORATE
HUMAN RESOURCES

Dear Ms. Green;

I received an envelope from Amtrak on or about August 1, 2001, dated July 30, 2001, regarding the 'New voluntary separation and voluntary early retirement plan information'. In this document I was informed I would receive the opportunity to retire early by electing that option in an acceptance document to be mailed at a later date. This document would list dollar amounts of three components: 'Retirement Income Plan' pension benefit, full-unreduced Railroad Retirement Annuity, and Amtrak Retiree Medical coverage. In specifics, one was worded as "If you choose this plan, Amtrak will: Provide you with a supplement equal to you full-unreduced Railroad Retirement Annuity. Amtrak will pay the supplement until you are able to receive your full Railroad Retirement Annuity benefit." In the documents mailed on September 15, 2001 the component of the 'full-unreduced Railroad Retirement Annuity' was eliminated from this option. This action is preventing me from acting on my desire to accept the Voluntary Early Retirement Plan.

Respectfully Yours;

J         B.

AMT001541

CONFIDENTIAL

NATIONAL RAILROAD PASSENGER CORPORATION



Certified Mail # 7001 0360 0001 3722 6462
Return Receipt Requested

2001 NOV -5  P 5: 06

CORPORATE
HUMAN RESOURCES

October 25, 2001

Lorraine Green
Vice President-Human Resources
National Railroad Passenger Corporation
60 Massachusetts Avenue, NE.
Washington, D.C. 2002

Dear Ms. Green:

A letter dated July 30, 2001 was sent to me by the Corporation that dealt with Amtrak's restructuring plan; specifically regarding how it would affect my management position with the Corporation.

In this letter, two offers of separation were presented for my consideration. One was the Voluntary Separation Plan (VSP) and the other was the Voluntary Early Retirement Plan (VERP).

Based on my age and other criteria included in the letter from the Corporation, I determined I was eligible to participate in either plan.

My decision was made to elect the Voluntary Early Retirement (VERP) as presented in this letter.

Subsequently, a letter was sent to me from the Corporation, dated September 14, 2001. In this letter the terms of the Voluntary Early Retirement Plan (VERP) were significantly changed from those originally offered in the letter of July 30, 2001.

Consequently, I was not able to elect to accept the changed offer.

Sincerely,

P          R

Cc: File Copy

AMT001534

CONFIDENTIAL

NATIONAL RAILROAD PASSENGER CORPORATION

 AMTRAK

Certified Mail # 7001 0360 0001 3722 6479
Return Receipt Requested

2001 NOV -5  ⌐ 5: 05

CORPORATE
HUMAN RESOURCES

October 25, 2001

Lorraine Green
Vice President-Human Resources
National Railroad Passenger Corporation
60 Massachusetts Avenue, NE.
Washington, D.C. 2002

Dear Ms. Green:

A letter dated July 30, 2001 was sent to me by the Corporation that dealt with
Amtrak's restructuring plan; specifically regarding how it would affect my management
position with the Corporation.

In this letter, two offers of separation were presented for my consideration. One
was the Voluntary Separation Plan (VSP) and the other was the Voluntary Early
Retirement Plan (VERP).

Based on my age and other criteria included in the letter from the Corporation, I
determined I was eligible to participate in either plan.

My decision was made to elect the Voluntary Early Retirement (VERP) as
presented in this letter.

Subsequently, a letter was sent to me from the Corporation, dated September 14,
2001. In this letter the terms of the Voluntary Early Retirement Plan (VERP) were
significantly changed from those originally offered in the letter of July 30, 2001.

Consequently, I was not able to elect to accept the changed offer.

Sincerely.

S    R

Cc: File Copy

AMT001529

CONFIDENTIAL

**R**        **P**        2001 NOV -5  P 5: 06

              **PA**        CORPORATE
                         HUMAN RESOURCES

October 26, 2001

Lorraine Green
Vice President Human Resources
Amtrak
60 Massachusetts Avenue, N.E.
Washington, DC 20002

Dear Lorraine Green:

I was planning to take the original Voluntary Early Retirement Package (VERP) as offered in your letter dated July 30, 2001. However, I cannot accept the VERP that was sent to me dated September 17, 2001.

Respectfully,

Ŕ         P⁄

Return receipt request
7000 0600 0028 0590 2599

AMT001530

CONFIDENTIAL

2001 NOV -2  A 9: 55

CORPORATE
HUMAN RESOURCES

October 27, 2001

Ms. Lorraine Green
Vice-President Human Resources
60 Massachusetts Avenue
Washington, DC, 20001

Dear Ms. Green,

I am one of the management employees that was offered the Volunteer Early
Retirement Package. I was very willing to accept the original offer in the
letter dated July 30. However I am unable to accept the package that I
received in the mail on September 17th.

My hope is that Amtrak will find a way to stand by their original offer
around which I had made future plans. Thank you for your consideration
regarding this matter.

Sincerely,

J        S

AMT001546

CONFIDENTIAL

2001 NOV -2  A 9: 55

HUMAN RESOURCES October 27, 2001

Ms. Lorraine Green
Vice-President Human Resources
60 Massachusetts Avenue
Washington, DC, 20001

Dear Ms. Green,

I am one of the management employees that was offered the Volunteer Early
Retirement Package. I was very willing to accept the original offer in the
letter dated July 30. However I am unable to accept the package that I
received in the mail on September 17th.

My hope is that Amtrak will find a way to stand by their original offer
around which I had made future plans. Thank you for your consideration
regarding this matter.

Sincerely,

C   C

AMT001547

CONFIDENTIAL

2001 NOV -2  A 9: 55

HUMAN RESOURCES

October 27, 2001

Ms. Lorraine Green
Vice-President Human Resources
60 Massachusetts Avenue
Washington, DC, 20001

Dear Ms. Green,

I am one of the management employees that was offered the Volunteer Early
Retirement Package. I was very willing to accept the original offer in the
letter dated July 30. However I am unable to accept the package that I
received in the mail on September 17th.

My hope is that Amtrak will find a way to stand by their original offer
around which I had made future plans. Thank you for your consideration
regarding this matter.

Sincerely,

C        C

AMT001548

CONFIDENTIAL

E.              D

≈        Maryland

2001 OCT 30  P 2: 48

COR. RATE
HUMAN RESOURCES

October 27, 2001

Lorraine A. Green
Vice President, Human Resources
Washington Union Station
60 Massachusetts Avenue, NE
Washington, DC 20002

Dear Ms. Green,

In careful consideration of the staff reduction options presented in your letters to me dated July 30, 2001 and September 14, 2001, I regretfully must decline participation.

The proposals presented in the original letter dated July 30, 2001 (and supported with detailed information on Amtrak's Intranet FAQ's August 13, 2001) were attractive and I would have accepted those terms as presented, however the amended "more modest VERP" is not acceptable to me and would penalize me if I did accept it.

Additionally, by making the VERP as outlined in the July 30, 2001 letter so attractive, I was lured away from applying for the VSP and subsequently denied participation in that program.

Sincerely,

E          D

AMT001552

CONFIDENTIAL

October 28, 2001

Lorraine Green
Vice President Human Resources
National Railroad Passenger Corporation
60 Massachusetts Avenue NE
Washington, DC 20002

2001 NOV -5 ⊃ 5: 06

CORPORATE
HUMAN RESOURCES

Dear Ms. Green:

I am an employee with 28 years of service who received an offer for voluntary early
retirement (VERP) in July 1994. At that time I declined to accept the offer as I believed
it was not financially sufficient to truly encourage retirement. When I received Amtrak's
offer of the VERP on July 30, 2001, I felt it was fair, and it was time to accept retirement.

When I received the VERP package on September 15, 2001, I was shocked the VERP
had been changed. What was even more upsetting was the $15,000 payment was offered
with no regard if you were a 10 year employee or a loyal 28 or 30 year employee.

After much anguish over the new VERP offer, I have reluctantly decided to accept the
current VERP. I understand I must sign the General Release Form, but I will sign the
form under strong protest.

Sincerely,

R          W

AMT001539

**CONFIDENTIAL**

October 25, 2001

Lorraine Green
VP Human Resources
Amtrak
60 Massachusetts Avenue NE
Washington, DC 20002

RE:   Voluntary Early Retirement Plan (VERP)

Dear Ms. Green,

When I received Amtrak's July 30th letter regarding the Corporations downsizing efforts, the Voluntary Severance Plan (VSP) and the Voluntary Early Retirement Plan (VERP), my first thought was that Amtrak had finally done something right. Why I say this is that this was the first time in my memory that Amtrak showed some monetary recognition for their long-time dedicated employees who, over the past 30 plus years, have dedicated themselves to making Amtrak a success. I was elated that I would be able to retire while helping Amtrak meet its goal of reducing its workforce. I saw it as a win/win situation; Amtrak got what it needed and so did all the retiree eligible employees…. a reasonable retirement package which for most, would enable them financially to retire from Amtrak.   I anxiously waited for mid September to receive my personalized retirement information package so that I could sign on the dotted line to retire.

Then, the events of September 11th happened which shook the nation.   These events just helped me reaffirm my decision to retire once I received the previously communicated VERP package. Needless to say, when I received the September 14th package regarding the VERP I was shocked, angered and disappointed. I couldn't understand how and why the package should have and/or could have changed so much and why nothing had been said prior to this letter warning of the change.  I could not fathom how the VERP went from offering a reasonably financially sound retirement package to one that most individuals could not live on. It was totally incomprehensible.   The fact that there was no recognition of service to the company probably angered me the most…you got $15,000 if you worked 10 years or 30 years.

Since that September 14th letter I have anguished over taking the retirement package. Unfortunately, from a financial standpoint, it does not make good sense, as I would have to draw significantly from savings to sustain myself. Had the originally promised package (July 30) been in place, there would have been no question that I would have retired. Unfortunately, because of the drastic reduction in the current package, I will not be able to accept the current VERP.

Respectfully yours,

M      W

CONFIDENTIAL

October 29, 2001

Lorraine Green
Vice President HR                2001 NOV -5 P 5: 06
Amtrak                              CONFIDENTIAL
60 Massachusetts Ave., N.E.    HUMAN RESOURCES
Washington, D.C. 20002

Dear Ms. Green:

I would like to take this opportunity to inform you that I have
reluctantly decided to accept the current, "less than generous",
Amtrak VERP package.  Needless to say, since I have decided to
take the current VERP offer, I certainly would have eagerly
accepted the original July 30, 2001 offer which included the bridge
annuity equal to my full, unreduced railroad retirement annuity.

I am very disappointed in Amtrak's decision to reduce the original
VERP offer at the last minute and replace the railroad retirement
bridge with a lump sum cash payment of $15,000 dollars. This
lump sum payment is the same for someone with only 10 years of
Amtrak service and for someone like myself with 29 years of
Amtrak service. Where is the reward for serving 3 times as long
but getting the same amount to voluntarily retire early? This is not
a good thing to do to a loyal, dedicated employee who has served
Amtrak for 29 years.

                        Respectfully,


                        R        . N


                              , MD



AMT001535

CONFIDENTIAL

AMTRAK

October 29, 2001

2001 NOV -5  P 5: 06

CORPORATE
HUMAN RESOURCES.

Lorraine Green
Vice President, Human Resources
60 Massachusetts AV
Washington, DC 20002

Ms. Green,

I had initially planned to accept the VERP offered by Amtrak in the July 30, 2001
correspondence mailed to all management employees.

Based on the changes in the correspondence received September 15, 2001, I
am now unable to accept the greatly reduced offer.

J          M.

AMT001532

CONFIDENTIAL

2001 NOV -2  A  9: 55

CORPORATE
HUMAN RESOURCES

October 29, 2001

Lorraine A. Green
Vice President
AMTRAK – Human Resources
60 Massachusetts Avenue, NE
Washington, DC   20002

Dear Ms. Green:

In August 2001, I received your letter dated July 30, 2001, offering Amtrak Employees two (2) Voluntary Separation Plans (VSP).  The first offer (VSP) effective August 3-24, 2001.  The second offer a Voluntary Early Retirement Plan (VERP), effective September 15 through October 31, 2001.

I opted not to accept the VSP based on the information in your letter stating I met the criteria for the VERP.

September 15, 2001, I received a second letter from you, dated September 14, 2001 resending the VERP.

The first week of October 2001, I received a letter dated October 2, 2001 signed by Arlene Friner, Chief Financial Officer referencing organizational changes to occur in mid-November that will directly impact my position as Contract Manager.

In view of the above changes I cannot accept the amended offer dated September 14, 2001.  I am requesting Amtrak reinstate the first option (VSP) with the right to exercise union seniority or honor the VERP as originally offered.

Respectfully yours,

M        W

Enclosures (3 letters)

AMT001523

CONFIDENTIAL

2001 NOV -5

COMPLETE
HUMAN RESOURCES

October 30, 2001

Ms. Lorraine A. Green
Vice President, Human Resources
National Railroad Passenger Corporation (Amtrak)
Washington Union Station
60 Massachusetts Avenue, N.E.
Washington, DC 20002

Re: Amtrak 2001 Voluntary Early Retirement Plan (VERP)

Dear Ms. Green:

In light of the announced restructuring, I was pleased to receive the July 30 letter notifying employees of the Voluntary Separation Plan (VSP) and the Voluntary Early Retirement Plan (VERP). During August I explored what accepting the announced VERP at age 55 would mean to the long-term financial security of my family.

Having spent over 27 years in Amtrak's corporate budgeting and financial analysis functions, I appreciate the financial condition of the company. I have also witnessed over those years, the creativity and dedication of employees that have seen Amtrak through many tough times.

Given the structure of the September 14th VERP, I am unable to consider retirement under the current offer. I will continue to support my remaining colleagues in the difficult days ahead.

Sincerely,

P'        B.

CONFIDENTIAL

·2001 NOV -2  A 9: 55

CORPORATE
HUMAN RESOURCES

October 31, 2001

C.       A

        , Md

Dear Lorraine A. Green:

I will not be taking the final Voluntary Early Retirement Plan (VERP) that was offered to me in your letter of September 14, 2001. It would be a hardship to live on $363.68 a month pension. As you know, this was over a $2,000 a month reduction from the original offer. My medical and dental insurance alone would take over 50% of my monthly pension.

However, I would have accepted the original Voluntary Early Retirement Plan that was offered in your letter of July 30, 2001. After receiving your letter of July 30, 2001, I started planning for my retirement.

Sincerely,

C.       A

AMT001545

NATIONAL RAILROAD PASSENGER CORPORATION

**CONFIDENTIAL**



2001 NOV -5  ⊃ 5: 06

CORPORATE
HUMAN RESOURCES

October 31, 2001

Ms. Lorraine Green
Vice President, Human Resources
National Railroad Passenger Corporation
60 Massachusetts Avenue, NE
Washington, DC 20002

Dear Ms. Green:

This refers to the voluntary early retirement program (VERP) extended to Amtrak employees 55 years of
age and over.

If the July 30, 2001 offer remained available in its entirety, I would have accepted early retirement
effective November 1, 2001. The modified VERP offer received at my home on September 17, 2001,
however, is declined.

Very truly yours,

B:      B

AMT001542

CONFIDENTIAL

2001 NOV -5 ⊃ 5: 06

CORPORATE
HUMAN RESOURCES

10/31/01

Lorranine Green
Human Resources Department
60 Massachusetts Ave., NE
Washington, DC 20002

Dear Ms. Green,

I was planning to take the voluntary early retirement package dated July 30, 2001.
However, I cannot accept the VERP that was sent to me on September 17, 2001.
Therefore I cannot accept it.

Sincerely,

P⁻  S·

Mailing Address:

Г    S

, IL

AMT001537

CONFIDENTIAL

2001 NOV -5 ⊃ 5: 0b

CORPORATE
HUMAN RESOURCES

Ms. Lorraine Green
Vice President, Human Resources
Amtrak
60 Massachusetts Avenue
Washington, D.C. 20002

Dear Ms. Green:

I received an envelope from Amtrak on or about August 1, 2001, dáted July 30, 2001,
regarding the "New Voluntary Separation and Voluntary Early Retirement Plan
information". In this document I was informed that I would receive the opportunity to
retire early by electing that option in an acceptance document to be mailed at a later date.
This document would list dollar amounts of three components: "Retirement Income Plan"
pension benefit, full-unreduced Railroad Retirement Annuity, and Amtrak Retiree
Medical coverage. In specifics, one was worded as "If you choose this plan, Amtrak will:
Provide you with a supplement equal to your full-unreduced Railroad Retirement
Annuity. Amtrak will pay the supplement until you are able to receive your full Railroad
Retirement Annuity benefit". In the documents mailed on September 15, 2001 the
component of the "full-unreduced Railroad Retirement Annuity" was eliminated from
this option. This action is preventing me from acting on my desire to accept the
"Voluntary Early Retirement Plan". However, my circumstances could change before
the October 31, 2001 deadline.

Sincerely,

J          A

                , Illinois

C: Original is being sent Certified Mail

AMT001543

CONFIDENTIAL

P     G

2001 NOV -5  P 5: 06

CORPORATE
HUMAN RESOURCES

National Railroad Passenger Corporation
Lorraine Green
Vice President Human Resources
60 Massachusetts Ave, N. E.
Washington, D. C. 20002

Ms. Green,

I was planning to take the original Voluntary Early Retirement Package as outlined in your
letter dated July 30, 2001.  However, I cannot accept the Voluntary Early Retirement
Package that was sent to me on September 17, 2001.

During the past 45 days I have attended the company sponsored retirement seminar in
Wilmington, met with two (2) financial planners and talked with Vanguard and T. Rowe
Price representatives. The conclusions derived from these meetings and conferences are
that without the railroad retirement bridge I cannot take part in the VERP.

Regards,

P     . G

AMT001531

CONFIDENTIAL

2001 NOV -5 ⊃ 5: 05

CORPORATE
HUMAN RESOURCES

_____ , Virginia
October 29, 2001

Lorraine Green
Vice President, Human Resources
National Railroad Passenger Corporation
60 Massachusetts Avenue, NE
Washington, DC 20002

Dear Ms. Green:

On July 30, 2001, eligible Amtrak employees received an early retirement offer from
you. The Voluntary Early Retirement Plan (VERP) clearly spelled out certain benefits
and stated that the window period for acceptance of the offer would be September 15
through October 31, 2001.

Shortly thereafter, I decided to accept the offer and made plans based on the financial
incentives detailed in your correspondence. I received notice that the offer had been
retracted on September 15. At this late date, my plans were difficult to change.

I had carefully perused the details of the original offer. In order to determine a firm
estimate of benefits, I had exchanged a number of E-mails with the Director of
Compensation and Benefits, Warren Reisig, and had discussed it with the Railroad
Retirement Board. I received no indication whatsoever that it might be retracted.

I plan to accept your reduced VERP offer. However, I was very disappointed that
Amtrak did not follow through on the stated benefits in the original offer, which I had
accepted in good faith.

Very truly yours,

B       H

AMT002186

2001 NOV -5 P 5:05                    **CONFIDENTIAL**

CORPORATE
HUMAN RESOURCES

Dear Ms Green,

I would have excepted Package Number
one, but Package Number two is not exceptable

—Thank you,

AMT002190

CONFIDENTIAL

2001 NOV -8 ₽ 3: 37        October 25, 2001

HUMAN RESOURCES

Amtrak
Human Resources Department
60 Massachusetts Avenue NE
Washington, DC 20002
Attn: Lorraine Green, VP

Dear Ms. Green,

I was a candidate for the Voluntary Early Retirement Plan (VERP) offered in July 2000, initially put out over the Amtrak Intranet and subsequently followed up with a letter to my home. The original offer was excellent and I was seriously considering accepting if after I had he opportunity to review the exact figures which we were told would be sent to us in the early part of September. However, as you know, the offer was drastically changed and what remained was virtually impossible to accept.

I have one question regarding Amtrak's retraction and modification of the original offer and that is why did you wait until you sent the follow up letter of September 14th to let us know of the terrible changes in the VERP offer. The original offer was initially sent out over the intranet, why didn't you at least send out an up-date over the intranet advising the candidates for the VERP that the offer had to be changed and that it would not be as attractive as the original offer. Instead, the original offer was still on the Amtrak Intranet on September 20th, six days after the date of the letter revising the VERP. Please don't tell me as the Amtrak representative at the VERP seminar said, that you were working up to the last minute to find a way to meet the terms of the original offer. That may be true, but to remain silent, and letting the candidates keep their hopes up until we received that devastating letter of September 14th was terrible and insensitive to the feelings of the Amtrak managers affected by these changes. If you should ever have a similar situation in the future, I would sincerely suggest that you be honest and forthcoming and advise your managers of your possible inability to comply with the original offer as soon as are aware of it. You have a terrific group of dedicated and hard working managers out there working for Amtrak, but their morale is floundering and the manner in which the VERP was handled certainly did not help the situation.

Sincerely,

R        L.

AMT002211

CONFIDENTIAL

U.S. Certified Mail # P 276 827 430

W.          C.

. . N. J. .

November 5, 2001

National Railroad Passenger Corporation

Ms. Lorraine Green
Vice President, Human Resources
60 Massachusetts Avenue, NE
Washington, D. C. 20002

Dear Ms. Green:

This if to inform you that I would have retired on November 1, 2001, under the
terms originally offered in your letter dated July 30, 2001, and reiterated in a letter
entitled "Early Retirement, Frequently Asked Questions" dated August 13, 2001. I
had arranged for three job interviews with other potential employers; and had to
inform all three that I could not accept any offers due to Amtrak's decision to
withdraw the annuity provision of the early retirement program. Two of the
companies had offered me a full time position. Additionally, I had verbally agreed
to sell my house with Mr. Lou Gambacort of G-2 Realty located in Piscataway.

The Company should also consider extension of the eligibility time limit for
employees qualified for the Voluntary Separation Program. Some employees who
were otherwise eligible for this program made their decision to wait for the
Voluntary Early Retirement Program based upon the erroneous information
supplied by the Company.


Sincerely,


W           C.

AMT001527

**Exhibit 63**

CONFIDENTIAL

VERP 2001
Date of 1st Payments

| Last Name | First Name | SS# | Lump Sum Payment | 1st Monthly Payment |
|---|---|---|---|---|
| A | O | | 11/13/2001 | 12/1/2001 |
| B | R | | 1/9/2002 | 12/1/2001 |
| B | M | | 11/19/2001 | 12/1/2001 |
| B | P | | 11/13/2001 | 12/1/2001 |
| B | G | | 11/13/2001 | 12/1/2001 |
| B | L | | 11/13/2001 | 11/13/2001 |
| B | J | | 11/13/2001 | 12/1/2001 |
| C | N | | 11/26/2001 | 12/1/2001 |
| C | J | | 11/14/2001 | 12/1/2001 |
| D | D | | 11/14/2001 | 12/1/2001 |
| D | A | | 11/15/2001 | 12/1/2001 |
| D | M | | 11/13/2001 | 12/1/2001 |
| D | K | | 11/14/2001 | 12/1/2001 |
| D | F | | 11/13/2001 | 12/1/2001 |
| E | A | | 11/19/2001 | 12/1/2001 |
| E | M | | 12/3/2001 | 12/3/2001 |
| F | J | | 11/15/2001 | 12/1/2001 |
| Fl | G | | 11/19/2001 | 12/1/2001 |
| Fl | J | | 11/14/2001 | 12/1/2001 |
| F | T | | 11/14/2001 | 12/1/2001 |
| G | J | | 11/13/2001 | 12/1/2001 |
| G | S | | 11/19/2001 | 12/1/2001 |
| H | P | | 11/28/2001 | 12/3/2001 |
| H | W | | 11/13/2001 | 12/1/2001 |
| H | B | | 11/13/2001 | 12/1/2001 |
| H | G | | 12/4/2001 | 12/4/2001 |
| H | J | | 11/13/2002 | 12/1/2001 |
| H | B | | 11/13/2001 | 12/1/2001 |
| H | P | | 11/15/2001 | 12/1/2001 |
| H | T | | 12/11/2001 | 12/1/2001 |
| H | M | | 11/13/2001 | 12/1/2001 |
| J | C | | 11/13/2001 | 12/1/2001 |
| K | H | | 11/30/2001 | 12/1/2001 |
| K | H | | 11/28/2001 | 12/1/2001 |
| K | J | | 11/15/2001 | 12/1/2001 |
| L | P | | 11/13/2001 | 12/11/2001 |
| L | J | | 11/14/2001 | 12/1/2001 |
| L | V | | 12/4/2001 | 12/4/2001 |
| L | J | | 11/26/2001 | 12/3/2001 |
| L | E | | 11/13/2001 | 12/1/2001 |
| M | C | | 11/13/2001 | 12/1/2001 |
| M | H | | 11/21/2001 | 12/3/2001 |

diana mahoney
Amtrak Retirement Programs

AMT018509

CONFIDENTIAL

VERP 2001
Date of 1st Payments

| Last Name | First Name | SS# | | 1st Payment |
|---|---|---|---|---|
| M | A | | 1/9/2002 | 12/1/2001 |
| M | G | | 11/14/2001 | 12/1/2001 |
| M | P | | 11/14/2001 | 12/1/2001 |
| N | J | | 11/15/2001 | 12/1/2001 |
| N | R | | 11/13/2001 | 12/1/2001 |
| N | D | | 12/12/2001 | 12/1/2001 |
| P | D | | 11/14/2001 | 12/1/2001 |
| P | F | | 11/19/2001 | 12/1/2001 |
| P | | | 12/11/2001 | 12/11/2001 |
| P | E | | 12/4/2001 | 12/6/2001 |
| R | F | | 12/12/2001 | 12/1/2001 |
| R | B | | 11/15/2001 | 12/1/2001 |
| R | P | | 11/14/2001 | 12/1/2001 |
| R | E | | 11/13/2001 | 12/1/2001 |
| S | T | | 11/14/2001 | 12/1/2001 |
| S | P | | 11/13/2001 | 12/1/2001 |
| S | J | | 11/15/2001 | 12/1/2001 |
| S | J | | 11/14/2001 | 12/1/2001 |
| T | S | | 11/14/2001 | 12/1/2001 |
| T | E | | 12/12/2001 | 12/1/2001 |
| T | C | | 11/15/2001 | 12/1/2001 |
| T | C | | 11/13/2001 | 12/1/2001 |
| T | N | | 12/7/2001 | 12/11/2001 |
| T | S | | 11/13/2001 | 12/1/2001 |
| T | R | | 1/9/2002 | 12/1/2001 |
| T | P | | 1/9/2002 | 12/1/2001 |
| T | M | | 11/13/2001 | 12/1/2001 |
| W | J | | 11/20/2001 | 12/1/2001 |
| W | M | | 1/9/2002 | 12/1/2001 |
| W | J | | 11/15/2001 | 12/1/2001 |
| W | T | | 11/13/2001 | 12/1/2001 |
| W | R | | 11/13/2001 | 12/1/2001 |
| W | R | | 11/13/2001 | 12/1/2001 |
| Y | V | | 11/13/2001 | 12/1/2001 |
| Z | B | | 12/11/2001 | 12/11/2001 |

diana mahoney
Amtrak Retirement Programs

AMT018510

**<u>Exhibit 64</u>**

## Voluntary Early Retirement Window Fact Sheet

### Expected Participation

### Actuary Estimates
- Would expect 70% to 85% participation with 5 years of age/ full railroad retirement supplement (option I)
- Would expect 70% to 80% participation with 5 years of age/ reduced railroad retirement supplement (option IV)
- Participation on other plans that actuary has worked on ranged from 10% to 86 %. Most of these plans have a relative value of 1 times pay. Option I has a value 2.2 times pay. Option IV has a value of 1.25 times pay.
- 2 of the 3 plans most like Amtrak's (in design) had participation between 75% and 78%, one was under 70%. Amtrak's supplement is stronger.
- Factors that affect the rate of acceptance:
  - Amount of benefit being offered
  - Medical benefits available
  - Threat of layoff
  - Opportunity for other employment
  - Male/female content of group
  - Other retirement savings
  - Strength of economy
  - Railroad retirement – 30 years of service / breaking connection

### Person by Person Review
### Amtrak
- Estimate - 75% based on option I
  - Level of pension benefit
  - Benefit compared to salary
  - Railroad retirement credited service
  - Age
  - Spouse /dependents

### Actuary
- Estimate – 74% based on option IV (see exhibit I).
  - Age
  - Benefit compared to salary

**AMT007544**

**Exhibit 65**

To:                 H          , F
From:               Reisig, Warren
Cc:                 Green, Lorraine
Bcc:
Received Date:      2001-10-22 09:27:05
Subject:            RE: Verp Package

---

P

I am responding to your e-mail to Lorraine Green regarding the VERP. The Retirement Income Plan for Employees of Amtrak must comply with the rules for retirement plans in the Internal Revenue Code and the Employee Retirement Income Security Act (ERISA). Under those rules, a retirement plan must have a written plan document, and the plan must be administered according to its written terms. In order to make any design changes, such as the VERP, Amtrak's Board of Directors must amend the written plan document.

The amendment adopted by the Board of Directors requires active participants to have attained age 55 or older and completed at least 10 years of service by October 31, 2001 in order to participate in the voluntary early retirement plan. The amendment allows Amtrak to add 5 years of age when computing pension benefits and grant a one-time lump sum payment of $15,000. If Amtrak administers the voluntary early retirement plan under any other criteria, it will violate both the Internal Revenue Code and ERISA provisions requiring adherence to the written plan document. Therefore Amtrak is not able to consider granting you additional benefits under the VERP plan.

-----Original Message-----
From:    Green, Lorraine
Sent:    Thursday, October 18, 2001 4:34 PM
To:      Reisig, Warren
Subject:     FW: Verp Package
Importance:      High

Warren, could you please respond on my behalf. Thanks.

-----Original Message-----
From:    H          , P
Sent:    Thursday, October 18, 2001 10:35 AM
To:      Green, Lorraine
Subject:     RE: Verp Package
Importance:      High


October 18, 2001

Lorraine:

This is a follow up on the memo regarding my question on the Verp Package. I would appreciate a response on this memo.

Thanks a lot.

P   H

-----Original Message-----
From:    H          P
Sent:    Monday, October 15, 2001 4:38 PM
To:      Green, Lorraine
Cc:      Warrington, George; Bagley, Stan

E-AMT 0010314

Subject:     Verp Package

October 15, 2001

Dear Lorraine:

Since I had intended to work until age 65 (age now, 62), the first package dated July 30, 2001 and the statement "there would be further reductions in non-agreement workforce", made me reconsider my position. After struggling with a decision, I decided to retire and take the package. Then the second package arrived September 18, 2001, shocking, and with the fear of jobs being cut, etc. has had me totally upset.

While I am thankful there is a package, several things have been bothering me - that we can afford:

     - Cell phone bills - just at the Bear Facility - about $1500.00 a month. I know a national contract is in process, but, until then,
      why don't they pull about half of the unnecessary phones here and across the Company.

     - The K Products Contract for "guest incentitives", that is a lot of money for mugs, beach towels, jackets, etc.

     - The salaries of new employees coming in our departments about $10,000.00 to $15,000.00 higher than ours. (on going  problem throughout the Company for the past several years).

     - The salaries of the jobs now being advertised.

These are some of the reasons that I would like my package revisited, and, hopefully, consideration to increase it in some way. I am asking confidentially, and, I know, you will say "if it is done for one it has to be done for everyone". I am so close to 65, I don't know what the others are doing, I am asking for myself - since each situation is different. I am worried about the effect the last three months has had on my health. We just got over the Profiler and now this. It has been constant for years, job cuts, no raises, and I guess it just catches up.

The statement in the letter of the second package, "company wants to maintain a surplus in the fund to ensure its integrity of future retirees". Well, we gave past retirees $75,000.00 to bridge and $25,000.00 to union people about four years ago, to leave. Even with the fluctuation of the stock market, we will still spend and fill jobs. I have 25 years here and have been a loyal, honest and conscientious employee and I would like to leave with some dignity. Aside from the fact " what a stressful way to leave a place you were dedicated too.

I know you are extremely busy and time is running out, but, I would appreciate your reviewing the package.

Sincerely,

P   H

Bear, DE

E-AMT 0010315

**Exhibit 66**

November 7, 2001


Mr. G        B

        , Delaware

Dear G        :

I am responding to your letter to George Warrington requesting Amtrak to make an adjustment to your pension benefit by adding an additional five years of age in the calculation of your pension annuity. Unfortunately, the laws governing our retirement plan prohibit us from making this adjustment.

The Retirement Income Plan for Employees of Amtrak must comply with the rules for retirement plans in the Internal Revenue Code and the Employee Retirement Income Security Act (ERISA). Under those rules, a retirement plan must have a written plan document, and the plan must be administered according to its written terms. In order to make any design changes, such as the 2001 voluntary early retirement plan (VERP), Amtrak's Board of Directors must amend the written plan document.

The amendment adopted by the Board of Directors requires active participants (employees) to have attained age 55 or older and completed at least 10 years of service by October 31, 2001 in order to participate in the VERP. If Amtrak administers the VERP under any other criteria, it will violate both the Internal Revenue Code and ERISA provisions requiring adherence to the written plan document.

Feel free to contact me at 202.906.2632 if you have any other questions.

Sincerely,



Warren S. Reisig
*Director, Compensation & Benefits*

cc:    Michael Dukakis, *Vice Chairman*
        *Acting Chairman of the Board – Amtrak*
        George Warrington, *President and Chief Executive Officer*

E-AMT 0023448

Lorraine Green

E-AMT 0023449

November 7, 2001

Mr. W        U

        , Pennsylvania

Dear W        :

I am responding to your letter to George Warrington requesting Amtrak to make an adjustment to your pension benefit by adding an additional five years of age in the calculation of your pension annuity. Unfortunately, the laws governing our retirement plan prohibit us from making this adjustment.

The Retirement Income Plan for Employees of Amtrak must comply with the rules for retirement plans in the Internal Revenue Code and the Employee Retirement Income Security Act (ERISA). Under those rules, a retirement plan must have a written plan document, and the plan must be administered according to its written terms. In order to make any design changes, such as the 2001 voluntary early retirement plan (VERP), Amtrak's Board of Directors must amend the written plan document.

The amendment adopted by the Board of Directors requires active participants (employees) to have attained age 55 or older and completed at least 10 years of service by October 31, 2001 in order to participate in the VERP. If Amtrak administers the VERP under any other criteria, it will violate both the Internal Revenue Code and ERISA provisions requiring adherence to the written plan document.

Feel free to contact me at 202.906.2632 if you have any other questions.

Sincerely,


Warren S. Reisig
*Director, Compensation & Benefits*

cc:     Michael Dukakis, *Vice Chairman*
        *Acting Chairman of the Board – Amtrak*
        George Warrington, *President and Chief Executive Officer*

E-AMT 0023501

Lorraine Green

E-AMT 0023502

November 7, 2001

Mr. P      M

          , Pennsylvania

Dear P      :

I am responding to your letter to George Warrington requesting Amtrak to make an adjustment to your pension benefit by adding an additional five years of age in the calculation of your pension annuity. Unfortunately, the laws governing our retirement plan prohibit us from making this adjustment.

The Retirement Income Plan for Employees of Amtrak must comply with the rules for retirement plans in the Internal Revenue Code and the Employee Retirement Income Security Act (ERISA). Under those rules, a retirement plan must have a written plan document, and the plan must be administered according to its written terms. In order to make any design changes, such as the 2001 voluntary early retirement plan (VERP), Amtrak's Board of Directors must amend the written plan document.

The amendment adopted by the Board of Directors requires active participants (employees) to have attained age 55 or older and completed at least 10 years of service by October 31, 2001 in order to participate in the VERP. If Amtrak administers the VERP under any other criteria, it will violate both the Internal Revenue Code and ERISA provisions requiring adherence to the written plan document.

Feel free to contact me at 202.906.2632 if you have any other questions.

Sincerely,


Warren S. Reisig
*Director, Compensation & Benefits*

cc:     Michael Dukakis, *Vice Chairman*
        *Acting Chairman of the Board – Amtrak*
        George Warrington, *President and Chief Executive Officer*

Lorraine Green

E-AMT 0023468

**Exhibit 67**

-----Original Message-----
From:    Herrmann, William
Sent:    Tuesday, September 25, 2001 9:22 AM
To:      B      , P
Cc:      Reisig, Warren
Subject:          RE: Materials Mentioned in VERP Release Agreement

P

Because this is an ERISA retirement plan, we refer to the plan and the Summary Plan Description (SPD) in
order to identify the benefits you are entitled to. The "Plan" is the entire program that was authorized by the
Board of Directors. The SPD is the document that you have received and it fully describes the benefits that you
are entitled to under the Plan should you choose to participate.

I hope this answers your question.

Byl

-----Original Message-----
From:    B      , P
Sent:    Monday, September 24, 2001 2:09 PM
To:      Herrmann, William
Subject:          FW: Materials Mentioned in VERP Release Agreement
Importance:       High

Warren phoned to tell me that you wrote the release agreement. He said the SPD is the "Amtrak Voluntary Early
Retirement Program" booklet. He said the 2001 Voluntary Early Retirement Plan is the Board Resolution that
modified the normal retirement plan to add 5 years age and $15,000. If we are to rely on only three sources of
information, why is it unclear at to what they are and why did we not receive all three?
Thanks,
F

-----Original Message-----
From:    B      , P
Sent:    Monday, September 24, 2001 10:11 AM
To:      Reisig, Warren
Cc:      Tana, Roe
Subject:          Materials Mentioned in VERP Release Agreement
Importance:       High

The General Release Agreement mentions two items in topic 10:
The 2001 Voluntary Early Retirement Plan and the 2001 Voluntary Early Retirement Plan Summary Plan Description.
I do not see these exact titles on the materials I have received. How do I get access to these vital documents?

Thanks,
P

_____

E-AMT 0005717