**Exhibit 72**

## RESOLUTIONS AUTHORIZING MANAGEMENT
## SEPARATION/SEVERANCE PLANS

WHEREAS, Management has presented to the Board an organizational restructuring plan for the Corporation; and

WHEREAS, This restructuring plan will result in the consolidation and elimination of a number of positions within the Corporation's management workforce; and

WHEREAS, Management believes that it is preferable to encourage employees who might be affected by the organizational restructuring to voluntarily leave Amtrak through programs that provide a transition to other employment; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of three proposed employee separation/severance plans: a Voluntary Separation Plan, an Early Retirement Plan, and an Involuntary Separation Plan; therefore, be it

RESOLVED, That the three employee separation/severance plans described in the attached Executive Summary are authorized and approved; and

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the three separation/ severance plans described in the attached Executive Summary.

National Railroad Passenger Corporation
Board of Directors
Adopted July 26, 2001

**AMT001397**

## Amtrak Board of Directors
## Agenda Item Executive Summary

**Title:** Management Separation/Severance Plans

### Background:

To achieve the cost savings associated with a 15 percent - or larger - reduction in management staff, the Human Resources Department has developed three separation/severance options:

- Voluntary Separation Plan
- Early Retirement Plan
- Involuntary Separation Plan

The following is demographic information on Amtrak's management payroll:

| Years of Service | Number of Management Employees | Average Annual Salary |
|---|---|---|
| Less than 5 | 738 | $65,068 |
| 5 – 15 | 774 | $59,895 |
| 16 or more | 1,366 | $59,944 |
| | | |
| **Total** | 2,878* | $61,245 |

### Proposal:

### Voluntary Separation Plan

Management employees (excluding members of the Management Committee and certain Amtrak Technologies employees) who voluntarily submit their resignation between August 3 and August 24, 2001 will receive the following separation package:

| Months of Prior Management Service | Paid Through | Health Insurance Provided |
|---|---|---|
| Less than 5 | September 30 | 6 months |
| 5 – 15 | October 31 | 9 months |
| 16 or more | November 30 | 12 months |
| Employee receives pass privileges for 6 months for travel while seeking other employment. | | |

* This number includes 595 management employees whose positions are funded out of capital or by commuter, reimbursable or commercial business lines.

In order to receive the benefits under this plan, an employee must agree to sign a release agreement. The Voluntary Separation Plan would be funded out of Amtrak's operating budget and is estimated to cost:

- $1.6 million – 100 employees
- $3.2 million – 200 employees
- $4.8 million – 300 employees

## Early Retirement Plan

Any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to pension formula; and
- A monthly supplement (equal to railroad retirement annuity) payable until employee is able to commence unreduced railroad retirement annuity benefits.

In order to receive benefits under this plan, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

The Early Retirement Plan will be funded out of Amtrak's Retirement Income Plan Trust. Since the pension plan is presently over funded, Amtrak will be able to maintain a contribution holiday for several more years. The Early Retirement Plan is estimated to cost:

- $5.9 million – 100 employees
- $11.7 million – 200 employees
- $17.6 million – 300 employees

## Involuntary Separation Plan

Any management employee who is identified for separation from Amtrak would be eligible for the following severance package:

| Whole Years of Amtrak Service | Weeks of Severance Pay | Lump Sum Payment with Release Agreement |
|---|---|---|
| Less than 5 | 2 | $2,500 |
| 5 – 15 | 3 | $3,500 |
| 16 or more | 4 | $5,000 |

AMT001399

The Involuntary Separation Plan will be funded out of Amtrak's operating budget
and is estimated to cost:

- $1.0 million — 100 employees
- $2.0 million — 200 employees
- $3.0 million — 300 employees

**Recommended Action:**
Management recommends that the Board approve the attached resolutions
authorizing the separation/severance plans set forth above.

**AMT001400**

## RESOLUTIONS AUTHORIZING MANAGEMENT
## SEPARATION/SEVERANCE PLANS

WHEREAS, Management has presented to the Board an organizational restructuring plan for the Corporation; and

WHEREAS, This restructuring plan will result in the consolidation and elimination of a number of positions within the Corporation's management workforce; and

WHEREAS, Management believes that it is preferable to encourage employees who might be affected by the organizational restructuring to voluntarily leave Amtrak through programs that provide a transition to other employment; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of three proposed employee separation/severance plans: a Voluntary Separation Plan, an Early Retirement Plan, and an Involuntary Separation Plan; therefore, be it

RESOLVED, That the three employee separation/severance plans described in the attached Executive Summary are authorized and approved; and

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the three separation/ severance plans described in the attached Executive Summary.

National Railroad Passenger Corporation<br>
Board of Directors<br>
Adopted July 26, 2001

AMT001401

**Amtrak Board of Directors**
**Agenda Item Executive Summary**

Title: Management Separation/Severance Plans

**Background:**

To achieve the cost savings associated with a 15 percent - or larger - reduction in management staff, the Human Resources Department has developed three separation/severance options:

- Voluntary Separation Plan
- Early Retirement Plan
- Involuntary Separation Plan

The following is demographic information on Amtrak's management payroll:

| | Number of Management Employees | Average Annual Salary |
|---|---|---|
| Less than 5 | 738 | $65,068 |
| 5 – 15 | 774 | $59,895 |
| 16 or more | 1,366 | $59,944 |
| | | |
| **Total** | **2,878** | **$61,245** |

**Proposal:**

**Voluntary Separation Plan**

Management employees (excluding members of the Management Committee and certain Amtrak Technologies employees) who voluntarily submit their resignation between August 3 and August 24, 2001 will receive the following separation package:

| Years of Prior Management Service | Paid Through | Health Insurance Provided |
|---|---|---|
| Less than 5 | September 30 | 6 months |
| 5 – 15 | October 31 | 9 months |
| 16 or more | November 30 | 12 months |
| Employee receives pass privileges for 6 months for travel while seeking other employment. | | |

---

* This number includes 595 management employees whose positions are funded out of capital or by commuter, reimbursable or commercial business lines.

In order to receive the benefits under this plan, an employee must agree to sign a release agreement. The Voluntary Separation Plan would be funded out of Amtrak's operating budget and is estimated to cost:

- $1.6 million – 100 employees
- $3.2 million – 200 employees
- $4.8 million – 300 employees

## Early Retirement Plan

Any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to pension formula; and
- A monthly supplement (equal to railroad retirement annuity) payable until employee is able to commence unreduced railroad retirement annuity benefits.

In order to receive benefits under this plan, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

The Early Retirement Plan will be funded out of Amtrak's Retirement Income Plan Trust. Since the pension plan is presently over funded, Amtrak will be able to maintain a contribution holiday for several more years. The Early Retirement Plan is estimated to cost:

- $5.9 million – 100 employees
- $11.7 million – 200 employees
- $17.6 million – 300 employees

## Involuntary Separation Plan

Any management employee who is identified for separation from Amtrak would be eligible for the following severance package:

| Whole Years of Amtrak Service | Weeks of Severance Pay | Lump Sum Payment with Release Agreement |
| --- | --- | --- |
| Less than 5 | 2 | $2,500 |
| 5 – 15 | 3 | $3,500 |
| 16 or more | 4 | $5,000 |

AMT001403

The Involuntary Separation Plan will be funded out of Amtrak's operating budget and is estimated to cost:

- $1.0 million – 100 employees
- $2.0 million – 200 employees
- $3.0 million – 300 employees

**Recommended Action:**
Management recommends that the Board approve the attached resolutions authorizing the separation/severance plans set forth above.

AMT001404

July 30, 2001

Dear Amtrak Employee:

Please read this letter carefully, as it affects your job as a "non-agreement covered" or "management" employee with Amtrak.

The framework of a restructuring plan has been developed that will better position our company for the future, as we strive to serve the national passenger rail network and achieve operational self-sufficiency by 2003.

This restructuring plan will capitalize on the progress we've made to steadily increase ridership and revenue over the past four years while engaging in aggressive cost management measures. Our restructuring plan will also enable us to deal with the under-performing economy and the weakening forecasts for travel.

In the course of the next several weeks, we will work to begin the restructuring plan. Final organizational design is expected to be completed in early October. However, it is clear that there will be a substantial consolidation of many of the business unit and corporate service functions.

This consolidation will significantly reduce the number of "non-agreement covered" or "management" employees on the payroll. In order to lessen the impact of any involuntary employment separations, beginning August 3, a Voluntary Separation Plan (VSP) will be offered.

We hope to achieve most of the reduction in the non-agreement workforce by personal choice through the VSP option, rather than through less-appealing involuntary staff reductions. You are not required to participate in the VSP, however if you do, your decision should be based on your personal situation.

Unfortunately, if we do not achieve our cost reduction objectives through the VSP, we will be required to further reduce the size of our non-agreement workforce. The severance benefits that the company will offer under an involuntary reduction-in-force will be less generous than the severance benefits offered under the VSP option now being offered.

In addition to the VSP, employees age 55 and older with 10 or more years of service with Amtrak, may consider electing a Voluntary Early Retirement Plan (VERP). The VERP is completely voluntary and is described in more detail in this letter.

AMT001405

*July 30, 2001*
*Page 2*

## Voluntary Separation Plan (VSP)

If you wish to participate in the VSP, you must sign and return an Election to Participate form between August 3 and August 24. You will be notified within one week of the date your Election to Participate form is received if your resignation is accepted. You will then be notified of your resignation effective date. In other words, your employment with Amtrak will end on the date you are notified that your resignation is accepted.

It is expected that the VSP will be available on a one-time only basis. Also, in order to insure that Amtrak operations are not negatively affected, Amtrak retains the right to disallow participation of an otherwise eligible non-agreement employee. If your resignation is not accepted, your decision to participate in the VSP will not be held against you and it will not hurt your career at Amtrak.

If you choose the VSP and execute a release agreement, you will receive a lump sum payment equal to your salary from the date of your resignation to the "pay thru" date indicated in the chart that follows, plus an additional $2,500. Also, Amtrak will pay the cost of continuing your medical benefits for you and your covered dependents for a period of time as indicated in the chart below. The amount of the lump sum payment you will receive and the length of time your medical benefits will continue to be paid by Amtrak will depend on your whole years of service as a non-agreement employee at Amtrak, as shown in this chart:

| Whole Years Of Non-Agreement Amtrak Service: | Lump Sum Equal to Salary from Resignation Date Until: | Medical Health Insurance Benefits Continue For: |
|---|---|---|
| Less than 5 | September 30 | 6 months |
| 5-15 | October 31 | 9 months |
| 16+ | November 30 | 12 months |

For example, suppose you have six years and 7 months of Amtrak service as a non-agreement employee and decide to participate in the VSP. And, you have been notified that your resignation has been accepted by Amtrak effective August 17. Based on the chart above, you have 6 whole years of service as a non-agreement employee and you will receive a lump sum payment equal to your salary for the period August 18 until October 31 (approximately 10 ½ weeks of salary), plus an additional $2,500. Amtrak will pay the cost of continuing your medical benefits for you and your dependents until May 31, 2002.

AMT001406

*July 30, 2001*
*Page 3*

In addition, if you elect to resign under the VSP, you will be able to use your travel pass for train travel while seeking other employment for up to six months.

If you elect the VSP, you:

♦ Must submit a signed Election to Participate form during the period of August 3 – 24, 2001. An Election to Participate form is enclosed with this letter;

♦ Must sign a release agreement indicating your acceptance of the terms of your severance package. A release agreement is enclosed with this letter for your reference only and should *NOT* be signed. You will receive a personalized release agreement for your signature once your resignation has been accepted.

♦ Will end your employment with Amtrak on the date that your resignation is accepted.

Please note, that if you elect to participate in the VSP you may exercise your seniority rights -- if any -- back into an agreement position in accordance with the applicable collective bargaining agreement.

If you are interested in electing the VSP, please complete the enclosed Election to Participate form and return it to:

Michael Ramirez
*Senior Director, Workforce Management*
Washington Union Station
60 Massachusetts Avenue, NE
Washington, DC 20002

Signing and returning the Election to Participate form means that you are willing to resign from Amtrak.

AMT001407

*July 30, 2001*
*Page 4*

## Voluntary Early Retirement Plan (VERP)

If you are age 55 or older and have at least 10 years of Amtrak service as of October 31, 2001, you may want to consider the VERP. Under this plan you will retire on November 1, 2001.

If you choose this plan, Amtrak will:

♦ Add five years to your age when computing your Retirement Income Plan (pension) benefit. Currently, if you receive your pension benefit before age 65, the amount of benefit you receive will be reduced because you will potentially be receiving benefits for a longer period of time than if you retired at age 65. The amount of the reduction depends on your age when you begin receiving benefits. By adding five years to your age, the early retirement reduction will be smaller. For example, if you are age 59 and elect to participate in the VERP, your benefit will be calculated as though you are age 64.

♦ Provide you with a supplement equal to your full-unreduced Railroad Retirement Annuity. Amtrak will pay the supplement until you are able to receive your full Railroad Retirement Annuity benefit.

♦ Enroll you in Amtrak Retiree Medical coverage. The Retiree Medical options are the same as those offered to active employees.

You will also be eligible for distributions from the Retirement 401(k) Savings Plan if you participate. However, you will be subject to the provisions of that Plan.

If you elect this plan, you must complete and return an election form during the window period of September 15 through October 31. All eligible employees will receive information to help with this decision. This information will include:

♦ A statement of the monthly benefit you will receive if you elect to participate in the VERP, including the different benefit amounts based on the different forms of payment (such as Life-Only Annuity, 50% Joint and Survivor Annuity, etc.) for which you are eligible;

♦ An election form and a booklet that explains the VERP in detail;

♦ An invitation to a special "Reaching Retirement" seminar with representatives from Amtrak's Benefits Department, the Railroad Retirement Board, and Vanguard; and

♦ Information regarding the pool of eligible employees.

AMT001408

## In Closing

I encourage you to consider the staff reduction options carefully — we understand that this is an important decision for you. If you have questions regarding the **Voluntary Separation Plan (VSP)** please contact:

| If you work in the following SBU Corporate Service Center | Contact | ATS Phone Number |
|---|---|---|
| **NEC** | Sheila Davidson | 728.1546 |
| | Director, Human Resources Operations | |
| | or | |
| | Suzanne Allan | 580.7612 |
| | Manager, Human Resources | |
| **Intercity Mail and Express** | John Miller | 821.2400 |
| | Director, Human Resources Operations | |
| | or | |
| | Ann McCullough | 825.0467 |
| | Manager, Human Resources | |
| **Amtrak West** | Tim Duffy | 761.6743 |
| | Director, Human Resources Operations | |
| | or | |
| | Barbara Hanna | 761.6910 |
| | Manager, Human Resources | |
| **Corporate Service Center** | Michael Ramirez | 777.3392 |
| | Senior Director, Workforce Management | |
| | or | |
| | Wanda Parker-Smith | 777.3623 |
| | Human Resources Consultant | |

*July 30, 2001*
*Page 6*

If you have questions regarding the **Voluntary Early Retirement Plan (VERP)** contact:

| Contact | ATS Phone Number |
|---|---|
| Roe Tana | 777.2272 |
| Warren Reisig | 777.2632 |

If you elect one of these options, we will do everything we can to help make your transition as smooth as possible.

As we move forward, I ask that you continue to provide your full support and dedication to your work. In the long run, our success in facing our challenges will mean an Amtrak that is stronger, more financially stable and better positioned for the future.

Very truly yours,

Lorraine A. Green
*Vice President, Human Resources*

**Enclosures**

**AMT001410**

## SOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

National Railroad Passenger Corporation<br>
Board of Directors<br>
Adopted September 14, 2001

AMT001411

**Amtrak Board of Directors**
**Agenda Item Executive Summary**

**Title:** Amended Management Voluntary Early Retirement Plan

**Background:**
As part of Amtrak's efforts to streamline its organization, eliminate inefficiencies
and reduce costs, the Board approved a Voluntary Early Retirement Plan (VERP) at
its meeting on July 26, 2001. The VERP as approved had two main
components: (i) five years of age added to Amtrak's pension formula; and (ii) a
full supplement to the Railroad Retirement benefits that would otherwise be
available until age 65. Management planned to fund the VERP benefits through
the accumulated surplus in Amtrak's Retirement Income Plan Trust (the "Fund").
Because a portion of the pension funds in this Fund are invested in the stock
market and the market has experienced a recent downturn, before proceeding
further with the VERP Senior Management requested an updated actuarial
analysis to ensure that the integrity of the pension fund is preserved.

The updated analysis showed that if Management proceeded with the plan as
originally formulated, the surplus in the Fund would be depleted and the
company would be required to make a significant contribution to the Fund as
early as 2003. According to the actuary, as a result of a combination of market
conditions, additional accrued liabilities and withdrawals, the forecasted surplus
in the Fund has declined from approximately $42 million in December 2000 to
$18.6 million on August 31, 2001.[1] While Management expects the Fund to
continue to grow over the long term, it has nevertheless determined that it would
be prudent to offer a more modest VERP than originally envisioned and maintain
a surplus in the Fund. Consequently, Management proposes to eliminate the
second component of the plan, the more costly Railroad Retirement supplement,
and instead offer a one-time lump sum payment of $15,000.

The revised VERP would provide that any management employee 55 years of
age or older with 10 or more years of Amtrak service who files retirement papers
between September 15 and October 31, 2001 will receive the following
retirement package:

- Five years of age added to the pension formula; and
- A one-time lump sum payment of $15,000.00

---

[1] The reduction of what appears to be $23.3 million accounts for approximately
$3.1 million of pension payments, $7.5 million of accruals and $11.7 million of
investment loss. Our actuary indicates that Amtrak's investment return over the
last five calendar years was 74% or 12% per annum compounded annually.

AMT001412

In order to receive benefits, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

Based on current actuarial forecasts and the anticipated costs of this amended plan, the Fund will show at least a $10 million surplus and Amtrak will therefore continue to enjoy a contribution holiday for several more years. Management estimates that participation in the VERP will be somewhere between 50 to 60 percent, down from 75% expected for the original plan. At these levels of participation, the VERP as revised is estimated to cost approximately $ 7.2 million at 50 percent participation and $8.6 million at 60 percent.

**Recommended Action:**
Management recommends that the Board approve the attached resolutions authorizing an amendment to the Voluntary Early Retirement Plan as set forth above.

AMT001413

## Amtrak Board of Directors
## Agenda Item Executive Summary

**Title:** Management Separation/Severance Plans

**Background:**

To achieve the cost savings associated with a 15 percent reduction in management staff, the Human Resources Department has developed three separation/severance options:

- Voluntary Separation Plan
- Early Retirement Plan
- Involuntary Separation Plan

The following is demographic information on Amtrak's management payroll:

| Years of Service | Number of Management Employees | Average Annual Salary |
|---|---|---|
| Less than 5 | 738 | $65,068 |
| 5 – 15 | 774 | $59,895 |
| 16 or more | 1,366 | $59,944 |
| | | |
| **Sub-Total** | 2,878 | $61,245 |
| **Less Capital, Commuter, and Reimbursable Positions** | 562 | |
| **Total** | 2,316 | |

**Proposal:**

## Voluntary Separation Plan

Management employees (excluding members of the Management Committee and certain Amtrak Technologies employees) who voluntarily submit their resignation between August 1 and August 24, 2001 will receive the following separation package:

| Whole Years of Management Service | Paid Thru Date | Health Insurance Provided |
|---|---|---|
| Less than 5 | September 30 | 6 months |
| 5 – 15 | October 31 | 9 months |
| 16 or more | November 30 | 12 months |
| Employee receives pass privileges for 6 months for travel while seeking other employment. | | |

**AMT001414**

In order to receive the benefits under this plan, an employee must agree to sign a release agreement. The Voluntary Separation Plan would be funded out of Amtrak's operating budget. We estimate that between 100 and 200 management employees will exercise this option at a total cost of $1.8 to $3.7 million dollars,

**Early Retirement Plan**

Any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to pension formula; and
- A monthly supplement (equal to railroad retirement annuity) payable until employee is able to commence unreduced railroad retirement annuity benefits.

In order to receive benefits under this plan, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

The Early Retirement Plan will be funded out of Amtrak's Retirement Income Plan Trust. Since the pension plan is presently over funded, Amtrak will be able to maintain a contribution holiday for several more years. The anticipated total cost of the Early Retirement Plan option is $$9.0 to $12 million. This estimate assumes 150 to 200 management employees will exercise this option.

**Involuntary Separation Plan**

Any management employee who is identified for separation from Amtrak would be eligible for the following severance package:

| Whole Years of Amtrak Service | Weeks of Severance Pay | Lump Sum Payment with Release Agreement |
|---|---|---|
| Less than 5 | 2 | $2,500 |
| 5 – 15 | 3 | $3,500 |
| 16 or more | 4 | $5,000 |

The Involuntary Separation Plan will be funded out of Amtrak's operating budget. The anticipated cost of this option will range between $2.0 million (200 employees involuntarily separated) to $3.0 million (300 employees involuntarily separated).

**AMT001415**

Case 1:06-cv-01539-GK   Document 20-15   Filed 01/16/2007   Page 21 of 49

**Recommended Action:**
Management recommends that the Board approve the attached resolutions
authorizing the separation/severance plans set forth above.

AMT001416

**SOLUTIONS AUTHORIZING AMENDMENT TO**
**2001 VOLUNTARY EARLY RETIREMENT PLAN**

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan
that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended
benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the
terms of proposed amended Voluntary Early Retirement Plan which has been
fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the
attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is
authorized to take all necessary steps to implement the terms of the plan
described in the attached Executive Summary.

National Railroad Passenger Corporation
Board of Directors
Adopted September 14, 2001

AMT001417

## Amtrak Board of Directors
## Agenda Item Executive Summary

**Title:** Amended Management Voluntary Early Retirement Plan

**Background:**
As part of Amtrak's efforts to streamline its organization, eliminate inefficiencies and reduce costs, the Board approved a Voluntary Early Retirement Plan (VERP) at its meeting on July 26, 2001. The VERP as approved had two main components: (i) five years of age added to Amtrak's pension formula; and (ii) a full supplement to the Railroad Retirement benefits that would otherwise be available until age 65. Management planned to fund the VERP benefits through the accumulated surplus in Amtrak's Retirement Income Plan Trust (the "Fund"). Because a portion of the pension funds in this Fund are invested in the stock market and the market has experienced a recent downturn, before proceeding further with the VERP Senior Management requested an updated actuarial analysis to ensure that the integrity of the pension fund is preserved.

The updated analysis showed that if Management proceeded with the plan as originally formulated, the surplus in the Fund would be depleted and the company would be required to make a significant contribution to the Fund as early as 2003. According to the actuary, as a result of a combination of market conditions, additional accrued liabilities and withdrawals, the forecasted surplus in the Fund has declined from approximately $42 million in December 2000 to $18.6 million on August 31, 2001.[1] While Management expects the Fund to continue to grow over the long term, it has nevertheless determined that it would be prudent to offer a more modest VERP than originally envisioned and maintain a surplus in the Fund. Consequently, Management proposes to eliminate the second component of the plan, the more costly Railroad Retirement supplement, and instead offer a one-time lump sum payment of $15,000.

The revised VERP would provide that any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to the pension formula; and
- A one-time lump sum payment of $15,000.00

---

[1] The reduction of what appears to be $23.3 million accounts for approximately $3.1 million of pension payments, $7.5 million of accruals and $11.7 million of investment loss. Our actuary indicates that Amtrak's investment return over the last five calendar years was 74% or 12% per annum compounded annually.

AMT001418

In order to receive benefits, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

Based on current actuarial forecasts and the anticipated costs of this amended plan, the Fund will show at least a $10 million surplus and Amtrak will therefore continue to enjoy a contribution holiday for several more years. Management estimates that participation in the VERP will be somewhere between 50 to 60 percent, down from 75% expected for the original plan. At these levels of participation, the VERP as revised is estimated to cost approximately $ 7.2 million at 50 percent participation and $8.6 million at 60 percent.

**Recommended Action:**
Management recommends that the Board approve the attached resolutions authorizing an amendment to the Voluntary Early Retirement Plan as set forth above.

**AMT001419**

## Amtrak Board of Directors
## Agenda Item Executive Summary

**Title:** Management Separation/Severance Plans

**Background:**

To achieve the cost savings associated with a 15 percent reduction in management staff, the Human Resources Department has developed three separation/severance options:

- Voluntary Separation Plan
- Early Retirement Plan
- Involuntary Separation Plan

The following is demographic information on Amtrak's management payroll:

| Years of Service | Number of Management Employees | Average Annual Salary |
|---|---|---|
| Less than 5 | 738 | $65,068 |
| 5 – 15 | 774 | $59,895 |
| 16 or more | 1,366 | $59,944 |
| | | |
| **Sub-Total** | 2,878 | $61,245 |
| **Less Capital, Commuter, and Reimbursable Positions** | 562 | |
| **Total** | 2,316 | |

**Proposal:**

**Voluntary Separation Plan**

Management employees (excluding members of the Management Committee and certain Amtrak Technologies employees) who voluntarily submit their resignation between August 1 and August 24, 2001 will receive the following separation package:

| Whole Years of Management Service | Paid Thru Date | Health Insurance Provided |
|---|---|---|
| Less than 5 | September 30 | 6 months |
| 5 – 15 | October 31 | 9 months |
| 16 or more | November 30 | 12 months |
| Employee receives pass privileges for 6 months for travel while seeking other employment. | | |

AMT001420

In order to receive the benefits under this plan, an employee must agree to sign a release agreement. The Voluntary Separation Plan would be funded out of Amtrak's operating budget. We estimate that between 100 and 200 management employees will exercise this option at a total cost of $1.8 to $3.7 million dollars,

**Early Retirement Plan**

Any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to pension formula; and
- A monthly supplement (equal to railroad retirement annuity) payable until employee is able to commence unreduced railroad retirement annuity benefits.

In order to receive benefits under this plan, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

The Early Retirement Plan will be funded out of Amtrak's Retirement Income Plan Trust. Since the pension plan is presently over funded, Amtrak will be able to maintain a contribution holiday for several more years. The anticipated total cost of the Early Retirement Plan option is $$9.0 to $12 million. This estimate assumes 150 to 200 management employees will exercise this option.

**Involuntary Separation Plan**

Any management employee who is identified for separation from Amtrak would be eligible for the following severance package:

| Whole Years of Amtrak Service | Weeks of Severance Pay | Lump Sum Payment with Release Agreement |
|---|---|---|
| Less than 5 | 2 | $2,500 |
| 5 – 15 | 3 | $3,500 |
| 16 or more | 4 | $5,000 |

The Involuntary Separation Plan will be funded out of Amtrak's operating budget. The anticipated cost of this option will range between $2.0 million (200 employees involuntarily separated) to $3.0 million (300 employees involuntarily separated).

AMT001421

**Recommended Action:**
Management recommends that the Board approve the attached resolutions
authorizing the separation/severance plans set forth above.

AMT001422

**Exhibit 73**

# Piper Rudnick

6225 Smith Avenue
Baltimore, Maryland 21209-3600
*main* 410.580.3000 *fax* 410.580.3001

JOY NAPIER-JOYCE
joy.napier@piperrudnick.com
*direct* 410.580.4223

August 14, 2003

**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**

David Dixon
TE/GE Division
P.O. Box 2508
Cincinnati, Ohio 45201

Attn:  D. Dixon, Grp 7525

> Re:    Retirement Income Plan for Employees of the National Railroad
> Passenger Corporation (Plan #001)

Dear Mr. Dixon:

This letter responds to your facsimile dated 8/1/03, in which you requested information regarding the adoption of Amendment II to the above-referenced plan (the "Plan"). You have requested that we provide further detail and evidentiary documents which demonstrate the timeline and facts surrounding the amendment of the Plan to add an early retirement window.

On 7/26/01, the management of the National Railroad Passenger Corporation (the "Company") presented to its Board of Directors an organizational restructuring plan designed to consolidate and eliminate positions within the Company's management workforce. As part of this plan, the Board was asked to approve a package of three employee separation/severance initiatives. One of these initiatives was a voluntary early retirement program (the "VERP"). The Company's management provided the Board with an executive summary of the proposed VERP. The executive summary specified that the VERP would be funded out of the Plan. It also assumed that "[s]ince the pension plan is presently over funded, Amtrak will be able to maintain a contribution holiday for several more years." The Board authorized and approved all three initiatives and specifically authorized the President and Chief Executive Officer to take all necessary steps to implement the three separation/severance plans described in the executive summary. A copy of the executive summary and 7/26/01 resolutions evidencing these actions is enclosed.

Following the 7/26/01 Board action, a letter was sent to all Company management employees on 7/30/01. A copy of this communication is enclosed herewith. This letter

**AMT001392**

**Piper Rudnick**

described the proposed terms of all three initiatives. It also informed employees of the basic terms of the VERP and that the window period in which they had to elect the VERP would run from September 15th until October 31st. The letter stated that employees would receive further information on the benefits of the VERP in future communications and indicated that such information would include:

- A statement of the monthly benefit an employee would receive if he or she elected to participate in the VERP, including the different benefit amounts based on the different forms of payment (such as Life-Only Annuity, 50% Joint and Survivor Annuity, etc.) for which he or she is eligible;

- An election form and booklet that explains the VERP in detail;

- An invitation to a special "Reaching Retirement" seminar with representatives from Amtrak's Benefits Department, the Railroad Retirement Board, and Vanguard; and

- Information regarding the pool of eligible employees.

While this communication provided details on the types of benefits available under the initial VERP authorized by the Board, it did not communicate the final terms.

Prior to implementing the VERP as initially proposed, the Company's management requested an updated actuarial analysis of the Plan to ensure that the "integrity of the pension fund is preserved." The updated actuarial analysis showed, however, that due in main part to recent losses in the stock market, the Plan's surplus was not as large as originally thought and under the terms of the initial VERP proposal, the surplus would be depleted and the Company would have to make a contribution to the Plan as early as 2003. Specifically, the Plan's actuaries determined that the Plan's surplus decreased from $42 million in December, 2000 to $18.6 million on August 31, 2001.

Following the actuarial analysis of the Plan's funding status, on 9/14/01, management presented the Board with a revised VERP, as described in an attached executive summary. The executive summary explained how the Plan's funding differed from the original assumptions and proposed a more modest VERP benefit in line with the Plan's funding level at that time. The Board approved the amended VERP and authorized the President and Chief Executive Officer to take all necessary steps to implement its terms. A copy of the executive summary and the 9/14/01 Board resolutions authorizing the amended VERP is enclosed.

On 9/14/01, the Company sent a package to each employee which explained the final terms of the VERP and included a personalized statement regarding the individual's estimated VERP benefit. As part of the package, a letter dated 9/14/01 highlighted the changes that had been made to the VERP since the initial communication. The letter explained that the Company

**AMT001393**

# Piper Rudnick

David Dixon
August 14, 2003
Page 3

had changed the terms of the VERP based on the updated actuarial analysis which reflected a smaller over-funding than originally assumed. The package also included a letter explaining how to elect the VERP, a booklet explaining the VERP, as amended, an election form, tax forms, and a release agreement. A copy of the entire package sent to employees is enclosed.

The Plan was formally amended on November 30, 2001 to incorporate the VERP benefit as approved on September 14, 2001.

From this chain of events, it is clear that the changes in the VERP as initially approved and communicated to employees were timely authorized by the Board and were based on the Board's judgement that there had been a material change in the assumptions about the Plan's funding status on which the Board's initial authorization was based. The amendment occurred before the beginning of the VERP election period. Furthermore, the Company provided each employee with detailed, accurate written material, which explained the specifics of the amended VERP benefit and gave them ample time to elect to participate.

I hope that the information herein sufficiently responds to the issues you have raised. I have also enclosed a revised Form 2848, Power of Attorney, which authorizes John E. Kratz, Jr. of our office, to act on behalf of the Company. If you have any questions or need anything further, please do not hesitate to contact me.

Very truly yours,

Joy Napier-Joyce

/jn

cc:   Warren Reisig

**AMT001394**

**Exhibit 74**

# Piper Rudnick

6225 Smith Avenue
Baltimore, Maryland 21209-3600
*main* 410.580.3000 *fax* 410.580.3001

JOHN R. WELLSCHLAGER
john.wellschlager@piperrudnick.com
*direct* 410.580.4281

**Facsimile**

**Date:** May 6, 2004

| *To:* | *Phone:* | *Fax:* |
|---|---|---|
| **Eli Gottesdiener** | 202.243.1000 | 202.537.1989 |

Original ☐ will / ☒ will not follow.                Pages *(including fax sheet)*: 8

**Comments:**

2152/15164-32

*The information contained in this facsimile message is confidential and, if addressed to our client or certain counsel, is subject to the attorney-client or work product privilege. This message is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U. S. Postal Service.*

*Piper Rudnick LLP*



Date:  **APR 2 7 2004**

Department of the Treasury
Internal Revenue Service
Tax Exempt/Government Entities

National Railroad Passenger Corporation
AMTRAK
c/o John E. Krantz
Piper Marbury Rudnick & Wolf LLP
6225 Smith Ave.
Baltimore, MD 21209

Name of Plan:
  National Railroad Passenger Corp.
  –AMTRAK Retirement Income Plan
Plan Number:
  001
Employer Identification Number:
  52-0910053
Person to Contact:
  David E. Dixon
Telephone Number:
  513-263-3561

Dear Sir or Madam:

After you adopted this plan, we received comments from interested parties about the plan's qualification.

We have determined that the comments do not have an adverse effect on the plan's qualification for favorable tax treatment.

If you have any questions concerning this matter, please contact the person whose name and telephone number are shown above.

Sincerely yours,

Paul T. Shultz
Paul T. Shultz
Director, EP Rulings & Agreements

Letter 1939

**AMT017986**

```
INTERNAL REVENUE SERVICE                          DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201


Date:  APR 2 7 2004               Employer Identification Number:
                                    52-0910053
                                  DLN:
NATIONAL RAILROAD PASSENGER CORP-   17007070265022
  AMTRAK                           Person to Contact:
C/O JOHN E KRATZ                    DAVID E. DIXON            ID# 31040
PIPER MARBURY RUDNICK & WOLF LLP   Contact Telephone Number:
6225 SMITH AVE                      (877) 829-5500
BALTIMORE, MD  21209-0000         Plan Name:
                                    RETIREMENT INCOME PLAN OF NATIONAL
                                    PASSENGER CORPORATION
                                  Plan Number: 001
```

Dear Applicant:

    We have made a favorable determination on the plan identified above based on the information you have supplied. Please keep this letter, the application forms submitted to request this letter and all correspondence with the Internal Revenue Service regarding your application for a determination letter in your permanent records. You must retain this information to preserve your reliance on this letter.

    Continued qualification of the plan under its present form will depend on its effect in operation. See section 1.401-1(b)(3) of the Income Tax Regulations. We will review the status of the plan in operation periodically.

    The enclosed Publication 794 explains the significance and the scope of this favorable determination letter based on the determination requests selected on your application forms. Publication 794 describes the information that must be retained to have reliance on this favorable determination letter. The publication also provide examples of the effect of a plan's operation on its qualified status and discusses the reporting requirements for qualified plans. Please read Publication 794.

    This letter relates only to the status of your plan under the Internal Revenue Code. It is not a determination regarding the effect of other federal or local statutes.

    This determination is subject to your adoption of the proposed amendments submitted in your letter dated December 30, 2003. The proposed amendments should be adopted on or before the date prescribed by the regulations under Code section 401(b).

    This determination letter is applicable for the amendment(s) executed on 1-14-02 & 11-30-01.

    Issues arising from the amendment of a defined benefit plan's benefit formula to convert that formula into a cash balance type benefit formula are under study, and this determination letter does not express an opinion on any of these issues. A cash balance type formula generally defines a benefit for

                                              Letter  835 (DO/CG)

                        **AMT017987**

-2-

NATIONAL RAILROAD PASSENGER CORP-

each employee by reference to a single-sum amount, such as 10 percent of final average pay times years of service, or the amount of the employee's hypothetical account balance.

This letter considers the changes in qualification requirements made by the Uruguay Round Agreements Act, Pub. L. 103-465, the Small Business Job Protection Act of 1996, Pub. L. 104-188, the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. 103-353, the Taxpayer Relief Act of 1997, Pub. L. 105-34, the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, and the Community Renewal Tax Relief Act of 2000, Pub. L. 106-554.

This letter may not be relied on with respect to whether the plan satisfies the requirements of section 401(a) of the Code, as amended by the Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. 107-16.

The requirement for employee benefits plans to file summary plan descriptions (SPD) with the U.S. Department of Labor was eliminated effective August 5, 1997. For more details, call 1-800-998-7542 for a free copy of the SPD card.

We have sent a copy of this letter to your representative as indicated in the power of attorney.

If you have questions concerning this matter, please contact the person whose name and telephone number are shown above.

Sincerely yours,

Paul T. Shultz

Paul T. Shultz
Director,
Employee Plans Rulings & Agreements

Enclosures:
Publication 794

AMT017988

Letter   835 (DO/CG)



Department
of the
Treasury
Internal
Revenue
Service

Publication 794
(Rev. July 2001)
Catalog Number 20630M

# Favorable Determination Letter

## Introduction

This publication explains the significance of your favorable determination letter, points out some features that may affect the qualified status of your employee retirement plan and nullify your determination letter without specific notice from us, and provides general information on the reporting requirements for your plan.

## Significance of a Favorable Determination Letter

An employee retirement plan qualified under Internal Revenue Code (IRC) section 401(a) (qualified plan) is entitled to favorable tax treatment. For example, contributions made in accordance with the plan document are generally currently deductible. However, participants will not include these contributions into income until the time they receive a distribution from the plan, at which time special income averaging rates for lump sum distributions may serve to reduce the tax liability. In some cases, taxation may be further deferred by rollover to another qualified plan or individual retirement arrangement. (See Publication 575, Pension and Annuity Income, for further details.) Finally, plan earnings may accumulate free of tax. Employee retirement plans that fail to satisfy the requirements under IRC section 401(a) are not entitled to favorable tax treatment. Therefore, many employers desire advance assurance that the terms of their plans satisfy the qualification requirements.

The Internal Revenue Service provides such advance assurance by means of the determination letter program. A favorable determination letter indicates that, in the opinion of the Service, the terms of the plan conform to the requirements of IRC section 401(a). A favorable determination letter expresses the Service's opinion regarding the form of the plan document. However, to be a qualified plan under IRC section 401(a) entitled to favorable tax treatment, a plan must satisfy, in both form and operation, the requirements of IRC section 401(a), including nondiscrimination and coverage requirements. A favorable determination letter may also provide assurance, on the basis of information and demonstrations provided in your application, that the plan satisfies certain of these nondiscrimination and coverage requirements in form or operation. See the following topic, Limitations and Scope of a Favorable Determination Letter, for more details.



**AMT017989**

## Limitations and Scope of a Favorable Determination Letter

A favorable determination letter is limited in scope. A determination letter generally applies to qualification requirements regarding the form of the plan. A determination letter may also apply to certain operational (non-form) requirements

Generally, a favorable determination letter does not consider, and may not be relied on with regard to:
• certain requirements under IRC section 401(a)(4), including the requirement that the plan be nondiscriminatory in the amounts of contributions or benefits for highly compensated and nonhighly compensated employees;
• the coverage requirements under IRC sections 410(b) and 401(a)(26); and
• the definition of compensation under IRC section 414(s).

However, if you requested one or more of the optional nondiscrimination and coverage determinations offered on the determination letter application forms (Form 5300, Form 5307, Schedule Q), your favorable determination letter considers, and may be relied on, with regard to the specific determination(s) you requested, provided you satisfy the following requirement: you must retain copies of the application forms, any required demonstrations, and all correspondence with the Internal Revenue Service related to the application for a favorable determination letter. A favorable determination letter cannot be relied on with regard to any optional determination request unless all of the required information is retained.

In addition, the following apply generally to all determination letters:

If you maintain two or more retirement plans, some of which were either not submitted to the Service for determination or not disclosed on each application, certain limitations and requirements will not have been considered on an aggregate basis. Therefore, you may not rely on the termination letter regarding the plans when considered as a total package.

A determination letter for a defined benefit plan may be relied on regarding

the requirements of IRC section 401(a)(26) if the application requested a determination regarding section 410(b)).

• A determination letter does not consider the special requirements relating to: (a) affiliated service groups, (b) leased employees, or (c) plan assets or liabilities involved in a merger, consolidation, spin-off or transfer of assets with another plan unless the letter includes a statement that the requirements of IRC section 414(m) (affiliated service groups), or 414(n) (leased employees) or 414(l) (mergers, consolidations, spin-offs, or transfers) have been considered.

• No determination letter may be relied on with respect to the effective availability of benefits, rights, or features under the plan. (See section 1.401(a)(4)-4(c) of the Income Tax Regulations.) Reliance on whether benefits, rights, or features are currently available to a non-discriminatory group of employees is provided to the extent requested in the application.

• A determination letter does not consider whether actuarial assumptions are reasonable for funding or deduction purposes or whether a specific contribution is deductible.

• A determination letter does not consider, and may not be relied on with respect to, certain other matters described in section 5.07 of Rev. Proc. 2001-6, 2001-1 I.R.B. 194 (i.e., whether a plan amendment is part of a pattern of amendments that significantly discriminates in favor of highly compensated employees; the use of the substantiation guidelines contained in Rev. Proc. 93-42, 1993-31 I.R.B. 32; and certain qualified separate lines of business requirements of IRC section 414(r)).

• The determination letter applies only to the employer and its participants on whose behalf the determination letter was issued.

• A determination letter does not express an opinion whether disability benefits or medical care benefits are acceptable as accident or health plan benefits deductible under IRC section 105 or 106.

• A determination letter may not be relied on with respect to whether a plan's exclusion classifications, if any, violate the minimum age or service requirements

of IRC section 410 by indirectly imposing an impermissible age or service requirement.

You should become familiar with the terms of the determination letter. Please call the contact person listed on the determination letter if you do not understand any terms in your determination letter.

Retention of Information. Whether a plan meets the qualification requirements is determined from the information in the written plan document, the application form and the supporting information submitted by the employer. Therefore, you must retain copies of any demonstrations or other information submitted with your application. Such demonstrations determine the extent of reliance provided by your determination letter. Failure to retain such information may limit the scope of reliance on issues for which demonstrations were provided.

Other Conditions for Reliance. We have not verified the information submitted with your application. The determination letter will not provide reliance if:

(1) there has been a misstatement or omission of material facts, (for example, the application indicated that the plan was a governmental plan and it was not a governmental plan);

(2) the facts subsequently developed are materially different than the facts on which the determination was made; or

(3) there is a change in applicable law.

Law changes affecting the plan. In general, a determination letter is issued based on the law in effect at the time the application is received. For terminating plans, a determination letter is based on the law in effect at the time of the plan's termination. However, your letter may include a statement indicating an exception to this rule.

Amendments to the plan. A favorable determination letter may no longer apply if there is a change in a statute, regulation, or revenue ruling applicable to the qualification of the plan. However, the determination letter will continue to apply for years before the effective date of the statute, regulation, or revenue ruling. If

AMT017990

the letter no longer applies to the plan, the plan must be amended to comply with the new requirements to maintain its qualified status. Generally, if a regulation changes, the amendment must be adopted by the end of the first plan year beginning after the adoption date of the regulation. Generally, if a revenue ruling changes, the amendment must be adopted by the end of the first plan year beginning after the publication date of the revenue ruling. Generally, these amendments must be effective not later than the first day of such plan year.

## Plan Must Qualify in Operation

Generally, a plan qualifies in operation if it continues to satisfy the coverage and non-discrimination requirements and is maintained according to the terms on which the favorable determination letter was issued. Changes in facts and other bases on which the determination letter was issued may mean that the determination letter may no longer be relied upon.

Some examples of the effect of a plan's operation on a favorable determination are:

Not meeting nondiscrimination in amount requirement. If the determination letter application requested a determination that the plan satisfies the nondiscrimination in amount requirement of section 1.401(a)(4)-1(b)(2) of the regulations on the basis of a design-based safe harbor, the plan will generally continue to satisfy this requirement in operation if the plan is maintained according to its terms. If the determination letter application requested a determination that the plan satisfies the nondiscrimination in amount requirement on the basis of a nondesign-based safe harbor or a general test, and the plan subsequently fails to meet this requirement in operation, the favorable determination letter may no longer be relied upon with respect to this requirement.

Not meeting minimum coverage requirements. If the determination letter application includes a request for a determination regarding the ratio percentage test of IRC section 410(b)

and the plan subsequently fails to satisfy the ratio-percentage test in operation, the letter may no longer be relied upon with respect to the coverage requirements. Likewise, if the determination letter application requests a determination regarding the average benefit test, the letter may no longer be relied on with respect to the coverage requirements once the plan fails to satisfy the average benefit test in operation.

Changes in testing methods. If the determination letter is based in part on a demonstration that a coverage or nondiscrimination requirement is satisfied, and, in the operation of the plan, the method used to test that this requirement continues to be satisfied is changed (or is required to be changed because the facts have changed) from the method employed in the demonstration, the letter may no longer be relied upon with respect to this requirement.

Contributions or benefits in excess of the limitations under IRC section 415. A retirement plan may not provide retirement benefits or, in the case of a defined contribution plan, contributions and other additions, that exceed the limitations specified in IRC section 415. Your plan contains provisions designed to provide benefits within these limitations. Please become familiar with these limitations for your plan will be disqualified if these limitations are exceeded.

Top heavy minimums. If this plan primarily benefits employees who are highly compensated, it may be a top heavy plan and must provide certain minimum benefits and vesting for lower compensated employees. If your plan provides the accelerated benefits and vesting only for years during which the plan is top heavy, failure to identify such years and to provide the accelerated vesting and benefits will disqualify the plan.

Actual deferral percentage or contribution percentage tests. If this plan provides for cash or deferred arrangements, employer matching contributions, or employee contributions, the determination letter does not consider whether special discrimination tests described in IRC section 401(k)(3) or 401(m)(2) have been satisfied in

operation. However, the letter considers whether the terms of the plan satisfy the section 401(k)(3) or 401(m)(2) requirements specified in IRC section 401(k)(3) or 401(m)(2).

## Reporting Requirements

Most plan administrators or employers who maintain an employee benefit plan must file an annual return/report. The following is a general discussion of the forms to be used for this purpose. See the instructions to each form for specific information:

Form 5500-EZ, Annual Return of One-Participant (Owners and their Spouses) Pension Benefit Plans - generally for a "One-participant Plan", which is a plan that covers only:
(1) an individual, or an individual and his or her spouse who wholly own a business, whether incorporated or not; or (2) partner(s) in a partnership or the partner(s) and the partner's spouse.

If Form 5500-EZ cannot be used, the one-participant plan should use Form 5500, Annual Return/Report of Employee Benefit Plan.

Note. A "one-participant" plan that has no more than $100,000 in assets at the end of the plan year is not required to file a return. However, Form 5500-EZ must be filed for any subsequent year in which plan assets exceed $100,000. (This amount may have increased after publication of this document.) If two or more one-participant plans have more than $100,000 in assets, a separate Form 5500-EZ must be filed for each plan.

A "Final" Form 5500-EZ must be filed if the plan is terminated or if assets drop below $100,000 and you wish to stop filing Form 5500-EZ.

Form 5500, Annual Return/Report of Employee Benefit Plan - for a pension benefit plan that is not eligible to file Form 5500-EZ.

**AMT017991**

ote. Keogh (H.R. 10) plans having over 100,000 in assets are required to file an annual return even if the only participants re owner-employees. The term "owner-mployee" includes a partner who owns lore than 10% interest in either the apital or profits of the partnership. This pplies to both defined contribution and efined benefit plans.

orm 5330 for prohibited transactions ransactions between a plan and omeone having a relationship to the lan (disqualified person) are prohibited, nless specifically exempted from this equirement. A few examples are loans, ales and exchanges of property, leasing f property, furnishing goods or services, nd use of plan assets by the disqualified erson. Disqualified persons who engage 1 a prohibited transaction for which there ; no exception must file Form 5330 by 1e last day of the seventh month after 1e end of the tax year of the disqualified erson.

orm 5330 for tax on nondeductible mployer contributions to qualified lans - If contributions are made to this lan in excess of the amount deductible, tax may be imposed upon the excess ontribution. Form 5330 must be filed by 1e last day of the seventh month after 1e end of the employer's tax year.

Form 5330 for tax on excess contributions to cash or deferred arrangements or excess employee contributions or employer matching contributions - If a plan includes a cash or deferred arrangement (IRC section 401(k)) or provides for employee contributions or employer matching contributions (IRC section 401(m)), then excess contributions that would cause the plan to fail the actual deferral percentage or the actual contribution percentage test are subject to a tax unless the excess is eliminated within 2½ months after the end of the plan year. Form 5330 must be filed by the due date of the employer's tax return for the plan year in which the tax was incurred.

Form 5330 for tax on reversions of plan assets - Under IRC section 4980, a tax is payable on the amount of almost any employer reversion of plan assets. Form 5330 must be filed by the last day of the month following the month in which the reversion occurred.

Form 5310-A for certain transactions - Under IRC section 6058(b), an actuarial statement is required at least 30 days before a merger, consolidation, or transfer (including spin-off) of assets to another plan. This statement is required for all plans. However, penalties for non-

filing will not apply to defined contribution plans for which:

(1) The sum of the account balances in each plan equals the fair market value of all plan assets,
(2) The assets of each plan are combined to form the assets of the plan as merged,
(3) Immediately after a merger, the account balance of each participant is equal to the sum of the account balances of the participant immediately before the merger, and
(4) The plans must not have an unamortized waiver or unallocated suspense account.

Penalties will also not apply if the assets transferred are less than three percent of the assets of the plan involved in the transfer (spinoff), and the transaction is not one of a series of two or more transfers (spinoff transactions) that are, in substance, one transaction.

The purpose of the above discussions is to illustrate some of the principal filing requirements that apply to pension plans. This is not an exclusive listing of all returns and schedules that must be filed.

**AMT017992**

**Exhibit 75**

## RESOLUTIONS ADOPTING AMENDMENTS TO DEFINED BENEFIT RETIREMENT INCOME PLAN AND MANAGEMENT AND AGREEMENT EMPLOYEE RETIREMENT SAVINGS PLANS

WHEREAS, The Corporation wishes to amend the National Railroad Passenger Corporation Retirement Savings Plan, the National Railroad Passenger Corporation Defined Benefit Retirement Income Plan, and National Railroad Passenger Corporation's Retirement Savings Plan for Agreement Employees (collectively, the "Plans") (1) to comply with the Uruguay Round Agreements Act of 1994 ("GATT"), the Uniformed Services Employment and Reemployment Rights Act of 1994, the Small Business Job Protection Act of 1996, the Taxpayer Relief Act of 1997, and the Internal Revenue Service Restructuring and Reform Act of 1998 (collectively, the "GUST Acts"), (2) to permit the President and CEO to make certain technical and administrative amendments to the Plans, and (3) to correct certain drafting errors in the Plans; and

WHEREAS, Section 13.01 of the Plans provides that the Corporation may amend the Plans at any time, subject to Board approval; therefore be it

RESOLVED, That the President and CEO is authorized and directed to prepare and execute an Amendment to each Plan to bring the Plan into compliance with the GUST Acts, including, effective January 1, 2000, the use of the interest rate and mortality table in Section 417(e) of the Internal Revenue Code of 1986 as amended by GATT, and to correct any drafting errors in each Plan; and

FURTHER RESOLVED, That the Plans are amended to permit the President and CEO to amend the Plans to assure that they continue to qualify under the Internal Revenue Code (the "Code"), and to comply with all other applicable laws, to provide for the proper administration of the Plans, to clarify the terms of the Plans, and to remedy any inconsistencies, ambiguities and omissions, provided that any such amendment shall be in compliance with the Board Statement of Policy as then in effect; and

FURTHER RESOLVED, That the President and CEO is authorized and directed to prepare and execute an Amendment to each Plan implementing the foregoing resolutions; and

E-AMT 0017719

FURTHER RESOLVED, That the President and CEO is authorized and directed to take such further actions and to execute such documents (including amendments) as he may deem advisable or desirable to adopt and implement the foregoing amendments to the Plans and to carry out the provisions of the Plans as so amended, including obtaining a determination letter from the Internal Revenue Service that each Plan, as amended, continues to qualify under Code sections 401 and 501.

National Railroad Passenger Corporation
Board of Directors
Adopted December 8, 1999

CONFIDENTIAL

**NATIONAL RAILROAD PASSENGER CORPORATION**

**BOARD OF DIRECTORS**

**MINUTES OF MEETING**

**DECEMBER 8, 1999**

The Board of Directors of the National Railroad Passenger Corporation held a meeting at the Corporation's headquarters at 60 Massachusetts Avenue, N.E. in Washington, D.C. on Wednesday, December 8, 1999 beginning at 8:00 a.m.

Board members attending the meeting were Governor Michael S. Dukakis, Governor Linwood Holton, Jolene M. Molitoris (alternate for the Secretary of Transportation), Amy M. Rosen, Mayor John Robert Smith, Governor Tommy G. Thompson, and George D. Warrington.

Schuyler Baab of Governor Thompson's staff and Mark Yachmetz of the Federal Railroad Administration (FRA) also attended the meeting.

Stan Bagley, Sandy Brown, Arlene Friner, Barbara Richardson and Stewart Simonson of Amtrak's Management Committee were present.

John Carten and Medaris Oliveri of the Corporation's staff attended the meeting.

Governor Thompson chaired the meeting; Mr. Simonson, Mr. Carten and Ms. Oliveri recorded the minutes.

AMT016486

**CONFIDENTIAL**

- 27 -

WHEREAS, The services of a consultant will be required to develop a five-year strategic business plan and a twenty-year capital needs assessment, as described in the attachment hereto; therefore, be it

RESOLVED, The Corporation is authorized to enter into an agreement with the LIRR and NJT to share equally in the cost of the necessary consulting services, at a cost to Amtrak of up to $500,000.

(6-0-1)

(Ms. Rosen abstained from the discussion and vote.)

Warren Reisig of Amtrak's staff joined the meeting, and Mr. Kelly left the meeting.

## RESOLUTIONS ADOPTING AMENDMENTS TO THE DEFINED BENEFIT RETIREMENT INCOME PLAN AND MANAGEMENT AND AGREEMENT EMPLOYEE RETIREMENT SAVINGS PLANS

Governor Thompson directed the Board's attention to resolutions adopting amendments to Amtrak's Defined Benefit Retirement Income Plan as well as the Retirement Savings Plans for agreement and management employees. Mr. Reisig advised the Board that Management proposes to amend the Plans to comply with recent legislation, to strengthen the Plans to better protect Amtrak, and to delegate authority to the President and CEO to make technical and administrative amendments to the Plans.

Following discussion, upon motion made by Governor Holton and seconded by Governor Dukakis, the Board voted to approve the following resolutions:

**AMT016512**

**CONFIDENTIAL**

- 28 -

WHEREAS, The Corporation wishes to amend the
National Railroad Passenger Corporation
Retirement Savings Plan, the National Rail-
road Passenger Corporation Defined Benefit
Retirement Income Plan, and National Railroad
Passenger Corporation's Retirement Savings
Plan for Agreement Employees (collectively,
the "Plans") (1) to comply with the Uruguay
Round Agreements Act of 1994 ("GATT"), the
Uniformed Services Employment and Reemploy-
ment Rights Act of 1994, the Small Business
Job Protection Act of 1996, the Taxpayer
Relief Act of 1997, and the Internal Revenue
Service Restructuring and Reform Act of 1998
(collectively, the "GUST Acts"), (2) to per-
mit the President and CEO to make certain
technical and administrative amendments to
the Plans, and (3) to correct certain draft-
ing errors in the Plans; and

WHEREAS, Section 13.01 of the Plans provides
that the Corporation may amend the Plans at
any time, subject to Board approval; there-
fore be it

RESOLVED, That the President and CEO is auth-
orized and directed to prepare and execute an
Amendment to each Plan to bring the Plan into
compliance with the GUST Acts, including
effective January 1, 2000, the use of the
interest rate and mortality table in Section
417(e) of the Internal Revenue Code of 1986
as amended by GATT, and to correct any draft-
ing errors in each Plan; and

FURTHER RESOLVED, That the Plans are amended
to permit the President and CEO to amend the
Plans to assure that they continue to qualify
under the Internal Revenue Code (the "Code"),
and to comply with all other applicable laws,
to provide for the proper administration of
the Plans, to clarify the terms of the Plans,
and to remedy any inconsistencies, ambigui-
ties and omissions, provided that any such
amendment shall be in compliance with the
Board Statement of Policy as then in effect;
and

**AMT016513**

CONFIDENTIAL

- 29 -

FURTHER RESOLVED, That the President and CEO is authorized and directed to prepare and execute an Amendment to each Plan implementing the foregoing resolutions; and

FURTHER RESOLVED, That the President and CEO is authorized and directed to take such further actions and to execute such documents (including amendments) as he may deem advisable or desirable to adopt and implement the foregoing amendments to the Plans and to carry out the provisions of the Plans as so amended, including obtaining a determination letter from the Internal Revenue Service that each Plan, as amended, continues to qualify under Code sections 401 and 501.

(7-0)

Ms. Serfaty joined the meeting, and Mr. Reisig left the meeting.

## RESOLUTIONS AUTHORIZING AN AGREEMENT WITH THE STATE OF WISCONSIN FOR JOINT FUNDING OF CONSULTING SERVICES

Governor Thompson recused himself from the discussion and vote on this agenda item, and Governor Dukakis assumed the chair.

Governor Dukakis directed the Board's attention to resolutions authorizing an agreement with the State of Wisconsin for joint funding of consulting services for engineering plans and environmental studies to determine the feasibility of upgrading the Canadian Pacific line to Madison, Wisconsin for start up of passenger rail service and a new station as part of the Midwest Regional Rail Initiative (MWRRI).

AMT016514

## Amtrak Board of Directors
## Agenda Item Executive Summary

**Title:** Adoption of Amendments to Defined Benefit Plan and Management and Agreement Employee Savings Plans

Amtrak wishes to amend the National Passenger Railroad Corporation Defined Benefit Plan and the National Passenger Railroad Corporation Management and Agreement Employee Savings Plans (collectively, the "Plans") to:
- Update the Plans to comply with pension plan provisions in Uruguay Round Agreements Act;
- Strengthen the Plans to better protect Amtrak against independent contractors makings claims for benefits under the Plans; and
- Permit the President and Chief Executive Officer to make technical and administrative amendments and correct technical drafting errors in the Plans.

The pension provisions in GATT (The General Agreement on Tariffs and Trade), officially known as the Retirement Protection Act contained in the Uruguay Round Agreements Act enacted on December 8, 1994 (Public Law 103465) includes pension provisions that affect virtually all private plans. The changes mandated by GATT have a positive impact on future contributions and administrative fees of the Plans. These provisions:
- Reduce the amount of certain lump-sum payments from the defined benefit plan by mandating interest rates that are higher than those now used to calculate the lump-sum value.  When higher interest rates are used to calculate the present value of a future pension benefit, the resulting lump-sum payment is lower. The mandated interest rate (which all defined benefit plans must use by the end of 2000 calendar year) is 100 percent of the 30-year Treasury rate.
- Provides that an individual who is reemployed following protected military service is treated as not having incurred a break in service under the Plans. Plans must also grant vesting and benefit credit for the period of time the individual was absent for military service.
- Allows the Plans to increase the involuntary cash-out distribution amount to $5,000 from $3,500.  This will provide savings to Amtrak, as the Company does not have to pay administrative fees to maintain small accounts in the Plans.

Independent contractors are excluded from benefits under the Amtrak Plans. Based on recent litigation, i.e., Microsoft, organizations have become increasingly concerned that individuals presumed to be excluded from employee benefit plan coverage could nonetheless be eligible under benefit plans. Claims by contract workers have increased, and we have therefore amended the Plans, to clarify the plan language to eliminate the potential inadvertent coverage of these workers.

E-AMT 0017262

Currently all amendments to the Plans much be approved by the Board.  Amtrak recommends providing authority to the  President and Chief Executive Officer to amend the Plans for the following reasons provided that such amendments are in compliance with the Board Statement of Policy.

- Assure that the Plans continue to qualify under the Internal Revenue Code;
- Comply with all other applicable laws;
- Provide for the proper administration of the Plans; and
- Remedy any inconsistencies, ambiguities and omissions.