**Exhibit 76**

**Denial of appeal**

**July 14, 2006**

**NATIONAL RAILROAD PASSENGER CORPORATION**
60 Massachusetts Avenue, NE, Washington, DC 20002
tel 202 906.2216  fax 202 906.3897

July 14, 2006

Lorraine A. Green
Vice President
Human Resources



## VIA FACSIMILE AND FIRST CLASS MAIL

Eli Gottesdiener, Esq.
Gottesdiener Law Firm, PLLC
1025 Connecticut Avenue, N.W., #1000
Washington, D.C.  20036

### Re:  Hall Claim for Benefits

Dear Mr. Gottesdiener:

I am writing in response to your appeal dated May 16, 2006 in connection with the claims for benefits (the "Claims") by Wade F. Hall, Hattie N. McCoy-Kemp and Victoria F. Staton (the "Claimants") under the Retirement Income Plan for Employees of National Railroad Passenger Corporation (the "Plan").  I am writing in my capacity as the officer of Amtrak designated to adjudicate appeals of denied claims for benefits under the Plan.  I have decided to deny your appeal of the determination by the Plan's Retirement Plan Committee (the "Committee") as set forth in the Committee's letter to you dated January 23, 2006 (the "Committee's Determination Letter").  I will explain the reasons for this decision in this letter.

As set forth below in more detail, I have carefully reviewed the Committee's Determination Letter and the factual record in this matter.  I find the summary set forth in the Committee's Determination Letter of the background of this matter, and of the Claims, to be accurate.  Accordingly, for reference purposes, I have repeated this information below substantially as set forth in the Committee's Determination Letter.

### Background Information

In 2001, Amtrak management was considering ways to reduce Amtrak's operating costs through a workforce reduction.  In order to minimize the number of involuntary dismissals, Amtrak decided to implement a voluntary early retirement plan, which would be made available to eligible Amtrak employees for a period of time commencing on September 15, 2001 and ending on October 31, 2001.

On July 26, 2001, at a meeting of Amtrak's Board of Directors (the "Board"), the Board voted to approve the Voluntary Early Retirement Program (the "VERP"), which included two components:  (1) an additional 5 years of age for purposes of determining the early retirement reduction applicable under the Plan, and (2) a monthly supplement payable until a participant qualified for unreduced Railroad Retirement Benefits ("Railroad Retirement Supplement").

Eli Gottesdiener, Esq.
July 14, 2006
Page 2

Before the window for the VERP opened to eligible employees on September 15, 2001, it became apparent that the cost of the VERP, in the version approved by the Board on July 26, 2001, was going to be significantly higher than originally estimated. Therefore, Amtrak management intended to present a revised, less costly version of the VERP to the Board for approval at a meeting scheduled on September 12, 2001. Under this revised version of the VERP, instead of the Railroad Retirement Supplement, each participant would receive a $15,000 lump sum payment. The additional 5 years of age for purposes of determining the early retirement reduction applicable under the Plan remained in place. The meeting was cancelled because of the catastrophic events of September 11, 2001. Left without time to reschedule a Board meeting before the VERP election window would open on September 15, 2001, the Board approved the revised version of the VERP on September 14, 2001 by written consent.

You filed suit on behalf of the Claimants on August 19, 2003 in United States District Court for the District of Columbia. On August 5, 2005, Judge Kessler ruled that Count I of the Complaint was appropriately cast as a claim for benefits under the Plan, and that this claim was premature because plaintiffs had not exhausted the Plan's claims procedures. You then filed the Claims with the Committee by letter dated August 5, 2005. The Committee denied the Claims as set forth in the Committee's Determination Letter, and you appealed the denial of the Claims by letter dated May 16, 2006 ("Appeal Letter").

### Summary of Claims

The following is a summary of the claims as set forth in your August 5, 2005 letter to the Committee.

With respect to Mr. Hall (who did not accept the VERP, continued working for Amtrak and retired under the generally applicable terms of the Plan), you claimed the full value of the July 2001 version of the VERP (plus interest). With respect to Ms. McCoy-Kemp (who accepted the September 2001 VERP), you claimed the difference in value between the July 2001 version of the VERP and the September 2001 VERP (plus interest). With respect to Ms. Staton (who did not accept the VERP, was later terminated and paid severance), you claimed the difference in value between the July 2001 version of the VERP and the severance (plus interest).

You asserted on behalf of the Claimants that the Plan was amended by the Board on July 26, 2001, when it voted to approve a VERP that included (1) an additional 5 years of age for Plan purposes, and (2) the Railroad Retirement Supplement. You further asserted that the Board's approval on September 14, 2001 of the change to the VERP's second prong from the Railroad Retirement Supplement to a lump sum payment of $15,000 per participant was ineffective and therefore, the terms of the July 2001 VERP

Eli Gottesdiener, Esq.
July 14, 2006
Page 3

remained in place even after September 14, 2001. You also asserted that the liability waivers executed by Ms. McCoy-Kemp and Ms. Staton are invalid because they were based on misinformation concerning the terms of the VERP.

In the alternative, and only if it is determined that the Plan <u>was</u> properly amended on September 14, 2001, you asserted that the most recent restatement of the Plan (executed December 30, 1994, effective January 1, 1989) was not properly authorized by the Board and consequently actions taken pursuant to it are unauthorized.

You did not claim that Mr. Hall, Ms. McCoy-Kemp or Ms. Staton was damaged by detrimentally relying on the July 2001 VERP.

### **Review of Factual Record**

In reaching the decision set forth in this letter, I have reviewed the factual record, including, but not limited, to the following items:

°   Your letter dated August 5, 2005 setting forth the Claims, the Committee's Determination Letter, and your Appeal Letter.

°   Executive summaries and resolutions of the Board dated July 26, 2001 and September 14, 2001 pertaining to the VERP.

°   A letter dated July 30, 2001 sent to Amtrak employees relating to the VERP.

°   Materials relating to the VERP provided to Amtrak employees in September 2001.

°   An amendment to the Plan relating to the VERP, dated November 20, 2001.

°   A letter to the Internal Revenue Service from Amtrak's outside counsel dated August 14, 2003 replying to a request for information from the IRS in connection with Amtrak's IRS determination letter request.

°   A determination letter from the Internal Revenue Service dated April 27, 2004 affirming the qualified status of the Plan following the VERP amendment.

°   Documentation of the appointment of the current Committee members, and resignation of the prior Committee members.

Eli Gottesdiener, Esq.
July 14, 2006
Page 6

benefits as well as appeals. Certainly, therefore, there is nothing improper with having the same law firm represent the *separate* adjudicators of claims and appeals.

     *Recusal by Mr. Herrmann.* With respect to Mr. Herrmann, you state in your letter that "[p]laintiffs also continue to maintain that Mr. Herrmann's involvement in the Committee's consideration of Plaintiffs' claim as counsel to the Committee was inappropriate. His apparent continuing involvement at the appellate level, in any capacity, is equally improper."[5]

     I reject this assertion. Mr. Herrmann did not serve as adjudicator at the initial claim level, nor does he serve as adjudicator upon appeal. Moreover, Mr. Herrmann did not serve as counsel to the Committee in connection with its consideration of the Claims, nor is he serving as counsel to me in connection with my consideration of the appeal. Mr. Herrmann has been involved in logistical matters in the claims adjudication process, such as coordinating meeting times and transmitting materials among Venable, the Committee members, you and me.

### Your Assertions Regarding Contacts With Amtrak's Counsel

     In addition to your incorrect assertion regarding Mr. Herrmann serving as counsel to the Committee, I also would like to point out another area where you have made incorrect factual assertions in your letter – that concerning the level of contacts between Venable and the Committee, on the one hand, and Amtrak's outside litigation counsel and Mr. Herrmann, on the other hand.

     In your letter, you state that "the Committee omitted any mention of the fact that the Committee and Venable also had numerous contacts with Amtrak's outside litigation counsel and Amtrak's Deputy General Counsel Mr. Herrmann . . . ."[6] This assertion is incorrect. It is my understanding that Venable met with Amtrak's outside litigation counsel on only one instance, at the beginning of its representation of the Committee in this matter, to obtain background materials. Moreover, as noted above, Mr. Herrmann has been involved in logistical matters in the claims adjudication process, such as coordinating meeting times and transmitting materials. In fact, at a brief meeting with Mr. Herrmann at the outset of Venable's engagement, Venable explained to Mr. Herrmann the significant limitations on the scope of his involvement in the claims process.

---

[5]     *Id.*, p. 12.
[6]     *Id.*, p. 5.

Eli Gottesdiener, Esq.
July 14, 2006
Page 7

### Basis for Decision to Deny Appeal

The premise of your appeal is stated at the end of your Appeal Letter, specifically, that the Board did not "take action" to amend the Plan on September 14, 2001.[7] This premise is based on your assertion that the September 14, 2001 Board resolutions were not validly adopted in accordance with the District of Columbia Business Corporation Act and Amtrak's Bylaws.

I reject this assertion. Based on a review of the factual record in this matter, I find that Governor Holton understood the substance of the proposed action that was placed before Board members for their unanimous consent on September 14, 2001. I further find that Governor Holton intended to sign the September 14, 2001 resolutions, but was unable to actually sign them himself because of the circumstances of the September 11, 2001 terrorist attacks. I further find that Governor Holton authorized and directed Assistant Corporate Secretary John Carten to sign the resolutions on the Governor's behalf, and considered such authorization and direction to be a proper delegation of a ministerial task, not an improper delegation of discretionary authority as a member of the Board. I do not believe that Governor Holton's actions were inconsistent with the requirements of the District of Columbia Business Corporation Act, and Amtrak Bylaws, governing action of the Amtrak Board by unanimous consent.

*Understanding the Substance of the Proposal.* Based on Governor Holton's deposition testimony in the *Hall* Litigation[8], I find that Governor Holton understood the substance of the action with respect to the VERP that he was being asked to authorize on September 14, 2001.

In reference to the conversation that Governor Holton had with Mr. Carten regarding the September 14, 2001 board resolutions, in his deposition Governor Holton testified that "[t]he substance of it was that that authorization for the management to implement an incentive plan, to urge members of the management to retire early, had been found to be very expensive and that an amendment was needed to cut down on the costs of it somewhat and that since the meeting on the 12[th] had had to be cancelled because of the World Trade Center terrorist attacks, that we needed to do it by unanimous consent of the directors and would I consent to it and I said yes and I said you can put my name on the document that carries out that purpose."[9]

---

[7]    *Id.*, p. 14.

[8]    References in this letter to Governor Holton's deposition testimony refer to the deposition taken on November 19, 2004 in the *Hall* Litigation (the "Holton Deposition").

[9]    Holton Deposition, p. 128.

Eli Gottesdiener, Esq.
July 14, 2006
Page 8

Moreover, Governor Holton testified that "I do know that I was informed that the management investigation of the implementation of the plan had found it was going to cost us too much and we didn't have the money to fund it . . . I was informed that the management decision was that the plan, as they originally hoped to implement it, was too expensive and that it had to be modified to reduce the cost."[10]

These excerpts show that Governor Holton understood the action that Amtrak Management asked him to approve by unanimous consent.

*Authorization of Mr. Carten to Sign Resolutions.*  Based on Governor Holton's deposition testimony, I find that Governor Holton authorized Mr. Carten to affix the Governor's signature to the September 14, 2001 resolutions.  This is evident from a number of instances in the deposition, including the following statements by Governor Holton:

- ○    "I'm certain in my own mind that I authorized John Carten to affix my signature to that document. . . I know that I authorized John to affix my signature to a document that had indicated my participation in the unanimous consent of the board to make changes in that retirement plan."[11]

- ○    "I have a memory that I learned of the need for a change in the retirement plan.  I was informed of the need for the change, I think in a conversation with John Carten, and that because the board meeting, which was scheduled for the 12th, had been postponed, and that there was a deadline of the, September the 15th, that it was needed to have the board act by unanimous consent.  And I authorized that unanimous consent."[12]

- ○    "Q [You]:  Well, was it something that you did sign?  A [Governor Holton]:  Not physically but I authorized my signature to go on that document."[13]

Moreover, it is evident from a number of instances in Governor Holton's deposition testimony, including the following, that Governor Holton viewed his

---

[10]    *Id.*, p. 54.

[11]    *Id.*, p. 108.

[12]    *Id.*, p. 104.

[13]    *Id.*, p. 49.

Eli Gottesdiener, Esq.
July 14, 2006
Page 9

authorization of Mr. Carten to affix the Governor's signature as the delegation of a
ministerial task as he was not in a position on September 14, 2001 to personally affix his
signature and return the written consent to Amtrak by fax, not as an abrogation of the
Governor's duties as director:

- ○   "I understood that somebody else can sign it [the consent] with my
      authority."[14]

- ○   "I was satisfied when I authorized the signature to be put on the
      document, that it was legal for me to do that."[15]

- ○   "It was not a shock to me to reach the conclusion that I could
      authorize somebody else to put my signature on a piece of
      paper."[16]

Based on the foregoing, I find that Governor Holton authorized Mr. Carten
to affix the Governor's signature to the resolutions, and understood that doing so
was simply delegation of a ministerial task.  I conclude that Governor Holton
validly approved the September 14, 2001 Board resolutions, as I do not believe
that Governor Holton's actions on that day were inconsistent with the
requirements of the District of Columbia Business Corporation Act, and Amtrak
Bylaws, governing action of the Amtrak Board by unanimous consent of its
directors.

*Assertions In Your Appeal Letter Regarding the Adoption and Efficacy of
the September 14, 2001 Board Resolutions.*  In reaching my decision to deny your
appeal, I have reviewed and considered the numerous assertions in your Appeals
Letter regarding the adoption and efficacy of the September 14, 2001 Board
resolutions, and have determined that they are unfounded.

I have set forth below a non-exhaustive list of examples of inaccurate
statements in your Appeals Letter regarding the adoption and efficacy of the
September 14, 2001 Board resolutions.  Because of the extensive number of such
statements in your letter, I have not attempted to reply to each one, so my silence
regarding any particular statement in your letter should not be construed as
acquiescence to it.

---

14      *Id.*, p. 65.

15      *Id.*, p. 81.

16      *Id.*, p. 79.

Eli Gottesdiener, Esq.
July 14, 2006
Page 10

    o    You state that "[t]he Committee did not explain the basis for its conclusion that the Governor fully understood and fully agreed with what the signing Directors understood and agreed . . . ."[17]

    In fact, the Committee did explain that the basis for its conclusion was the Governor's deposition testimony.  As set forth in detail above, the Governor's deposition testimony strongly supports the conclusion that the Governor fully understood and fully agreed with what all of the other Directors understood and agreed with respect to the adopted resolutions.

    o    You call into question whether the Board and the others involved in obtaining approval of the September 14, 2001 resolutions acted in good faith, stating that the Committee did not "assess the candor or conduct of other persons involved directly and indirectly in the events of September 14[th]."[18]

    The implication that the Board and the others involved in obtaining approval of the September 14, 2001 resolutions acted in bad faith or without candor is unfounded.  There is no indication that anybody acted in bad faith or without candor.  The Board members involved include individuals of stature, with distinguished records of public service.  The Board members and the others involved in obtaining approval of the September 14, 2001 resolutions faced difficult and unprecedented circumstances in light of the September 11, 2001 terrorist attacks; I believe they acted appropriately under the circumstances.  In short, your implication that there was bad faith or lack of candor is simply baseless.

    o    You state that "Governor Holton indicated that he was surprised at the manner in which Mr. Carten manifested the Governor's agreement to what had been described to him – by using a photocopy of Governor Holton's signature that did not disclose that it had been placed there not by Governor Holton but by another, authorized party."[19]

    In fact, I do not believe that Governor Holton indicated that he was surprised about the manner in which his signature was affixed to the resolutions.  When you asked the Governor in his deposition "[d]id you assume, let's say back in September of 2001, that he [Mr. Carten] would sign for you actually in a fashion that would on its face indicate that you hadn't physically signed and that

---

[17]    Appeal Letter, p. 7.

[18]    *Id.*, p. 7.

[19]    *Id.*, p. 3.

Eli Gottesdiener, Esq.
July 14, 2006
Page 11

someone had signed for you with authorization", the Governor stated "I didn't give it any thought as to how he would sign it" – a response that does not indicate surprise at all.[20]

    &deg;    You assert that the September 14, 2001 resolutions were invalid because "none of the Directors, including Governor Holton, ever signed anything referencing their agreement to act in the absence of a meeting . . . While [the resolutions] may have been appropriate for use during an in-person meeting and could also have been easily adapted for a telephonic meeting, they were not appropriately modified for use as unanimous written 'consent' forms because they do not reflect consent to take 'the action' 'set[] forth' ' without meeting'."[21]

This assertion does not accurately reflect my understanding of District of Columbia corporate law requirements or the provisions of Amtrak's Bylaws. In fact, I do not believe that there is any requirement under District of Columbia corporate law or Amtrak's Bylaws that resolutions adopted by the written consent of all Board members specifically acknowledge that such resolutions are being adopted by consent without a meeting as opposed to at a meeting.

    &deg;    You state that "it is undisputed that on the day in question, September 14, 2001, which was the eve of the start of the September 15-October 31, 2001 VERP window, the Board did not meet. Instead . . . management attempted to get the Board to consent to act in the absence of even a telephonic meeting and take 'action' via the written unanimous consent. . . Amtrak's Board has on numerous occasions availed itself of the convenience and flexibility that rule [permitting telephonic Board meetings] allows and nothing in the record suggests it was not possible for Amtrak to convene a telephonic meeting of the Board between September 12th and September 15[th]."[22]

This argument is misleading because it implies that the use of a telephonic Board meeting to adopt resolutions is superior as a matter of corporate law to the adoption of resolutions by unanimous written consent. In fact, the various methods of adopting resolutions – by Board meeting (whether in person or by telephone) – and by unanimous written consent – are equally valid and acceptable means of adopting resolutions; neither is superior to the other.

---

[20]    Holton Deposition, p. 131.

[21]    Appeal Letter, p. 3.

[22]    *Id.*, p. 2.

Eli Gottesdiener, Esq.
July 14, 2006
Page 12

Aside from the fact that this argument is misleading as a matter of District of Columbia corporate law, it also trivializes and ignores the reality that we all faced in the immediate aftermath of the September 11, 2001 terrorist attacks. While it is possible five years later to gloss over the immediate impact of the attacks, it is important to remember the state of disarray that prevailed immediately following September 11th.

In sum, I have considered and rejected the assertions in your letter regarding the adoption and efficacy of the September 14, 2001 Board resolutions.

*Authorization of the Most Recent Restatement of Plan.* Finally, in the alternative, and only if it is determined that the Plan <u>was</u> properly amended on September 14, 2001, you asserted that the most recent restatement of the Plan (executed December 30, 1994, effective January 1, 1989) was not properly authorized by the Board and consequently actions taken pursuant to it are unauthorized.

In this regard, I agree with the Committee's conclusion that assuming for purposes of the Claims (without deciding the matter) that the 1994 restatement of the Plan was not properly authorized when originally adopted, the subsequent actions of the Board in authorizing amendments to the Plan, and otherwise acting with respect to the Plan, amount to an implied ratification of the 1994 restatement of the Plan.[23]

### Conclusion

To conclude, I disagree with the premise of your appeal – that the Board did not "take action" to amend the Plan on September 14, 2001 because the September 14, 2001 Board resolutions were not validly adopted by reason of the fact that Governor Holton did not personally sign them.[24] Rather, I find that Governor Holton did validly consent in his capacity as an Amtrak Board member to the resolutions because he understood the substance of the resolutions, wished to manifest his consent to the resolutions in writing, and authorized Mr. Carten to perform the ministerial task of affixing his signature. Accordingly, I find that the September 14, 2001 resolutions were valid, and reject your appeal of the Committee's denial of the Claims.

### ERISA Rights

I am providing the following information as required by the claims procedure regulations under ERISA:

---

[23]     Committee's Determination Letter, p. 6.

[24]     Appeal Letter, p. 14.

Eli Gottesdiener, Esq.
July 14, 2006
Page 13

       o     *Specific Reason or Reasons for Adverse Determination.* As set forth above in more detail under the heading "Basis for Decision to Deny Appeal", I have denied the appeal because I find that Governor Holton effectively consented to the September 14, 2001 board resolutions.

       o     *Reference to the Specific Plan Provisions On Which Determination Is Based.* The determination is based on Plan section 4.06 and Exhibit B.

       o     *Entitlement to Relevant Information.* The Claimants are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the Claims. You have already been provided copies of the items listed above under the heading "Review of Factual Record", with the exception of your Appeal Letter. However, if you would like additional copies of any of these items, please let me know.

       In addition, I have enclosed copies of notes of interviews that Venable conducted with Alicia Serfaty and with John Carten, as well as notes that Venable attorneys took when they met with the Committee regarding the Claims. While I do not believe that these items are required to be produced, I have considered the arguments set forth in your Appeal Letter and have decided to provide them.

       o     *Voluntary Appeal Procedures.* The Plan does not provide a voluntary appeal procedure.

       o     *Right to Bring Civil Action.* The Claimants have a right to bring an action under Section 502(a) of ERISA.

       Very truly yours,

       Lorraine Green

cc:    John R. Wellschlager, Esq.
       Barbara E. Schlaff, Esq.
       Robert J. Bolger, Esq.

5411
3310 - Debi

Dec. 13, 2005 - Notes
w/ Amtrak 29 yrs
John Carton

→ July 01 - he was present - 6 voting directors
    Quorum - Management- presented plans
→ Send out bd pkg. before every meeting
→ Normal meeting
→ Corp. secretary - he prepares formal minutes
    ì includes approved resolutions in minutes
→ He Prepares - formal minutes -

        Alicia, John, MAdius Solidus — at meetings

→ Alicia ì Madius - Both at July meeting

→ Approve minutes from previous meeting at
    each meeting

→ Meeting at end of Aug. →

→ Usually would have July minutes ready
    for approval for next meeting.

Bd meeting → Postponed meeting until Sept 20th

→ Window - opened on Sept 15th

                                    sometimes
→ Do have telephonic bd meeting but doesn't
    know why they didn't at that time.

→ Sent out resolutions - on Sept 12

→ Gov Holton → called John
    John explained what they were doing
    ì timing was important. John read

him executive summary & resolutions

→ ~~Bd Th~~ Gov understood that the plan
was reducing benefit.

→ ~~Jugged~~ He John has affixed Gov signature
more than once on unanimous consent

→) Gov. → typically comfortable w/ author
signature

→) He took Gov's signature from another
instrument.

→) Never sent copy to Gov Holton of the
signed instrument.

→) Next ~~one~~ Bd meeting ~~the~~ Sept 20th
  – Short meeting – he doesn't recall
    if they discussed the Sept Resolution

→) Sent out pkg w/ new benefit.
  – ~~Ber~~ to employees – typically
do not present pkgs to Bd

→ When you typically ~~formally~~ amend
plan – do you present ~~them~~
the amended form to Bd – John: Not
typically presented to bd – Not necessary
~~to~~ reflected in minutes

→

→ Ratification — they don't ratify resolution
in any minutes.

⇒ Since signing of sept minutes —
~~they~~ ~~he has not~~ discussed the with Gov
or sent follow up docs.

He can't remember it ~~they~~
→ ~~Not~~ discussion of VERP w/ BOD
after Sept. meeting. ? He ~~can't~~
~~remember~~

asked him
→ Look at sept 20th, Nov & Dec.
minutes to see if VERP was
discussed [implied Rat.]

→ He asked about whether they should
consider cleanup resolutions.

→ Monthly meeting — No annual
→

→ ~~core~~ Previously, they have not
used cleanup resolutions

→

→ John will email = re review of
minutes, following Sept consents

→ written consents never part of later bd
pkg.

[Alicia:]

Updated Bd re numbers = maybe in Jan.

Plan Amendment Procedure — in past.
→ Technical Amendments — always follow
2 step project
→ Authorization from management to
~~Date~~ ~~Board~~

→ Minutes of past meeting would
be approved

→ Aug 20th Meeting — still confirming #s
& evaluating 4 alternative options.

→ ~~Someone~~ would have talked w/ chairman
but didn't bring up formally at Bd meeting

→ Aug meeting — first meeting as corp Sec.
or maybe sept.

→ Sept. meeting for budget.
Resolutions
→ Executive Summary & Faxed

410
204 956

4:00 — Bill- email to confirm mtg tomorrow is
at 10:00

— ~~Sept 15th~~ Pkg - sent out to employees
— before Sept 15th window

~~Sept~~

→ Action Reducing benefit. → No Pkg after
Sept 12 resolution.

→ Never send out pkg.

→ Nov. 20? ~~th~~ mangement formally amend plan —
~~was that~~ That amendment was never
part of Bd pkg.

→ ~~Board~~ Would have never gone back
after plan was amended to tell
them they amended — they would
just assume.

→ Bd Never sees plan amendment.

→ Implementing plan amendments always done
2 step process.

→ Status update

→ ~~Ratimplication~~ — Bd didn't repudiate the action
that took place in Sept.

management
→ Never discussed ratifying the defect because
they didn't view it as a defect of the
time

→ Oral updates - suspect but can't say for sure *(implementing this)*

→ Bd clearly aware plan was being implemente

→ Informal updates were given [may have been formal updates?]

→ ~~XXXX~~ She doesn't think she was at July meeti

→ Technical defect not brought to attention of Bd

Bill recalls *(doing an)* update

**Claim denial appeal – final further letter in support**

**May 16, 2006**



**Gottesdiener**
**Law Firm, PLLC**

New York | Washington, D.C.
www.gottesdienerlaw.com

1025 Connecticut Ave, N.W. #1000
Washington, D.C. 20036
Tel: 202.243.1000
Fax: 202.243.1001

**Eli Gottesdiener**
eli@gottesdienerlaw.com

May 16, 2006

<u>Via Facsimile and Overnight Mail</u>

Lorraine Green
Vice President, Human Resources
National Railroad Passenger Corporation
60 Massachusetts Avenue, N.E.
Washington, D.C.  20004-1008

Dear Ms. Green:

This is in further to the appeal of Wade F. Hall, Hattie N. McCoy-Kemp, and Victoria F. Staton ("Plaintiffs") dated February 9, 2006 from the January 23, 2006 denial of the claim Plaintiffs made on August 5, 2005 for benefits due under the Retirement Income Plan For Employees Of National Railroad Passenger Corporation (the "Plan").  This letter -- together with Plaintiffs' prior submissions, the letters of the Plan's Retirement Plan Committee (the "Committee") and your or your counsel's letters to Plaintiffs, and all documents, records and other information relevant to Plaintiffs' benefit claim determination at the initial or review level (whether produced or withheld), and all documents produced (or withheld by the defense) or filed with the Court by either side in *Hall v. National Railroad Passenger Corp.,* 03-1764 (GK) (D.D.C.), all of which are hereby submitted for your consideration -- constitutes Plaintiffs' appeal and the record of such appeal from the Committee's January 23rd denial.

### The Claims Process to Date

On August 5, 2005, Plaintiffs filed their claim for benefits with the Committee.  Plaintiffs contend that they were and are entitled to elect the July 26, 2001 VERP with the Railroad Retirement Supplement because the Amtrak Board did not take "action" to amend the Pension Plan and remove the Railroad Retirement Supplement from the Plan.  More specifically, Plaintiffs claim that management's attempt to cutback the VERP containing the Railroad Retirement Supplement was ineffective under ERISA and as a matter of corporate law in light of the terms of the Amtrak Plan and the laws and by-laws governing the conduct of Amtrak's corporate affairs.

In support of that contention, Plaintiffs explained in their August 5th letter -- including by incorporation by reference, among other things, more detailed arguments made in the *Hall v. National Railroad Passenger Corp.,* 03-1764 (GK) (D.D.C.) litigation under Count I of their Second Amended Complaint, *see* Claim Ltr. at 5 -- that in accordance with ERISA's

Lorraine Green                                          Gottesdiener Law Firm, PLLC
May 16, 2006
Page 2

requirements, Plan § 13.01 provides a procedure for amending the Plan and identifies the persons who have authority to do so. *See* ERISA § 402(b)(3), 29 U.S.C. § 1102(b)(3). Specifically, Plan § 13.01 states that only the Company's Board may amend the Plan and, more specifically, that any amendment to the Plan may be effective only "by action of [the Company's] Board." Plaintiffs explained that under ERISA this means that the Board had to have taken effective corporate action according to its governing statutes, articles of incorporation and by-laws in order to have taken "action" within the meaning of the Plan and ERISA.[1]

Plaintiffs explained that the D.C. Business Corporations Act ("DCBCA") requires the board manage the business and affairs of the corporation through "action . . . taken" at "meeting[s]" of the board pursuant to a quorum, D.C. Code § 29-101.42(b), and that the DCBCA governs Amtrak's internal operations to the extent not inconsistent with federal law, *see* 49 U.S.C. § 24301(e). Plaintiffs noted that while the DCBCA also allows for action to be taken by a board without a meeting, D.C. Code § 29-101.136 ("Requirements of action without meeting"), such action will be valid only "if a consent <u>shall be signed</u> . . . by all of the members of the board" permitting action in the absence of a meeting and "setting forth the action so taken." *Id.* (emphasis added).[2] Plaintiffs also noted that Amtrak's By-Laws § 4.12, "Unanimous Written Consent," contains a provision parallel to the DCBCA with verbatim language.[3]

Plaintiffs explained that it is undisputed that on the day in question, September 14, 2001, which was the eve of the start of the September 15-October 31, 2001 VERP window, the Board did not meet. Instead, Plaintiffs showed, management attempted to get the Board to consent to act in the absence of even a telephonic meeting and take "action" via the written unanimous

---

[1] In *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995), the Supreme Court confirmed that a purported ERISA plan amendment not adopted in accordance with a plan's amendment procedures is ineffective to alter the terms of such plan and that it was appropriate for adversely affected participants to have such purported amendments declared ineffective on that basis.

[2] The provision reads in full: "Any action required or permitted to be taken at a meeting of the shareholders of a corporation or of the board of directors or of any committee thereof may be taken without a meeting if a consent in writing setting forth the action so taken shall be signed by all of the shareholders entitled to vote with respect to the subject matter thereof, or by all of the members of the board or of such committee as the case may be, and such written consent is filed with the minutes of proceedings of the shareholders or the board or the committee. Such consent shall have the same force and effect as a unanimous vote of the shareholders or the board or the committee, as the case may be, and may be stated as such in any article or document filed with the Mayor under this chapter."

[3] Amtrak has acknowledged, for example in a brief filed with the United States Supreme Court, that "Amtrak's corporate governance is dictated by the company's Articles of Incorporation and Bylaws." Respondent's Brief, *Lebron v. National Railroad Passenger Corporation,* No. 93-1525 at *5 (S. Ct. Sept. 8, 1994).

Lorraine Green                                                    Gottesdiener Law Firm, PLLC
May 16, 2006
Page 3

consent.[4]  However, none of the Directors, including Governor Holton, ever signed anything referencing their agreement to act in the absence of a meeting.  The draft resolutions management proffered to the Directors on September 14th were originally designed for use during an in-person meeting scheduled for September 12th but postponed (briefly, until September 20th) due to the events of September 11th.  While they may have been appropriate for use during an in-person meeting and could also have been easily adapted for a telephonic meeting, they were not appropriately modified for use as unanimous written "consent" forms because they do not reflect consent to take "the action" "set[] forth" "without meeting."[5]

Additionally, Plaintiffs showed that one Director, former Virginia Governor Linwood Holton, did not read or sign the draft resolutions that management proposed to the Board to eliminate the Railroad Retirement Supplement, or the Executive Summary that management tendered along with the draft resolutions.  Instead, Plaintiffs explained, Mr. Holton merely discussed the matter with John Carten, an Amtrak staff member who also acted as a Board assistant secretary, and then, without discussing the matter with anyone else (including any member of the Amtrak Board), Governor Holton purportedly gave Mr. Carten oral consent to "sign" "for" him.

There is a dispute as to the manner in which Governor Holton indicated he wanted or expected his "signature" to be placed on the draft resolution and what if anything Amtrak's General Counsel knew about Mr. Carten's actions before Plaintiffs challenged the validity of the September 14th resolutions in the *Hall* litigation.  Governor Holton indicated that he was surprised at the manner in which Mr. Carten manifested the Governor's agreement to what had been described to him – by using a photocopy of Governor Holton's signature that did not disclose that it had been placed there not by Governor Holton but by another, authorized party.

---

[4] District of Columbia law and the Corporation's by-laws permit meetings to be conducted telephonically such that a meeting of the Board is no less a meeting within the meaning of the DCBCA and the By-Laws simply because it is held by that means.  In fact, Amtrak's Board has on numerous occasions availed itself of the convenience and flexibility that rule allows and nothing in the record suggests it was not possible for Amtrak to convene a telephonic meeting of the Board between September 12th and September 15th.  Plaintiffs argued that management's failure to proceed on that basis does not excuse non-compliance with the law and by-laws' written unanimous consent procedures.

[5] "Resolutions Authorizing Amendment to 2001 Voluntary Early Retirement Plan" consists of two resolutions preceded by three "whereas" clauses that state:  "WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and WHEREAS, Management has set forth in the attached Executive Summary the terms of the proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and be it FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary."  Plaintiffs have also argued that the resolutions are defective as consents because they were not "filed with the minutes of proceedings of . . . the board," as required.

Lorraine Green                                          Gottesdiener Law Firm, PLLC
May 16, 2006
Page 4

(Of course, in virtually all other cases of this sort, an original signature is affixed by someone other than the person whose assent is being manifested but the signer in that case uses a backslash and his or her initials or full name to disclose not just his or her identify but first and foremost the fact that the person whose name or authority did not actually sign the document in question).  Amtrak's General Counsel also tried to distance herself from Mr. Carten's actions, claiming not to have had prior knowledge of this practice.  Plaintiffs argued all of this testimony was self-serving and unreliable and that Mr. Carten's actions as well as the Governor's and General Counsel's attempts to distance themselves from those actions is strong circumstantial evidence that all of them knew or suspected what they were doing was wrong.

Assuming the failure to satisfy the express "consent" and the express "sign[ing]" requirements of the law and by-laws could be overlooked, Plaintiffs argued that there is nevertheless an insurmountable "meeting-of-the-minds" problem:  while the Directors' signatures on the resolutions are, as a matter of law, sufficient to signify their mutuality of assent to the exact terms of the resolutions as among themselves, Mr. Carten's placement of a photocopy of Governor Holton's signature on a previously blank draft resolution form obviously has no such legal significance.  Without the presumption of mutuality of assent that the assenter's signature conveys, Governor Holton would have to have had in his mind as a matter of fact precisely what was detailed in the resolutions and accompanying Executive Summary.  However, it is undisputed that Governor Holton did not have and did not read either of those documents.  Nor did Mr. Carten read them to him verbatim.  This precludes any possibility of mutuality of assent as between him and the rest of the Board.

Regarding the claims procedure, Plaintiffs contended that the Plan had failed to establish and maintain a reasonable claims procedure and that the Plan and current Summary Plan Description ("SPD") "are both defective in multiple material respects regarding the required claims process and process."  *Id.* at 4.  Plaintiffs also argued that neither the current Members of the Committee nor any employee of Amtrak under the circumstances should be involved in the determination of Plaintiffs' claim and that an independent decision maker, not selected by Amtrak, should be utilized in this instance because of their personal and professional conflicts of interest with respect to the matters at hand.[6]

---

[6] Plaintiffs explained, for example, that because the Plan is a defined benefit plan, every payment of increased benefits by the Plan increases the contribution obligation of the Corporation which is already in desperate financial straights and under constant threat of dismantlement.  Here, Plaintiffs explained, it is extremely unlikely that an Amtrak employee (especially one with additional conflicts of interest arising from prior direct involvement in the adoption or implementation of either VERP) could objectively decide whether the Board of Directors and top level management procedurally failed to amend the Plan to eliminate the Railroad Retirement Supplement with the result that the Company would have to pay tens of millions of dollars in contributions.  Plaintiffs added that it would be especially inappropriate to permit a Committee Member such as William Herrmann to sit in judgment on Plaintiffs' claim since his judgment and conduct are or may be at issue in the *Hall* litigation (where he is a Defendant and a material witness) and in the context of Plaintiffs' claim for benefits.  Mr. Herrmann would be essentially ruling on the correctness of his own conduct and advice given in connection with the original and reduced VERP and as to the communications and alleged miscommunications to participants regarding both VERPs.

Lorraine Green                                                    Gottesdiener Law Firm, PLLC
May 16, 2006
Page 5


Plaintiffs asked that in the event of an adverse determination that the Committee produce, among other relevant information, all documents upon which it relied in making any such adverse determination. *Id.* at 6.

On November 1, 2005, the Committee wrote Plaintiffs, through counsel, informing them, of among other things, that "special circumstances require a 90-day extension of time for processing the claims." The Committee stated that the Committee had made that determination that special circumstances required a 90-day extension of time for the processing of Plaintiffs' claim "[i]n accordance with 29 CFR Sec. 2560.503-1(f)(1)." November 1st Ltr. at 1. The Committee did not cite any basis in the Plan or SPD for the extension or more generally address Plaintiffs' contention that the Plan had failed to establish and maintain a reasonable claims procedure. Regarding Plaintiffs' request that the Committee recuse itself, the Committee said: "You assert that an independent adjudicator should be appointed to decide the claims, because you believe the Committee is biased and incapable of fair adjudication of the claims. We don't believe that assertion is well taken, and we reject it." *Id.* at 3. No reason was provided, nor did the Committee state that it intended to supply a reason at some future point.

On January 23, 2006, the Committee denied Plaintiffs' claim. Under the heading: "Steps Taken By the Committee In Adjudicating The Claims," the Committee assured Plaintiffs that:

> The Committee has given extensive and careful consideration to the claims of the Claimants. The Committee has engaged independent legal counsel to assist it in properly executing our fiduciary duties in deciding those claims. Counsel has reviewed the extensive record in this matter, including the litigation pleadings, depositions of Linwood Holton (former Amtrak Director and former Governor of Virginia), Alicia Serfaty (Amtrak's Corporate Secretary and General Counsel), John Carten (Amtrak's Director-Board Liaison and an Assistant Corporate Secretary), and Medaris Oliveri (an Assistant Corporate Secretary), Board of Directors' resolutions, Plan amendments, and the materials provided to Amtrak employees relating to the VERP. In addition, counsel spoke with Ms. Serfaty and Mr. Carten concerning this matter.

Jan. 23rd Denial Ltr. at 3.[7]

Notwithstanding the specificity of these disclosures in respect to the steps the Committee and its counsel Venable, LLP ("Venable") had taken before the Committee rendered its decision, the Committee omitted any mention of the fact that the Committee and Venable also had

---

[7] Given the Committee's statements here and elsewhere in its letter regarding its reliance on "counsel to assist it" and the Committee's further statements that "Counsel" (and not the Committee) reviewed the extensive record in this matter, and "counsel" (not the Committee) spoke to the two witnesses identified above, all references herein to the Committee should be deemed to refer to counsel and vice versa, unless the context plainly indicates otherwise.

Lorraine Green                                              Gottesdiener Law Firm, PLLC
May 16, 2006
Page 6

numerous contacts with Amtrak's outside litigation counsel and Amtrak's Deputy General
Counsel Mr. Herrmann who apparently had arranged for Venable to be hired in the first place,
once Amtrak (and not the Committee Members) decided Venable would be suitable counsel for
the Committee.[8]

The basic reason the Committee gave in its January 23rd denial letter for denying
Plaintiffs' claims was because the Committee concluded that "the version of the [VERP]
containing the reduced benefits approved by the Board . . . on September 14, 2001 was the
effective final and operative version of the VERP, and superseded the earlier version of the
VERP approved at a meeting of Amtrak's Board of Directors on July 26, 2001." *Id.* at 1. The
Committee reached that determination while acknowledging that the Board did not actually
comply with the terms of D.C. Code § 29-101.136 and By-Laws § 4.12 "because Governor
Holton did not personally sign the written consent." *Id.* at 5.[9]

The Committee did not address the fact that the "written consent" that the other
Directors did personally sign did not state or manifest their consent that the Board take official
"action" with respect to the matter in the absence of a formal meeting with a quorum. The
Committee appears to have assumed that that requirement could also be ignored even though
the signed resolutions are equally consistent with an intent on the part of one or more of the
signing Directors that the Board would still be taking the action referenced in an official and
legally effective manner only after first discussing the matter during a meeting.[10]

The Committee concluded that it did not matter that not all Directors signed the
resolutions approving a reduced VERP because the signature requirement was nothing more than
a "ministerial" act that any board member was free to "delegate[e]" to a third-party. *Id.* at 5
(emphasis added). The Committee found compliance with the signature requirement should be
excused here "because Governor Holton fully understood and agreed with the content of the

---

[8] The Committee Members were not "introduced" to their counsel until after Amtrak decided Venable would
represent them. *See* April 21st log and April 21st production, discussed below.

[9] The Committee indicated that it was relying on Mr. Holton's and Mr. Carten's depositions in the *Hall* litigation to
determine as a matter of fact what occurred on September 14, 2001. It did not explain why it did not rely on the
other sources of factual information which it stated the Committee or counsel had reviewed as to the events of
September 14, 2001. The Committee did not make any attempt to reconcile the discrepancies in their testimony or
to question Governor Holton further.

[10] The Committee did not address the fact that nothing in the resolutions is inconsistent with one or more of the
Directors believing that a telephonic meeting would still be held. Under those circumstances, a pre-signed
resolution might be necessary or useful as a proxy or for otherwise evidencing one or more Directors' agreement
with management's proposal, whether or not other Directors, after discussion, may wish to decline to adopt the
proposal or to modify it.

Lorraine Green                                          Gottesdiener Law Firm, PLLC
May 16, 2006
Page 7

resolutions and intended to manifest his agreement in writing." *Id.*[11]

The Committee did not dispute that Governor Holton did not read nor had read to him
verbatim the resolutions in question and did not read nor had read to him verbatim the
accompanying Executive Summary. The Committee also did not dispute that Governor Holton
had no prior notice or warning of the changes to the VERP that management would be
proposing. The Committee did not explain the basis for its conclusion that the Governor fully
understood and fully agreed with what the signing Directors understood and agreed when all he
received was a summary from a staff member who was himself paraphrasing the resolutions
based on his (the staff member's) understanding of them.

As an alternative basis for its denial of Plaintiffs' claim, the Committee held even if the
Board failed to comply with the statute and by-law's unanimous written consent procedure as a
matter of corporate law, that "technical" non-compliance could be excused as a matter of ERISA
law because although the plan specified that the sponsor could amend the plan only through by
"action of its Board," the plan did not "require[e] any more specific methodology." *Id.* at 3.
(stating that Amtrak has reserved the right in the Plan document to amend the Plan 'by action of
its Board', without requiring any more specific methodology"). The Committee explained that
"courts have held that an ERISA plan amendment should not be invalidated for technical
violations of a plan's procedures unless there is a showing of bad faith or active concealment on
the part of the sponsor." *Id.* at 5. The Committee cited no case law to support its assertion or
discuss whether there is authority to the contrary.[12]

---

[11] More particularly, the Committee said: "The Committee finds that because Governor Holton fully understood and
agreed with the content of the resolutions and intended to manifest his agreement in writing, the Governor's
instruction to Mr. Carten to affix the Governor's signature to the consent was no more than the delegation of a
ministerial act to Mr. Carten. The Committee finds that such delegation of a purely ministerial act is not
inconsistent with the requirement that the consent be unanimously approved in writing by the directors with voting
power." *Id.*

[12] Having found that the failure to comply with the statute and by-laws constituted a "technical" violation, the
Committee went on to say that it found no reason to believe the Board had not acted in good faith. It did not discuss
questions Plaintiffs raised about the manner in which Mr. Carten chose to show Governor Holton's agreement with
what had been described to him or assess the candor and conduct of other persons involved directly and indirectly in
the events of September 14th. The Committee asserted that "the Board acted in good faith, to the best of its abilities
in light of the September 11, 2001 terrorist attacks," although it did not say that it found that a telephonic meeting
was not possible between September 12th and September 15th. It also did not reference the evidence well known
to Amtrak as to Governor Holton's habits and that with advance notice Governor Holton could have easily made
arrangements to receive and review personally all necessary papers and sign (and/or modify) any resolutions or
consents that met with his approval. The Committee asserted that "Amtrak clearly communicated to eligible
Amtrak employees before the window opened on September 15, 2001 that the terms of the VERP had changed
from the terms previously communicated to them." The Committee did not address the evidence to which Plaintiffs
have pointed in support of arguments to the contrary or mention the fact that the issue is a contested one. The
Committee rejected what it said it understood to be Plaintiffs McCoy-Kemp's and Staton's challenges to the
purported releases they signed upon terminating employment with Amtrak, saying "[t]he Committee rejects this
claim, because the Committee finds that the terms of the VERP were accurately represented to Ms. McCoy-Kemp and
Ms. Staton." *Id.* at 6.

Lorraine Green                                                    Gottesdiener Law Firm, PLLC
May 16, 2006
Page 8

Without reference to its November 1st letter, the Committee again denied Plaintiffs'
contention that an independent adjudicator should be appointed to decide Plaintiffs' claims, this
time adding that "[t]he Committee is composed of new members who were not directly involved
in the adoption and implementation of the VERP.   In addition, we have been assisted by
independent legal counsel in our consideration of the claims."  *Id.* at 6.[13]  The Committee did not
say why it had not provided this explanation earlier.[14]

In conclusion, under the heading "Claims Procedure of the Plan and Right to Bring Civil
Action," the Committee said:  "See attached Section XV of the Plan, setting forth the Plan's
claims procedures."[15]  The Committee made no reference to the SPD or Plaintiffs' contention
that it was defective and the Plan had failed to establish and maintain a reasonable claims
procedure.  The Committee also omitted mention of Plaintiffs' specific request for pertinent
documents, failed to produce any such documents, and did not inform Plaintiffs that they had the
right to "be provided, upon request and free of charge . . . all documents, records, and other
information relevant to the claimant's claim for benefits."  29 C.F.R. § 52560.503-1(h)(2)(iii).

The Committee closed by stating that "[t]he Claimants have 60 days following receipt of
this letter to appeal this adverse determination.  The officer of Amtrak designated to adjudicate
appeals is the Vice President, Human Resources, Ms. Lorraine Green. Appeals may be directed
to Ms. Green's attention at National Railroad Passenger Corporation, 60 Massachusetts Avenue,
NE, Washington, D.C. 20002.  If there is an adverse determination on appeal, the Claimants have
a right to bring a civil action under Section 502(a) of ERISA."  As it had in its initial November
1st letter, the Committee open-copied on its letter:  "Counsel to the Committee" Barbara E.
Schlaff and Robert J. Bolger of Venable and John R. Wellschlager, "Counsel to the Company."

---

[13] The Committee also said "ERISA clearly contemplates that employees of a plan sponsor may serve as fiduciaries
responsible for claims adjudication under a plan" – a point Plaintiffs had acknowledged originally in seeking the
recusals but noting that this is not an ordinary or routine "claims adjudication" or claim for benefits.  *See* Claim Ltr.
at 3.

[14] The Committee also addressed what it characterized as Plaintiffs' contention that "the most recent restatement of
the Plan (executed December 30, 1994, effective January 1, 1989) was not properly authorized by Amtrak's Board
and consequently actions taken pursuant to it are unauthorized."  *Id.*  However, the Committee did not address the
context in which Plaintiffs raised the issue – namely, the need for Amtrak employees to be recused from deciding
the issue.  The Committee responded as follows:  "Assuming for purposes of this claim (without deciding the
matter) that the 1994 restatement of the Plan was not properly authorized when originally adopted, the Committee
nonetheless rejects this claim on the basis that subsequent actions of the Board in authorizing amendments to the
Plan, and otherwise acting with respect to the Plan, amount to an implied ratification of the 1994 restatement of the
Plan. We also note that it is the Committee's duty under ERISA to administer the Plan in the best interests of all Plan
participants and beneficiaries. If we were to conclude that the 1994 restatement of the Plan was not properly
adopted, the tax qualification of the Plan could be jeopardized - a result which would be detrimental to all Plan
participants and beneficiaries."  *Id.*  The Committee added that its determination in this regard "results from [the
foregoing] reason . . ., not from a specific Plan provision."  *Id.* at 7.

[15] The Committee's reference was to a two page excerpt from the "Printed 12/23/94" version of the Plan.

Lorraine Green                                          Gottesdiener Law Firm, PLLC
May 16, 2006
Page 9


On February 9, 2006, Plaintiffs appealed the denial of their claim.[16]  As an initial matter, Plaintiffs requested that you (Ms. Green) recuse yourself from this matter because of "your intimate involvement in the matters in question."  Plaintiffs added that, for example, the factual record suggests that "you authorized the printing of pamphlets to be sent to VERP eligible employees on September 14th without even knowing whether or not the Board had taken official action to amend the Plan."

Plaintiffs further objected that the Committee had violated and ignored Plaintiffs' rights to receive all documents, records and information relevant to their claim and asked that this be immediately corrected and Plaintiffs' appeal be held in abeyance pending the required requested disclosures and Plaintiffs' submission of further arguments after having had an opportunity to review same.

On February 16, 2006, Plaintiffs wrote Venable to ask whether it was representing the new Committee Members in connection with Plaintiffs' claim for benefits and/or in any capacity in the *Hall* litigation.  Plaintiffs also asked Amtrak's outside litigation similar questions in a letter that same day.

Venable responded on February 22, 2006, stating that the firm represented the Committee Members "in connection with [Plaintiffs'] claim for benefits" and that Venable did not represent any party in the *Hall* litigation.  Venable also said:  "We also have been retained to represent Ms. Lorraine Green in her fiduciary capacity as the plan's appeals officer in connection with the August 5, 2005 claim."  Venable did not reference the fact that on February 9th, Plaintiffs had asked you to recuse yourself.[17]

On March 16, 2006, you wrote Plaintiffs' counsel, again without reference to Plaintiffs' request that you recuse youself, saying that you were in receipt of Plaintiffs' appeal and that "[p]ursuant to your request, we are assembling certain documents, records and information which

---

[16] Without objection from the Committee, Plaintiffs incorporated by reference "all arguments and points raised in prior filings or any form of written communication concerning the invalidity of the September 14, 2001 amendment, and the validity of July 26, 2001 amendment," and "the deposition testimony of all witnesses deposed in this case with particular reference to Governor Holton, John Carten and Alicia M. Serfaty," and "all documents Plaintiffs have ever reference[d] on the[se] topics including documents not yet produced or withheld for any reason."  Claim Ltr. at 5.  Plaintiffs continue that practice of incorporation, supplemented with the summary contained on page 1 of this letter, and submit for your consideration all documents, records and information there referenced.

[17] On February 24, 2006, counsel for Amtrak in the *Hall* litigation stated that his firm represented only the Committee in the litigation but not the individual Committee members:  "They are not named as individuals . . . and thus we could not represent them in such a capacity."  In that same letter, Amtrak and the Committee for the first time disclosed to Plaintiffs that two of the new Members were recommended for appointment in April 2005 and a third in June 2005 following the March/April 2005 resignations of the prior Members.  Attachments to the letter indicate that two of the appointments were actually (on April 21, 2005) but nothing attached indicates the third recommended appointment (of Mr. Hardison) was ever actually made.

Lorraine Green                                          Gottesdiener Law Firm, PLLC
May 16, 2006
Page 10

you have asked for.  We expect this process to be completed in the next week or two."  You also
said:  "pursuant to your request, I will hold [Plaintiffs'] appeal in abeyance for the time being."
On March 20, 2006, Plaintiffs responded by, among other things, explaining that Plaintiffs see
in your letter additional grounds for your recusal.

        Plaintiffs did not hear from you again until April 21, 2006 when, under cover of a letter
sent on your behalf by Venable, you forwarded Plaintiffs some of the documents they had
originally requested of the Committee on August 5th and, through you, again on February 9th.
*See* Venable Ltr., April 21, 2006.

        The Venable April 21st letter states that Venable represents you "in [your] capacity as
appeals officer" under the Plan and that "[o]n behalf of Ms. Green, we are responding to your
request in your letter to Ms. Green dated February 9, 2006, for documents, records and other
information in connection with the determination by the Retirement Plan Committee of the Plan,
as set forth in the letter to you dated January 23, 2006, relating to [Plaintiffs'] claim for benefits."
The letter continues:  "Please note that we have determined that some of the documents you
requested in your February 9, 2006 letter are not relevant under the applicable regulations and
others are privileged or work product and such documents are not being produced."  Venable Ltr.
at 1.  The letter continues:  "We are enclosing with this letter all non-privileged, non-work
product relevant documents responsive to your request, and a list of those documents which are
being withheld."  *Id.*

        The Venable letter also states:  "We have not enclosed copies of the pleadings filed in the
*Hall v. National Passenger Railroad Corp*. litigation because you already have them."  *Id.*
However, the letter does not assert or explain how or which of those filings were relevant to the
Committee's determination within the meaning of the Department of Labor claims regulations.[18]

        The Venable letter concludes by saying that "as the appeals officer under the Plan," you
will "provide a response to the substance of the matters raised in [Plaintiffs'] letters . . .  dated
February 9, 2006 and March 20, 2006, following receipt of [Plaintiffs'] 'further arguments', as
described in [Plaintiffs'] March 20, 2006 letter."  No reason was given for the continued failure
to address Plaintiffs' requests for your recusal, as to which Plaintiffs had not indicated they
believed they needed to make any "further arguments."

---

[18] From the documents produced, it appears that Venable used the word "pleadings" to refer to pleadings (which
under the Federal Rules of Civil Procedure are limited to complaints, answers, counterclaims, etc.) as well as other
other court filings such as motions, memoranda, etc., that do not qualify as "pleadings."  As of today's date, the
docket in *Hall* contains over 90 separate entries of the pleadings and other filings.

Lorraine Green                                             Gottesdiener Law Firm, PLLC
May 16, 2006
Page 11

<p align="center">**Plaintiffs' Further Appeal of the Denial of Their Claim**</p>

**1.    Request for Recusals.**

Plaintiffs reiterate their request that you recuse yourself as appeals officer in this matter and also seek the recusal of Venable and Mr. Herrmann from any further involvement in the adjudication of Plaintiffs' claims.

In your case, as previously indicated, Plaintiffs believe that you have multiple, direct, disqualifying personal and professional conflicts of interest as regards the VERP, these claims for benefits and the *Hall* litigation.  You have direct personal and professional reasons for denying Plaintiffs' claims without regard for their merit and you are a material witness in both this matter and the *Hall* litigation on a number of potentially important issues.  Plaintiffs believe that your failure to recuse yourself by now, or even acknowledge or respond to Plaintiffs' repeated requests for recusal, shows the extent to which these conflicts have affected your judgment.  Your use of Venable and Mr. Herrmann as your legal counsel in this matter provides further evidence of the extent to which you have allowed your conflicts to influence you.

As regards Venable, its conflicts of interest and the manner in which it has thus far acted requires it too to withdraw from further involvement here.  Without attempting to be exhaustive (which in any event is not possible due to extensive withholding of relevant documents, records and other information, discussed below), Venable's lack of objectivity in this matter -- presumably borne of its positional conflicts as counsel to numerous plan sponsors and desire to earn fees -- is evidenced by, among other things, its attempt to represent you after having represented the Committee, whose decision you are supposed to review -- indeed, review *de novo*.  Venable cannot objectively review its own work.  Because that decision and reasoning was effectively Venable's, using Venable as your counsel guarantees that Plaintiffs will not get a full and fair review of either the decision or its reasoning.

Further evidence of the effect that Venable's conflicts have had on its judgment can be seen in its failure to even acknowledge Plaintiffs' request for pertinent information regarding the determination of their claim and failure to promptly right that wrong when Plaintiffs explicitly brought it to Venable's attention.  It took Venable close to three months to send Plaintiffs any documents under cover of its April 21st letter.  When it finally did, it engaged in the withholding of clearly relevant documents on grounds plainly spurious (discussed below).[19]

---

[19] Much of the withheld material appears to be material that, if disclosed, would show the bias and collusion on the part of those involved in the handling of Plaintiffs' claim to ensure the matter is resolved in a way and at a pace that affords Amtrak the maximum litigative advantage in the *Hall* litigation.  Venable appears to have been unaware of Plaintiffs' request for relevant information prior to February 9th or the law's requirement that such information be disclosed upon request and thus unaware that its statements on January 23rd about how independent and thorough its review had been could be challenged with evidence from its own files.  Now, rather than simply disclose all relevant documents, records and other information, Venable has compounded the problem by stonewalling.

Lorraine Green                                                    Gottesdiener Law Firm, PLLC
May 16, 2006
Page 12

        Plaintiffs also continue to maintain that Mr. Herrmann's involvement in the Committee's
consideration of Plaintiffs' claim as counsel to the Committee was inappropriate.  His apparent
continuing involvement at the appellate level, in any capacity, is equally improper.  Mr.
Herrmann is personally and professionally conflicted in multiple ways in these matters and his
presence, literally or figuratively, in any phase of these proceedings (other than as a witness
being questioned as such) taints them and makes them fundamentally unfair to Plaintiffs.  That
you and Venable did not insist that he remain walled-off from these proceedings again shows the
degree to which you lack the necessary independence to be involved any further here.

        **2.      Improper Denial of All Documents, Records and Other Information Relevant
                to the Committee's Claim Determination.**

        Plaintiffs have been denied the documents, records and other information relevant to their
claim that they specifically requested and to which they were and are entitled.  Full compliance
with the claims regulations was essential for Plaintiffs to receive a meaningful opportunity to be
heard and to obtain a full and fair review of their claims.[20]  Together with the Plan's failure to
establish and maintain a reasonable claims process, the extensive withholding of highly relevant
materials and information has deprived Plaintiffs of their rights to a fair and impartial hearing.

                (1)      "Privilege."

        None of the withholdings based on privilege are proper or even colorable.  Venable's
April 21st letter states:  "Please note that we have determined that some of the documents you
requested in your February 9, 2006 letter *are not relevant* under the applicable regulations and
*others are privileged or work product* and such documents are not being produced.  We are
enclosing with this letter all non-privileged, non-work product relevant documents responsive to
your request, and a list of those documents which are being withheld."  April 21st Ltr. at 1
(emphasis added).  This is a direct acknowledgement that all of documents or portions of
documents withheld on grounds of privilege **are** "relevant under the applicable regulations" –
but you have decided to withhold them anyway.[21]  That is improper under the regulations which
do not recognize claims of privilege whenever the documents (or other information) in question
satisfy the regulations' special definition of relevance.  Thus, if a document was "submitted,
considered, or generated in the course of making the benefit determination, without regard to
whether such document, record, or other information was relied upon in making the benefit
determination," it must be produced.

        Moreover, even assuming that you or the Committee can invoke privilege, here there
would be no such valid claim.  Either the withheld material is within the fiduciary exception to

_____

[20] Full compliance was equally necessary for Plaintiffs to be able to convincingly establish the bias of decision
makers involved in the claims and appeals process.

[21] The contention, as appears on the log, that some of these documents or document portions can also be withheld
separately on the grounds of "scope" is addressed below.

Lorraine Green                                                      Gottesdiener Law Firm, PLLC
May 16, 2006
Page 13

the attorney-client privilege and/or work product privileges, and/or in the case of the repeated
invocation of "work product" for notes or documents created by Amtrak's litigation counsel but
which were directly or indirectly submitted to the Committee or its counsel in connection with
the benefit determination, any claim of privilege was plainly waived. The withheld materials and
information should be disclosed immediately.[22]

        (2)        "<u>Scope</u>."

        The "scope" objections are simply designed to help conceal the record of extensive
contacts between you, the Committee and Venable on the one hand and Amtrak on the other that
demonstrate the bias and collusion infecting this process. Given the Committee's admission of
the extent to which it relied on counsel's investigation, opinions and legal advice to reach its
determination, for "relevan[ce]" purposes under the regulations, all documents "submitted [to
Venable], considered [by Venable], or generated [by Venable] in the course of making the
benefit determination, without regard to whether such document, record, or other information
was relied upon in making the benefit determination," must be produced.

        (3)        "<u>Other Information</u>."

        Plaintiffs' repeated request for other, relevant "information" has been repeatedly ignored.
The regulations are clear and require disclosure not just of relevant documents and records but
also "other information" relevant to the determination of Plaintiffs' claim. The Committee,
through counsel, conducted interviews of witnesses, and of other counsel. All of the information
obtained from those interviews or conversations are relevant and must be produced.

        (4)        <u>Other documents</u>.

        Numerous categories of materials specifically requested have been ignored, such
Venable's billing statements, invoices and documents reflecting who hired Venable, when, how
much the firm has been paid and what were and are the source of those payments. All of these
documents (and/or information) should have been disclosed. Plaintiffs request that you instruct
Venable to disclose those materials and information now.

        Plaintiffs provide two additional examples rather than demonstrate item-by-item the
extent to which Plaintiffs have been denied documents, records and information relevant to the
determination of their claim.

---

[22] Nevertheless, Plaintiffs do **not** request your or your replacement's decision be held in abeyance while you do so,
if you do so. These proceedings were and are fundamentally unfair even without regard to these improper
withholdings and Plaintiffs are not required to further delay their return to federal court based on an unrealistic hope
that they will suddenly have their claims fully and fairly adjudicated.

Lorraine Green                                    Gottesdiener Law Firm, PLLC
May 16, 2006
Page 14

First, notwithstanding the express language of the regulation, Plaintiffs have not received any documents or records that demonstrate compliance with the administrative processes and safeguards required by 29 C.F.R. § 52560.503-1(b)(5) including, without limitation, processes and safeguards to assure that plan provisions were and are applied consistent with governing plan documents and consistently with respect to similarly situated claimants. Nor, if there are no such documents or records, have Plaintiffs been provided with the "other information" that no such documents or record exist.

Second, Venable ignores the governing regulations' requirement that the claimants be provided copies of all relevant documents, records and information as to the *Hall* filings referenced in the Venable April 21st letter when it says it is not producing copies of those filings "because [Plaintiffs] already have them." Putting aside the most basic objection that Plaintiffs' possession or access to those documents does not provide Venable with any basis under the regulations -- which contain no "you-already-have-them" exception – to withhold them, the critical point is that without Venable at least *identifying which ones are relevant* within the meaning of the claims regulation, Plaintiffs are left as much in the dark as if they were not told anything at all about the filings.[23]

3.    **Plaintiffs' Claim Should Be Granted Because the Amtrak Board of Directors Took No Action to Amend the Pension Plan on September 14, 2001.**

An objective adjudicator would have readily concluded that the Amtrak Board did not "take[]" "action" on September 14, 2001 within the meaning of D.C. Code § 29-101.136 and/or Amtrak's By-Laws § 4.12, based on a thorough and impartial review of the facts. Similarly, an objective adjudicator would have concluded that *because* the Amtrak Board did not "take[]" "action" on September 14, 2001 within the meaning of D.C. Code § 29-101.136 and/or Amtrak's By-Laws § 4.12, it also did not take "action" within the meaning of Plan § 13.01 on September 14, 2001 to amend the VERP to eliminate the Railroad Retirement Supplement. The terms of the statute and by-laws are plain and admit of no exception: board action without a meeting is valid only if "[the] consent _shall_ be signed . . . _by all of the members of the board,_" D.C. Code § 29-101.136 (emphasis added); By-Laws § 4.12 (emphasis added). Here, there was no consent to proceed without a meeting, nor was the draft resolution management tendered "signed by all of the members of the board."

Regrettably, the Committee's desire to save Amtrak what it would cost if those provisions were applied as written and the unamended Plan implemented as it existed just prior

---

[23] Plaintiffs are confused as well by the fact that, notwithstanding its assertion that it would not provide any filings from the *Hall* case, Venable did indeed do so. Plaintiffs found several defense filings -- no plaintiff-filings – among the documents produced. Read literally (but, again, with the apparently intended modification to the word "pleadings"), the January 23rd letter's representation that "Counsel has reviewed . . . the litigation pleadings" means all filings, including Plaintiffs' submissions, were reviewed. Whatever the truth is, Plaintiffs are entitled to know it, to a detailed listing of all of the relevant *Hall* filings or copies of exactly what was reviewed and hence, by definition, relevant.

Lorraine Green                                              Gottesdiener Law Firm, PLLC
May 16, 2006
Page 15

to the failed, purported September 14, 2001 reduced VERP amendment, have caused it to ignore the explicit, unambiguous language of D.C. Code § 29-101.136 and By-Laws § 4.12, and the indisputable principles governing the amendment of ERISA plans.

The Committee's (*i.e.,* Venable's) discussion of the issue presented never once quotes or discusses the text of the law and by-law it is supposed to be applying, so transparently result-oriented is it. The Committee insists that the act of complying with the express requirements of the law and by-laws of the Corporation as regards the taking of formal corporate action in the absence of a meeting can be "delegat[ed]" but cites nothing in support of that contention, which is really nothing more than the Committee's attempt at an excuse. The related contention that the act of personally signing the consent to proceed without a meeting (and to authorize the corporate business at issue) should be deemed "ministerial" is another unsubstantiated, unprincipled assertion that fails to join issue with the facts, the law and/or Plaintiffs' actual contentions.

Sincerely,

Eli Gottesdiener

Cc:    Barbara E. Schlaff, Esq. (via email)
       Robert J. Bolger, Jr., Esq. (via email)
       Harry I. Atlas, Esq. (via email)
       William H. Herrmann, Esq. (via facsimile)
       John R. Wellschlager, Esq. (via email)
       Desmond T. McIlwain, Esq. (via email)

**Claim denial appeal – further letter in support**

**March 20, 2006**



**Gottesdiener**
**Law Firm, PLLC**

New York | Washington, D.C.
www.gottesdienerlaw.com

1025 Connecticut Ave, N.W. #1000
Washington, D.C. 20036
Tel: 202.243.1000
Fax: 202.243.1001

**Eli Gottesdiener**
eli@gottesdienerlaw.com

March 20, 2006

<u>Via Facsimile</u>

Lorraine Green
Vice President, Human Resources
National Railroad Passenger Corporation
60 Massachusetts Avenue, N.E.
Washington, D.C.  20004-1008

Dear Ms. Green:

In regards to your letter of March 16, 2006, we do not agree that you have accurately characterized the state of the proceedings.  Moreover, your letter provides additional grounds for your recusal.

1.      You identify yourself as the "Plan Appeals Officer."  While you at one point say that "I will hold your appeal in abeyance for the time being," you otherwise show that you have not clearly distinguished your role as a named fiduciary for deciding participant appeals from your role as a corporate HR employee.  Thus, your letter contains repeated references to "we" – "we are assembling certain documents . . . . We expect this process to be completed in the next week or two . . . . your clients will have 60 days from the time we deliver the materials we are producing ….."  This is all the more striking in that your letter ignores that we have asked you to recuse yourself and to do so immediately.  In that setting you have not taken the care to even speak to the appellants in terms that attempt to communicate an independence from your employer or the Committee's whose denial you are supposed to independently review.

I also note that you sent your letter through Amtrak's Deputy General Counsel William Herrmann who is a named Defendant in this matter even though the Committee did the same thing previously and as a result I am already requesting documents and information bearing on why the Committee's denial was faxed to me in that manner, "with particular reference to what role he or anyone else acting in whole or in part on behalf of the Sponsor had in any aspect of the adjudication of my clients' claim."  Whether you recuse yourself or not, that item should now be read to encompass all documents and information bearing on Mr. Herrmann's role or the Law Department's role in the processing of an appeal directed to you personally as a supposedly independent adjudicator.  We reiterate our request that you step aside immediately, except insofar

Lorraine Green                                            Gottesdiener Law Firm, PLLC
March 20, 2006
Page 2

as you are assisting in the production of documents (that we should already have in our possession).[1]

    2.    You also misstate the state of the proceedings.  You say that "your clients will have 60 days from the time we deliver the materials we are producing *to perfect their appeal*." (emphasis added).  Our appeal has been perfected – it is the denial by the Committee that was inadequate because it ignored our statutory right to relevant documents, explicitly requested in the original claim letter.   We requested that our perfected appeal be held in abeyance until such time as we have received the materials we should already have, have had an opportunity to review them, and have had "an opportunity to make further arguments."  I will construe your letter as providing my clients with 60 days from the receipt (or "deliver[y]") of the materials you ("we") "are producing" to make such further arguments as they deem appropriate.

    Sincerely,

Eli Gottesdiener

Cc:    Wade F. Hall
    Hattie N. McCoy-Kemp
    Victoria F. Staton
    John R. Wellschlager, Esq.

---

[1] As you communicated with me by facsimile through Mr. Herrmann and did not provide me any direct facsimile number, I am faxing this letter to the attention of Mr. Herrmann, who I can only assume is acting as your counsel in this matter.  All your communications with him or anyone else acting as your counsel or advisor in this matter are subject to our pending requests for documents, records and information.

**Claim denial appeal – further letter in support**

**March 20, 2006**



**Gottesdiener**
**Law Firm, PLLC**

New York | Washington, D.C.
www.gottesdienerlaw.com

1025 Connecticut Ave, N.W. #1000
Washington, D.C. 20036
Tel: 202.243.1000
Fax: 202.243.1001

**Eli Gottesdiener**
eli@gottesdienerlaw.com

February 9, 2006

<u>Via Overnight Mail</u>

Lorraine Green
Vice President, Human Resources
National Railroad Passenger Corporation
60 Massachusetts Avenue, N.E.
Washington, D.C.  20004-1008

Dear Ms. Green:

This is an appeal from the January 23, 2006 denial of the claim made on August 5, 2005 by Wade F. Hall, Hattie N. McCoy-Kemp, and Victoria F. Staton for benefits due under the Retirement Income Plan For Employees Of National Railroad Passenger Corporation (the "Plan").

1.    We are informed that you have been selected to serve as the named fiduciary responsible for providing my clients with a full and fair review of their benefit claim denial.  If you were so designated, we believe that your intimate involvement in the matters in question requires you to recuse yourself.  Indeed, the factual record suggests that you authorized the printing of pamphlets to be sent to VERP eligible employees on September 14th without even knowing whether or not the Board had taken official action to amend the Plan.  (We have previously incorporated other documents and arguments by reference – this is merely an example of the reasons why you should have no further involvement with this matter).

2.    Neither you nor the Committee have the power, by law or by virtue of the Plan instrument, to render a decision as to whether or not a certain provision or provisions did or did not become a part of the Plan as a matter of federal or District of Columbia law.  You should therefore decline to adjudicate this appeal, vacate the Committee's decision and inform Judge Kessler that my clients have exhausted their administrative remedies and neither the Committee nor you have the jurisdiction to adjudicate my clients' claim for benefits until the Court decides whether the September 14, 2001 purported Plan amendment was duly enacted under District of Columbia corporations law and federal pension law.  Any other decision simply underscores your and the Committee's lack of objectivity.

3.    The Committee's decision is entitled to no weight because it delayed its decision unreasonably and in conjunction with an admitted attempt by the Plan sponsor to avoid the judicial adjudication of the validity of the September 14th amendment, in a misguided effort to gain litigative advantage.  Again, you are unable to objectively review this evidence of the

Lorraine Green                                      Gottesdiener Law Firm, PLLC
February 9, 2006
Page 2

Committee's bias and collusion with the Plan sponsor in this fashion due to the position you hold
and your intimate involvement in the matters in question referenced above.

4.    The Committee's decision is entitled to no weight because it ignored two of three
arguments advanced for why the Board did not, as a matter of law, take valid action on
September 14th to amend the Plan.  As to the contentions the Committee makes for why an
exception should be made for the Board's failure to comply with the statutory unanimous
consent procedures, they are without merit.  The statute is plain on its face, and its requirements
clear.  Compliance with them is not optional, or waiveable.  Nor is a Director's duty under the
statute delegable as the Committee states or implies.

5.    The Committee's decision is entitled to no weight because the Committee
impertinently ignored our explicit request for all documents and information relevant to this
claim.  *See* Claim Ltr. at 6.  ERISA § 503(a)(2), 29 U.S.C. § 1133(a)(2) provides, "in accordance
with regulations of the Secretary, every employee benefit plan shall . . . afford a reasonable
opportunity to any participant whose claim for benefits has been denied for a full and fair review
by the appropriate named fiduciary of the decision denying the claim."  ERISA § 503(a)(2), 29
U.S.C. § 1133(a)(2).

The regulation applicable to my clients' claim states that any plan's claims review
procedure must "[p]rovide that a claimant shall be provided, upon request and free of charge . . .
copies of all documents, records, and other information relevant to the claimant's claim for
benefits.  Whether a document, record or other information is relevant to a claim for benefits
shall be determined by reference to paragraph (m)(8) of this section."  29 C.F.R. § 52560.503-
1(h)(2)(iii).  Paragraph (m)(8) provides in pertinent part:  "A document, record, or other
information shall be considered "relevant" to a claimant's claim if such document, record, or
other information:  (i) Was relied upon in making the benefit determination; (ii) Was submitted,
considered, or generated in the course of making the benefit determination, without regard to
whether such document, record, or other information was relied upon in making the benefit
determination; (iii) Demonstrates compliance with the administrative processes and safeguards
required pursuant to paragraph (b)(5) of this section in making the benefit determination."  *Id.* §
52560.503-1(m)(8).

The Committee's failure to even acknowledge my clients' request let alone discharge
their duties under this notice-and-comment regulation is strong evidence of its bias and inability
to fairly consider my clients' claims.

6.    Before recusing yourself from further involvement in this matter, you should
immediately cause to be provided to us all "documents, records and other *information,*" *id.*
(emphasis added), relevant to my clients' claim including but not limited to:

(1)    All documents and information regarding the selection and appointment of
the Members of the Committee who purported to adjudicate this claim, and all documents

Lorraine Green                                                    Gottesdiener Law Firm, PLLC
February 9, 2006
Page 3

regarding the removal or resignation of the Members who were serving since shortly after my clients filed suit in August 2003, including all reasons why those Members are no longer serving on the Committee and the timing of their resignation or removal vis-a-vis this claim for benefits.

(2)      All documents and information regarding your selection and appointment by the Board of Directors *or* any other person or persons as the person or named fiduciary with authority to provide my clients with a full and fair review of their claim.[1]

(3)      All documents and information regarding all communications or other interactions between the Committee or any of its Members and Committee counsel[2] regarding this claim.[3]

(4)      All documents and information in the possession, custody or control of the Committee or any of its Members regarding this claim.

(5)      All documents and information in the possession, custody or control of Committee counsel regarding this claim.

(6)      All documents and information regarding all communications or other interactions between the Committee or its Members regarding this claim and counsel for the Sponsor (or for any current or former director, officer or employee or agent of the Sponsor).[4]

(7)      All documents and information regarding all communications or other interactions between the Committee or its Members and any other fiduciary (including but not limited to the Sponsor, as fiduciary), named fiduciary or other person regarding this matter.

(8)      All drafts of the Committee's January 23, 2006 denial letter.

(9)      All interview notes or notes taken or made in connection with the adjudication of this claim.

(10)     All emails written or received in connection with this claim.

---

[1] A copy of the written instrument by which the Amtrak Board of Directors designated you to serve in that capacity must also be provided under ERISA § 104(b)(2) and/or (b)(4), which we hereby invoke.

[2] Including but not limited to Barbara E. Schlaff and Robert J. Bolger.

[3] "Claim" for purposes of this letter includes but is not limited to all factual and legal matters pertaining to this claim.

[4] Counsel for the Sponsor includes but is not limited to John R. Wellschlager, Mark Muedking, Joy Napier-Joyce, Katrina Kamantauskas-Holder, Roxane Sokolove Marenberg, Desmond T. McIlwain, Alicia Serfaty, William Herrmann.  All references to the Sponsor including any current or former director, officer or employee or agent of the Sponsor acting in whole or in part in a non-fiduciary capacity.

Lorraine Green                                                    Gottesdiener Law Firm, PLLC
February 9, 2006
Page 4

       (11)    All other documents or information generated in connection with this claim, including audio or videotapes.

       (12)    All documents reviewed in whole or in part by the Committee or any of its Members or any of its counsel in connection with this claim.

       (13)    All retainer and related agreements pertaining to the retention of counsel for the Committee as relates to this claim, including all bills, invoices, expenses reports, etc.

       (14)    All documents pertaining to the validity of the 12/23/94 version of the Plan that are or were in the Committee's possession, custody or control, or that of any of its Members or of its counsel.

       (15)    All information of which the Committee, any of its Members or its counsel are aware pertaining to the validity of the 12/23/94 version of the Plan.

       (16)    All documents and information that reflect or constitute what the Committee calls "subsequent actions of the Board in authorizing amendments to the Plan, and otherwise acting with respect to the Plan" such that they can be deemed to be "an implied ratification of the 1994 restatement of the Plan," with specific reference to exactly which actions constitute such ratification.  Also produce all documents and information indicating whether the Sponsor has ever informed the Internal Revenue Service as to its failure to properly amend the Plan or any theory that can be likened to the Committee's that this failure to amend can be or was cured retroactively and/or through implied ratification.  Also produce all documents and information pertaining to any consideration that the Committee has given to its obligations to inform current or prior participants regarding these matters.

       (17)    All documents and information that comprise "the extensive record in this matter" that the Committee and/or any of its Members and/or any of its counsel considered (in whole or in part) in denying my clients' claim.

       (18)    All documents and information reflecting cooperation or informational or other exchanges among the Committee and the Sponsor in connection with the adjudication of this claim, including but not limited to the timing of the Committee's denial and all considerations bearing on the timing of the Committee's denial (including but not limited to considerations pertaining to the briefing schedule set by Judge Kessler in the District Court case and the Committee's ability to withhold decision until such time as it may have been deemed advantageous to the Sponsor (or the Committee) as a litigant in the District Court case.  Included in this request are all documents and information bearing on why the Committee's denial was faxed to me by Amtrak's Deputy General Counsel William Herrmann, with particular reference to what role he or anyone else acting in whole or in part on behalf of the Sponsor had in any aspect of the adjudication of my clients' claim.

Lorraine Green                                                    Gottesdiener Law Firm, PLLC
February 9, 2006
Page 5

     Please provide the above-referenced documents, records and information to us on a rolling basis and, if you have not already denied the appeal for the reason set forth in paragraph 2 above, please hold this appeal in abeyance until I have had an opportunity to make further arguments after I have received all relevant documents, records and information.

     If you refuse to produce any of the requested documents, records or information kindly explain specifically what is being withheld and specifically why, with reference with the numbered subparagraphs above.

             Sincerely,

             Eli Gottesdiener

Cc:   Wade F. Hall
       Hattie N. McCoy-Kemp
       Victoria F. Staton

**Claim denial**

**January 23, 2006**

# NATIONAL RAILROAD PASSENGER CORPORATION
## LAW DEPARTMENT
60 Massachusetts Avenue, N.E.
Washington, D.C. 20002

---

The documents accompanying this facsimile transmittal may contain confidential information which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, or the person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of any of the information in this transmittal is strictly prohibited. If you have received this transmittal in error, please immediately notify the sender by telephone and return the original transmittal by mail.

---

## FACSIMILE COVER PAGE

**DATE:**       **January 23, 2006**       **NO. OF PAGES INCLUDING COVER:  21**

**TO:**       **Eli Gottesdiener, Esq.**

**COMPANY NAME:  Gottesdiener Law Firm**

**PHONE NUMBER:**       **FACSIMILE NUMBER:**       **202-243-1001**
**718-788-1650**

**FROM:**       **William H. Herrmann, Esq.**
**Deputy General Counsel**
**Phone: 202-906-3971**
**Fax: 202-906-2821**

**COMMENTS:**

If transmission is interrupted or of poor quality, please call 202-906-3310

**RETIREMENT PLAN COMMITTEE,
RETIREMENT INCOME PLAN FOR EMPLOYEES OF
NATIONAL RAILROAD PASSENGER CORPORATION
60 MASSACHUSETTS AVENUE, N.E.
WASHINGTON, DC 20002**

January 23, 2006

Via Facsimile and First Class Mail

Eli Gottesdiener, Esq.
Gottesdiener Law Firm, PLLC
1025 Connecticut Avenue, Suite 1000
Washington, D.C. 20036

      Re:    Claim For Benefits Under The Retirement Income Plan For Employees Of
             National Railroad Passenger Corporation

Dear Mr. Gottesdiener:

      We are writing in response to your letter dated August 5, 2005 (the "August 2005 Letter"), in which you make claims for benefits under the Retirement Income Plan for Employees of National Railroad Passenger Corporation ("Plan") on behalf of Wade F. Hall, Hattie N. McCoy-Kemp and Victoria F. Staton ("Claimants"). Under Article XV of the Plan, we, as the Retirement Plan Committee ("Committee"), are responsible for responding to claims under the Plan. The purpose of this letter is to inform you that, after careful consideration of the claims of the Claimants, we have decided to deny the claims because we find that the version of the Voluntary Early Retirement Program ("VERP") containing the reduced benefits approved by the Board of Directors of National Railroad Passenger Corporation ("Amtrak") on September 14, 2001 was the effective final and operative version of the VERP, and superseded the earlier version of the VERP approved at a meeting of Amtrak's Board of Directors on July 26, 2001.

**Background Information**

      In 2001, Amtrak management was considering ways to reduce Amtrak's operating costs through a workforce reduction. In order to minimize the number of involuntary dismissals, Amtrak decided to implement a voluntary early retirement plan, which would be made available to eligible Amtrak employees for a period of time commencing on September 15, 2001 and ending on October 31, 2001.

      On July 26, 2001, at a meeting of Amtrak's Board of Directors, the Board voted to approve a VERP that included two components: (1) an additional 5 years of age for purposes of determining the early retirement reduction applicable under the Plan, and (2) a monthly supplement payable until a participant qualified for unreduced Railroad Retirement Benefits ("Railroad Retirement Supplement").

Eli Gottesdiener, Esq.
January 23, 2006
Page 2


Before the window for the VERP opened to eligible employees on September 15,
2001, it became apparent that the cost of the VERP, in the version approved by the Board
on July 26, 2001, was going to be significantly higher than originally estimated.
Therefore, Amtrak management intended to present a scaled-back version of the VERP to
Amtrak's Board of Directors for approval at a meeting scheduled on September 12, 2001,
but this meeting was cancelled because of the catastrophic events of September 11, 2001.
Left without time to reschedule a Board meeting before the VERP election window
would open on September 15, 2001, the Board approved a scaled-back version of the
VERP on September 14, 2001 by written consent.  Under this revised version of the
VERP, instead of the Railroad Retirement Supplement, each participant would receive a
$15,000 lump sum payment.  The additional 5 years of age for purposes of determining
the early retirement reduction applicable under the Plan remained in place.

You filed suit on behalf of the Claimants on August 19, 2003 in United States
District Court for the District of Columbia.  On August 5, 2005, Judge Kessler ruled that
Count I of the Complaint was appropriately cast as a claim for benefits under the Plan,
and that this claim was premature because plaintiffs had not exhausted the Plan's claims
procedures.  You then submitted the August 2005 Letter to the Committee on behalf of
the Claimants.

### Summary of Claims

With respect to Mr. Hall (who did not accept the VERP, continued working for
Amtrak and retired under the generally applicable terms of the Plan), you are claiming
the full value of the July 2001 VERP (plus interest).[1]  With respect to Ms. McCoy-Kemp
(who accepted the September 2001 VERP), you are claiming the difference in value
between the July 2001 VERP and the September 2001 VERP (plus interest).  With
respect to Ms. Staton (who did not accept the VERP, was later terminated and paid
severance), you are claiming the difference in value between the July 2001 VERP and the
severance (plus interest).

You assert on behalf of the Claimants that the Plan was amended by the Board of
Directors of Amtrak on July 26, 2001, when it voted to approve a VERP that included (1)
an additional 5 years of age for Plan purposes, and (2) the Railroad Retirement
Supplement.  You further assert that the Amtrak Board's approval on September 14, 2001

---

[1]    For purposes of brevity, we refer herein to the "July 2001 VERP" and the "September 2001
VERP" to mean the versions of the VERP approved by the Board on July 26, 2001 and September 14,
2001, respectively.  It is the Committee's finding that the only operative version of the VERP is that which
was approved by Amtrak's Board of Directors on September 14, 2001 and communicated to eligible
employees before the window opened on September 15, 2001 as the final version of the program.

Eli Gottesdiener, Esq.
January 23, 2006
Page 3

of the change to the VERP's second prong from the Railroad Retirement Supplement to a lump sum payment of $15,000 per participant was ineffective and therefore, the terms of the July 2001 VERP remained in place even after September 14, 2001. Correspondingly, you assert that the liability waivers executed by Ms. McCoy-Kemp and Ms. Staton are invalid because they were based on misinformation concerning the terms of the VERP.

In the alternative, and only if it is determined that the Plan was properly amended on September 14, 2001, you assert that the most recent restatement of the Plan (executed December 30, 1994, effective January 1, 1989) was not properly authorized by Amtrak's Board and consequently actions taken pursuant to it are unauthorized.

You are not claiming that Mr. Hall, Ms. McCoy-Kemp or Ms. Staton were damaged by detrimentally relying on the July 2001 VERP.

## Steps Taken By The Committee In Adjudicating The Claims

The Committee has given extensive and careful consideration to the claims of the Claimants. The Committee has engaged independent legal counsel to assist it in properly executing its fiduciary duties in deciding those claims. Counsel has reviewed the extensive record in this matter, including the litigation pleadings, depositions of Linwood Holton (former Amtrak Director and former Governor of Virginia), Alicia Serfaty (Amtrak's Corporate Secretary and General Counsel), John Carten (Amtrak's Director – Board Liaison and an Assistant Corporate Secretary), and Medaris Oliveri (an Assistant Corporate Secretary), Board of Directors' resolutions, Plan amendments, and the materials provided to Amtrak employees relating to the VERP. In addition, counsel spoke with Ms. Serfaty and Mr. Carten concerning this matter.

## Factual Background Surrounding The September 14, 2001 Board Action

The Committee finds the following relevant facts in connection with the September 14, 2001 Board action:

(1)     Amtrak has reserved the right in the Plan document to amend the Plan "by action of its Board", without requiring any more specific methodology.

(2)     A formal meeting of the Board of Directors was scheduled for September 12, 2001. It was Amtrak management's intention to make a presentation at the scheduled September 12, 2001 Board meeting regarding the VERP and request Board approval for a scaled-back version of the VERP. Management intended to explain that review of the financial implications of the VERP following the July 26, 2001 Board meeting indicated that the cost of the VERP was substantially higher than originally anticipated, and that

Eli Gottesdiener, Esq.
January 23, 2006
Page 4


there was a need to reduce the cost of the VERP before the early retirement window
opened on September 15, 2001.

(3)     The Board was forced to cancel its meeting scheduled for September 12,
2001 because of the catastrophic circumstances presented by the September 11, 2001
terrorist attacks.

(4)     On or before September 14, 2001, each of the members of Amtrak's Board
of Directors was contacted by or at the direction of Ms. Serfaty, and consent resolutions
and an Executive Summary were faxed to each Director (see enclosed). The consent
resolutions sent to the Board authorized the Railroad Retirement Supplement prong of the
VERP to be replaced with a lump sum payment of $15,000. The Executive Summary set
forth in some detail the actions that Amtrak was asking the Board to approve.

(5)     For each member of Amtrak's Board other than Governor Holton, it is
undisputed that the Board member individually signed a counterpart of the consent
resolutions and returned the signed counterpart for filing with the minutes of proceedings
of Amtrak's Board.

(6)     Based on the deposition testimony of Governor Holton and Mr. Carten, it
appears that Governor Holton was not in his office when the faxed consent resolutions
and Executive Summary were sent to him on September 14, 2001. However, Governor
Holton contacted Mr. Carten, and Governor Holton and Mr. Carten had a telephone
conversation on September 14, 2001, during which Mr. Carten reviewed with Governor
Holton the Executive Summary and the requested consent resolutions.

(7)     Governor Holton did not personally affix his signature to the consent
resolutions which were faxed to him. Rather, after his telephone conversation with Mr.
Carten regarding the consent resolutions, Governor Holton instructed Mr. Carten to affix
the Governor's signature to the consent. Based on Governor Holton's instruction, Mr.
Carten copied and pasted Governor Holton's signature to the consent resolutions and filed
this counterpart with the other counterparts to the consent resolutions on September 14,
2001.

(8)     Governor Holton approved the July 2001 VERP at the July 26, 2001
Board meeting, and understood the context and nature of the change to the July 2001
VERP which was being proposed on September 14, 2001. When questioned about the
matter in his deposition, Governor Holton confirmed that he understood the proposed
changes to the July 2001 VERP, and he intended to approve the changes proposed on
September 14, 2001. Because he was not in a position to fax his signature to the

Eli Gottesdiener, Esq.
January 23, 2006
Page 5

resolutions back to Amtrak on September 14, 2001, he asked Mr. Carten to affix his signature to the resolutions.

(9)    The terms of the September 2001 VERP, as approved by the Board on September 14, 2001, were clearly communicated to eligible employees before the window opened on September 15, 2001.  Based on the final versions of the written materials provided to employees, there is no basis for confusion or misunderstanding concerning the terms of the VERP.

(10)    The formal amendment to the Plan document reflecting the September 2001 VERP was executed by Amtrak management on November 30, 2001.  There was never any formal amendment executed reflecting the July 2001 VERP.

### Legal Impact Of The September 14, 2001 Board Action

Based on the foregoing factual background, the Committee finds that the VERP as approved by Amtrak's Board on September 14, 2001 was the effective, final and operative version of the VERP made available to Amtrak employees on September 15, 2001, for the following independent reasons:

(1)    Under Section 29-101-1.136 of the District of Columbia Business Corporation Act and under Section 4.12 of Amtrak's Bylaws, a Board of Directors can act by unanimous written consent of its directors.  As noted above, a question concerning the validity of the September 14, 2001 Board action is asserted by Claimants because Governor Holton did not personally sign the written consent.  The Committee finds that because Governor Holton fully understood and agreed with the content of the resolutions and intended to manifest his agreement in writing, the Governor's instruction to Mr. Carten to affix the Governor's signature to the consent was no more than the delegation of a ministerial act to Mr. Carten.  The Committee finds that such delegation of a purely ministerial act is not inconsistent with the requirement that the consent be unanimously approved in writing by the directors with voting power.  Therefore, the Committee believes that the Board action of September 14, 2001 was effective to approve the September 2001 VERP.

(2)    Assuming for the sake of argument that the September 14, 2001 Board action suffered from a technical defect (a position with which the Committee disagrees), courts have held that an ERISA plan amendment should not be invalidated for technical violations of a plan's procedures unless there is a showing of bad faith or active concealment on the part of the sponsor.  The circumstances surrounding the instant claims are quite the opposite.  The Board acted in good faith, to the best of its abilities in light of the September 11, 2001 terrorist attacks, and Amtrak clearly communicated to

Eli Gottesdiener, Esq.
January 23, 2006
Page 6

eligible Amtrak employees before the window opened on September 15, 2001 that the
terms of the VERP had changed from the terms previously communicated to them.

### Validity of the Releases Signed by Ms. McCoy-Kemp and Ms. Staton

You assert that the liability waivers executed by Ms. McCoy-Kemp and Ms.
Staton are invalid because they were based on misinformation concerning the terms of
the VERP. The Committee rejects this claim, because the Committee finds that the terms
of the VERP were accurately represented to Ms. McCoy-Kemp and Ms. Staton.

### Validity of the 1994 Restatement of the Plan

You assert (as an alternative to the claim that the Plan was not properly amended
on September 14, 2001), that the most recent restatement of the Plan (executed December
30, 1994, effective January 1, 1989) was not properly authorized by Amtrak's Board and
consequently actions taken pursuant to it are unauthorized. Assuming for purposes of
this claim (without deciding the matter) that the 1994 restatement of the Plan was not
properly authorized when originally adopted, the Committee nonetheless rejects this
claim on the basis that subsequent actions of the Board in authorizing amendments to the
Plan, and otherwise acting with respect to the Plan, amount to an implied ratification of
the 1994 restatement of the Plan.[2] We also note that it is the Committee's duty under
ERISA to administer the Plan in the best interests of all Plan participants and
beneficiaries. If we were to conclude that the 1994 restatement of the Plan was not
properly adopted, the tax qualification of the Plan could be jeopardized – a result which
would be detrimental to all Plan participants and beneficiaries.

### Adjudication by the Committee

You assert that an independent adjudicator should be appointed to decide the
claims, because you believe the Committee is biased and incapable of fair adjudication of
the claims. We reject this assertion. The Committee is composed of new members who
were not directly involved in the adoption and implementation of the VERP. In addition,
we have been assisted by independent legal counsel in our consideration of the claims.
Finally, we note that ERISA clearly contemplates that employees of a plan sponsor may
serve as fiduciaries responsible for claims adjudication under a plan.

---

[2]    In the August 2005 Letter, you state that you are making a claim based on the asserted lack of
authorization for the 1994 restatement of the Plan only as an alternative to the claim that the Plan was not
amended on September 14, 2001 and only if that claim is denied. We note that we are responding to your
alternative claim regarding the 1994 restatement of the Plan because we have found the Board action on
September 14, 2001 approving the revised VERP to be valid.

Eli Gottesdiener, Esq.
January 23, 2006
Page 7

### ERISA Claims Denial Information

In accordance with 29 C.F.R. Section 2560.503-1(g), the Committee provides the following information with respect to the claims:

    (1)    **Specific Reasons for Adverse Determination.**

        (a)    The claim for benefits based on the assertion that the Board's approval on September 14, 2001 of the reduced VERP was ineffective is denied for the reasons stated above under the heading entitled "Legal Impact of the September 14, 2001 Board Action".

        (b)    The claim based on the asserted invalidity of the releases signed by Ms. McCoy-Kemp and Ms. Staton is denied for the reason stated above under the heading entitled "Validity of the Releases Signed by Ms. McCoy-Kemp and Ms. Staton".

        (c)    The claim based on the asserted failure to properly adopt the 1994 restatement of the Plan is denied for the reason stated above under the heading "Validity of the 1994 Restatement of the Plan".

    (2)    **Reference to Specific Plan Provision on Which Determination is Based.**

        Determinations (a) and (b) above are based on Section 4.06 and Exhibit B to the Plan, as adopted by amendment dated November 30, 2001. Determination (c) above results from the reason stated above under the heading "Validity of the 1994 Restatement of the Plan", not from a specific Plan provision.

    (3)    **Description of Additional Material or Information Necessary to Perfect Claims.**

        This is not applicable, because the denial of the claims is not the result of a defect in the form of the claims or supporting information.

    (4)    **Claims Procedures of the Plan and Right to Bring Civil Action.**

        See attached Section XV of the Plan, setting forth the Plan's claims procedures. The Claimants have 60 days following receipt of this letter to appeal this adverse determination. The officer of Amtrak designated to adjudicate appeals is the Vice President, Human Resources, Ms. Lorraine Green. Appeals may be directed to Ms. Green's attention at National Railroad Passenger Corporation, 60 Massachusetts Avenue,

Eli Gottesdiener, Esq.
January 23, 2006
Page 8


N.E., Washington, DC  20002.  If there is an adverse determination upon appeal, the
Claimants have a right to bring a civil action under Section 502(a) of ERISA.

                        Very truly yours,

                        RETIREMENT PLAN COMMITTEE,
                        RETIREMENT INCOME PLAN FOR
                        EMPLOYEES OF NATIONAL RAILROAD
                        PASSENGER CORPORATION

                        By: _____
                            Paula Porter, Chairperson


Enclosure:  Section XV of the Plan and September 14, 2001 Consent Resolutions
cc:      Mr. Matthew Hardison, Committee Member
         Mr. Jeffrey Carnicelli, Committee Member
         Barbara E. Schlaff, Esq., Counsel to the Committee
         Robert J. Bolger, Esq., Counsel to the Committee
         John R. Wellschlager, Esq., Counsel to the Company.

RETIREMENT INCOME PLAN FOR
EMPLOYEES OF
NATIONAL RAILROAD PASSENGER CORPORATION

Printed 12/23/94

## ARTICLE XV
### Claims Procedure

15.01    Claims Procedure. A claim for benefits under the Plan by a Participant, Retired Participant, Spouse, or Beneficiary, or any other person shall be filed by submitting to the Retirement Plan Committee a written application on a form designated by the Retirement Plan Committee. The Retirement Plan Committee shall, within a reasonable time, consider the claim and shall issue its determination in writing. If the claim is denied in whole or in part by the Retirement Plan Committee, the Retirement Plan Committee shall, within a reasonable time, provide the claimant with a written notice setting forth in a manner calculated to be understood by the claimant:

(a)    The specific reason or reasons for the denial of the claim;

(b)    Specific reference to pertinent Plan provisions on which the denial is based;

(c)    A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(d)    An explanation of the Plan's claim review procedure.

The Retirement Plan Committee shall provide each claimant with a reasonable opportunity to appeal a denial of a claim to an officer of the Sponsor designated by the Board for a full and fair review. The designated officer shall be identified by the Board as a fiduciary with respect to the Plan in accordance with Section 402(a)(2) of the Act. The claimant or his duly authorized representative may:

(a)    request a review upon written application to the designated officer;

(b)    review pertinent documents; and

(c)    submit issues and comments in writing.

The Retirement Plan Committee may establish such time limits within which claimants may request review of denied claims as are reasonable in relation to the nature of the benefit which is the subject of the claim and to other attendant circumstances, but which in no event shall be less than 60 days after receipt by the claimant of written notice of denial of his claim. The decision by the designated officer with respect to the claim shall be made not later than 60 days after receipt of the request for review, unless special circumstances require an extension of time for processing, in which case a decision will be rendered as soon as possible but not later than 120 days

74

after receipt of the request for review. The decision on review shall be in writing, shall include specific reasons for the decision and specific references to the pertinent Plan provisions on which the decision is based, and shall be written in a manner calculated to be understood by the claimant. To the extent permitted by law, the decision of the Retirement Plan Committee (if no review is properly requested) or the decision of the designated officer on review, as the case may be, shall be final and binding on all parties if it is supported by the facts which were considered and is reasonably based on the applicable provisions of law, the Plan and the trust instrument.

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

National Railroad Passenger Corporation
Board of Directors
Adopted September 14, 2001

**Amtrak Board of Directors**
**Agenda Item Executive Summary**

Title:  Amended Management Voluntary Early Retirement Plan

Background:
As part of Amtrak's efforts to streamline its organization, eliminate inefficiencies and reduce costs, the Board approved a Voluntary Early Retirement Plan (VERP) at its meeting on July 26, 2001. The VERP as approved had two main components: (i) five years of age added to Amtrak's pension formula; and (ii) a full supplement to the Railroad Retirement benefits that would otherwise be available until age 65. Management planned to fund the VERP benefits through the accumulated surplus in Amtrak's Retirement Income Plan Trust (the "Fund"). Because a portion of the pension funds in this Fund are invested in the stock market and the market has experienced a recent downturn, before proceeding further with the VERP Senior Management requested an updated actuarial analysis to ensure that the integrity of the pension fund is preserved.

The updated analysis showed that if Management proceeded with the plan as originally formulated, the surplus in the Fund would be depleted and the company would be required to make a significant contribution to the Fund as early as 2003. According to the actuary, as a result of a combination of market conditions, additional accrued liabilities and withdrawals, the forecasted surplus in the Fund has declined from approximately $42 million in December 2000 to $18.6 million on August 31, 2001.[1] While Management expects the Fund to continue to grow over the long term, it has nevertheless determined that it would be prudent to offer a more modest VERP than originally envisioned and maintain a surplus in the Fund. Consequently, Management proposes to eliminate the second component of the plan, the more costly Railroad Retirement supplement, and instead offer a one-time lump sum payment of $15,000.

The revised VERP would provide that any management employee 55 years of age or older with 10 or more years of Amtrak service who files retirement papers between September 15 and October 31, 2001 will receive the following retirement package:

- Five years of age added to the pension formula; and
- A one-time lump sum payment of $15,000.00

---

[1] The reduction of what appears to be $23.3 million accounts for approximately $3.1 million of pension payments, $7.5 million of accruals and $11.7 million of investment loss. Our actuary indicates that Amtrak's investment return over the last five calendar years was 74% or 12% per annum compounded annually.

In order to receive benefits, an employee must elect to retire from Amtrak during the window period and sign a release agreement. The employee must also agree not to exercise seniority rights back into an agreement-covered position.

Based on current actuarial forecasts and the anticipated costs of this amended plan, the Fund will show at least a $10 million surplus and Amtrak will therefore continue to enjoy a contribution holiday for several more years. Management estimates that participation in the VERP will be somewhere between 50 to 60 percent, down from 75% expected for the original plan. At these levels of participation, the VERP as revised is estimated to cost approximately $ 7.2 million at 50 percent participation and $8.6 million at 60 percent.

**Recommended Action:**
Management recommends that the Board approve the attached resolutions authorizing an amendment to the Voluntary Early Retirement Plan as set forth above.

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

_____
Board Member

September 14, 2001
Date

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.


Approved:

_____        September 14, 2001
Board Member                             Date

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.


Approved:


*Linwood Holton*
Board Member

September 14, 2001
Date

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

_Michael Jackson_
Board Member

<u>September 14, 2001</u>
Date

### RESOLUTIONS AUTHORIZING AMENDMENT TO
### 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

_____
Board Member

<u>September 14, 2001</u>
Date

## RESOLUTIONS AUTHORIZING AMENDMENT TO
## 2001 VOLUNTARY EARLY RETIREMENT PLAN

WHEREAS, This Board previously approved a Voluntary Early Retirement Plan that provided certain enhanced pension benefits for eligible employees; and

WHEREAS, Management has recommended that this Board adopt an amended benefit plan based on actuarial adjustments in the pension plan funding; and

WHEREAS, Management has set forth in the attached Executive Summary the terms of proposed amended Voluntary Early Retirement Plan which has been fully described to Members of this Board; therefore, be it

RESOLVED, That the amended Voluntary Early Retirement Plan described in the attached Executive Summary is authorized and approved; and, be it

FURTHER RESOLVED, That the President and Chief Executive Officer is authorized to take all necessary steps to implement the terms of the plan described in the attached Executive Summary.

Approved:

Board Member

September 14, 2001
Date

**Claim**

**August 5, 2005**

# Gottesdiener Law Firm, pllc

www.gottesdienerlaw.com

### Eli Gottesdiener

1025 Connecticut Avenue, Suite 1000
Washington, D.C.  20036
Phone:  (202) 243-1000
Fax:     (202) 243-1001

<div style="display:flex; justify-content:space-between;">

**WRITER'S EMAIL ADDRESS**
eli@gottesdienerlaw.com

**Member, District of Columbia,**
**New York, Maryland and Pennsylvania Bar**

</div>

August 5, 2005

<u>By Facsimile and Email</u>

Retirement Plan Committee
Retirement Income Plan for Employees
of National Railroad Passenger Corporation Benefit Plan Committee

c/o John R. Wellschlager
DLA Piper Rudnick Gray Cary US LLP
6225 Smith Avenue
Baltimore, Maryland 21209-3600

Re:  Claim for Benefits

Dear Retirement Plan Committee:

In accordance with the Order of August 5, 2005 by the Honorable Gladys Kessler of the United States District Court for the District of Columbia, in <u>*Hall v. National Railroad Passenger Corp.,*</u> 03-CV-1764 (GK), Wade F. Hall, Hattie N. McCoy-Kemp, and Victoria F. Staton ("Plaintiffs"), each hereby make a claim for benefits under Retirement Income Plan for Employees of National Railroad Passenger Corporation (the "Plan").  This claim is being served on your counsel directly through facsimile and electronic means the same day of notification of the Court's Order to ensure that the Court's Order of dismissal will not take effect prior to the lodging of this claim in the event the Plan may wish to interpose any form of limitations defense. We think such a defense would be unavailing and one the Committee should have informed the Court it would raise if it obtained a dismissal of Count I of Plaintiffs' Complaint, but out of an abundance of caution we hereby make this claim as soon as possible to forestall disputes over matter of form.  The Committee has known (or should have known) about this claim since August 19, 2003 when it was filed and personally served on National Railroad Passenger Corporation ("Amtrak") and a representative of the Committee (which, however, did not then exist, as you know).

The grounds for this claim, or at least the core of the claim, are well-known at this point to the Committee and are outlined below. But it is precisely the fact that the Committee Members' involvement with the substance of the claim has been so extensive and personal, that Plaintiffs respectfully submit that the Committee must recuse itself in favor of truly disinterested fiduciaries, not selected by the Committee, the sponsor, or counsel for the sponsor but in some wholly independent method (that is made known to Plaintiffs in its particulars) or jointly with Plaintiffs. Instead of carefully and dispassionately weighing the (irrefutable) evidence that there was never a valid Plan amendment on or about September 14, 2001 to cutback the July 2001 VERP, the Members will approach the claim with layers of bias against it, as will Amtrak which would otherwise have a role in any eventual appeal, according to the Plan document's Article XV Claims Procedure at least as appears from the copies in Plaintiffs' possession.

There can be no principled basis for refusing this request under these circumstances: the sole legitimate interest of the Committee is a truly disinterested ERISA-compliant outcome, in process and substance. The Committee, along with the sponsor and the President, asked the Court to require Plaintiffs to submit a claim but now that Plaintiffs are doing so the Committee should, acting as fiduciary, see what it may not have been as focused on as litigant: that it cannot possibly render a decision in a manner that will be fair and be seen as fair to Plaintiffs given the unique circumstances here.

First, Plaintiffs have for nearly two years publicly accused the individual Members of violating their fiduciary duties in administering the Plan in violation of its terms (former Count I) and in violation of ERISA (Count II). Putting to the side feelings of a personal nature, a fair Committee ruling is impossible - it is basic to our law that no man can be a judge in his own case. Yet that is what the Committee would be doing by attempt to adjudicate this claim. A true fiduciary would step aside and have an independent appointed. A conflicted fiduciary would seek the expedient course and claim an ability to act. Here the Committee would be required to condemn its own conduct - not mere mistakes, but breaches of duties, knowing breaches of duty and continuing breaches of duty *after* they had been brought to their attention. Whatever level of personal self-examination the Committee Members believe they are capable, Plaintiffs submit they are not required to be subjected to decision makers so burdened and so distracted. They are entitled to reasonably disinterested decision makers and neither the Committee as constituted nor Amtrak itself fits that bill. Neither is capable of rendering a fair decision or having any further role in this claim, other than jointly with Plaintiffs, in the selection of unbiased mutually acceptable decision makers.

Second, pecuniary considerations of course are part of these irreconcilable conflicts for both the Members and Amtrak. The sponsor's financial condition and the Plan's funding levels vis-à-vis the impact of a favorable ruling on Plaintiffs' behalf are such that it cannot be expected of these individual Members to be truly disinterested and free from bias, however great their personal efforts.

Indeed, as to the Members, this is quite unlike the typical claim wherein the Committee's decision will impact solely the Plan's Trust (and Amtrak's funding obligations). A ruling in favor of this claim could subject each Member to liability in one form or another. But as officers

or employees of the Company there is an additional serious conflict. The scope of claim, while currently made on behalf of three persons, implicates a sufficiently large amount of money as to generate additional pressures that would tax anyone's ability to be truly objective.

The Members and President are officers and employees of the Company (which is not in and of itself cause for a presumption of conflict under ERISA[1]) and know of its financial plight and the precarious nature of the Plan's funded status and future prospects. They will be for personal and professional reasons overly protective of the Company, the Plan's asset pool and/or their own current and future prospects for employment and future promotion, whether aware of it or not, to be open sufficiently to re-examining what they have already decided without the benefit of the very type of non-litigative setting they themselves sought from the Court.

Also, it cannot be overlooked that two of the three Members -- and one in particular -- may be or may be perceived to be or may perceive himself to be - personally responsible for the VERP being enacted at the level it was in July 2001 and hence much of the lawsuit itself in the first place. His fellow Members will be aware of that and together the chances that they will jointly issue a ruling favorable to Plaintiffs is nil. The President has his own issues with his continuing breaches with respect to his non-appointment of the Committee for a year or more.

It would in short take a super-human effort to find that a grievous mistake or series of such mistakes were made, and the claim should be honored (with interest).

Unless the Members can approach all of these questions with complete indifference -- in the sense of not impacting the outcome -- they cannot be further involved. Yet it is too much to ask of them not to be concerned about the adverse effects that may result from a finding in Plaintiffs' favor, including on themselves as Defendants in this case, as co-workers of employees who may not appreciate a ruling in Plaintiffs' favor reducing already scare resources in the Plan or Amtrak, as employees of a perpetually fiscally strapped Company who very existence is constantly in doubt. For these reasons, the Committee, the President and Amtrak (similarly accused) should have no further involvement with this claim or any appeal if the claim is denied.[2]

Additional reasons for recusal include the fact that Plaintiffs intend to pursue in one or more fashions that the Members have permitted the Plan to be operated in violation of the

---

[1] The Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq*.

[2] Additional reasons for recusal include the fact that Plaintiffs intend to pursue in one or more fashions that the Members have permitted the Plan to be operated in violation of the Internal Revenue Code's nondiscrimination provisions as set forth in Plaintiffs' motion for summary judgment under Count II. Plaintiffs do not make this claim here at the present time. Additionally -- and this Plaintiffs *do* make this claim now but *only* as an alternative to the claim that the Plan was not amended on September 14, 2001 and *only* if that claim is denied -- Plaintiffs contend the Members, Amtrak, and its President are all acting unlawfully with respect to the Plan insofar as the Plan restatement in 1994 was never approved by the then current Board or retroactively specially amended by any subsequent Board and contrary representations have been made to the IRS and to Judge Kessler (via Defendants' Answer). Further, the Board appears to have abdicated its responsibility for plan amendments for years, turning that responsibility over to the Committee -- until it went out of existence in or about 1995. None of the Plan's fiduciaries can possibility neutrally and detachedly consider these claims.

Internal Revenue Code's nondiscrimination provisions as set forth in Plaintiffs' motion for summary judgment under Count II.  Plaintiffs do not make this claim here at the present time.

Additionally -- and this Plaintiffs *do* make this claim now but *only* as an alternative to the claim that the Plan was not amended on September 14, 2001 and *only* if that claim is denied -- Plaintiffs contend the Members, Amtrak, and its President are all acting unlawfully with respect to the Plan insofar as the Plan restatement in 1994 was never approved by the then current Board or retroactively specially amended by any subsequent Board and contrary representations have been made to the IRS and to Judge Kessler (via Defendants' Answer).  Further, the Board appears to have abdicated its responsibility for plan amendments for years, turning that responsibility over to the Committee -- until it went out of existence in or about 1995.  None of the Plan's fiduciaries can possibility neutrally and detachedly consider these claims.

Plaintiffs have reviewed the Plan and current SPD and submit that they are both defective in multiple material respects regarding the required claims process and process.  This is another reason for this matter to be handled differently than the typical claim for benefits.[3]

Plaintiffs see nothing in the claims procedures preventing incorporation by reference. They therefore incorporate by reference all arguments and points raised in prior filings or any form of written communication concerning the invalidity of the September 14, 2001 amendment, and the validity of July 26, 2001 amendment.  They also incorporate the deposition testimony of all witnesses deposed in this case with particular reference to Governor Holton, John Carten and Alicia M. Serfaty.  Also incorporated by reference are all documents Plaintiffs have ever references on the topics including documents not yet produced or withheld for any reason.

As the Court set forth in its August 5th Order the legal standard for a plan amendment is clear.  And just as clearly not met in this instance.  The law (and By-laws of the Company) mean what they say and for good reason.  The text of the law is unambiguous and what Government Holton did and did not do is equal unambiguous.  There is no good-enough, or exceptions, particularly not when the Board is already not at full complement.  All Board Members needed to personally sign a unanimous consent resolution.  The reasons are manifold and salutary and include to ensure that the solemnity of the Director's act is brought home to him and to foster a degree of care and reflection that, paraphrasing, "go ahead and sign for me, sounds okay," can never approach.

That gets to the second independent basis why there was no amendment - even assuming somehow that the plain meaning of the words should not be applied, on the indisputable facts there was no legally cognizable meeting of the minds of the Directors:  while every other Director acted upon the basis of a resolution that stated it had an Executive Summary attached and that it had been reviewed (whether true or not, the physical signature and representation of the Director suffices to establish that), factually and legally it is a complete fiction -- that the law will not recognize -- that Governor Holton read the resolution and its attachment.  He did not do so and the very fact that he and John Carten agreed that Carten who sign something that was

---

[3] The Plan and SPD contain conflicting indications as to the form a claim for benefits should take.  Plaintiffs request if the Plan's claims process is valid and sufficient in all respects that the requirement that the claim be submitted on form designated by the Committee be waived if otherwise enforceable.

4

such a direct misrepresentation of fact further underscores the dangerous of loosening the law as Amtrak wants to do in this circumstance for reasons of pure expediency. Moreover, the Governor's brief oral conversation with a Company functionary cannot possibly form a sufficiently exact substitute of what actually or what the law will presume was actually in the minds of the properly signing Directors when they signed. So assuming the Governor "signed" what he was signing and consenting to cannot have been *identical* to what the other Directors all agreed to. In essence, he agreed to one thing - essentially John Carten's rendition of a proposal - - and the Directors all consented to something else. That neither Carten nor the Governor made any effort to directly contact at least *one* other Director to ensure some manner of quality control on this slap-dash process is a further infirmity in an already void process.

That gets to a third point - this has not yet been raised in written form - the other Directors written consents were all premised on their belief that all *other* Directors *personally signed.* But they too are void. Putting aside their legal inability to waive the statute, at least if all the Directors signing that day were alerted *in advance* that their vote might be counted and the resolution adopted *even if* one of their number did not personally sign, did not personally read what he was "signing" and did not, as he represented, read personally the Executive Summary, their consents may have implied a form of consent to have the resolution adopted without the required safeguards in place as to one of their number. It would not have saved the process from invalidity but would have been preferable to what did occur: the other Directors were left in the dark and had no earthly idea that employees' benefits were being proposed to be cut with one Director's personal signature and direct physical engagement as to the operative documents cavalierly tossed to the side by management whose own crass mistakes caused the fire-drill atmosphere from being forced on the Directors in the first place (9-11 or no).

The Committee or such independent fiduciary who hears this claim should find on the facts that unanimous consent was lacking and no amendment occurred. The Committee or such independent fiduciary who hears this claim should also find if they consider the question - which they should not because it has not been submitted to them -- that Plan was amended as Plan alleges on July 26, 2001. It should also be found that any waivers obtained following September 14, 2001 are void: they were the product of miscommunications and misrepresentations to participants such as Hattie McCoy-Kemp who was provided with misinformation, i.e., the VERP with Railroad Retirement Supplement, had been amended out of the Plan and was no longer legally available. Plaintiffs should be permitted to elect the VERP with Railroad Retirement Supplement now, with interest.

Nothing in this letter is to be construed as a waiver of any pending claim or Plaintiffs' agreement that any of the issues here are matters of discretion or discretionary interpretation, or should be committed to anyone other than the Court for decision, particularly the reading of the D.C. Code, the application of that law and the By-Laws to fact and the application of ERISA to all of the foregoing. Those are all questions for the Court *de novo.*

**Exhibit 76**

Thank you for your attention to this claim.  We look forward to your prompt, detailed reply and disclosure of all relevant materials upon which you relied in whole or in part in reaching your decision.


Sincerely,


Eli Gottesdiener

**Exhibit 77**

John Robert Smith
Chairman, Amtrak Board of Directors
Mayor, Meridian, MS

Governor Holton has played an essential role in focusing Amtrak on the future of rail passenger service in this country – development of rail corridors providing highly marketable, frequent service between regional downtown business centers.  His efforts have helped to spearhead work to develop rail corridors in Virginia and across the country, including the Charlotte-Raleigh-Richmond-Washington Southeast HSR Corridor.

The Governor  brings a soberness to the board and, as chairman, I rely heavily on him for his honesty, candor and direct approach to every issue that comes before us.

In board meetings, he will press the staff to get the best possible information and will often give me a wink to let me know that he's testing the staff to see if they have really thought through every angle or idea.

We had to wait a long time to get him on the board but it was well worth the wait. Our board would be sorely diminished without him. Besides, it's reassuring to have at least one other board member who doesn't speak with an accent.

David Gunn
President and CEO
Amtrak

Governor Holton was instrumental in the Board's management and oversight of the Acela program, helping to define its goals, forcing management to better focus on schedule and budget, and intervening personally with the contractors to reduce delays and costs.  His focus at every monthly Board meeting on the progress of the high-speed rail program helped to minimize program delays and enabled Amtrak to introduce its premium, highly popular Acela Express service months earlier than would otherwise have been the case.