# EXHIBIT K

**NATIONAL RAILROAD PASSENGER CORPORATION**
60 Massachusetts Avenue, NE, Washington, DC 20002
tel 202 906.2216  fax 202 906.3897

July 14, 2006

Lorraine A. Green
Vice President
Human Resources



## VIA FACSIMILE AND FIRST CLASS MAIL

Eli Gottesdiener, Esq.
Gottesdiener Law Firm, PLLC
1025 Connecticut Avenue, N.W., #1000
Washington, D.C. 20036

    Re: **Hall Claim for Benefits**

Dear Mr. Gottesdiener:

    I am writing in response to your appeal dated May 16, 2006 in connection with the claims for benefits (the "Claims") by Wade F. Hall, Hattie N. McCoy-Kemp and Victoria F. Staton (the "Claimants") under the Retirement Income Plan for Employees of National Railroad Passenger Corporation (the "Plan"). I am writing in my capacity as the officer of Amtrak designated to adjudicate appeals of denied claims for benefits under the Plan. I have decided to deny your appeal of the determination by the Plan's Retirement Plan Committee (the "Committee") as set forth in the Committee's letter to you dated January 23, 2006 (the "Committee's Determination Letter"). I will explain the reasons for this decision in this letter.

    As set forth below in more detail, I have carefully reviewed the Committee's Determination Letter and the factual record in this matter. I find the summary set forth in the Committee's Determination Letter of the background of this matter, and of the Claims, to be accurate. Accordingly, for reference purposes, I have repeated this information below substantially as set forth in the Committee's Determination Letter.

### Background Information

    In 2001, Amtrak management was considering ways to reduce Amtrak's operating costs through a workforce reduction. In order to minimize the number of involuntary dismissals, Amtrak decided to implement a voluntary early retirement plan, which would be made available to eligible Amtrak employees for a period of time commencing on September 15, 2001 and ending on October 31, 2001.

    On July 26, 2001, at a meeting of Amtrak's Board of Directors (the "Board"), the Board voted to approve the Voluntary Early Retirement Program (the "VERP"), which included two components: (1) an additional 5 years of age for purposes of determining the early retirement reduction applicable under the Plan, and (2) a monthly supplement payable until a participant qualified for unreduced Railroad Retirement Benefits ("Railroad Retirement Supplement").

HALL2000173

Eli Gottesdiener, Esq.
July 14, 2006
Page 2

      Before the window for the VERP opened to eligible employees on September 15, 2001, it became apparent that the cost of the VERP, in the version approved by the Board on July 26, 2001, was going to be significantly higher than originally estimated. Therefore, Amtrak management intended to present a revised, less costly version of the VERP to the Board for approval at a meeting scheduled on September 12, 2001. Under this revised version of the VERP, instead of the Railroad Retirement Supplement, each participant would receive a $15,000 lump sum payment. The additional 5 years of age for purposes of determining the early retirement reduction applicable under the Plan remained in place. The meeting was cancelled because of the catastrophic events of September 11, 2001. Left without time to reschedule a Board meeting before the VERP election window would open on September 15, 2001, the Board approved the revised version of the VERP on September 14, 2001 by written consent.

      You filed suit on behalf of the Claimants on August 19, 2003 in United States District Court for the District of Columbia. On August 5, 2005, Judge Kessler ruled that Count I of the Complaint was appropriately cast as a claim for benefits under the Plan, and that this claim was premature because plaintiffs had not exhausted the Plan's claims procedures. You then filed the Claims with the Committee by letter dated August 5, 2005. The Committee denied the Claims as set forth in the Committee's Determination Letter, and you appealed the denial of the Claims by letter dated May 16, 2006 ("Appeal Letter").

### Summary of Claims

      The following is a summary of the claims as set forth in your August 5, 2005 letter to the Committee.

      With respect to Mr. Hall (who did not accept the VERP, continued working for Amtrak and retired under the generally applicable terms of the Plan), you claimed the full value of the July 2001 version of the VERP (plus interest). With respect to Ms. McCoy-Kemp (who accepted the September 2001 VERP), you claimed the difference in value between the July 2001 version of the VERP and the September 2001 VERP (plus interest). With respect to Ms. Staton (who did not accept the VERP, was later terminated and paid severance), you claimed the difference in value between the July 2001 version of the VERP and the severance (plus interest).

      You asserted on behalf of the Claimants that the Plan was amended by the Board on July 26, 2001, when it voted to approve a VERP that included (1) an additional 5 years of age for Plan purposes, and (2) the Railroad Retirement Supplement. You further asserted that the Board's approval on September 14, 2001 of the change to the VERP's second prong from the Railroad Retirement Supplement to a lump sum payment of $15,000 per participant was ineffective and therefore, the terms of the July 2001 VERP

HALL2000174

Eli Gottesdiener, Esq.
July 14, 2006
Page 3

remained in place even after September 14, 2001. You also asserted that the liability waivers executed by Ms. McCoy-Kemp and Ms. Staton are invalid because they were based on misinformation concerning the terms of the VERP.

In the alternative, and only if it is determined that the Plan **was** properly amended on September 14, 2001, you asserted that the most recent restatement of the Plan (executed December 30, 1994, effective January 1, 1989) was not properly authorized by the Board and consequently actions taken pursuant to it are unauthorized.

You did not claim that Mr. Hall, Ms. McCoy-Kemp or Ms. Staton was damaged by detrimentally relying on the July 2001 VERP.

**Review of Factual Record**

In reaching the decision set forth in this letter, I have reviewed the factual record, including, but not limited, to the following items:

- Your letter dated August 5, 2005 setting forth the Claims, the Committee's Determination Letter, and your Appeal Letter.

- Executive summaries and resolutions of the Board dated July 26, 2001 and September 14, 2001 pertaining to the VERP.

- A letter dated July 30, 2001 sent to Amtrak employees relating to the VERP.

- Materials relating to the VERP provided to Amtrak employees in September 2001.

- An amendment to the Plan relating to the VERP, dated November 20, 2001.

- A letter to the Internal Revenue Service from Amtrak's outside counsel dated August 14, 2003 replying to a request for information from the IRS in connection with Amtrak's IRS determination letter request.

- A determination letter from the Internal Revenue Service dated April 27, 2004 affirming the qualified status of the Plan following the VERP amendment.

- Documentation of the appointment of the current Committee members, and resignation of the prior Committee members.

HALL2000175

Eli Gottesdiener, Esq.
July 14, 2006
Page 4

    o    Depositions of Linwood Holton and John Carten taken on November 19, 2004 and April 12-13, 2004, respectively, in the litigation involving the Claimants and Amtrak (the "*Hall* Litigation").

    o    Memorandum from Venable, LLP ("Venable") to the Committee in connection with the Committee's consideration of the Claims.

My observations, analysis and conclusions in this letter are based on my review and consideration of the factual record.

### Requests for Recusal

At this point, I would like to address your request for recusal by Venable, William Herrmann and me.

*My Recusal.* You have requested that I recuse myself in this matter. You state in your Appeal Letter that "Plaintiffs believe that [I] have multiple, direct, disqualifying personal and professional conflicts of interest as regards the VERP, these claims for benefits and the *Hall* litigation. [I] have direct personal and professional reasons for denying Plaintiffs' claims without regard for their merit and [I am] a material witness in both this matter and the *Hall* litigation on a number of potentially important issues."[1]

As an initial matter, I suspect that you would not be satisfied with any Amtrak employee serving as appeals officer. You indicate as much in footnote 6 of your Appeals Letter, where you state that "it is extremely unlikely that an Amtrak employee . . . could objectively decide whether the Board of Directors and top level management procedurally failed to amend the Plan to eliminate the Railroad Retirement Supplement with the result that the Company would have to pay tens of millions of dollars in contributions."[2]

I reject your request that I recuse myself because your request is factually inaccurate, inconsistent with common ERISA claims review practice, and inconsistent with applicable law.

Your assertions regarding my level of involvement with the VERP are factually inaccurate. In reality, my involvement in 2001 with the VERP was minimal. I did not have any material involvement in designing the VERP, nor did I have any material involvement in interacting with the Board in connection with approval of the VERP.

---

[1]     Appeal Letter, p. 11.

[2]     *Id.*, p. 4.

Eli Gottesdiener, Esq.
July 14, 2006
Page 5

Moreover, your request that I recuse myself is inconsistent with common ERISA claims review practice. As you know, in the context of ERISA claims for pension benefits, it is common for the *same* person or committee to adjudicate *both* the initial review and any appeal. The Plan is designed to provide a higher level of objectivity for appeals than is typical by requiring an officer who is separate from the Committee to adjudicate appeals. For you to seek to impugn the fairness of the process by objecting to my service as appeals officer in this instance on the basis of a conflict of interest – when common practice would be for the Committee itself to adjudicate the appeal – is disingenuous.

Finally, your request that I recuse myself, and your objection to the notion of any Amtrak employee adjudicating this appeal, are inconsistent with the general structure of ERISA's claims procedure regulations, which clearly contemplate that employees of a plan sponsor – even those who participate in a plan – will rule on claims for benefits. They also are inconsistent with the specific requirements of ERISA's claims procedure regulations, inasmuch as the regulations require specific indicia of independence in the context of health plan appeals but not pension appeals.[3]

*Recusal by Venable.* With respect to Venable, you state in your letter that Venable lacks objectivity in this matter, and you attribute this purported lack of objectivity in this matter to Venable's "positional conflicts as counsel to numerous plan sponsors and desire to earn fees."[4]

I reject this assertion. As an initial matter, it is inappropriate to ask for Venable to recuse itself because Venable is not adjudicating the Claims – I am. Moreover, you have not identified anything that Venable has done that indicates bias. Almost every law firm that is qualified to serve as counsel for the adjudicator in connection with an ERISA claim for benefits serves as counsel to numerous plan sponsors and desires to earn fees. If these were valid grounds for recusal, it would be difficult or impossible to find qualified legal counsel to advise an adjudicator in connection with an ERISA claim for benefits.

Finally, you object to Venable's representation of the designated appeals officer on the grounds that it also represented the Committee. This objection is not well founded. As noted above and as you certainly know, it is legally acceptable and common practice to have the *same* person or entity adjudicate *both* initial claims for pension

---

[3] See 29 CFR §2560.503-1(h)(3)(ii), which provides that a health plan appeal must be "conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual"; there is no such requirement for pension appeals.

[4] Appeal Letter, p. 11.

HALL2000177

Eli Gottesdiener, Esq.
July 14, 2006
Page 6

benefits as well as appeals. Certainly, therefore, there is nothing improper with having the same law firm represent the *separate* adjudicators of claims and appeals.

*Recusal by Mr. Herrmann.* With respect to Mr. Herrmann, you state in your letter that "[p]laintiffs also continue to maintain that Mr. Herrmann's involvement in the Committee's consideration of Plaintiffs' claim as counsel to the Committee was inappropriate. His apparent continuing involvement at the appellate level, in any capacity, is equally improper."[5]

I reject this assertion. Mr. Herrmann did not serve as adjudicator at the initial claim level, nor does he serve as adjudicator upon appeal. Moreover, Mr. Herrmann did not serve as counsel to the Committee in connection with its consideration of the Claims, nor is he serving as counsel to me in connection with my consideration of the appeal. Mr. Herrmann has been involved in logistical matters in the claims adjudication process, such as coordinating meeting times and transmitting materials among Venable, the Committee members, you and me.

### Your Assertions Regarding Contacts With Amtrak's Counsel

In addition to your incorrect assertion regarding Mr. Herrmann serving as counsel to the Committee, I also would like to point out another area where you have made incorrect factual assertions in your letter – that concerning the level of contacts between Venable and the Committee, on the one hand, and Amtrak's outside litigation counsel and Mr. Herrmann, on the other hand.

In your letter, you state that "the Committee omitted any mention of the fact that the Committee and Venable also had numerous contacts with Amtrak's outside litigation counsel and Amtrak's Deputy General Counsel Mr. Herrmann . . . ."[6] This assertion is incorrect. It is my understanding that Venable met with Amtrak's outside litigation counsel on only one instance, at the beginning of its representation of the Committee in this matter, to obtain background materials. Moreover, as noted above, Mr. Herrmann has been involved in logistical matters in the claims adjudication process, such as coordinating meeting times and transmitting materials. In fact, at a brief meeting with Mr. Herrmann at the outset of Venable's engagement, Venable explained to Mr. Herrmann the significant limitations on the scope of his involvement in the claims process.

---

[5]   *Id.*, p. 12.
[6]   *Id.*, p. 5.

HALL2000178

Eli Gottesdiener, Esq.
July 14, 2006
Page 7

### Basis for Decision to Deny Appeal

The premise of your appeal is stated at the end of your Appeal Letter, specifically, that the Board did not "take action" to amend the Plan on September 14, 2001.[7] This premise is based on your assertion that the September 14, 2001 Board resolutions were not validly adopted in accordance with the District of Columbia Business Corporation Act and Amtrak's Bylaws.

I reject this assertion. Based on a review of the factual record in this matter, I find that Governor Holton understood the substance of the proposed action that was placed before Board members for their unanimous consent on September 14, 2001. I further find that Governor Holton intended to sign the September 14, 2001 resolutions, but was unable to actually sign them himself because of the circumstances of the September 11, 2001 terrorist attacks. I further find that Governor Holton authorized and directed Assistant Corporate Secretary John Carten to sign the resolutions on the Governor's behalf, and considered such authorization and direction to be a proper delegation of a ministerial task, not an improper delegation of discretionary authority as a member of the Board. I do not believe that Governor Holton's actions were inconsistent with the requirements of the District of Columbia Business Corporation Act, and Amtrak Bylaws, governing action of the Amtrak Board by unanimous consent.

*Understanding the Substance of the Proposal.* Based on Governor Holton's deposition testimony in the *Hall* Litigation[8], I find that Governor Holton understood the substance of the action with respect to the VERP that he was being asked to authorize on September 14, 2001.

In reference to the conversation that Governor Holton had with Mr. Carten regarding the September 14, 2001 board resolutions, in his deposition Governor Holton testified that "[t]he substance of it was that that authorization for the management to implement an incentive plan, to urge members of the management to retire early, had been found to be very expensive and that an amendment was needed to cut down on the costs of it somewhat and that since the meeting on the 12th had had to be cancelled because of the World Trade Center terrorist attacks, that we needed to do it by unanimous consent of the directors and would I consent to it and I said yes and I said you can put my name on the document that carries out that purpose."[9]

---

[7]   *Id.*, p. 14.

[8]   References in this letter to Governor Holton's deposition testimony refer to the deposition taken on November 19, 2004 in the *Hall* Litigation (the "Holton Deposition").

[9]   Holton Deposition, p. 128.

HALL2000179

Eli Gottesdiener, Esq.
July 14, 2006
Page 8

Moreover, Governor Holton testified that "I do know that I was informed that the management investigation of the implementation of the plan had found it was going to cost us too much and we didn't have the money to fund it . . . I was informed that the management decision was that the plan, as they originally hoped to implement it, was too expensive and that it had to be modified to reduce the cost."[10]

These excerpts show that Governor Holton understood the action that Amtrak Management asked him to approve by unanimous consent.

*Authorization of Mr. Carten to Sign Resolutions.* Based on Governor Holton's deposition testimony, I find that Governor Holton authorized Mr. Carten to affix the Governor's signature to the September 14, 2001 resolutions. This is evident from a number of instances in the deposition, including the following statements by Governor Holton:

- "I'm certain in my own mind that I authorized John Carten to affix my signature to that document. . . I know that I authorized John to affix my signature to a document that had indicated my participation in the unanimous consent of the board to make changes in that retirement plan."[11]

- "I have a memory that I learned of the need for a change in the retirement plan. I was informed of the need for the change, I think in a conversation with John Carten, and that because the board meeting, which was scheduled for the 12th, had been postponed, and that there was a deadline of the, September the 15th, that it was needed to have the board act by unanimous consent. And I authorized that unanimous consent."[12]

- "Q [You]: Well, was it something that you did sign? A [Governor Holton]: Not physically but I authorized my signature to go on that document."[13]

Moreover, it is evident from a number of instances in Governor Holton's deposition testimony, including the following, that Governor Holton viewed his

---

[10] *Id.*, p. 54.

[11] *Id.*, p. 108.

[12] *Id.*, p. 104.

[13] *Id.*, p. 49.

HALL2000180

Eli Gottesdiener, Esq.
July 14, 2006
Page 9

authorization of Mr. Carten to affix the Governor's signature as the delegation of a ministerial task as he was not in a position on September 14, 2001 to personally affix his signature and return the written consent to Amtrak by fax, not as an abrogation of the Governor's duties as director:

- "I understood that somebody else can sign it [the consent] with my authority."[14]

- "I was satisfied when I authorized the signature to be put on the document, that it was legal for me to do that."[15]

- "It was not a shock to me to reach the conclusion that I could authorize somebody else to put my signature on a piece of paper."[16]

Based on the foregoing, I find that Governor Holton authorized Mr. Carten to affix the Governor's signature to the resolutions, and understood that doing so was simply delegation of a ministerial task. I conclude that Governor Holton validly approved the September 14, 2001 Board resolutions, as I do not believe that Governor Holton's actions on that day were inconsistent with the requirements of the District of Columbia Business Corporation Act, and Amtrak Bylaws, governing action of the Amtrak Board by unanimous consent of its directors.

*Assertions In Your Appeal Letter Regarding the Adoption and Efficacy of the September 14, 2001 Board Resolutions.* In reaching my decision to deny your appeal, I have reviewed and considered the numerous assertions in your Appeals Letter regarding the adoption and efficacy of the September 14, 2001 Board resolutions, and have determined that they are unfounded.

I have set forth below a non-exhaustive list of examples of inaccurate statements in your Appeals Letter regarding the adoption and efficacy of the September 14, 2001 Board resolutions. Because of the extensive number of such statements in your letter, I have not attempted to reply to each one, so my silence regarding any particular statement in your letter should not be construed as acquiescence to it.

---

[14]    *Id.*, p. 65.

[15]    *Id.*, p. 81.

[16]    *Id.*, p. 79.

HALL2000181

    ◦    You state that "[t]he Committee did not explain the basis for its conclusion that the Governor fully understood and fully agreed with what the signing Directors understood and agreed . . . ."[17]

In fact, the Committee did explain that the basis for its conclusion was the Governor's deposition testimony. As set forth in detail above, the Governor's deposition testimony strongly supports the conclusion that the Governor fully understood and fully agreed with what all of the other Directors understood and agreed with respect to the adopted resolutions.

    ◦    You call into question whether the Board and the others involved in obtaining approval of the September 14, 2001 resolutions acted in good faith, stating that the Committee did not "assess the candor or conduct of other persons involved directly and indirectly in the events of September 14th."[18]

The implication that the Board and the others involved in obtaining approval of the September 14, 2001 resolutions acted in bad faith or without candor is unfounded. There is no indication that anybody acted in bad faith or without candor. The Board members involved include individuals of stature, with distinguished records of public service. The Board members and the others involved in obtaining approval of the September 14, 2001 resolutions faced difficult and unprecedented circumstances in light of the September 11, 2001 terrorist attacks; I believe they acted appropriately under the circumstances. In short, your implication that there was bad faith or lack of candor is simply baseless.

    ◦    You state that "Governor Holton indicated that he was surprised at the manner in which Mr. Carten manifested the Governor's agreement to what had been described to him – by using a photocopy of Governor Holton's signature that did not disclose that it had been placed there not by Governor Holton but by another, authorized party."[19]

In fact, I do not believe that Governor Holton indicated that he was surprised about the manner in which his signature was affixed to the resolutions. When you asked the Governor in his deposition "[d]id you assume, let's say back in September of 2001, that he [Mr. Carten] would sign for you actually in a fashion that would on its face indicate that you hadn't physically signed and that

---

[17]    Appeal Letter, p. 7.

[18]    *Id.*, p. 7.

[19]    *Id.*, p. 3.

HALL2000182

Eli Gottesdiener, Esq.
July 14, 2006
Page 11

someone had signed for you with authorization", the Governor stated "I didn't give it any thought as to how he would sign it" – a response that does not indicate surprise at all.[20]

○ You assert that the September 14, 2001 resolutions were invalid because "none of the Directors, including Governor Holton, ever signed anything referencing their agreement to act in the absence of a meeting . . . While [the resolutions] may have been appropriate for use during an in-person meeting and could also have been easily adapted for a telephonic meeting, they were not appropriately modified for use as unanimous written 'consent' forms because they do not reflect consent to take 'the action' 'set[] forth' ' without meeting'."[21]

This assertion does not accurately reflect my understanding of District of Columbia corporate law requirements or the provisions of Amtrak's Bylaws. In fact, I do not believe that there is any requirement under District of Columbia corporate law or Amtrak's Bylaws that resolutions adopted by the written consent of all Board members specifically acknowledge that such resolutions are being adopted by consent without a meeting as opposed to at a meeting.

○ You state that "it is undisputed that on the day in question, September 14, 2001, which was the eve of the start of the September 15-October 31, 2001 VERP window, the Board did not meet. Instead . . . management attempted to get the Board to consent to act in the absence of even a telephonic meeting and take 'action' via the written unanimous consent. . . Amtrak's Board has on numerous occasions availed itself of the convenience and flexibility that rule [permitting telephonic Board meetings] allows and nothing in the record suggests it was not possible for Amtrak to convene a telephonic meeting of the Board between September 12th and September 15th."[22]

This argument is misleading because it implies that the use of a telephonic Board meeting to adopt resolutions is superior as a matter of corporate law to the adoption of resolutions by unanimous written consent. In fact, the various methods of adopting resolutions – by Board meeting (whether in person or by telephone) – and by unanimous written consent – are equally valid and acceptable means of adopting resolutions; neither is superior to the other.

---

[20]   Holton Deposition, p. 131.

[21]   Appeal Letter, p. 3.

[22]   *Id.*, p. 2.

HALL2000183

Eli Gottesdiener, Esq.
July 14, 2006
Page 12

      Aside from the fact that this argument is misleading as a matter of District of Columbia corporate law, it also trivializes and ignores the reality that we all faced in the immediate aftermath of the September 11, 2001 terrorist attacks. While it is possible five years later to gloss over the immediate impact of the attacks, it is important to remember the state of disarray that prevailed immediately following September 11th.

      In sum, I have considered and rejected the assertions in your letter regarding the adoption and efficacy of the September 14, 2001 Board resolutions.

      *Authorization of the Most Recent Restatement of Plan.* Finally, in the alternative, and only if it is determined that the Plan **was** properly amended on September 14, 2001, you asserted that the most recent restatement of the Plan (executed December 30, 1994, effective January 1, 1989) was not properly authorized by the Board and consequently actions taken pursuant to it are unauthorized.

      In this regard, I agree with the Committee's conclusion that assuming for purposes of the Claims (without deciding the matter) that the 1994 restatement of the Plan was not properly authorized when originally adopted, the subsequent actions of the Board in authorizing amendments to the Plan, and otherwise acting with respect to the Plan, amount to an implied ratification of the 1994 restatement of the Plan.[23]

### Conclusion

      To conclude, I disagree with the premise of your appeal – that the Board did not "take action" to amend the Plan on September 14, 2001 because the September 14, 2001 Board resolutions were not validly adopted by reason of the fact that Governor Holton did not personally sign them.[24] Rather, I find that Governor Holton did validly consent in his capacity as an Amtrak Board member to the resolutions because he understood the substance of the resolutions, wished to manifest his consent to the resolutions in writing, and authorized Mr. Carten to perform the ministerial task of affixing his signature. Accordingly, I find that the September 14, 2001 resolutions were valid, and reject your appeal of the Committee's denial of the Claims.

### ERISA Rights

      I am providing the following information as required by the claims procedure regulations under ERISA:

---

[23]     Committee's Determination Letter, p. 6.

[24]     Appeal Letter, p. 14.

HALL2000184

Eli Gottesdiener, Esq.
July 14, 2006
Page 13

        o    *Specific Reason or Reasons for Adverse Determination.* As set forth above in more detail under the heading "Basis for Decision to Deny Appeal", I have denied the appeal because I find that Governor Holton effectively consented to the September 14, 2001 board resolutions.

        o    *Reference to the Specific Plan Provisions On Which Determination Is Based.* The determination is based on Plan section 4.06 and Exhibit B.

        o    *Entitlement to Relevant Information.* The Claimants are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the Claims. You have already been provided copies of the items listed above under the heading "Review of Factual Record", with the exception of your Appeal Letter. However, if you would like additional copies of any of these items, please let me know.

In addition, I have enclosed copies of notes of interviews that Venable conducted with Alicia Serfaty and with John Carten, as well as notes that Venable attorneys took when they met with the Committee regarding the Claims. While I do not believe that these items are required to be produced, I have considered the arguments set forth in your Appeal Letter and have decided to provide them.

        o    *Voluntary Appeal Procedures.* The Plan does not provide a voluntary appeal procedure.

        o    *Right to Bring Civil Action.* The Claimants have a right to bring an action under Section 502(a) of ERISA.

Very truly yours,

*[signature]*
Lorraine Green

cc:    John R. Wellschlager, Esq.
       Barbara E. Schlaff, Esq.
       Robert J. Bolger, Esq.